# EXHIBIT 1

Morgan, Lewis & Bockius LLP
1717 Main Street, Suite 3200
Dallas, TX 75201 7347
Tel: 214.466.4000
Fax: 214.466.4001
www.morganlewis.com



**Morgan Lewis**
C O U N S E L O R S   A T   L A W

**Ann Marie Painter**
Partner
214.466.4121
annmarie.painter@MorganLewis.com

December 30, 2008

**BY HAND DELIVERY**

Federal Deposit Insurance Corporation
1601 Bryan Street
Dallas, Texas 75201

Re:    Deutsche Bank National Trust Company Proof of Claim

Dear Sir or Madam:

Enclosed please find a Proof of Claim, which is hereby submitted on behalf of Deutsche Bank National Trust Company.  If you have any questions, please do not hesitate to contact me directly.

Sincerely,

*Ann Marie Painter*

Ann Marie Painter
AMP/ph

Enclosures

cc:    John Rosenthal – Morgan Lewis, San Francisco
       Kristine Bailey – Morgan Lewis, San Francisco

## Federal Deposit Insurance Corporation as Receiver for:
### Washington Mutual Bank

(Name of Bank/Financial Institution and Location)

### PROOF OF CLAIM

### CONFIDENTIAL TREATMENT REQUESTED

*Attachment A contains confidential, non-public financial information. Claimant Deutsche Bank National Trust Company requests that the claim, the information contained in Attachment A, and the non-public documents attached hereto be considered and treated as confidential.*

SSN/Tax ID # (1)    **33-0943418**

The undersigned, (2) Barbara Campbell, Vice President

says that the    **Washington Mutual Bank**                                    now in liquidation is

(Name of Bank/Financial Institution)

justly indebted to (3)    **Deutsche Bank National Trust Company**            in the sum of

(Individual/Joint/Corporation/Partnership/Firm/Agency)

(4)    **$10,146,399,660 (approximately, see Attachment A)**    Dollars upon the following Claim:

| Description of (invoice) claim: | Liability Number | Amount of Claim |
|---|---|---|
| C L A I M (5) **See Exhibit A** | | **$6,764,266,440 to $10,146,399,660 approx., (see Attachment A).** |
| S | Total Claim: (6) | **Approximately $10,146,399,660 (see Attachment A).** |

The undersigned further states that he/she makes this Claim on behalf of

### (7) Deutsche Bank National Trust Company

that no part of said debt has been paid, that

### (8) Deutsche Bank National Trust Company

(Individual/Joint/Corporation/Partnership/Firm/Agency)

has given no endorsement or assignment of the same or any part thereof, and that there is no set-off or counterclaim, or other legal or equitable defense to said Claim or any part thereof.

NAME (9)    Barbara Campbell    , Vice President

(Signature of Person making    (Title)
the Claim)

FIRM    **Deutsche Bank National Trust Company**

(If applicable)

ADDRESS (10)   **1761 East St Andrew Pl**

CITY/STATE/ZIP    **Santa Ana, CA 92705-4934**

TELEPHONE NUMBER    **714-247-6278**

The penalty for knowingly making or inviting reliance of any false, forged, or counterfeit statement, document, or thing for the purpose of influencing in any way the action of the Federal Deposit Insurance Corporation is a fine of not more than $1,000,000 or imprisonment for not more than thirty years, or both (18 U.S.C. Section 1007).

RLS7212

**CONFIDENTIAL TREATMENT REQUESTED**

**ATTACHMENT A**
to
**Proof of Claim of**
**DEUTSCHE BANK NATIONAL TRUST COMPANY,**
**AS TRUSTEE AND CUSTODIAN**

A. **CAPACITIES AND DOCUMENTS.**

1.  This proof of claim ("Proof of Claim") is made by Deutsche Bank National Trust Company ("DBNTC") (a) as trustee ("Trustee") for the securitization trusts listed on Exhibit A-1 attached hereto (the "Trusts"), on behalf of itself, the Trusts and the owners of certain residential mortgaged backed securities issued by the Trusts (the "Securities"), (b) as trustee of certain "net interest margin" trusts listed on Exhibit A-2 ("NIM Trusts", and collectively with the Trusts, the "Securitization Trusts") pursuant to which DBNTC owns, on behalf of NIM Trust beneficiaries, interests in certain Securities (the "NIM Trustee") and (c) as custodian (the "Custodian") under certain custody agreements listed on Exhibit A-3 (the "Custody Agreements") by and among DBNTC, and one or more of Washington Mutual Bank (in some cases, as successor-in-interest to Long Beach Mortgage) and/or its affiliates (collectively, "WAMU"), and/or third party lenders or purchasers of mortgage loans.

2.  Each of the Trusts holds, as Trust assets or collateral, mortgage loans originated by and/or sold into the Trusts by WAMU.

3.  With respect to each Trust, DBNTC entered into one or more Pooling and Servicing Agreements, Servicing Agreements, Indentures or Trust Agreements, and related ancillary agreements (collectively, the "Governing Documents"). The Governing Documents are voluminous and are in the possession of both the Trustee and WAMU. Accordingly, it is impractical and wasteful to attach them to this Proof of Claim. Additional documentation regarding the Trusts is available on the SEC's EDGAR website at http://sec.gov/, and the monthly distribution reports and prospectus supplements for each Trust are available on the Trustee's investor reporting website at https://tss.sfs.db.com/investpublic/. Upon request by the FDIC, the Trustee will furnish electronic or hard copies of any Governing Documents in its possession.

4.  Pursuant to the Governing Documents for each Trust, WAMU sold, either directly or indirectly, mortgage loans into the related Trusts. In connection with such sales, WAMU also made numerous representations, warranties and covenants ("Representations and Warranties") concerning the mortgage loans, which Representations and Warranties were ultimately assigned to the Trusts pursuant the Governing Documents and certain ancillary agreements. The Trusts have claims for breach of such Representations and Warranties as further described herein.

5.  DBNTC has also served as Custodian under the Custody Agreements. Pursuant to the Custody Agreements, DBNTC has held in custody mortgage loan files evidencing mortgage loans originated, purchased, financed and/or serviced by WAMU. In

addition, pursuant to certain Custody Agreements, the Custodian held and disbursed funds with respect to the funding and/or financing of such mortgage loans in accordance with instructions furnished to the Custodian by WAMU, loan purchasers or lenders. The Custody Agreements are voluminous and are in the possession of both the Trustee and WAMU. Accordingly, it is impractical and unnecessary to attach them to this Proof of Claim. Upon request by the FDIC, the Trustee will furnish electronic or hard copies of any Custody Agreements in its possession.

6.   DBNTC is aware that certain other parties to the Trusts, including, without limitation, securities underwriters, depositors, loan servicers, insurers and investors, intend to file proofs of claim in these proceedings relating to the Governing Documents and ancillary agreements which may be duplicative of, or supplemental to, the claims stated herein (the "Third Party Trust Related Claims"). To the extent that such Third Party Trust Related Claims relate to or are property of the Trusts, DBNTC incorporates such Third Party Trust Related Claims herein by reference.

## B.  DESCRIPTION OF CLAIMS.

### Claims Arising from Breach of Representations and Warranties (Estimated Range: $6.764 billion to $10.146 billion)

7.   Pursuant to the Governing Documents, WAMU, as seller and [master] servicer, made certain Representations and Warranties in connection with the sale of the mortgage loans to the Trusts. WAMU has breached certain of these Representations and Warranties. Pursuant to the Governing Documents, WAMU has express contractual obligations (i) to notify certain parties to the Governing Documents, including the Trustee, when WAMU becomes aware of breaches of Representations and Warranties, (ii) to make certain cure payments with respect to certain such breaches or (iii) to repurchase the mortgage loans affected by WAMU's breaches, at the repurchase price (the "Repurchase Price") specified in the Governing Documents (typically equal to the unpaid principal balance of such mortgage loans, plus accrued interest thereon through the date of repurchase) (the "Repurchase Obligations"). Further, as described below, WAMU is liable to the Trustee and the Trusts for all liability, loss, cost and expense arising from breaches of Representations and Warranties, including all costs and expenses of enforcement of these obligations.

