# EXHIBIT 3

Morgan, Lewis & Bockius LLP
1717 Main Street, Suite 3200
Dallas, TX 75201 7347
Tel: 214.466.4000
Fax: 214.466.4001
www.morganlewis.com



**Morgan Lewis**
C O U N S E L O R S   A T   L A W

**Ann Marie Painter**
Partner
214.466.4121
annmarie.painter@MorganLewis.com

December 30, 2008

**BY HAND DELIVERY**

Federal Deposit Insurance Corporation
1601 Bryan Street
Dallas, Texas 75201

Re:     Deutsche Bank National Trust Company Proof of Claim

Dear Sir or Madam:

Enclosed please find a Proof of Claim, which is hereby submitted on behalf of Deutsche Bank National Trust Company. If you have any questions, please do not hesitate to contact me directly.

Sincerely,

*Ann Marie Painter*

Ann Marie Painter
AMP/ph

Enclosures

cc:     John Rosenthal – Morgan Lewis, San Francisco
        Kristine Bailey – Morgan Lewis, San Francisco

DB1/62194206.2

## Federal Deposit Insurance Corporation as Receiver for:
### Washington Mutual Bank
(Name of Bank/Financial Institution and Location)

### PROOF OF CLAIM

### CONFIDENTIAL TREATMENT REQUESTED

*Attachment A contains confidential, non-public financial information. Claimant Deutsche Bank National Trust Company requests that the claim, the information contained in Attachment A, and the non-public documents attached hereto be considered and treated as confidential.*

SSN/Tax ID # (1)    **33-0943418**

The undersigned, (2) Barbara Campbell, Vice President

says that the    **Washington Mutual Bank**_____    now in liquidation is
(Name of Bank/Financial Institution)

justly indebted to (3)    **Deutsche Bank National Trust Company**_____    in the sum of
(Individual/Joint/Corporation/Partnership/Firm/Agency)

(4)    **$10,146,399,660 (approximately, see Attachment A)**    Dollars upon the following Claim:

| | Description of (Invoice) claim: | Liability Number | Amount of Claim |
|---|---|---|---|
| C L A I M S | (5) See Exhibit A | | $6,764,266,440 to $10,146,399,660 approx., (see Attachment A). |
| | | Total Claim: (6) | Approximately $10,146,399,660 (see Attachment A). |

The undersigned further states that he/she makes this Claim on behalf of

### (7) Deutsche Bank National Trust Company

that no part of said debt has been paid, that

### (8) Deutsche Bank National Trust Company
(Individual/Joint/Corporation/Partnership/Firm/Agency)

has given no endorsement or assignment of the same or any part thereof, and that there is no set-off or counterclaim, or other legal or equitable defense to said Claim or any part thereof.

NAME (9)    Barbara Campbell    , Vice President

_____
(Signature of Person making    (Title)
the Claim)

FIRM    **Deutsche Bank National Trust Company**
(If applicable)

ADDRESS (10)    **1761 East St Andrew Pl**

CITY/STATE/ZIP    **Santa Ana, CA 92705-4934**

TELEPHONE NUMBER    **714-247-6278**

The penalty for knowingly making or inviting reliance of any false, forged, or counterfeit statement, document, or thing for the purpose of influencing in any way the action of the Federal Deposit Insurance Corporation is a fine of not more than $1,000,000 or imprisonment for not more than thirty years, or both (18 U.S.C. Section 1007).

RLS7212

ATTACHMENT A
to
Proof of Claim of
**DEUTSCHE BANK NATIONAL TRUST COMPANY,
AS TRUSTEE AND CUSTODIAN**

## A. CAPACITIES AND DOCUMENTS.

1. This proof of claim ("Proof of Claim") is made by Deutsche Bank National Trust Company ("DBNTC") (a) as trustee ("Trustee") for the securitization trusts listed on Exhibit A-1 attached hereto (the "Trusts"), on behalf of itself, the Trusts and the owners of certain residential mortgaged backed securities issued by the Trusts (the "Securities"), (b) as trustee of certain "net interest margin" trusts listed on Exhibit A-2 ("NIM Trusts", and collectively with the Trusts, the "Securitization Trusts") pursuant to which DBNTC owns, on behalf of NIM Trust beneficiaries, interests in certain Securities (the "NIM Trustee") and (c) as custodian (the "Custodian") under certain custody agreements listed on Exhibit A-3 (the "Custody Agreements") by and among DBNTC, and one or more of Washington Mutual Bank (in some cases, as successor-in-interest to Long Beach Mortgage) and/or its affiliates (collectively, "WAMU"), and/or third party lenders or purchasers of mortgage loans.

2. Each of the Trusts holds, as Trust assets or collateral, mortgage loans originated by and/or sold into the Trusts by WAMU.

3. With respect to each Trust, DBNTC entered into one or more Pooling and Servicing Agreements, Servicing Agreements, Indentures or Trust Agreements, and related ancillary agreements (collectively, the "Governing Documents"). The Governing Documents are voluminous and are in the possession of both the Trustee and WAMU. Accordingly, it is impractical and wasteful to attach them to this Proof of Claim. Additional documentation regarding the Trusts is available on the SEC's EDGAR website at http://sec.gov/, and the monthly distribution reports and prospectus supplements for each Trust are available on the Trustee's investor reporting website at https://tss.sfs.db.com/investpublic/. Upon request by the FDIC, the Trustee will furnish electronic or hard copies of any Governing Documents in its possession.

4. Pursuant to the Governing Documents for each Trust, WAMU sold, either directly or indirectly, mortgage loans into the related Trusts. In connection with such sales, WAMU also made numerous representations, warranties and covenants ("Representations and Warranties") concerning the mortgage loans, which Representations and Warranties were ultimately assigned to the Trusts pursuant the Governing Documents and certain ancillary agreements. The Trusts have claims for breach of such Representations and Warranties as further described herein.

5. DBNTC has also served as Custodian under the Custody Agreements. Pursuant to the Custody Agreements, DBNTC has held in custody mortgage loan files evidencing mortgage loans originated, purchased, financed and/or serviced by WAMU. In

addition, pursuant to certain Custody Agreements, the Custodian held and disbursed funds with respect to the funding and/or financing of such mortgage loans in accordance with instructions furnished to the Custodian by WAMU, loan purchasers or lenders. The Custody Agreements are voluminous and are in the possession of both the Trustee and WAMU. Accordingly, it is impractical and unnecessary to attach them to this Proof of Claim. Upon request by the FDIC, the Trustee will furnish electronic or hard copies of any Custody Agreements in its possession.

6.   DBNTC is aware that certain other parties to the Trusts, including, without limitation, securities underwriters, depositors, loan servicers, insurers and investors, intend to file proofs of claim in these proceedings relating to the Governing Documents and ancillary agreements which may be duplicative of, or supplemental to, the claims stated herein (the "Third Party Trust Related Claims"). To the extent that such Third Party Trust Related Claims relate to or are property of the Trusts, DBNTC incorporates such Third Party Trust Related Claims herein by reference.

## B. DESCRIPTION OF CLAIMS.

### Claims Arising from Breach of Representations and Warranties (Estimated Range: $6.764 billion to $10.146 billion)

7.   Pursuant to the Governing Documents, WAMU, as seller and [master] servicer, made certain Representations and Warranties in connection with the sale of the mortgage loans to the Trusts. WAMU has breached certain of these Representations and Warranties. Pursuant to the Governing Documents, WAMU has express contractual obligations (i) to notify certain parties to the Governing Documents, including the Trustee, when WAMU becomes aware of breaches of Representations and Warranties, (ii) to make certain cure payments with respect to certain such breaches or (iii) to repurchase the mortgage loans affected by WAMU's breaches, at the repurchase price (the "Repurchase Price") specified in the Governing Documents (typically equal to the unpaid principal balance of such mortgage loans, plus accrued interest thereon through the date of repurchase) (the "Repurchase Obligations"). Further, as described below, WAMU is liable to the Trustee and the Trusts for all liability, loss, cost and expense arising from breaches of Representations and Warranties, including all costs and expenses of enforcement of these obligations.

8.   Based on the public statements of the FDIC, it is unclear to the Trustee which obligations under the Governing Documents the FDIC purports to have assumed and assigned to JPMorgan Chase Bank, National Association ("JPMC"). Moreover, the FDIC has not notified the Trustee whether it intends to repudiate any obligations of WAMU under the Governing Documents, many of which obligations are executory in nature. The Trustee asserts that the FDIC does not have the power, with respect to the Governing Documents for any particular Trust, to "cherry pick" valuable contractual rights of WAMU, such as servicing rights, while repudiating potentially burdensome obligations of WAMU, such as Repurchase Obligations under those same contracts. Rather, if the FDIC wishes to reap the benefits of these contracts (by receiving the purchase price paid by JPMC for WAMU's assets), it must also accept their burdens. Accordingly, to the extent that the FDIC purports to have assumed and assigned to JPMC any rights and benefits of WAMU to service Mortgage Loans under the

Governing Documents for any Trust, the FDIC must make provision to perform fully all of WAMU's obligations under the Governing Documents for that Trust. In this regard, the Trustee notes that a single entity—Washington Mutual Bank (fka Long Beach Mortgage Company)-- generally entered into the Governing Documents both as seller and as [master] servicer. In addition, the Governing Documents represent an integrated set of contractual undertakings on behalf of WAMU with respect to the formation and servicing of the Trusts and WAMU (or its successors and assigns) cannot selectively assume the benefits of these undertakings while repudiating the related burdens. To the extent that WAMU has either (a) failed—in its capacities as seller or servicer-- to notify the Trustee and other transaction parties of material breaches of Representations and Warranties of which it was aware, and/or (b) repudiates and fails to perform its obligations to replace or repurchase defective loans, the Trusts have claims for breach of such obligations (the "Repurchase Claims"). Moreover, even if the FDIC did have the power to repudiate certain obligations of WAMU to the Trusts while assuming and assigning other obligations, the Trusts would have a right of set-off against any and all amounts owing to WAMU under the Governing Documents (including the right to recover servicing advances) with respect to any and all damages arising from the breach of such repudiated obligations.

9.    As of September 28, 2008, the Trusts held in excess of $49.9 billion in current principal balance outstanding of mortgage loans sold to the Trusts by WAMU. Recent media reports allege certain abuses in WAMU's loan origination procedures which, if true, would constitute breaches of the Representations and Warranties. (_see_ _e.g._ attached NY Times article dated as of December 27, 2008). Notwithstanding provisions of the Governing Documents permitting the Trustee and certain other parties access to WAMU's books and records concerning the mortgage loans, the Trustee is informed and believes that during the last 18 months, WAMU has consistently refused to allow the Trustee, bond insurers, and investors with an interest in the Trusts to perform any meaningful due diligence to determine whether Representations and Warranties were breached. Since WAMU's denial of counterparties' contractual inspection rights has deprived those parties of the ability to detect and quantify specific breaches of Representations and Warranties, claimants must be given reasonable access and time to investigate their claims prior to specifying them with greater particularity. Nevertheless, on the basis of the limited data currently available to the Trustee, the Trustee further describes these claims below.

10.   Assuming, for purposes of this Proof of Claim, that WAMU has and will continue to breach its obligations with respect to Repurchase Claims, the damages flowing from such breaches will vary depending on the losses suffered by the Trusts in respect of the related mortgage loans. Certain of the properties underlying the mortgage loans subject to Repurchase Claims either (a) have been foreclosed upon and are owned by the Trusts as of the date of this Proof of Claim (the "REO Loans") or (b) are owned by the Mortgagors (the "Mortgagor-Owned Loans"). The dollar amount of any Repurchase Claims related to REO Loans and Mortgagor-Owned Loans will be affected by the value of those loans and their underlying collateral because the damages suffered by the Trusts as a result of WAMU's breach will be partially offset by the value of the collateral retained by the Trusts. Due to the ever-changing nature of market forces impacting the value of REO Loans and Mortgagor-Owned Loans, the amount due to the Trusts on account of the REO Loans and Mortgagor-Owned Loans

remains in flux. Until the amount of WAMU's exposure on REO Loans and Mortgagor-Owned Loans is finally determined, the Trusts' corresponding claim remains unliquidated and may decrease or increase as a result of fluctuations in the valuation of the underlying property and related loans, and payments of principal and interest either made or not made by the mortgagor of the underlying loans. Certain of the properties underlying the mortgage loans subject to Repurchase Claims have been foreclosed upon and in turn sold ("REO Sold Loans"). The sale prices of the properties underlying the REO Sold Loans will be a partial offset to the Repurchase Price related to such REO Sold Loans.

11. On information and belief, taking into account (a) industry information regarding frequency of breaches of representations and warranties in portfolios of mortgage loans similar to those sold by WAMU to the Trusts, (b) the performance of the mortgage loans held by the Trusts and (c) the severity of losses experienced by the Trusts to date and anticipated in the future, the Trustee estimates that the Trusts have claims in respect to breaches of Representations and Warranties, in the estimated range of $6.764 billion to $10.146 billion.

12. Although Representations and Warranties were breached at the time that they were made, certain of the Repurchase Claims of the Trusts are unmatured, unliquidated and/or contingent in nature because, although breaches of Representation and Warranties exist for certain mortgage loans, such breaches have not been (a) discovered and/or (b) asserted, and/or (c) otherwise given rise to claims for the Repurchase Price as of the date hereof. The actual Repurchase Claims relating to such loans would be increased by accrued interest thereon and the Trusts' cost of enforcement, and be partially offset by the value of mortgage loan collateral and mortgage payments retained by the Trusts by reason of WAMU's failure to repurchase such loans.

13. In addition to the foregoing, under the Governing Documents, WAMU is also subject to Repurchase Claims with respect to missing or defective documents in mortgage loan files. The Governing Documents generally provide that if a material defect in any Mortgage File is discovered which may materially and adversely affect the value of the related Mortgage Loan, or the interests of the Trustee (as pledgee of the Mortgage Loans), the Noteholders or the Certificateholders in such Mortgage Loan, then the responsible party shall cure such defect, repurchase the related Mortgage Loan at the purchase price or substitute a qualified substitute mortgage loan for the related Mortgage Loan upon the same terms and conditions set forth for breaches of representations and warranties as to the Mortgage.

14. The Trustee or other document custodian has furnished WAMU, on an ongoing basis, document exception reports with respect to missing or defective loan file documents. The Exceptions Reports are voluminous and are in the possession of both the Trustee and WAMU. Accordingly it is impractical and wasteful to attach them to this Proof of Claim. Upon request by the FDIC, the Trustee will furnish electronic or hard copies of any Exceptions Reports in its possession. If WAMU repudiates or fails to satisfy its obligations under the Governing Documents, the Trustee will require additional time to assess the materiality of the remaining missing defective documents and to calculate the amount of any Repurchase Claims with respect thereto. For purposes of this Proof of Claim, however, the Trustee asserts that all loans with missing or defective loan file

documents are subject to Repurchase Claims for the Repurchase Price. The Trustee is not in a position to calculate the amount of such Repurchase Price until the population of such loans and the materiality of any document exceptions are finally determined (since borrowers continue to pay interest on some of these loans and, in many cases, other recoveries continue to be made on collateral securing such loans).

## Indemnification Claims

15. The Trusts have been damaged by virtue of WAMU's defaults and breaches with respect to the Representations and Warranties under the Governing Documents and ancillary agreements. Without limiting the generality of the foregoing, the Trusts have incurred, and will continue to incur, significant legal expenses enforcing mortgage loan documents and defending against borrower counterclaims and third party claims arising from breaches or alleged breaches of Representations and Warranties or of other obligations of WAMU (including loan servicing obligations) under the Governing Documents.

16. Without limiting the generality of the foregoing, WAMU is obligated to indemnify, defend and hold the Trusts and the Trustee harmless all liability, loss, cost or expense arising from the claims asserted in the following litigation matters:

(a) Elaine Trahan vs. Long Beach Mortgage Company et al, pending in the United District Court, Eastern District of Texas. A putative class action seeking to invalidate certain variable rate mortgage loans under Texas law.

(b) Jenkins vs. Deutsche Bank et al, actions brought in the United States District Count for the Eastern District of New York and the Southern District of Florida alleging inappropriate foreclosure and debt collection activity.

(c) Suits and other proceedings against the Trusts and/or the Trustee by the cities of Buffalo, NY, Cleveland, OH, and other jurisdictions claiming that REO properties owned by the Trusts have not been maintained in accordance with law and constitute a nuisance. In addition, the Trusts and/or the Trustee have been forced to address similar allegations. Such property maintenance is the sole obligation of WAMU, as loan servicer, with respect to certain of the properties at issue in these matters. The affected Trusts and the Trustee are entitled to indemnification by WAMU, its successors and assigns, against any liability, loss, cost or expense suffered in connection with such matters.

