Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Home Equity Loan or in the application of any insurance in relation to such Home Equity Loan;

(xxxix)     Each Home Equity Loan constitutes a "qualified mortgage" within the meaning of Section 860(G)(a)(3) of the Code;

(xl)          The information set forth in the Prepayment Charge Schedule is complete, true and correct in all material respects at the date or dates respecting with such information is furnished and each Prepayment Charge is permissible and enforceable in accordance with its terms upon the Mortgagor's full and voluntary Principal Prepayment (except to the extent that: (1) the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally; (2) the collectability thereof may be limited due to acceleration in connection with a foreclosure or other involuntary prepayment; or (3) subsequent changes in applicable law may limit or prohibit enforceability thereof) under applicable law;

(xli)        The Loan to Value Ratio for each Home Equity Loan was no greater than 90% at the time of origination;

(xlii)       The first date on which each Mortgagor must make a payment on the related Mortgage Note is no later than 60 days from the date of this Agreement;

(xliii)      With respect to any Home Equity Loan, the related Mortgagor shall not fail to make the first Monthly Payment due under such Home Equity Loan by the second succeeding Due Date after the Due Date on which such Monthly Payment was due (a "First Payment Default");

(xliv)       Each Mortgage Note and each Mortgage is in substantially one of the forms attached hereto as Exhibit 6;

(xlv)        The Seller has not advanced funds, or induced, solicited or knowingly received any advance of funds by a party other than the Mortgagor, directly or indirectly, for the payment of any amount required under the Home Equity Loans;

(xlvi)       There is no proceeding pending, or to best of the Seller's knowledge threatened, for the total or partial condemnation of the Mortgaged Property or the taking by eminent domain of any Mortgaged Property;

(xlvii)      None of the Home Equity Loans are classified as "high cost" loans under Section 32 of the Home Ownership and Equity Protection Act of 1994;

(xlviii)     Each Subsequent Home Equity Loan will comply with the requirements of Section (1)(c)(ix) of this Agreement;

(xlix)      The Seller has originated and identified additional Home Equity Loans not on the Home Equity Loan Schedule as of the Closing Date to be sold to the Depositor and to be included as part of the Group 1 Loans (the "Identified Group 1 Loans"). As of the Closing Date, the Identified Group 1 Loans had aggregate Scheduled Principal Balances which when subtracted from the Group 1 Pre-Funding Amount would cause the Group 1 Pre-Funding Amount to be less than 25% of the aggregate Certificate Principal Balances of the Group 1 Certificates as of the Closing Date; and

(l)      The Seller has originated and identified additional Home Equity Loans not on the Home Equity Loan Schedule as of the Closing Date to be sold to the Depositor and to be included as part of the Group 2 Loans (the "Identified Group 2 Loans"). As of the Closing Date, the Identified Group 2 Loans had aggregate Scheduled Principal Balances which when subtracted from the Group 2 Pre-Funding Amount would cause the Group 2 Pre-Funding Amount to be less than 25% of the aggregate Certificate Principal Balances of the Group 2 Certificates as of the Closing Date.

SECTION 7.   Repurchase Obligation for Defective Documentation and for Breach of Representation and Warranty.

(a)      The representations and warranties contained in Section 5 (ix), (xii) and (xiv) and Section 6 shall not be impaired by any review and examination of loan files or other documents evidencing or relating to the Home Equity Loans or any failure on the part of the Seller or the Purchaser to review or examine such documents and shall inure to the benefit of any assignee, transferee or designee of the Purchaser, including the Trustee for the benefit of holders of fixed rate and floating rate mortgage pass-through certificates evidencing an interest in all or a portion of the Home Equity Loans. With respect to the representations and warranties contained herein which are made to the knowledge or the best of knowledge of the Seller, or as to which the Seller has no knowledge, if it is discovered that the substance of any such representation and warranty was inaccurate as of the date such representation and warranty was made or deemed to be made, and such inaccuracy materially and adversely affects the value of the related Home Equity Loan or the interest therein of the Purchaser or the Purchaser's assignee, transferee or designee, then notwithstanding the lack of knowledge by the Seller with respect to the substance of such representation and warranty being inaccurate at the time the representation and warranty was made, the Seller shall take such action described in the following paragraph in respect of such Home Equity Loan.

