"Plan":   Any employee benefit plan or certain other retirement plans and arrangements, including individual retirement accounts and annuities, Keogh plans and bank collective investment funds and insurance company general or separate accounts in which such plans, accounts or arrangements are invested, that are subject to ERISA and Section 4975 of the Code.

"Pre-Funding Account":  Either of the Group 1 Pre-Funding Account or the Group 2 Pre-Funding Account.

"Pre-Funding Period":  With respect to each Loan Group, the period commencing on the Closing Date and ending on the earlier to occur of (i) the date on which the amount on deposit in the Pre-Funding Accounts (exclusive of any investment earnings) is less than $100,000 and (ii) November 30, 2000.

"Prepayment Assumption":  With respect to the Home Equity Loans for Loan Group 1, 120% of the Structuring Assumption.  The Structuring Assumption assumes a constant prepayment rate ("CPR") of 4.0% per annum of the then unpaid Stated Principal Balance of such Home Equity Loan in the first month of the life of such Home Equity Loan and an additional 1.455% per annum in each month thereafter until the 12th month.  Beginning in the 12th month and in each month thereafter during the life of such home equity loans, 100% Structuring Assumption assumes a CPR of 20%.  A prepayment rate for the Home Equity Loans for Loan Group 2 of 27% CPR. The Prepayment Assumption is used solely for determining the accrual of original issue discount on the Certificates for federal income tax purposes.  A CPR (or Constant Prepayment Rate) represents an annualized constant assumed rate of prepayment each month of a pool of home equity loans relative to its outstanding principal balance for the life of such pool.

"Prepayment Charge":  With respect to any Prepayment Period, any prepayment premium, penalty or charge collected by the Master Servicer from a Mortgagor in connection with any voluntary Principal Prepayment in full pursuant to the terms of the related Mortgage Note and held from time to time as a part of the Trust Fund.

"Prepayment Charge Schedule":  As of any date, the list of Home Equity Loans that permit collection of Prepayment Charges included in the Trust Fund on such date, attached hereto as Schedule 2 (including the prepayment charge summary attached thereto).   The Prepayment Charge Schedule may be part of the Home Equity Loan Schedule, and shall set forth the following information with respect to each related Home Equity Loan by Loan Group:

(i)      the Master Servicer's Home Equity Loan identifying number;

(ii)     a code indicating the type of Prepayment Charge;

(iii)    the state of origination of the related Home Equity Loan;

(iv)    the date on which the first Monthly Payment was due on the related Home Equity Loan;

32

1011956A27

(v)     the term of the related Home Equity Loan; and

(vi)    the principal balance of the related Home Equity Loan as of the Cut-off Date.

The Prepayment Charge Schedule shall be amended from time to time by the Master Servicer in accordance with the provisions of this Agreement.

"Prepayment Interest Shortfall": With respect to any Distribution Date, for each Home Equity Loan that was during the related Prepayment Period the subject of a Principal Prepayment in full or in part that was applied by the Master Servicer to reduce the outstanding principal balance of such loan on a date preceding the Due Date in the succeeding Prepayment Period, an amount equal to interest at the applicable Net Mortgage Rate on the amount of such Principal Prepayment for the number of days commencing on the date on which the prepayment is applied and ending on the last day of the related Prepayment Period. The obligations of the Master Servicer in respect of any Prepayment Interest Shortfall are set forth in Section 3.24.

"Prepayment Period": With respect to any Distribution Date, the calendar month preceding the calendar month in which such Distribution Date occurs.

"Prepaid Interest Deposit Amount": With respect to the Distribution Dates in September and October 2000 and each Original Home Equity Loan that does not have a Due Date in the related Due Period, an amount equal to 30 days' interest on the Stated Principal Balance of such Original Home Equity Loans at the related Net Mortgage Rate.

"Principal Distribution Amount": With respect to any Distribution Date and either Loan Group, the lesser of:

(a)     the excess of the Available Distribution Amount for such Loan Group over the amount payable on the Class A Certificates and the Subordinated Certificates pursuant to Section 4.01(a)(1); and

(b)     the sum of:

(i)     the principal portion of each Monthly Payment on the Home Equity Loans of such Loan Group due during the related Due Period, whether or not received on or prior to the related Determination Date;

(ii)    the Stated Principal Balance of any Home Equity Loan of such Loan Group that was purchased during the related Prepayment Period pursuant to or as contemplated by Section 2.03, Section 3.16(c) or Section 9.01 and the amount of any shortfall deposited in the Collection Account in connection with the substitution of a Deleted Home Equity Loan pursuant to Section 2.03 during the related Prepayment Period;

(iii)    the principal portion of all other unscheduled collections (including, without limitation, Principal Prepayments, Insurance Proceeds, Liquidation Proceeds and REO Principal Amortization) received during the related Prepayment Period with respect to such Loan Group, net of any portion thereof that represents a recovery of principal for which an advance was made by the Master Servicer pursuant to Section 4.03 in respect of a preceding Distribution Date and such Loan Group;

(iv)    the principal portion of any Realized Losses incurred on the Home Equity Loans of such Loan Group during the related Prepayment Period to the extent covered by Net Monthly Excess Cashflow of the related Loan Group for such Distribution Date; and

(v)    the amount of any Overcollateralization Increase Amount for such Distribution Date and related Certificate Group to the extent covered by Net Monthly Excess Cashflow of such Loan Group for such Distribution Date;

minus:

(vi)    the amount of any Overcollateralization Reduction Amount for such Loan Group for such Distribution Date.

"Principal Prepayment": Any payment of principal made by the Mortgagor on a Home Equity Loan which is received in advance of its scheduled Due Date and which is not accompanied by an amount of interest (without regard to any Prepayment Charge that may have been collected by the Master Servicer in connection with such payment of principal) representing the full amount of scheduled interest due on any Due Date in any month or months subsequent to the month of prepayment.

"PTCE": A Prohibited Transaction Class Exemption.

"Purchase Price": With respect to any Home Equity Loan or REO Property to be purchased pursuant to or as contemplated by Section 2.03, Section 3.16(c) or Section 9.01, and as confirmed by an Officers' Certificate from the Master Servicer to the Trustee, an amount equal to the sum of (i) 100% of the Stated Principal Balance thereof as of the date of purchase (or such other price as provided in Section 9.01), (ii) in the case of (x) a Home Equity Loan, accrued interest on such Stated Principal Balance at the applicable Net Mortgage Rate in effect from time to time from the Due Date as to which interest was last covered by a payment by the Mortgagor or an advance by the Master Servicer, which payment or advance had as of the date of purchase been distributed pursuant to Section 4.01, through the end of the calendar month in which the purchase is to be effected and (y) an REO Property, the sum of (1) accrued interest on such Stated Principal Balance at the applicable Net Mortgage Rate in effect from time to time from the Due Date as to which interest was last covered by a payment by the Mortgagor or an advance by the Master Servicer through the end of the calendar month immediately preceding the calendar month in which such REO Property was acquired, plus (2) REO Imputed Interest for such REO

34

Property for each calendar month commencing with the calendar month in which such REO Property was acquired and ending with the calendar month in which such purchase is to be effected, net of the total of all net rental income. Insurance Proceeds, Liquidation Proceeds and P&I Advances that as of the date of purchase had been distributed as or to cover REO Imputed Interest pursuant to Section 4.01, (iii) any unreimbursed Servicing Advances and P&I Advances and any unpaid Servicing Fees allocable to such Home Equity Loan or REO Property and any P&I Advances previously reimbursed to the Master Servicer pursuant to Section 3.11(a)(iv), (iv) any amounts previously withdrawn from the Collection Account in respect of such Home Equity Loan or REO Property pursuant to Section 3.11(a)(ix) and Section 3.16(b), and (v) in the case of a Home Equity Loan required to be purchased pursuant to Section 2.03, expenses reasonably incurred or to be incurred by the Master Servicer or the Trustee in respect of the breach or defect giving rise to the purchase obligation.

"Qualified Substitute Home Equity Loan": A home equity loan substituted for a Deleted Home Equity Loan pursuant to the terms of this Agreement which must, on the date of such substitution, (i) have an outstanding principal balance, after application of all scheduled payments of principal and interest due during or prior to the month of substitution, not in excess of the Scheduled Principal Balance of the Deleted Home Equity Loan as of the Due Date in the calendar month during which the substitution occurs, (ii) have a Mortgage Rate not less than (and not more than one percentage point in excess of) the Mortgage Rate of the Deleted Home Equity Loan, (iii) with respect to each Adjustable Rate Home Equity Loan have a Maximum Mortgage Rate not less than the Maximum Mortgage Rate on the Deleted Home Equity Loan, (iv) with respect to each Adjustable Rate Home Equity Loan have a Minimum Mortgage Rate not less than the Minimum Mortgage Rate of the Deleted Home Equity Loan, (v) with respect to each Adjustable Rate Home Equity Loan have a Gross Margin equal to the Gross Margin of the Deleted Home Equity Loan, (vi) with respect to each Adjustable Rate Home Equity Loan have a next Adjustment Date not more than two months later than the next Adjustment Date on the Deleted Home Equity Loan, (vii) have a remaining term to maturity not greater than (and not more than one year less than) that of the Deleted Home Equity Loan, (viii) have the same Due Date as the Due Date on the Deleted Home Equity Loan, (ix) have a Loan-to-Value Ratio as of the date of substitution equal to or lower than the Loan-to-Value Ratio of the Deleted Home Equity Loan as of such date, (x) have a risk grading determined by the Master Servicer at least equal to the risk grading assigned on the Deleted Home Equity Loan and (xi) conform to each representation and warranty set forth in Section 6 of the Mortgage Loan Purchase Agreement. In the event that one or more home equity loans are substituted for one or more Deleted Home Equity Loans, the amounts described in clause (i) hereof shall be determined on the basis of aggregate principal balances, the Mortgage Rates described in clause (ii) hereof shall be determined on the basis of weighted average Mortgage Rates, the terms described in clause (vii) hereof shall be determined on the basis of weighted average remaining term to maturity, the Loan-to-Value Ratios described in clause (ix) hereof shall be satisfied as to each such Home Equity Loan, the risk gradings described in clause (x) hereof shall be satisfied as to each such Home Equity Loan and, except to the extent otherwise provided in this sentence, the representations and warranties described in clause (xi) hereof must be satisfied as to each Qualified Substitute Home Equity Loan or in the aggregate, as the case may be.

35

"Rate Cap Agreement": An interest rate cap contract under which the Current WAC Excess for the Adjustable Rate Certificates and the Certificateholder's Interest Index Carryover is paid.

"Rating Agency or Rating Agencies": Moody's and Fitch or their successors. If such agencies or their successors are no longer in existence. "Rating Agencies" shall be such nationally recognized statistical rating agencies, or other comparable Persons, designated by the Depositor, notice of which designation shall be given to the Trustee and the Master Servicer.

"Realized Loss": With respect to each Home Equity Loan as to which a Final Recovery Determination has been made, an amount (not less than zero) equal to (i) the unpaid principal balance of such Home Equity Loan as of the commencement of the calendar month in which the Final Recovery Determination was made, plus (ii) accrued interest from the Due Date as to which interest was last paid by the Mortgagor through the end of the calendar month in which such Final Recovery Determination was made, calculated in the case of each calendar month during such period (A) at an annual rate equal to the annual rate at which interest was then accruing on such Home Equity Loan and (B) on a principal amount equal to the Stated Principal Balance of such Home Equity Loan as of the close of business on the Distribution Date during such calendar month, plus (iii) any amounts previously withdrawn from the Collection Account in respect of such Home Equity Loan pursuant to Section 3.11(a)(ix) and Section 3.16(b), minus (iv) the proceeds, if any, received in respect of such Home Equity Loan during the calendar month in which such Final Recovery Determination was made, net of amounts that are payable therefrom to the Master Servicer with respect to such Home Equity Loan pursuant to Section 3.11(a)(iii).

With respect to any REO Property as to which a Final Recovery Determination has been made, an amount (not less than zero) equal to (i) the unpaid principal balance of the related Home Equity Loan as of the date of acquisition of such REO Property on behalf of REMIC I, plus (ii) accrued interest from the Due Date as to which interest was last paid by the Mortgagor in respect of the related Home Equity Loan through the end of the calendar month immediately preceding the calendar month in which such REO Property was acquired, calculated in the case of each calendar month during such period (A) at an annual rate equal to the annual rate at which interest was then accruing on the related Home Equity Loan and (B) on a principal amount equal to the Stated Principal Balance of the related Home Equity Loan as of the close of business on the Distribution Date during such calendar month, plus (iii) REO Imputed Interest for such REO Property for each calendar month commencing with the calendar month in which such REO Property was acquired and ending with the calendar month in which such Final Recovery Determination was made, plus (iv) any amounts previously withdrawn from the Collection Account in respect of the related Home Equity Loan pursuant to Section 3.11(a)(ix) and Section 3.16(b), minus (v) the aggregate of all P&I Advances made by the Master Servicer in respect of such REO Property or the related Home Equity Loan for which the Master Servicer has been or, in connection with such Final Recovery Determination, will be reimbursed pursuant to Section 3.23 out of rental income, Insurance Proceeds and Liquidation Proceeds received in respect of such REO Property, minus (vi) the total of all net rental income, Insurance Proceeds and Liquidation Proceeds received in respect of such REO Property that has been, or in

36

connection with such Final Recovery Determination, will be transferred to the Distribution Account pursuant to Section 3.23.

With respect to each Home Equity Loan which has become the subject of a Deficient Valuation, the difference between the principal balance of the Home Equity Loan outstanding immediately prior to such Deficient Valuation and the principal balance of the Home Equity Loan as reduced by the Deficient Valuation.

With respect to each Home Equity Loan which has become the subject of a Debt Service Reduction, the portion, if any, of the reduction in each affected Monthly Payment attributable to a reduction in the Mortgage Rate imposed by a court of competent jurisdiction. Each such Realized Loss shall be deemed to have been incurred on the Due Date for each affected Monthly Payment.

"Record Date": With respect to any Distribution Date and the Fixed Rate Certificates (and any Definitive Certificates), the close of business on the last Business Day of the month immediately preceding the month in which such applicable Distribution Date occurs. With respect to any Distribution Date and the Adjustable Rate Certificates (other than any Definitive Certificates) the Business Day prior to such Distribution Date.