8.   Based on the public statements of the FDIC, it is unclear to the Trustee which obligations under the Governing Documents the FDIC purports to have assumed and assigned to JPMorgan Chase Bank, National Association ("JPMC"). Moreover, the FDIC has not notified the Trustee whether it intends to repudiate any obligations of WAMU under the Governing Documents, many of which obligations are executory in nature. The Trustee asserts that the FDIC does not have the power, with respect to the Governing Documents for any particular Trust, to "cherry pick" valuable contractual rights of WAMU, such as servicing rights, while repudiating potentially burdensome obligations of WAMU, such as Repurchase Obligations under those same contracts. Rather, if the FDIC wishes to reap the benefits of these contracts (by receiving the purchase price paid by JPMC for WAMU's assets), it must also accept their burdens. Accordingly, to the extent that the FDIC purports to have assumed and assigned to JPMC any rights and benefits of WAMU to service Mortgage Loans under the

Governing Documents for any Trust, the FDIC must make provision to perform fully all of WAMU's obligations under the Governing Documents for that Trust. In this regard, the Trustee notes that a single entity—Washington Mutual Bank (fka Long Beach Mortgage Company)-- generally entered into the Governing Documents both as seller and as [master] servicer. In addition, the Governing Documents represent an integrated set of contractual undertakings on behalf of WAMU with respect to the formation and servicing of the Trusts and WAMU (or its successors and assigns) cannot selectively assume the benefits of these undertakings while repudiating the related burdens. To the extent that WAMU has either (a) failed—in its capacities as seller or servicer-- to notify the Trustee and other transaction parties of material breaches of Representations and Warranties of which it was aware, and/or (b) repudiates and fails to perform its obligations to replace or repurchase defective loans, the Trusts have claims for breach of such obligations (the "Repurchase Claims"). Moreover, even if the FDIC did have the power to repudiate certain obligations of WAMU to the Trusts while assuming and assigning other obligations, the Trusts would have a right of set-off against any and all amounts owing to WAMU under the Governing Documents (including the right to recover servicing advances) with respect to any and all damages arising from the breach of such repudiated obligations.

9.    As of September 28, 2008, the Trusts held in excess of $49.9 billion in current principal balance outstanding of mortgage loans sold to the Trusts by WAMU.  Recent media reports allege certain abuses in WAMU's loan origination procedures which, if true, would constitute breaches of the Representations and Warranties. (*see* *e.g.* attached NY Times article dated as of December 27, 2008).   Notwithstanding provisions of the Governing Documents permitting the Trustee and certain other parties access to WAMU's books and records concerning the mortgage loans, the Trustee is informed and believes that during the last 18 months, WAMU has consistently refused to allow the Trustee, bond insurers, and investors with an interest in the Trusts to perform any meaningful due diligence to determine whether Representations and Warranties were breached.  Since WAMU's denial of counterparties' contractual inspection rights has deprived those parties of the ability to detect and quantify specific breaches of Representations and Warranties, claimants must be given reasonable access and time to investigate their claims prior to specifying them with greater particularity.  Nevertheless, on the basis of the limited data currently available to the Trustee, the Trustee further describes these claims below.

10.   Assuming, for purposes of this Proof of Claim, that WAMU has and will continue to breach its obligations with respect to Repurchase Claims, the damages flowing from such breaches will vary depending on the losses suffered by the Trusts in respect of the related mortgage loans.  Certain of the properties underlying the mortgage loans subject to Repurchase Claims either (a) have been foreclosed upon and are owned by the Trusts as of the date of this Proof of Claim (the "REO Loans") or (b) are owned by the Mortgagors (the "Mortgagor-Owned Loans").   The dollar amount of any Repurchase Claims related to REO Loans and Mortgagor-Owned Loans will be affected by the value of those loans and their underlying collateral because the damages suffered by the Trusts as a result of WAMU's breach will be partially offset by the value of the collateral retained by the Trusts.  Due to the ever-changing nature of market forces impacting the value of REO Loans and Mortgagor-Owned Loans, the amount due to the Trusts on account of the REO Loans and Mortgagor-Owned Loans

remains in flux. Until the amount of WAMU's exposure on REO Loans and Mortgagor-Owned Loans is finally determined, the Trusts' corresponding claim remains unliquidated and may decrease or increase as a result of fluctuations in the valuation of the underlying property and related loans, and payments of principal and interest either made or not made by the mortgagor of the underlying loans. Certain of the properties underlying the mortgage loans subject to Repurchase Claims have been foreclosed upon and in turn sold ("REO Sold Loans").   The sale prices of the properties underlying the REO Sold Loans will be a partial offset to the Repurchase Price related to such REO Sold Loans.

11.   On information and belief, taking into account (a) industry information regarding frequency of breaches of representations and warranties in portfolios of mortgage loans similar to those sold by WAMU to the Trusts, (b) the performance of the mortgage loans held by the Trusts and (c) the severity of losses experienced by the Trusts to date and anticipated in the future, the Trustee estimates that the Trusts have claims in respect to breaches of Representations and Warranties, in the estimated range of $6.764 billion to $10.146 billion.

12.   Although Representations and Warranties were breached at the time that they were made, certain of the Repurchase Claims of the Trusts are unmatured, unliquidated and/or contingent in nature because, although breaches of Representation and Warranties exist for certain mortgage loans, such breaches have not been (a) discovered and/or (b) asserted, and/or (c) otherwise given rise to claims for the Repurchase Price as of the date hereof. The actual Repurchase Claims relating to such loans would be increased by accrued interest thereon and the Trusts' cost of enforcement, and be partially offset by the value of mortgage loan collateral and mortgage payments retained by the Trusts by reason of WAMU's failure to repurchase such loans.

13.   In addition to the foregoing, under the Governing Documents, WAMU is also subject to Repurchase Claims with respect to missing or defective documents in mortgage loan files.   The Governing Documents generally provide that if a material defect in any Mortgage File is discovered which may materially and adversely affect the value of the related Mortgage Loan, or the interests of the Trustee (as pledgee of the Mortgage Loans), the Noteholders or the Certificateholders in such Mortgage Loan, then the responsible party shall cure such defect, repurchase the related Mortgage Loan at the purchase price or substitute a qualified substitute mortgage loan for the related Mortgage Loan upon the same terms and conditions set forth for breaches of representations and warranties as to the Mortgage.

14.   The Trustee or other document custodian has furnished WAMU, on an ongoing basis, document exception reports with respect to missing or defective loan file documents. The Exceptions Reports are voluminous and are in the possession of both the Trustee and WAMU. Accordingly it is impractical and wasteful to attach them to this Proof of Claim. Upon request by the FDIC, the Trustee will furnish electronic or hard copies of any Exceptions Reports in its possession.  If WAMU repudiates or fails to satisfy its obligations under the Governing Documents, the Trustee will require additional time to assess the materiality of the remaining missing defective documents and to calculate the amount of any Repurchase Claims with respect thereto.  For purposes of this Proof of Claim, however, the Trustee asserts that all loans with missing or defective loan file

documents are subject to Repurchase Claims for the Repurchase Price. The Trustee is not in a position to calculate the amount of such Repurchase Price until the population of such loans and the materiality of any document exceptions are finally determined (since borrowers continue to pay interest on some of these loans and, in many cases, other recoveries continue to be made on collateral securing such loans).

## Indemnification Claims

15.     The Trusts have been damaged by virtue of WAMU's defaults and breaches with respect to the Representations and Warranties under the Governing Documents and ancillary agreements. Without limiting the generality of the foregoing, the Trusts have incurred, and will continue to incur, significant legal expenses enforcing mortgage loan documents and defending against borrower counterclaims and third party claims arising from breaches or alleged breaches of Representations and Warranties or of other obligations of WAMU (including loan servicing obligations) under the Governing Documents.

16.     Without limiting the generality of the foregoing, WAMU is obligated to indemnify, defend and hold the Trusts and the Trustee harmless all liability, loss, cost or expense arising from the claims asserted in the following litigation matters:

    (a)    Elaine Trahan vs. Long Beach Mortgage Company et al, pending in the United District Court, Eastern District of Texas. A putative class action seeking to invalidate certain variable rate mortgage loans under Texas law.

    (b)    Jenkins vs. Deutsche Bank et al, actions brought in the United States District Count for the Eastern District of New York and the Southern District of Florida alleging inappropriate foreclosure and debt collection activity.

    (c)    Suits and other proceedings against the Trusts and/or the Trustee by the cities of Buffalo, NY, Cleveland, OH, and other jurisdictions claiming that REO properties owned by the Trusts have not been maintained in accordance with law and constitute a nuisance. In addition, the Trusts and/or the Trustee have been forced to address similar allegations. Such property maintenance is the sole obligation of WAMU, as loan servicer, with respect to certain of the properties at issue in these matters. The affected Trusts and the Trustee are entitled to indemnification by WAMU, its successors and assigns, against any liability, loss, cost or expense suffered in connection with such matters.