(d) Suits or counterclaims (typically asserted in the context of foreclosure proceedings) alleging breaches, inter alia, of the Truth in Lending Act, Fair Debt Collection Practices Act and other laws, in connection with the origination and/or servicing of WAMU-originated mortgage loans currently owned by Trusts. Because WAMU, as [master] servicer has handled all such litigation on behalf of the Trusts and the Trustee, the Trustee is currently unaware of the existence or nature of all such claims and reserves the right to amend this Proof of Claim to specify such matters at a later date. The affected Trusts and the Trustee are entitled to indemnification by WAMU, its successors and assigns, against any liability, loss, cost or expense suffered in connection with such matters.

17. Pursuant to the Governing Documents and applicable law, WAMU is liable to the Trusts and the Trustee for any losses, claims, expenses or damages, including legal fees and related costs, arising out of or based upon any breaches of any representation, warranty or covenant made by WAMU or any affiliate of WAMU in the Governing Documents. Such liability arises both from WAMU's breach of its contractual obligation to the Trusts and the Trustee to perform all of its obligations under the Governing Documents and from WAMU's obligation to indemnify, defend and hold the Trusts and the Trustee harmless from any liability, loss, cost or expense arising from WAMU's failure to perform such obligations. Moreover, even if the FDIC, as receiver for WAMU, were entitled to assume and assign certain obligations of WAMU while repudiating others, the Trustee and the Trusts would have a right of set-off with respect to breach claims for any repudiated obligations, against any and all amounts owing by the Trusts to WAMU (including the right to recover servicing advances) in any capacity under the Governing Documents. To the extent that WAMU (a) assumes, or assumes and assigns, any of its rights under the Governing Documents, and (b) indemnifies, or causes its successor-in-interest to indemnify, the Trusts and the Trustee for such matters, such indemnification obligation will have been satisfied. Although, to date, the Trustee is informed and believes that JPMC has performed certain of such obligations, neither JPMC nor the FDIC, as receive of WAMU, has made a clear statement to the Trustee specifying which obligations of WAMU have been assumed by JPMC and which, if any, obligations have not been so assumed, but rather assumed or rejected by the FDIC as receiver of WAMU. Accordingly, for purposes of this Proof of Claim, the Trustee assumes such obligations may not be fully satisfied.

18. Based upon the foregoing, the Trustee asserts a claim against WAMU for indemnification for, *inter alia*, all losses, claims, expenses and damages, including legal fees and related costs, arising out of or based upon any breaches of any representation, warranty or covenant made by WAMU under the Governing Documents.

**Servicing Claims**

19. As stated above, WAMU generally served as "servicer" or "master servicer" with respect to the mortgage loans held by the Trusts. The Trustee is informed and believes that JPMC intended to assume, at a minimum, all of WAMU's loan servicing rights and obligations. To the extent that JPMC, as successor-in-interest to WAMU, as [master] servicer, performs all obligations of WAMU, as [master] servicer, under the Governing Documents (including by curing any breaches that have occurred), WAMU will have mitigated claims with respect to WAMU's servicing of the loans. The Trustee reserves the right to amend this Proof of Claim to specify further any servicing claims in the event that such assumption has not taken place.

**Claims as NIM Trustee**

20. As NIM Trustee, the Trustee is the legal owner, for the benefit of securities holders under the NIM Trusts, of Securities issued by the Trusts. Since the NIM Trusts were formed concurrently and in conjunction with the corresponding Trusts, the NIM Trustee was the original purchaser of such Securities.

21. As purchaser of the such Securities on behalf of the NIM Trusts, the NIM Trustee hereby alleges that, to the extent that WAMU knew or should have known of the breaches of Representations and Warranties described above, the NIM Trusts have a claim for common law fraud and/or negligent misrepresentation and/or violation of applicable federal and state securities laws in connection with the issuance, distribution and sale of the such Securities to the NIM Trusts. Such claim is unliquidated and partially unmatured, but would be measured by the impact, if any, of such breaches on cash flows to the NIM Trusts.

## Claims as Custodian

22. Pursuant to the Custody Agreements, DBNTC is entitled to be paid certain fees stipulated therein, plus expenses incurred in connection with its serving as Custodian. In addition, where WAMU is seller/servicer under the Custody Agreement, WAMU has agreed to indemnify, defend and hold the Custodian harmless against all liabilities, loss, cost and expense incurred by the Custodian in the performance of its duties as Custodian. The Custodian reserves the right to amend this Proof of Claim to specify further any claims relating to any fees or expenses are incurred and remain outstanding in connection with the Custody Agreements.

## C. MISCELLANEOUS

23. By executing and filing this Proof of Claim, DBNTC does not waive any right to any security or any other right or rights with respect to any claim that DBNTC has or may have against WAMU or any other person or persons. The filing of this Proof of Claim is not intended and should not be construed to be an election of remedies or waiver of any past, present or future Defaults or Events of Default under the Governing Documents and ancillary agreements.

24. To the knowledge of the signatory hereto, the claims are not subject to any setoff or counterclaim, and no judgment has been rendered on the claims. The amount of all payments made prior to the date hereof, if any, have been credited and deducted.

25. DBNTC reserves its right to amend and/or supplement this Proof of Claim and to assert any and all other claims of whatever kind or nature that it has, or may have, that come to DBNTC's attention or arise after the filing of this Proof of Claim. The filing of this Proof of Claim shall not be deemed a waiver of any such claims or rights.

26. Nothing contained in this Proof of Claim shall be deemed or construed as: (a) a waiver of, or other limitation on, any rights or remedies of DBNTC or the Securitization Trusts, or any predecessor in interest to DBNTC or the Securitization Trusts, under the Governing Documents or ancillary agreements, at law, or in equity (including any setoff rights, lien rights, rights of recoupment, or any other rights that the Trustee or each Trust has or may have against WAMU or any other entity), all of which rights are expressly reserved; (b) a consent by DBNTC or the Securitization Trusts, or any predecessor in interest to DBNTC or the Securitization Trusts, to the jurisdiction of any court with respect to proceedings, if any, commenced in any action against, or otherwise involving DBNTC or the Securitization Trusts, or any predecessor in interest to DBNTC or the Securitization Trusts; (c) a waiver or release of, or any limitation on DBNTC's or the Securitization Trusts', or any predecessor in interest to DBNTC's or

the Securitization Trusts', right to trial by jury in the Court or any other court in any proceeding; (d) a waiver or release of, or any other limitation on, DBNTC's or the Securitization Trusts', or any predecessor in interest to DBNTC or the Securitization Trusts', rights to have any orders entered only after de novo review by the applicable court; (e) a waiver of, or any other limitation on, DBNTC or the Securitization Trusts', or any predecessor in interest to DBNTC's or the Securitization Trusts', right to seek a withdrawal of the reference with respect to any matter, including any matter relating to this Proof of Claim; or (f) a waiver or release of, or any other limitation on, DBNTC's or the Securitization Trusts', or any predecessor in interest to DBNTC's or the Securitization Trusts', right to assert that any portion of the claims asserted herein are entitled to treatment as priority claims.    Without limiting the generality of the foregoing, the Trustee asserts, on behalf of each Trust and itself, the right to set off the amount of all claims of such Trust and itself as Trustee of such Trust, against all claims and amounts assertable by or distributable to WAMU (or its successors-in-interest under the Governing Documents) in any capacity, including, without limitation, any rights of WAMU to recover delinquency advances, servicing advances or other amounts distributable with respect to securities or other interests in such Trusts.

Welcome to
TimesPeople          TimesPeople Lets You Share and Discover the Best of NYTimes.com          11:13 AM          Log In or Register
What's this?                                                                                                                       No thanks

HOME PAGE   TODAY'S PAPER   VIDEO   MOST POPULAR   TIMES TOPICS          Get Home Delivery   Log In   Register Now

# The New York Times

## Business

Search All NYTimes.com                        Go

WORLD   U.S.   N.Y. / REGION   BUSINESS   TECHNOLOGY   SCIENCE   HEALTH   SPORTS   OPINION   ARTS   STYLE   TRAVEL   JOBS   REAL ESTATE   AUTOS

**Search Business**                    **Financial Tools**            **More in Business »**
News, Stocks, Funds, Companies   Go    Select a Financial Tool        World        Markets    Economy   DealBook   Media &        Small      Your
                                                                      Business                                     Advertising    Business   Money

THE RECKONING

## Saying Yes, WaMu Built Empire on Shaky Loans

By PETER S. GOODMAN and GRETCHEN MORGENSON
Published: December 27, 2008

SIGN IN TO E-MAIL OR
SAVE THIS

PRINT

REPRINTS

SHARE

*"We hope to do to this industry what Wal-Mart did to theirs, Starbucks did to theirs, Costco did to theirs and Lowe's-Home Depot did to their industry. And I think if we've done our job, five years from now you're not going to call us a bank."*

More Articles in Business »

Have you joined?   It's free.

The New York Times
nytimes.com   Linked in

The New York Times and LinkedIn have teamed up
to give you customized industry news. Automatically.

Click here to activate

ART CLIX TOOLS
SPONSORED BY

THE WRESTLER

— Kerry K. Killinger, chief executive of Washington Mutual, 2003

Enlarge This Image



Sandy Huffaker for The New York Times
"It was just disheartening," said Sherri Zaback, a mortgage screener for Washington Mutual. "Just spit it out and get it done. That's they wanted us to do. Garbage in, garbage out."

**The Reckoning**
*Mortgage Factory*
Articles in this series have explored the causes of the financial crisis.

Previous Articles in the Series »

**Multimedia**



Video
Washington Mutual 'Power of Yes'
Ad via YouTube

SAN DIEGO — As a supervisor at a Washington Mutual mortgage processing center, John D. Parsons was accustomed to seeing baby sitters claiming salaries worthy of college presidents, and schoolteachers with incomes rivaling stockbrokers'. He rarely questioned them. A real estate frenzy was under way and WaMu, as his bank was known, was all about saying yes.

Yet even by WaMu's relaxed standards, one mortgage four years ago raised eyebrows. The borrower was claiming a six-figure income and an unusual profession: mariachi singer.

Mr. Parsons could not verify the singer's income, so he had him photographed in front of his home dressed in his mariachi outfit. The photo went into a WaMu file. Approved.

"I'd lie if I said every piece of documentation was properly signed and dated," said Mr. Parsons, speaking through wire-reinforced glass at a California prison near here, where he is serving 16 months for theft after his fourth arrest — all involving drugs.

While Mr. Parsons, whose incarceration is not related to his work for WaMu, oversaw a team screening mortgage applications, he was snorting methamphetamine daily, he said.

"In our world, it was tolerated," said Sherri Zaback, who worked for Mr. Parsons and recalls seeing drug paraphernalia on his desk. "Everybody said, 'He gets the job done.' "

At WaMu, getting the job done meant lending money to nearly anyone who asked for it — the force behind the

Sponsored Archive

IBM.

CLICK HERE FOR
FULL ARTICLES
AND RELATED
IBM SOLUTIONS

Thinking
about energy.

IBM's dramatic vision of the world's changing challenges is reshaping the way we think about energy, have made a significant difference in the lives of millions.

**The Green Road Less Traveled**

Whoever knew — IBM is reinventing traffic congestion in Stockholm. Well, it is, and there's a terrific story.

**Flush With Energy**

The Arctic Hotel in Ilulissat, Greenland, is a charming little place on the West coast that means world over, perfect in fact. Even Senator...

**Doha and Dalian**

In the last few weeks, I happened to visit Doha and Dalian, and I must say I've learned...

**It's Too Late for Later**

It may be one of the most hopeful human efforts we've seen in the last century where climate change could take center stage at more's meetings...

The New York Times

bank's meteoric rise and its precipitous collapse this year in the biggest bank failure in American history.



On a financial landscape littered with wreckage, WaMu, a Seattle-based bank that opened branches at a clip worthy of a fast-food chain, stands out as a singularly brazen case of lax lending. By the first half of this year, the value of its bad loans had reached $11.5 billion, nearly tripling from $4.2 billion a year earlier.

Interviews with two dozen former employees, mortgage brokers, real estate agents and appraisers reveal the relentless pressure to churn out loans that produced such results. While that sample may not fully represent a bank with tens of thousands of people, it does reflect the views of employees in WaMu mortgage operations in California,

**PUSH TO GROW** Former employees say that with Kerry Killinger in charge, WaMu became a loan factory, ignoring borrowers' incomes.

Florida, Illinois and Texas.

Their accounts are consistent with those of 89 other former employees who are confidential witnesses in a class action filed against WaMu in federal court in Seattle by former shareholders.

According to these accounts, pressure to keep lending emanated from the top, where executives profited from the swift expansion — not least, Kerry K. Killinger, who was WaMu's chief executive from 1990 until he was forced out in September.

Between 2001 and 2007, Mr. Killinger received compensation of $88 million, according to the Corporate Library, a research firm. He declined to respond to a list of questions, and his spokesman said he was unavailable for an interview.

During Mr. Killinger's tenure, WaMu pressed sales agents to pump out loans while disregarding borrowers' incomes and assets, according to former employees. The bank set up what insiders described as a system of dubious legality that enabled real estate agents to collect fees of more than $10,000 for bringing in borrowers, sometimes making the agents more beholden to WaMu than they were to their clients.

WaMu gave mortgage brokers handsome commissions for selling the riskiest loans, which carried higher fees, bolstering profits and ultimately the compensation of the bank's executives. WaMu pressured appraisers to provide inflated property values that made loans appear less risky, enabling Wall Street to bundle them more easily for sale to investors.

"It was the Wild West," said Steven M. Knobel, a founder of an appraisal company, Mitchell, Maxwell & Jackson, that did business with WaMu until 2007. "If you were alive, they would give you a loan. Actually, I think if you were dead, they would still give you a loan."

JPMorgan Chase, which bought WaMu for $1.9 billion in September and received $25 billion a few weeks later as part of the taxpayer bailout of the financial services industry, declined to make former WaMu executives available for interviews.

JPMorgan also declined to comment on WaMu's operations before it bought the company. "It is a different era for our customers and for the company," a spokesman said.

For those who placed their faith and money in WaMu, the bank's implosion came as a shock.

"I never had a clue about the amount of off-the-cliff activity that was going on at Washington Mutual, and I was in constant contact with the company," said Vincent Au, president of Avalon Partners, an investment firm. "There were people at WaMu that

**Breaking News Alerts by E-Mail**



Sign up to be notified when important news breaks.

Sign Up

Privacy Policy

**MOST POPULAR - BUSINESS**

E-MAILED   BLOGGED

1. Digital Domain: What Carriers Aren't Eager to Tell You About Texting
2. The Evidence Gap: Patient's DNA May Be Signal to Tailor Medication
3. Italian Makers of Prosecco Seek Recognition
4. An NPR Reporter Becomes the News
5. The Reckoning: Saying Yes, WaMu Built Empire on Shaky Loans
6. Everybody's Business: They Told Me That Madoff Never Lost Money
7. Gazprom, Once Mighty, Is Reeling
8. Von Trapps Reunited, Without the Singing
9. Green Inc.: Prius: It's Not Just a Car, It's an Emergency Generator
10. Black Workers Hurt by Detroit's Ills

Go to Complete List »



**The New York Times**          **DINING**
nytimes.com/dining

**Let the good times tiptoe**

Also in Dining:
New Year's recipes
Holiday beverage and dessert recipes
An old acquaintance to be forgotten

**ADVERTISEMENTS**

Vanguard®
A handful of funds that can meet most investors' needs

Need to know more?
Get 50% off home delivery of The Times

Get 50% off when you give the gift of The New York Times

Get Times Reader Free. A Digital Newspaper That Reads Like The Real Thing.

**Donate Now**
to The Neediest Cases Fund
Click Here



NOV. 4 WAS JUST THE BEGINNING.
Subscribe now to The New York Times and get 50% off. Click here. ▶

The New York Times

Ads by Google                    what's this?

orchestrated nothing more than a sham or charade. These people broke every fundamental rule of running a company."

### 'Like a Sweatshop'

Some WaMu employees who worked for the bank during the boom now have regrets.

"It was a disgrace," said Dana Zweibel, a former financial representative at a WaMu branch in Tampa, Fla. "We were giving loans to people that never should have had loans."

If Ms. Zweibel doubted whether customers could pay, supervisors directed her to keep selling, she said.

"We were told from up above that that's not our concern," she said. "Our concern is just to write the loan."

The ultimate supervisor at WaMu was Mr. Killinger, who joined the company in 1983 and became chief executive in 1990. He inherited a bank that was founded in 1889 and had survived the Depression and the savings and loan scandal of the 1980s.