Upon discovery by the Seller, the Purchaser or any assignee, transferee or designee of the Purchaser of any materially defective document in, or that any material document was not transferred by the Seller (as listed on the Trustee's Preliminary Exception Report), as part of, any Mortgage File or of a breach of any of the representations and warranties contained in Section 5 or Section 6 that materially and adversely affects the value of any Home Equity Loan or the interest of the Purchaser or the Purchaser's assignee, transferee or designee, the party discovering the breach shall give prompt written notice to the others. Within ninety (90) days of its discovery or its receipt of notice of any such missing documentation which was not

18

transferred to the Purchaser as described above or materially defective documentation or any such breach of a representation and warranty, the Seller promptly shall deliver such missing document or cure such defect or breach in all material respects, or in the event the Seller cannot deliver such missing document or such defect or breach cannot be cured, the Seller shall, within 90 days of its discovery or receipt of notice, either (i) repurchase the affected Home Equity Loan at a price equal to the Purchase Price (as such term is defined in the Pooling and Servicing Agreement) or (ii) pursuant to the provisions of the Pooling and Servicing Agreement, cause the removal of such Home Equity Loan from the Trust Fund and substitute one or more Qualified Substitute Home Equity Loans. The Seller shall amend the Closing Schedule or Subsequent Schedule, as applicable to reflect the withdrawal of such Home Equity Loan from the terms of this Agreement and the Pooling and Servicing Agreement and the addition, if any, of a Qualified Substitute Home Equity Loan. The Seller shall deliver to the Purchaser such amended Closing Schedule or Subsequent Schedule, as applicable and shall deliver such other documents as are required by this Agreement or the Pooling and Servicing Agreement within five (5) days of any such amendment. Any repurchase pursuant to this Section 7(a) shall be accomplished by deposit in the Collection Account of the amount of the Purchase Price in accordance with Section 2.03 of the Pooling and Servicing Agreement. Any repurchase or substitution required by this Section shall be made in a manner consistent with Section 2.03 of the Pooling and Servicing Agreement.

(b)     It is understood and agreed that the obligations of the Seller set forth in this Section 7 to cure, repurchase or substitute for a defective Home Equity Loan constitute the sole remedies of the Purchaser against the Seller respecting a missing or defective document or a breach of the representations and warranties contained in Section 5 or Section 6.

SECTION 8.   Closing; Payment for the Home Equity Loans.  The closing of the purchase and sale of the Home Equity Loans shall be held at the New York City office of Stroock & Stroock & Lavan LLP at 10:00 am New York City time on the Closing Date.

The closing shall be subject to each of the following conditions:

(a)     All of the representations and warranties of the Seller under this Agreement shall be true and correct in all material respects as of the date as of which they are made and no event shall have occurred which, with notice or the passage of time, would constitute a default under this Agreement;

(b)     The Purchaser shall have received, or the attorneys of the Purchaser shall have received in escrow (to be released from escrow at the time of closing), all Closing Documents as specified in Section 9 of this Agreement, in such forms as are agreed upon and acceptable to the Purchaser, duly executed by all signatories other than the Purchaser as required pursuant to the respective terms thereof;

(c)     The Seller shall have delivered or caused to be delivered and released to the Purchaser or to its designee, all documents (including without limitation, the Original Home Equity Loans) required to be so delivered by the Purchaser pursuant to Section 2.01 of the Pooling and Servicing Agreement; and

19

(d)     All other terms and conditions of this Agreement shall have been complied with.

Subject to the foregoing conditions, the Purchaser shall deliver or cause to be delivered to the Seller on the Closing Date, against delivery and release by the Seller to the Trustee of all documents required pursuant to the Pooling and Servicing Agreement, the consideration for the Home Equity Loans as specified in Section 3 of this Agreement, by delivery to the Seller of the Purchase Price in immediately available funds and delivery of the Long Beach Mortgage Securities Corp. Certificates to Long Beach Asset Holdings Corp.