"Reference Banks": Bankers Trust Company of California, N.A., Barclay's Bank PLC, The Tokyo Mitsubishi Bank and National Westminster Bank PLC and their successors in interest; provided, however, that if any of the foregoing banks are not suitable to serve as a Reference Bank, then any leading banks selected by the Trustee which are engaged in transactions in Eurodollar deposits in the international Eurocurrency market (i) with an established place of business in London, (ii) not controlling, under the control of or under common control with the Depositor or any Affiliate thereof and (iii) which have been designated as such by the Trustee.

"Refinanced Home Equity Loan": A Home Equity Loan the proceeds of which were not used to purchase the related Mortgaged Property.

"Regular Certificate": As specified in the Preliminary Statement.

"Regular Interest": A "regular interest" in a REMIC within the meaning of Section 860G(a)(1) of the Code.

"Relief Act": The Soldiers' and Sailors' Civil Relief Act of 1940, as amended.

"Relief Act Interest Shortfall": With respect to any Distribution Date and any Home Equity Loan, any reduction in the amount of interest collectible on such Home Equity Loan for the most recently ended calendar month as a result of the application of the Relief Act.

"REMIC": A "real estate mortgage investment conduit" within the meaning of Section 860D of the Code.

1011956v27

"REMIC I": The segregated pool of assets subject hereto, constituting the primary trust created hereby and to be administered hereunder, with respect to which a REMIC election is to be made, consisting of: (i) such Home Equity Loans and Prepayment Charges as from time to time are subject to this Agreement, together with the Mortgage Files relating thereto, and together with all collections thereon and proceeds thereof, (ii) any REO Property, together with all collections thereon and proceeds thereof, (iii) the Trustee's rights with respect to the Home Equity Loans under all insurance policies required to be maintained pursuant to this Agreement and any proceeds thereof, (iv) the Depositor's rights under the Mortgage Loan Purchase Agreement (including any security interest created thereby) to the extent conveyed pursuant to Section 2.01 and (v) the Collection Account (other than any amounts representing any Master Servicer Prepayment Charge Payment Amount, amounts in the Pre-Funding Accounts, the Capitalized Interest Accounts and the Group 2 Reserve Fund), the Distribution Account (other than any amounts representing any Master Servicer Prepayment Charge Payment Amount, amounts in the Pre-Funding Accounts, the Capitalized Interest Accounts and the Group 2 Reserve Fund) and any REO Account and such assets that are deposited therein from time to time and any investments thereof, together with any and all income, proceeds and payments with respect thereto. Notwithstanding the foregoing, however, REMIC I specifically excludes all payments and other collections of principal and interest due on the Home Equity Loans on or before the Cut-off Date and all Prepayment Charges payable in connection with Principal Prepayments made on or before the Cut-off Date and the Supplemental Interest Reserve Fund and Rate Cap Agreement.

"REMIC II": The segregated pool of assets consisting of all of the REMIC I Regular Interests conveyed in trust to the Trustee for the benefit of REMIC III, as holder of the REMIC II Regular Interests, and the Class R-II Certificateholders pursuant to Section 2.07, and all amounts deposited therein, with respect to which a separate REMIC election is to be made.

"REMIC II Regular Interest": Any of the separate non-certificated beneficial ownership interests in REMIC II issued hereunder and designated as a "regular interest" in REMIC II.

"REMIC III": The segregated pool of assets consisting of all of the REMIC II Regular Interests conveyed in trust to the Trustee for the benefit of the REMIC III Certificateholders pursuant to Section 2.09, and all amounts deposited therein, with respect to which a separate REMIC election is to be made.

"REMIC III Certificate": Any Regular Certificate or Class R-III Certificate.

"REMIC III Certificateholder": The Holder of any REMIC III Certificate.

"REMIC Provisions": Provisions of the federal income tax law relating to real estate mortgage investment conduits, which appear at Section 860A through 860G of the Code, and related provisions, and proposed, temporary and final regulations and published rulings, notices and announcements promulgated thereunder, as the foregoing may be in effect from time to time.

10119056v27

"Remittance Report":  A report in form mutually agreed to between the Trustee and the Master Servicer on a magnetic disk or tape prepared by the Master Servicer pursuant to Section 4.03 with such additions, deletions and modifications as agreed to by the Trustee and the Master Servicer.

"Rents from Real Property":  With respect to any REO Property, gross income of the character described in Section 856(d) of the Code as being included in the term "rents from real property."

"REO Account":  Each of the accounts maintained, or caused to be maintained, by the Master Servicer in respect of an REO Property pursuant to Section 3.23.

"REO Disposition":  The sale or other disposition of an REO Property on behalf of REMIC I.

"REO Imputed Interest":  As to any REO Property, for any calendar month during which such REO Property was at any time part of REMIC I, one month's interest at the applicable Net Mortgage Rate on the Stated Principal Balance of such REO Property (or, in the case of the first such calendar month, of the related Home Equity Loan, if appropriate) as of the close of business on the Distribution Date in such calendar month.

"REO Principal Amortization":  With respect to any REO Property, for any calendar month, the excess, if any, of (a) the aggregate of all amounts received in respect of such REO Property during such calendar month, whether in the form of rental income, sale proceeds (including, without limitation, that portion of the Termination Price paid in connection with a purchase of all of the Home Equity Loans and REO Properties pursuant to Section 9.01 that is allocable to such REO Property) or otherwise, net of any portion of such amounts (i) payable pursuant to Section 3.23(c) in respect of the proper operation, management and maintenance of such REO Property or (ii) payable or reimbursable to the Master Servicer pursuant to Section 3.23(d) for unpaid Servicing Fees in respect of the related Home Equity Loan and unreimbursed Servicing Advances and P&I Advances in respect of such REO Property or the related Home Equity Loan, over (b) the REO Imputed Interest in respect of such REO Property for such calendar month.

"REO Property":  A Mortgaged Property acquired by the Master Servicer on behalf of REMIC I through foreclosure or deed-in-lieu of foreclosure, as described in Section 3.23.

"Request for Release":  A release signed by a Servicing Officer, or in a mutually agreeable electronic format which will, in lieu of a signature on its face, originate from a Servicing Officer, in the form of Exhibit E-1 or Exhibit E-2 attached hereto.

"Required Overcollateralized Amount":  With respect to each Loan Group and any Distribution Date (i) prior to the Stepdown Date for the related Certificate Group, $9,375,000 for Loan Group 1 and (a) on the first Distribution Date $8,438,000 and (b) after the first Distribution

Date but before the Stepdown Date $22,500,000 for Loan Group 2 (ii) on or after the Stepdown Date for the related Certificate Group provided a Trigger Event is not in effect, the greater of (x) 5.00% for Loan Group 1 and 4.00% for Loan Group 2 of the aggregate Stated Principal Balance of the Home Equity Loans in the related Loan Group as of the last day of the related Due Period and (y) $1,875,000 for Loan Group 1 and $5,625,000 for Loan Group 2 and (iii) on or after the Stepdown Date for the related Certificate Group and if a Trigger Event is in effect with respect to such Certificate Group, the Required Overcollateralized Amount for such Loan Group for the immediately preceding Distribution Date.

"Reserve Interest Rate":  With respect to any Interest Determination Date, the rate per annum that the Trustee determines to be either (i) the arithmetic mean (rounded upwards if necessary to the nearest whole multiple of 1/16%) of the one-month U.S. dollar lending rates which New York City banks selected by the Trustee are quoting on the relevant Interest Determination Date to the principal London offices of leading banks in the London interbank market or (ii) in the event that the Trustee can determine no such arithmetic mean, the lowest one-month U.S. dollar lending rate which New York City banks selected by the Trustee are quoting on such Interest Determination Date to leading European banks.

"Residential Dwelling":  Any one of the following: (i) an attached or detached one-family dwelling, (ii) a detached two- to four-family dwelling, (iii) a one-family dwelling unit in a condominium project or (iv) a detached one-family dwelling in a planned unit development, none of which is a co-operative, mobile or manufactured home (unless such mobile or manufactured home is treated as real property under applicable state law).

"Residual Certificates":  As specified in the Preliminary Statement.

"Residual Interest":  The sole class of "residual interests" in a REMIC within the meaning of Section 860G(a)(2) of the Code.

"Responsible Officer":  When used with respect to the Trustee, the President, any vice president, any assistant vice president, the Secretary, any assistant secretary, the Treasurer, any assistant treasurer, any trust officer or assistant trust officer, the Controller and any assistant controller or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers and, with respect to a particular matter, to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject.

"Scheduled Principal Balance":  With respect to any Home Equity Loan: (a) as of the Cut-off Date, the outstanding principal balance of such Home Equity Loan as of such date, net of the principal portion of all unpaid Monthly Payments, if any, due on or before such date; (b) as of any Due Date subsequent to the Cut-off Date up to and including the Due Date in the calendar month in which a Liquidation Event occurs with respect to such Home Equity Loan, the Scheduled Principal Balance of such Home Equity Loan as of the Cut-off Date, minus the sum of (i) the principal portion of each Monthly Payment due on or before such Due Date but subsequent to the Cut-off Date, whether or not received, (ii) all Principal Prepayments received

before such Due Date but after the Cut-off Date, (iii) the principal portion of all Liquidation Proceeds and Insurance Proceeds received before such Due Date but after the Cut-off Date, net of any portion thereof that represents principal due (without regard to any acceleration of payments under the related Mortgage and Mortgage Note) on a Due Date occurring on or before the date on which such proceeds were received and (iv) any Realized Loss incurred with respect thereto as a result of a Deficient Valuation occurring before such Due Date, but only to the extent such Realized Loss represents a reduction in the portion of principal of such Home Equity Loan not yet due (without regard to any acceleration of payments under the related Mortgage and Mortgage Note) as of the date of such Deficient Valuation; and (c) as of any Due Date subsequent to the occurrence of a Liquidation Event with respect to such Home Equity Loan, zero. With respect to any REO Property: (a) as of any Due Date subsequent to the date of its acquisition on behalf of the Trust Fund up to and including the Due Date in the calendar month in which a Liquidation Event occurs with respect to such REO Property, an amount (not less than zero) equal to the Scheduled Principal Balance of the related Home Equity Loan as of the Due Date in the calendar month in which such REO Property was acquired, minus the aggregate amount of REO Principal Amortization, if any, in respect of such REO Property for all previously ended calendar months; and (b) as of any Due Date subsequent to the occurrence of a Liquidation Event with respect to such REO Property, zero.

"Seller": Long Beach Mortgage Company, or its successor in interest, in its capacity as seller under the Mortgage Loan Purchase Agreement.

"Senior Interest Distribution Amount": With respect to any Distribution Date, an amount equal to the sum of (i) the Interest Distribution Amount for such Distribution Date for the related Class A Certificates and (ii) the Interest Carry Forward Amount with respect to such Class A Certificates.

"Servicing Account": The account or accounts created and maintained pursuant to Section 3.09.

"Servicing Advances": The reasonable "out-of-pocket" costs and expenses incurred by the Master Servicer in the performance of its servicing obligations in connection with a default, delinquency or other unanticipated event, including, but not limited to, the cost of (i) the preservation, restoration and protection of a Mortgaged Property, (ii) any enforcement or judicial proceedings, including foreclosures, in respect of a particular Home Equity Loan, (iii) the management (including reasonable fees in connection therewith) and liquidation of any REO Property and (iv) the performance of its obligations under Section 3.01, Section 3.09, Section 3.14, Section 3.16 and Section 3.23. The Master Servicer shall not be required to make any Nonrecoverable Servicing Advances.

"Servicing Fee": With respect to each Home Equity Loan and for any calendar month, an amount equal to one month's interest (or in the event of any payment of interest which accompanies a Principal Prepayment in full made by the Mortgagor during such calendar month, interest for the number of days covered by such payment of interest) at the applicable Servicing Fee Rate on the same principal amount on which interest on such Home Equity Loan accrues for

41

such calendar month. A portion of such Servicing Fee may be retained by any Sub-Servicer as its servicing compensation.

"Servicing Fee Rate": 0.50% per annum; provided, however, that if the Back-Up Servicer has assumed the duties of the Master Servicer, the Servicing Fee Rate shall be as specified in the Back-Up Servicing Agreement.

"Servicing Officer":  Any employee of the Master Servicer involved in, or responsible for, the administration and servicing of the Home Equity Loans, whose name and specimen signature appear on a list of Servicing Officers furnished by the Master Servicer to the Trustee and the Depositor on the Closing Date, as such list may from time to time be amended.

"Single Certificate": With respect to any Class of Certificates (other than the Class P Certificates and the Residual Certificates), a hypothetical Certificate of such Class evidencing a Percentage Interest for such Class corresponding to an initial Certificate Principal Balance or Notional Amount of $1,000. With respect to the Class P Certificates and the Residual Certificates, a hypothetical Certificate of such Class evidencing a 20% Percentage Interest in such Class.

"Special Distribution Date": November 30, 2000.

"Startup Day": With respect to each of REMIC I, REMIC II and REMIC III, the day designated as such pursuant to Section 10.01(b) hereof.

"Stated Principal Balance":  With respect to any Home Equity Loan:  (a) as of any date of determination up to but not including the Distribution Date on which the proceeds, if any, of a Liquidation Event with respect to such Home Equity Loan would be distributed, the Scheduled Principal Balance of such Home Equity Loan as of the Cut-off Date, as shown in the Home Equity Loan Schedule, minus the sum of (i) the principal portion of each Monthly Payment due on a Due Date subsequent to the Cut-off Date, to the extent received from the Mortgagor or advanced by the Master Servicer and distributed pursuant to Section 4.01 on or before such date of determination, (ii) all Principal Prepayments received after the Cut-off Date, to the extent distributed pursuant to Section 4.01 on or before such date of determination, (iii) all Liquidation Proceeds and Insurance Proceeds applied by the Master Servicer as recoveries of principal in accordance with the provisions of Section 3.16, to the extent distributed pursuant to Section 4.01 on or before such date of determination and (iv) any Realized Loss incurred with respect thereto as a result of a Deficient Valuation made during or prior to the Prepayment Period for the most recent Distribution Date coinciding with or preceding such date of determination; and (b) as of any date of determination coinciding with or subsequent to the Distribution Date on which the proceeds, if any, of a Liquidation Event with respect to such Home Equity Loan would be distributed, zero. With respect to any REO Property: (a) as of any date of determination up to but not including the Distribution Date on which the proceeds, if any, of a Liquidation Event with respect to such REO Property would be distributed, an amount (not less than zero) equal to the Stated Principal Balance of the related Home Equity Loan as of the date on which such REO Property was acquired on behalf of REMIC I, minus the sum of (i) if such REO Property was

-42-

acquired before the Distribution Date in any calendar month, the principal portion of the Monthly Payment due on the Due Date in the calendar month of acquisition, to the extent advanced by the Master Servicer and distributed pursuant to Section 4.01 on or before such date of determination, and (ii) the aggregate amount of REO Principal Amortization in respect of such REO Property for all previously ended calendar months, to the extent distributed pursuant to Section 4.01 on or before such date of determination; and (b) as of any date of determination coinciding with or subsequent to the Distribution Date on which the proceeds, if any, of a Liquidation Event with respect to such REO Property would be distributed, zero.