    (d)    Suits or counterclaims (typically asserted in the context of foreclosure proceedings) alleging breaches, inter alia, of the Truth in Lending Act, Fair Debt Collection Practices Act and other laws, in connection with the origination and/or servicing of WAMU-originated mortgage loans currently owned by Trusts. Because WAMU, as [master] servicer has handled all such litigation on behalf of the Trusts and the Trustee, the Trustee is currently unaware of the existence or nature of all such claims and reserves the right to amend this Proof of Claim to specify such matters at a later date. The affected Trusts and the Trustee are entitled to indemnification by WAMU, its successors and assigns, against any liability, loss, cost or expense suffered in connection with such matters.

17.    Pursuant to the Governing Documents and applicable law, WAMU is liable to the Trusts and the Trustee for any losses, claims, expenses or damages, including legal fees and related costs, arising out of or based upon any breaches of any representation, warranty or covenant made by WAMU or any affiliate of WAMU in the Governing Documents. Such liability arises both from WAMU's breach of its contractual obligation to the Trusts and the Trustee to perform all of its obligations under the Governing Documents and from WAMU's obligation to indemnify, defend and hold the Trusts and the Trustee harmless from any liability, loss, cost or expense arising from WAMU's failure to perform such obligations. Moreover, even if the FDIC, as receiver for WAMU, were entitled to assume and assign certain obligations of WAMU while repudiating others, the Trustee and the Trusts would have a right of set-off with respect to breach claims for any repudiated obligations, against any and all amounts owing by the Trusts to WAMU (including the right to recover servicing advances) in any capacity under the Governing Documents. To the extent that WAMU (a) assumes, or assumes and assigns, any of its rights under the Governing Documents, and (b) indemnifies, or causes its successor-in-interest to indemnify, the Trusts and the Trustee for such matters, such indemnification obligation will have been satisfied. Although, to date, the Trustee is informed and believes that JPMC has performed certain of such obligations, neither JPMC nor the FDIC, as receive of WAMU, has made a clear statement to the Trustee specifying which obligations of WAMU have been assumed by JPMC and which, if any, obligations have not been so assumed, but rather assumed or rejected by the FDIC as receiver of WAMU. Accordingly, for purposes of this Proof of Claim, the Trustee assumes such obligations may not be fully satisfied.

18.    Based upon the foregoing, the Trustee asserts a claim against WAMU for indemnification for, *inter alia*, all losses, claims, expenses and damages, including legal fees and related costs, arising out of or based upon any breaches of any representation, warranty or covenant made by WAMU under the Governing Documents.

**Servicing Claims**

19.    As stated above, WAMU generally served as "servicer" or "master servicer" with respect to the mortgage loans held by the Trusts. The Trustee is informed and believes that JPMC intended to assume, at a minimum, all of WAMU's loan servicing rights and obligations. To the extent that JPMC, as successor-in-interest to WAMU, as [master] servicer, performs all obligations of WAMU, as [master] servicer, under the Governing Documents (including by curing any breaches that have occurred), WAMU will have mitigated claims with respect to WAMU's servicing of the loans. The Trustee reserves the right to amend this Proof of Claim to specify further any servicing claims in the event that such assumption has not taken place.

**Claims as NIM Trustee**

20.    As NIM Trustee, the Trustee is the legal owner, for the benefit of securities holders under the NIM Trusts, of Securities issued by the Trusts. Since the NIM Trusts were formed concurrently and in conjunction with the corresponding Trusts, the NIM Trustee was the original purchaser of such Securities.

21.    As purchaser of the such Securities on behalf of the NIM Trusts, the NIM Trustee hereby alleges that, to the extent that WAMU knew or should have known of the breaches of Representations and Warranties described above, the NIM Trusts have a claim for common law fraud and/or negligent misrepresentation and/or violation of applicable federal and state securities laws in connection with the issuance, distribution and sale of the such Securities to the NIM Trusts.  Such claim is unliquidated and partially unmatured, but would be measured by the impact, if any, of such breaches on cash flows to the NIM Trusts.

**Claims as Custodian**

22.    Pursuant to the Custody Agreements, DBNTC is entitled to be paid certain fees stipulated therein, plus expenses incurred in connection with its serving as Custodian. In addition, where WAMU is seller/servicer under the Custody Agreement, WAMU has agreed to indemnify, defend and hold the Custodian harmless against all liabilities, loss, cost and expense incurred by the Custodian in the performance of its duties as Custodian.  The Custodian reserves the right to amend this Proof of Claim to specify further any claims relating to any fees or expenses are incurred and remain outstanding in connection with the Custody Agreements.

**C.  MISCELLANEOUS**

23.    By executing and filing this Proof of Claim, DBNTC does not waive any right to any security or any other right or rights with respect to any claim that DBNTC has or may have against WAMU or any other person or persons. The filing of this Proof of Claim is not intended and should not be construed to be an election of remedies or waiver of any past, present or future Defaults or Events of Default under the Governing Documents and ancillary agreements.

24.    To the knowledge of the signatory hereto, the claims are not subject to any setoff or counterclaim, and no judgment has been rendered on the claims. The amount of all payments made prior to the date hereof, if any, have been credited and deducted.

25.    DBNTC reserves its right to amend and/or supplement this Proof of Claim and to assert any and all other claims of whatever kind or nature that it has, or may have, that come to DBNTC's attention or arise after the filing of this Proof of Claim. The filing of this Proof of Claim shall not be deemed a waiver of any such claims or rights.

26.    Nothing contained in this Proof of Claim shall be deemed or construed as: (a) a waiver of, or other limitation on, any rights or remedies of DBNTC or the Securitization Trusts, or any predecessor in interest to DBNTC or the Securitization Trusts, under the Governing Documents or ancillary agreements, at law, or in equity (including any setoff rights, lien rights, rights of recoupment, or any other rights that the Trustee or each Trust has or may have against WAMU or any other entity), all of which rights are expressly reserved; (b) a consent by DBNTC or the Securitization Trusts, or any predecessor in interest to DBNTC or the Securitization Trusts, to the jurisdiction of any court with respect to proceedings, if any, commenced in any action against, or otherwise involving DBNTC or the Securitization Trusts, or any predecessor in interest to DBNTC or the Securitization Trusts; (c) a waiver or release of, or any limitation on DBNTC's or the Securitization Trusts', or any predecessor in interest to DBNTC's or

the Securitization Trusts', right to trial by jury in the Court or any other court in any proceeding; (d) a waiver or release of, or any other limitation on, DBNTC's or the Securitization Trusts', or any predecessor in interest to DBNTC or the Securitization Trusts', rights to have any orders entered only after de novo review by the applicable court; (e) a waiver of, or any other limitation on, DBNTC or the Securitization Trusts', or any predecessor in interest to DBNTC's or the Securitization Trusts', right to seek a withdrawal of the reference with respect to any matter, including any matter relating to this Proof of Claim; or (f) a waiver or release of, or any other limitation on, DBNTC's or the Securitization Trusts', or any predecessor in interest to DBNTC's or the Securitization Trusts', right to assert that any portion of the claims asserted herein are entitled to treatment as priority claims. Without limiting the generality of the foregoing, the Trustee asserts, on behalf of each Trust and itself, the right to set off the amount of all claims of such Trust and itself as Trustee of such Trust, against all claims and amounts assertable by or distributable to WAMU (or its successors-in-interest under the Governing Documents) in any capacity, including, without limitation, any rights of WAMU to recover delinquency advances, servicing advances or other amounts distributable with respect to securities or other interests in such Trusts.

**Welcome to TimesPeople**
What's this ?    TimesPeople Lets You Share and Discover the Best of NYTimes.com    11:13 AM    Log In or Register
No, thanks

HOME PAGE    TODAY'S PAPER    VIDEO    MOST POPULAR    TIMES TOPICS    Get Home Delivery   Log In   Register Now

# The New York Times

## Business

Search All NYTimes.com    Go

WORLD    U.S.    N.Y. / REGION    BUSINESS    TECHNOLOGY    SCIENCE    HEALTH    SPORTS    OPINION    ARTS    STYLE    TRAVEL    **JOBS**    REAL ESTATE    AUTOS

**Search Business**    **Financial Tools**    **More in Business »**
News, Stocks, Funds, Companies    Go    Select a Financial Tool    World Business    Markets    Economy    DealBook    Media & Advertising    Small Business    Your Money

THE RECKONING

# Saying Yes, WaMu Built Empire on Shaky Loans

By PETER S. GOODMAN and GRETCHEN MORGENSON
Published: December 27, 2008

*"We hope to do to this industry what Wal-Mart did to theirs, Starbucks did to theirs, Costco did to theirs and Lowe's-Home Depot did to their industry. And I think if we've done our job, five years from now you're not going to call us a bank."*

SIGN IN TO E-MAIL OR SAVE THIS

PRINT

REPRINTS

SHARE

More Articles in Business »

Have you joined ?   It's free.
nytimes.com   Linked in.
The New York Times and LinkedIn have teamed up to give you customized industry news. Automatically.
Click here to activate

Enlarge This Image



Sandy Huffaker for The New York Times
"It was just disheartening," said Sherri Zaback, a mortgage screener for Washington Mutual. "Just spit it out and get it done. That's they wanted us to do. Garbage in, garbage out."