An investment analyst by training, he was attuned to Wall Street's hunger for growth. Between late 1996 and early 2002, he transformed WaMu into the nation's sixth-largest bank through a series of acquisitions.

A crucial deal came in 1999, with the purchase of Long Beach Financial, a California lender specializing in subprime mortgages, loans extended to borrowers with troubled credit.

WaMu underscored its eagerness to lend with an advertising campaign introduced during the 2003 Academy Awards: "The Power of Yes." No mere advertising pitch, this was also the mantra inside the bank, underwriters said.

"WaMu came out with that slogan, and that was what we had to live by," Ms. Zaback said. "We joked about it a lot." A file would get marked problematic and then somehow get approved. "We'd say: 'O.K.! The power of yes.' "

Revenue at WaMu's home-lending unit swelled from $707 million in 2002 to almost $2 billion the following year, when the "The Power of Yes" campaign started.

Between 2000 and 2003, WaMu's retail branches grew 70 percent, reaching 2,200 across 38 states, as the bank used an image of cheeky irreverence to attract new customers. In offbeat television ads, casually dressed WaMu employees ridiculed staid bankers in suits.

Branches were pushed to increase lending. "It was just disgusting," said Ms. Zweibel, the Tampa representative. "They wanted you to spend time, while you're running teller transactions and opening checking accounts, selling people loans."

Employees in Tampa who fell short were ordered to drive to a WaMu office in Sarasota, an hour away. There, they sat in a phone bank with 20 other people, calling customers to push home equity loans.

"The regional manager would be over your shoulder, listening to every word," Ms. Zweibel recalled. "They treated us like we were in a sweatshop."

On the other end of the country, at WaMu's San Diego processing office, Ms. Zaback's job was to take loan applications from branches in Southern California and make sure they passed muster. Most of the loans she said she handled merely required borrowers to provide an address and Social Security number, and to state their income and assets.

She ran applications through WaMu's computer system for approval. If she needed more

**Umbilical Cord Bank**
Get a FREE Information Kit CA Residents Save $500, Exp 1/16
www.ViaCord.com/Cord-Blood-Experts

Ads by Google                                    what's this?

**Cord Blood Banking**
Bank Your Baby's Cord Blood CA Residents Save $500, Exp 1/16
www.ViaCord.com/Cord-Blood-Experts

information, she had to consult with a loan officer — which she described as an unpleasant experience. "They would be furious," Ms. Zaback said. "They would put it on you, that they weren't going to get paid if you stood in the way."

On one loan application in 2005, a borrower identified himself as a gardener and listed his monthly income at $12,000, Ms. Zaback recalled. She could not verify his business license, so she took the file to her boss, Mr. Parsons.

He used the mariachi singer as inspiration: a photo of the borrower's truck emblazoned with the name of his landscaping business went into the file. Approved.

Mr. Parsons, who worked for WaMu in San Diego from about 2002 through 2005, said his supervisors constantly praised his performance. "My numbers were through the roof," he said.

On another occasion, Ms. Zaback asked a loan officer for verification of an applicant's assets. The officer sent a letter from a bank showing a balance of about $150,000 in the borrower's account, she recalled. But when Ms. Zaback called the bank to confirm, she was told the balance was only $5,000.

The loan officer yelled at her, Ms. Zaback recalled. "She said, 'We don't call the bank to verify.' " Ms. Zaback said she told Mr. Parsons that she no longer wanted to work with that loan officer, but he replied: "Too bad."

Shortly thereafter, Mr. Parsons disappeared from the office. Ms. Zaback later learned of his arrest for burglary and drug possession.

The sheer workload at WaMu ensured that loan reviews were limited. Ms. Zaback's office had 108 people, and several hundred new files a day. She was required to process at least 10 files daily.

"I'd typically spend a maximum of 35 minutes per file," she said. "It was just disheartening. Just spit it out and get it done. That's what they wanted us to do. Garbage in, and garbage out."

### Referral Fees for Loans

WaMu's boiler room culture flourished in Southern California, where housing prices rose so rapidly during the bubble that creative financing was needed to attract buyers.

To that end, WaMu embraced so-called option ARMs, adjustable rate mortgages that enticed borrowers with a selection of low initial rates and allowed them to decide how much to pay each month. But people who opted for minimum payments were underpaying the interest due and adding to their principal, eventually causing loan payments to balloon.

Customers were often left with the impression that low payments would continue long term, according to former WaMu sales agents.

For WaMu, variable-rate loans — option ARMs, in particular — were especially attractive because they carried higher fees than other loans, and allowed WaMu to book profits on interest payments that borrowers deferred. Because WaMu was selling many of its loans to investors, it did not worry about defaults: by the time loans went bad, they were often in other hands.

WaMu's adjustable-rate mortgages expanded from about one-fourth of new home loans in 2003 to 70 percent by 2006. In 2005 and 2006 — when WaMu pushed option ARMs most aggressively — Mr. Killinger received pay of $19 million and $24 million respectively.

### The ARM Loan Niche

WaMu's retail mortgage office in Downey, Calif., specialized in selling option ARMs to Latino customers who spoke little English and depended on advice from real estate brokers, according to a former sales agent who requested anonymity because he was still in the mortgage business.

According to that agent, WaMu turned real estate agents into a pipeline for loan applications by enabling them to collect "referral fees" for clients who became WaMu borrowers.

Buyers were typically oblivious to agents' fees, the agent said, and agents rarely explained the loan terms.

"Their Realtor was their trusted friend," the agent said. "The Realtors would sell them on a minimum payment, and that was an outright lie."

According to the agent, the strategy was the brainchild of Thomas Ramirez, who oversaw a sales team of about 20 agents at the Downey branch during the first half of this decade, and now works for Wells Fargo.

Mr. Ramirez confirmed that he and his team enabled real estate agents to collect commissions, but he maintained that the fees were fully disclosed.

"I don't think the bank would have let us do the program if it was bad," Mr. Ramirez said.

Mr. Ramirez's team sold nearly $1 billion worth of loans in 2004, he said. His performance made him a perennial member of WaMu's President's Club, which brought big bonuses and recognition at an awards ceremony typically hosted by Mr. Killinger in tropical venues like Hawaii.

Mr. Ramirez's success prompted WaMu to populate a neighboring building in Downey with loan processors, underwriters and appraisers who worked for him. The fees proved so enticing that real estate agents arrived in Downey from all over Southern California, bearing six and seven loan applications at a time, the former agent said.

WaMu banned referral fees in 2006, fearing they could be construed as illegal payments from the bank to agents. But the bank allowed Mr. Ramirez's team to continue using the referral fees, the agent said.

**Forced Out With Millions**

By 2005, the word was out that WaMu would accept applications with a mere statement of the borrower's income and assets — often with no documentation required — so long as credit scores were adequate, according to Ms. Zaback and other underwriters.

"We had a flier that said, 'A thin file is a good file,' " recalled Michele Culbertson, a wholesale sales agent with WaMu.

Martine Lado, an agent in the Irvine, Calif., office, said she coached brokers to leave parts of applications blank to avoid prompting verification if the borrower's job or income was sketchy.

"We were looking for people who understood how to do loans at WaMu," Ms. Lado said.

Top producers became heroes. Craig Clark, called the "king of the option ARM" by colleagues, closed loans totaling about $1 billion in 2005, according to four of his former coworkers, a tally he amassed in part by challenging anyone who doubted him.

"He was a bulldozer when it came to getting his stuff done," said Lisa Alvarez, who worked in the Irvine office from 2003 to 2006.

Christine Crocker, who managed WaMu's wholesale underwriting division in Irvine,

recalled one mortgage to an elderly couple from a broker on Mr. Clark's team.

With a fixed income of about $3,200 a month, the couple needed a fixed-rate loan. But their broker earned a commission of three percentage points by arranging an option ARM for them, and did so by listing their income as $7,000 a month. Soon, their payment jumped from roughly $1,000 a month to about $3,000, causing them to fall behind.

Mr. Clark, who now works for JPMorgan, referred calls to a company spokesman, who provided no further details.

In 2006, WaMu slowed option ARM lending. But earlier, ill-considered loans had already begun hurting its results. In 2007, it recorded a $67 million loss and shut down its subprime lending unit.

By the time shareholders joined WaMu for its annual meeting in Seattle last April, WaMu had posted a first-quarter loss of $1.14 billion and increased its loan loss reserve to $3.5 billion. Its stock had lost more than half its value in the previous two months. Anger was in the air.

Some shareholders were irate that Mr. Killinger and other executives were excluding mortgage losses from the computation of their bonuses. Others were enraged that WaMu turned down an $8-a-share takeover bid from JPMorgan.

"Calm down and have a little faith," Mr. Killinger told the crowd. "We will get through this."

WaMu asked shareholders to approve a $7 billion investment by Texas Pacific Group, a private equity firm, and other unnamed investors. David Bonderman, a founder of Texas Pacific and a former WaMu director, declined to comment.

Hostile shareholders argued that the deal would dilute their holdings, but Mr. Killinger forced it through, saying WaMu desperately needed new capital.

Weeks later, with WaMu in tatters, directors stripped Mr. Killinger of his board chairmanship. And the bank began including mortgage losses when calculating executive bonuses.

In September, Mr. Killinger was forced to retire. Later that month, with WaMu buckling under roughly $180 billion in mortgage-related loans, regulators seized the bank and sold it to JPMorgan for $1.9 billion, a fraction of the $40 billion valuation the stock market gave WaMu at its peak.

Billions that investors had plowed into WaMu were wiped out, as were prospects for many of the bank's 50,000 employees. But Mr. Killinger still had his millions, rankling laid-off workers and shareholders alike.

"Kerry has made over $100 million over his tenure based on the aggressiveness that sunk the company," said Mr. Au, the money manager. "How does he justify taking that money?"

In June, Mr. Au sent an e-mail message to the company asking executives to return some of their pay. He says he has not heard back.

A version of this article appeared in print on December 28, 2008, on page A1 of the New York edition.

More Articles in Business »

Get Times Reader Free. A Digital Newspaper That Reads Like The Real Thing.

**Past Coverage**

FAIR GAME: Was There A Loan It Didn't Like? (**November 2, 2008**)
TALKING BUSINESS: D-Day Has Arrived For Congress (**September 27, 2008**)
In Largest Bank Failure, U.S. Seizes, Then Sells (**September 26, 2008**)
A Wall Street Goliath Teeters Amid Fears of a Widening Crisis (**September 14, 2008**)

**Related Searches**

Washington Mutual Inc        Get E-Mail Alerts
Mortgages                    Get E-Mail Alerts
Banks and Banking            Get E-Mail Alerts

**INSIDE NYTIMES.COM**                                                    ◀ ▶

HEALTH »              N.Y. / REGION »        OPINION »             BUSINESS »            OPINION »              TELEVISION »

        Editorial                  Continue               
                                                Notebook                                      Reading>>
                                                Verlyn Klinkenborg
                                                reports from a perfectly
                                                ordinary place.
                                                                                             

Leaving Platform That    Setting Off a Tsunami: Did                      Patient's DNA May Be    Letters: Does the E-Book    'Scrubs,' Near Death, Is
Elevated AIDS Fight      It Happen Here?                                 Signal to Tailor Drugs   Have a Bright Future?      Given a Miracle Cure

Home   World   U.S.   N.Y. / Region   Business   Technology   Science   Health   Sports   Opinion   Arts   Style   Travel   Jobs   Real Estate   Automobiles   Back to Top

Copyright 2008 The New York Times Company   Privacy Policy   Search   Corrections   RSS   First Look   Help   Contact Us   Work for Us   Site Map

Get Times Reader Free. A Digital Newspaper That Reads Like The Real Thing.

**Past Coverage**

FAIR GAME: Was There A Loan It Didn't Like? (**November 2, 2008**)
TALKING BUSINESS: D-Day Has Arrived For Congress (**September 27, 2008**)
In Largest Bank Failure, U.S. Seizes, Then Sells (**September 26, 2008**)
A Wall Street Goliath Teeters Amid Fears of a Widening Crisis (**September 14, 2008**)

**Related Searches**

Washington Mutual Inc        Get E-Mail Alerts
Mortgages                    Get E-Mail Alerts
Banks and Banking            Get E-Mail Alerts

**INSIDE NYTIMES.COM**                                                    ◀ ▶

HEALTH »              N.Y. / REGION »        OPINION »             BUSINESS »            OPINION »              TELEVISION »

        Editorial Notebook        Continue Reading>>    

Verlyn Klinkenborg reports from a perfectly ordinary place.



Leaving Platform That Elevated AIDS Fight    Setting Off a Tsunami: Did It Happen Here?    Patient's DNA May Be Signal to Tailor Drugs    Letters: Does the E-Book Have a Bright Future?    'Scrubs,' Near Death, Is Given a Miracle Cure

Home   World   U.S.   N.Y. / Region   Business   Technology   Science   Health   Sports   Opinion   Arts   Style   Travel   Jobs   Real Estate   Automobiles   Back to Top

Copyright 2008 The New York Times Company   Privacy Policy   Search   Corrections   RSS   First Look   Help   Contact Us   Work for Us   Site Map

7 of 7                                                                    12/30/2008 11:13 AM

# Exhibit A-1
## To Proof of Claim of
## Deutsche Bank National Trust Company

| Issue ID | Transaction | Series | Agreement Date | Original Collateral Balance | Current Principal Balance 9/25/08 |
|---|---|---|---|---|---|
| LB0002 | Long Beach Mortgage Loan Trust | 2000-1 | 12/1/00 | 1,000,000,594.71 | 34,811,895.51 |
| LB00F1 | Long Beach Home Equity Loan Trust | 2000-LB1 | 8/1/00 | 1,312,248,898.65 | 59,532,662.65 |
| LB0101 | Long Beach Mortgage Loan Trust | 2001-1 | 3/1/01 | 725,466,488.78 | 36,039,908.53 |
| LB0102 | Long Beach Mortgage Loan Trust | 2001-2 | 7/1/01 | 1,594,353,660.72 | 71,505,949.50 |
| LB0103 | Long Beach Mortgage Loan Trust | 2001-3 | 9/1/01 | 1,001,006,145.53 | 49,540,692.95 |
| LB0104 | Long Beach Mortgage Loan Trust | 2001-4 | 12/1/01 | 1,999,995,140.51 | 104550975.6 |
| LB0201 | Long Beach Mortgage Loan Trust | 2002-1 | 4/1/02 | 1,600,002,996.85 | 78,501,732.67 |
| LB0202 | Long Beach Mortgage Loan Trust | 2002-2 | 6/1/02 | 1,000,001,438.60 | 52,951,722.09 |
| LB0205 | Long Beach Mortgage Loan Trust | 2002-5 | 11/1/02 | 1,000,000,848.34 | 73,845,139.93 |
| LB0301 | Long Beach Mortgage Loan Trust | 2003-1 | 2/1/03 | 2,000,000,169.33 | 130,090,598.75 |
| LB0302 | Long Beach Mortgage Loan Trust | 2003-2 | 4/1/03 | 926,370,950.24 | 63,358,995.33 |
| LB0303 | Long Beach Mortgage Loan Trust | 2003-3 | 6/1/03 | 900,000,208.99 | 75,119,530.93 |
| LB0304 | Long Beach Mortgage Loan Trust | 2003-4 | 7/1/03 | 2,200,000,305.17 | 224,438,308.88 |
| LB0401 | Long Beach Mortgage Loan Trust | 2004-1 | 2/1/04 | 4,500,000,018.86 | 532,202,224.67 |
| LB0402 | Long Beach Mortgage Loan Trust | 2004-2 | 5/1/04 | 1,519,139,252.43 | 204,931,765.30 |
| LB0403 | Long Beach Mortgage Loan Trust | 2004-3 | 6/1/04 | 1,999,383,410.65 | 292,775,378.36 |
| LB0404 | Long Beach Mortgage Loan Trust | 2004-4 | 9/1/04 | 2,719,328,087.12 | 386,675,678.52 |
| LB0405 | Long Beach Mortgage Loan Trust | 2004-5 | 8/1/04 | 1,015,407,092.63 | 151,014,830.26 |
| LB0406 | Long Beach Mortgage Loan Trust | 2004-6 | 10/1/04 | 1,104,297,532.58 | 165,563,241.68 |
| LB0501 | Long Beach Mortgage Loan Trust | 2005-1 | 1/1/05 | 3,500,003,000.56 | 581,873,653.66 |
| LB0502 | Long Beach Mortgage Loan Trust | 2005-2 | 4/1/05 | 2,500,002,732.02 | 485,463,232.28 |