SECTION 9.   Closing Documents.  Without limiting the generality of Section 8 hereof, the closing shall be subject to delivery of each of the following documents:

(a)     An Officers' Certificate of the Seller, dated the Closing Date, upon which the Purchaser and Credit Suisse First Boston Corporation as representative of the several underwriters (the "Representative") may rely, in the form of Exhibit 2 hereto, and attached thereto copies of the certificate of incorporation, by-laws and certificate of good standing of the Seller under the laws of Delaware;

(b)     An Officers' Certificate of the Seller, dated the Closing Date, upon which the Purchaser and the Representative may rely, in the form of Exhibit 3 hereto, with respect to certain facts regarding the sale of the Home Equity Loans by the Seller to the Purchaser;

(c)     An Opinion of Counsel of the Seller, dated the Closing Date and addressed to the Purchaser and the Underwriter, substantially in the form attached hereto as Exhibit 4;

(d)     Such opinions of counsel as the Rating Agencies or the Trustee may request in connection with the sale of the Home Equity Loans by the Seller to the Purchaser or the Seller's execution and delivery of, or performance under, this Agreement;

(e)     A letter from Deloitte & Touche L.L.P., certified public accountants, dated the date hereof and to the effect that they have performed certain specified procedures as a result of which they determined that certain information of an accounting, financial or statistical nature set forth in the Purchaser's Prospectus Supplement, dated August 28, 2000, under the captions "Summary of Prospectus Supplement," "The Home Equity Loan Pool," "Yield on the Certificates," "Description of the Certificates" and "Pooling and Servicing Agreement—The Master Servicer" agrees with the records of the Seller;

(f)     The Seller shall deliver to the Purchaser for inclusion in the Prospectus Supplement under the captions "The Home Equity Loan Pool" and "Pooling and Servicing Agreement—The Master Servicer," or for inclusion in other offering material such publicly available information regarding the Seller, its financial condition and its home equity loan delinquency, foreclosure and loss experience, underwriting standards, lending activities and loan

sales, production, and servicing and collection practices, and any similar nonpublic, unaudited financial information and a computer tape with respect to the pool information;

       (g)    Letters from at least two nationally recognized statistical rating agencies rating the Offered Certificates; and

       (h)    Such further information, certificates, opinions and documents as the Purchaser or the Underwriter may reasonably request.

       SECTION 10. <u>Costs</u>. The Seller shall pay (or shall reimburse the Purchaser or any other Person to the extent that the Purchaser or such other Person shall pay) all costs and expenses incurred in connection with the transfer and delivery of the Home Equity Loans, including without limitation, recording fees, fees for title policy endorsements and continuations and the fees for recording Assignments of Mortgage, the fees and expenses of the Seller's in-house accountants and in-house attorneys, the costs and expenses incurred in connection with determining the Seller's loan loss, foreclosure and delinquency experience, the costs and expenses incurred in connection with obtaining the documents referred to in Sections 9(d) and 9(e), the cost of an opinion of counsel regarding the true sale of the home equity loans, the legal fees and disbursements of Stroock & Stroock & Lavan, LLP, counsel to the Representative and the Purchaser, the costs and expenses of printing (or otherwise reproducing) and delivering this Agreement, the Pooling and Servicing Agreement, the Certificates, the prospectus, prospectus supplement, any blue sky filings and private placement memorandum relating to the Certificates and other related documents, the initial fees, costs and expenses of the Trustee, the fees and expenses of the Purchaser's counsel in connection with the preparation of all documents relating to the securitization of the Home Equity Loans, the filing fee charged by the Securities and Exchange Commission for registration of the Certificates, the cost of any opinions of outside special counsel that may be required for the Seller, the cost of obtaining the documents referred to in Section 9(e) hereof and the fees charged by any rating agency to rate the Certificates. All other costs and expenses in connection with the transactions contemplated hereunder shall be borne by the party incurring such expense.

       SECTION 11. <u>Servicing</u>. The Seller has represented to the Purchaser that the Home Equity Loans are being serviced in accordance with the terms of the Pooling and Servicing Agreement, and it is understood and agreed by and between the Seller and the Purchaser that any interim servicing arrangements with the Seller will be superseded by the servicing arrangements set forth in the Pooling and Servicing Agreement.