"Stayed Funds":  If the Master Servicer is the subject of a proceeding under the federal Bankruptcy Code and the making of a Remittance (as defined in Section 7.02(b)) is prohibited by Section 362 of the federal Bankruptcy Code, funds that are in the custody of the Master Servicer, a trustee in bankruptcy or a federal bankruptcy court and should have been the subject of such Remittance absent such prohibition.

"Stepdown Date":  With respect to either Loan Group for any Distribution Date, the Distribution Date occurring in September 2003.

"Subordinated Certificates":  As specified in the Preliminary Statement.

"Subordinated Offered Certificates":  As specified in the Preliminary Statement.

"Subsequent Home Equity Loan":  Any of the home equity loans transferred and assigned to the Trustee pursuant to (i) the provisions of a Subsequent Transfer Agreement and (ii) the provisions hereof, as from time to time are held as a part of the Trust Fund (including any REO Property), the home equity loans so held being identified on the Home Equity Loan Schedule for the related Subsequent Transfer Date, notwithstanding foreclosure or other acquisition of title of the related Mortgaged Property.  When used with respect to a single Subsequent Transfer Date, "Subsequent Home Equity Loan" shall mean a Subsequent Home Equity Loan conveyed to the Trust Fund on such Subsequent Transfer Date.

"Subsequent Transfer Agreement":   A Subsequent Transfer Agreement substantially in the form of Exhibit H hereto, executed and delivered by the Seller, the Depositor and the Trustee as provided in Section 2.11(a).

"Subsequent Transfer Date":  For any Subsequent Transfer Agreement, the "Subsequent Transfer Date" identified in such Subsequent Transfer Agreement; provided, however, the Subsequent Transfer Date for any Subsequent Transfer Agreement may not be a date earlier than the date on which the Subsequent Transfer Agreement is executed and delivered by the parties thereto pursuant to Section 2.11(a).

"Sub-Servicer":  Any Person with which the Master Servicer has entered into a Sub-Servicing Agreement and which meets the qualifications of a Sub-Servicer pursuant to Section 3.02.

43

"Sub-Servicing Account":  An account established by a Sub-Servicer which meets the requirements set forth in Section 3.08 and is otherwise acceptable to the Master Servicer.

"Sub-Servicing Agreement":  The written contract between the Master Servicer and a Sub-Servicer relating to servicing and administration of certain Home Equity Loans as provided in Section 3.02.

"Substitution Shortfall Amount":  As defined in Section 2.03(d).

"Tax Returns":  The federal income tax return on Internal Revenue Service Form 1066, U.S. Real Estate Mortgage Investment Conduit Income Tax Return, including Schedule Q thereto, Quarterly Notice to Residual Interest Holders of REMIC Taxable Income or Net Loss Allocation, or any successor forms, to be filed on behalf of the Trust Fund due to its classification as a REMIC under the REMIC Provisions, together with any and all other information reports or returns that may be required to be furnished to the Certificateholders or filed with the Internal Revenue Service or any other governmental taxing authority under any applicable provisions of federal, state or local tax laws.

"Telerate Page 3750":  The display designated as page "3750" on the Dow Jones Telerate Capital Markets Report (or such other page as may replace page 3750 on that report for the purpose of displaying London interbank offered rates of major banks).

"Termination Payment":  As defined in the Cap Agreement.

"Termination Price":  As defined in Section 9.01.

"Terminator":  As defined in Section 9.01.

"Transfer":  Any direct or indirect transfer, sale, pledge, hypothecation, or other form of assignment of any Ownership Interest in a Certificate.

"Transferee":  Any Person who is acquiring by Transfer any Ownership Interest in a Certificate.

"Transferor":  Any Person who is disposing by Transfer of any Ownership Interest in a Certificate.

"Trigger Event":  A Trigger Event with respect to a Certificate Group has occurred with respect to a Distribution Date if the Delinquency Percentage for the related Loan Group exceeds 50.0% for Loan Group 1 or 40% for Loan Group 2 of the related Credit Enhancement Percentage.

"Trust":  Asset Backed Securities Corporation Long Beach Home Equity Loan Trust 2000-LB1, Series 2000-LB1, the trust created under this Agreement.

"Trust Cap Payment Amount":  For any Distribution Date, the sum of the Cap Premium for such Distribution Date and the Cap Premium Carryover for such Distribution Date.

"Trust Fund":  The corpus of the trust created hereunder consisting of (i) the Home Equity Loans and all interest and principal received on or with respect thereto after the related Cut-off Date, other than such amounts which were due on the Home Equity Loans on or before the related Cut-off Date; (ii) the Collection Account, the Distribution Account, the Pre-Funding Accounts and the Capitalized Interest Accounts and, in the case of the Group 2 Certificates, the rights under the Cap Agreement and the Group 2 Reserve Fund and Supplemental Interest Reserve Fund and all amounts deposited therein pursuant to the applicable provisions of this Agreement (including, without limitation, amounts received from the Seller on the Closing Date which shall be deposited by the Trustee in the Collection Account pursuant to Section 2.01); (iii) property that secured a Home Equity Loan and has been acquired by foreclosure, deed-in-lieu of foreclosure or otherwise; and (iv) all proceeds of the conversion, voluntary or involuntary, of any of the foregoing.

"Trustee":  Bankers Trust Company of California, N.A. a national banking association, or its successor in interest, or any successor trustee appointed as herein provided.

"Trustee's Fee":  The amount payable to the Trustee on each Distribution Date pursuant to Section 8.05 as compensation for all services rendered by it in the execution of the trust hereby created and in the exercise and performance of any of the powers and duties of the Trustee hereunder.

"Uninsured Cause":  Any cause of damage to a Mortgaged Property such that the complete restoration of such property is not fully reimbursable by the hazard insurance policies required to be maintained pursuant to Section 3.14.

"United States Person":  A citizen or resident of the United States, a corporation, partnership or other entity created or organized in, or under the laws of, the United States, or any State thereof or the District of Columbia (except, in the case of a partnership, to the extent provided in regulations) or an estate whose income is subject to United States federal income tax regardless of its source, or a trust if a court within the United States is able to exercise primary supervision over the administration of the trust and one or more United States persons have the authority to control all substantial decisions of the trust.  To the extent prescribed in regulations by the Secretary of the Treasury, which have not yet been issued, a trust which was in existence on August 20, 1996 (other than a trust treated as owned by the grantor under subpart E of part I of subchapter J of chapter 1 of the Code), and which was treated as a United States person on August 20, 1996 may elect to continue to be treated as a United States person notwithstanding the previous sentence.  The term "United States" shall have the meaning set forth in Section 7701 of the Code.

"Unpaid Realized Loss Amount":  With respect to any Class of Subordinated Certificates and as to any Distribution Date, the excess of (i) Applied Realized Loss Amounts with respect to that Class over (ii) the sum of all distributions in reduction of Applied Realized

1011956\27

Loss Amounts on all previous Distribution Dates.  Any amounts distributed to a Class of Subordinated Certificates in respect of any Unpaid Realized Loss Amount will not be applied to reduce the Certificate Principal Balance of that Class.

"Unutilized Pre-Funding Amount":  The Pre-Funding Amount immediately after the end of the Pre-Funding Period.

"Value":  With respect to any Mortgaged Property, the lesser of (i) the value thereof as determined by an appraisal made for the originator of the Home Equity Loan at the time of origination of the Home Equity Loan by an appraiser who met the minimum requirements of Fannie Mae, and (ii) the purchase price paid for the related Mortgaged Property by the Mortgagor with the proceeds of the Home Equity Loan, provided, however, in the case of a Refinanced Home Equity Loan, such value of the Mortgaged Property is based solely upon the value determined by an appraisal made for the originator of such Refinanced Home Equity Loan at the time of origination of such Refinanced Home Equity Loan by an appraiser who met the minimum requirements of Fannie Mae.

"Voting Rights":  The portion of the voting rights of all of the Certificates which is allocated to any Certificate.  With respect to any date of determination, 93% of all voting rights will be allocated among all Holders of the Offered Certificates in proportion to their then outstanding Certificate Principal Balances. 1% and 1%, respectively, of all voting rights will be allocated among the Holders of the Class X-F Certificates and Class X-V Certificates 1% and 1%, respectively, of all voting rights will be allocated among the Holders of the Class B-IOF Certificates and Class B-IOV Certificates; 1% and 1%, respectively, of all voting rights will be allocated among the Holders of the Class P-F Certificates and the Class P-V Certificates, and 1% of all voting rights will be allocated among Holders of the Residual Certificates, in each case in proportion to the percentage interests evidenced by their respective Certificates.

SECTION 1.02.     Allocation of Certain Interest Shortfalls.

For purposes of calculating the amount of Accrued Certificate Interest and the amount of the Interest Distribution Amount for the Class A Certificates, the Subordinated Certificates and the Class X Certificates for any Distribution Date, (1) the aggregate amount of any Prepayment Interest Shortfalls (to the extent not covered by payments by the Master Servicer pursuant to Section 3.24) and any Relief Act Interest Shortfall incurred in respect of the Home Equity Loans for any Distribution Date shall be allocated first, among the Class X Certificates on a *pro rata* basis based on, and to the extent of, one month's interest at the then applicable respective Pass-Through Rate on the respective Notional Amount of each such Certificate and thereafter, among the Class A Certificates and the Subordinated Certificates on a pro rata basis based on, and to the extent of, one month's interest at the then applicable respective Pass-Through Rate on the respective Certificate Principal Balance of each such Certificate and (2) the aggregate amount of any Realized Losses incurred for any Distribution Date shall be allocated among the Class X Certificates on a *pro rata* basis based on, and to the extent of, one month's interest at the then applicable respective Pass-Through Rate on the respective Notional Amount of each such Certificate.

46

SECTION 1.03.      Designation of Interests in REMICs.

(a)      The Trustee shall elect that each of REMIC I, REMIC II and REMIC III shall be treated as a REMIC under Section 860D of the Code.   Any inconsistencies or ambiguities in this Agreement or in the administration of this Agreement shall be resolved in a manner that preserves the validity of such REMIC elections. Fees and expenses of the Trust Fund shall be paid from REMIC I.

(b)      REMIC I will be evidenced by (x) the Class IB-IOF, Class IQ-F, Class IB-IOV, Class IQ-V, Class P-F and Class P-V Certificates (together, the "REMIC I Regular Interests"), which (i) (except in the case of Class P-F and Class P-V Certificates) will be uncertificated and non-transferable, and (ii) are hereby designated as the "regular interests" in REMIC I and (y) the Class R-I Certificates, which are hereby designated as the single "residual interest" in REMIC I (the REMIC I Regular Interests, together with the Class R-I Certificates, the "REMIC I Certificates").  The Class IB-IOF, Class IQ-F and Class P-F Certificates will be referred to as the "REMIC I Group 1 Regular Interests" and the Class IB-IOV, Class IQ-V and Class P-V Certificates will be referred to as the "REMIC I Group 2 Regular Interests."  The REMIC I Regular Interests shall be recorded on the records of REMIC I as being issued to and held by the Trustee on behalf of REMIC II.

The REMIC I Certificates will have the following designations, initial principal balances and pass-through rates:

| REMIC I Certificates | Initial Balance | Pass-Through Rate |
|---|---|---|
| P-F | $            100 | 0% (3) |
| P-V | $            100 | 0% (3) |
| IB-IOF | $   31,000,000 | (1) |
| IQ-F | $ 343,999,900 | (1) |
| IB-IOV | $   90,000,000 | (2) |
| IQ-V | $1,034,999,900 | (2) |
| R-I | $              0 | 0% |

(1)      The pass-through rate on these REMIC I Regular Interests shall for the first four Interest Accrual Periods shall be 8.60% and at any time of determination thereafter shall equal the Net WAC Pass-Through Rate of the Home Equity Loans in Group 1.

(2)      The pass-through rate on these REMIC I Regular Interests for the first four Interest Accrual Periods shall be 9.35% and at any time of determination thereafter shall equal the Net WAC Pass-Through Rate of the Home Equity Loans in Group 2.

(3)      The Class P-F and Class P-V Certificates shall not be entitled to interest but shall be entitled to receive all Prepayment Charges collected with respect to the Home Equity Loans in each of Group 1 and Group 2, respectively.  Such Prepayment Charges shall not

47

be available for distribution with respect to any other Class of REMIC I Certificates. The Prepayment Charges received by the Class P-F and Class P-V Certificates shall not be applied to the principal balance of those Certificates.

On each Distribution Date, principal collections and Realized Losses on the Home Equity Loans in Group 1 shall be allocated sequentially, in reverse order to which they are listed above, to the REMIC I Group 1 Regular Interests until the principal balance of each such class is reduced to zero. All principal collections and Realized Losses on the Home Equity Loans in Loan Group 2 shall be allocated sequentially, in reverse order to which they are listed above, to the REMIC I Group 2 Regular Interests until the principal balance of each such class is reduced to zero. Notwithstanding the above, the Class P-F and Class P-V Certificates shall not be entitled to any principal collections so long as the Class IQ-F and Class IQ-V Interests remain outstanding, respectively. Any principal collections otherwise payable to the Class P-F and Class P-V Certificates will instead be payable to the Class IQ-F and Class IQ-V Interests, respectively, until the principal balance of the Class IQ-F and Class IQ-V Interests, respectively, have been reduced to zero, and any remaining principal collections on the Home Equity Loans in Group 1 and Group 2, respectively, shall be payable to the Class P-F and Class P-V Certificates, respectively, to the extent of their respective Certificate Principal Balances. The Class R-I Certificates shall have no principal balance and no pass-through rate and shall be entitled to only those distributable assets, if any, remaining in REMIC I on each Distribution Date after all amounts required to be distributed to the REMIC I Regular Interests and applicable Trust Fund expenses have been paid.