— Kerry K. Killinger, chief executive of Washington Mutual, 2003


ARTICLE TOOLS
SPONSORED BY
THE WRESTLER
A GOLDEN GLOBE NOMINEE

SAN DIEGO — As a supervisor at a Washington Mutual mortgage processing center, John D. Parsons was accustomed to seeing baby sitters claiming salaries worthy of college presidents, and schoolteachers with incomes rivaling stockbrokers'. He rarely questioned them. A real estate frenzy was under way and WaMu, as his bank was known, was all about saying yes.

Yet even by WaMu's relaxed standards, one mortgage four years ago raised eyebrows. The borrower was claiming a six-figure income and an unusual profession: mariachi singer.

Mr. Parsons could not verify the singer's income, so he had him photographed in front of his home dressed in his mariachi outfit. The photo went into a WaMu file. Approved.

"I'd lie if I said every piece of documentation was properly signed and dated," said Mr. Parsons, speaking through wire-reinforced glass at a California prison near here, where he is serving 16 months for theft after his fourth arrest — all involving drugs.

While Mr. Parsons, whose incarceration is not related to his work for WaMu, oversaw a team screening mortgage applications, he was snorting methamphetamine daily, he said.

"In our world, it was tolerated," said Sherri Zaback, who worked for Mr. Parsons and recalls seeing drug paraphernalia on his desk. "Everybody said, 'He gets the job done.' "

At WaMu, getting the job done meant lending money to nearly anyone who asked for it — the force behind the

**The Reckoning**
*Mortgage Factory*
Articles in this series have explored the causes of the financial crisis.

Previous Articles in the Series »

**Multimedia**



Video
Washington Mutual 'Power of Yes' Ad via YouTube





IBM.
CLICK HERE FOR FULL ARTICLES AND RELATED IBM SOLUTIONS

Sponsored Archive

**Thinking about energy.**
IBM is taking some of the world's key energy challenges, and then possible solutions through an index featuring facts, cold examples, links, and stories.

The Green Road Less Traveled

Whoever knew — IBM is managing traffic congestion in Stockholm. WeBit is, and therein lies a story.

Flush With Energy

The Arctic Hotel in Ilulissat, Greenland, is a charming little place on the West Coast, but people would never confuse it for a Four Seasons.

Doha and Dalian
In the last few weeks, I happened to visit Doha and Dalian, and I must say I was stunned.

It's Too Late for Later

The next column — the final New York Times column, coming next Wednesday — is almost 20 years later, and going forward it is mass emerging.

The New York Times



Graphic
Rise and Fall

bank's meteoric rise and its precipitous collapse this year in the biggest bank failure in American history.

On a financial landscape littered with wreckage, WaMu, a Seattle-based bank that opened branches at a clip worthy of a fast-food chain, stands out as a singularly brazen case of lax lending. By the first half of this year, the value of its bad loans had reached $11.5 billion, nearly tripling from $4.2 billion a year earlier.

Interviews with two dozen former employees, mortgage brokers, real estate agents and appraisers reveal the relentless pressure to churn out loans that produced such results. While that sample may not fully represent a bank with tens of thousands of people, it does reflect the views of employees in WaMu mortgage operations in California,

**PUSH TO GROW** Former employees say that with Kerry Killinger in charge, WaMu became a loan factory, ignoring borrowers' incomes.

Florida, Illinois and Texas.

Their accounts are consistent with those of 89 other former employees who are confidential witnesses in a class action filed against WaMu in federal court in Seattle by former shareholders.

According to these accounts, pressure to keep lending emanated from the top, where executives profited from the swift expansion — not least, Kerry K. Killinger, who was WaMu's chief executive from 1990 until he was forced out in September.

Between 2001 and 2007, Mr. Killinger received compensation of $88 million, according to the Corporate Library, a research firm. He declined to respond to a list of questions, and his spokesman said he was unavailable for an interview.

During Mr. Killinger's tenure, WaMu pressed sales agents to pump out loans while disregarding borrowers' incomes and assets, according to former employees. The bank set up what insiders described as a system of dubious legality that enabled real estate agents to collect fees of more than $10,000 for bringing in borrowers, sometimes making the agents more beholden to WaMu than they were to their clients.

WaMu gave mortgage brokers handsome commissions for selling the riskiest loans, which carried higher fees, bolstering profits and ultimately the compensation of the bank's executives. WaMu pressured appraisers to provide inflated property values that made loans appear less risky, enabling Wall Street to bundle them more easily for sale to investors.

"It was the Wild West," said Steven M. Knobel, a founder of an appraisal company, Mitchell, Maxwell & Jackson, that did business with WaMu until 2007. "If you were alive, they would give you a loan. Actually, I think if you were dead, they would still give you a loan."

JPMorgan Chase, which bought WaMu for $1.9 billion in September and received $25 billion a few weeks later as part of the taxpayer bailout of the financial services industry, declined to make former WaMu executives available for interviews.

JPMorgan also declined to comment on WaMu's operations before it bought the company. "It is a different era for our customers and for the company," a spokesman said.

For those who placed their faith and money in WaMu, the bank's implosion came as a shock.

"I never had a clue about the amount of off-the-cliff activity that was going on at Washington Mutual, and I was in constant contact with the company," said Vincent Au, president of Avalon Partners, an investment firm. "There were people at WaMu that

**Breaking News Alerts by E-Mail**

Sign up to be notified when important news breaks.

Sign Up

Privacy Policy

MOST POPULAR - BUSINESS

E-MAILED    BLOGGED

1. Digital Domain: What Carriers Aren't Eager to Tell You About Texting

2. The Evidence Gap: Patient's DNA May Be Signal to Tailor Medication

3. Italian Makers of Prosecco Seek Recognition

4. An NPR Reporter Becomes the News

5. The Reckoning: Saying Yes, WaMu Built Empire on Shaky Loans

6. Everybody's Business: They Told Me That Madoff Never Lost Money

7. Gazprom, Once Mighty, Is Reeling

8. Von Trapps Reunited, Without the Singing

9. Green Inc.: Prius: It's Not Just a Car, It's an Emergency Generator

10. Black Workers Hurt by Detroit's Ills

Go to Complete List »



The New York Times    **DINING**
nytimes.com/dining

Let the good times tiptoe

Also in Dining:
New Year's recipes
Holiday beverage and dessert recipes
An old acquaintance to be forgotten

ADVERTISEMENTS

Vanguard®
A handful of funds that can meet most investors' needs

Need to know more?
Get 50% off home delivery of The Times

Get 50% off when you give the gift of The New York Times

Get Times Reader Free. A Digital Newspaper That Reads Like The Real Thing.

**Donate Now**
to The Neediest Cases Fund
Click Here


NOV. 4 WAS JUST THE BEGINNING.
Subscribe now to The New York Times and get 50% off. Click here. ›
The New York Times

Ads by Google                    what's this?

orchestrated nothing more than a sham or charade. These people broke every fundamental rule of running a company."

**'Like a Sweatshop'**

Some WaMu employees who worked for the bank during the boom now have regrets.

"It was a disgrace," said Dana Zweibel, a former financial representative at a WaMu branch in Tampa, Fla. "We were giving loans to people that never should have had loans."

If Ms. Zweibel doubted whether customers could pay, supervisors directed her to keep selling, she said.

"We were told from up above that that's not our concern," she said. "Our concern is just to write the loan."

The ultimate supervisor at WaMu was Mr. Killinger, who joined the company in 1983 and became chief executive in 1990. He inherited a bank that was founded in 1889 and had survived the Depression and the savings and loan scandal of the 1980s.

An investment analyst by training, he was attuned to Wall Street's hunger for growth. Between late 1996 and early 2002, he transformed WaMu into the nation's sixth-largest bank through a series of acquisitions.

A crucial deal came in 1999, with the purchase of Long Beach Financial, a California lender specializing in subprime mortgages, loans extended to borrowers with troubled credit.

WaMu underscored its eagerness to lend with an advertising campaign introduced during the 2003 Academy Awards: "The Power of Yes." No mere advertising pitch, this was also the mantra inside the bank, underwriters said.

"WaMu came out with that slogan, and that was what we had to live by," Ms. Zaback said. "We joked about it a lot." A file would get marked problematic and then somehow get approved. "We'd say: 'O.K.! The power of yes.' "

Revenue at WaMu's home-lending unit swelled from $707 million in 2002 to almost $2 billion the following year, when the "The Power of Yes" campaign started.