# Exhibit A-1
## To Proof of Claim of
## Deutsche Bank National Trust Company

| Issue ID | Transaction | Series | Agreement Date | Original Collateral Balance | Current Principal Balance 9/25/08 |
|---|---|---|---|---|---|
| LB0503 | Long Beach Mortgage Loan Trust | 2005-3 | 9/1/05 | 1,527,819,573.20 | 496,077,274.56 |
| LB05W1 | Long Beach Mortgage Loan Trust | 2005-WL1 | 7/1/2005 | 2,783,633,153.00 | 624,023,514.56 |
| LB05W2 | Long Beach Mortgage Loan Trust | 2005-WL2 | 8/1/05 | 2,755,716,668.32 | 791,199,316.92 |
| LB05W3 | Long Beach Mortgage Loan Trust | 2005-WL3 | 11/1/05 | 2,191,257,007.17 | 827,566,265.49 |
| LB0601 | Long Beach Mortgage Loan Trust | 2006-1 | 2/1/06 | 2,499,987,903.06 | 1,160,361,979.44 |
| LB0602 | Long Beach Mortgage Loan Trust | 2006-2 | 3/1/06 | 3,003,799,169.81 | 1,386,914,706.65 |
| LB0603 | Long Beach Mortgage Loan Trust | 2006-3 | 4/1/06 | 1,743,796,134.40 | 888,155,925.30 |
| LB0604 | Long Beach Mortgage Loan Trust | 2006-4 | 5/1/06 | 1,922,678,765.19 | 1,053,549,542.12 |
| LB0605 | Long Beach Mortgage Loan Trust | 2006-5 | 6/1/06 | 1,925,001,176.58 | 1,061,924,757.27 |
| LB0606 | Long Beach Mortgage Loan Trust | 2006-6 | 7/1/06 | 1,688,107,433.24 | 1,031,620,844.36 |
| LB0607 | Long Beach Mortgage Loan Trust | 2006-7 | 8/1/06 | 1,596,611,009.81 | 1,066,308,386.86 |
| LB0608 | Long Beach Mortgage Loan Trust | 2006-8 | 9/1/06 | 1,380,727,062.40 | 954,086,893.15 |
| LB0609 | Long Beach Mortgage Loan Trust | 2006-9 | 10/1/06 | 1,520,086,184.10 | 1,091,628,311.24 |
| LB060A | Long Beach Mortgage Loan Trust | 2006-A | 5/1/06 | 532,619,585.98 | 144,205,711.88 |
| LB0610 | Long Beach Mortgage Loan Trust | 2006-10 | 11/1/06 | 1,008,199,873.58 | 740,325,465.58 |
| LB0611 | Long Beach Mortgage Loan Trust | 2006-11 | 12/1/06 | 1,499,999,921.58 | 1,126,024,144.81 |
| LB06W1 | Long Beach Mortgage Loan Trust | 2006-WL1 | 1/1/06 | 1,903,659,401.04 | 810,309,534.48 |
| LB06W2 | Long Beach Mortgage Loan Trust | 2006-WL2 | 1/1/06 | 1,908,950,760.04 | 739,358,759.85 |
| LB06W3 | Long Beach Mortgage Loan Trust | 2006-WL3 | 1/1/06 | 1,917,874,232.74 | 737,068,803.57 |
| WA0001 | Washington Mutual Mortgage Securities Corp. | 2000-1 | 3/31/00 | 6,701,536,869.34 | 480,305,038.41 |
| WA0107 | Washington Mutual Mortgage Securities Corp. | 2001-7 | 5/1/01 | 1,051,032,555.94 | 19,541,729.02 |
| WA01A3 | Washington Mutual Mortgage Securities Corp. | 2001-AR3 | 11/9/01 | 1,167,350,333.57 | 32,739,901.70 |

# Exhibit A-1
## To Proof of Claim of
## Deutsche Bank National Trust Company

| Issue ID | Transaction | Series | Agreement Date | Original Collateral Balance | Current Principal Balance 9/25/08 |
|---|---|---|---|---|---|
| WA02A2 | Washington Mutual Mortgage Securities Corp. | 2002-AR2 | 2/26/02 | 846,869,196.58 | 133,386,070.04 |
| WA02A6 | Washington Mutual Mortgage Securities Corp. | 2002-AR6 | 5/1/02 | 976,270,151.47 | 33,967,222.14 |
| WA02A9 | Washington Mutual Mortgage Securities Corp. | 2002-AR9 | 7/1/02 | 1,497,233,409.59 | 63,032,301.89 |
| WA02AC | Washington Mutual Mortgage Securities Corp. | 2002-AR12 | 9/1/02 | 998,724,014.44 | 7,164,395.08 |
| WA02AD | Washington Mutual Mortgage Securities Corp. | 2002-AR13 | 9/1/02 | 801,901,920.87 | 6,622,003.44 |
| WA02AE | Washington Mutual Mortgage Securities Corp. | 2002-AR14 | 10/25/02 | 1,028,589,782.28 | 10,938,312.60 |
| WA02AF | Washington Mutual Mortgage Securities Corp. | 2002-AR15 | 10/1/02 | 1,975,024,800.28 | 22,477,420.27 |
| WA02AG | Washington Mutual Mortgage Securities Corp. | 2002-AR16 | 10/1/02 | 1,030,719,967.88 | 21,216,427.56 |
| WA02AH | Washington Mutual Mortgage Securities Corp. | 2002-AR17 | 10/1/02 | 1,141,838,488.95 | 59,353,086.07 |
| WA02AI | Washington Mutual Mortgage Securities Corp. | 2002-AR18 | 11/1/02 | 1,995,977,878.00 | 48,423,693.51 |
| WA02AJ | Washington Mutual Mortgage Securities Corp. | 2002-AR19 | 12/1/02 | 1,999,854,039.48 | 47,816,425.15 |
| WA02T1 | Washington Mutual Bank FA | 2002-PR2 | 9/27/02 | $1,810,000,000.00 | $412,182,299.00 |
| WA02T2 | Washington Mutual Bank FA | 2002-PR3 | 11/26/02 | $1,569,403,402.00 | $460,528,036.14 |
| WA03A1 | Washington Mutual Mortgage Securities Corp. | 2003-AR1 | 1/1/03 | 1,929,958,305.53 | 78,084,582.05 |
| WA03A2 | Washington Mutual Mortgage Securities Corp. | 2003-AR2 | 2/1/03 | 453,072,396.92 | 14,354,070.03 |
| WA03A3 | Washington Mutual Mortgage Securities Corp. | 2003-AR3 | 2/1/03 | 1,498,678,348.09 | 76,606,402.47 |
| WA03A4 | Washington Mutual Mortgage Securities Corp. | 2003-AR4 | 3/1/03 | 1,248,537,577.61 | 96,324,730.77 |
| WA03A5 | Washington Mutual Mortgage Securities Corp. | 2003-AR5 | 4/1/03 | 1,497,993,405.95 | 191,453,076.81 |
| WA03A6 | Washington Mutual Mortgage Securities Corp. | 2003-AR6 | 5/1/03 | 1,817,570,225.97 | 273,859,507.75 |
| WA03A7 | Washington Mutual Mortgage Securities Corp. | 2003-AR7 | 6/1/03 | 1,782,734,144.99 | 330,974,020.39 |
| WA03A8 | Washington Mutual Mortgage Securities Corp. | 2003-AR8 | 7/1/03 | 1,249,964,133.60 | 306,284,588.45 |
| WA03A9 | Washington Mutual Mortgage Securities Corp. | 2003-AR9 | 8/1/03 | 1,499,961,494.15 | 459,523,660.91 |

# Exhibit A-1
## To Proof of Claim of
## Deutsche Bank National Trust Company

| Issue ID | Transaction | Series | Agreement Date | Original Collateral Balance | Current Principal Balance 9/25/08 |
|---|---|---|---|---|---|
| WA03AA | Washington Mutual Mortgage Securities Corp. | 2003-AR10 | 9/1/03 | 2,149,945,638.93 | 758,972,394.10 |
| WA03AB | Washington Mutual Mortgage Securities Corp. | 2003-AR11 | 10/1/03 | 569,335,006.37 | 201,418,222.95 |
| WA03AC | Washington Mutual Mortgage Securities Corp. | 2003-AR12 | 12/22/03 | 624,366,307.97 | 169,054,089.25 |
| WA04A1 | Washington Mutual Mortgage Securities Corp. | 2004-AR1 | 2/12/04 | 549,954,684.34 | 184,779,040.96 |
| WA04A2 | Washington Mutual Mortgage Securities Corp. | 2004-AR2 | 4/28/04 | 607,568,701.01 | 75,847,329.67 |
| WA04A3 | Washington Mutual Mortgage Securities Corp. | 2004-AR3 | 4/27/04 | 1,199,094,712.64 | 627,200,249.89 |
| WA04A4 | Washington Mutual Mortgage Securities Corp. | 2004-AR4 | 5/25/04 | 999,949,639.60 | 640,104,266.85 |
| WA04A5 | Washington Mutual Mortgage Securities Corp. | 2004-AR5 | 5/25/04 | 324,778,296.44 | 319,246,042.00 |
| WA04A6 | Washington Mutual Mortgage Securities Corp. | 2004-AR6 | 5/27/04 | 694,961,493.88 | 120,471,550.20 |
| WA04A7 | Washington Mutual Mortgage Securities Corp. | 2004-AR7 | 6/24/04 | 899,173,380.28 | 557,746,399.24 |
| WA04A8 | Washington Mutual Mortgage Securities Corp. | 2004-AR8 | 6/25/04 | 763,824,537.00 | 135,742,545.16 |
| WA04AA | Washington Mutual Mortgage Securities Corp. | 2004-AR10 | 7/27/04 | 1,264,666,962.70 | 243,688,955.92 |
| WA04AC | Washington Mutual Mortgage Securities Corp. | 2004-AR12 | 10/26/04 | 1,784,625,919.86 | 340,395,443.18 |
| WA04AD | Washington Mutual Mortgage Securities Corp. | 2004-AR13 | 11/23/04 | 1,539,705,677.27 | 325,216,452.97 |
| WA05A1 | Washington Mutual Mortgage Securities Corp. | 2005-AR1 | 1/18/05 | 2,971,414,173.32 | 714,587,307.20 |
| WA05A2 | Washington Mutual Mortgage Securities Corp. | 2005-AR2 | 1/26/05 | 3,267,405,771.83 | 920,722,624.68 |
| WA05A4 | Washington Mutual Mortgage Securities Corp. | 2005-AR4 | 3/24/05 | 750,504,106.41 | 506,442,449.82 |
| WA05A6 | Washington Mutual Mortgage Securities Corp. | 2005-AR6 | 4/26/05 | 3,167,184,178.32 | 932,737,574.84 |
| WA05A8 | Washington Mutual Mortgage Securities Corp. | 2005-AR8 | 7/15/05 | 3,029,599,417.91 | 893,576,756.98 |
| WA05A9 | Washington Mutual Mortgage Securities Corp. | 2005-AR9 | 7/21/05 | 1,505,402,999.34 | 423,681,934.44 |
| WA05AA | Washington Mutual Mortgage Securities Corp. | 2005-AR10 | 8/25/05 | 3,201,069,294.58 | 1,104,192,858.61 |
| WA05AB | WaMu Asset Acceptance Corp. | 2005-AR13 | 10/25/05 | 3,901,265,905.06 | 1,555,245,023.74 |

# Exhibit A-1
## To Proof of Claim of
## Deutsche Bank National Trust Company

| Issue ID | Transaction | Series | Agreement Date | Original Collateral Balance | Current Principal Balance 9/25/08 |
|---|---|---|---|---|---|
| WA05AC | WaMu Asset Acceptance Corp. | 2005-AR16 | 11/23/05 | 924,385,186.87 | 709,012,720.73 |
| WA05AD | WaMu Asset Acceptance Corp. | 2005-AR18 | 12/29/05 | 767,442,752.54 | 759,313,543.32 |
| WA0601 | Washington Mutual Home Equity Trust | I | 3/7/2006 | 5,389,459,150.00 | 3,561,666,083.13 |
| WA0602 | WaMu | 2006-OA1 | 12/13/2006 | 2,736,034,892.85 | 1,376,479,667.76 |
| WA06A1 | WaMu Asset Acceptance Corp. | 2006-AR1 | 1/30/06 | 1,516,188,758.27 | 719,352,278.04 |
| WA06A3 | WaMu Asset Acceptance Corp. | 2006-AR3 | 2/23/06 | 1,019,582,771.26 | 512,708,347.22 |
| WA06A4 | Washington Mutual Mortgage Securities Corp. | 2006-AR4 | 4/25/06 | 932,087,563.09 | 474,865,940.42 |
| WA06A5 | WaMu Asset Acceptance Corp. | 2006-AR5 | 5/25/06 | 796,522,188.53 | 481,442,704.76 |
| WA06C1 | WM Covered Bond Program | 1 | 5/18/07 | One Revolving Pool for all Series | |
| WA06C2 | WM Covered Bond Program | 2 | 5/18/07 | One Revolving Pool for all Series | |
| WA0701 | WaMu | 2007-Flex1 | 10/25/2007 | 5,199,147,685.89 | 4,067,805,919.38 |
| WA07C3 | WM Covered Bond Program | 3 | 5/18/07 | One Revolving Pool for all Series | |
| WA07H1 | WaMu Asset Acceptance Corp. | 2007-HE1 | 1/1/07 | 1,393,794,251.58 | 1,096,561,655.17 |
| CO9201 | Coast Federal | 1992-1 | 8/1/92 | 374,106,546.77 | 17,992,505.24 |
| DB9902 | Ace Securities | 1999-2 | 7/1/99 | 416,860,972.94 | 9,435,113.28 |
| MS0001 | Morgan Stanley ABS Capital I Inc. | 2000-1 | 7/1/00 | 360,107,788.57 | 7,463,097.13 |
| GS06L1 | GSAMP Trust | 2006-S1 | 1/1/06 | 516,812,864.78 | 122,133,901.15 |
| GS05X2 | GSAMP Trust | 2005-S2 | | | |

# Exhibit A-2
## To Proof of Claim of
## Deutsche Bank National Trust Company

| Issue ID | Transaction | Series | Agreement Date | Current Principal Balance |
|----------|-------------|--------|----------------|---------------------------|
| LB05N3 | Long Beach Asset Holding Corp. | CI 2005-WL1 | 10/21/2005 | 70,367,411.73 |
| LB05N4 | Long Beach Asset Holding Corp. | CI 2005-WL2 | 9/7/2005 | 12,747,551.05 |
| LB05N6 | Long Beach Asset Holding Corp. | CI 2005-WL3 | 12/7/2005 | 20,387,875.63 |
| LB06N6 | Long Beach Asset Holding Corp. | CI 2006-3 | 4/26/2006 | 27,829,138.01 |
| LB06N7 | Long Beach CI NIM Notes | 2006-4 | 5/30/2006 | 32,297,749.83 |
| LB06N8 | Long Beach CI NIM Notes | 2006-5 | 6/30/2006 | 31,437,470.34 |
| LB06N9 | Long Beach CI NIM Notes | 2006-6 | 7/31/2006 | 27,629,292.83 |
| LB06NA | Long Beach CI NIM Notes | 2006-7 | 8/31/2006 | 33,011,254.77 |
| LB06NB | Long Beach CI NIM Notes | 2006-8 | 9/27/2006 | 24,248,851.46 |
| LB06NC | Long Beach CI NIM Notes | 2006-9 | 10/30/2006 | 39,191,206.64 |
| LB06ND | Long Beach CI NIM Notes | 2006-10 | 11/29/2006 | 26,473,498.22 |
| LB06NE | Long Beach CI NIM Notes | 2006-11 | 12/27/2006 | 40,894,919.43 |
| WA07N1 | WaMu CI NIM Notes | 2007-WM1 | 1/30/2007 | 30,502,416.51 |
| LB03P1 (LB03PB ) | Long Beach Securities Corp. | 2003-P1 (2003-W5) | 4/30/03 | TBD |
| LB03P2 | Long Beach Securities Corp. | 2003-W9 | 6/26/03 | TBD |
| LB04N2 | Long Beach Asset Holding Corp. | 2004-2 | 5/26/04 | TBD |
| LB04N4 | Long Beach Asset Holding Corp. | 2004-4 | 11/24/04 | 5,755,410.65 |
| LB04N6 | Long Beach Asset Holding Corp. | 2004-6 | 10/29/04 | 9,158,820.66 |
| LB05N2 | Long Beach Asset Holding Corp. | 2005-2 | 4/26/05 | 15,457,776.33 |
| LB05N5 | Long Beach Asset Holding Corp. | 2005-3 | 9/20/05 | 8,131,609.43 |
| LB06N2 | Long Beach Asset Holding Corp. | 2006-WL2 | 3/30/2006 | 43,959,237.65 |
| LB06N4 | Long Beach Asset Holding Corp. | 2006-1 | 2/28/06 | 41,252,394.94 |
| LB06N5 | Long Beach Asset Holding Corp. | 2006-2 | 3/30/00 | 55,779,764.27 |
| LB07P3 | Long Beach Asset Holdings Corp CI | 2003-3 | 11/16/07 | TBD |
| LB07P4 | Long Beach Asset Holdings Corp CI | 2003-4 | 11/16/07 | TBD |