       SECTION 12. <u>Mandatory Delivery; Grant of Security Interest</u>. The sale and delivery on the Closing Date of the Original Home Equity Loans and on each Subsequent Transfer Date of the related Subsequent Home Equity Loans described on the Home Equity Loan Schedule in accordance with the terms and conditions of this Agreement is mandatory. It is specifically understood and agreed that each Home Equity Loan is unique and identifiable on the date hereof and that an award of money damages would be insufficient to compensate the Purchaser for the losses and damages incurred by the Purchaser in the event of the Seller's failure to deliver the Home Equity Loans on or before the Closing Date or Subsequent Transfer Date as

applicable.  The Seller hereby grants to the Purchaser a lien on and a continuing security interest in the Seller's interest in each Home Equity Loan and each document and instrument evidencing each such Home Equity Loan to secure the performance by the Seller of its obligation hereunder, and the Seller agrees that it holds such Home Equity Loans in custody for the Purchaser, subject to (i) the Purchaser's right, [prior to the Closing Date], to reject any Home Equity Loan to the extent permitted by this Agreement and (ii) the Purchaser's obligation to deliver or cause to be delivered the consideration for the Home Equity Loans pursuant to Section 8 hereof.  Any Home Equity Loans rejected by the Purchaser shall concurrently therewith be released from the security interest created hereby.  The Seller agrees that, upon acceptance of the Home Equity Loans by the Purchaser or its designee and delivery of payment to the Seller, that its security interest in the Home Equity Loans shall be released.  All rights and remedies of the Purchaser under this Agreement are distinct from, and cumulative with, any other rights or remedies under this Agreement or afforded by law or equity and all such rights and remedies may be exercised concurrently, independently or successively.

Notwithstanding the foregoing, if on the Closing Date, each of the conditions set forth in Section 8 hereof shall have been satisfied and the Purchaser shall not have paid or caused to be paid the Purchase Price, or any such condition shall not have been waived or satisfied and the Purchaser determines not to pay or cause to be paid the Purchase Price, the Purchaser shall immediately effect the redelivery of the Home Equity Loans, if delivery to the Purchaser has occurred and the security interest created by this Section 12 shall be deemed to have been released.

SECTION 13.  Notices.  All demands, notices and communications hereunder shall be in writing and shall be deemed to have been duly given if personally delivered to or mailed by registered mail, postage prepaid, or transmitted by telex or telegraph and confirmed by a similar mailed writing, if to the Purchaser, addressed to the Purchaser at 11 Madison Avenue, New York, New York 10010, Attention: Secretary, or such other address as may hereafter be furnished to the Seller in writing by the Purchaser; if to the Seller, addressed to the Seller at 1100 Town & Country Road, Suite 1650, Orange, California 92868, Attention: General Counsel, or to such other address as the Seller may designate in writing to the Purchaser.

SECTION 14.  Severability of Provisions.  Any part, provision, representation or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof.  Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to any Home Equity Loan shall not invalidate or render unenforceable such provision in any other jurisdiction.  To the extent permitted by applicable law, the parties hereto waive any provision of law which prohibits or renders void or unenforceable any provision hereof.

1011959v10

SECTION 15. Agreement of Parties. The Seller and the Purchaser each agree to execute and deliver such instruments (including UCC financing statements and continuation statements) and take such actions as either of the others may, from time to time, reasonably request in order to effectuate the purpose and to carry out the terms of this Agreement and the Pooling and Servicing Agreement.

SECTION 16. Survival. The Seller agrees that the representations, warranties and agreements made by it herein and in any certificate or other instrument delivered pursuant hereto shall be deemed to be relied upon by the Purchaser, notwithstanding any investigation heretofore or hereafter made by the Purchaser or on its behalf, and that the representations, warranties and agreements made by the Seller herein or in any such certificate or other instrument shall survive the delivery of and payment for the Home Equity Loans and shall continue in full force and effect, notwithstanding any restrictive or qualified endorsement on the Mortgage Notes and notwithstanding subsequent termination of this Agreement, the Pooling and Servicing Agreement or the Trust Fund.