(c)    REMIC II will be evidenced by (x) the Class IIAF1, Class IIAF2, Class IIAF3, Class IIAF4, Class IIAF5, Class IIAF6, Class IIM1F, Class IIM2F, Class IIBF, Class IIB-IOF, Class IIQ-F, Class IIAV, Class IIM1V, Class IIM2V, Class IIBV, Class IIB-IOV and Class IIQ-V (the "REMIC II Regular Interests"), which will be uncertificated and non-transferable and are hereby designated as the "regular interests" in REMIC II and (y) the Class R-II Certificates, which are hereby designated as the single "residual interest" in REMIC II (the REMIC II Regular Interests, together with the Class R-II Certificates, the "REMIC II Certificates"). The Class IIAF1, Class IIAF2, Class IIAF3, Class IIAF4, Class IIAF5, Class IIAF6, Class IIM1F, Class IIM2F, Class IIBF, Class IIB-IOF, Class IIQ-F will be referred to as the REMIC II Group 1 Regular Interests and the Class IIAV, Class IIM1V, Class IIM2V, Class IIBV, Class IIB-IOV and Class IIQ-V will be referred to as the REMIC II Group 2 Regular Interests. The REMIC II Regular Interests shall be recorded on the records of REMIC II as being issued to and held by the Trustee on behalf of REMIC III.

Any Net Monthly Excess Cashflow that is used to pay the Overcollateralization Increase Amount (the "Turbo Amount") and that is payable from interest on the Home Equity Loans in Group 1 will not be paid directly as principal to the REMIC II Group 1 Regular Interests, but instead a portion of the interest payable with respect to the Class IIQ-F Interest which equals 1% of the Turbo Amount will be payable as a reduction of the principal balances of the REMIC II Group 1 Regular Interests which are entitled to receive principal ("REMIC II Group 1 Offered Interests") in the same manner in which the Turbo Amount is allocated among the Group 1 Offered Certificates, respectively (and will be accrued and added to principal on the

48

Class IIQ-F Interests) and that is payable from interest on the Home Equity Loans. Principal payments on the Home Equity Loans shall be allocated 99% to the Class IIQ-F Interests, and 1% to the REMIC II Group 1 Offered Interests until paid in full. The aggregate amount of principal allocated to the REMIC II Group 1 Offered Interests shall be apportioned among such classes in the same manner as principal is payable with respect to the Group 1 Offered Certificates, respectively. Notwithstanding the above, principal payments on the REMIC II Group 1 Regular Interests that are attributable to the Excess Overcollateralization Amount shall be allocated to the Class IIQ-F Interests. Realized Losses shall be applied such that after all distributions have been made on such Distribution Date (i) the principal balances of the REMIC II Group 1 Offered Interests are each 1% of the principal balances of the Group 1 Offered Certificates, respectively; and (ii) the aggregate principal balance of the Class IIQ-F Interests is equal to the Loan Balance of the Group 1 Home Equity Loans less an amount equal 1% of the aggregate Certificate Principal Balances of the Group 1 Certificates.

The Turbo Amount that is payable from interest on the Home Equity Loans in Group 2 will not be paid directly as principal to the REMIC II Group 2 Regular Interests, but instead a portion of the interest payable with respect to the Class IIQ-V Interest which equals 1% of the Turbo Amount will be payable as a reduction of the principal balances of the REMIC II Group 2 Regular Interests which are entitled to receive principal ("REMIC II Group 2 Offered Interests") in the same manner in which the Turbo Amount is allocated among the Group 2 Offered Certificates, respectively (and will be accrued and added to principal on the Class IIQ-V Interests) and that is payable from interest on the Home Equity Loans. Principal payments on the Home Equity Loans shall be allocated 99% to the Class IIQ-V Interests, and 1% to the REMIC II Group 2 Offered Interests until paid in full. The aggregate amount of principal allocated to the REMIC II Group 2 Offered Interests shall be apportioned among such classes in the same manner as principal is payable with respect to the Group 2 Offered Certificates, respectively. Notwithstanding the above, principal payments on the REMIC II Group 2 Regular Interests that are attributable to the Excess Overcollateralization Amount shall be allocated to the Class IIQ-V Interests. Realized Losses shall be applied such that after all distributions have been made on such Distribution Date (i) the principal balances of the REMIC II Group 2 Offered Interests are each 1% of the principal balances of the Group 2 Offered Certificates, respectively; and (ii) the aggregate principal balance of the Class IIQ-V Interests is equal to the Loan Balance of the Group 2 Home Equity Loans less an amount equal 1% of the aggregate Certificate Principal Balances of the Group 2 Certificates.

The REMIC II Certificates will have the following designations and pass-through rates, and distributions of principal and interest thereon shall be allocated to the Certificates in the following manner:

| REMIC II Certificates | Initial Balance | Pass-Through Rate | Allocation of Principal | Allocation of Interest |
|---|---|---|---|---|
| IIA1F | $1,048,000 | (1) | (5) | (6), (7) |
| IIA2F | $ 735,000 | (1) | (5) | (6), (7) |

49

| | | | | |
|---|---|---|---|---|
| IIA3F | $ 347.000 | (1) | (5) | (6), (7) |
| IIA4F | $ 422.000 | (1) | (5) | (6), (7) |
| IIAF5 | $ 223.000 | (1) | (5) | (6), (7) |
| IIAF6 | $ 375.000 | (1) | (5) | (6), (7) |
| IIM1F | $ 253.130 | (1) | (5) | (6), (7) |
| IIM2F | $ 196.870 | (1) | (5) | (6), (7) |
| IIBF | $ 140.620 | (1) | (5) | (6), (7) |
| IIB-IOF | $ 0 | (3) | N/A | B-IOF |
| IIQ-F | $371.259.280 | (1) | (5) | (6), (7) |
| IIAV | $9.112.500 | (2) | (5) | (6), (8) |
| IIM1V | $ 843.750 | (2) | (5) | (6), (8) |
| IIM2V | $ 646.870 | (2) | (5) | (6), (8) |
| IIBV | $ 562.500 | (2) | (5) | (6), (8) |
| IIB-IOV | $ 0 | (4) | N/A | B-IOV |
| IIQ-V | $1.113.834.280 | (2) | (5) | (6), (8) |
| R-II | $ 0 | 0% | N/A | N/A |

(1)   The pass-through rate on these REMIC II Regular Interests shall at any time of determination equal the Net WAC Pass-Through Rates of the REMIC I Group 1 Regular Interests. after first subtracting 4.125% from the pass-through rates of each of such regular interests (other than the Class IQ-F Interests) for the Distribution Dates 1-30.

(2)   The Pass-Through Rate on these REMIC II Regular Interests shall at any time of determination equal the Net WAC Pass-Through Rates of the REMIC I Group 2 Regular Interests. after first subtracting 4.125% from the pass-through rates of each of such regular interests (other than the Class IQ-V Interests) for the Distribution Dates 1-30.

(3)   Interest on the Class IIB-IOF will equal a strip of interest off the principal balance of the Class IB-IOF Interest at 4.125% per annum for the first 30 Distribution Dates and 0% thereafter.

(4)   Interest on the Class IIB-IOV will equal a strip of interest off the principal balance of the Class IB-IOV Interest at 4.125% per annum for the first 30 Distribution Dates and 0% thereafter.

(5)   Principal will be allocated to and apportioned among the Offered Certificates in the same proportion as principal is payable with respect to such Certificates. except that a portion of such principal in an amount up to the Excess Overcollateralization Amount for each of the Group 1 and Group 2 Certificates shall first be allocated as a payment of interest to the Class X-F and Class X-V Certificates. respectively. and all of the principal of each respective Group will be allocated as a payment of interest to the Class X-F and Class X-V Certificates. respectively. after the principal balances of the Group 1 and Group 2 Certificates. respectively. have each been reduced to zero.

(6)     Except as provided in note (7), interest will be allocated among the Offered Certificates in the same proportion as interest is payable on such Certificates.

(7)     Any interest with respect to this REMIC II Group 1 Regular Interest in excess of the product of (i) 100 times the weighted average coupon of the REMIC II Group 1 Offered Interests, where each of such classes, other than the Class IIQ-F Interests is first subject to a cap and floor equal to the Group 1 Offered Certificates Pass-Through Rates, respectively, and the Class IIQ-F Interests are subject to a cap equal to 0%, and (ii) the principal balance of this REMIC II Regular Interest, will be allocated to the Class X-F Certificates and not allocated to the Group 1 Certificates.  However, the Class X-F Certificates shall be subordinated to the extent provided in Section 4.04.

(8)     Any interest with respect to this REMIC II Group 2 Regular Interest in excess of the product of (i) 100 times the weighted average coupon of the REMIC II Group 2 Offered Interests, where each of such classes, other than the Class IIQ-V Interests is first subject to a cap and floor equal to the lesser of the Group 2 Offered Certificates Pass-Through Rates, respectively, or Group 2 Net WAC Cap and the Class IIQ-V Interests are subject to a cap equal to 0%, and (ii) the principal balance of this REMIC II Regular Interest, will be allocated to the Class X-V Certificates and not allocated to the Group 2 Certificates. However, the Class X-V Certificates shall be subordinated to the extent provided in Section 4.04.

On each Distribution Date, available funds, if any, remaining in REMIC II after payments of interest and principal, as designated above, will be distributed to the Class R-II Certificate.  It is expected that there will not be any distributions on the Class R-II Certificates.

(d)     The Group 1 Certificates and the Group 2 Certificates are hereby designated as "regular interests" with respect to REMIC III (the "REMIC III Regular Interests") and the Class R-III Certificate is hereby designated as the single "residual interest" with respect to REMIC III.  On each Distribution Date, Available Distribution Amount, if any, remaining in REMIC III after payments of interest and principal as designated herein shall be distributed to the Class R-III Certificates.

Solely for the purposes of satisfying Treasury Regulation 1.860G-1(a)(4)(iii) the "latest possible maturity date" for each REMIC Certificate is September 20, 2034.

The beneficial ownership interests in REMIC III created hereunder shall be evidenced by the interests having the following characteristics and terms as follows:

| Designation | Pass-Through Rate | Initial Aggregate Certificate Principal Balance | Scheduled Final Distribution Date |
|---|---|---|---|
| Class AF1 | 7.701% | $104,800,000 | September 2030 |
| Class AF2 | 7.570% | $ 73,500,000 | September 2030 |
| Class AF3 | 7.610% | $ 34,700,000 | September 2030 |
| Class AF4 | 7.825% | $ 42,200,000 | September 2030 |
| Class AF5 | 8.050%(1)(2) | $ 22,300,000 | September 2030 |
| Class AF6 | 7.615%(1) | $ 37,500,000 | September 2030 |

51

| | | | |
|---|---|---|---|
| Class M1F | 8.240%(1) | $ 25,313,000 | September 2030 |
| Class M2F | 8.700%(1) | $ 19,687,000 | September 2030 |
| Class BF | 9.290%(1) | $ 14,062,000 | September 2030 |
| Class AV | Adjustable(1)(3) | $911,250,000 | August 2030 |
| Class M1V | Adjustable(1)(3) | $ 84,375,000 | August 2030 |
| Class M2V | Adjustable(1)(3) | $ 64,687,000 | August 2030 |
| Class BV | Adjustable(1)(3) | $ 56,250,000 | August 2030 |
| Class B-IOF | 4.125% | (4) | September 2030 |
| Class B-IOV | 4.125% | (4) | August 2030 |
| Class X-F | — | 937,900 | September 2030 |
| Class X-V | — | 8,437,900 | August 2030 |
| Class R-III | — | (5) | September 2030 |

---

(1)    The Pass-Through Rate of these Certificates are subject to a rate cap.

(2)    The Pass-Through Rate will increase to 8.55% after the Distribution Date on which the aggregate Stated Principal Balance of the Home Equity Loans (and properties acquired in respect thereof) remaining in the Trust Fund is reduced to less than 10% of the aggregate Stated Principal Balance of the Home Equity Loans as of the related Cut-off Date.

(3)    The Pass-Through Rate will increase to One-Month LIBOR plus 0.52% for the Class AV Certificates. One-Month LIBOR plus 0.90% for the Class MV1 Certificates, One-Month LIBOR plus 1.65% for the M2V Certificates and One-Month LIBOR plus 3.15% for the Class BV Certificates after the Distribution Date on which the aggregate Stated Principal Balance of the Home Equity Loans (and properties acquired in respect thereof) remaining in the Trust Fund is reduced to less than 10% of the aggregate Stated Principal Balance of the Home Equity Loans as of the related Cut-off Date.

(4)    These Certificates will accrue interest at their Pass-Through Rate on the applicable Notional Amount.

(5)    These Certificates do not have a Certificate Principal Balance.

## ARTICLE II

### CONVEYANCE OF MORTGAGE LOANS: ORIGINAL ISSUANCE OF CERTIFICATES

SECTION 2.01.          Conveyance of Home Equity Loans.

The Depositor, concurrently with the execution and delivery hereof. does hereby transfer, assign, set over and otherwise convey to the Trustee without recourse for the benefit of the Certificateholders all the right, title and interest of the Depositor, including any security interest therein for the benefit of the Depositor, in and to the Original Home Equity Loans identified on the Home Equity Loan Schedule. the rights of the Depositor under the Mortgage Loan Purchase Agreement (other than the Depositor's rights under Sections 17 and 18 thereof), and all other assets included or to be included in REMIC I.  Such assignment includes all interest and principal received by the Depositor or the Master Servicer on or with respect to the Original Home Equity Loans (other than payments of principal and interest due on such Home Equity

52

Loans on or before the Cut-off Date). The Depositor herewith delivers to the Trustee an executed copy of the Mortgage Loan Purchase Agreement.

If the assignment and transfer of the Original Home Equity Loans and the Subsequent Home Equity Loans and the other property specified in Sections 2.01 and 2.11 from the Depositor to the Trustee pursuant to this Agreement is held or deemed not to be a sale or is held or deemed to be a pledge of security for a loan, the Depositor intends that the rights and obligations of the parties shall be established pursuant to the terms of this Agreement and that, in such event, (i) the Depositor shall be deemed to have granted and does hereby grant to the Trustee as of the Closing Date and each Subsequent Transfer Date a perfected, first priority security interest in the entire right, title and interest of the Depositor in and to the Original Home Equity Loans and the related Subsequent Home Equity Loans and all other property conveyed to the Trust Fund pursuant to this Sections 2.01 and 2.11 and all proceeds thereof, and (ii) this Agreement shall constitute a security agreement under applicable law.