Between 2000 and 2003, WaMu's retail branches grew 70 percent, reaching 2,200 across 38 states, as the bank used an image of cheeky irreverence to attract new customers. In offbeat television ads, casually dressed WaMu employees ridiculed staid bankers in suits.

Branches were pushed to increase lending. "It was just disgusting," said Ms. Zweibel, the Tampa representative. "They wanted you to spend time, while you're running teller transactions and opening checking accounts, selling people loans."

Employees in Tampa who fell short were ordered to drive to a WaMu office in Sarasota, an hour away. There, they sat in a phone bank with 20 other people, calling customers to push home equity loans.

"The regional manager would be over your shoulder, listening to every word," Ms. Zweibel recalled. "They treated us like we were in a sweatshop."

On the other end of the country, at WaMu's San Diego processing office, Ms. Zaback's job was to take loan applications from branches in Southern California and make sure they passed muster. Most of the loans she said she handled merely required borrowers to provide an address and Social Security number, and to state their income and assets.

She ran applications through WaMu's computer system for approval. If she needed more

**Umbilical Cord Bank**

Get a FREE Information Kit CA Residents Save $500, Exp 1/16

www.ViaCord.com/Cord-Blood-Experts

Ads by Google                     what's this?

**Cord Blood Banking**

Bank Your Baby's Cord Blood CA Residents Save $500, Exp 1/16

www.ViaCord.com/Cord-Blood-Experts

information, she had to consult with a loan officer — which she described as an unpleasant experience. "They would be furious," Ms. Zaback said. "They would put it on you, that they weren't going to get paid if you stood in the way."

On one loan application in 2005, a borrower identified himself as a gardener and listed his monthly income at $12,000, Ms. Zaback recalled. She could not verify his business license, so she took the file to her boss, Mr. Parsons.

He used the mariachi singer as inspiration: a photo of the borrower's truck emblazoned with the name of his landscaping business went into the file. Approved.

Mr. Parsons, who worked for WaMu in San Diego from about 2002 through 2005, said his supervisors constantly praised his performance. "My numbers were through the roof," he said.

On another occasion, Ms. Zaback asked a loan officer for verification of an applicant's assets. The officer sent a letter from a bank showing a balance of about $150,000 in the borrower's account, she recalled. But when Ms. Zaback called the bank to confirm, she was told the balance was only $5,000.

The loan officer yelled at her, Ms. Zaback recalled. "She said, 'We don't call the bank to verify.' " Ms. Zaback said she told Mr. Parsons that she no longer wanted to work with that loan officer, but he replied: "Too bad."

Shortly thereafter, Mr. Parsons disappeared from the office. Ms. Zaback later learned of his arrest for burglary and drug possession.

The sheer workload at WaMu ensured that loan reviews were limited. Ms. Zaback's office had 108 people, and several hundred new files a day. She was required to process at least 10 files daily.

"I'd typically spend a maximum of 35 minutes per file," she said. "It was just disheartening. Just spit it out and get it done. That's what they wanted us to do. Garbage in, and garbage out."

**Referral Fees for Loans**

WaMu's boiler room culture flourished in Southern California, where housing prices rose so rapidly during the bubble that creative financing was needed to attract buyers.

To that end, WaMu embraced so-called option ARMs, adjustable rate mortgages that enticed borrowers with a selection of low initial rates and allowed them to decide how much to pay each month. But people who opted for minimum payments were underpaying the interest due and adding to their principal, eventually causing loan payments to balloon.

Customers were often left with the impression that low payments would continue long term, according to former WaMu sales agents.

For WaMu, variable-rate loans — option ARMs, in particular — were especially attractive because they carried higher fees than other loans, and allowed WaMu to book profits on interest payments that borrowers deferred. Because WaMu was selling many of its loans to investors, it did not worry about defaults: by the time loans went bad, they were often in other hands.

WaMu's adjustable-rate mortgages expanded from about one-fourth of new home loans in 2003 to 70 percent by 2006. In 2005 and 2006 — when WaMu pushed option ARMs most aggressively — Mr. Killinger received pay of $19 million and $24 million respectively.

**The ARM Loan Niche**

WaMu's retail mortgage office in Downey, Calif., specialized in selling option ARMs to Latino customers who spoke little English and depended on advice from real estate brokers, according to a former sales agent who requested anonymity because he was still in the mortgage business.

According to that agent, WaMu turned real estate agents into a pipeline for loan applications by enabling them to collect "referral fees" for clients who became WaMu borrowers.

Buyers were typically oblivious to agents' fees, the agent said, and agents rarely explained the loan terms.

"Their Realtor was their trusted friend," the agent said. "The Realtors would sell them on a minimum payment, and that was an outright lie."

According to the agent, the strategy was the brainchild of Thomas Ramirez, who oversaw a sales team of about 20 agents at the Downey branch during the first half of this decade, and now works for Wells Fargo.

Mr. Ramirez confirmed that he and his team enabled real estate agents to collect commissions, but he maintained that the fees were fully disclosed.

"I don't think the bank would have let us do the program if it was bad," Mr. Ramirez said.

Mr. Ramirez's team sold nearly $1 billion worth of loans in 2004, he said. His performance made him a perennial member of WaMu's President's Club, which brought big bonuses and recognition at an awards ceremony typically hosted by Mr. Killinger in tropical venues like Hawaii.

Mr. Ramirez's success prompted WaMu to populate a neighboring building in Downey with loan processors, underwriters and appraisers who worked for him. The fees proved so enticing that real estate agents arrived in Downey from all over Southern California, bearing six and seven loan applications at a time, the former agent said.

WaMu banned referral fees in 2006, fearing they could be construed as illegal payments from the bank to agents. But the bank allowed Mr. Ramirez's team to continue using the referral fees, the agent said.

## Forced Out With Millions

By 2005, the word was out that WaMu would accept applications with a mere statement of the borrower's income and assets — often with no documentation required — so long as credit scores were adequate, according to Ms. Zaback and other underwriters.

"We had a flier that said, 'A thin file is a good file,' " recalled Michele Culbertson, a wholesale sales agent with WaMu.

Martine Lado, an agent in the Irvine, Calif., office, said she coached brokers to leave parts of applications blank to avoid prompting verification if the borrower's job or income was sketchy.

"We were looking for people who understood how to do loans at WaMu," Ms. Lado said.

Top producers became heroes. Craig Clark, called the "king of the option ARM" by colleagues, closed loans totaling about $1 billion in 2005, according to four of his former coworkers, a tally he amassed in part by challenging anyone who doubted him.

"He was a bulldozer when it came to getting his stuff done," said Lisa Alvarez, who worked in the Irvine office from 2003 to 2006.

Christine Crocker, who managed WaMu's wholesale underwriting division in Irvine,

recalled one mortgage to an elderly couple from a broker on Mr. Clark's team.

With a fixed income of about $3,200 a month, the couple needed a fixed-rate loan. But their broker earned a commission of three percentage points by arranging an option ARM for them, and did so by listing their income as $7,000 a month. Soon, their payment jumped from roughly $1,000 a month to about $3,000, causing them to fall behind.

Mr. Clark, who now works for JPMorgan, referred calls to a company spokesman, who provided no further details.

In 2006, WaMu slowed option ARM lending. But earlier, ill-considered loans had already begun hurting its results. In 2007, it recorded a $67 million loss and shut down its subprime lending unit.

By the time shareholders joined WaMu for its annual meeting in Seattle last April, WaMu had posted a first-quarter loss of $1.14 billion and increased its loan loss reserve to $3.5 billion. Its stock had lost more than half its value in the previous two months. Anger was in the air.

Some shareholders were irate that Mr. Killinger and other executives were excluding mortgage losses from the computation of their bonuses. Others were enraged that WaMu turned down an $8-a-share takeover bid from JPMorgan.

"Calm down and have a little faith," Mr. Killinger told the crowd. "We will get through this."

WaMu asked shareholders to approve a $7 billion investment by Texas Pacific Group, a private equity firm, and other unnamed investors. David Bonderman, a founder of Texas Pacific and a former WaMu director, declined to comment.

Hostile shareholders argued that the deal would dilute their holdings, but Mr. Killinger forced it through, saying WaMu desperately needed new capital.

Weeks later, with WaMu in tatters, directors stripped Mr. Killinger of his board chairmanship. And the bank began including mortgage losses when calculating executive bonuses.

In September, Mr. Killinger was forced to retire. Later that month, with WaMu buckling under roughly $180 billion in mortgage-related loans, regulators seized the bank and sold it to JPMorgan for $1.9 billion, a fraction of the $40 billion valuation the stock market gave WaMu at its peak.