# Exhibit A-3
## To Proof of Claim of
## Deutsche Bank National Trust Company

| Issue ID | Transaction | Agreement Date |
|---|---|---|
| LB03CM | Long Beach Mortgage Company Custodial Agreement | 10/15/2003 |
| FB022C | ASSET BACKED SECURITIES CORP. 2002-HE3 | 10/1/2002 |
| FB050C | CREDIT SUISSE FIRST BOSTON BI PARTY | 6/1/2005 |
| GC04FC | GREENWICH/DB FHA, VA AND CONVENTIONAL | 5/20/2004 |
| GC04JC | GREENWICH/WAMU 2004-RP1 | 5/20/2004 |
| GC056C | GREENWICH RBSGC 2005-RP1 | 2/1/2005 |
| GS04WC | GOLDMAN/LONG BEACH WAREHOUSE | 12/1/2004 |
| GS052C | GOLDMAN/WASHINGTON MUTUAL CUSTODY WAREHO | 1/1/2005 |
| GS05CC | GSAA 2005-7 SECURITY CUSTODY ONLY | 6/1/2005 |
| GS063C | GSAA 2006-1 CUSTODY ONLY | 6/1/2006 |
| GS06FC | GSR 2006-5F CUSTODY ONLY | 5/1/2006 |
| GS06HC | GSR 2006 6F CUSTODY ONLY | 6/1/2006 |
| GS06MC | GSR 2006-8F CUSTODY ONLY SECURITY | 8/1/2006 |
| GS06RC | GSR 2006-9F CUSTODY ONLY | 10/1/2006 |
| GS078C | GSR 2007-2F CUSTODY ONLY | 3/1/2007 |
| GS07BC | GSR 2007-3F CUSTODY ONLY | 4/1/2007 |
| GS07EC | GSR 2007-4F CUSTODY ONLY | 6/1/2007 |
| LB032C | LONG BEACH/FANNIE MAE POOLS | 5/1/2007 |
| LB052C | WASHINGTON MUTUAL/LBMC REPO FACILITY | 6/22/2005 |
| LH012C | LEHMAN/THORNBURG-SASCO 2001-8A | 5/1/2001 |
| LH07EC | LEHMAN/ SASCO 2007-GEL2 | 4/1/2007 |
| MS02BC | MORGAN STANLEY 2002-WL1 BANK ONE TRUSTEE | 6/1/2002 |
| MS02JC | MORGAN STANLEY/LONG BEACH | 10/1/2002 |
| MS03EC | MORGAN STANLEY - WAMU | 9/1/2003 |
| MS045C | MORGAN STANLEY FANNIE MAE | 3/23/2004 |
| MS04GC | MORGAN STANLEY FREDDIE MAC | 8/18/2004 |
| WA071C | WASHINGTON MUTUAL WAMU 2007-HE2 | 4/10/2007 |
| WA072C | WASHINGTON MUTUAL WAMU 2007-HE3 | 5/10/2007 |
| WA073C | WASHINGTON MUTUAL WAMU 2007-HE4 | 6/13/2007 |

# EXHIBIT 4

## Electronic Version of Agreements:
## filed in CD-Rom format

**EXHIBIT 5**

# MORTGAGE LOAN PURCHASE AGREEMENT

This is a Mortgage Loan Purchase Agreement (the "Agreement"), dated February 24, 2006, between Long Beach Securities Corp., a Delaware corporation (the "Purchaser") and Long Beach Mortgage Company, a Delaware corporation (the "Seller").

<u>Preliminary Statement</u>

The Seller intends to sell certain mortgage loans and the swap agreement to the Purchaser on the terms and subject to the conditions set forth in this Agreement. The Purchaser intends to deposit the mortgage loans and the swap agreement into a mortgage pool constituting the trust fund. The trust fund will issue asset backed certificates designated as Long Beach Mortgage Loan Trust 2006-2 Asset-Backed Certificates, Series 2006-2 (the "Certificates"). The Certificates will consist of twenty-one classes of certificates. The Certificates will be issued pursuant to a Pooling and Servicing Agreement, dated as of March 1, 2006 (the "Pooling and Servicing Agreement"), among the Purchaser, as depositor, Deutsche Bank National Trust Company, as trustee (the "Trustee") and the Seller, as master servicer (in such capacity, the "Master Servicer"). Capitalized terms used but not defined herein shall have the meanings set forth in the Pooling and Servicing Agreement.

The parties hereto agree as follows:

SECTION 1.    <u>Agreement to Purchase</u>.

The Seller agrees to sell, and the Purchaser agrees to purchase, on or before March 7, 2006 (the "Closing Date"), certain fixed-rate and adjustable-rate residential mortgage loans (the "Mortgage Loans") and a swap agreement, dated March 7, 2006 between Washington Mutual Bank and Bank of America, N.A. (the "Counterparty") as set forth on <u>Schedule A</u> attached hereto (the "Trust Swap Agreement"). The Trust Swap Agreement will be novated to the Seller pursuant to a novation dated as of March 7, 2006, among the Counterparty, WMB and the Seller. The Trust Swap Agreement will be novated to the Purchaser pursuant to a novation dated as of March 7, 2006, among the Counterparty, the Seller and the Purchaser.

SECTION 2.    <u>Mortgage Loan Schedule</u>.

The Purchaser and the Seller have agreed upon which of the mortgage loans owned by the Seller are to be purchased by the Purchaser pursuant to this Agreement on the Closing Date and the Seller shall prepare or cause to be prepared on or prior to the Closing Date a final schedule (the "Closing Schedule") that shall describe such Mortgage Loans and set forth all of the Mortgage Loans to be purchased under this Agreement. The Closing Schedule shall conform to the requirements set forth in this Agreement and to the definition of "Mortgage Loan Schedule" under the Pooling and Servicing Agreement. The Closing Schedule shall be the Mortgage Loan Schedule under the Pooling and Servicing Agreement.

(ix)     Each Mortgage Note, each Mortgage, each Assignment and any other document required to be delivered by or on behalf of the Seller under this Agreement or the Pooling and Servicing Agreement to the Purchaser or any assignee, transferee or designee of the Purchaser for each Mortgage Loan has been or will be, in accordance with Section 4(b) hereof, delivered to the Purchaser or any such assignee, transferee or designee. With respect to each Mortgage Loan, the Seller is in possession of a complete Mortgage File in compliance with the Pooling and Servicing Agreement, except for such documents that have been delivered (1) to the Purchaser or any assignee, transferee or designee of the Purchaser or (2) for recording to the appropriate public recording office and have not yet been returned;

(x)     The Seller (A) is a solvent entity and is paying its debts as they become due, (B) immediately after giving effect to the transfer of the Mortgage Loans, will be a solvent entity and will have sufficient resources to pay its debts as they become due and (C) did not sell the Mortgage Loans to the Purchaser with the intent to hinder, delay or defraud any of its creditors; and

(xi)     The transfer of the Mortgage Loans to the Purchaser at the Closing Date will be treated by the Seller for financial accounting and reporting purposes as a sale of assets.

SECTION 6.     Representations and Warranties of the Seller Relating to the Individual Mortgage Loans.

The Seller hereby represents and warrants to the Purchaser, that as of the Closing Date with respect to each Mortgage Loan:

(i)     The information set forth on the Mortgage Loan Schedule with respect to each Mortgage Loan is true and correct in all material respects as of the Cut-off Date, unless another date is set forth on the Mortgage Loan Schedule;

(ii)     [reserved];

(iii)     Each Mortgage is a valid and enforceable first or second lien on the Mortgaged Property, including all improvements thereon, subject only to (a) the lien of non-delinquent current real property taxes and assessments, (b) covenants, conditions and restrictions, rights of way, easements and other matters of public record as of the date of recording of such Mortgage, such exceptions appearing of record being acceptable to mortgage lending institutions generally or specifically reflected in the appraisal made in connection with the origination of the related Mortgage Loan and which do not materially interfere with the benefits of the security intended to be provided by such Mortgage, (c) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by such Mortgage and (d) in the case of a second lien, only to a first lien on such Mortgaged Property;

SE 2144624 v5

(iv)     Immediately prior to the assignment of the Mortgage Loans to the Purchaser, the Seller had good title to, and was the sole legal and beneficial owner of, each Mortgage Loan, free and clear of any pledge, lien, encumbrance or security interest and has full right and authority, subject to no interest or participation of, or agreement with, any other party to sell and assign the same.  The form of endorsement of each Mortgage Note satisfied the requirement, if any, of endorsement in order to transfer all right, title and interest of the party so endorsing, as noteholder or assignee thereof, in and to that Mortgage Note; and each Assignment to be delivered hereunder is in recordable form and is sufficient to effect the assignment of and to transfer to the assignee thereunder the benefits of the assignor, as mortgagee or assignee thereof, under each Mortgage to which that Assignment relates;

(v)     To the best of the Seller's knowledge, there is no delinquent tax or assessment lien against any Mortgaged Property;

(vi)     There is no valid offset, defense or counterclaim to any Mortgage Note (including any obligation of the Mortgagor to pay the unpaid principal of or interest on such Mortgage Note) or the Mortgage, nor will the operation of any of the terms of the Mortgage Note and the Mortgage, or the exercise of any right thereunder, render the Mortgage Note or the Mortgage unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto;

(vii)     To the best of the Seller's knowledge, there are no mechanics' liens or claims for work, labor or material affecting any Mortgaged Property which are or may be a lien prior to, or equal with, the lien of the related Mortgage, except those which are insured against by the title insurance policy referred to in (xi) below;

(viii)     To the best of the Seller's knowledge, each Mortgaged Property is free of material damage and is at least in average repair;

(ix)     Each Mortgage Loan at origination complied in all material respects with applicable local, state and federal laws, including, without limitation, predatory and abusive lending, usury, equal credit opportunity, real estate settlement procedures, truth-in-lending and disclosure laws, and consummation of the transactions contemplated hereby, including without limitation the receipt of interest does not involve the violation of any such laws;

(x)     Neither the Seller nor any prior holder of any Mortgage has modified the Mortgage in any material respect, satisfied, canceled or subordinated such Mortgage in whole or in part; released the related Mortgaged Property in whole or in part from the lien of such Mortgage; or executed any instrument of release, cancellation, modification or satisfaction with respect thereto (except that a Mortgage Loan may have been modified by a written instrument signed by the

Seller or a prior holder of the Mortgage Loan which has been recorded, if necessary, to protect the interests of the Seller and the Purchaser and which has been delivered to the Purchaser or any assignee, transferee or designee of the Purchaser as part of the Mortgage File, and the terms of which are reflected in the Mortgage Loan Schedule);

(xi)   A lender's policy of title insurance together with a condominium endorsement and extended coverage endorsement, if applicable, and, with respect to each Adjustable Rate Mortgage Loan, an adjustable rate mortgage endorsement in an amount at least equal to the balance of the Mortgage Loan as of the Cut-off Date or a commitment (binder) to issue the same was effective on the date of the origination of each Mortgage Loan, each such policy is valid and remains in full force and effect, the transfer of the related Mortgage Loan to the Purchaser and the Trustee does not affect the validity or enforceability of such policy and each such policy was issued by a title insurer qualified to do business in the jurisdiction where the Mortgaged Property is located and acceptable to Fannie Mae or Freddie Mac and in a form acceptable to Fannie Mae or Freddie Mac on the date of origination of such Mortgage Loan, which policy insures the Seller and successor owners of indebtedness secured by the insured Mortgage, as to the first or second, as the case may be, priority lien of the Mortgage; to the best of the Seller's knowledge, no claims have been made under such mortgage title insurance policy and no prior holder of the related Mortgage, including the Seller, has done, by act or omission, anything which would impair the coverage of such mortgage title insurance policy;

(xii)   Each Mortgage Loan was originated by, or generated on behalf of, the Seller, or originated by a savings and loan association, savings bank, commercial bank, credit union, insurance company or similar institution which is supervised and examined by a federal or state authority, or by a mortgagee approved by the Secretary of Housing and Urban Development pursuant to Sections 203 and 211 of the National Housing Act;

(xiii)   With respect to each Adjustable Rate Mortgage Loan, on each Adjustment Date, the Mortgage Rate will be adjusted to equal the Index plus the Gross Margin, rounded to the nearest 0.125%, subject to the Periodic Rate Cap, the Maximum Mortgage Rate and the Minimum Mortgage Rate. The related Mortgage Note is payable on the first day of each month in self-amortizing monthly installments of principal and interest (unless such Mortgage Loan is a mortgage loan that requires the payment of interest only with respect to some or all of the related monthly payments as indicated on the Mortgage Loan Schedule), with interest payable in arrears, and requires a Monthly Payment which is sufficient to fully amortize the outstanding principal balance of the Mortgage Loan over its remaining term and to pay interest at the applicable Mortgage Rate. No Mortgage Loan is subject to negative amortization. All rate adjustments have been performed in accordance with the terms of the related Mortgage Note or subsequent modifications, if any;

SE 2144624 v5

(xiv)   To the best of the Seller's knowledge, all of the improvements which were included for the purpose of determining the Value of the Mortgaged Property lie wholly within the boundaries and building restriction lines of such property, and no improvements on adjoining properties encroach upon the Mortgaged Property;

(xv)   All inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy, have been made or obtained from the appropriate authorities and to the best of the Seller's knowledge, the Mortgaged Property is lawfully occupied under applicable law;

(xvi)   All parties which have had any interest in the Mortgage, whether as mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were) in compliance with any and all applicable licensing requirements of the laws of the state wherein the Mortgaged Property is located;

(xvii)   The Mortgage Note and the related Mortgage are genuine, and each is the legal, valid and binding obligation of the Mortgagor enforceable against the Mortgagor by the mortgagee or its representative in accordance with its terms, except only as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by law.  To the best of the Seller's knowledge, all parties to the Mortgage Note and the Mortgage had full legal capacity to execute all Mortgage Loan documents and to convey the estate purported to be conveyed by the Mortgage and each Mortgage Note and Mortgage have been duly and validly executed by such parties;

(xviii)   The proceeds of each Mortgage Loan have been fully disbursed, there is no requirement for future advances thereunder and any and all requirements as to completion of any on-site or off-site improvements and as to disbursements of any escrow funds therefor have been complied with.  All costs, fees and expenses incurred in making, closing or recording the Mortgage Loans were paid;

(xix)   The related Mortgage contains customary and enforceable provisions which render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security, including, (i) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (ii) otherwise by judicial foreclosure.  There is no homestead or other exemption available to the Mortgagor which would interfere with the right to sell the Mortgaged Property at a trustee's sale or the right to foreclose the Mortgage;

(xx)   With respect to each Mortgage constituting a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly

11

SE 2144624 v5

designated and currently so serves and is named in such Mortgage, and no fees or expenses are or will become payable by the Purchaser to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Mortgagor;

(xxi)   There exist no deficiencies with respect to escrow deposits and payments, if such are required, for which customary arrangements for repayment thereof have not been made, and no escrow deposits or payments of other charges or payments due the Seller have been capitalized under the Mortgage or the related Mortgage Note;

(xxii)   The origination, underwriting and collection practices used by the Seller with respect to each Mortgage Loan have been in all material respects legal, proper, prudent and customary in the subprime mortgage servicing business. Each Mortgage Loan is currently being serviced by Washington Mutual Bank;

(xxiii)   There is no pledged account or other security other than real estate securing the Mortgagor's obligations;

(xxiv)   No Mortgage Loan has a shared appreciation feature, or other contingent interest feature;

(xxv)   [reserved];

(xxvi)   The improvements upon each Mortgaged Property are covered by a valid and existing hazard insurance policy with a generally acceptable carrier that provides for fire extended coverage and coverage of such other hazards as are customarily covered by hazard insurance policies with extended coverage in the area where the Mortgaged Property is located representing coverage not less than the lesser of the outstanding principal balance of the related Mortgage Loan or the minimum amount required to compensate for damage or loss on a replacement cost basis.  All individual insurance policies and flood policies referred to in this clause (xxvi) and in clause (xxvii) below contain a standard mortgagee clause naming the Seller or the original mortgagee, and its successors in interest, as mortgagee, and the Seller has received no notice that any premiums due and payable thereon have not been paid; the Mortgage obligates the Mortgagor thereunder to maintain all such insurance, including flood insurance, at the Mortgagor's cost and expense, and upon the Mortgagor's failure to do so, authorizes the holder of the Mortgage to obtain and maintain such insurance at the Mortgagor's cost and expense and to seek reimbursement therefor from the Mortgagor;