SECTION 17. Indemnification. (a) The Seller will indemnify and hold harmless each of (i) Credit Suisse First Boston Corporation, as representative of the underwriters (the "Representative"), (ii) the Purchaser and (iii) each person, if any, who controls the Representative or the Purchaser within the meaning of Section 15 of the Securities Act of 1933, as amended (the "1933 Act") or the Securities Exchange Act of 1934, as amended (the "1934 Act") ((i) through (iii) collectively, the "Indemnified Party") against any and all losses, claims, expenses, damages or liabilities, to which the Indemnified Party may become subject, under the 1933 Act or otherwise, and will reimburse each Indemnified Party for any legal or other expenses incurred by the Indemnified Party in connection with investigating or defending any such loss, claim, expenses, damage, liability or action insofar as such losses, claims, expenses, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in the Prospectus Supplement dated August 28, 2000 (the "Prospectus Supplement"), as amended or supplemented, relating to the public offering of the Certificates, representing interests in the Home Equity Loans, or in any other offering document (the "Private Placement Memorandum") relating to the offering by the Purchaser or an affiliate thereof, of the Class X, Class P and Class B-IO Certificates, or the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances in which they were made, not misleading, in each case to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in reliance upon and in conformity with (i) information furnished in writing to the Purchaser or any of its affiliates by the Seller specifically for use therein, which shall include, with respect to the Prospectus Supplement, the information set forth under the captions "Summary of Prospectus Supplement—The Home Equity Loans," "Summary of Prospectus—Statistical Calculation Information," "Risk Factors" (but only to the extent that the information under "Risk Factors" has been furnished by the Seller), "The Home Equity Loan Pool," "Pooling and Servicing Agreement—The Master Servicer" and, with respect to any Private Placement Memorandum, any information of a comparable nature, (ii) the data files containing information with respect to the Home Equity Loans as transmitted by modem to the Purchaser by the Seller or any of its affiliates (as such

1011959v10

transmitted information may have been amended in writing by the Seller or any of its affiliates and received by the Purchaser subsequent to transmission) specifically for use therein, which shall include, with respect to the Prospectus Supplement, the information set forth under the captions "Summary of Prospectus Supplement—The Home Equity Loans," "Summary of Prospectus—Statistical Calculation Information," "Risk Factors" (but only to the extent that the information under "Risk Factors" has been furnished by the Seller), "The Home Equity Loan Pool," "Pooling and Servicing Agreement." The Master Servicer" and, with respect to any Private Placement Memorandum, any information of a comparable nature or (iii) any representation, warranty or covenant made by the Seller or any affiliate of the Seller in this Agreement and the Pooling and Servicing Agreement, on which the Indemnified Party has relied ((i) through (iii) collectively "Seller Information"), provided however, that to the extent that any such losses, claims, expenses, damages or liabilities to which the Indemnified Party may become subject arise out of or are based upon both (1) statements, omissions, representations, warranties or covenants of the Seller described above and (2) any other factual basis, the Seller shall indemnify and hold harmless the Indemnified Party only to the extent that the losses, claims expenses, damages or liabilities of the person or persons asserting the claim are determined to arise from or be based only upon matters set forth in clause (1) above. The Seller's liability under this Section 17 shall be in addition to any other liability the Seller may otherwise have.

(b)     The Purchaser agrees to indemnify and hold harmless the Seller, its officers and its directors, and each person who controls the Seller within the meaning of either the 1933 Act against any and all losses, claims, damages or liabilities, joint or several, to which they may become subject under the 1933 Act, or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of a material fact contained in the Prospectus Supplement, the Prospectus or Private Placement Memorandum, or in any revision or amendment thereof or supplement thereto, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances in which they were made, not misleading, except insofar as such losses, claims, damages or liabilities are caused by any untrue statement or omission or alleged untrue statement or omission made therein in reliance upon and in conformity with the Seller's Information and will reimburse the Seller and any controlling person for any legal or other expenses reasonably incurred by such Seller and any controlling person in connection with investigating or defending any such loss, claim, damage, liability or action. The Purchaser's liability under this Section 17 shall be in addition to any other liability the Purchaser may otherwise have.