In connection with such transfer and assignment, the Depositor does hereby deliver to, and deposit with, the Trustee, or to one or more Custodians as the agent or agents of the Trustee, the following documents or instruments with respect to each Original Home Equity Loan so transferred and assigned and in connection with the transfer and assignment of each Subsequent Home Equity Loan, will deliver or will deliver to, and deposit with, the Trustee, or to one or more Custodians as the agent or agents of the Trustee, the following documents or instruments with respect to each Subsequent Home Equity Loan (each, a "Mortgage File"):

(a) the original Mortgage Note, endorsed in blank or in the following form: "Pay to the order of Bankers Trust Company of California, N.A., as Trustee under the applicable agreement, without recourse," with all prior and intervening endorsements showing a complete chain of endorsement from the originator to the Person so endorsing to the Trustee or a copy of such original Mortgage Note with an accompanying lost note affidavit executed by the Seller;

(b) the original Mortgage with evidence of recording thereon, and a copy, certified by the appropriate recording office, of the recorded power of attorney, if the Mortgage was executed pursuant to a power of attorney, with evidence of recording thereon;

(c) an original Assignment of the Mortgage in blank;

(d) the original recorded Assignment or Assignments of the Mortgage showing a complete chain of assignment from the originator to the Person assigning the Mortgage to the Trustee or as contemplated by the immediately preceding clause (c);

(e) the original or copies of each assumption, modification, written assurance or substitution agreement, if any; and

53

(f)     the original lender's title insurance policy, together with all endorsements or riders which were issued with or subsequent to the issuance of such policy, insuring the priority of the Mortgage as a first lien on the Mortgaged Property represented therein as a fee interest vested in the Mortgagor, or in the event such original title policy is unavailable, a written commitment or uniform binder or preliminary report of title issued by the title insurance or escrow company.

On the Closing Date (i) no more than 1% of the Original Home Equity Loans by Scheduled Principal Balance as of the Cut-off Date may have lost note affidavits in lieu of the original Mortgage Notes and (ii) the Seller shall deliver to the Trustee a copy of the original Mortgage Note for each Home Equity Loan with respect to which a lost note affidavit is delivered.

The Master Servicer, in its capacity as Seller, shall promptly (and in no event later than thirty (30) Business Days, subject to extension upon a mutual agreement between the Master Servicer and the Trustee, following the later of the Closing Date (or for a Subsequent Home Equity Loan, the Subsequent Transfer Date) and the date of receipt by the Master Servicer of the recording information for a Mortgage) submit or cause to be submitted for recording, at no expense to the Trust Fund, the Trustee or the Depositor, in the appropriate public office for real property records, each Assignment referred to in Sections 2.01(c) and (d) above and shall execute each original Assignment in the following form: "Bankers Trust Company of California, N.A., as Trustee under the applicable agreement." In the event that any such Assignment is lost or returned unrecorded because of a defect therein, the Master Servicer, in its capacity as Seller, shall promptly prepare or cause to be prepared a substitute Assignment or cure or cause to be cured such defect, as the case may be, and thereafter cause each such Assignment to be duly recorded.     Notwithstanding the foregoing, however, for administrative convenience and facilitation of servicing and to reduce closing costs, the Assignments shall not be required to be completed and submitted for recording with respect to any Home Equity Loan if the Trustee and each Rating Agency has received an opinion of counsel, satisfactory in form and substance to the Trustee and each Rating Agency, to the effect that the recordation of such Assignments in any specific jurisdiction is not necessary to protect the Trustee's interest in the related Mortgage Note; provided further, however, notwithstanding the delivery of any opinion of counsel, each assignment of Mortgage shall be submitted for recording by the Seller in the manner described above, at no expense to the Trust Fund or Trustee, upon the earliest to occur of: (i) reasonable direction by Holders of Certificates entitled to at least 25% of the Voting Rights, (ii) failure of the Master Servicer Termination Test, (iii) the occurrence of a bankruptcy, insolvency or foreclosure relating to the Seller, (iv) the occurrence of a servicing transfer as described in Section 7.02 hereof and (iv) if the Seller is not the Master Servicer and with respect to any one assignment of Mortgage, the occurrence of a bankruptcy, insolvency or foreclosure relating to the Mortgagor under the related Mortgage.  Notwithstanding the foregoing, if the Master Servicer is unable to pay the cost of recording the Assignments of Mortgage, such expense will be paid by the Trustee and shall be reimbursable to the Trustee as an Extraordinary Trust Fund Expense.

[0110956.27]

If any of the documents referred to in Sections 2.01(b), (c) or (d) above has as of the Closing Date (or for a Subsequent Home Equity Loan, as of the Subsequent Transfer Date) been submitted for recording but either (x) has not been returned from the applicable public recording office or (y) has been lost or such public recording office has retained the original of such document, the obligations of the Depositor to deliver such documents shall be deemed to be satisfied upon (1) delivery to the Trustee, or to the appropriate Custodian on behalf of the Trustee, of a copy of each such document certified by the Seller in the case of (x) above or the applicable public recording office in the case of (y) above to be a true and complete copy of the original that was submitted for recording and (2) if such copy is certified by the Seller, delivery to the Trustee, or to the appropriate Custodian on behalf of the Trustee, promptly upon receipt thereof of either the original or a copy of such document certified by the applicable public recording office to be a true and complete copy of the original. If the original lender's title insurance policy was not delivered pursuant to Section 2.01(f) above, the Depositor shall deliver or cause to be delivered to the Trustee, or to the appropriate Custodian on behalf of the Trustee, promptly after receipt thereof, the original lender's title insurance policy. The Depositor shall deliver or cause to be delivered to the Trustee, or to the appropriate Custodian on behalf of the Trustee, promptly upon receipt thereof any other original documents constituting a part of a Mortgage File received with respect to any Home Equity Loan, including, but not limited to, any original documents evidencing an assumption or modification of any Home Equity Loan.

All original documents relating to the Home Equity Loans that are not delivered to the Trustee, or to the appropriate Custodian on behalf of the Trustee, are and shall be held by or on behalf of the Seller, the Depositor or the Master Servicer, as the case may be, in trust for the benefit of the Trustee on behalf of the Certificateholders. In the event that any such original document is required pursuant to the terms of this Section to be a part of a Mortgage File, such document shall be delivered promptly to the Trustee, or to the appropriate Custodian on behalf of the Trustee. Any such original document delivered to or held by the Depositor that is not required pursuant to the terms of this Section to be a part of a Mortgage File, shall be delivered promptly to the Master Servicer.

SECTION 2.02.      Acceptance of REMIC I by the Trustee.

Subject to the provisions of Section 2.01 and subject to any exceptions noted on the exception report described in the next paragraph below, the Trustee acknowledges receipt (or, with respect to Original Home Equity Loans subject to a Custodial Agreement, receipt by the respective Custodian as the duly appointed agent of the Trustee) of the documents referred to in Section 2.01 (other than such documents described in Section 2.01(e)) above and all other assets included in the definition of "REMIC I" under clauses (i), (iii), (iv) and (v) (to the extent of amounts deposited into the Distribution Account) and declares that it, or such Custodian as its agent, holds and will hold such documents and the other documents delivered to it constituting the Mortgage File, and that it holds or will hold all such assets and such other assets included in the definition of "REMIC I" in trust for the exclusive use and benefit of all present and future Certificateholders. The Trustee acknowledges receipt of the Group 1 Pre-Funding Amount, the Group 2 Pre-Funding Amount, the Group 1 Capitalized Interest Amount and the Group 2

55

Capitalized Interest Amount for the exclusive use and benefit of all present and future Certificateholders.

The Trustee agrees, for the benefit of the Certificateholders, to review (or cause a Custodian on its behalf to review) each Mortgage File on or before the Closing Date with respect to Original Home Equity Loans or Subsequent Transfer Date with respect to Subsequent Home Equity Loans and to certify in substantially the form attached hereto as Exhibit C-1 (or cause the Custodian to certify in the form of the Initial Certification attached to the Custodial Agreement) that, as to each Original Home Equity Loan or Subsequent Home Equity Loan listed in the Home Equity Loan Schedule (other than any Original Home Equity Loan or Subsequent Home Equity Loan paid in full or any Original Home Equity Loan or Subsequent Home Equity Loan specifically identified in the exception report annexed thereto as not being covered by such certification), (i) all documents constituting part of such Mortgage File (other than such documents described in Section 2.01(e)) required to be delivered to it pursuant to this Agreement are in its possession, (ii) such documents have been reviewed by it or such Custodian and are not mutilated, torn or defaced unless initialed by the related borrower and relate to such Original Home Equity Loan or Subsequent Home Equity Loan and (iii) based on its or the Custodian's examination and only as to the foregoing, the information set forth in the Home Equity Loan Schedule that corresponds to items (i) through (iii), (ix), (xii) and (xviii) through (xx) of the definition of "Home Equity Loan Schedule" accurately reflects information set forth in the Mortgage File.  It is herein acknowledged that, in conducting such review, the Trustee or such Custodian was under no duty or obligation (i) to inspect, review or examine any such documents, instruments, certificates or other papers to determine whether they are genuine, enforceable, or appropriate for the represented purpose (including with respect to Section 2.01(f), whether such title insurance policy insures the priority of the Mortgage as a first lien) or whether they have actually been recorded or that they are other than what they purport to be on their face or (ii) to determine whether any Mortgage File should include any of the documents specified in clause (e) of Section 2.01.

Prior to the first anniversary date of this Agreement with respect to the Original Mortgage Loans, or 90 days after the related Subsequent Transfer Date, the Trustee shall deliver to the Depositor and the Master Servicer a final certification in the form annexed hereto as Exhibit C-2 (or shall cause the Custodian to deliver to the Trustee, the Depositor and the Master Servicer a final certification in the form attached to the Custodial Agreement) evidencing the completeness of the Mortgage Files, with any applicable exceptions noted thereon.

If in the process of reviewing the Mortgage Files and making or preparing, as the case may be, the certifications referred to above, the Trustee or any Custodian finds any document or documents constituting a part of a Mortgage File to be missing or defective in any material respect, at the conclusion of its review the Trustee (or a Custodian on behalf of the Trustee) shall so notify the Depositor, the Seller, the NIMs Insurer and the Master Servicer.  In addition, upon the discovery by the Depositor, the Master Servicer, the NIMs Insurer or the Trustee of a breach of any of the representations and warranties made by the Seller in the Mortgage Loan Purchase Agreement in respect of any Original Home Equity Loan which materially adversely affects such Original Home Equity Loan or the interests of the related

56

Certificateholders in such Original Home Equity Loan, the party discovering such breach shall give prompt written notice to the other parties.

SECTION 2.03.    Repurchase or Substitution of Home Equity Loans by the Seller or the Depositor; Payment of Prepayment Charges in the event of breach.

(a)    Upon discovery or receipt of notice of any materially defective document in, or that a document is missing from, the Mortgage File or of the breach by the Seller of any representation, warranty or covenant under the Mortgage Loan Purchase Agreement in respect of any Home Equity Loan which materially adversely affects the value of such Home Equity Loan or the interest therein of the Certificateholders (in the case of any such representation or warranty made to the knowledge or the best of knowledge of the Seller, as to which the Seller has no knowledge, without regard to the Seller's lack of knowledge with respect to the substance of such representation or warranty being inaccurate at the time it was made), the Trustee (or a Custodian on behalf of the Trustee) shall promptly notify the Seller, the NIMs Insurer and the Master Servicer of such defect, missing document or breach and request that the Seller deliver such missing document or cure such defect or breach within 90 days from the date the Seller was notified of such missing document, defect or breach, and if the Seller does not deliver such missing document or cure such defect or breach in all material respects during such period, the Master Servicer (or, in accordance with Section 3.02(b), the Trustee) shall enforce the obligations of the Seller under the Mortgage Loan Purchase Agreement to repurchase such Home Equity Loan from REMIC I at the Purchase Price within 90 days after the date on which the Seller was notified (subject to Section 2.03(e)) of such missing document, defect or breach, if and to the extent that the Seller, as the case may be, is obligated to do so under the Mortgage Loan Purchase Agreement. The Purchase Price for the repurchased Home Equity Loan shall be deposited in the Collection Account, and the Trustee, upon receipt of written certification from the Master Servicer of such deposit, shall release to the Seller the related Mortgage File and shall execute and deliver such instruments of transfer or assignment, in each case without recourse, as the Seller shall furnish to it and as shall be necessary to vest in the Seller any Home Equity Loan released pursuant hereto, and the Trustee shall have no further responsibility with regard to such Mortgage File. In lieu of repurchasing any such Home Equity Loan as provided above, if so provided in the Mortgage Loan Purchase Agreement, the Seller may cause such Home Equity Loan to be removed from REMIC I (in which case it shall become a Deleted Home Equity Loan) and substitute one or more Qualified Substitute Home Equity Loans in the manner and subject to the limitations set forth in Section 2.03(d). It is understood and agreed that the obligation of the Seller to cure or to repurchase (or to substitute for) any Home Equity Loan as to which a document is missing, a material defect in a constituent document exists or as to which such a breach has occurred and is continuing shall constitute the sole remedy respecting such omission, defect or breach available to the Trustee on behalf of the Certificateholders.

(b)    (i)    Subject to Section 2.03(e), within 90 days of the earlier of discovery by the Seller or receipt of notice by the Seller of the breach of any representation or warranty of the Seller set forth in Section 5 or Section 6 of the Mortgage Loan Purchase Agreement with respect to any Home Equity Loan, which materially adversely affects the value

57

of such Home Equity Loan or the interest therein of the Certificateholders, the Seller shall (i) cure such breach in all material respects, (ii) repurchase the Home Equity Loan from REMIC I at the Purchase Price or (iii) remove such Home Equity Loan from REMIC I (in which case it shall become a Deleted Home Equity Loan) and substitute one or more Qualified Substitute Home Equity Loans in the manner and subject to the limitations set forth in Section 2.03(d).   The Purchase Price for any repurchased Home Equity Loan shall be delivered to the Master Servicer for deposit in the Collection Account, and the Trustee, upon receipt of written certification from the Master Servicer of such deposit, shall at the Seller's direction release to the Seller the related Mortgage File and shall execute and deliver such instruments of transfer or assignment furnished by the Seller, in each case without recourse, as the Seller shall furnish to it and as shall be necessary to vest in the Seller any Home Equity Loan released pursuant hereto.