Billions that investors had plowed into WaMu were wiped out, as were prospects for many of the bank's 50,000 employees. But Mr. Killinger still had his millions, rankling laid-off workers and shareholders alike.

"Kerry has made over $100 million over his tenure based on the aggressiveness that sunk the company," said Mr. Au, the money manager. "How does he justify taking that money?"

In June, Mr. Au sent an e-mail message to the company asking executives to return some of their pay. He says he has not heard back.

A version of this article appeared in print on December 28, 2008, on page A1 of the New York edition.

More Articles in Business »

Get Times Reader Free. A Digital Newspaper That Reads Like The Real Thing.

### Past Coverage

FAIR GAME: Was There A Loan It Didn't Like? (November 2, 2008)
TALKING BUSINESS: D-Day Has Arrived For Congress (September 27, 2008)
In Largest Bank Failure, U.S. Seizes, Then Sells (September 26, 2008)
A Wall Street Goliath Teeters Amid Fears of a Widening Crisis (September 14, 2008)

### Related Searches

| | |
|---|---|
| Washington Mutual Inc | Get E-Mail Alerts |
| Mortgages | Get E-Mail Alerts |
| Banks and Banking | Get E-Mail Alerts |

### INSIDE NYTIMES.COM

‹ ▸

HEALTH »



Leaving Platform That Elevated AIDS Fight

N.Y. / REGION »



Setting Off a Tsunami: Did It Happen Here?

OPINION »

### Editorial Notebook



Verlyn Klinkenborg reports from a perfectly ordinary place.

BUSINESS »



Patient's DNA May Be Signal to Tailor Drugs

OPINION »

### Continue Reading>>

Letters: Does the E-Book Have a Bright Future?

TELEVISION »

'Scrubs,' Near Death, Is Given a Miracle Cure

Home  World  U.S.  N.Y. / Region  Business  Technology  Science  Health  Sports  Opinion  Arts  Style  Travel  Jobs  Real Estate  Automobiles  Back to Top

Copyright 2008 The New York Times Company    Privacy Policy    Search    Corrections    RSS    First Look    Help    Contact Us    Work for Us    Site Map

# Exhibit A-1
## To Proof of Claim of
## Deutsche Bank National Trust Company

| Issue ID | Transaction | Series | Agreement Date | Original Collateral Balance | Current Principal Balance 9/25/08 |
|---|---|---|---|---|---|
| LB0002 | Long Beach Mortgage Loan Trust | 2000-1 | 12/1/00 | 1,000,000,594.71 | 34,811,895.51 |
| LB00F1 | Long Beach Home Equity Loan Trust | 2000-LB1 | 8/1/00 | 1,312,248,898.65 | 59,532,662.65 |
| LB0101 | Long Beach Mortgage Loan Trust | 2001-1 | 3/1/01 | 725,466,488.78 | 36,039,908.53 |
| LB0102 | Long Beach Mortgage Loan Trust | 2001-2 | 7/1/01 | 1,594,353,660.72 | 71,505,949.50 |
| LB0103 | Long Beach Mortgage Loan Trust | 2001-3 | 9/1/01 | 1,001,006,145.53 | 49,540,692.95 |
| LB0104 | Long Beach Mortgage Loan Trust | 2001-4 | 12/1/01 | 1,999,995,140.51 | 104550975.6 |
| LB0201 | Long Beach Mortgage Loan Trust | 2002-1 | 4/1/02 | 1,600,002,996.85 | 78,501,732.67 |
| LB0202 | Long Beach Mortgage Loan Trust | 2002-2 | 6/1/02 | 1,000,001,438.60 | 52,951,722.09 |
| LB0205 | Long Beach Mortgage Loan Trust | 2002-5 | 11/1/02 | 1,000,000,848.34 | 73,845,139.93 |
| LB0301 | Long Beach Mortgage Loan Trust | 2003-1 | 2/1/03 | 2,000,000,169.33 | 130,090,598.75 |
| LB0302 | Long Beach Mortgage Loan Trust | 2003-2 | 4/1/03 | 926,370,950.24 | 63,358,995.33 |
| LB0303 | Long Beach Mortgage Loan Trust | 2003-3 | 6/1/03 | 900,000,208.99 | 75,119,530.93 |
| LB0304 | Long Beach Mortgage Loan Trust | 2003-4 | 7/1/03 | 2,200,000,305.17 | 224,438,308.88 |
| LB0401 | Long Beach Mortgage Loan Trust | 2004-1 | 2/1/04 | 4,500,000,018.86 | 532,202,224.67 |
| LB0402 | Long Beach Mortgage Loan Trust | 2004-2 | 5/1/04 | 1,519,139,252.43 | 204,931,765.30 |
| LB0403 | Long Beach Mortgage Loan Trust | 2004-3 | 6/1/04 | 1,999,383,410.65 | 292,775,378.36 |
| LB0404 | Long Beach Mortgage Loan Trust | 2004-4 | 9/1/04 | 2,719,328,087.12 | 386,675,678.52 |
| LB0405 | Long Beach Mortgage Loan Trust | 2004-5 | 8/1/04 | 1,015,407,092.63 | 151,014,830.26 |
| LB0406 | Long Beach Mortgage Loan Trust | 2004-6 | 10/1/04 | 1,104,297,532.58 | 165,563,241.68 |
| LB0501 | Long Beach Mortgage Loan Trust | 2005-1 | 1/1/05 | 3,500,003,000.56 | 581,873,653.66 |
| LB0502 | Long Beach Mortgage Loan Trust | 2005-2 | 4/1/05 | 2,500,002,732.02 | 485,463,232.28 |

**Exhibit A-1**
**To Proof of Claim of**
**Deutsche Bank National Trust Company**

| Issue ID | Transaction | Series | Agreement Date | Original Collateral Balance | Current Principal Balance 9/25/08 |
|---|---|---|---|---|---|
| LB0503 | Long Beach Mortgage Loan Trust | 2005-3 | 9/1/05 | 1,527,819,573.20 | 496,077,274.56 |
| LB05W1 | Long Beach Mortgage Loan Trust | 2005-WL1 | 7/1/2005 | 2,783,633,153.00 | 624,023,514.56 |
| LB05W2 | Long Beach Mortgage Loan Trust | 2005-WL2 | 8/1/05 | 2,755,716,668.32 | 791,199,316.92 |
| LB05W3 | Long Beach Mortgage Loan Trust | 2005-WL3 | 11/1/05 | 2,191,257,007.17 | 827,566,265.49 |
| LB0601 | Long Beach Mortgage Loan Trust | 2006-1 | 2/1/06 | 2,499,987,903.06 | 1,160,361,979.44 |
| LB0602 | Long Beach Mortgage Loan Trust | 2006-2 | 3/1/06 | 3,003,799,169.81 | 1,386,914,706.65 |
| LB0603 | Long Beach Mortgage Loan Trust | 2006-3 | 4/1/06 | 1,743,796,134.40 | 888,155,925.30 |
| LB0604 | Long Beach Mortgage Loan Trust | 2006-4 | 5/1/06 | 1,922,678,765.19 | 1,053,549,542.12 |
| LB0605 | Long Beach Mortgage Loan Trust | 2006-5 | 6/1/06 | 1,925,001,176.58 | 1,061,924,757.27 |
| LB0606 | Long Beach Mortgage Loan Trust | 2006-6 | 7/1/06 | 1,688,107,433.24 | 1,031,620,844.36 |
| LB0607 | Long Beach Mortgage Loan Trust | 2006-7 | 8/1/06 | 1,596,611,009.81 | 1,066,308,386.86 |
| LB0608 | Long Beach Mortgage Loan Trust | 2006-8 | 9/1/06 | 1,380,727,062.40 | 954,086,893.15 |
| LB0609 | Long Beach Mortgage Loan Trust | 2006-9 | 10/1/06 | 1,520,086,184.10 | 1,091,628,311.24 |
| LB060A | Long Beach Mortgage Loan Trust | 2006-A | 5/1/06 | 532,619,585.98 | 144,205,711.88 |
| LB0610 | Long Beach Mortgage Loan Trust | 2006-10 | 11/1/06 | 1,008,199,873.58 | 740,325,465.58 |
| LB0611 | Long Beach Mortgage Loan Trust | 2006-11 | 12/1/06 | 1,499,999,921.58 | 1,126,024,144.81 |
| LB06W1 | Long Beach Mortgage Loan Trust | 2006-WL1 | 1/1/06 | 1,903,659,401.04 | 810,309,534.48 |
| LB06W2 | Long Beach Mortgage Loan Trust | 2006-WL2 | 1/1/06 | 1,908,950,760.04 | 739,358,759.85 |
| LB06W3 | Long Beach Mortgage Loan Trust | 2006-WL3 | 1/1/06 | 1,917,874,232.74 | 737,068,803.57 |
| WA0001 | Washington Mutual Mortgage Securities Corp. | 2000-1 | 3/31/00 | 6,701,536,869.34 | 480,305,038.41 |
| WA0107 | Washington Mutual Mortgage Securities Corp. | 2001-7 | 5/1/01 | 1,051,032,555.94 | 19,541,729.02 |
| WA01A3 | Washington Mutual Mortgage Securities Corp. | 2001-AR3 | 11/9/01 | 1,167,350,333.57 | 32,739,901.70 |