(xxvii)   If the Mortgaged Property is in an area identified in the Federal Register by the Federal Emergency Management Agency as subject to special flood hazards, a flood insurance policy in a form meeting the requirements of the current guidelines of the Flood Insurance Administration is in effect with respect to such Mortgaged Property with a generally acceptable carrier in an amount representing coverage not less than the least of (A) the original outstanding principal balance of the Mortgage Loan, (B) the minimum amount required to compensate for

SE 2144624 v5

damage or loss on a replacement cost basis or (C) the maximum amount of insurance that is available under the Flood Disaster Protection Act of 1973;

(xxviii) There is no default, breach, violation or event of acceleration existing under the Mortgage or the related Mortgage Note; and neither the Seller nor any other entity involved in originating or servicing the Mortgage Loan has waived any default, breach, violation or event of acceleration;

(xxix)  Each Mortgaged Property is improved by a one- to four-family residential dwelling, including condominium units and dwelling units in planned unit developments, which, to the best of the Seller's knowledge, does not include cooperatives and does not constitute property other than real property under state law;

(xxx)   There is no obligation on the part of the Seller or any other party under the terms of the Mortgage or related Mortgage Note to make payments in addition to those made by the Mortgagor;

(xxxi)  Any future advances made prior to the Cut-off Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term reflected on the related Mortgage Loan Schedule.   The consolidated principal amount does not exceed the original principal amount of the Mortgage Loan;

(xxxii) Each Mortgage Loan was underwritten in accordance with the Seller's underwriting guidelines as described in the Prospectus Supplement as applicable to its credit grade in all material respects (the "Underwriting Guidelines");

(xxxiii) Each appraisal of a Mortgage Loan that was used to determine the appraised value of the related Mortgaged Property was conducted generally in accordance with the Seller's Underwriting Guidelines, and included an assessment by the appraiser of the fair market value of the related Mortgaged Property at the time of the appraisal.  The Mortgage File contains an appraisal of the applicable Mortgaged Property;

(xxxiv) None of the Mortgage Loans is a graduated payment Mortgage Loan, nor is any Mortgage Loan subject to a temporary buydown or similar arrangement;

(xxxv) There are no Mortgage Loans with respect to which the monthly payment due thereon in January, 2006 had not been made, none of the Mortgage Loans has been contractually delinquent for more than 30 days more than once during the preceding twelve months and, no Mortgage Loan has ever experienced a delinquency of 60 or more days since the origination thereof;

SE 2144624 v5

(xxxvi) Each Mortgage contains a provision that is, to the extent not prohibited by federal or state law, enforceable for the acceleration of the payment of the unpaid principal balance of the Mortgage Loan in the event that the Mortgaged Property is sold or transferred without the prior written consent of the mortgagee thereunder;

(xxxvii)  To the best of the Seller's knowledge no misrepresentation, negligence, fraud or similar occurrence with respect to a Mortgage Loan has taken place on the part of any person, including, without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan or in the application of any insurance in relation to such Mortgage Loan;

(xxxviii) Each Mortgage Loan constitutes a "qualified mortgage" within the meaning of Section 860G(a)(3) of the Code;

(xxxix) The information set forth in the Prepayment Charge Schedule is complete, true and correct in all material respects at the date or dates respecting which such information is furnished and each Prepayment Charge is permissible and enforceable in accordance with its terms under applicable law upon the Mortgagor's voluntary Principal Prepayment (except to the extent that:  (1) the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally; or (2) the collectability thereof may be limited due to acceleration in connection with a foreclosure or other involuntary prepayment).  No Mortgage Loan originated before October 1, 2002 has a Prepayment Charge for a term in excess of five years from the date of its origination and no Mortgage Loan originated on or after October 1, 2002 has a prepayment charge for a term in excess of three years from the date of its origination;

(xl)     The Loan-to-Value Ratio for each Mortgage Loan was no greater than 100% at the time of origination;

(xli)     The first date on which each Mortgagor must make a payment on the related Mortgage Note is no later than 60 days from the date of this Agreement;

(xlii)     With respect to each Mortgage Loan, the related Mortgagor shall not fail or has not failed to make the first monthly payment due under the terms of the Mortgage Loan by the second succeeding Due Date after the Due Date on which such monthly payment was due;

(xliii)  The transfer, assignment and conveyance of the Mortgage Notes and the Mortgages by the Seller pursuant to this Agreement are not subject to the bulk transfer or any similar statutory provisions in effect in any relevant jurisdiction, except any as may have been complied with;

14

(xliv)   There are no defaults in complying with the terms of the Mortgage, and either (1) any taxes, governmental assessments, insurance premiums, water, sewer and municipal charges or ground rents which previously became due and owing have been paid, or (2) an escrow of funds has been established in an amount sufficient to pay for every such item which remains unpaid and which has been assessed but is not yet due and payable.  Except for payments in the nature of escrow payments, including without limitation, taxes and insurance payments, the Seller has not advanced funds, or induced, solicited or knowingly received any advance of funds by a party other than the Mortgagor, directly or indirectly, for the payment of any amount required by the Mortgage Note, except for interest accruing from the date of the Mortgage Note or date of disbursement of the Mortgage proceeds, whichever is greater, to the day which precedes by one month the Due Date of the first installment of principal and interest;

(xlv)   There is no proceeding pending, or to best of the Seller's knowledge threatened, for the total or partial condemnation of the Mortgaged Property or the taking by eminent domain of any Mortgaged Property;

(xlvi)   No Mortgage Loan is subject to the requirements of the Home Ownership and Equity Protection Act of 1994, as amended, or is a "high cost" or "predatory" loan under any state or local law or regulation applicable to the originator of such Mortgage Loan or which would result in liability to the purchaser or assignee of such Mortgage Loan under any predatory or abusive lending law.  In the event that Financial Security Assurance, Inc. becomes a NIMS Insurer, no Mortgage Loan is a "covered" loan under the laws of the states of California, Colorado or Ohio;

(xlvii)   No proceeds from any Mortgage Loans were used to finance single-premium credit insurance policies.  No borrower was required to purchase any credit life, disability, accident or health insurance product as a condition of obtaining the extension of credit.  No borrower obtained a prepaid single-premium credit life, disability, accident or health insurance policy in connection with the origination of the Mortgage Loan;

(xlviii)   The Seller did not select the Mortgage Loans with the intent to adversely affect the interests of the Purchaser;

(xlix)   The Seller has not received any notice that any Mortgagor has filed for any bankruptcy or similar legal protection since the date of the origination of such Mortgage Loan.  Prior to the date of the origination of any Mortgage Loan, the Seller did not receive any notice that any Mortgagor has filed for bankruptcy or similar legal protection except as permitted under the Underwriting Guidelines;

(l)   No Group I Mortgage Loan is a "High-Cost Home Loan" as defined in the Georgia Fair Lending Act, as amended (the "Georgia Act"), and no Mortgage Loan that was originated on or after October 1, 2002 and before March 7, 2003, is secured by a Mortgaged Property located in the State of Georgia;

SE 2144624 v5

(li)     No Group I Mortgage Loan is a "High Cost Home Loan" as defined in the Kentucky high-cost loan statute effective June 24, 2003 (Ky. Rev. Stat. Section 360.100);

(lii)    No Group I Mortgage Loan is a "High Cost Home Loan" as defined in the New Jersey Home Ownership Act effective November 27, 2003 (N.J.S.A. 46; 10B-22 et seq.);

(liii)   No Group I Mortgage Loan is a subsection 10 mortgage under the Oklahoma Home Ownership and Equity Protection Act;

(liv)    No Group I Mortgage Loan is a "High-Cost Home Loan" as defined in New York Banking Law 6-1;

(lv)     No Group I Mortgage Loan is a "High Cost Home Loan" as defined in the Arkansas Home Loan Protection Act effective July 16, 2003 (Act 1340 of 2003);

(lvi)    No Group I Mortgage Loan is a "High-Cost Home Loan" as defined in the New Mexico Home Loan Protection Act effective January 1, 2004 (N.M. Stat. Am. §§ 58-21A-1 et seq.);

(lvii)   [reserved];

(lviii)  Each Group I Mortgage Loan was originated in compliance with the following anti-predatory lending guidelines:

a.   Each Group I Mortgage Loan satisfies the eligibility for purchase requirements and was originated in compliance with Lender Letter # LL03-00 dated April 11, 2000 for Fannie Mae Sellers (the "Lender Letter");

b.   No borrower was encouraged or required by the Seller to select a Group I Mortgage Loan product offered by the Group I Mortgage Loan's originator which is a higher cost product designed for less creditworthy borrowers, unless at the time of the Group I Mortgage Loan's origination, such borrower did not qualify taking into account credit history and debt-to-income ratios for a lower-cost credit product then offered by the Group I Mortgage Loan's originator or any affiliate of the Group I Mortgage Loan's originator;

c.   The methodology used in underwriting the extension of credit for each Group I Mortgage Loan employs objective mathematical principles which relate the borrower's income, assets and liabilities to the proposed payment and such underwriting methodology does not rely on the extent of the borrower's equity in the collateral as the principal determining factor in approving such credit extension.  Such underwriting methodology provided reasonable assurance that at the time of origination (application/approval) the borrower had a reasonable ability to make timely payments on the Group I Mortgage Loan;

16

d.  With respect to any Group I Mortgage Loan that contains a provision permitting imposition of a premium upon a prepayment prior to maturity, (i) the Seller's pricing methods include mortgage loans with and without prepayment premiums; borrowers selecting Group I Mortgage Loans which include such prepayment premiums receive a monetary benefit, including but not limited to a rate or fee reduction, in exchange for selecting a Group I Mortgage Loan with a prepayment premium, (ii) prior to the Group I Mortgage Loan's origination, the borrower had the opportunity to choose between an array of mortgage loan products which included mortgage loan products with prepayment premiums and mortgage loan products that did not require payment of such a premium, (iii) the prepayment premium is disclosed to the borrower in the loan documents pursuant to applicable state and federal law, and (iv) notwithstanding any state or federal law to the contrary, the Master Servicer shall not impose such prepayment premium in any instance when the mortgage debt is accelerated as the result of the borrower's default in making the loan payments;

e.  All points and fees related to each Group I Mortgage Loan were disclosed in writing to the borrower in accordance with applicable state and federal law.  Except in the case of a Group I Mortgage Loan in an original principal amount of less than $60,000 which would have resulted in an unprofitable origination, no borrower was charged "points and fees" (whether or not financed) in an amount greater than 5% of the principal amount of such loan, such 5% limitation calculated in accordance with the Lender Letter;

f.  All fees and charges (including finance charges) and whether or not financed, assessed, collected or to be collected in connection with the origination and servicing of each Group I Mortgage Loan have been disclosed in writing to the borrower in accordance with applicable state and federal law and regulation;

(lix)  No Group I Mortgage Loan had a principal balance at origination in excess of Fannie Mae's conforming loan balance limitations for single family loans set forth in the Fannie Mae Charter Act and the Fannie Mae Selling Guide in effect at the time of such Group I Mortgage Loan's origination;

(lx)  With respect to each Group I Mortgage Loan, information regarding the borrower credit file related to such Mortgage Loan has been furnished to credit reporting agencies in compliance with the provisions of the Fair Credit Reporting Act and the applicable implementing regulations;

(lxi)  No Mortgage Loan is a "High Cost Loan" or "Covered Loan" (as such terms are defined in the Standard & Poor's LEVELS® Glossary in effect on the Closing Date which is now Version 5.6d Revised, Exhibit E, applicable portions of which are attached hereto as Exhibit A) and no Mortgage Loan originated on or after October 1, 2002 through March 6, 2003 is governed by the Georgia Act;

17

(lxii)   No Group I Mortgage Loan is a "High Cost Home Mortgage Loan" as defined in the Massachusetts Predatory Home Loan Practices Act effective November 7, 2004 (Mass. Ann. Laws ch. 183C);

(lxiii)   No Group I Mortgage Loan is a "High Cost Home Loan" as defined in the Indiana Home Loan Practices Act effective January 1, 2005 (Ind. Code Ann. §§ 24-9-1 through 24-9-9); and

(lxiv)   With respect to any Group I Mortgage Loan originated on or after August 1, 2004, neither the related Mortgage nor the related Mortgage Note requires the Mortgagor to submit to arbitration to resolve any dispute arising out of or relating in any way to the Mortgage Loan transaction.

SECTION 7.   <u>Repurchase Obligation for Defective Documentation and for Breach of Representation and Warranty</u>.

(a) The representations and warranties contained in Section 5(ix) and Section 6 shall not be impaired by any review and examination of loan files or other documents evidencing or relating to the Mortgage Loans or any failure on the part of the Seller or the Purchaser to review or examine such documents and shall inure to the benefit of any assignee, transferee or designee of the Purchaser, including the Trustee for the benefit of holders of asset-backed certificates evidencing an interest in all or a portion of the Mortgage Loans.  With respect to the representations and warranties contained herein which are made to the knowledge or the best of knowledge of the Seller, or as to which the Seller has no knowledge, if it is discovered that the substance of any such representation and warranty was inaccurate as of the date such representation and warranty was made or deemed to be made, and such inaccuracy materially and adversely affects the value of the related Mortgage Loan or the interest therein of the Purchaser or the Purchaser's assignee, transferee or designee, then notwithstanding the lack of knowledge by the Seller with respect to the substance of such representation and warranty being inaccurate at the time the representation and warranty was made, the Seller shall take such action described in the following paragraph in respect of such Mortgage Loan.

Upon discovery by the Seller, the Purchaser or any assignee, transferee or designee of the Purchaser of any materially defective document in, or that any material document was not transferred by the Seller (as listed on the Trustee's initial certification), as part of any Mortgage File or of a breach of any of the representations and warranties contained in Section 5 or Section 6 that materially and adversely affects the value of any Mortgage Loan or the interest of the Purchaser or the Purchaser's assignee, transferee or designee (it being understood that with respect to the representations and warranties set forth in the last sentence of (xxxix), (xlvi), the first sentence of (xlvii), (lxi) and (lxiv) of Section 6 herein, a breach of any such representation or warranty shall in and of itself be deemed to materially and adversely affect the interest therein of the Purchaser and the Purchaser's assignee, transferee or designee) in any Mortgage Loan, the party discovering the breach shall give prompt written notice to the others.  Within ninety (90) days of the earlier of the discovery or the Seller's receipt of notice of any such missing documentation which was not transferred to the Purchaser as described above or materially defective documentation or any such breach of a representation and warranty, the Seller promptly shall deliver such missing document or cure such defect or