(c)     In case any proceeding (including any governmental investigation) shall be instituted involving any person in respect of which indemnity may be sought pursuant to either Section 17(a) or 17(b) above, such person (the "indemnified party") shall promptly notify the person against whom such indemnity may be sought (the "indemnifying party") in writing and the indemnifying party, upon request of the indemnified party, shall retain counsel reasonably satisfactory to the indemnified party to represent the indemnified party and any others the indemnifying party may designate in such proceeding and shall pay the reasonable fees and disbursements of such counsel related to such proceeding. In any such proceeding, any

indemnified party shall have the right to retain its own counsel, but the reasonable fees and expenses of such counsel shall be at the expense of such indemnified party unless (i) the indemnifying party and the indemnified party shall have mutually agreed to the retention of such counsel, (ii) the named parties to any such proceeding (including any impleaded parties) include both the indemnifying party and the indemnified party and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them or (iii) the indemnifying party has failed to assume the defense of such action and employ counsel reasonably satisfactory to the indemnified party. It is understood that the indemnifying party shall not, in connection with any proceeding or related proceedings in the same jurisdiction, be liable for the reasonable fees and expenses of more than one separate firm for all such indemnified parties. Such firm shall be designated in writing by the Purchaser, in the case of parties indemnified pursuant to clause 17(a) and by the Seller, in the case of parties indemnified pursuant to clause 17(b). The indemnifying party may, at its option, at any time upon written notice to the indemnified party, assume the defense of any proceeding and may designate counsel satisfactory to the indemnified party in connection therewith provided that the counsel so designated would have no actual or potential conflict of interest in connection with such representation. Unless it shall assume the defense of any proceeding, the indemnifying party shall not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent or if there be a final judgment for the plaintiff, the indemnifying party agrees to indemnify the indemnified party from and against any loss or liability by reason of such settlement or judgment. If the indemnifying party assumes the defense of any proceeding, it shall be entitled to settle such proceeding with the prior written consent of the indemnified party or, if (i) such settlement does not include a statement as to, or on admission of fault, culpability or failure to act by or on behalf of the indemnified party and (ii) such settlement provides for an unconditional release of the indemnified party in connection with all matters relating to the proceeding which have been asserted against the indemnified party in such proceeding by the other parties to such settlement, without the prior written consent of the indemnified party.

(d) If the indemnification provided for in this Section 17 is unavailable to an indemnified party under Section 17(a) or 17(b) hereof or insufficient in respect of any losses, claims, damages or liabilities referred to therein, then the indemnifying party, in lieu of indemnifying such indemnified party, shall contribute to the amount paid or payable by such indemnified party as a result of such losses, claims, damages or liabilities, in such proportion as is appropriate to reflect the relative fault of the indemnified and indemnifying parties in connection with the statements or omissions which resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations. The relative fault of the indemnified and indemnifying parties shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by such parties and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

(e) In order to provide for just and equitable contribution in circumstances in which the indemnification provided for in paragraph (a) of this Section 17 is due in accordance with its terms but is for any reason held by a court to be unavailable from the Seller on grounds

of policy or otherwise, the Seller on the one hand and the Purchaser on the other hand shall contribute to the aggregate losses, claims, damages and liabilities (including legal and other expenses reasonably incurred in connection with investigating or defending same) (collectively, "Losses") to which the Seller on the one hand and the Purchaser on the other hand may be subject in such proportion as is appropriate to reflect the relative benefits received by the Seller on the one hand and the Purchaser on the other hand from the sale of the Home Equity Loans; provided, however, that in no case shall the Purchaser be responsible for any amount in excess of 0.225% of the aggregate initial principal balance of the Home Equity Loans.  If the allocation provided by the immediately preceding sentence is unavailable for any reason, the Seller on the one hand and the Purchaser on the other hand shall contribute in such proportion as is appropriate to reflect not only such relative benefits but also the relative fault of the Seller on the one hand and the Purchaser on the other hand in connection with the statements or omissions that resulted in such Losses as well as any other relevant equitable considerations.  Benefits received by the Seller shall be deemed to be equal to the total net proceeds from the sale (before deducting expenses) plus the value of all Certificates retained by the Seller or one of its affiliates and benefits received by the Purchaser shall be deemed to be equal to 0.225% of the aggregate initial principal balance of the Home Equity Loans.  Relative fault shall be determined by reference to whether any alleged untrue statement or omission relates to the information provided by the Seller on the one hand or the Purchaser on the other hand.  The Seller and the Purchaser agree that it would not be just and equitable if contribution were determined by pro rata allocation or any other method of allocation that does not take account of the equitable considerations referred to above. Notwithstanding the provisions of this subsection (e) the Representative shall not be required to contribute any amount in excess of the amount by which the total price at which the related Offered Certificates underwritten by it and distributed to the public were offered to the public exceeds the amount of any damages which such Representative has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission.  No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation.  For purposes of this Section 17, each person, if any, who controls the Purchaser within the meaning of the Securities Act or the 1934 Act and each director, officer, employee and agent of the Purchaser shall have the same rights to contribution as the Purchaser, and each person, if any, who controls the Seller within the meaning of either the Securities Act or the 1934 Act and each director of the Seller shall have the same rights to contribution as the Seller, subject in each case to the applicable terms and conditions of this paragraph 17(e).