(ii)     The Depositor hereby represents and warrants that each Original Home Equity Loan in Loan Group 1 and Loan Group 2 has an original Stated Principal Balance of no more than $800,000 and $1,000,000, respectively, except for Home Equity Loans for which the related Mortgaged Property (a) is a two-family property in which case the Stated Principal Balance may be up to $403,750 and $530,000, receptively, (b) is a three-family property in which case the Stated Principal Balance may be up to $317,617.53 and $499,329.46, respectively or (c) is a four-family property in which case the Stated Principal Balance may be up to $399,311.23 and $499,801.30 respectively.   Subject to Section 2.03(e), within 90 days of the earlier of discovery by the Depositor or receipt of notice by the Depositor of the breach of the previous representation with respect to any Home Equity Loan in either Loan Group, which materially adversely affects the value of such Home Equity Loan or the interests therein of the Certificateholders, the Depositor shall (i) cure such breach in all material respects, (ii) repurchase the Home Equity Loan from REMIC I at the Purchase Price or (iii) remove such Home Equity Loan from REMIC I (in which case it shall become a Deleted Home Equity Loan) and substitute one or more Qualified Substitute Home Equity Loans in the manner and subject to the limitations set forth in Section 2.03(d).

(iii)     The Purchase Price for any repurchased Home Equity Loan shall be delivered to the Master Servicer for deposit in the Collection Account, and the Trustee, upon receipt of written certification from the Master Servicer of such deposit, shall at the Depositor's direction release to the Depositor the related Mortgage File and shall execute and deliver such instruments of transfer or assignment furnished by the Depositor, in each case without recourse, as the Depositor shall furnish to it and as shall be necessary to vest in the Depositor any Home Equity Loans released pursuant hereto.

(c)     (i)     As promptly as practicable (and no later than 90 days) after the earlier of discovery by the Master Servicer or receipt of notice by the Master Servicer of the breach of any representation, warranty or covenant of the Master Servicer set forth in Section 2.05 which materially and adversely affects the interests of the Certificateholders in any Home Equity Loan, the Master Servicer shall cure such breach in all material respects.

(ii)     Within 90 days of the earlier of discovery by the Master Servicer or receipt of notice by the Master Servicer of the breach of any representation, warranty or covenant

58

of the Master Servicer set forth in Section 2.05 which materially and adversely affects the interests of the Holders of the Class P Certificates to any Prepayment Charge, the Master Servicer shall cure such breach in all material respects. If the representation made by the Master Servicer in Section 2.05(vii) is breached, the Master Servicer must pay into the Collection Account the amount of the scheduled Prepayment Charge, less any amount previously collected and paid by the Master Servicer into the Collection Account; and if the covenant made by the Master Servicer in Section 2.05(viii) is breached, the Master Servicer must pay into the Collection Account the amount of the waived Prepayment Charge.

(d)     Any substitution of Qualified Substitute Home Equity Loans for Deleted Home Equity Loans made pursuant to Section 2.03(a), in the case of the Seller, or Section 2.03(b), in the case of the Depositor, must be effected prior to the date which is two years after the Closing Date for REMIC I.

As to any Deleted Home Equity Loan for which the Seller or the Depositor substitutes a Qualified Substitute Home Equity Loan or Loans, such substitution shall be effected by the Seller or the Depositor, as the case may be, delivering to the Trustee (or a Custodian on behalf of the Trustee), for such Qualified Substitute Home Equity Loan or Loans, the Mortgage Note, the Mortgage, the Assignment to the Trustee, and such other documents and agreements, with all necessary endorsements thereon, as are required by Section 2.01, together with an Officers' Certificate providing that each such Qualified Substitute Home Equity Loan satisfies the definition thereof and specifying the Substitution Shortfall Amount (as described below), if any, in connection with such substitution. The Trustee (or a Custodian on behalf of the Trustee) shall acknowledge receipt for such Qualified Substitute Home Equity Loan or Loans and, within ten Business Days thereafter, review such documents as specified in Section 2.02 and deliver to the Depositor and the Master Servicer, with respect to such Qualified Substitute Home Equity Loan or Loans, a certification substantially in the form attached hereto as Exhibit C-1, with any applicable exceptions noted thereon. Within one year of the date of substitution, the Trustee shall deliver to the Depositor, the Seller, the NIMs Insurer and the Master Servicer a certification substantially in the form of Exhibit C-2 hereto with respect to such Qualified Substitute Home Equity Loan or Loans, with any applicable exceptions noted thereon. Monthly Payments due with respect to Qualified Substitute Home Equity Loans in the month of substitution are not part of REMIC I and will be retained by the Depositor or the Seller, as the case may be. For the month of substitution, distributions to Certificateholders will reflect the Monthly Payment due on such Deleted Home Equity Loan on or before the Due Date in the month of substitution, and the Depositor or the Seller, as the case may be, shall thereafter be entitled to retain all amounts subsequently received in respect of such Deleted Home Equity Loan. The Depositor shall give or cause to be given written notice to the Certificateholders that such substitution has taken place, shall amend the Home Equity Loan Schedule to reflect the removal of such Deleted Home Equity Loan from the terms of this Agreement and the substitution of the Qualified Substitute Home Equity Loan or Loans and shall deliver a copy of such amended Home Equity Loan Schedule to the Trustee. Upon such substitution, such Qualified Substitute Home Equity Loan or Loans shall constitute part of the Mortgage Pool and shall be subject in all respects to the terms of this Agreement and, in the case of a substitution effected by the Seller, the Mortgage Loan Purchase

Agreement, including, in the case of a substitution effected by the Seller, all applicable representations and warranties thereof included in the Mortgage Loan Purchase Agreement, and in the case of a substitution effected by the Depositor, all applicable representations and warranties thereof set forth in Section 2.04, in each case as of the date of substitution.

For any month in which the Depositor or the Seller substitutes one or more Qualified Substitute Home Equity Loans for one or more Deleted Home Equity Loans, the Master Servicer will determine the amount (the "Substitution Shortfall Amount"), if any, by which the aggregate Purchase Price of all such Deleted Home Equity Loans exceeds the aggregate of, as to each such Qualified Substitute Home Equity Loan, the Scheduled Principal Balance thereof as of the date of substitution, together with one month's interest on such Scheduled Principal Balance at the applicable Net Mortgage Rate, plus all outstanding P&I Advances and Servicing Advances. On the date of such substitution, the Depositor or the Seller, as the case may be, will deliver or cause to be delivered to the Master Servicer for deposit in the Collection Account an amount equal to the Substitution Shortfall Amount, if any, and the Trustee, upon receipt of the related Qualified Substitute Home Equity Loan or Loans and certification by the Master Servicer of such deposit, shall release to the Depositor or the Seller, as the case may be, the related Mortgage File or Files and shall execute and deliver such instruments of transfer or assignment, in each case without recourse, as the Depositor or the Seller, as the case may be, shall deliver to it and as shall be necessary to vest therein any Deleted Home Equity Loan released pursuant hereto.

In addition, the Depositor or the Seller, as the case may be, shall obtain at its own expense and deliver to the Trustee and the NIMs Insurer an Opinion of Counsel to the effect that such substitution will not cause (a) any federal tax to be imposed on any of REMIC I, created hereunder, including without limitation, any federal tax imposed on "prohibited transactions" under Section 860F(a)(1) of the Code or on "contributions after the startup date" under Section 860G(d)(1) of the Code, or (b) any REMIC hereunder to fail to qualify as a REMIC at any time that any Certificate is outstanding.

(e)    Upon discovery by the Depositor, the Seller, the Master Servicer, the NIMs Insurer or the Trustee that any Home Equity Loan does not constitute a "qualified mortgage" within the meaning of Section 860G(a)(3) of the Code, the party discovering such fact shall within two Business Days give written notice thereof to the other parties. In connection therewith, the Seller or the Depositor shall repurchase or, subject to the limitations set forth in Section 2.03(d), substitute one or more Qualified Substitute Home Equity Loans for the affected Home Equity Loan within 90 days of the earlier of discovery or receipt of such notice with respect to such affected Home Equity Loan. Such repurchase or substitution shall be made by (i) the Seller, if the affected Home Equity Loan's status as a non-qualified mortgage is or results from a breach of any representation, warranty or covenant made by the Seller under the Mortgage Loan Purchase Agreement or (ii) the Depositor, if the affected Home Equity Loan's status as a non-qualified mortgage is a breach of any representation or warranty of the Depositor set forth in Section 2.04, or if its status as a non-qualified mortgage is a breach of no representation or warranty. Any such repurchase or substitution shall be made in the same manner as set forth in Section 2.03(a), if made by the Seller, or Section 2.03(b), if made by the Depositor. The Trustee

60

shall reconvey to the Depositor or the Seller, as the case may be, the Home Equity Loan to be released pursuant hereto in the same manner, and on the same terms and conditions, as it would a Home Equity Loan repurchased for breach of a representation or warranty.

SECTION 2.04.        Representations and Warranties of the Depositor.

The Depositor hereby represents, warrants and covenants to the Trustee that as of the Closing Date:

(i)        The Depositor is a corporation duly formed and validly existing under the laws governing its creation and existence, is in compliance with the laws of each state in which any Mortgaged Property or the Depositor is located or doing business and is in good standing in each jurisdiction in which the nature of its business, or the properties owned or leased by it make such qualification necessary.  The Depositor has all requisite authority to own and operate its properties, to carry out its business as presently conducted and as proposed to be conducted and to enter into and discharge its obligations under this Agreement and the other Operative Documents to which it is a party.

(ii)        The execution and delivery of this Agreement and the other Operative Documents to which it is a party by the Depositor and its performance and compliance with the terms of this Agreement and the other Operative Documents to which it is a party have been duly authorized by all necessary corporate action on the part of the Depositor and will not violate the Depositor's Charter or Bylaws or constitute a default (or an event which, with notice or lapse of time, or both, would constitute a default) under, or result in a breach of, any material contract, agreement or other instrument to which the Depositor is a party or by which the Depositor is bound or violate any statute or any order, rule or regulation of any court, governmental agency or body or other tribunal having jurisdiction over the Depositor or any of its properties.

(iii)        This Agreement and the other Operative Documents to which the Depositor is a party, assuming due authorization, execution and delivery by the other parties hereto and thereto, each constitutes a valid, legal and binding obligation of the Depositor, enforceable against it in accordance with the terms hereof and thereof, except as the enforcement thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and by general principles of equity (whether considered in a proceeding or action in equity or at law).

(iv)        The Depositor is not in default with respect to any order or decree of any court or any order, regulation or demand of any federal, state, municipal or governmental agency, which default could materially and adversely affect the condition (financial or other) or operations of the Depositor or its properties or the consequences of which could materially and adversely affect its performance hereunder and under the other Operative Documents to which the Depositor is a party.

(v)        No litigation, proceeding or investigation is pending with respect to which the Depositor has received service of process or, to the best of the Depositor's knowledge,

61

1011956\27

threatened against the Depositor which litigation, proceeding or investigation might have consequences that would prohibit its entering into this Agreement or any other Operative Documents to which it is a party or that would materially and adversely affect the condition (financial or otherwise) or operations of the Depositor or its properties or might have consequences that would materially and adversely affect the validity or enforceability of the Home Equity Loans or the Depositor's performance hereunder and under the other Operative Documents to which the Depositor is a party.

(vi)     The statements contained in the Registration Statement which describe the Depositor or matters or activities for which the Depositor is responsible in accordance with the Operative Documents or which are attributed to the Depositor therein are true and correct in all material respects, and the Registration Statement does not contain any untrue statement of a material fact with respect to the Depositor or omit to state a material fact required to be stated therein or necessary in order to make the statements contained therein with respect to the Depositor not misleading.

(vii)    Immediately prior to the sale and assignment by the Depositor to the Trustee on behalf of the Trust of each Home Equity Loan, the Depositor had good and equitable title to each Home Equity Loan subject to no prior lien, claim, participation interest, mortgage, security interest, pledge, charge or other encumbrance or other interest of any nature;

(viii)   As of the Closing Date, the Depositor has transferred all right, title and interest in the Original Home Equity Loans to the Trustee on behalf of the Trust; and

(ix)     The Depositor is solvent and will not be made insolvent by the transfer of the Home Equity Loans, and the Depositor is not aware of any impending insolvency.  The Depositor has not transferred the Home Equity Loans to the Trustee on behalf of the Trust with any intent to hinder, delay or defraud any of its creditors.

(x)      All actions, approvals, consents, waivers, exemptions, variances, franchises, orders, permits, authorizations, rights and licenses required to be taken, given or obtained, as the case may be, by or from any federal, state or other governmental authority or agency (other than any such actions, approvals, etc. under any state securities laws, real estate syndication or "Blue Sky" statutes, as to which the Depositor makes no such representation or warranty), that are necessary or advisable in connection with the purchase and sale of the Certificates and the execution and delivery by the Depositor of the Operative Documents to which it is a party, have been duly taken, given or obtained, as the case may be, are in full force and effect on the date hereof, are not subject to any pending proceedings or appeals (administrative, judicial or otherwise) and either the time within which any appeal therefrom may be taken or review thereof may be obtained has expired or no review thereof may be obtained or appeal therefrom taken, and are adequate to authorize the consummation of the transactions contemplated by this Agreement and the other Operative Documents on the part of the Depositor and the performance by the Depositor of its obligations under this Agreement and such of the other Operative Documents to which it is a party.

10119560.27

(xi)     The transfer, assignment and conveyance of the Mortgage Notes and the Mortgages by the Depositor hereunder are not subject to the bulk transfer laws of any similar statutory provisions in effect in any applicable jurisdiction.

(xii)    No certificate of an officer, statement furnished in writing or report delivered, or to be delivered pursuant to the terms hereof by the Depositor contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary to make the certificate, statement or report not misleading.

SECTION 2.05.          Representations, Warranties and Covenants of the Master Servicer.