# Exhibit A-1
## To Proof of Claim of
## Deutsche Bank National Trust Company

| Issue ID | Transaction | Series | Agreement Date | Original Collateral Balance | Current Principal Balance 9/25/08 |
|---|---|---|---|---|---|
| WA02A2 | Washington Mutual Mortgage Securities Corp. | 2002-AR2 | 2/26/02 | 846,869,196.58 | 133,386,070.04 |
| WA02A6 | Washington Mutual Mortgage Securities Corp. | 2002-AR6 | 5/1/02 | 976,270,151.47 | 33,967,222.14 |
| WA02A9 | Washington Mutual Mortgage Securities Corp. | 2002-AR9 | 7/1/02 | 1,497,233,409.59 | 63,032,301.89 |
| WA02AC | Washington Mutual Mortgage Securities Corp. | 2002-AR12 | 9/1/02 | 998,724,014.44 | 7,164,395.08 |
| WA02AD | Washington Mutual Mortgage Securities Corp. | 2002-AR13 | 9/1/02 | 801,901,920.87 | 6,622,003.44 |
| WA02AE | Washington Mutual Mortgage Securities Corp. | 2002-AR14 | 10/25/02 | 1,028,589,782.28 | 10,938,312.60 |
| WA02AF | Washington Mutual Mortgage Securities Corp. | 2002-AR15 | 10/1/02 | 1,975,024,800.28 | 22,477,420.27 |
| WA02AG | Washington Mutual Mortgage Securities Corp. | 2002-AR16 | 10/1/02 | 1,030,719,967.88 | 21,216,427.56 |
| WA02AH | Washington Mutual Mortgage Securities Corp. | 2002-AR17 | 10/1/02 | 1,141,838,488.95 | 59,353,086.07 |
| WA02AI | Washington Mutual Mortgage Securities Corp. | 2002-AR18 | 11/1/02 | 1,995,977,878.00 | 48,423,693.51 |
| WA02AJ | Washington Mutual Mortgage Securities Corp. | 2002-AR19 | 12/1/02 | 1,999,854,039.48 | 47,816,425.15 |
| WA02T1 | Washington Mutual Bank FA | 2002-PR2 | 9/27/02 | $1,810,000,000.00 | $412,182,299.00 |
| WA02T2 | Washington Mutual Bank FA | 2002-PR3 | 11/26/02 | $1,569,403,402.00 | $460,528,036.14 |
| WA03A1 | Washington Mutual Mortgage Securities Corp. | 2003-AR1 | 1/1/03 | 1,929,958,305.53 | 78,084,582.05 |
| WA03A2 | Washington Mutual Mortgage Securities Corp. | 2003-AR2 | 2/1/03 | 453,072,396.92 | 14,354,070.03 |
| WA03A3 | Washington Mutual Mortgage Securities Corp. | 2003-AR3 | 2/1/03 | 1,498,678,348.09 | 76,606,402.47 |
| WA03A4 | Washington Mutual Mortgage Securities Corp. | 2003-AR4 | 3/1/03 | 1,248,537,577.61 | 96,324,730.77 |
| WA03A5 | Washington Mutual Mortgage Securities Corp. | 2003-AR5 | 4/1/03 | 1,497,993,405.95 | 191,453,076.81 |
| WA03A6 | Washington Mutual Mortgage Securities Corp. | 2003-AR6 | 5/1/03 | 1,817,570,225.97 | 273,859,507.75 |
| WA03A7 | Washington Mutual Mortgage Securities Corp. | 2003-AR7 | 6/1/03 | 1,782,734,144.99 | 330,974,020.39 |
| WA03A8 | Washington Mutual Mortgage Securities Corp. | 2003-AR8 | 7/1/03 | 1,249,964,133.60 | 306,284,588.45 |
| WA03A9 | Washington Mutual Mortgage Securities Corp. | 2003-AR9 | 8/1/03 | 1,499,961,494.15 | 459,523,660.91 |

**Exhibit A-1**
**To Proof of Claim of**
**Deutsche Bank National Trust Company**

| Issue ID | Transaction | Series | Agreement Date | Original Collateral Balance | Current Principal Balance 9/25/08 |
|---|---|---|---|---|---|
| WA03AA | Washington Mutual Mortgage Securities Corp. | 2003-AR10 | 9/1/03 | 2,149,945,638.93 | 758,972,394.10 |
| WA03AB | Washington Mutual Mortgage Securities Corp. | 2003-AR11 | 10/1/03 | 569,335,006.37 | 201,418,222.95 |
| WA03AC | Washington Mutual Mortgage Securities Corp. | 2003-AR12 | 12/22/03 | 624,366,307.97 | 169,054,089.25 |
| WA04A1 | Washington Mutual Mortgage Securities Corp. | 2004-AR1 | 2/12/04 | 549,954,684.34 | 184,779,040.96 |
| WA04A2 | Washington Mutual Mortgage Securities Corp. | 2004-AR2 | 4/28/04 | 607,568,701.01 | 75,847,329.67 |
| WA04A3 | Washington Mutual Mortgage Securities Corp. | 2004-AR3 | 4/27/04 | 1,199,094,712.64 | 627,200,249.89 |
| WA04A4 | Washington Mutual Mortgage Securities Corp. | 2004-AR4 | 5/25/04 | 999,949,639.60 | 640,104,266.85 |
| WA04A5 | Washington Mutual Mortgage Securities Corp. | 2004-AR5 | 5/25/04 | 324,778,296.44 | 319,246,042.00 |
| WA04A6 | Washington Mutual Mortgage Securities Corp. | 2004-AR6 | 5/27/04 | 694,961,493.88 | 120,471,550.20 |
| WA04A7 | Washington Mutual Mortgage Securities Corp. | 2004-AR7 | 6/24/04 | 899,173,380.28 | 557,746,399.24 |
| WA04A8 | Washington Mutual Mortgage Securities Corp. | 2004-AR8 | 6/25/04 | 763,824,537.00 | 135,742,545.16 |
| WA04AA | Washington Mutual Mortgage Securities Corp. | 2004-AR10 | 7/27/04 | 1,264,666,962.70 | 243,688,955.92 |
| WA04AC | Washington Mutual Mortgage Securities Corp. | 2004-AR12 | 10/26/04 | 1,784,625,919.86 | 340,395,443.18 |
| WA04AD | Washington Mutual Mortgage Securities Corp. | 2004-AR13 | 11/23/04 | 1,539,705,677.27 | 325,216,452.97 |
| WA05A1 | Washington Mutual Mortgage Securities Corp. | 2005-AR1 | 1/18/05 | 2,971,414,173.32 | 714,587,307.20 |
| WA05A2 | Washington Mutual Mortgage Securities Corp. | 2005-AR2 | 1/26/05 | 3,267,405,771.83 | 920,722,624.68 |
| WA05A4 | Washington Mutual Mortgage Securities Corp. | 2005-AR4 | 3/24/05 | 750,504,106.41 | 506,442,449.82 |
| WA05A6 | Washington Mutual Mortgage Securities Corp. | 2005-AR6 | 4/26/05 | 3,167,184,178.32 | 932,737,574.84 |
| WA05A8 | Washington Mutual Mortgage Securities Corp. | 2005-AR8 | 7/15/05 | 3,029,599,417.91 | 893,576,756.98 |
| WA05A9 | Washington Mutual Mortgage Securities Corp. | 2005-AR9 | 7/21/05 | 1,505,402,999.34 | 423,681,934.44 |
| WA05AA | Washington Mutual Mortgage Securities Corp. | 2005-AR10 | 8/25/05 | 3,201,069,294.58 | 1,104,192,858.61 |
| WA05AB | WaMu Asset Acceptance Corp. | 2005-AR13 | 10/25/05 | 3,901,265,905.06 | 1,555,245,023.74 |