**EXHIBIT 6**

Exhibit 6

|    | Issue ID | § 6(vi) | § 6(ix) | § 6(xvii) | § 6(xxii) | § 6(xxxii) |
|----|----------|---------|---------|-----------|-----------|-------------|
| 1  | LB00F1   | MLPA §6(vii) | MLPA§6(x) | MLPA§6(xviii) | MLPA§6(xxiii) | MLPA §6(xxxiii) |
| 2  | LB0002   | MLPA §6(vii) | MLPA§6(x) | MLPA§6(xviii) | MLPA§6(xxiii) | MLPA §6(xxxiii) |
| 3  | LB0101   | MLPA §6(vii) | MLPA§6(x) | MLPA§6(xviii) | | MLPA §6(xxxiii) |
| 4  | LB0102   | MLPA §6(vii) | MLPA§6(x) | MLPA§6(xviii) | MLPA§6(xxiii) | MLPA §6(xxxiii) |
| 5  | LB0103   | MLPA §6(vii) | MLPA§6(x) | MLPA§6(xviii) | MLPA§6(xxiii) | MLPA §6(xxxiii) |
| 6  | LB0104   | MLPA §6(vii) | MLPA§6(x) | MLPA§6(xviii) | MLPA§6(xxiii) | MLPA §6(xxxiii) |
| 7  | LB0201   | MLPA §6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 8  | LB0202   | MLPA §6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 9  | LB0205   | MLPA §6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 10 | LB0301   | MLPA §6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 11 | LB0302   | MLPA §6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 12 | LB0303   | MLPA §6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 13 | LB0304   | MLPA §6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 14 | LB0401   | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 15 | LB0402   | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 16 | LB0403   | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 17 | LB0404   | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 18 | LB0405   | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 19 | LB0406   | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 20 | LB0501   | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 21 | LB0502   | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 22 | GS05X2   | MLPA §3.1(e) | MLPA §3.1(h) | MLPA §3.1(p) | MLPA §3.1(u) | MLPA §3.1(dd) |
| 23 | LB05W1   | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 24 | LB0503   | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 25 | LB05W2   | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 26 | LB05W3   | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 27 | GS06L1   | MLPA §3.1(e) | MLPA §3.1(h) | MLPA §3.1(p) | MLPA §3.1(u) | MLPA §3.1(dd) |
| 28 | LB06W1   | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 29 | LB06W2   | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 30 | LB06W3   | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 31 | LB0601   | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 32 | LB0602   | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 33 | LB0603   | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 34 | LB0604   | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 35 | LB060A   | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 36 | LB0605   | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |

| | Issue ID | § 6(vi) | § 6(ix) | § 6(xvii) | § 6(xxii) | § 6(xxxii) |
|---|---|---|---|---|---|---|
| 37 | LB0606 | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 38 | LB0607 | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 39 | LB0608 | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 40 | LB0609 | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 41 | LB0610 | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 42 | LB0611 | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 43 | WA07H1 | MLPA§6(vi) | MLPA§6(ix) | MLPA§6(xvii) | MLPA§6(xxii) | MLPA §6(xxxii) |
| 44 | WA0001 | PSA §2.04(v) | PSA §2.04(vii) | PSA §2.04(x) | PSA §2.04(xx) | PSA §2.04(xxiii) |
| 45 | WA0107 | PSA §2.04(v) | PSA §2.04(vii) | PSA §2.04(x) | PSA §2.04(xx) | PSA §2.04(xxiii) |
| 46 | WA01A3 | PSA §2.03(vi) | PSA §2.03(viii) | PSA §2.03(xvi) | | PSA §2.03(xxi) |
| 47 | WA02A2 | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 48 | WA02A6 | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 49 | WA02A9 | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 50 | WA02AC | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 51 | WA02AD | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 52 | WA02AE | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 53 | WA02AF | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 54 | WA02AG | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 55 | WA02AH | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 56 | WA02AI | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 57 | WA02AJ | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 58 | WA03A1 | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 59 | WA03A2 | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 60 | WA03A3 | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 61 | WA03A4 | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 62 | WA03A5 | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 63 | WA03A6 | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 64 | WA03A7 | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 65 | WA03A8 | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 66 | WA03A9 | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 67 | WA03AA | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 68 | WA03AB | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 69 | WA03AC | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 70 | WA04A1 | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 71 | WA04A2 | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 72 | WA04A3 | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |

Exhibit 6

|    | Issue ID | § 6(vi) | § 6(ix) | § 6(xvii) | § 6(xxii) | § 6(xxxii) |
|----|----------|---------|---------|-----------|-----------|------------|
| 73 | WA04A4 | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 74 | WA04A5 | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 75 | WA04A6 | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 76 | WA04A7 | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 77 | WA04A8 | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 78 | WA04AA | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 79 | WA04AC | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 80 | WA04AD | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 81 | WA05A1 | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 82 | WA05A2 | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 83 | WA05A4 | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 84 | WA05A6 | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 85 | WA05A8 | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 86 | WA05A9 | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 87 | WA05AA | PSA §2.08(vi) | PSA §2.08(viii) | PSA §2.08(xvi) | | PSA §2.08(xxi) |
| 88 | WA05AB | MLPSA §3.1(v) | MLPSA §3.1(vii) | MLPSA §3.1(xvi) | | MLPSA §3.1(xx) |
| 89 | WA05AC | MLPSA §3.1(v) | MLPSA §3.1(vii) | MLPSA §3.1(xvi) | | MLPSA §3.1(xx) |
| 90 | WA05AD | MLPSA §3.1(v) | MLPSA §3.1(vii) | MLPSA §3.1(xvi) | | MLPSA §3.1(xx) |
| 91 | WA0601 | | PSA §2.08(i) | PSA §2.08(h) | | |
| 92 | WA0602 | | PSA §2.08(i) | PSA §2.08(h) | | |
| 93 | WA06A1 | MLPSA §3.1(v) | MLPSA §3.1(vii) | MLPSA §3.1(xvi) | | MLPSA §3.1(xx) |
| 94 | WA06A3 | MLPSA §3.1(v) | MLPSA §3.1(vii) | MLPSA §3.1(xvi) | | MLPSA §3.1(xx) |
| 95 | WA06A4 | MLPSA §3.1(v) | MLPSA §3.1(vii) | MLPSA §3.1(xvi) | | MLPSA §3.1(xx) |
| 96 | WA06A5 | MLPSA §3.1(v) | MLPSA §3.1(vii) | MLPSA §3.1(xvi) | | MLPSA §3.1(xx) |
| 97 | WA0701 | | PSA §2.08(i) | PSA §2.08(h) | | |
| 98 | MS0001 | MLPA §7.02(e) | MLPA §7.02(g) | MLPA §7.02(k) | MLPA §7.02(hh) | |
| 99 | CO9201 | PSA 2.03 (xii) | PSA 2.03(iii), (xv) | | | PSA 2.03 (xxviii) |

Exhibit 6

|    | Issue ID | § 6(xxxiii) | § 6(xxxvii) | § 6(xxviii) | § 6(xl) | § 6(xlviii) |
|----|----------|-------------|-------------|-------------|---------|-------------|
| 1  | LB00F1   | MLPA§6(xxxiv) | MLPA§6(xxxvii) | MLPA§6(xxix) | MLPA§6(xli) | |
| 2  | LB0002   | MLPA§6(xxxiv) | MLPA§6(xxxviii) | MLPA§6(xxix) | MLPA§6(xli) | MLPA§6(xlviii) |
| 3  | LB0101   | MLPA§6(xxxiv) | MLPA§6(xxxviii) | MLPA§6(xxix) | MLPA§6(xli) | MLPA§6(xlviv) |
| 4  | LB0102   | MLPA§6(xxxiv) | MLPA§6(xxxviii) | MLPA§6(xxix) | MLPA§6(xli) | MLPA§6(xlix) |
| 5  | LB0103   | MLPA§6(xxxiv) | MLPA§6(xxxviii) | MLPA§6(xxix) | MLPA§6(xli) | MLPA§6(xlix) |
| 6  | LB0104   | MLPA§6(xxxiv) | MLPA§6(xxxviii) | MLPA§6(xxix) | MLPA§6(xli) | MLPA§6(xlix) |
| 7  | LB0201   | MLPA §6(xxxiii) | MLPA§6(xxvii) | MLPA§6(xxviii) | MLPA§6(xl) | MLPA§6(xlviii) |
| 8  | LB0202   | MLPA §6(xxxiii) | MLPA§6(xxxvii) | MLPA§6(xxviii) | MLPA§6(xl) | MLPA§6(xlviii) |
| 9  | LB0205   | MLPA §6(xxxiii) | MLPA§6(xxxvii) | MLPA§6(xxviii) | MLPA§6(xl) | MLPA§6(xlviii) |
| 10 | LB0301   | MLPA §6(xxxiii) | MLPA§6(xxvii) | MLPA§6(xxviii) | MLPA§6(xl) | MLPA§6(xlviii) |
| 11 | LB0302   | MLPA §6(xxxiii) | MLPA§6(xxxvii) | MLPA§6(xxviii) | MLPA§6(xl) | MLPA§6(xlviii) |
| 12 | LB0303   | MLPA §6(xxxiii) | MLPA§6(xxxvii) | MLPA§6(xxviii) | MLPA§6(xl) | MLPA§6(xlviii) |
| 13 | LB0304   | MLPA §6(xxxiii) | MLPA§6(xxxvii) | MLPA§6(xxviii) | MLPA§6(xl) | MLPA§6(xlviii) |
| 14 | LB0401   | MLPA§6(xxxvii) | MLPA§6(xxxviii) | MLPA§6(xxxviii) | MLPA§6(xl) | MLPA §6(xlviii) |
| 15 | LB0402   | MLPA§6(xxxvii) | MLPA§6(xxxvii) | MLPA§6(xxxviii) | MLPA§6(xl) | MLPA §6(xlviii) |
| 16 | LB0403   | MLPA§6(xxxvii) | MLPA§6(xxxviii) | MLPA§6(xxxviii) | MLPA§6(xl) | MLPA §6(xlviii) |
| 17 | LB0404   | MLPA§6(xxxvii) | MLPA§6(xxxviii) | MLPA§6(xxxviii) | MLPA§6(xl) | MLPA §6(xlviii) |
| 18 | LB0405   | MLPA§6(xxxiii) | MLPA§6(xxxvii) | MLPA§6(xxviii) | MLPA§6(xl) | MLPA §6(xlviii) |
| 19 | LB0406   | MLPA§6(xxxiii) | MLPA§6(xxvii) | MLPA§6(xxviii) | MLPA§6(xl) | MLPA §6(xlviii) |
| 20 | LB0501   | MLPA§6(xxxiii) | MLPA§6(xxviii) | MLPA§6(xxviii) | MLPA§6(xl) | MLPA §6(xlviii) |
| 21 | LB0502   | MLPA§6(xxxiii) | MLPA§6(xxxvii) | MLPA§6(xxviii) | MLPA§6(xl) | MLPA §6(xlviii) |
| 22 | GS05X2   | MLPA §3.1(ee) | MLPA §3.1(ii) | MLPA §3.1(z) | MLPA §3.1(ll) | MLPA §3.1(rr) |
| 23 | LB05W1   | MLPA§6(xxxvii) | MLPA§6(xxxviii) | MLPA§6(xxxviii) | MLPA§6(xl) | MLPA §6(xlviii) |
| 24 | LB0503   | MLPA§6(xxxvii) | MLPA§6(xxxviii) | MLPA§6(xxxviii) | MLPA§6(xl) | MLPA §6(xlviii) |
| 25 | LB05W2   | MLPA§6(xxxvii) | MLPA§6(xxxviii) | MLPA§6(xxxviii) | MLPA§6(xl) | MLPA §6(xlviii) |
| 26 | LB05W3   | MLPA§6(xxxvii) | MLPA§6(xxxviii) | MLPA§6(xxxviii) | MLPA§6(xl) | MLPA §6(xlviii) |
| 27 | GS06L1   | MLPA §3.1(ee) | MLPA §3.1(ii) | MLPA §3.1(z) | MLPA §3.1(ll) | MLPA §3.1(rr) |
| 28 | LB06W1   | MLPA §6(xxxiii) | MLPA§6(xxxviii) | MLPA§6(xxviii) | MLPA§6(xl) | MLPA §6(xlviii) |
| 29 | LB06W2   | MLPA §6(xxxiii) | MLPA§6(xxxviii) | MLPA§6(xxviii) | MLPA§6(xl) | MLPA §6(xlviii) |
| 30 | LB06W3   | MLPA §6(xxxiii) | MLPA§6(xxxviii) | MLPA§6(xxviii) | MLPA§6(xl) | MLPA §6(xlviii) |
| 31 | LB0601   | MLPA §6(xxxiii) | MLPA§6(xxxvii) | MLPA§6(xxviii) | MLPA§6(xl) | MLPA §6(xlviii) |
| 32 | LB0602   | MLPA§6(xxxiii) | MLPA§6(xxxvii) | MLPA§6(xxxviii) | MLPA§6(xl) | MLPA §6(xlviii) |
| 33 | LB0603   | MLPA §6(xxxiii) | MLPA§6(xxxvii) | MLPA§6(xxxviii) | MLPA§6(xl) | MLPA §6(xlviii) |
| 34 | LB0604   | MLPA §6(xxxiii) | MLPA§6(xxxvii) | MLPA§6(xxxviii) | MLPA§6(xl) | MLPA §6(xlviii) |
| 35 | LB060A   | MLPA §6(xxxiii) | MLPA§6(xxxvii) | MLPA§6(xxxviii) | MLPA§6(xl) | MLPA §6(xlviii) |
| 36 | LB0605   | MLPA §6(xxxiii) | MLPA§6(xxxvii) | MLPA§6(xxxviii) | MLPA§6(xl) | MLPA §6(xlviii) |

| | Issue ID | § 6(xxxiii) | § 6(xxxvii) | § 6(xxviii) | § 6(xl) | § 6(xlviii) |
|---|---|---|---|---|---|---|
| 37 | LB0606 | MLPA §6(xxxiii) | MLPA§6(xxxvii) | MLPA§6(xxxviii) | MLPA§6(xl) | MLPA §6(xlviii) |
| 38 | LB0607 | MLPA §6(xxxiii) | MLPA§6(xxxvii) | MLPA§6(xxxviii) | MLPA§6(xl) | MLPA §6(xlviii) |
| 39 | LB0608 | MLPA §6(xxxiii) | MLPA§6(xxxvii) | MLPA§6(xxxviii) | MLPA§6(xl) | MLPA §6(xlviii) |
| 40 | LB0609 | MLPA §6(xxxiii) | MLPA§6(xxxvii) | MLPA§6(xxxviii) | MLPA§6(xl) | MLPA §6(xlviii) |
| 41 | LB0610 | MLPA §6(xxxiii) | MLPA§6(xxxvii) | MLPA§6(xxxviii) | MLPA§6(xl) | MLPA §6(xlviii) |
| 42 | LB0611 | MLPA §6(xxxiii) | MLPA§6(xxxvii) | MLPA§6(xxxviii) | MLPA§6(xl) | MLPA §6(xlviii) |
| 43 | WA07H1 | MLPA§6(xxxviii) | MLPA§6(xxxvii) | MLPA§6(xxxviii) | MLPA §6(xl) | MLPA §6(xlviii) |
| 44 | WA0001 | PSA §2.04(xxv) | PSA §2.04(xxxvi) | PSA §2.04(xvi) | PSA §2.04(xxix) | |
| 45 | WA0107 | PSA §2.04(xxv) | PSA §2.04(xxxvi) | PSA §2.04(xvi) | PSA §2.04(xxix) | |
| 46 | WA01A3 | PSA §2.03(xx) | | | PSA §2.03(xxv) | PSA §2.03(xxiii) |
| 47 | WA02A2 | PSA §2.08(xx) | | | PSA §2.03(xxv) | PSA §2.08(xxiii) |
| 48 | WA02A6 | PSA §2.08(xx) | | | PSA §2.08(xxv) | PSA §2.08(xxiii) |
| 49 | WA02A9 | PSA §2.08(xx) | | | PSA §2.08(xxv) | PSA §2.08(xxiii) |
| 50 | WA02AC | PSA §2.08(xx) | | | PSA §2.08(xxvii) | PSA §2.08(xxiii) |
| 51 | WA02AD | PSA §2.08(xx) | | | PSA §2.08(xxv) | PSA §2.08(xxiii) |
| 52 | WA02AE | PSA §2.08(xx) | | | PSA §2.08(xxvii) | PSA §2.08(xxiii) |
| 53 | WA02AF | PSA §2.08(xx) | | | PSA §2.08(xxvii) | PSA §2.08(xxiii) |
| 54 | WA02AG | PSA §2.08(xx) | | | PSA §2.08(xxvii) | PSA §2.08(xxiii) |
| 55 | WA02AH | PSA §2.08(xx) | | | PSA §2.08(xxvii) | PSA §2.08(xxiii) |
| 56 | WA02AI | PSA §2.08(xx) | | | PSA §2.08(xxvii) | PSA §2.08(xxiii) |
| 57 | WA02AJ | PSA §2.08(xx) | | | PSA §2.08(xxv) | PSA §2.08(xxiii) |
| 58 | WA03A1 | PSA §2.08(xx) | | | PSA §2.08(xxvii) | PSA §2.08(xxiii) |
| 59 | WA03A2 | PSA §2.08(xx) | | | PSA §2.08(xxvii) | PSA §2.08(xxiii) |
| 60 | WA03A3 | PSA §2.08(xx) | | | PSA §2.08(xxvii) | PSA §2.08(xxiii) |
| 61 | WA03A4 | PSA §2.08(xx) | | | PSA §2.08(xxvii) | PSA §2.08(xxiii) |
| 62 | WA03A5 | PSA §2.08(xx) | | | PSA §2.08(xxvii) | PSA §2.08(xxiii) |
| 63 | WA03A6 | PSA §2.08(xx) | | | PSA §2.08(xxvii) | PSA §2.08(xxiii) |
| 64 | WA03A7 | PSA §2.08(xx) | | | PSA §2.08(xxvii) | PSA §2.08(xxiii) |
| 65 | WA03A8 | PSA §2.08(xx) | | | PSA §2.08(xxvii) | PSA §2.08(xxiii) |
| 66 | WA03A9 | PSA §2.08(xx) | | | PSA §2.08(xxvii) | PSA §2.08(xxiii) |
| 67 | WA03AA | PSA §2.08(xx) | | | PSA §2.08(xxvii) | PSA §2.08(xxiii) |
| 68 | WA03AB | PSA §2.08(xx) | | | PSA §2.08(xxvii) | PSA §2.08(xxiii) |
| 69 | WA03AC | PSA §2.08(xx) | | | PSA §2.08(xxvii) | PSA §2.08(xxiii) |
| 70 | WA04A1 | PSA §2.08(xx) | | | PSA §2.08(xxvii) | PSA §2.08(xxiii) |
| 71 | WA04A2 | PSA §2.08(xx) | | | PSA §2.08(xxv) | PSA §2.08(xxiii) |
| 72 | WA04A3 | PSA §2.08(xx) | | | PSA §2.08(xxvii) | PSA §2.08(xxiii) |