(f)     The indemnity and contribution agreements contained in this Section 17 shall remain operative and in full force and effect regardless of (i) any termination of this Agreement, (ii) any investigation made by the Purchaser or any person controlling the Purchaser or by or on behalf of the Seller and their respective directors or officers or any person controlling the Seller, and (iii) acceptance of and payment for any of the Certificates.

SECTION 18. Termination of Obligations.  The Purchaser may terminate its obligations hereunder by notice to the Seller at any time before delivery of and payment of the purchase price for the Home Equity Loans if:  (i) any of the conditions set forth in Section 8 and

9 hereof are not satisfied when and as provided therein; (ii) there shall have been the entry of a decree or order by a court or agency or supervisory authority having jurisdiction in the premises for the appointment of a conservator, receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to the Seller or for the winding up or liquidation of the affairs of the Seller; (iii) there shall have been the consent by the Seller to the appointment of a conservator or receiver or liquidator in any insolvency, readjustment of debt, marshaling of assets and liabilities or similar proceedings of or relating to the Seller or of or relating to substantially all of the Mortgaged Property of the Seller; or (iv) a Termination Event shall have occurred.  The termination of the Purchaser's obligations hereunder shall not terminate the Purchaser's rights hereunder or its right to exercise any remedy available to it at law or in equity.  A "Termination Event" means the existence of any one or more of the following conditions:

> (a)     a stop order suspending the effectiveness of the Registration Statement shall have been issued or a proceeding for that purpose shall have been initiated or threatened by the Securities and Exchange Commission; or

> (b)     subsequent to the execution and delivery of this Agreement, a downgrading, or public notification of a possible change, without indication of direction, shall have occurred in the rating afforded any of the debt securities or claims paying ability of any person providing any form of credit enhancement for any of the Certificates, by any "nationally recognized statistical rating organization," as that term is defined by the Commission for purposes of Rule 436(g)(2) under the 1933 Act; or

> (c)     subsequent to the execution and delivery of this Agreement, there shall have occurred an adverse change in the condition, financial or otherwise, in the earnings, affairs, regulatory situation or business prospects of the Seller which is reasonably determined by the Purchaser to be material; or

> (d)     subsequent to the date of this Agreement there shall have occurred any of the following: (i) any suspension or limitation of trading in securities generally on the New York Stock Exchange or any setting of minimum prices for trading on such exchange, or any suspension of trading of any securities of the Seller on any exchange or in the over-the-counter market or a suspension or material limitation in trading in securities substantially similar to the Certificates; (ii) a general moratorium on commercial banking activities in New York declared by either Federal or New York State authorities; or (iii) the engagement by the United States in hostilities, or the escalation of such hostilities, or any calamity or crisis, if the effect of any such event specified in this clause (iii) in the reasonable judgment of the Purchaser makes it impracticable or inadvisable to proceed with the public offering or the delivery of the Certificates on the terms and in the manner contemplated in the Prospectus Supplement.