The Master Servicer hereby represents, warrants and covenants to the Trustee, for the benefit of each of the Trustee, the Certificateholders and to the Depositor that as of the Closing Date or as of such date specifically provided herein:

(i)      The Master Servicer is a corporation duly organized, validly existing and in good standing under the laws of the state of its incorporation and is duly authorized and qualified to transact any and all business contemplated by this Agreement to be conducted by the Master Servicer in any state in which a Mortgaged Property is located or is otherwise not required under applicable law to effect such qualification and, in any event, is in compliance with the doing business laws of any such State, to the extent necessary to ensure its ability to enforce each Home Equity Loan and to service the Home Equity Loans in accordance with the terms of this Agreement;

(ii)     The Master Servicer has the full power and authority to service each Home Equity Loan, and to execute, deliver and perform, and to enter into and consummate the transactions contemplated by this Agreement and has duly authorized by all necessary action on the part of the Master Servicer the execution, delivery and performance of this Agreement; and this Agreement, assuming the due authorization, execution and delivery thereof by the Depositor and the Trustee, constitutes a legal, valid and binding obligation of the Master Servicer, enforceable against the Master Servicer in accordance with its terms, except to the extent that (a) the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally and (b) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to the equitable defenses and to the discretion of the court before which any proceeding therefor may be brought;

(iii)    The execution and delivery of this Agreement by the Master Servicer, the servicing of the Home Equity Loans by the Master Servicer hereunder, the consummation by the Master Servicer of any other of the transactions herein contemplated, and the fulfillment of or compliance with the terms hereof are in the ordinary course of business of the Master Servicer and will

63

not (A) result in a breach of any term or provision of the charter or by-laws of the Master Servicer or (B) conflict with, result in a breach, violation or acceleration of, or result in a default under, the terms of any other material agreement or instrument to which the Master Servicer is a party or by which it may be bound, or any statute, order or regulation applicable to the Master Servicer of any court, regulatory body, administrative agency or governmental body having jurisdiction over the Master Servicer; and the Master Servicer is not a party to, bound by, or in breach or violation of any indenture or other agreement or instrument, or subject to or in violation of any statute, order or regulation of any court, regulatory body, administrative agency or governmental body having jurisdiction over it, which materially and adversely affects or, to the Master Servicer's knowledge, would in the future materially and adversely affect, (x) the ability of the Master Servicer to perform its obligations under this Agreement or (y) the business, operations, financial condition, properties or assets of the Master Servicer taken as a whole;

(iv)   The Master Servicer is an approved seller/servicer for Fannie Mae or Freddie Mac in good standing and is a HUD approved mortgagee pursuant to Section 203 and Section 211 of the National Housing Act;

(v)   No litigation is pending against the Master Servicer that would materially and adversely affect the execution, delivery or enforceability of this Agreement or the ability of the Master Servicer to service the Home Equity Loans or to perform any of its other obligations hereunder in accordance with the terms hereof;

(vi)   No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Master Servicer of, or compliance by the Master Servicer with, this Agreement or the consummation by the Master Servicer of the transactions contemplated by this Agreement, except for such consents, approvals, authorizations or orders, if any, that have been obtained prior to the Closing Date;

(vii)   The information set forth in the Prepayment Charge Schedule is complete, true and correct in all material respects at the date or dates respecting which such information is furnished and each Prepayment Charge is permissible and enforceable in accordance with its terms under applicable law upon the Mortgagor's full and voluntary principal prepayment (except to the extent that: (1) the enforceability thereof may be limited by bankruptcy, insolvency, moratorium, receivership and other similar laws relating to creditors' rights generally; (2) the collectability thereof may be limited due to acceleration in connection with a foreclosure or other involuntary prepayment; or (3) subsequent changes in applicable law may limit or prohibit enforceability thereof);

(viii)   The Master Servicer will not waive any Prepayment Charge or part of a Prepayment Charge unless such waiver would maximize recovery of total

64

proceeds taking into account the value of such Prepayment Charge and related Home Equity Loan and doing so is standard and customary in servicing home equity loans similar to the Home Equity Loans (including any waiver of a Prepayment Charge in connection with a refinancing of a Home Equity Loan that is related to a default or a reasonably foreseeable default), and in no event will it waive a Prepayment Charge in connection with a refinancing of a Home Equity Loan that is not related to a default or a reasonably foreseeable default; and

(ix)    The Master Servicer covenants that its computer and other systems used in servicing the Home Equity Loans operate in a manner such that the Master Servicer can service the Home Equity Loans in accordance with the terms of this Agreement.

It is understood and agreed that the representations, warranties and covenants set forth in this Section 2.05 shall survive delivery of the Mortgage Files to the Trustee or to a Custodian, as the case may be, and shall inure to the benefit of the Trustee, the Depositor and the Certificateholders.  Upon discovery by any of the Depositor, the Master Servicer, the NIMs Insurer or the Trustee of a breach of any of the foregoing representations, warranties and covenants which materially and adversely affects the value of any Home Equity Loan, Prepayment Charge or the interests therein of the Certificateholders, the party discovering such breach shall give prompt written notice (but in no event later than two Business Days following such discovery) to the Trustee.  The obligation of the Master Servicer set forth in Section 2.03(c) to cure breaches shall constitute the sole remedy against the Master Servicer available to the Certificateholders, the Depositor or the Trustee on behalf of the Certificateholders respecting a breach of the representations, warranties and covenants contained in this Section 2.05.  The preceding sentence shall not, however, limit any remedies available to the Certificateholders, the Depositor or the Trustee on behalf of the Certificateholders, pursuant to the Mortgage Loan Purchase Agreement signed by the Master Servicer in its capacity as Seller, respecting a breach of the representations, warranties and covenants of the Master Servicer in its capacity as Seller contained in the Mortgage Loan Purchase Agreement or pursuant to Section 7.01 hereof.

SECTION 2.06.        Issuance of Class R-I Certificates.

The Trustee acknowledges the assignment to it of the Original Home Equity Loans and the delivery to it, or any Custodian on its behalf, of the Mortgage Files, subject to the provisions of Section 2.01 and Section 2.02, together with the assignment to it of all other assets included in REMIC I, receipt of which is hereby acknowledged.  Concurrently with such assignment and delivery and in exchange therefor, the Trustee, pursuant to the written request of the Depositor executed by an officer of the Depositor, has executed, authenticated and delivered to or upon the order of the Depositor, the Class R-I Certificates in authorized denominations.  The interests evidenced by the Class R-I Certificates, together with the REMIC I Regular Interests, constitute the entire beneficial ownership interest in REMIC I.  The rights of the Class R-I Certificateholders and REMIC II (as holder of the REMIC I Regular Interests) to receive distributions from the proceeds of REMIC I in respect of the Class R-I Certificates and the REMIC I Regular Interests, respectively, and all ownership interests evidenced or constituted by

65

the Class R-I Certificates and the REMIC I Regular Interests, shall be as set forth in this Agreement.

SECTION 2.07.       Conveyance of REMIC I Regular Interests; Acceptance of REMIC II by the Trustee.

The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey to the Trustee without recourse all the right, title and interest of the Depositor in and to the REMIC I Regular Interests for the benefit of the Class R-II and REMIC III Certificateholders. The Trustee acknowledges receipt of the REMIC I Regular Interests and declares that it holds and will hold the same in trust for the exclusive use and benefit of all present and future Class R-II Certificateholders and REMIC III Certificateholders. The rights of the Class R-II Certificateholders and REMIC III (as holder of the REMIC II Regular Interests) to receive distributions from the proceeds of REMIC II in respect of the Class R-II Certificates and REMIC II Regular Interests, respectively, and all ownership interests evidenced or constituted by the Class R-II Certificates and the REMIC II Regular Interests, shall be as set forth in this Agreement.

SECTION 2.08.       Issuance of Class R-II Certificates.

The Trustee acknowledges the assignment to it of the REMIC I Regular Interests and, concurrently therewith and in exchange therefor, pursuant to the written request of the Depositor executed by an officer of the Depositor, the Trustee has executed, authenticated and delivered to or upon the order of the Depositor, the Class R-II Certificates in authorized denominations. The interests evidenced by the Class R-II Certificates, together with the REMIC II Regular Interests, constitute the entire beneficial ownership interest in REMIC II.

SECTION 2.09.       Conveyance of REMIC II Regular Interests; Acceptance of REMIC III by the Trustee.

The Depositor, concurrently with the execution and delivery hereof, does hereby transfer, assign, set over and otherwise convey to the Trustee without recourse all the right, title and interest of the Depositor in and to the REMIC II Regular Interests for the benefit of the REMIC III Certificateholders. The Trustee acknowledges receipt of the REMIC II Regular Interests and declares that it holds and will hold the same in trust for the exclusive use and benefit of all present and future REMIC III Certificateholders. The rights of the REMIC III Certificateholders to receive distributions from the proceeds of REMIC III in respect of the REMIC III Certificates, and all ownership interests evidenced or constituted by the REMIC III Certificates, shall be as set forth in this Agreement.

SECTION 2.10.       Issuance of REMIC III Certificates.

The Trustee acknowledges the assignment to it of the REMIC II Regular Interests and, concurrently therewith and in exchange therefor, pursuant to the written request of the Depositor executed by an officer of the Depositor, the Trustee has executed, authenticated and

101195662

delivered to or upon the order of the Depositor, the REMIC III Certificates in authorized denominations evidencing the entire beneficial ownership interest in REMIC III.

SECTION 2.11.        Subsequent Transfers.

(a)      Upon five Business Days prior written notice to the Trustee and the NIMs Insurer, the Depositor, the Seller and the Trustee shall complete, execute and deliver a Subsequent Transfer Agreement. Subject to the satisfaction of the conditions set forth in Article II and paragraph (b) below and pursuant to the terms of the related Subsequent Transfer Agreement, in consideration of the Trustee's delivery on each Subsequent Transfer Date to or upon the order of the Seller of all or a portion of the balance of funds in the related Pre-Funding Account, the Seller shall on each Subsequent Transfer Date transfer, assign, set over and otherwise convey to the Depositor, without recourse, all the right, title and interest of the Seller in and to each Subsequent Home Equity Loan identified on the Home Equity Loan Schedule the rights of the Seller and all other assets included or to be included in REMIC I. Such assignment includes all interest and principal received by the Seller on or with respect to the Subsequent Home Equity Loans (other than the payment of principal and interest due on such Home Equity Loans on or before the Subsequent Cut-off Date), and the Depositor shall simultaneously transfer, assign, set over and otherwise convey to the Trustee without recourse for the benefit of the Certificateholders, all the right, title and interest of the Depositor in and to each Subsequent Home Equity Loan identified on the Home Equity Loan Schedule the rights of the Depositor and all other assets included or to be included in REMIC I. Such assignment includes all interest and principal received by the Depositor or the Master Servicer on or with respect to the Subsequent Home Equity Loans (other than the payment of principal and interest due on such Home Equity Loans on or before the Subsequent Cut-off Date).

The amount released from the Group 1 Pre-Funding Account by the Trustee pursuant to this Section 2.11 shall be 100% of the aggregate Scheduled Principal Balances of the Subsequent Home Equity Loans so transferred to Loan Group 1 as of the Cut-off Date.  The amount released from the Group 2 Pre-Funding Account by the Trustee pursuant to this Section 2.11 shall be 100% of the aggregate Scheduled Principal Balances of the Subsequent Home Equity Loans so transferred to Loan Group 2 as of the Cut-off Date.

(b)      The Trustee shall contribute from the Pre-Funding Accounts funds in an amount equal to the aggregate Scheduled Principal Balance of the Subsequent Home Equity Loans as of the Cut-off Date so transferred to the Trust Fund to purchase the Subsequent Home Equity Loans on behalf of the Trust Fund pursuant to a fixed priced contract, along with the other property and rights related thereto described in Section 2.11(a) hereof only upon the satisfaction of each of the following conditions:

(i)      the Trustee and the NIMs Insurer will be provided Opinions of Counsel addressed to the Rating Agencies with respect to the sale of the Subsequent Home Equity Loans conveyed on such Subsequent Transfer Date (such opinions being substantially similar to the opinions delivered on the Closing Date to the Rating

67

Agencies with respect to the sale of the Original Home Equity Loans on the Closing Date);

(ii)    the execution and delivery of such Subsequent Transfer Agreement or conveyance of the related Subsequent Home Equity Loans does not result in a reduction or withdrawal of any ratings assigned to the Certificates by the Ratings Agencies;

(iii)    the Depositor shall deliver to the Trustee and the NIMs Insurer an Officer's Certificate confirming the satisfaction of each of the conditions set forth in Article II and this Section 2.11(b) required to be satisfied by such Subsequent Transfer Date;

(iv)    each Subsequent Home Equity Loan conveyed on such Subsequent Transfer Date satisfies the representations and warranties applicable to it under this Agreement, provided, however, that with respect to a breach of a representation and warranty with respect to a Subsequent Home Equity Loan set forth in this clause (iv), the obligation under Section 2.04 of this Agreement of the Seller to cure, repurchase or replace such Subsequent Home Equity Loan shall constitute the sole remedy against the Seller respecting such breach available to Certificateholders, the Depositor or the Trustee.

(v)    the Subsequent Home Equity Loans conveyed on such Subsequent Transfer Date were not selected in a manner intended to be adverse to the interests of the Certificateholders;

(vi)    no Subsequent Home Equity Loan conveyed on such Subsequent Transfer Date was 30 or more days delinquent;

(vii)    each Subsequent Home Equity Loan conveyed on such Subsequent Transfer Date is secured by a first lien on the related Mortgaged Property;

(viii)    the Subsequent Home Equity Loans for Loan Group I conveyed on such Subsequent Transfer Date must have a Minimum Weighted Average Coupon of 11.35% and in the case of each Loan Group, following the conveyance of the Subsequent Home Equity Loans on such Subsequent Transfer Date, the characteristics of such Loan Group listed below will not vary by more than the permitted variance listed below for each characteristic with respect to the Initial Home Equity Loans as set forth on the Home Equity Loan Schedule delivered on the Closing Date; provided that for the purpose of making such calculations, the characteristics for each Home Equity Loan made will be taken as of the related Cut-off Date for such Home Equity Loan:

| | Max or Min |
|---|---|
| Loan Group 1: | |
| Minimum Loan Rate............................................................... | 6.94% |

1011956.27

| | |
|---|---:|
| Maximum Maturity | 360 Months |
| Maximum Weighted Average Remaining Term | 348 Months |
| Maximum Weighted Average Loan-to-Value Ratio | 75.75% |
| Maximum Loan-to-Value | 90.00% |
| Maximum Balloon Loan %: | 2.00% |
| Maximum State Concentration %: | 19.00% |
| Maximum Zip Code Concentration %: | 2.00% |
| Maximum Non-Owner Occupied %: | 9.00% |
| Maximum % C's & D's | 17.00% |
| Maximum % DTI > 40% | 58.00% |
| Minimum Weighted Average FICO | 562 |
| Maximum % Second Liens: | 0.00% |
| Maximum % 30 Day past due loans: | 0.00% |

| Loan Group 2: | Max or Min |
|---|---:|
| Minimum Weighted Average Coupon: | 10.68% |
| Minimum Loan Rate | 7.50% |
| Maximum Maturity | 360 Months |
| Maximum Weighted Average Remaining Term | 360 Months |
| Weighted Average Loan-to-Value Ratio | 78.50% |
| Maximum Loan-to-Value | 90.00% |
| Maximum Balloon Loan %: | 1.00% |
| Maximum State Concentration %: | 33.00% |
| Maximum Zip Code Concentration %: | 1.00% |
| Maximum Non-Owner Occupied %: | 5.00% |
| Maximum % C's & D's | 19.00% |
| Maximum % DTI > 40% | 64.00% |
| Minimum Weighted Average FICO | 562 |
| Maximum % Second Liens: | 0.00% |
| Maximum % 30 Day past due loans: | 0.00% |

(ix)    neither the Seller nor the Depositor is insolvent and neither the Seller nor the Depositor will be rendered insolvent by the conveyance of Subsequent Home Equity Loans on such Subsequent Transfer Date;

(x)    delivery of a letter or letters addressed to the Trustee and the NIMs Insurer from an independent accountant retained by the Seller confirming that the characteristics of each Loan Group, following the acquisition of the related Subsequent Home Equity Loans, conform to the characteristics identified in this Section 2.11(b)(viii). In the event such accounting firm requires the Trustee to agree to the procedures performed by such accounting firm, the Seller shall direct the Trustee in writing to so agree; it being understood and agreed that the Trustee will deliver such letter of agreement in conclusive reliance upon the direction of

1011956v27

the Seller, and the Trustee makes no independent inquiry or investigation as to, and shall have no obligation or liability in respect of, the sufficiency, validity or correctness of such procedures;

(xi)    delivery to the Trustee and the NIMs Insurer of an Opinion of Counsel, which Opinion of Counsel shall not be at the expense of either the Trustee or the Trust Fund, addressed to the Trustee, to the effect that such purchase of Subsequent Home Equity Loans will not (i) result in the imposition of the tax on "prohibited transactions" on the Trust Fund or contributions after the Startup Date, as defined in Sections 860F(a)(2) and 860G(d) of the Code, respectively or (ii) cause the Trust Fund to fail to qualify as a REMIC at any time that any Certificates are outstanding; and

(xii)    delivery to the Trustee of the Mortgage File for each Subsequent Home Equity Loan to be transferred pursuant to the related Subsequent Transfer Agreement.