# Exhibit A-1
## To Proof of Claim of
## Deutsche Bank National Trust Company

| Issue ID | Transaction | Series | Agreement Date | Original Collateral Balance | Current Principal Balance 9/25/08 |
|---|---|---|---|---|---|
| WA05AC | WaMu Asset Acceptance Corp. | 2005-AR16 | 11/23/05 | 924,385,186.87 | 709,012,720.73 |
| WA05AD | WaMu Asset Acceptance Corp. | 2005-AR18 | 12/29/05 | 767,442,752.54 | 759,313,543.32 |
| WA0601 | Washington Mutual Home Equity Trust | I | 3/7/2006 | 5,389,459,150.00 | 3,561,666,083.13 |
| WA0602 | WaMu | 2006-OA1 | 12/13/2006 | 2,736,034,892.85 | 1,376,479,667.76 |
| WA06A1 | WaMu Asset Acceptance Corp. | 2006-AR1 | 1/30/06 | 1,516,188,758.27 | 719,352,278.04 |
| WA06A3 | WaMu Asset Acceptance Corp. | 2006-AR3 | 2/23/06 | 1,019,582,771.26 | 512,708,347.22 |
| WA06A4 | Washington Mutual Mortgage Securities Corp. | 2006-AR4 | 4/25/06 | 932,087,563.09 | 474,865,940.42 |
| WA06A5 | WaMu Asset Acceptance Corp. | 2006-AR5 | 5/25/06 | 796,522,188.53 | 481,442,704.76 |
| WA06C1 | WM Covered Bond Program | 1 | 5/18/07 | One Revolving Pool for all Series | |
| WA06C2 | WM Covered Bond Program | 2 | 5/18/07 | One Revolving Pool for all Series | |
| WA0701 | WaMu | 2007-Flex1 | 10/25/2007 | 5,199,147,685.89 | 4,067,805,919.38 |
| WA07C3 | WM Covered Bond Program | 3 | 5/18/07 | One Revolving Pool for all Series | |
| WA07H1 | WaMu Asset Acceptance Corp. | 2007-HE1 | 1/1/07 | 1,393,794,251.58 | 1,096,561,655.17 |
| CO9201 | Coast Federal | 1992-1 | 8/1/92 | 374,106,546.77 | 17,992,505.24 |
| DB9902 | Ace Securities | 1999-2 | 7/1/99 | 416,860,972.94 | 9,435,113.28 |
| MS0001 | Morgan Stanley ABS Capital I Inc. | 2000-1 | 7/1/00 | 360,107,788.57 | 7,463,097.13 |
| GS06L1 | GSAMP Trust | 2006-S1 | 1/1/06 | 516,812,864.78 | 122,133,901.15 |
| GS05X2 | GSAMP Trust | 2005-S2 | | | |

## Exhibit A-2
## To Proof of Claim of
## Deutsche Bank National Trust Company

| Issue ID | Transaction | Series | Agreement Date | Current Principal Balance |
|---|---|---|---|---|
| LB05N3 | Long Beach Asset Holding Corp. | CI 2005-WL1 | 10/21/2005 | 70,367,411.73 |
| LB05N4 | Long Beach Asset Holding Corp. | CI 2005-WL2 | 9/7/2005 | 12,747,551.05 |
| LB05N6 | Long Beach Asset Holding Corp. | CI 2005-WL3 | 12/7/2005 | 20,387,875.63 |
| LB06N6 | Long Beach Asset Holding Corp. | CI 2006-3 | 4/26/2006 | 27,829,138.01 |
| LB06N7 | Long Beach CI NIM Notes | 2006-4 | 5/30/2006 | 32,297,749.83 |
| LB06N8 | Long Beach CI NIM Notes | 2006-5 | 6/30/2006 | 31,437,470.34 |
| LB06N9 | Long Beach CI NIM Notes | 2006-6 | 7/31/2006 | 27,629,292.83 |
| LB06NA | Long Beach CI NIM Notes | 2006-7 | 8/31/2006 | 33,011,254.77 |
| LB06NB | Long Beach CI NIM Notes | 2006-8 | 9/27/2006 | 24,248,851.46 |
| LB06NC | Long Beach CI NIM Notes | 2006-9 | 10/30/2006 | 39,191,206.64 |
| LB06ND | Long Beach CI NIM Notes | 2006-10 | 11/29/2006 | 26,473,498.22 |
| LB06NE | Long Beach CI NIM Notes | 2006-11 | 12/27/2006 | 40,894,919.43 |
| WA07N1 | WaMu CI NIM Notes | 2007-WM1 | 1/30/2007 | 30,502,416.51 |
| LB03P1 (LB03PB ) | Long Beach Securities Corp. | 2003-P1 (2003-W5) | 4/30/03 | TBD |
| LB03P2 | Long Beach Securities Corp. | 2003-W9 | 6/26/03 | TBD |
| LB04N2 | Long Beach Asset Holding Corp. | 2004-2 | 5/26/04 | TBD |
| LB04N4 | Long Beach Asset Holding Corp. | 2004-4 | 11/24/04 | 5,755,410.65 |
| LB04N6 | Long Beach Asset Holding Corp. | 2004-6 | 10/29/04 | 9,158,820.66 |
| LB05N2 | Long Beach Asset Holding Corp. | 2005-2 | 4/26/05 | 15,457,776.33 |
| LB05N5 | Long Beach Asset Holding Corp. | 2005-3 | 9/20/05 | 8,131,609.43 |
| LB06N2 | Long Beach Asset Holding Corp. | 2006-WL2 | 3/30/2006 | 43,959,237.65 |
| LB06N4 | Long Beach Asset Holding Corp. | 2006-1 | 2/28/06 | 41,252,394.94 |
| LB06N5 | Long Beach Asset Holding Corp. | 2006-2 | 3/30/00 | 55,779,764.27 |
| LB07P3 | Long Beach Asset Holdings Corp CI | 2003-3 | 11/16/07 | TBD |
| LB07P4 | Long Beach Asset Holdings Corp CI | 2003-4 | 11/16/07 | TBD |

# Exhibit A-3
## To Proof of Claim of
## Deutsche Bank National Trust Company

| Issue ID | Transaction | Agreement Date |
|----------|-------------|----------------|
| LB03CM | Long Beach Mortgage Company Custodial Agreement | 10/15/2003 |
| FB022C | ASSET BACKED SECURITIES CORP. 2002-HE3 | 10/1/2002 |
| FB050C | CREDIT SUISSE FIRST BOSTON BI PARTY | 6/1/2005 |
| GC04FC | GREENWICH/DB FHA, VA AND CONVENTIONAL | 5/20/2004 |
| GC04JC | GREENWICH/WAMU 2004-RP1 | 5/20/2004 |
| GC056C | GREENWICH RBSGC 2005-RP1 | 2/1/2005 |
| GS04WC | GOLDMAN/LONG BEACH WAREHOUSE | 12/1/2004 |
| GS052C | GOLDMAN/WASHINGTON MUTUAL CUSTODY WAREHO | 1/1/2005 |
| GS05CC | GSAA 2005-7 SECURITY CUSTODY ONLY | 6/1/2005 |
| GS063C | GSAA 2006-1 CUSTODY ONLY | 6/1/2006 |
| GS06FC | GSR 2006-5F CUSTODY ONLY | 5/1/2006 |
| GS06HC | GSR 2006 6F CUSTODY ONLY | 6/1/2006 |
| GS06MC | GSR 2006-8F CUSTODY ONLY SECURITY | 8/1/2006 |
| GS06RC | GSR 2006-9F CUSTODY ONLY | 10/1/2006 |
| GS078C | GSR 2007-2F CUSTODY ONLY | 3/1/2007 |
| GS07BC | GSR 2007-3F CUSTODY ONLY | 4/1/2007 |
| GS07EC | GSR 2007-4F CUSTODY ONLY | 6/1/2007 |
| LB032C | LONG BEACH/FANNIE MAE POOLS | 5/1/2007 |
| LB052C | WASHINGTON MUTUAL/LBMC REPO FACILITY | 6/22/2005 |
| LH012C | LEHMAN/THORNBURG-SASCO 2001-8A | 5/1/2001 |
| LH07EC | LEHMAN/ SASCO 2007-GEL2 | 4/1/2007 |
| MS02BC | MORGAN STANLEY 2002-WL1 BANK ONE TRUSTEE | 6/1/2002 |
| MS02JC | MORGAN STANLEY/LONG BEACH | 10/1/2002 |
| MS03EC | MORGAN STANLEY - WAMU | 9/1/2003 |
| MS045C | MORGAN STANLEY FANNIE MAE | 3/23/2004 |
| MS04GC | MORGAN STANLEY FREDDIE MAC | 8/18/2004 |
| WA071C | WASHINGTON MUTUAL WAMU 2007-HE2 | 4/10/2007 |
| WA072C | WASHINGTON MUTUAL WAMU 2007-HE3 | 5/10/2007 |
| WA073C | WASHINGTON MUTUAL WAMU 2007-HE4 | 6/13/2007 |