| | Issue ID | § 6(xxxiii) | § 6(xxxvii) | § 6(xxviii) | § 6(xl) | § 6(xlviii) |
|---|---|---|---|---|---|---|
| 73 | WA04A4 | PSA §2.08(xx) | | | PSA §2.08(xxvii) | PSA §2.08(xxiii) |
| 74 | WA04A5 | PSA §2.08(xx) | | | PSA §2.08(xxvii) | PSA §2.08(xxiii) |
| 75 | WA04A6 | PSA §2.08(xx) | | | PSA §2.08(xxv) | PSA §2.08(xxiii) |
| 76 | WA04A7 | PSA §2.08(xx) | | | PSA §2.08(xxvii) | PSA §2.08(xxiii) |
| 77 | WA04A8 | PSA §2.08(xx) | | | PSA §2.08(xxv) | PSA §2.08(xxiii) |
| 78 | WA04AA | PSA §2.08(xx) | | | PSA §2.08(xxv) | PSA §2.08(xxiii) |
| 79 | WA04AC | PSA §2.08(xx) | | | PSA §2.08(xxv) | PSA §2.08(xxiii) |
| 80 | WA04AD | PSA §2.08(xx) | | | PSA §2.08(xxv) | PSA §2.08(xxiii) |
| 81 | WA05A1 | PSA §2.08(xx) | | | PSA §2.08(xxv) | PSA §2.08(xxiii) |
| 82 | WA05A2 | PSA §2.08(xx) | | | PSA §2.08(xxv) | PSA §2.08(xxiii) |
| 83 | WA05A4 | PSA §2.08(xx) | | | PSA §2.08(xxvii) | PSA §2.08(xxiii) |
| 84 | WA05A6 | PSA §2.08(xx) | | | PSA §2.08(xxvii) | PSA §2.08(xxiii) |
| 85 | WA05A8 | PSA §2.08(xx) | | | PSA §2.08(xxv) | PSA §2.08(xxiii) |
| 86 | WA05A9 | PSA §2.08(xx) | | | PSA §2.08(xxv) | PSA §2.08(xxiii) |
| 87 | WA05AA | PSA §2.08(xx) | | | PSA §2.08(xxv) | PSA §2.08(xxiii) |
| 88 | WA05AB | MLPSA §3.1(xix) | | | MLPSA §3.1(xxix) | MLPSA §3.1(xxii) |
| 89 | WA05AC | MLPSA §3.1(xix) | | | MLPSA §3.1(xxix) | MLPSA §3.1(xxii) |
| 90 | WA05AD | MLPSA §3.1(xix) | | | MLPSA §3.1(xxix) | MLPSA §3.1(xxii) |
| 91 | WA0601 | | | | PSA §2.08(f) | |
| 92 | WA0602 | | | | PSA §2.08(f) | |
| 93 | WA06A1 | MLPSA §3.1(xix) | | | MLPSA §3.1(xxix) | MLPSA §3.1(xxii) |
| 94 | WA06A3 | MLPSA §3.1(xix) | | | MLPSA §3.1(xxix) | MLPSA §3.1(xxii) |
| 95 | WA06A4 | MLPSA §3.1(xix) | | | MLPSA §3.1(xxix) | MLPSA §3.1(xxii) |
| 96 | WA06A5 | MLPSA §3.1(xix) | | | MLPSA §3.1(xxix) | MLPSA §3.1(xxii) |
| 97 | WA0701 | | | | PSA §2.08(f) | |
| 98 | MS0001 | MLPA §7.02(mm) | MLPA §7.02(vv) | MLPA §7.02(q) | MLPA §7.02(o) | MLPA §7.01(i) |
| 99 | CO9201 | PSA 2.03 (xxiii) | | | PSA 2.03 (ix) | |

Exhibit 6

|   | Issue ID | § 6(lviii) | § 6(xxxv) | § 6(xlii) | § 6(xliv) |
|---|---|---|---|---|---|
| 1 | LB00F1 | | MLPA §6(iii) | MLPA §6(xliii) | MLPA §6(xxii), (xlv) |
| 2 | LB0002 | | MLPA §6(iii) | MLPA §6(xliii) | MLPA §6(xxii), (xlv) |
| 3 | LB0101 | | MLPA §6(iii) | MLPA §6(xliii) | MLPA §6(xxii), (xlv) |
| 4 | LB0102 | MLPA§6(li)-(liii) | | | MLPA §6(xlv) |
| 5 | LB0103 | MLPA§6(li) | | MLPA §6(xliii) | MLPA §6(xlv) |
| 6 | LB0104 | MLPA§6(li) | MLPA§6(iii)(a) | MLPA §6(xliii) | MLPA §6(xlv) |
| 7 | LB0201 | MLPA§6(l) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 8 | LB0202 | MLPA§6(l) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 9 | LB0205 | | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 10 | LB0301 | MLPA§6(l) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 11 | LB0302 | | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 12 | LB0303 | | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 13 | LB0304 | | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 14 | LB0401 | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 15 | LB0402 | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 16 | LB0403 | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 17 | LB0404 | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 18 | LB0405 | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 19 | LB0406 | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 20 | LB0501 | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 21 | LB0502 | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 22 | GS05X2 | MLPA §3.1(yy) | MLPA §3.1(gg) | | MLPA §3.1(oo) |
| 23 | LB05W1 | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 24 | LB0503 | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 25 | LB05W2 | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 26 | LB05W3 | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 27 | GS06L1 | MLPA §3.1(yy) | MLPA §3.1(gg) | | MLPA §3.1(oo) |
| 28 | LB06W1 | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 29 | LB06W2 | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 30 | LB06W3 | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 31 | LB0601 | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 32 | LB0602 | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 33 | LB0603 | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 34 | LB0604 | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 35 | LB060A | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 36 | LB0605 | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |

Exhibit 6

|    | Issue ID | § 6(lviii) | § 6(xxxv) | § 6(xlii) | § 6(xliv) |
|----|----------|-----------|-----------|-----------|-----------|
| 37 | LB0606 | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 38 | LB0607 | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 39 | LB0608 | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 40 | LB0609 | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 41 | LB0610 | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 42 | LB0611 | MLPA§6(lviii) | MLPA§6(xxxv) | MLPA §6(xlii) | MLPA §6(xliv) |
| 43 | WA07H1 | MLPA§6(lviii) | | | |
| 44 | WA0001 | PSA §2.04(xxviii) | PSA §2.04(ii) | | PSA §2.04(iii) |
| 45 | WA0107 | PSA §2.04(xxviii) | PSA §2.04(ii) | | PSA §2.04(iii) |
| 46 | WA01A3 | | PSA §2.03(iv) | | |
| 47 | WA02A2 | | PSA §2.08(iv) | | |
| 48 | WA02A6 | | PSA §2.08(iv) | | |
| 49 | WA02A9 | | PSA §2.08(iv) | | |
| 50 | WA02AC | | PSA §2.08(iv) | | |
| 51 | WA02AD | | PSA §2.08(iv) | | |
| 52 | WA02AE | | PSA §2.08(iv) | | |
| 53 | WA02AF | | PSA §2.08(iv) | | |
| 54 | WA02AG | | PSA §2.08(iv) | | |
| 55 | WA02AH | | PSA §2.08(iv) | | |
| 56 | WA02AI | | PSA §2.08(iv) | | |
| 57 | WA02AJ | | PSA §2.08(iv) | | |
| 58 | WA03A1 | | PSA §2.08(iv) | | |
| 59 | WA03A2 | | PSA §2.08(iv) | | |
| 60 | WA03A3 | | PSA §2.08(iv) | | |
| 61 | WA03A4 | | PSA §2.08(iv) | | |
| 62 | WA03A5 | | PSA §2.08(iv) | | |
| 63 | WA03A6 | | PSA §2.08(iv) | | |
| 64 | WA03A7 | | PSA §2.08(iv) | | |
| 65 | WA03A8 | | PSA §2.08(iv) | | |
| 66 | WA03A9 | | PSA §2.08(iv) | | |
| 67 | WA03AA | | PSA §2.08(iv) | | |
| 68 | WA03AB | | PSA §2.08(iv) | | |
| 69 | WA03AC | | PSA §2.08(iv) | | |
| 70 | WA04A1 | | PSA §2.08(iv) | | |
| 71 | WA04A2 | | PSA §2.08(iv) | | |
| 72 | WA04A3 | | PSA §2.08(iv) | | |

Exhibit 6

|    | Issue ID | § 6(lviii) | § 6(xxxv) | § 6(xlii) | § 6(xliv) |
|----|----------|------------|-----------------|-----------|---------------|
| 73 | WA04A4 | | PSA §2.08(iv) | | |
| 74 | WA04A5 | | PSA §2.08(iv) | | |
| 75 | WA04A6 | | PSA §2.08(iv) | | |
| 76 | WA04A7 | | PSA §2.08(iv) | | |
| 77 | WA04A8 | | PSA §2.08(iv) | | |
| 78 | WA04AA | | PSA §2.08(iv) | | |
| 79 | WA04AC | | PSA §2.08(iv) | | |
| 80 | WA04AD | | PSA §2.08(iv) | | |
| 81 | WA05A1 | | PSA §2.08(iv) | | |
| 82 | WA05A2 | | PSA §2.08(iv) | | |
| 83 | WA05A4 | | PSA §2.08(iv) | | |
| 84 | WA05A6 | | PSA §2.08(iv) | | |
| 85 | WA05A8 | | PSA §2.08(iv) | | |
| 86 | WA05A9 | | PSA §2.08(iv) | | |
| 87 | WA05AA | | PSA §2.08(iv) | | |
| 88 | WA05AB | | MLPSA §3.1 (iv) | | |
| 89 | WA05AC | | MLPSA §3.1 (iv) | | |
| 90 | WA05AD | | MLPSA §3.1 (iv) | | |
| 91 | WA0601 | | PSA §2.08(d) | | |
| 92 | WA0602 | | PSA §2.08(d) | | |
| 93 | WA06A1 | | MLPSA §3.1 (iv) | | |
| 94 | WA06A3 | | MLPSA §3.1 (iv) | | |
| 95 | WA06A4 | | MLPSA §3.1 (iv) | | |
| 96 | WA06A5 | | MLPSA §3.1 (iv) | | |
| 97 | WA0701 | | PSA §2.08(d) | | |
| 98 | MS0001 | MLPA §7.02(a) | | | MLPA §7.02(c) |
| 99 | CO9201 | | PSA 2.03(x) | | PSA 2.03(x) |

**EXHIBIT 7**

EXHIBIT 7

| | Issue ID | Notice Obligation | Repurchase Obligation | Indemnification Rights | Access Rights |
|---|---|---|---|---|---|
| 1 | LB00F1 | PSA § 2.05 | PSA § 2.04 | PSA § 8.05(b) | PSA § 6.06 |
| 2 | LB0002 | PSA § 2.03 | PSA § 2.03 | PSA § 8.05(b) | PSA § 6.05 |
| 3 | LB0101 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05(b) | PSA § 6.05 |
| 4 | LB0102 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05(b) | PSA § 6.05 |
| 5 | LB0103 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05(b) | PSA § 6.05 |
| 6 | LB0104 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05(b) | PSA § 6.05 |
| 7 | LB0201 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05(b) | PSA § 6.05 |
| 8 | LB0202 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05(b) | PSA § 6.05 |
| 9 | LB0205 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05(b) | PSA § 6.05 |
| 10 | LB0301 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05(b) | PSA § 6.05 |
| 11 | LB0302 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05(b) | PSA § 6.05 |
| 12 | LB0303 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05(b) | PSA § 6.05 |
| 13 | LB0304 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05(b) | PSA § 6.05 |
| 14 | LB0401 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05(b) | PSA § 6.05 |
| 15 | LB0402 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05(b) | PSA § 6.05 |
| 16 | LB0403 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05(b) | PSA § 6.05 |
| 17 | LB0404 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05(b) | PSA § 6.05 |
| 18 | LB0405 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05(b) | PSA § 6.05 |
| 19 | LB0406 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05(b) | PSA § 6.05 |
| 20 | LB0501 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05(b) | PSA § 6.05 |
| 21 | LB0502 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05(b) | PSA § 6.05 |
| 22 | GS05X2 | PSA § 2.03(d) | MLPA § 3.3 | PSA § 8.05 | PSA § 3.19 |
| 23 | LB05W1 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05(b) | PSA § 6.05 |
| 24 | LB0503 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05(b) | PSA § 6.05 |
| 25 | LB05W2 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05(b) | PSA § 6.05 |
| 26 | LB05W3 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05(b) | PSA § 6.05 |
| 27 | GS06L1 | PSA § 2.03(d) | MLPA § 3.3 | PSA § 8.05 | PSA § 3.19 |
| 28 | LB06W1 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05 | PSA § 6.05 |
| 29 | LB06W2 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05 | PSA § 6.05 |
| 30 | LB06W3 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05 | PSA § 6.05 |
| 31 | LB0601 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05(b) | PSA § 6.05 |
| 32 | LB0602 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05 | PSA § 6.05 |
| 33 | LB0603 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05 | PSA § 6.05 |
| 34 | LB0604 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05 | PSA § 6.05 |
| 35 | LB060A | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05 | PSA § 6.05 |
| 36 | LB0605 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05 | PSA § 6.05 |
| 37 | LB0606 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05 | PSA § 6.05 |
| 38 | LB0607 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05 | PSA § 6.05 |
| 39 | LB0608 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05 | PSA § 6.05 |
| 40 | LB0609 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05 | PSA § 6.05 |
| 41 | LB0610 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05 | PSA § 6.05 |
| 42 | LB0611 | PSA § 2.04(b) | PSA § 2.03 | PSA § 8.05 | PSA § 6.05 |
| 43 | WA07H1 | PSA § 2.03 | PSA § 2.03 | PSA § 8.05 | PSA § 6.05 |
| 44 | WA0001 | PSA § 2.04(b) | | PSA §7.01(c) | PSA § 3.05 |
| 45 | WA0107 | PSA § 2.04(b) | | PSA §7.01(c) | PSA § 3.05 |
| 46 | WA01A3 | PSA § 2.03 | PSA § 2.03 | PSA § 8.05 | PSA § 6.05 |
| 47 | WA02A2 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 48 | WA02A6 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 49 | WA02A9 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |

| | Issue ID | Notice Obligation | Repurchase Obligation | Indemnification Rights | Access Rights |
|---|---|---|---|---|---|
| 50 | WA02AC | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 51 | WA02AD | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 52 | WA02AE | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 53 | WA02AF | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 54 | WA02AG | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 55 | WA02AH | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 56 | WA02AI | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 57 | WA02AJ | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 58 | WA03A1 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 59 | WA03A2 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 60 | WA03A3 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 61 | WA03A4 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 62 | WA03A5 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 63 | WA03A6 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 64 | WA03A7 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 65 | WA03A8 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 66 | WA03A9 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 67 | WA03AA | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 68 | WA03AB | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 69 | WA03AC | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 70 | WA04A1 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 71 | WA04A2 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 72 | WA04A3 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 73 | WA04A4 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 74 | WA04A5 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 75 | WA04A6 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 76 | WA04A7 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 77 | WA04A8 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 78 | WA04AA | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 79 | WA04AC | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 80 | WA04AD | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 81 | WA05A1 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 82 | WA05A2 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 83 | WA05A4 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 84 | WA05A6 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 85 | WA05A8 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 86 | WA05A9 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 87 | WA05AA | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 88 | WA05AB | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 89 | WA05AC | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 90 | WA05AD | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 91 | WA0601 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 92 | WA0602 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 93 | WA06A1 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 94 | WA06A3 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 95 | WA06A4 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 96 | WA06A5 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 97 | WA0701 | PSA § 2.08 | PSA § 2.08 | PSA § 8.05 | PSA § 6.05 |
| 98 | MS0001 | MLPA §7.03(a) | MLPA §7.03(b) | MLPA §13.01 | IA § 11.17 |
| 99 | CO9201 | PSA § 2.03 | PSA § 2.03 | PSA § 8.05(b) | PSA § 3.12 |