1011959v10

SECTION 19. <u>GOVERNING LAW</u>.  THIS AGREEMENT AND THE RIGHTS, DUTIES, OBLIGATIONS AND RESPONSIBILITIES OF THE PARTIES HERETO SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS (INCLUDING THE CHOICE OF LAW PROVISIONS) AND DECISIONS OF THE STATE OF NEW YORK.  THE PARTIES HERETO INTEND THAT THE PROVISIONS OF SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW SHALL APPLY TO THIS AGREEMENT.

SECTION 20. <u>Miscellaneous</u>  This Agreement may be executed in two or more counterparts, each of which when so executed and delivered shall be an original, but all of which together shall constitute one and the same instrument.  This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.  This Agreement supersedes all prior agreements and understandings relating to the subject matter hereof.  Neither this Agreement nor any term hereof may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.  The headings in this Agreement are for purposes of reference only and shall not limit or otherwise affect the meaning hereof.

It is the express intent of the parties hereto that the conveyance of the Home Equity Loans by the Seller to the Purchaser as provided in Section 4 hereof be, and be construed as, a sale of the Home Equity Loans by the Seller to the Purchaser and not as a pledge of the Home Equity Loans by the Seller to the Purchaser to secure a debt or other obligation of the Seller.  However, in the event that, notwithstanding the aforementioned intent of the parties, the Home Equity Loans are held to be property of the Seller, then, (a) it is the express intent of the parties that such conveyance be deemed a pledge of the Home Equity Loans by the Seller to the Purchaser to secure a debt or other obligation of the Seller and (b) (1) this Agreement shall also be deemed to be a security agreement within the meaning of Articles 8 and 9 of the New York Uniform Commercial Code; (2) the conveyance provided for in Section 4 hereof shall be deemed to be a grant by the Seller to the Purchaser of a security interest in all of the Seller's right, title and interest in and to the Home Equity Loans and all amounts payable to the holders of the Home Equity Loans in accordance with the terms thereof and all proceeds of the conversion, voluntary or involuntary, of the foregoing into cash, instruments, securities or other property, including without limitation all amounts, other than investment earnings, from time to time held or invested in the Collection Account whether in the form of cash, instruments, securities or other property; (3) the possession by the Purchaser or its agent of Mortgage Notes, the related Mortgages and such other items of property that constitute instruments, money, negotiable documents or chattel paper shall be deemed to be "possession by the secured party" for purposes of perfecting the security interest pursuant to Section 9-305 of the New York Uniform Commercial Code; and (4) notifications to persons holding such property, and acknowledgments, receipts or confirmations from persons holding such property, shall be deemed notifications to, or acknowledgments, receipts or confirmations from, financial intermediaries, bailees or agents (as applicable) of the Purchaser for the purpose of perfecting such security interest under applicable law.  Any assignment of the interest of the Purchaser pursuant to Section 4(d) hereof shall also be deemed to be an assignment of any security interest created hereby.  The Seller and the Purchaser

1011959v10

shall, to the extent consistent with this Agreement, take such actions as may be necessary to ensure that, if this Agreement were deemed to create a security interest in the Home Equity Loans, such security interest would be deemed to be a perfected security interest of first priority under applicable law and will be maintained as such throughout the term of this Agreement and the Pooling and Servicing Agreement.

            SECTION 21. <u>Third Party Beneficiary</u>. Each of the Trustee and R.V.I Guaranty Co., Ltd., shall be a third party beneficiary hereof and shall be entitled to enforce the provisions hereof as if a party hereto, except the provisions of Section 17 and 18 hereof.  This provision shall not limit waiver, enforcement and consent powers that the R.V.I Guaranty Co., Ltd. has except as specifically agreed in a separate letter agreement between such parties or as otherwise agreed between the R.V.I. Guaranty Co., Ltd. and the parties may perform in accordance with such powers.  The Representative, on behalf of the underwriters, shall be a third party beneficiary hereof solely with respect to Section 17 and shall be entitled to enforce the provisions of Section 17 as if it were a party hereto.

IN WITNESS WHEREOF, the Purchaser and the Seller have caused their names to be signed by their respective officers thereunto duly authorized as of the date first above written.

ASSET BACKED SECURITIES
CORPORATION

By:_____

    Name: FIACHAR A O'DRISCOLL
    Title: VICE PRESIDENT

LONG BEACH MORTGAGE COMPANY

By:_____
    Name:
    Title:

30