The Trustee shall not be required to investigate or otherwise verify compliance with these conditions, except for its own receipt of documents specified above, and shall be entitled to rely on the required Officer's Certificate.

(c)    In connection with each Subsequent Transfer Date and on the related Distribution Date, the Seller shall determine (i) the amount and correct dispositions of the funds distributed from the Pre-Funding Accounts and (ii) any other necessary matters in connection with the administration of the Capitalized Interest Accounts and the Pre-Funding Accounts. In the event that any amounts are released by the Trustee from a Pre-Funding Account or from a Capitalized Interest Account as a result of the Seller's calculation error, the Trustee shall not be liable therefor, and the Seller shall immediately repay such amounts to the Trustee.

SECTION 2.12.    Mandatory Prepayment.

Any Unutilized Pre-Funding Amount shall be distributed to Holders of the related Group of Certificates in accordance with Section 4.01 hereof on the first to occur of (i) the Distribution Date following the date on which the Pre-Funding Period ends or (ii) the Special Distribution Date if the aggregate Unutilized Pre-Funding Amount on the Special Distribution Date (plus amounts remaining in the Capitalized Interest Accounts) exceeds 0.95% of the assets of the REMIC I.

## ARTICLE III

## ADMINISTRATION AND SERVICING
## OF THE MORTGAGE LOANS

SECTION 3.01.    Master Servicer to Act as Master Servicer.

70

104J956x27

attorney to carry out such duties including a power of attorney to take title to Mortgaged Properties after foreclosure on behalf of the Trustee and the Certificateholders. The Trustee shall execute a separate power of attorney in favor of the Master Servicer for the purposes described herein to the extent necessary or desirable to enable the Master Servicer to perform its duties hereunder. The Trustee shall not be liable for the actions of the Master Servicer or any Sub-Servicers under such powers of attorney.

Subject to Section 3.09 hereof. in accordance with the standards of the preceding paragraph. the Master Servicer shall advance or cause to be advanced funds as necessary for the purpose of effecting the timely payment of taxes and assessments on the Mortgaged Properties. which advances shall be Servicing Advances reimbursable in the first instance from related collections from the Mortgagors pursuant to Section 3.09. and further as provided in Section 3.11. Any cost incurred by the Master Servicer or by Sub-Servicers in effecting the timely payment of taxes and assessments on a Mortgaged Property shall not. for the purpose of calculating distributions to Certificateholders. be added to the unpaid principal balance of the related Home Equity Loan. notwithstanding that the terms of such Home Equity Loan so permit.

Notwithstanding anything in this Agreement to the contrary. the Master Servicer may not make any future advances with respect to a Home Equity Loan (except as provided in Section 4.03) and the Master Servicer shall not (i) permit any modification with respect to any Home Equity Loan that would change the Mortgage Rate. reduce or increase the principal balance (except for reductions resulting from actual payments of principal) or change the final maturity date on such Home Equity Loan (unless. as provided in Section 3.07. the Mortgagor is in default with respect to the Home Equity Loan or such default is. in the judgment of the Master Servicer. reasonably foreseeable) or (ii) permit any modification. waiver or amendment of any term of any Home Equity Loan that would both (A) effect an exchange or reissuance of such Home Equity Loan under Section 1001 of the Code (or final. temporary or proposed Treasury regulations promulgated thereunder) and (B) cause any of REMIC I. REMIC II or REMIC III to fail to qualify as a REMIC under the Code or the imposition of any tax on "prohibited transactions" or "contributions after the startup date" under the REMIC Provisions.

The Master Servicer may delegate its responsibilities under this Agreement; provided. however. that no such delegation shall release the Master Servicer from the responsibilities or liabilities arising under this Agreement.

SECTION 3.02.    Sub-Servicing Agreements Between the Master Servicer and Sub-Servicers.

(a)    The Master Servicer may enter into Sub-Servicing Agreements (provided that (i) such agreements would not result in a withdrawal or a downgrading by any Rating Agency of the ratings on any Class of Certificates. as evidenced by a letter to that effect delivered by each Rating Agency to the Depositor and the Trustee and (ii) the NIMs Insurer shall have consented to such Sub-Servicing Agreement. which consent shall not be unreasonably withheld) with Sub-Servicers. for the servicing and administration of the Home Equity Loans. The Trustee is hereby authorized to acknowledge. at the request of the Master Servicer. any Sub-Servicing

The Master Servicer shall service and administer the Home Equity Loans on behalf of the Trustee and in the best interests of and for the benefit of the Certificateholders (as determined by the Master Servicer in its reasonable judgment) in accordance with the terms of this Agreement and the respective Home Equity Loans and. to the extent consistent with such terms. in the same manner in which it services and administers similar home equity loans for its own portfolio. giving due consideration to customary and usual standards of practice of mortgage lenders and loan servicers administering similar home equity loans but without regard to:

(i)     any relationship that the Master Servicer, any Sub-Servicer or any Affiliate of the Master Servicer or any Sub-Servicer may have with the related Mortgagor:

(ii)    the ownership or non-ownership of any Certificate by the Master Servicer or any Affiliate of the Master Servicer:

(iii)   the Master Servicer's obligation to make P&I Advances or Servicing Advances: or

(iv)    the Master Servicer's or any Sub-Servicer's right to receive compensation for its services hereunder or with respect to any particular transaction.

To the extent consistent with the foregoing. the Master Servicer shall seek to maximize the timely and complete recovery of principal and interest on the Mortgage Notes. Subject only to the above-described servicing standards and the terms of this Agreement and of the respective Home Equity Loans. the Master Servicer shall have full power and authority. acting alone or through Sub-Servicers as provided in Section 3.02. to do or cause to be done any and all things in connection with such servicing and administration which it may deem necessary or desirable. Without limiting the generality of the foregoing. the Master Servicer in its own name or in the name of a Sub-Servicer is hereby authorized and empowered by the Trustee when the Master Servicer believes it appropriate in its best judgment in accordance with the servicing standards set forth above. to execute and deliver. on behalf of the Certificateholders and the Trustee. and upon notice to the Trustee. any and all instruments of satisfaction or cancellation. or of partial or full release or discharge. and all other comparable instruments. with respect to the Home Equity Loans and the Mortgaged Properties and to institute foreclosure proceedings or obtain a deed-in-lieu of foreclosure so as to convert the ownership of such properties. and to hold or cause to be held title to such properties. on behalf of the Trustee and Certificateholders. The Master Servicer shall service and administer the Home Equity Loans in accordance with applicable state and federal law and shall provide to the Mortgagors any reports required to be provided to them thereby. The Master Servicer shall also comply in the performance of this Agreement with all reasonable rules and requirements of each insurer under any standard hazard insurance policy. Subject to Section 3.17. the Trustee shall execute. at the written request of the Master Servicer. and furnish to the Master Servicer and any Sub-Servicer such documents as are necessary or appropriate to enable the Master Servicer or any Sub-Servicer to carry out their servicing and administrative duties hereunder. and the Trustee hereby grants to the Master Servicer a power of

71

Agreement that meets the requirements applicable to Sub-Servicing Agreements set forth in this Agreement and that is otherwise permitted under this Agreement.

Each Sub-Servicer shall be (i) authorized to transact business in the state or states in which the related Mortgaged Properties it is to service are situated, if and to the extent required by applicable law to enable the Sub-Servicer to perform its obligations hereunder and under the Sub-Servicing Agreement, (ii) an institution approved as a home equity loan originator by the Federal Housing Administration or an institution the deposit accounts in which are insured by the FDIC and (iii) a Freddie Mac or Fannie Mae approved mortgage servicer. Each Sub-Servicing Agreement must impose on the Sub-Servicer requirements conforming to the provisions set forth in Section 3.08 and provide for servicing of the Home Equity Loans consistent with the terms of this Agreement. The Master Servicer will examine each Sub-Servicing Agreement and will be familiar with the terms thereof. The terms of any Sub-Servicing Agreement will not be inconsistent with any of the provisions of this Agreement. The Master Servicer and the Sub-Servicers may enter into and make amendments to the Sub-Servicing Agreements or enter into different forms of Sub-Servicing Agreements; provided, however, that any such amendments or different forms shall be consistent with and not violate the provisions of this Agreement, and that no such amendment or different form shall be made or entered into which could be reasonably expected to be materially adverse to the interests of the Certificateholders, without the consent of the Holders of Certificates entitled to at least 66% of the Voting Rights. Any variation without the consent of the Holders of Certificates entitled to at least 66% of the Voting Rights from the provisions set forth in Section 3.08 relating to insurance or priority requirements of Sub-Servicing Accounts, or credits and charges to the Sub-Servicing Accounts or the timing and amount of remittances by the Sub-Servicers to the Master Servicer, are conclusively deemed to be inconsistent with this Agreement and therefore prohibited. The Master Servicer shall deliver to the Trustee copies of all Sub-Servicing Agreements, and any amendments or modifications thereof, promptly upon the Master Servicer's execution and delivery of such instruments.

(b)     As part of its servicing activities hereunder, the Master Servicer (except as otherwise provided in the last sentence of this paragraph), for the benefit of the Trustee and the Certificateholders, shall enforce the obligations of each Sub-Servicer under the related Sub-Servicing Agreement and of the Seller under the Mortgage Loan Purchase Agreement, including, without limitation, any obligation to make advances in respect of delinquent payments as required by a Sub-Servicing Agreement, or to purchase a Home Equity Loan on account of missing or defective documentation or on account of a breach of a representation, warranty or covenant, as described in Section 2.03(a). Such enforcement, including, without limitation, the legal prosecution of claims, termination of Sub-Servicing Agreements, and the pursuit of other appropriate remedies, shall be in such form and carried out to such an extent and at such time as the Master Servicer, in its good faith business judgment, would require were it the owner of the related Home Equity Loans. The Master Servicer shall pay the costs of such enforcement at its own expense, and shall be reimbursed therefor only (i) from a general recovery resulting from such enforcement, to the extent, if any, that such recovery exceeds all amounts due in respect of the related Home Equity Loans or (ii) from a specific recovery of costs, expenses or attorneys'

fees against the party against whom such enforcement is directed.  Enforcement of the Mortgage Loan Purchase Agreement against the Seller shall be effected by the Master Servicer to the extent it is not the Seller, and otherwise by the Trustee, in accordance with the foregoing provisions of this paragraph.

SECTION 3.03.        Successor Sub-Servicers.

The Master Servicer shall be entitled to terminate any Sub-Servicing Agreement and the rights and obligations of any Sub-Servicer pursuant to any Sub-Servicing Agreement in accordance with the terms and conditions of such Sub-Servicing Agreement.  In the event of termination of any Sub-Servicer, all servicing obligations of such Sub-Servicer shall be assumed simultaneously by the Master Servicer without any act or deed on the part of such Sub-Servicer or the Master Servicer, and the Master Servicer either shall service directly the related Home Equity Loans or shall enter into a Sub-Servicing Agreement with a successor Sub-Servicer which qualifies under Section 3.02.

Any Sub-Servicing Agreement shall include the provision that such agreement may be immediately terminated by the Trustee without fee, in accordance with the terms of this Agreement, in the event that the Master Servicer shall, for any reason, no longer be the Master Servicer (including termination due to a Master Servicer Event of Default).

SECTION 3.04.        Liability of the Master Servicer.

Notwithstanding any Sub-Servicing Agreement, any of the provisions of this Agreement relating to agreements or arrangements between the Master Servicer and a Sub-Servicer or reference to actions taken through a Sub-Servicer or otherwise, the Master Servicer shall remain obligated and primarily liable to the Trustee and the Certificateholders for the servicing and administering of the Home Equity Loans in accordance with the provisions of Section 3.01 without diminution of such obligation or liability by virtue of such Sub-Servicing Agreements or arrangements or by virtue of indemnification from the Sub-Servicer and to the same extent and under the same terms and conditions as if the Master Servicer alone were servicing and administering the Home Equity Loans.  The Master Servicer shall be entitled to enter into any agreement with a Sub-Servicer for indemnification of the Master Servicer by such Sub-Servicer and nothing contained in this Agreement shall be deemed to limit or modify such indemnification.

SECTION 3.05.        No Contractual Relationship Between Sub-Servicers and Trustee or Certificateholders.

Any Sub-Servicing Agreement that may be entered into and any transactions or services relating to the Home Equity Loans involving a Sub-Servicer in its capacity as such shall be deemed to be between the Sub-Servicer and the Master Servicer alone, and the Trustee and Certificateholders shall not be deemed parties thereto and shall have no claims, rights, obligations, duties or liabilities with respect to the Sub-Servicer except as set forth in Section 3.06.  The Master Servicer shall be solely liable for all fees owed by it to any Sub-Servicer,

74