irrespective of whether the Master Servicer's compensation pursuant to this Agreement is sufficient to pay such fees.

SECTION 3.06.        Assumption or Termination of Sub-Servicing Agreements by Trustee.

In the event the Master Servicer shall for any reason no longer be the Master Servicer (including by reason of the occurrence of a Master Servicer Event of Default), the Back-Up Servicer, or the Trust Administrator if there is no Back-Up Servicer, shall thereupon assume all of the rights and obligations of the Master Servicer under each Sub-Servicing Agreement that the Master Servicer may have entered into, unless the Back-Up Servicer or Trust Administrator, as applicable elects to terminate any Sub-Servicing Agreement in accordance with its terms as provided in Section 3.03 or unless the Back-Up Servicer or Trust Administrator, as applicable. Upon such assumption, the Trustee, its designee or the successor servicer for the Trustee appointed pursuant to Section 7.02 shall be deemed, subject to Section 3.03, to have assumed all of the Master Servicer's interest therein and to have replaced the Master Servicer as a party to each Sub-Servicing Agreement to the same extent as if each Sub-Servicing Agreement had been assigned to the assuming party, except that (i) the Master Servicer shall not thereby be relieved of any liability or obligations under any Sub-Servicing Agreement that arose before it ceased to be the Master Servicer and (ii) none of the Trustee, its designee or any successor Master Servicer shall be deemed to have assumed any liability or obligation of the Master Servicer that arose before it ceased to be the Master Servicer.

The Master Servicer at its expense shall, upon request of the Trustee, deliver to the assuming party all documents and records relating to each Sub-Servicing Agreement and the Home Equity Loans then being serviced and an accounting of amounts collected and held by or on behalf of it, and otherwise use its best efforts to effect the orderly and efficient transfer of the Sub-Servicing Agreements to the assuming party.

SECTION 3.07.        Collection of Certain Home Equity Loan Payments.

The Master Servicer shall make reasonable efforts to collect all payments called for under the terms and provisions of the Home Equity Loans, and shall, to the extent such procedures shall be consistent with this Agreement and the terms and provisions of any applicable insurance policies, follow such collection procedures as it would follow with respect to home equity loans comparable to the Home Equity Loans and held for its own account. Consistent with the foregoing, the Master Servicer may in its discretion (i) waive any late payment charge or, if applicable, any penalty interest, or (ii) extend the due dates for the Monthly Payments due on a Mortgage Note for a period of not greater than 180 days; provided that any extension pursuant to clause (ii) above shall not affect the amortization schedule of any Home Equity Loan for purposes of any computation hereunder, except as provided below; provided further that the NIMs Insurer's prior written consent shall be required for any modification, waiver or amendment if the aggregate number of outstanding Home Equity Loans which have been modified, waived or amended exceeds 5% of the number of Home Equity Loans as of the Cut-Off Date. In the event of any such arrangement pursuant to clause (ii) above, the Master

10110562

Servicer shall make timely advances on such Home Equity Loan during such extension pursuant to Section 4.03 and in accordance with the amortization schedule of such Home Equity Loan without modification thereof by reason of such arrangements, subject to Section 4.03(d) pursuant to which the Master Servicer shall not be required to make any such advances that are Nonrecoverable P&I Advances. Notwithstanding the foregoing, in the event that any Home Equity Loan is in default or, in the judgment of the Master Servicer, such default is reasonably foreseeable, the Master Servicer, consistent with the standards set forth in Section 3.01, may also waive, modify or vary any term of such Home Equity Loan (including modifications that would change the Mortgage Rate, forgive the payment of principal or interest or extend the final maturity date of such Home Equity Loan), accept payment from the related Mortgagor of an amount less than the Stated Principal Balance in final satisfaction of such Home Equity Loan (such payment, a "Short Pay-off") or consent to the postponement of strict compliance with any such term or otherwise grant indulgence to any Mortgagor.

SECTION 3.08.        Sub-Servicing Accounts.

In those cases where a Sub-Servicer is servicing a Home Equity Loan pursuant to a Sub-Servicing Agreement, the Sub-Servicer will be required to establish and maintain one or more accounts (collectively, the "Sub-Servicing Account"). The Sub-Servicing Account shall be an Eligible Account. The Sub-Servicer shall deposit in the clearing account (which account must be an Eligible Account) in which it customarily deposits payments and collections on home equity loans in connection with its home equity loan servicing activities on a daily basis, and in no event more than one Business Day after the Sub-Servicer's receipt thereof, all proceeds of Home Equity Loans received by the Sub-Servicer less its servicing compensation to the extent permitted by the Sub-Servicing Agreement, and shall thereafter deposit such amounts in the Sub-Servicing Account, in no event more than two Business Days after the deposit of such funds into the clearing account. The Sub-Servicer shall thereafter deposit such proceeds in the Collection Account or remit such proceeds to the Master Servicer for deposit in the Collection Account not later than two Business Days after the deposit of such amounts in the Sub-Servicing Account. For purposes of this Agreement, the Master Servicer shall be deemed to have received payments on the Home Equity Loans when the Sub-Servicer receives such payments.

SECTION 3.09.        Collection of Taxes, Assessments and Similar Items; Servicing Accounts.

The Master Servicer shall establish and maintain, or cause to be established and maintained, one or more accounts (the "Servicing Accounts"). Servicing Accounts shall be Eligible Accounts. The Master Servicer shall deposit in the clearing account (which account must be an Eligible Account) in which it customarily deposits payments and collections on home equity loans in connection with its home equity loan servicing activities on a daily basis, and in no event more than one Business Day after the Master Servicer's receipt thereof, all collections from the Mortgagors (or related advances from Sub-Servicers) for the payment of taxes, assessments, hazard insurance premiums and comparable items for the account of the Mortgagors ("Escrow Payments") collected on account of the Home Equity Loans and shall thereafter deposit such Escrow Payments in the Servicing Accounts, in no event more than two Business Days after

76

the deposit of such funds in the clearing account, for the purpose of effecting the payment of any such items as required under the terms of this Agreement. Withdrawals of amounts from a Servicing Account may be made only to (i) effect payment of taxes, assessments, hazard insurance premiums, and comparable items; (ii) reimburse the Master Servicer (or a Sub-Servicer to the extent provided in the related Sub-Servicing Agreement) out of related collections for any advances made pursuant to Section 3.01 (with respect to taxes and assessments) and Section 3.14 (with respect to hazard insurance); (iii) refund to Mortgagors any sums as may be determined to be overages; (iv) pay interest, if required and as described below, to Mortgagors on balances in the Servicing Account; (v) clear and terminate the Servicing Account at the termination of the Master Servicer's obligations and responsibilities in respect of the Home Equity Loans under this Agreement in accordance with Article IX or (vi) recover amounts deposited in error. As part of its servicing duties, the Master Servicer or Sub-Servicers shall pay to the Mortgagors interest on funds in Servicing Accounts, to the extent required by law and, to the extent that interest earned on funds in the Servicing Accounts is insufficient, to pay such interest from its or their own funds, without any reimbursement therefor. To the extent that a Mortgage does not provide for Escrow Payments, the Master Servicer shall determine whether any such payments are made by the Mortgagor in a manner and at a time that avoids the loss of the Mortgaged Property due to a tax sale or the foreclosure of a tax lien. The Master Servicer assumes full responsibility for the payment of all such bills within such time and shall effect payments of all such bills irrespective of the Mortgagor's faithful performance in the payment of same or the making of the Escrow Payments and shall make advances from its own funds to effect such payments; provided, however, that such advances are deemed to be Servicing Advances.

SECTION 3.10.    Collection Account, Distribution Account, Pre-Funding Account, and Capitalized Interest Account.

(a)    On behalf of the Trust Fund, the Master Servicer shall establish and maintain, or cause to be established and maintained, one or more accounts (such account or accounts, the "Collection Account"), held in trust for the benefit of the Trustee and the Certificateholders. On behalf of the Trust Fund, the Master Servicer shall deposit or cause to be deposited in the clearing account (which account must be an Eligible Account) in which it customarily deposits payments and collections on home equity loans in connection with its home equity loan servicing activities on a daily basis, and in no event more than one Business Day after the Master Servicer's receipt thereof, and shall thereafter deposit in the Collection Account, in no event more than two Business Days after the deposit of such funds into the clearing account, as and when received or as otherwise required hereunder, the following payments and collections received or made by it subsequent to the related Cut-off Date (other than in respect of principal or interest on the related Home Equity Loans due on or before the related Cut-off Date), or payments (other than Principal Prepayments) received by it on or prior to the related Cut-off Date but allocable to a Due Period subsequent thereto:

(i)    all payments on account of principal, including Principal Prepayments, on the Home Equity Loans;

10119560.27

(ii)     all payments on account of interest (net of the related Servicing Fee) on each Home Equity Loan;

(iii)    all Insurance Proceeds and Liquidation Proceeds (other than proceeds collected in respect of any particular REO Property and amounts paid by the Master Servicer in connection with a purchase of Home Equity Loans and REO Properties pursuant to Section 9.01);

(iv)    any amounts required to be deposited pursuant to Section 3.12 in connection with any losses realized on Permitted Investments with respect to funds held in the Collection Account;

(v)     any amounts required to be deposited by the Master Servicer pursuant to the second paragraph of Section 3.14(a) in respect of any blanket policy deductibles;

(vi)    all proceeds of any Home Equity Loan repurchased or purchased in accordance with Section 2.03 or Section 9.01;

(vii)   all Substitution Shortfall Amounts; and

(viii)  all Prepayment Charges collected by the Master Servicer.

For purposes of the immediately preceding sentence, the Cut-off Date with respect to any Qualified Substitute Home Equity Loan shall be deemed to be the date of substitution.

The foregoing requirements for deposit in the Collection Accounts shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, payments in the nature of late payment charges, NSF fees, reconveyance fees, assumption fees and other similar fees and charges need not be deposited by the Master Servicer in the Collection Account and shall, upon collection, belong to the Master Servicer as additional compensation for its servicing activities. In the event the Master Servicer shall deposit in the Collection Account any amount not required to be deposited therein, it may at any time withdraw such amount from the Collection Account, any provision herein to the contrary notwithstanding.

(b)     On behalf of the Trust Fund, the Trustee shall establish and maintain one or more accounts (such account or accounts, the "Distribution Account"), held in trust for the benefit of the Certificateholders. On behalf of the Trust Fund, the Master Servicer shall deliver to the Trustee in immediately available funds for deposit in the Distribution Account on or before 3:00 p.m. New York time (i) on the Master Servicer Remittance Date, that portion of the Available Distribution Amount (calculated without regard to the references in clause (2) of the definition thereof to amounts that may be withdrawn from the Distribution Account) for both Loan Groups and the related Distribution Date then on deposit in the Collection Account, the amount of all Prepayment Charges on the Prepayment Charge Schedule collected by the Master Servicer in connection with the voluntary Principal Prepayment in full of any of the Home Equity Loans then on deposit in the Collection Account (other than any such Prepayment Charges

78

received after the related Prepayment Period) and the amount of any funds reimbursable to an Advancing Person pursuant to Section 3.26. and (ii) on each Business Day as of the commencement of which the balance on deposit in the Collection Account exceeds $75,000 following any withdrawals pursuant to the next succeeding sentence. the amount of such excess, but only if the Collection Account constitutes an Eligible Account solely pursuant to clause (ii) of the definition of "Eligible Account." If the balance on deposit in the Collection Account exceeds $75,000 as of the commencement of business on any Business Day and the Collection Account constitutes an Eligible Account solely pursuant to clause (ii) of the definition of "Eligible Account." the Master Servicer shall. on or before 3:00 p.m. New York time on such Business Day. withdraw from the Collection Account any and all amounts payable or reimbursable to the Depositor. the Master Servicer. the Trustee. the Seller or any Sub-Servicer pursuant to Section 3.11 and shall pay such amounts to the Persons entitled thereto.

(c)     Funds in the Collection Account and the Distribution Account may be invested in Permitted Investments in accordance with the provisions set forth in Section 3.12. The Master Servicer shall give notice to the Trustee and the Depositor of the location of the Collection Account maintained by it when established and prior to any change thereof.  The Trustee shall give notice to the Master Servicer and the Depositor of the location of the Distribution Account when established and prior to any change thereof.

(d)     Funds held in the Collection Account at any time may be delivered by the Master Servicer to the Trustee for deposit in an account (which may be the Distribution Account and must satisfy the standards for the Distribution Account as set forth in the definition thereof) and for all purposes of this Agreement shall be deemed to be a part of the Collection Account; provided. however. that the Trustee shall have the sole authority to withdraw any funds held pursuant to this subsection (d). In the event the Master Servicer shall deliver to the Trustee for deposit in the Distribution Account any amount not required to be deposited therein, it may at any time request that the Trustee withdraw such amount from the Distribution Account and remit to it any such amount. any provision herein to the contrary notwithstanding.  In addition. the Master Servicer shall deliver to the Trustee from time to time for deposit. and the Trustee shall so deposit. in the Distribution Account:

(i)     any P&I Advances. as required pursuant to Section 4.03. unless delivered directly to the Trustee by an Advancing Person:

(ii)     any amounts required to be deposited pursuant to Section 3.23(d) or (f) in connection with any REO Property:

(iii)     any amounts to be paid by the Master Servicer in connection with a purchase of Home Equity Loans and REO Properties pursuant to Section 9.01;

(iv)     any amounts required to be deposited pursuant to Section 3.24 in connection with any Prepayment Interest Shortfalls; and

79

(v)     any Stayed Funds, as soon as permitted by the federal bankruptcy court having jurisdiction in such matters, and

(vi)    the Capitalized Interest Requirement, if any.

(e)     Promptly upon receipt of any Stayed Funds, whether from the Master Servicer, a trustee in bankruptcy, federal bankruptcy court or other source, the Trustee shall deposit such funds in the Distribution Account, subject to withdrawal thereof pursuant to Section 7.02(b) or as otherwise contemplated hereunder.

With respect to the Distribution Dates in September and October 2000, the Master Servicer shall deposit on the Master Servicer Remittance Date, the aggregate Prepaid Interest Deposit Amounts with respect to each Loan Group into the Distribution Account.

(f)     The Trustee shall establish and maintain, on behalf of the Certificateholders, two separate accounts denominated the Group 1 Pre-Funding Account and the Group 2 Pre-Funding Account in the name of the Trustee. Each of the Pre-Funding Accounts shall be treated as an "outside reserve fund" under applicable Treasury regulations and shall not be part of any REMIC created hereunder. Any investment earnings on the Pre-Funding Accounts shall be treated as owned by the Seller and will be taxable to the Seller. On the Closing Date the Seller shall remit $187,751,101.35 to the Trustee for deposit in the Pre-Funding Accounts. The Trustee shall allocate (i) $94,007,555.33 of the such amount to the Group 1 Pre-Funding Account for the purchase of Subsequent Home Equity Loans to be included in Loan Group 1 and (ii) $93,743,546.02 of the such amount to the Group 2 Pre-Funding Account for the purchase of Subsequent Home Equity Loans to be included in Loan Group 2.

The Trustee shall establish and maintain, on behalf of the Certificateholders, two separate accounts denominated the Group 1 Capitalized Interest Account and the Group 2 Capitalized Interest Account in the name of the Trustee. Each of the Capitalized Interest Accounts shall be treated as an "outside reserve fund" under applicable Treasury regulations and shall not be part of any REMIC. Any investment earnings on the Capitalized Interest Accounts shall be treated as owned by the Seller and will be taxable to the Seller.

On each Subsequent Transfer Date, upon satisfaction of the conditions set forth in Section 2.11 hereof, the Trustee shall withdraw from the related Pre-Funding Accounts an amount equal to 100% of the aggregate of the Scheduled Principal Balances of the Subsequent Home Equity Loans as of their Cut-off Date sold to the Trust Fund for inclusion in Loan Group 1 or Loan Group 2, as the case may be, on such Subsequent Transfer Date and pay such amount to or upon the order of the Seller.

On the first to occur of (i) the Business Day prior to the Distribution Date on which the Pre-Funding Period ends or (ii) the Special Distribution Date if the aggregate Unutilized Pre-Funding Amount on the Special Distribution Date (plus amounts remaining in the Capitalized Interest Accounts) exceeds 0.95% of the assets of REMIC 1, the Trustee shall (i) withdraw the Unutilized Pre-Funding Amount, if any, from each of the Pre-Funding Accounts,

80

(ii) promptly deposit each amount in the Distribution Account and (iii) distribute each amount to the related Certificate Group on such Distribution Date pursuant to Section 4.01 hereof.

The amount deposited in the Distribution Account pursuant to the preceding paragraph shall be net of any investment earnings on the amounts on deposit in the Pre-Funding Accounts.

On the Business Day prior to each Distribution Date, through the Distribution Date immediately following the Due Period in which the Pre-Funding Period ends, the Trustee shall transfer from each Capitalized Interest Account to the Distribution Account the related Capitalized Interest Requirement and shall distribute such amount as part of the related Available Distribution Amount to the related Certificate Group on such Distribution Date. If on November 30, 2000 any amounts are remaining in the Group 1 Capitalized Interest Account, an amount equal to the lesser of (i) the amount remaining on deposit in the Group 1 Capitalized Interest Account and (ii) the Capitalized Interest Requirement for Loan Group 1 for the December 2000 Distribution Date shall be deposited in the Distribution Account and the Trustee shall release any remaining amounts to the Seller.

On each Distribution Date during the Pre-Funding Period and on the Distribution Date immediately following the end of the Pre-Funding Period, the Trustee shall withdraw from the Group 1 Capitalized Interest Account and release to the Seller an amount equal to the lesser of (i) the amount remaining on deposit in the Group 1 Capitalized Interest Account on such date and (ii) the product of (A) a fraction, the numerator of which is the aggregate Scheduled Principal Balance of Subsequent Home Equity Loans that (x) had a Due Date during the Prepayment Period relating to such Distribution Date, (y) had a Cut-off Date prior to the first day of the month of such Distribution Date and (z) had a Subsequent Transfer Date during the Prepayment Period relating to such Distribution Date and the denominator of which is the amount on deposit in the Group 1 Pre-Funding Account as of the first or the related Due Period and (B) the amount remaining on deposit in the Group 1 Capitalized Interest Account immediately prior to such Distribution Date (or, in the case of the December 2000 Distribution Date, the amount remaining on deposit in the Group 1 Capitalized Interest Account on November 30, 2000).

On the Business Day prior to the first Distribution Date, the Trustee shall transfer from the Group 2 Capitalized Interest Account to the Distribution Account, the Capitalized Interest Requirement for the Group 2 Certificates.

SECTION 3.11.        Withdrawals from the Collection Account and Distribution Account.

(a)        The Master Servicer shall, from time to time, make withdrawals from the Collection Account for any of the following purposes or as described in Section 4.03:

81

(i)      to remit to the Trustee for deposit in the Distribution Account the amounts required to be so remitted pursuant to Section 3.10(b) or permitted to be so remitted pursuant to the first sentence of Section 3.10(d);

(ii)      subject to Section 3.16(d), to reimburse the Master Servicer for P&I Advances, but only to the extent of amounts received which represent Late Collections (net of the related Servicing Fees) of Monthly Payments on Home Equity Loans with respect to which such P&I Advances were made in accordance with the provisions of Section 4.03;

(iii)      subject to Section 3.16(d), to pay the Master Servicer or any Sub-Servicer (a) any unpaid Servicing Fees or (b) any unreimbursed Servicing Advances with respect to each Home Equity Loan, but only to the extent of any Late Collections, Liquidation Proceeds, Insurance Proceeds or other amounts as may be collected by the Master Servicer from a Mortgagor, or otherwise received with respect to such Home Equity Loan;

(iv)      to pay to the Master Servicer as servicing compensation (in addition to the Servicing Fee) on the Master Servicer Remittance Date any interest or investment income earned on funds deposited in the Collection Account;

(v)      to pay to the Master Servicer, the Depositor or the Seller, as the case may be, with respect to each Home Equity Loan that has previously been purchased or replaced pursuant to Section 2.03 or Section 3.16(c) all amounts received thereon subsequent to the date of purchase or substitution, as the case may be;

(vi)      to reimburse the Master Servicer for any P&I Advance or Servicing Advance previously made which the Master Servicer has determined to be a Nonrecoverable P&I Advance or Nonrecoverable Servicing Advance in accordance with the provisions of Section 4.03;

(vii)      to reimburse the Master Servicer or the Depositor for expenses incurred by or reimbursable to the Master Servicer or the Depositor, as the case may be, pursuant to Section 6.03;

(viii)      to reimburse the Master Servicer or the Trustee, as the case may be, for expenses reasonably incurred in respect of the breach or defect giving rise to the purchase obligation under Section 2.03 or Section 2.04 of this Agreement that were included in the Purchase Price of the Home Equity Loan, including any expenses arising out of the enforcement of the purchase obligation;

(ix)      to pay, or to reimburse the Master Servicer for advances in respect of, expenses incurred in connection with any Home Equity Loan pursuant to Section 3.16(b); and

(x)    to clear and terminate the Collection Account pursuant to Section 9.01.

The Master Servicer shall keep and maintain separate accounting, on a Home Equity Loan by Home Equity Loan basis, for the purpose of justifying any withdrawal from the Collection Account, to the extent held by or on behalf of it, pursuant to subclauses (ii), (iii), (v), (vi), (viii) and (ix) above. The Master Servicer shall provide written notification to the Trustee, on or prior to the next succeeding Master Servicer Remittance Date, upon making any withdrawals from the Collection Account pursuant to subclause (vii) above.

(b)    The Trustee shall, from time to time, make withdrawals from the Distribution Account, for any of the following purposes, without priority:

(i)    to make distributions to Certificateholders in accordance with Section 4.01;

(ii)    to pay to itself amounts to which it is entitled (including the Trustee's Fee) pursuant to Section 8.05;

(iii)    to pay itself any interest income earned on funds deposited in the Distribution Account pursuant to Section 3.12(c);

(iv)    to reimburse itself pursuant to Section 7.02 or pursuant to Section 7.01 to the extent such amounts in Section 7.01 were not reimbursed by the Master Servicer;

(v)    to pay any amounts in respect of taxes pursuant to Section 10.01(g)(iii);

(vi)    to remit to the Master Servicer any amount deposited in the Distribution Account by the Master Servicer but not required to be deposited therein in accordance with Section 3.10(d);

(vii)    to pay to an Advancing Person reimbursements for P&I Advances and/or Servicing Advances pursuant to Section 3.26; and

(viii)    to clear and terminate the Distribution Account pursuant to Section 9.01.

SECTION 3.12.    Investment of Funds in the Collection Account and the Distribution Account.

(a)    The Master Servicer may direct any depository institution maintaining the Collection Account (for purposes of this Section 3.12, an "Investment Account"), and the Trustee, in its individual capacity, may direct any depository institution maintaining the Distribution Account (for purposes of this Section 3.12, also an "Investment Account"), to invest

the funds in such Investment Account in one or more Permitted Investments bearing interest or sold at a discount, and maturing, unless payable on demand, (i) no later than the Business Day immediately preceding the date on which such funds are required to be withdrawn from such account pursuant to this Agreement, if a Person other than the Trustee is the obligor thereon and (ii) no later than the date on which such funds are required to be withdrawn from such account pursuant to this Agreement, if the Trustee is the obligor thereon. All such Permitted Investments shall be held to maturity, unless payable on demand. Any investment of funds in an Investment Account shall be made in the name of the Trustee (in its capacity as such) or in the name of a nominee of the Trustee. The Trustee shall be entitled to sole possession (except with respect to investment direction of funds held in the Collection Account and any income and gain realized thereon) over each such investment, and any certificate or other instrument evidencing any such investment shall be delivered directly to the Trustee or its agent, together with any document of transfer necessary to transfer title to such investment to the Trustee or its nominee. In the event amounts on deposit in an Investment Account are at any time invested in a Permitted Investment payable on demand, the Trustee shall:

(x)    consistent with any notice required to be given thereunder, demand that payment thereon be made on the last day such Permitted Investment may otherwise mature hereunder in an amount equal to the lesser of (1) all amounts then payable thereunder and (2) the amount required to be withdrawn on such date; and

(y)    demand payment of all amounts due thereunder promptly upon determination by a Responsible Officer of the Trustee that such Permitted Investment would not constitute a Permitted Investment in respect of funds thereafter on deposit in the Investment Account.

(b)    All income and gain realized from the investment of funds deposited in the Collection Account and any REO Account held by or on behalf of the Master Servicer, shall be for the benefit of the Master Servicer and shall be subject to its withdrawal in accordance with Section 3.11 or Section 3.23, as applicable or withdrawal by the Trustee in accordance with Section 3.11. The Master Servicer shall deposit in the Collection Account or any REO Account, as applicable, the amount of any loss of principal incurred in respect of any such Permitted Investment made with funds in such accounts immediately upon realization of such loss.

(c)    All income and gain realized from the investment of funds deposited in the Distribution Account held by or on behalf of the Trustee, shall be for the benefit of the Trustee and shall be subject to its withdrawal at any time. The Trustee shall deposit in the Distribution Account, the amount of any loss of principal incurred in respect of any such Permitted Investment made with funds in such accounts immediately upon realization of such loss.

(d)    Except as otherwise expressly provided in this Agreement, if any default occurs in the making of a payment due under any Permitted Investment, or if a default occurs in any other performance required under any Permitted Investment, the Trustee may and, subject to Section 8.01 and Section 8.02(v), upon the request of the Holders of Certificates representing

84

more than 50% of the Voting Rights allocated to any Class of Certificates, shall take such action as may be appropriate to enforce such payment or performance, including the institution and prosecution of appropriate proceedings.

SECTION 3.13.        Investment of Funds in the Capitalized Interest Accounts and Pre-Funding Accounts.

The Trustee shall invest funds in the Capitalized Interest Accounts or Pre-Funding Accounts as directed in writing by the Master Servicer in Permitted Investments, which shall mature not later than the Business Day next preceding the Distribution Date (except that if such Permitted Investment is an obligation of the institution that maintains such account, then such Permitted Investment shall mature not later than such Distribution Date) and, in each case, shall not be sold or disposed of prior to its maturity. All such Permitted Investments shall be made in the name of the Trustee, for the benefit of the Certificateholders.

SECTION 3.14.        Maintenance of Hazard Insurance and Errors and Omissions and Fidelity Coverage.

(a)      The Master Servicer shall cause to be maintained for each Home Equity Loan fire insurance with extended coverage on the related Mortgaged Property in an amount which is at least equal to the least of (i) the current principal balance of such Home Equity Loan, (ii) the amount necessary to fully compensate for any damage or loss to the improvements that are a part of such property on a replacement cost basis and (iii) the maximum insurable value of the improvements which are a part of such Mortgaged Property, in each case in an amount not less than such amount as is necessary to avoid the application of any coinsurance clause contained in the related hazard insurance policy. The Master Servicer shall also cause to be maintained fire insurance with extended coverage on each REO Property in an amount which is at least equal to the lesser of (i) the maximum insurable value of the improvements which are a part of such property and (ii) the outstanding principal balance of the related Home Equity Loan at the time it became an REO Property, plus accrued interest at the Mortgage Rate and related Servicing Advances. The Master Servicer will comply in the performance of this Agreement with all reasonable rules and requirements of each insurer under any such hazard policies. Any amounts to be collected by the Master Servicer under any such policies (other than amounts to be applied to the restoration or repair of the property subject to the related Mortgage or amounts to be released to the Mortgagor in accordance with the procedures that the Master Servicer would follow in servicing loans held for its own account, subject to the terms and conditions of the related Mortgage and Mortgage Note) shall be deposited in the Collection Account, subject to withdrawal pursuant to Section 3.11, if received in respect of a Home Equity Loan, or in the REO Account, subject to withdrawal pursuant to Section 3.23, if received in respect of an REO Property. Any cost incurred by the Master Servicer in maintaining any such insurance shall not, for the purpose of calculating distributions to Certificateholders, be added to the unpaid principal balance of the related Home Equity Loan, notwithstanding that the terms of such Home Equity Loan so permit. It is understood and agreed that no earthquake or other additional insurance is to be required of any Mortgagor other than pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance. If the Mortgaged Property

85

or REO Property is at any time in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards and flood insurance has been made available, the Master Servicer will cause to be maintained a flood insurance policy in respect thereof. Such flood insurance shall be in an amount equal to the lesser of (i) the unpaid principal balance of the related Home Equity Loan and (ii) the maximum amount of such insurance available for the related Mortgaged Property under the national flood insurance program (assuming that the area in which such Mortgaged Property is located is participating in such program).

In the event that the Master Servicer shall obtain and maintain a blanket policy with an insurer having a General Policy Rating of A:X or better in Best's Key Rating Guide (or such other rating that is comparable to such rating) insuring against hazard losses on all of the Home Equity Loans, it shall conclusively be deemed to have satisfied its obligations as set forth in the first two sentences of this Section 3.14, it being understood and agreed that such policy may contain a deductible clause, in which case the Master Servicer shall, in the event that there shall not have been maintained on the related Mortgaged Property or REO Property a policy complying with the first two sentences of this Section 3.14, and there shall have been one or more losses which would have been covered by such policy, deposit to the Collection Account from its own funds the amount not otherwise payable under the blanket policy because of such deductible clause. In connection with its activities as administrator and servicer of the Home Equity Loans, the Master Servicer agrees to prepare and present, on behalf of itself, the Trustee and Certificateholders, claims under any such blanket policy in a timely fashion in accordance with the terms of such policy.

(b)     The Master Servicer shall keep in force during the term of this Agreement a policy or policies of insurance covering errors and omissions for failure in the performance of the Master Servicer's obligations under this Agreement, which policy or policies shall be in such form and amount that would meet the requirements of Fannie Mae or Freddie Mac if it were the purchaser of the Home Equity Loans, unless the Master Servicer has obtained a waiver of such requirements from Fannie Mae or Freddie Mac. The Master Servicer shall also maintain a fidelity bond in the form and amount that would meet the requirements of Fannie Mae or Freddie Mac, unless the Master Servicer has obtained a waiver of such requirements from Fannie Mae or Freddie Mac. The Master Servicer shall provide the Trustee (upon the Trustee's reasonable request) with copies of any such insurance policies and fidelity bond. The Master Servicer shall be deemed to have complied with this provision if an Affiliate of the Master Servicer has such errors and omissions and fidelity bond coverage and, by the terms of such insurance policy or fidelity bond, the coverage afforded thereunder extends to the Master Servicer. Any such errors and omissions policy and fidelity bond shall by its terms not be cancelable without thirty days' prior written notice to the Trustee. The Master Servicer shall also cause each Sub-Servicer to maintain a policy of insurance covering errors and omissions and a fidelity bond which would meet such requirements.

101 1956v27

SECTION 3.15.      Enforcement   of   Due-On-Sale   Clauses;   Assumption
Agreements.

The Master Servicer will, to the extent it has knowledge of any conveyance or prospective conveyance of any Mortgaged Property by any Mortgagor (whether by absolute conveyance or by contract of sale, and whether or not the Mortgagor remains or is to remain liable under the Mortgage Note and/or the Mortgage), exercise its rights to accelerate the maturity of such Home Equity Loan under the "due-on-sale" clause, if any, applicable thereto; provided, however, that the Master Servicer shall not be required to take such action if in its sole business judgment the Master Servicer believes it is not in the best interests of the Trust Fund and shall not exercise any such rights if prohibited by law from doing so.  If the Master Servicer reasonably believes it is unable under applicable law to enforce such "due-on-sale" clause, or if any of the other conditions set forth in the proviso to the preceding sentence apply, the Master Servicer will enter into an assumption and modification agreement from or with the person to whom such property has been conveyed or is proposed to be conveyed, pursuant to which such person becomes liable under the Mortgage Note and, to the extent permitted by applicable state law, the Mortgagor remains liable thereon.  The Master Servicer is also authorized to enter into a substitution of liability agreement with such person, pursuant to which the original Mortgagor is released from liability and such person is substituted as the Mortgagor and becomes liable under the Mortgage Note, provided that no such substitution shall be effective unless such person satisfies the underwriting criteria of the Master Servicer and has a credit risk rating at least equal to that of the original Mortgagor.   In connection with any assumption, modification or substitution, the Master Servicer shall apply such underwriting standards and follow such practices and procedures as shall be normal and usual in its general mortgage servicing activities and as it applies to other home equity loans owned solely by it.  The Master Servicer shall not take or enter into any assumption and modification agreement, however, unless (to the extent practicable in the circumstances) it shall have received confirmation, in writing, of the continued effectiveness of any applicable hazard insurance policy, or a new policy meeting the requirements of this Section is obtained.  Any fee collected by the Master Servicer in respect of an assumption or substitution of liability agreement will be retained by the Master Servicer as additional servicing compensation.  In connection with any such assumption, no material term of the Mortgage Note (including but not limited to the related Mortgage Rate and the amount of the Monthly Payment) may be amended or modified, except as otherwise required pursuant to the terms thereof.  The Master Servicer shall notify the Trustee and any respective Custodian that any such substitution, modification or assumption agreement has been completed by forwarding to the Trustee or to such Custodian, as the case may be, the executed original of such substitution or assumption agreement, which document shall be added to the related Mortgage File and shall, for all purposes, be considered a part of such Mortgage File to the same extent as all other documents and instruments constituting a part thereof.

Notwithstanding the foregoing paragraph or any other provision of this Agreement, the Master Servicer shall not be deemed to be in default, breach or any other violation of its obligations hereunder by reason of any assumption of a Home Equity Loan by operation of law or by the terms of the Mortgage Note or any assumption which the Master

Servicer may be restricted by law from preventing, for any reason whatever. For purposes of this Section 3.15, the term "assumption" is deemed to also include a sale (of the Mortgaged Property) subject to the Mortgage that is not accompanied by an assumption or substitution of liability agreement.

SECTION 3.16.      Realization Upon Defaulted Home Equity Loans.

(a)      The Master Servicer shall use its best efforts consistent with the servicing standard set forth in Section 3.01, to foreclose upon or otherwise comparably convert the ownership of properties securing such of the Home Equity Loans (including selling any such Home Equity Loan rather than converting the ownership of the related properties if such sale would maximize the timely and complete recovery of principal and interest on the related Mortgage Note in accordance with the servicing standard set forth in Section 3.01) as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments pursuant to Section 3.07. The Master Servicer shall be responsible for all costs and expenses incurred by it in any such proceedings; provided, however, that such costs and expenses will be recoverable as Servicing Advances by the Master Servicer as contemplated in Section 3.11 and Section 3.23. The foregoing is subject to the provision that, in any case in which Mortgaged Property shall have suffered damage from an Uninsured Cause, the Master Servicer shall not be required to expend its own funds toward the restoration of such property unless it shall determine in its sole and absolute discretion that such restoration will increase the proceeds of liquidation of the related Home Equity Loan after reimbursement to itself for such expenses.

(b)      Notwithstanding the foregoing provisions of this Section 3.16 or any other provision of this Agreement, with respect to any Home Equity Loan as to which the Master Servicer has received actual notice of, or has actual knowledge of, the presence of any toxic or hazardous substance on the related Mortgaged Property, the Master Servicer shall not, on behalf of the Trustee, either (i) obtain title to such Mortgaged Property as a result of or in lieu of foreclosure or otherwise or (ii) otherwise acquire possession of, or take any other action with respect to, such Mortgaged Property, if, as a result of any such action, the Trustee, the Trust Fund or the Certificateholders would be considered to hold title to, to be a "mortgagee-in-possession" of, or to be an "owner" or "operator" of such Mortgaged Property within the meaning of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended from time to time, or any comparable law, unless the Master Servicer has also previously determined, based on its reasonable judgment and a report prepared by a Person who regularly conducts environmental audits using customary industry standards, that:

(1)      such Mortgaged Property is in compliance with applicable environmental laws or, if not, that it would be in the best economic interest of the Trust Fund to take such actions as are necessary to bring the Mortgaged Property into compliance therewith; and

(2)      there are no circumstances present at such Mortgaged Property relating to the use, management or disposal of any hazardous substances,

88

hazardous materials, hazardous wastes, or petroleum-based materials for which investigation, testing, monitoring, containment, clean-up or remediation could be required under any federal, state or local law or regulation, or that if any such materials are present for which such action could be required, that it would be in the best economic interest of the Trust Fund to take such actions with respect to the affected Mortgaged Property.

Notwithstanding the foregoing, if such environmental audit reveals or if the Master Servicer has knowledge or notice that such Mortgaged Property contains such wastes or substances or are within one mile of the site of such wastes or substances, the Master Servicer shall not foreclose or accept deed in lieu of foreclosure without the prior written consent of the NIMs Insurer.

The cost of the environmental audit report contemplated by this Section 3.16 shall be advanced by the Master Servicer, subject to the Master Servicer's right to be reimbursed therefor from the Collection Account as provided in Section 3.11(a)(ix), such right of reimbursement being prior to the rights of Certificateholders to receive any amount in the Collection Account received in respect of the affected Home Equity Loan or other Home Equity Loans. It is understood by the parties hereto that any such advance will be deemed a Servicing Advance.

If the Master Servicer determines, as described above, that it is in the best economic interest of the Trust Fund to take such actions as are necessary to bring any such Mortgaged Property into compliance with applicable environmental laws, or to take such action with respect to the containment, clean-up or remediation of hazardous substances, hazardous materials, hazardous wastes or petroleum-based materials affecting any such Mortgaged Property, then the Master Servicer shall take such action as it deems to be in the best economic interest of the Trust Fund. The cost of any such compliance, containment, cleanup or remediation shall be advanced by the Master Servicer, subject to the Master Servicer's right to be reimbursed therefor from the Collection Account as provided in Section 3.11(a)(ix), such right of reimbursement being prior to the rights of Certificateholders to receive any amount in the Collection Account received in respect of the affected Home Equity Loan or other Home Equity Loans. It is understood by the parties hereto that any such advance will be deemed a Servicing Advance.

(c)     The Master Servicer may at its option purchase from REMIC I any Home Equity Loan or related REO Property that is 90 days or more delinquent, which the Master Servicer determines in good faith will otherwise become subject to foreclosure proceedings (evidence of such determination to be delivered in writing to the Trustee prior to purchase), at a price equal to the Purchase Price; provided, however, that the Master Servicer shall purchase any such Home Equity Loans or related REO Properties on the basis of delinquency, purchasing the most delinquent Home Equity Loans or related REO Properties first. The Purchase Price for any Home Equity Loan or related REO Property purchased hereunder shall be deposited in the Collection Account, and the Trustee, upon receipt of written certification from the Master Servicer of such deposit, shall release or cause to be released to the Master Servicer the related

101195662

Mortgage File and shall execute and deliver such instruments of transfer or assignment. in each case without recourse. as the Master Servicer shall furnish and as shall be necessary to vest in the Master Servicer title to any Home Equity Loan or related REO Property released pursuant hereto.

(d)     Proceeds received in connection with any Final Recovery Determination. as well as any recovery resulting from a partial collection of Insurance Proceeds or Liquidation Proceeds. in respect of any Home Equity Loan. will be applied in the following order of priority: first. to reimburse the Master Servicer or any Sub-Servicer for any related unreimbursed Servicing Advances and P&I Advances. pursuant to Section 3.11(a)(ii) or (a)(iii); second. to accrued and unpaid interest on the Home Equity Loan. to the date of the Final Recovery Determination. or to the Due Date prior to the Distribution Date on which such amounts are to be distributed if not in connection with a Final Recovery Determination: and third. as a recovery of principal of the Home Equity Loan. If the amount of the recovery so allocated to interest is less than the full amount of accrued and unpaid interest due on such Home Equity Loan. the amount of such recovery will be allocated by the Master Servicer as follow: first. to unpaid Servicing Fees: and second. to the balance of the interest then due and owing. The portion of the recovery so allocated to unpaid Servicing Fees shall be reimbursed to the Master Servicer or any Sub-Servicer pursuant to Section 3.11(a)(iii).

SECTION 3.17.     Trustee to Cooperate: Release of Mortgage Files.

(a)     Upon the payment in full of any Home Equity Loan. or the receipt by the Master Servicer of a notification that payment in full shall be escrowed in a manner customary for such purposes. the Master Servicer will immediately notify the Trustee and any related Custodian by a certification in the form of Exhibit E-2 (which certification shall include a statement to the effect that all amounts received or to be received in connection with such payment which are required to be deposited in the Collection Account pursuant to Section 3.10 have been or will be so deposited) of a Servicing Officer and shall request delivery to it of the Mortgage File. Upon receipt of such certification and request. the Trustee or such Custodian, as the case may be. shall promptly release the related Mortgage File to the Master Servicer. No expenses incurred in connection with any instrument of satisfaction or deed of reconveyance shall be chargeable to the Collection Account or the Distribution Account.

(b)     From time to time and as appropriate for the servicing or foreclosure of any Home Equity Loan. including. for this purpose. collection under any insurance policy relating to the Home Equity Loans. the Trustee and any related Custodian shall. upon request of the Master Servicer and delivery to the Trustee or such Custodian. as the case may be, of a Request for Release in the form of Exhibit E-1. release the related Mortgage File to the Master Servicer. and the Trustee shall. at the direction of the Master Servicer. execute such documents as shall be necessary to the prosecution of any such proceedings and the Master Servicer shall retain such Mortgage File in trust for the benefit of the Certificateholders. Such Request for Release shall obligate the Master Servicer to return each and every document previously requested from the Mortgage File to the Trustee or to such Custodian when the need therefor by the Master Servicer no longer exists. unless the Home Equity Loan has been liquidated and the Liquidation Proceeds relating to the Home Equity Loan have been deposited in the Collection

Account or the Mortgage File or such document has been delivered to an attorney, or to a public trustee or other public official as required by law, for purposes of initiating or pursuing legal action or other proceedings for the foreclosure of the Mortgaged Property either judicially or non-judicially, and the Master Servicer has delivered to the Trustee a certificate of a Servicing Officer certifying as to the name and address of the Person to which such Mortgage File or such document was delivered and the purpose or purposes of such delivery. Upon receipt of a certificate of a Servicing Officer stating that such Home Equity Loan was liquidated and that all amounts received or to be received in connection with such liquidation that are required to be deposited into the Collection Account have been so deposited, or that such Home Equity Loan has become an REO Property, a copy of the Request for Release shall be released by the Trustee or such Custodian to the Master Servicer or its designee.

(c)     Upon written certification of a Servicing Officer, the Trustee shall execute and deliver to the Master Servicer any court pleadings, requests for trustee's sale or other documents reasonably necessary to the foreclosure or trustee's sale in respect of a Mortgaged Property or to any legal action brought to obtain judgment against any Mortgagor on the Mortgage Note or Mortgage or to obtain a deficiency judgment, or to enforce any other remedies or rights provided by the Mortgage Note or Mortgage or otherwise available at law or in equity, or shall exercise and deliver to the Master Servicer a power of attorney sufficient to authorize the Master Servicer to execute such documents on its behalf, provided that the Trustee shall be obligated to execute the documents identified above if necessary to enable the Master Servicer to perform its duties hereunder. Each such certification shall include a request that such pleadings or documents be executed by the Trustee and a statement as to the reason such documents or pleadings are required and that the execution and delivery thereof by the Trustee will not invalidate or otherwise affect the lien of the Mortgage, except for the termination of such a lien upon completion of the foreclosure or trustee's sale.

SECTION 3.18.            Servicing Compensation.

As compensation for the activities of the Master Servicer hereunder, the Master Servicer shall be entitled to the Servicing Fee with respect to each Home Equity Loan payable solely from payments of interest in respect of such Home Equity Loan, subject to Section 3.24. In addition, the Master Servicer shall be entitled to recover unpaid Servicing Fees out of Late Collections, Insurance Proceeds or Liquidation Proceeds to the extent permitted by Section 3.11(a)(iii) and out of amounts derived from the operation and sale of an REO Property to the extent permitted by Section 3.23. The right to receive the Servicing Fee may not be transferred in whole or in part except in connection with the transfer of all of the Master Servicer's responsibilities and obligations under this Agreement; provided, however, that the Master Servicer may pay from the Servicing Fee any amounts due to a Sub-Servicer pursuant to a Sub-Servicing Agreement entered into under Section 3.02.

Additional servicing compensation in the form of assumption or modification fees, late payment charges, NSF fees, reconveyance fees and other similar fees and charges (other than Prepayment Charges) shall be retained by the Master Servicer (subject to Section 3.24) only to the extent such fees or charges are received by the Master Servicer. The Master Servicer shall

also be entitled pursuant to Section 3.11(a)(iv) to withdraw from the Collection Account, and pursuant to Section 3.23(b) to withdraw from any REO Account, as additional servicing compensation, interest or other income earned on deposits therein, subject to Section 3.12 and Section 3.24. The Master Servicer shall be required to pay all expenses incurred by it in connection with its servicing activities hereunder (including premiums for the insurance required by Section 3.14, to the extent such premiums are not paid by the related Mortgagors or by a Sub-Servicer, it being understood however, that payment of such premiums by the Master Servicer shall constitute Servicing Advances and servicing compensation of each Sub-Servicer, and to the extent provided herein in Section 8.05, the fees and expenses of the Trustee) and shall not be entitled to reimbursement therefor except as specifically provided herein.

SECTION 3.19.        Reports to the Trustee; Collection Account Statements.

Not later than fifteen days after each Distribution Date, the Master Servicer shall forward to the Trustee, the NIMs Insurer and the Depositor a statement prepared by the Master Servicer setting forth the status of the Collection Account as of the close of business on such Distribution Date and showing, for the period covered by such statement, the aggregate amount of deposits into and withdrawals from the Collection Account of each category of deposit specified in Section 3.10(a) and each category of withdrawal specified in Section 3.11, in each case, by Loan Group. Such statement may be in the form of the then current Fannie Mae Monthly Accounting Report for its Guaranteed Mortgage Pass-Through Program with appropriate additions and changes, and shall also include information as to the aggregate of the outstanding principal balances of all of the Home Equity Loans as of the last day of the calendar month immediately preceding such Distribution Date. . Copies of such statement shall be provided by the Trustee to any Certificateholder and to any Person identified to the Trustee as a prospective transferee of a Certificate, upon request at the expense of the requesting party, provided such statement is delivered by the Master Servicer to the Trustee.

SECTION 3.20.        Statement as to Compliance.

The Master Servicer will deliver to the Trustee, the NIMs Insurer, the Depositor and each Rating Agency on or before April 15 of each calendar year commencing in 2001, an Officers' Certificate stating, as to each signatory thereof, that (i) a review of the activities of the Master Servicer during the preceding year and of performance under this Agreement has been made under such officers' supervision and (ii) to the best of such officers' knowledge, based on such review, the Master Servicer has fulfilled all of its obligations under this Agreement throughout such year, or, if there has been a default in the fulfillment of any such obligation, specifying each such default known to such officer and the nature and status thereof. Copies of any such statement shall be provided by the Trustee to any Certificateholder upon the request and at the expense of the requesting party, provided that such statement is delivered by the Master Servicer to the Trustee.

SECTION 3.21.        Independent Public Accountants' Servicing Report.

92

Not later than April 15 of each calendar year commencing in 2001, the Master Servicer, at its expense, shall cause a nationally recognized firm of independent certified public accountants to furnish to the Master Servicer a report stating that (i) it has obtained a letter of representation regarding certain matters from the management of the Master Servicer which includes an assertion that the Master Servicer has complied with certain minimum residential home equity loan servicing standards, identified in the Uniform Single Attestation Program for Mortgage Bankers established by the Mortgage Bankers Association of America, with respect to the servicing of residential home equity loans during the most recently completed fiscal year and (ii) on the basis of an examination conducted by such firm in accordance with standards established by the American Institute of Certified Public Accountants, such representation is fairly stated in all material respects, subject to such exceptions and other qualifications that may be appropriate. In rendering its report such firm may rely, as to matters relating to the direct servicing of residential home equity loans by Sub-Servicers, upon comparable reports of firms of independent certified public accountants rendered on the basis of examinations conducted in accordance with the same standards (rendered within one year of such report) with respect to those Sub-Servicers. Immediately upon receipt of such report, the Master Servicer shall furnish a copy of such report to the Trustee, the NIMs Insurer and each Rating Agency. Copies of such statement shall be provided by the Trustee to any Certificateholder upon request at the Master Servicer's expense, provided that such statement is delivered by the Master Servicer to the Trustee. In the event such firm of independent certified public accountants requires the Trustee to agree to the procedures performed by such firm, the Master Servicer shall direct the Trustee in writing to so agree; it being understood and agreed that the Trustee will deliver such letter of agreement in conclusive reliance upon the direction of the Master Servicer, and the Trustee has not made any independent inquiry or investigation as to, and shall have no obligation or liability in respect of, the sufficiency, validity or correctness of such procedures.

SECTION 3.22.    Access to Certain Documentation.

The Master Servicer shall provide to the Office of Thrift Supervision, the FDIC, and any other federal or state banking or insurance regulatory authority that may exercise authority over any Certificateholder, access to the documentation regarding the Home Equity Loans serviced by the Master Servicer under this Agreement, as may be required by applicable laws and regulations. Such access shall be afforded without charge, but only upon reasonable request and during normal business hours at the offices of the Master Servicer designated by it. In addition, access to the documentation regarding the Home Equity Loans serviced by the Master Servicer under this Agreement will be provided to any Certificateholder, the Trustee, the NIMs Insurer and to any Person identified to the Master Servicer as a prospective transferee of a Certificate, upon reasonable request during normal business hours at the offices of the Master Servicer designated by it at the expense of the Person requesting such access.

SECTION 3.23.    Title, Management and Disposition of REO Property.

(a)    The deed or certificate of sale of any REO Property shall be taken in the name of the Trustee, or its nominee, in trust for the benefit of the Certificateholders. The Master Servicer, on behalf of REMIC 1 (and on behalf of the Trustee for the benefit of the

93

Certificateholders), shall either sell any REO Property before the close of the third taxable year after the year REMIC I acquires ownership of such REO Property for purposes of Section 860G(a)(8) of the Code or request from the Internal Revenue Service, no later than 60 days before the day on which the three-year grace period would otherwise expire, an extension of the three-year grace period, unless the Master Servicer shall have delivered to the Trustee, the NIMs Insurer and the Depositor an Opinion of Counsel, addressed to the Trustee, the NIMs Insurer and the Depositor, to the effect that the holding by REMIC I of such REO Property subsequent to three years after its acquisition will not result in the imposition on any REMIC created hereunder of taxes on "prohibited transactions" thereof, as defined in Section 860F of the Code, or cause any of REMIC I, REMIC II or REMIC III to fail to qualify as a REMIC under Federal law at any time that any Certificates are outstanding. The Master Servicer shall manage, conserve, protect and operate each REO Property for the Certificateholders solely for the purpose of its prompt disposition and sale in a manner which does not cause such REO Property to fail to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code or result in the receipt by any REMIC created hereunder of any "income from non-permitted assets" within the meaning of Section 860F(a)(2)(B) of the Code, or any "net income from foreclosure property" which is subject to taxation under the REMIC Provisions.

(b)     The Master Servicer shall segregate and hold all funds collected and received in connection with the operation of any REO Property separate and apart from its own funds and general assets and shall establish and maintain, or cause to be established and maintained, with respect to REO Properties an account held in trust for the Trustee for the benefit of the Certificateholders (the "REO Account"), which shall be an Eligible Account. The Master Servicer shall be permitted to allow the Collection Account to serve as the REO Account, subject to separate ledgers for each REO Property. The Master Servicer shall be entitled to retain or withdraw any interest income paid on funds deposited in the REO Account.

(c)     The Master Servicer shall have full power and authority, subject only to the specific requirements and prohibitions of this Agreement, to do any and all things in connection with any REO Property as are consistent with the manner in which the Master Servicer manages and operates similar property owned by the Master Servicer or any of its Affiliates, all on such terms and for such period as the Master Servicer deems to be in the best interests of Certificateholders. In connection therewith, the Master Servicer shall deposit, or cause to be deposited in the clearing account (which account must be an Eligible Account) in which it customarily deposits payments and collections on home equity loans in connection with its home equity loan servicing activities on a daily basis, and in no event more than one Business Day after the Master Servicer's receipt thereof, and shall thereafter deposit in the REO Account, in no event more than two Business Days after the deposit of such funds into the clearing account, all revenues received by it with respect to an REO Property and shall withdraw therefrom funds necessary for the proper operation, management and maintenance of such REO Property including, without limitation:

(i)     all insurance premiums due and payable in respect of such REO Property;

94

10119560.27

    (ii)    all real estate taxes and assessments in respect of such REO Property that may result in the imposition of a lien thereon; and

    (iii)    all costs and expenses necessary to maintain such REO Property.

To the extent that amounts on deposit in the REO Account with respect to an REO Property are insufficient for the purposes set forth in clauses (i) through (iii) above with respect to such REO Property, the Master Servicer shall advance from its own funds as Servicing Advances such amount as is necessary for such purposes if, but only if, the Master Servicer would make such advances if the Master Servicer owned the REO Property and if in the Master Servicer's sole judgment, the payment of such amounts will be recoverable from the rental or sale of the REO Property.

    Notwithstanding the foregoing, neither the Master Servicer nor the Trustee shall:

    (i)    authorize the Trust Fund to enter into, renew or extend any New Lease with respect to any REO Property, if the New Lease by its terms will give rise to any income that does not constitute Rents from Real Property;

    (ii)    authorize any amount to be received or accrued under any New Lease other than amounts that will constitute Rents from Real Property;

    (iii)    authorize any construction on any REO Property, other than the completion of a building or other improvement thereon, and then only if more than ten percent of the construction of such building or other improvement was completed before default on the related Home Equity Loan became imminent, all within the meaning of Section 856(e)(4)(B) of the Code; or

    (iv)    authorize any Person to Directly Operate any REO Property on any date more than 90 days after its date of acquisition by the Trust Fund;

unless, in any such case, the Master Servicer has obtained an Opinion of Counsel, provided to the Trustee and the NIMs Insurer, to the effect that such action will not cause such REO Property to fail to qualify as "foreclosure property" within the meaning of Section 860G(a)(8) of the Code at any time that it is held by REMIC I, in which case the Master Servicer may take such actions as are specified in such Opinion of Counsel.

    The Master Servicer may contract with any Independent Contractor for the operation and management of any REO Property, provided that:

    (i)    the terms and conditions of any such contract shall not be inconsistent herewith;

    (ii)    any such contract shall require, or shall be administered to require, that the Independent Contractor pay all costs and expenses incurred in connection with the operation and management of such REO Property, including those listed above and remit

all related revenues (net of such costs and expenses) to the Master Servicer as soon as practicable, but in no event later than thirty days following the receipt thereof by such Independent Contractor;

(iii)    none of the provisions of this Section 3.23(c) relating to any such contract or to actions taken through any such Independent Contractor shall be deemed to relieve the Master Servicer of any of its duties and obligations to the Trustee on behalf of the Certificateholders with respect to the operation and management of any such REO Property; and

(iv)    the Master Servicer shall be obligated with respect thereto to the same extent as if it alone were performing all duties and obligations in connection with the operation and management of such REO Property.

The Master Servicer shall be entitled to enter into any agreement with any Independent Contractor performing services for it related to its duties and obligations hereunder for indemnification of the Master Servicer by such Independent Contractor, and nothing in this Agreement shall be deemed to limit or modify such indemnification. The Master Servicer shall be solely liable for all fees owed by it to any such Independent Contractor, irrespective of whether the Master Servicer's compensation pursuant to Section 3.18 is sufficient to pay such fees; provided, however, that to the extent that any payments made by such Independent Contractor would constitute Servicing Advances if made by the Master Servicer, such amounts shall be reimbursable as Servicing Advances made by the Master Servicer.

(d)    In addition to the withdrawals permitted under Section 3.23(c), the Master Servicer may from time to time make withdrawals from the REO Account for any REO Property: (i) to pay itself or any Sub-Servicer unpaid Servicing Fees in respect of the related Home Equity Loan; and (ii) to reimburse itself or any Sub-Servicer for unreimbursed Servicing Advances and P&I Advances made in respect of such REO Property or the related Home Equity Loan. On the Master Servicer Remittance Date, the Master Servicer shall withdraw from each REO Account maintained by it and deposit into the Distribution Account in accordance with Section 3.10(d)(ii), for distribution on the related Distribution Date in accordance with Section 4.01, the income from the related REO Property received during the prior calendar month, net of any withdrawals made pursuant to Section 3.23(c) or this Section 3.23(d).

(e)    Subject to the time constraints set forth in Section 3.23(a), each REO Disposition shall be carried out by the Master Servicer at such price and upon such terms and conditions as the Master Servicer shall deem necessary or advisable, as shall be normal and usual in its general servicing activities for similar properties.

(f)    The proceeds from the REO Disposition, net of any amount required by law to be remitted to the Mortgagor under the related Home Equity Loan and net of any payment or reimbursement to the Master Servicer or any Sub-Servicer as provided above, shall be deposited in the Distribution Account in accordance with Section 3.10(d)(ii) on the Master Servicer Remittance Date in the month following the receipt thereof for distribution on the

related Distribution Date in accordance with Section 4.01.  Any REO Disposition shall be for cash only (unless changes in the REMIC Provisions made subsequent to the Startup Day allow a sale for other consideration).

(g)    The Master Servicer shall file information returns with respect to the receipt of mortgage interest received in a trade or business, reports of foreclosures and abandonments of any Mortgaged Property and cancellation of indebtedness income with respect to any Mortgaged Property as required by Sections 6050H, 6050J and 6050P of the Code, respectively.  Such reports shall be in form and substance sufficient to meet the reporting requirements imposed by such Sections 6050H, 6050J and 6050P of the Code.

SECTION 3.24.    Obligations of the Master Servicer in Respect of Prepayment Interest Shortfalls.

The Master Servicer shall deliver to the Trustee for deposit into the Distribution Account on or before 3:00 p.m. New York time on the Master Servicer Remittance Date from its own funds an amount equal to the lesser of (i) the aggregate of the Prepayment Interest Shortfalls for the related Distribution Date resulting solely from Principal Prepayments during the related Prepayment Period and the related Loan Group and (ii) the amount of its aggregate Servicing Fee for the related Loan Group for the most recently ended calendar month.

SECTION 3.25.    Obligations of the Master Servicer in Respect of Mortgage Rates and Monthly Payments.

In the event that a shortfall in any collection on or liability with respect to any Home Equity Loan results from or is attributable to adjustments to Mortgage Rates, Monthly Payments or Stated Principal Balances that were made by the Master Servicer in a manner not consistent with the terms of the related Mortgage Note and this Agreement, the Master Servicer, upon discovery or receipt of notice thereof, immediately shall deliver to the Trustee for deposit in the Distribution Account from its own funds the amount of any such shortfall and shall indemnify and hold harmless the Trust Fund, the Trustee, the Depositor and any successor master servicer in respect of any such liability.  Such indemnities shall survive the termination or discharge of this Agreement.  Notwithstanding the foregoing, this Section 3.25 shall not limit the ability of the Master Servicer to seek recovery of any such amounts from the related Mortgagor under the terms of the related Mortgage Note, as permitted by law.

SECTION 3.26.    Advance Facility.

(a)    The Master Servicer is hereby authorized to enter into a facility with any Person which provides that such Person (an "Advancing Person") may fund P&I Advances and/or Servicing Advances under this Agreement, although no such facility shall reduce or otherwise affect the Master Servicer's obligation to fund such P&I Advances and/or Servicing Advances.  To the extent that an Advancing Person funds any P&I Advance or any Servicing Advance and provides the Trustee with notice acknowledged by the Master Servicer that such Advancing Person is entitled to reimbursement, such Advancing Person shall be entitled to

97

receive reimbursement pursuant to this Agreement for such amount to the extent provided in Section 3.26(b). Such notice from the Advancing Person must specify the amount of the reimbursement and must specify which Section of this Agreement permits the applicable P&I Advance or Servicing Advance to be reimbursed. The Trustee shall have no duty or liability with respect to any calculation of any reimbursement to be paid to an Advancing Person and shall be entitled to rely without independent investigation on the Advancing Person's notice provided pursuant to this Section 3.26. An Advancing Person whose obligations hereunder are limited to the funding of P&I Advances and/or Servicing Advances shall not be required to meet the qualifications of a Sub-Servicer pursuant to Section 3.02 hereof.

(b)     If an Advancing Person is entitled to reimbursement for any particular P&I Advance or Servicing Advance, then the Master Servicer shall not be permitted to reimburse itself therefor under Section 3.11(a)(ii), Section 3.11(a)(iii), Section 3.11(a)(vi) or Section 3.11(a)(ix), but instead the Master Servicer shall include such amounts in the applicable remittance to the Trustee made pursuant to Section 3.10(b) to the extent of amounts on deposit in the Collection Account on the related Master Servicer Remittance Date. The Trustee is hereby authorized to pay to an Advancing Person, reimbursements for P&I Advances and Servicing Advances from the Distribution Account to the same extent the Master Servicer would have been permitted to reimburse itself for such P&I Advances and/or Servicing Advances in accordance with Section 3.11(a)(ii), Section 3.11(a)(iii), Section 3.11(a)(vi) or Section 3.11(a)(ix), as the case may be, had the Master Servicer made such Advance or Servicing Advance.

SECTION 3.27.     Group 2 Reserve Fund.

(a)     The Depositor hereby directs the Trustee to execute and deliver on behalf of the Trust the Cap Agreement and authorizes the Trustee to perform its obligations thereunder on behalf of the Trust in accordance with the terms of the Cap Agreement. On the Closing Date, the Trustee shall enter into the Cap Agreement, on behalf of the Trust, with the Cap Provider and establish and maintain in its name, in trust for the benefit of the Group 2 Certificateholders, the Group 2 Reserve Fund. The Group 2 Reserve Fund shall be an Eligible Account, and funds on deposit therein shall be held separate and apart from, and shall not be commingled with, any other moneys, including without limitation, other moneys held by the Trustee pursuant to this Agreement. The Group 2 Reserve Fund shall be treated as an "outside reserve fund" under applicable Treasury regulations and will not be part of any REMIC created hereunder. For tax purposes, any investment earnings on the Group 2 Reserve Fund will be treated as owned by the Class X-V Certificateholders and will be taxable to the Class X-V Certificateholders. For tax purposes, distributions made to any outside reserve fund under this document shall be treated as made to the owner of such fund.

(b)     Funds in the Group 2 Reserve Fund may be invested in Permitted Investments. Any earnings on such amounts shall be treated as any other amounts deposited to the Group 2 Reserve Fund. The Class X-V Certificateholders shall evidence ownership of the Group 2 Reserve Fund for federal tax purposes only and shall direct the Trustee in writing as to the investment of amounts therein.

98

(c)     The Trustee shall deposit all amounts received with respect to the Cap Agreement in the Group 2 Reserve Fund.

(d)     With respect to any Distribution Date upon which a Group 2 Reserve Fund Transfer Amount is required to be distributed, the Trustee shall make such distribution in accordance with Section 4.01(a)(4) of this Agreement.

(e)     The Trustee will distribute amounts on deposit in the Group 2 Reserve Fund on each Distribution Date to the Class X-V Certificates:

(1)     after all other distributions are made on such Distribution Date if and to the extent that the amount on deposit in the Group 2 Reserve Fund exceeds the Group 2 Specified Reserve Fund Requirement for such Distribution Date; and

(2)     on the Group 2 Reserve Fund Release Date, after all other distributions are made on such Distribution Date.

(f)     Each Group 2 Certificateholder, by its acceptance of the related Group 2 Certificate, acknowledges and agrees that it has no present interest in the Group 2 Reserve Fund and the amounts on deposit or to be deposited therein, but shall have only a contingent interest in related amounts distributable on the Group 2 Certificates as provided in this Agreement. The Depositor, the Seller and each Residual Certificateholder, by its acceptance of the Class R Certificate, acknowledges and agrees that it has no interest in the Group 2 Reserve Fund and the amounts on deposit or to be deposited therein.

(g)     If any payments are owed to the Cap Provider beginning with the Distribution Date in June 2003, the Master Servicer shall direct the Trustee to request and the Trustee shall request, the Cap Provider to furnish IRS Form W-8ECI to the Trustee.

SECTION 3.28.     Supplemental Interest Reserve Fund.

On the Closing Date, the holders of the Class X-V Certificates will deposit, or cause to be deposited, into the Supplemental Interest Reserve Fund, $10,000. On each Distribution Date as to which there is Current WAC Excess or Certificateholders' Interest Index Carryover for any class of Adjustable Rate Certificates, the Trustee is hereby directed to, and shall therefore, deposit into the Supplemental Interest Reserve Account an amount equal to the Current WAC Excess of the Accrued Certificate Interest for each affected Class of Adjustable Rate Certificates which is payable pursuant to Section 4.01(a)(1)(ii) through 4.01(a)(1)(v) and 4.01(a)(3)(xiii), and/or the Certificateholders' Interest Index Carryover for each affected Class of Adjustable Rate Certificates pursuant to Section 4.01(a)(3)(xiii). If no Current WAC Excess or Certificateholders' Interest Index Carryover is payable on a Distribution Date, the Trustee shall deposit into the Supplemental Interest Reserve Fund on behalf of the Class X-V Certificateholders an amount such that when added to other amounts already on deposit in the fund, the aggregate amount on deposit therein is equal to $10,000. For federal and state income tax purposes, the Class X-V Certificateholders will be deemed to be the owners of the

99

Supplemental Interest Reserve Fund and all amounts deposited into the Supplemental Interest Reserve Fund (other than the initial $10,000 deposit). Amounts held in the Supplemental Interest Reserve Fund and not distributable to the related Class of Adjustable Rate Certificateholders on any Distribution Date will be invested by the Trustee in investments designated by the Class X-V Certificateholders having maturities on or prior to the next succeeding Distribution Date on which such amounts will be distributable to the related Class or Classes of Adjustable Rate Certificateholders. Upon the termination of the Trust Fund, or the payment in full of the related Adjustable Rate Certificates, all amounts remaining on deposit in the Supplemental Interest Reserve Fund will be released from the lien of the Trust and distributed to the Class X-V Certificateholders or their designees. The Supplemental Interest Reserve Fund will be part of the Trust but not part of any REMIC and any payments to the related Adjustable Rate Certificates of Current WAC Excess and Certificateholders' Interest Index Carryover with respect to any Class of Adjustable Rate Certificates will not be payments with respect to a "regular interest" in a REMIC within the meaning of Code Section 860G(a)(1).

## ARTICLE IV

## PAYMENTS TO CERTIFICATEHOLDERS

SECTION 4.01.    Distributions.

(a)(1)  On each Distribution Date, the Trustee shall withdraw from the Distribution Account an amount equal to the Interest Remittance Amount for the related Loan Group and distribute to the related Certificateholders and in the case of the Group 2 Certificates, the Cap Provider, the following amounts, in the following order of priority:

(i)    to the Cap Provider in the case of the Group 2 Certificates so long as an Early Termination Date has not been designated under the Cap Agreement, the Trust Cap Payment Amount or if a Cap Default has occurred under the Cap Agreement, and the Cap Provider has designated an Early Termination Date, any Termination Payment owed to the Cap Provider and any Carryover Termination Payment owed to the Cap Provider;

(ii)    to the Holders of the related Class A Certificates, the Senior Interest Distribution Amount;

(iii)    to the extent of the Interest Remittance Amount for the related Loan Group remaining after distribution of the Senior Interest Distribution Amount to the related Class A Certificates and, with respect to the Group 2 Certificates, after payment to the Cap Provider the amounts set forth in (i) above, to the Holders of the related Class M-1 Certificates, the Interest Distribution Amount allocable to such Class of Certificates;

(iv)    to the extent of the Interest Remittance Amount for the related Loan Group remaining after distribution of the Senior Interest Distribution Amount to the related Class A Certificates and the Interest Distribution Amount allocable to the Class M-1

100

Certificates of the related Certificate Group and, with respect to the Group 2 Certificates, after payment to the Cap Provider the amounts set forth in (i) above, to the Holders of the related Class M-2 Certificates, the Interest Distribution Amount allocable to such Class of Certificates;

(v)     to the extent of the Interest Remittance Amount for the related Loan Group remaining after distribution of the Senior Interest Distribution Amount to the related Class A Certificates and the Interest Distribution Amounts allocable to the Class M-1 Certificates and the Class M-2 Certificates of the related Certificate Group and, with respect to the Group 2 Certificates, after payment to the Cap Provider the amounts set forth in (i) above, pro rata to the Holders of the related Class B Certificates and the related Class B-IO Certificates, the related Interest Distribution Amount allocable to such Class of Certificates.

(2)     On each Distribution Date, the Trustee shall withdraw from the Distribution Account an amount equal to the Principal Distribution Amount for the related Loan Group and distribute to the related Certificateholders the following amounts, in the following order of priority:

(A)     On each Distribution Date (a) prior to the related Stepdown Date or (b) on which a Trigger Event for the related Certificate Group is in effect, the Principal Distribution Amount for the related Loan Group shall be distributed in the following order of priority:

(x)(1)  in the case of the Group 1 Certificates

(i)     first, to the Class AF6 Certificates, an amount equal to the Class AF6 Lockout Distribution Amount and

(ii)    second, the remainder sequentially to the Class AF1, Class AF2, Class AF3, Class AF4, Class AF5 and Class AF6 Certificates, in that order, until their respective Certificate Principal Balances have been reduced to zero; and

(x)(2)  in the case of the Group 2 Certificates, to the Class AV Certificates until the Certificate Principal Balance has been reduced to zero; and

(y)     for each Certificate Group, sequentially, to the related Class M-1, Class M-2 and Class B Certificates, in that order, until their respective Certificate Principal Balances have been reduced to zero.

(B)     On each Distribution Date (a) on or after the related Stepdown Date and (b) on which a Trigger Event for the related Certificate Group is not in effect, the Principal Distribution Amount  for the related Loan Group shall be distributed in the following order of priority:

101

(i) the lesser of (x) the Principal Distribution Amount for the related Certificate Group and (y) the Class A Principal Distribution Amount for the related Certificate Group, shall be distributed in the following order of priority:

(x) in the case of Group 1 Certificates, (i) first, to the Class AF6 Certificates an amount equal to the Class AF6 Lockout Distribution Amount and (ii) second, the remainder, sequentially to the Class AF1, Class AF2, Class AF3, Class AF4, Class AF5 and Class AF6 Certificates, in that order, until their respective Certificate Principal Balances have been reduced to zero; and

(y) in the case of Group 2 Certificates, to the Class AV Certificates until the Certificate Principal Balance thereof has been reduced to zero;

(ii) the lesser of (x) the excess of (i) the Principal Distribution Amount for the related Certificate Group over (ii) the amount distributed to the holders of the related Class A Certificates pursuant to clause (B)(i) above, and (y) the Class M-1 Principal Distribution Amount for the related Certificate Group, shall be distributed to the Holders of the related Class M-1 Certificates, until the Certificate Principal Balance thereof has been reduced to zero;

(iii) the lesser of (x) the excess of (i) the Principal Distribution Amount for the related Certificate Group over (ii) the sum of the amounts distributed to the Holders of the related Class A Certificates pursuant to clause (B)(i) above and to the Holders of the related Class M-1 Certificates pursuant to clause (B)(ii) above, and (y) the Class M-2 Principal Distribution Amount for the related Certificate Group, shall be distributed to the Holders of the related Class M-2 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; and

(iv) the lesser of (x) the excess of (i) the Principal Distribution Amount for the related Certificate Group over (ii) the sum of the amounts distributed to the Holders of the related Class A Certificates pursuant to clause (B)(i) above, to the Holders of the related Class M-1 Certificates pursuant to clause (B)(ii) above and to the Holders of the related Class M-2 Certificates pursuant to clause (B)(iii) above, and (y) the Class B Principal Distribution Amount for the related Certificate Group, shall be distributed to the Holders of the related Class B Certificates, until the Certificate Principal Balance thereof has been reduced to zero.

(3) On each Distribution Date, the Net Monthly Excess Cashflow for a Loan Group (or, in the case of clause (i) below, the Net Monthly Excess Cashflow for a Loan Group exclusive of any Overcollateralization Reduction Amount for the related Certificate Group) shall be distributed as follows:

(i) to the Holders of the Class or Classes of Certificates of the related Certificate Group then entitled to receive distributions in respect of principal, in an

102

amount equal to the principal portion of any Realized Losses incurred or deemed to have been incurred on the Home Equity Loans for the related Loan Group during the related Prepayment Period, applied in the same order of priority as payments of principal would otherwise be applied on such Distribution Date to reduce the Certificate Principal Balance of such Classes of Certificates;

(ii)     to the Holders of the Class or Classes of Certificates of the related Certificate Group then entitled to receive distributions in respect of principal, in an amount equal to the Overcollateralization Increase Amount for the related Certificate Group, applied in the same order of priority as payments of principal would otherwise be applied on such Distribution Date to reduce the Certificate Principal Balance of such Certificates until the aggregate Certificate Principal Balance of such Classes of Certificates is reduced to zero;

(iii)    to the Holders of the Class M-1 Certificates of the related Certificate Group, in an amount equal to the Interest Carry Forward Amount allocable to such Class of Certificates;

(iv)    to the Holders of the Class M-1 Certificates of the related Certificate Group, any Unpaid Realized Loss Amount for such Class of Certificates;

(v)     to the Holders of the Class M-2 Certificates of the related Certificate Group in an amount equal to the Interest Carry Forward Amount allocable to such Class of Certificates;

(vi)    to the Holders of the Class M-2 Certificates of the related Certificate Group, any Unpaid Realized Loss Amount for such Class of Certificates;

(vii)   pro rata to the Holders of the Class B Certificates and the Class B-IO Certificates of the related Certificate Group, in an amount equal to the Interest Carry Forward Amount allocable to such Class of Certificates;

(viii)  to the Holders of the Class B Certificates of the related Certificate Group, any Unpaid Realized Loss Amount for such Class of Certificates;

(ix)    to the Holders of the related Class A Certificates, in an amount equal to such Holders allocated share of any Prepayment Interest Shortfalls for the related Loan Group (to the extent not covered by payments pursuant to Section 3.24) and any Relief Act Interest Shortfall allocated to such Certificates;

(x)     to the Holders of the related Class M-1 Certificates, in an amount equal to such Holders allocated share of any Prepayment Interest Shortfalls for the related Loan Group (to the extent not covered by payments pursuant to Section 3.24) and any Relief Act Interest Shortfall allocated to such Certificates;

(xi)     to the Holders of the related Class M-2 Certificates, in an amount equal to such Holders allocated share of any Prepayment Interest Shortfalls for the related Loan Group (to the extent not covered by payments pursuant to Section 3.24) and any Relief Act Interest Shortfall allocated to such Certificates;

(xii)    pro rata to the Holders of the related Class B Certificates and Class B-IO Certificates, in an amount equal to such Holders allocated share of any Prepayment Interest Shortfalls for the related Loan Group (to the extent not covered by payments pursuant to Section 3.24) and any Relief Act Interest Shortfall allocated to such Certificates;

(xiii)   to the Class X-V Certificate, the lesser of (i) the Class X Distribution Amount attributable to the Class X-V Certificates (computed without regard to this Section (xiii) or Section (xiv)) and (ii) the sum of the Certificateholders' Interest Index Carryover and the Current WAC Excess for each Class of Adjustable Rate Certificates provided that, pursuant to Section 3.28 hereof, on any Distribution Date as to which there is any Current WAC Excess or unpaid Certificateholders' Interest Index Carryover for any Class of Adjustable Rate Certificates, the Trustee will transfer, from amounts that would otherwise be distributable to the Class X-V Certificates pursuant to this clause, the amount of any Current WAC Excess or Certificateholders' Interest Index Carryover for the Adjustable Rate Certificates into the Supplemental Interest Reserve Fund, for immediate transfer pursuant to this clause to the related Adjustable Rate Certificates as payment of Current WAC Excess or the Certificateholders' Interest Index Carryover for the Adjustable Rate Certificates.

(xiv)    to the Cap Provider in the case of the Group 2 Certificates if an Early Termination Date has been designated under the Cap Agreement (other than an Early Termination Date designated by the Counterparty following a Cap Default), any Termination Payment owed to the Counterparty and any Carryover Termination Payment owed to the Counterparty;

(xv)     to the Holders of the related Class X Certificates, the Class X Distribution Amount for the related Loan Group; and

(xvi)    to the Holders of the Class R-I Certificates, any remaining amounts; provided that if such Distribution Date is the Distribution Date immediately following the expiration of the latest Prepayment Charge term as identified on the Home Equity Loan Schedule or any Distribution Date thereafter, then any such remaining amounts will be distributed *first*, to the Holders of the related Class-P Certificates, until the Certificate Principal Balance thereof has been reduced to zero; and *second*, to the Holders of the Class R-I Certificates.

(4)     On each Distribution Date, the Trustee shall withdraw from the Group 2 Reserve Fund an amount equal to the Group 2 Reserve Fund Transfer Amount and apply such

104

amount, after making all other distributions on such Distribution Date, in the following order or priority:

(i)     to the Holders of the Class AV Certificates, the Senior Interest Distribution Amount to the extent not otherwise paid on such Distribution Date;

(ii)    to the Holders of the Class M1V Certificates, the Interest Distribution Amount allocable to such Certificates to the extent not otherwise paid on such Distribution Date;

(iii)   to the Holders of the Class M2V Certificates, the Interest Distribution Amount allocable to such Certificates to the extent not otherwise paid on such Distribution Date;

(iv)    pro rata to the Holders of the Class BV Certificates and the Class B-IOV Certificates, the related Interest Distribution Amount allocable to such Certificates to the extent not otherwise paid on such Distribution Date;

(v)     to the Holders of the Class or Classes of Group 2 Certificates then entitled to receive distributions in respect of principal, in an amount equal to the principal portion of any Realized Losses incurred on the Home Equity Loans in Loan Group 2 during the related Prepayment Period in the same order of priority as payments of principal would otherwise be applied on such Distribution Date;

(vi)    to the Holders of the Class M1V Certificates, in an amount equal to the Interest Carry Forward Amount allocable to such Certificates to the extent not otherwise paid on such Distribution Date;

(vii)   to the Holders of the Class M1V Certificates, any Unpaid Realized Loss Amount for that Class of Certificates;

(viii)  to the Holders of the Class M2V Certificates, in an amount equal to the Interest Carry Forward Amount allocable to such Certificates to the extent not otherwise paid on such Distribution Date;

(ix)    to the Holders of the Class M2V Certificates, any Unpaid Realized Loss Amount for that Class of Certificates;

(x)     pro rata to the Holders of the Class BV Certificates and the Class B-IOV Certificates, in an amount equal to the related Interest Carry Forward Amount allocable to such Certificates to the extent not otherwise paid on such Distribution Date; and

(xi)    to the Holders of the Class BV Certificates, any Unpaid Realized Loss Amount for that Class of Certificates.

105

(b)     On each Distribution Date, the Trustee shall withdraw any amounts then on deposit in the Distribution Account that represent Prepayment Charges collected by the Master Servicer in connection with the Principal Prepayment of any of the Home Equity Loans in either Loan Group or any Master Servicer Prepayment Charge Payment Amount with respect to either Loan Group and shall distribute such amounts to the Holders of the related Class P Certificates. Such distributions shall not be applied to reduce the Certificate Principal Balance of the related Class P Certificates.

(c)     All distributions made with respect to each Class of Certificates on each Distribution Date shall be allocated *pro rata* among the outstanding Certificates in such Class based on their respective Percentage Interests. Payments in respect of each Class of Certificates on each Distribution Date will be made to the Holders of the respective Class of Certificates of record on the related Record Date (except as otherwise provided in Section 4.01(e) or Section 9.01 respecting the final distribution on such Class), based on the aggregate Percentage Interest represented by their respective Certificates, and shall be made by wire transfer of immediately available funds to the account of any such Holder at a bank or other entity having appropriate facilities therefor, if such Holder shall have so notified the Trustee in writing at least five Business Days prior to the Record Date immediately prior to such Distribution Date and is the registered owner of Certificates having an initial aggregate Certificate Principal Balance that is in excess of the lesser of (i) $5,000,000 or (ii) two-thirds of the initial Certificate Principal Balance of such Class of Certificates, or otherwise by check mailed by first class mail to the address of such Holder appearing in the Certificate Register. The final distribution on each Certificate will be made in like manner, but only upon presentment and surrender of such Certificate at the Corporate Trust Office or such other location specified in the notice to Certificateholders of such final distribution.

Each distribution with respect to a Book-Entry Certificate shall be paid to the Depository, as Holder thereof, and the Depository shall be responsible for crediting the amount of such distribution to the accounts of its Depository Participants in accordance with its normal procedures. Each Depository Participant shall be responsible for disbursing such distribution to the Certificate Owners that it represents and to each indirect participating brokerage firm (a "brokerage firm" or "indirect participating firm") for which it acts as agent. Each brokerage firm shall be responsible for disbursing funds to the Certificate Owners that it represents. None of the Trustee, the Certificate Registrar, the Depositor or the Master Servicer shall have any responsibility therefor except as otherwise provided by this Agreement or applicable law.

(d)     The rights of the Certificateholders to receive distributions in respect of the Certificates, and all interests of the Certificateholders in such distributions, shall be as set forth in this Agreement. None of the Holders of any Class of Certificates, the Trustee or the Master Servicer shall in any way be responsible or liable to the Holders of any other Class of Certificates in respect of amounts properly previously distributed on the Certificates.

(e)     Except as otherwise provided in Section 9.01, whenever the Trustee expects that the final distribution with respect to any Class of Certificates will be made on the next Distribution Date, the Trustee shall, no later than five (5) days after the related

Determination Date, mail to each Holder on such date of such Class of Certificates a notice to the effect that:

> (i)     the Trustee expects that the final distribution with respect to such Class of Certificates will be made on such Distribution Date, but only upon presentation and surrender of such Certificates at the office of the Trustee therein specified, and

> (ii)    no interest shall accrue on such Certificates from and after the end of the related Interest Accrual Period.

Any funds not distributed to any Holder or Holders of Certificates of such Class on such Distribution Date because of the failure of such Holder or Holders to tender their Certificates shall, on such date, be set aside and held in trust by the Trustee and credited to the account of the appropriate non-tendering Holder or Holders. If any Certificates as to which notice has been given pursuant to this Section 4.01(e) shall not have been surrendered for cancellation within six months after the time specified in such notice, the Trustee shall mail a second notice to the remaining non-tendering Certificateholders to surrender their Certificates for cancellation in order to receive the final distribution with respect thereto. If within one year after the second notice all such Certificates shall not have been surrendered for cancellation, the Trustee shall, directly or through an agent, mail a final notice to remaining non-tendering Certificateholders concerning surrender of their Certificates but shall continue to hold any remaining funds for the benefit of non-tendering Certificateholders. The costs and expenses of maintaining the funds in trust and of contacting such Certificateholders shall be paid out of the assets remaining in such trust fund. If within one year after the final notice any such Certificates shall not have been surrendered for cancellation, the Trustee shall pay to Salomon Smith Barney Inc. all such amounts, and all rights of non-tendering Certificateholders in or to such amounts shall thereupon cease. No interest shall accrue or be payable to any Certificateholder on any amount held in trust by the Trustee as a result of such Certificateholder's failure to surrender its Certificate(s) for final payment thereof in accordance with this Section 4.01(e).

> (f)     Notwithstanding anything to the contrary herein, (i) in no event shall the Certificate Principal Balance of a Class A Certificate or a Subordinated Certificate be reduced more than once in respect of any particular amount both (a) allocated to such Certificate in respect of Realized Losses pursuant to Section 4.04 and (b) distributed to the Holder of such Certificate in reduction of the Certificate Principal Balance thereof pursuant to this Section 4.01 from Net Monthly Excess Cashflow and (ii) in no event shall the Uncertificated Balance of a REMIC I Regular Interest be reduced more than once in respect of any particular amount both (a) allocated to such REMIC I Regular Interest in respect of Realized Losses pursuant to Section 4.04 and (b) distributed on such REMIC I Regular Interest in reduction of the Uncertificated Balance thereof pursuant to this Section 4.01.

> (g)     On the Special Distribution Date the Trustee will distribute the Unutilized Pre-Funding Amount for each Loan Group, if any, to the related Certificateholders in the same order of priority as set forth in Section 4.01(a)(2)(A) as if such Special Distribution Date were a Distribution Date.

SECTION 4.02.      Statements to Certificateholders.

On each Distribution Date, the Trustee shall prepare and forward by mail to each Holder of the Regular Certificates, a statement as to the distributions made on such Distribution Date for such Certificate Group setting forth:

(i)      the amount of the distribution made on such Distribution Date to the Holders of the Certificates of each Class of the related Certificate Group allocable to principal, and the amount of distribution made on such Distribution Date to the Holders of the related Class P Certificates allocable to Prepayment Charges;

(ii)      the amount of the distribution made on such Distribution Date to the Holders of the Certificates of each Class of the related Certificate Group allocable to interest;

(iii)      the aggregate Servicing Fee received by the Master Servicer during the related Due Period for such Certificate Group and such other customary information as the Trustee deems necessary or desirable, or which a Certificateholder reasonably requests, to enable Certificateholders to prepare their tax returns;

(iv)      the aggregate amount of P&I Advances for such Distribution Date for the related Loan Group;

(v)      the aggregate Stated Principal Balance of the Home Equity Loans and any REO Properties as of the close of business on such Distribution Date for the related Loan Group;

(vi)      the number, aggregate principal balance, weighted average remaining term to maturity and weighted average Mortgage Rate of the Home Equity Loans for the related Loan Group as of the related Due Date;

(vii)      the number and aggregate unpaid principal balance of Home Equity Loans of the related Loan Group (a) delinquent 30-59 days, (b) delinquent 60-89 days, (c) delinquent 90 or more days in each case, as of the last day of the preceding calendar month, (d) as to which foreclosure proceedings have been commenced and (e) with respect to which the related Mortgagor has filed for protection under applicable bankruptcy laws, with respect to whom bankruptcy proceedings are pending or with respect to whom bankruptcy protection is in force;

(viii)      with respect to any Home Equity Loan of the related Loan Group that became an REO Property during the preceding calendar month, the loan number of such Home Equity Loan, the unpaid principal balance and the Stated Principal Balance of such Home Equity Loan as of the date it became an REO Property;

108

(ix)   the book value and the Stated Principal Balance of any REO Property of any Loan Group as of the close of business on the last Business Day of the calendar month preceding the Distribution Date;

(x)   the aggregate amount of Principal Prepayments with respect to the related Loan Group made during the related Prepayment Period;

(xi)   the aggregate amount of Realized Losses with respect to the related Loan Group incurred during the related Prepayment Period (or, in the case of Bankruptcy Losses allocable to interest, during the related Due Period), separately identifying whether such Realized Losses constituted Bankruptcy Losses and the aggregate amount of Realized Losses with respect to the related Loan Group incurred since the Closing Date;

(xii)   the aggregate amount of Extraordinary Trust Fund Expenses for the related Loan Group withdrawn from the Collection Account or the Distribution Account for such Distribution Date;

(xiii)   the aggregate Certificate Principal Balance of each Class of Certificates, after giving effect to the distributions, and allocations of Realized Losses for the related Loan Group, made on such Distribution Date, separately identifying any reduction thereof due to allocations of such Realized Losses;

(xiv)   the Certificate Factor for each such Class of Certificates applicable to such Distribution Date;

(xv)   the Interest Distribution Amount in respect of the Class A Certificates and the Subordinated Certificates for such Distribution Date and the Interest Carry Forward Amount, if any, with respect to the Class A Certificates and the Subordinated Certificates on such Distribution Date, and in the case of the Class A Certificates and the Subordinated Certificates, separately identifying any reduction thereof due to allocations of Realized Losses, Prepayment Interest Shortfalls and Relief Act Interest Shortfalls;

(xvi)   the aggregate amount of any Prepayment Interest Shortfall for the related Loan Group for such Distribution Date, to the extent not covered by payments by the Master Servicer pursuant to Section 3.24;

(xvii)   the aggregate amount of Relief Act Interest Shortfalls for the related Loan Group for such Distribution Date;

(xviii)  the Required Overcollateralized Amount and the Credit Enhancement Percentage for such Certificate Group and such Distribution Date;

(xix)   the Overcollateralization Increase Amount, if any, for such Certificate Group and such Distribution Date;

109

(xx)   the Overcollateralization Reduction Amount, if any, for such Certificate Group and such Distribution Date;

(xxi)   with respect to any Home Equity Loan of the related Loan Group as to which foreclosure proceedings have been concluded, the loan number and unpaid principal balance of such Home Equity Loan as of the date of such conclusion of foreclosure proceedings;

(xxii)   with respect to Home Equity Loans of the related Loan Group as to which a Liquidation Event has occurred, the number of such Home Equity Loans, the unpaid principal balance of such Home Equity Loans as of the date of such Liquidation Event and the amount of proceeds (including Liquidation Proceeds and Insurance Proceeds) collected in respect of such Home Equity Loans;

(xxiii)   the respective Pass-Through Rates applicable to the Class A Certificates, the Subordinated Certificates for such Distribution Date and the Pass-Through Rate applicable to the Class A Certificates and the Subordinated Certificates for the immediately succeeding Distribution Date;

(xxiv)   the Loss Severity Percentage with respect to each Home Equity Loan of the related Loan Group;

(xxv)   the Aggregate Loss Severity Percentage;

(xxvi)   the Cumulative Loss Percentage;

(xxvii)   with respect to the Group 2 Certificates, the amount of any payment made by the Counterparty under the Cap Agreement, the Group 2 Specified Reserve Fund Requirement for such Distribution Date, the amount on deposit in the Group 2 Reserve Fund, deposits into and withdrawals from the Group 2 Reserve Fund since the preceding Distribution Date (or since the Closing Date in the case of the first Distribution Date), the amount of any income or gain (or loss) on amounts held in the Group 2 Reserve Fund, the Group 2 Reserve Fund Transfer Amount for the related Distribution Date and the amount released to the Holder of the Class X-V Certificates for the Group 2 Reserve Fund on such Distribution Date;

(xxviii)   during the Pre-Funding Period, the Stated Principal Balance of the Subsequent Home Equity Loans purchased by the Trust Fund from funds on deposit in the Group 1 Pre-Funding Account and in the Group 2 Pre-Funding Account during the related Due Period and any amounts with respect to Loan Group 1 and Loan Group 2 remaining in each Pre-Funding Account and with respect to the first three Distribution Dates; and

(xxix)   the amount of any Net Monthly Excess Cash Flow with respect to the related Loan Group on such Distribution Date and the allocation thereof to the

110

Certificateholders with respect to Applied Realized Loss Amounts and Unpaid Realized Loss Amounts for such Loan Group.

The Trustee will make such statement (and, at its option, any additional files containing the same information in an alternative format) available each month to Certificateholders, the Master Servicer, the Rating Agencies and Standard & Poor's Ratings Services, a divisions of the McGraw-Hill Companies via the Trustee's internet website. The Trustee's internet website shall initially be located at "http:\\www-apps.gis.deutsche-bank.com/invr. Assistance in using the website can be obtained by calling the Trustee's customer service desk at 1-800-735-7777. Parties that are unable to use the above distribution options are entitled to have a paper copy mailed to them via first class mail by calling the customer service desk and indicating such. The Trustee shall have the right to change the way such statements are distributed in order to make such distribution more convenient and/or more accessible to the above parties and the Trustee shall provide timely and adequate notification to all above parties regarding any such changes.

In the case of information furnished pursuant to subclauses (i) through (iii) above, the amounts shall be expressed as a dollar amount per Single Certificate of the relevant Class.

Within a reasonable period of time after the end of each calendar year, the Trustee shall furnish to each Person who at any time during the calendar year was a Holder of a Regular Certificate a statement containing the information set forth in subclauses (i) through (iii) above, aggregated for such calendar year or applicable portion thereof during which such person was a Certificateholder. Such obligation of the Trustee shall be deemed to have been satisfied to the extent that substantially comparable information shall be provided by the Trustee pursuant to any requirements of the Code as from time to time are in force.

On each Distribution Date, the Trustee shall forward to the Depositor, each Holder of a Non-Offered Certificate, the NIMs Insurer and the Master Servicer, a copy of the reports forwarded to the Regular Certificateholders on such Distribution Date and a statement setting forth the amounts, if any, actually distributed with respect to the Residual Certificates, respectively, on such Distribution Date.

Within a reasonable period of time after the end of each calendar year, the Trustee shall furnish to each Person who at any time during the calendar year was a Holder of a Residual Certificate a statement setting forth the amount, if any, actually distributed with respect to the Residual Certificates, as appropriate, aggregated for such calendar year or applicable portion thereof during which such Person was a Certificateholder. Such obligation of the Trustee shall be deemed to have been satisfied to the extent that substantially comparable information shall be prepared by the Trustee and furnished to such Holders pursuant to the rules and regulations of the Code as are in force from time to time.

The Trustee shall, upon request, furnish to each Certificateholder, during the term of this Agreement, such periodic, special, or other reports or information, whether or not provided for herein, as shall be reasonable with respect to the Certificateholder, or otherwise with

111

respect to the purposes of this Agreement, all such reports or information to be provided at the expense of the Certificateholder in accordance with such reasonable and explicit instructions and directions as the Certificateholder may provide. For purposes of this Section 4.02, the Trustee's duties are limited to the extent that the Trustee receives timely reports as required from the Master Servicer.

On each Distribution Date the Trustee shall provide Bloomberg Financial Markets, L.P. ("Bloomberg") CUSIP level factors for each class of Certificates as of such Distribution Date, using a format and media mutually acceptable to the Trustee and Bloomberg.

SECTION 4.03.        Remittance Reports; P&I Advances.

(a)      Within two Business Days after the Determination Date, but in no event later than such date which would allow the Trustee to submit a claim to the NIMs Insurer under an indenture dated as of September 1, 2000 between Long Beach Asset Holdings Corp. NIMs Trust 2000-2, as issuer and the Trustee as indenture trustee, the Master Servicer shall deliver to the Trustee and the NIMs Insurer by telecopy (or by such other means as the Master Servicer and the Trustee may agree from time to time) a Remittance Report with respect to the related Distribution Date. Such Remittance Report will include with respect to each Loan Group (i) the amount of P&I Advances to be made by the Master Servicer for the related Loan Group in respect of the related Distribution Date, the aggregate amount of P&I Advances outstanding for the related Loan Group after giving effect to such P&I Advances, and the aggregate amount of Nonrecoverable P&I Advances for the related Loan Group in respect of such Distribution Date and (ii) such other information with respect to the Home Equity Loans for the related Loan Group as the Trustee may reasonably require to perform the calculations necessary to make the distributions contemplated by Section 4.01 and to prepare the statements to Certificateholders contemplated by Section 4.02. The Trustee shall not be responsible to recompute, recalculate or verify any information provided to it by the Master Servicer.

(b)      The amount of P&I Advances with respect to either Loan Group to be made by the Master Servicer for any Distribution Date shall equal, subject to Section 4.03(d), the sum of (i) the aggregate amount of Monthly Payments (with each interest portion thereof net of the related Servicing Fee), due on the related Due Date in respect of the Home Equity Loans (other than with respect to any Balloon Loan with a delinquent Balloon Payment as described in clause (iii) below), which Monthly Payments were delinquent as of the close of business on the related Determination Date, plus (ii) with respect to each REO Property of such Loan Group (other than with respect to any REO Property relating to a Balloon Loan with a delinquent Balloon Payment as described in clause (iv) below), which REO Property was acquired during or prior to the related Prepayment Period and as to which such REO Property an REO Disposition did not occur during the related Prepayment Period, an amount equal to the excess, if any, of the Monthly Payments (with each interest portion thereof net of the related Servicing Fee) that would have been due on the related Due Date in respect of the related Home Equity Loans, over the net income from such REO Property transferred to the Distribution Account pursuant to Section 3.23 for distribution on such Distribution Date, plus (iii) with respect to each Balloon Loan of such Loan Group with a delinquent Balloon Payment, an amount equal to the assumed monthly

112

principal and interest payment (with each interest portion thereof net of the related Servicing Fee) that would have been due on the related Due Date based on the original principal amortization schedule for such Balloon Loan assuming such Home Equity Loan was not a Balloon Loan, plus (iv) with respect to each REO Property relating to a Balloon Loan of such Loan Group with a delinquent Balloon Payment, which REO Property was acquired during or prior to the related Prepayment Period and as to which REO Property an REO Disposition did not occur during the related Prepayment Period, an amount equal to the excess, if any, of the assumed monthly principal and interest payment (with each interest portion thereof net of the related Servicing Fee) that would have been due on the related Due Date based on the original principal amortization schedule for the related Balloon Loan assuming such Home Equity Loan was not a Balloon Loan, over the net income from such REO Property transferred to the Distribution Account pursuant to Section 3.23 for distribution on such Distribution Date.

On or before 3:00 p.m. New York time on the Master Servicer Remittance Date, the Master Servicer shall remit in immediately available funds to the Trustee for deposit in the Distribution Account an amount equal to the aggregate amount of P&I Advances, if any, to be made in respect of the Home Equity Loans and REO Properties for the related Distribution Date either (i) from its own funds or (ii) from the Collection Account, to the extent of funds held therein for future distribution with respect to the related Certificate Group (in which case, it will cause to be made an appropriate entry in the records of Collection Account that amounts held for future distribution have been, as permitted by this Section 4.03, used by the Master Servicer in discharge of any such P&I Advance) or (iii) in the form of any combination of (i) and (ii) aggregating the total amount of P&I Advances to be made by the Master Servicer with respect to the Home Equity Loans and REO Properties of the related Loan Group. Any amounts held for future distribution and so used shall be appropriately reflected in the Master Servicer's records and replaced by the Master Servicer by deposit in the Collection Account on or before any future Master Servicer Remittance Date to the extent that the Available Distribution Amount for such Loan Group and the related Distribution Date (determined without regard to P&I Advances to be made on the Master Servicer Remittance Date with respect to such Loan Group) shall be less than the total amount that would be distributed to the Classes of Certificateholders pursuant to Section 4.01 on such Distribution Date if such amounts held for future distributions had not been so used to make P&I Advances on the related Certificate Group. The Trustee will provide notice to the Master Servicer by telecopy by the close of business on any Master Servicer Remittance Date in the event that the amount remitted by the Master Servicer to the Trustee on such date is less than the P&I Advances required to be made by the Master Servicer for such Loan Group and the related Distribution Date.

(c)      The obligation of the Master Servicer to make such P&I Advances is mandatory, notwithstanding any other provision of this Agreement but subject to (d) below, and, with respect to any Home Equity Loan or REO Property, shall continue until a Final Recovery Determination in connection therewith or the removal thereof from REMIC I pursuant to any applicable provision of this Agreement, except as otherwise provided in this Section.

(d)      Notwithstanding anything herein to the contrary, no P&I Advance or Servicing Advance shall be required to be made hereunder by the Master Servicer if such P&I

113

Advance or Servicing Advance would, if made, constitute a Nonrecoverable P&I Advance or Nonrecoverable Servicing Advance. The determination by the Master Servicer that it has made a Nonrecoverable P&I Advance or a Nonrecoverable Servicing Advance or that any proposed P&I Advance or Servicing Advance, if made, would constitute a Nonrecoverable P&I Advance or a Nonrecoverable Servicing Advance, respectively, shall be evidenced by an Officers' Certificate of the Master Servicer delivered to the Depositor and the Trustee.

SECTION 4.04.    Allocation of Realized Losses.

(a)    Prior to each Determination Date, the Master Servicer shall determine as to each Home Equity Loan and REO Property: (i) the total amount of Realized Losses, if any, incurred in connection with any Final Recovery Determinations made during the related Prepayment Period; (ii) whether and the extent to which such Realized Losses constituted Bankruptcy Losses and (iii) the respective portions of such Realized Losses allocable to interest and allocable to principal. Prior to each Determination Date, the Master Servicer shall also determine as to each Home Equity Loan: (A) the total amount of Realized Losses, if any, incurred in connection with any Deficient Valuations made during the related Prepayment Period and (B) the total amount of Realized Losses, if any, incurred in connection with Debt Service Reductions in respect of Monthly Payments due during the related Due Period. The information described in the two preceding sentences that is to be supplied by the Master Servicer shall be evidenced by an Officers' Certificate delivered to the Trustee and the NIMs Insurer by the Master Servicer prior to the Determination Date immediately following the end of (x) in the case of Bankruptcy Losses allocable to interest, the Due Period during which any such Realized Loss was incurred, and (y) in the case of all other Realized Losses, the Prepayment Period during which any such Realized Loss was incurred.

(b)    Realized Losses on the Home Equity Loans of a Loan Group shall be allocated by the Trustee on each Distribution Date as follows: first, to Net Monthly Excess Cashflow of the related Certificate Group; and second, to the related Class X Certificates, until the Certificate Principal Balance thereof has been reduced to zero. Thereafter, any Applied Realized Loss Amounts for a Loan Group shall be allocated: first, to the related Class B Certificates, until the Certificate Principal Balance thereof has been reduced to zero; second, to the related Class M-2 Certificates, until the Certificate Principal Balance thereof has been reduced to zero; and third, to the related Class M-1 Certificates, until the Certificate Principal Balance thereof has been reduced to zero. All Realized Losses to be allocated to the Certificate Principal Balances of all Classes on any Distribution Date shall be so allocated after the actual distributions to be made on such date as provided above. All references above to the Certificate Principal Balance of any Class of Certificates shall be to the Certificate Principal Balance of such Class immediately prior to the relevant Distribution Date, before reduction thereof by any Realized Losses, in each case to be allocated to such Class of Certificates, on such Distribution Date.

Any allocation of Realized Losses to a Subordinated Certificate on any Distribution Date shall be made by reducing the Certificate Principal Balance thereof by the amount so allocated, or in the case of a Class X Certificate, by reducing the amount otherwise

114

payable in respect thereof pursuant to Section 4.01(a)(3)(xv).  No allocations of any Realized Losses shall be made to the Certificate Principal Balances of the Class A Certificates or the Class P Certificates.

As used herein, an allocation of a Realized Loss on a "*pro rata* basis" among two or more specified Classes of Certificates means an allocation on a *pro rata* basis, among the various Classes so specified, to each such Class of Certificates on the basis of their then outstanding Certificate Principal Balances prior to giving effect to distributions to be made on such Distribution Date.  All Realized Losses and all other losses allocated to a Class of Certificates hereunder will be allocated among the Certificates of such Class in proportion to the Percentage Interests evidenced thereby.  Notwithstanding any other provision of Section 4.04, Realized Losses shall be allocated first to the Class R-I Certificates to the extent of any amount otherwise distributable to such Certificates.

SECTION 4.05.    Compliance with Withholding Requirements.

Notwithstanding any other provision of this Agreement, the Trustee shall comply with all federal withholding requirements respecting payments to Certificateholders of interest or original issue discount that the Trustee reasonably believes are applicable under the Code.  The consent of Certificateholders shall not be required for such withholding.  In the event the Trustee does withhold any amount from interest or original issue discount payments or advances thereof to any Certificateholder pursuant to federal withholding requirements, the Trustee shall indicate the amount withheld to such Certificateholders.

SECTION 4.06.    Commission Reporting.

Within 15 days after each Distribution Date, the Trustee shall, in accordance with industry standards, file with the Commission via the Electronic Data Gathering and Retrieval System, a Form 8-K with a copy of the statement to Certificateholders for such Distribution Date as an exhibit thereto.  Prior to January 30, 2001, the Trustee shall in accordance with industry standards file a Form 15 Suspension Notification with respect to the Trust Fund, if applicable. Prior to March 30, 2001, the Trustee shall file a Form 10-K, in substance conforming to industry standards, with respect to the Trust Fund.  The Depositor hereby grants to the Trustee a limited power of attorney to execute and file each such document on behalf of the Depositor.  Such power of attorney shall continue until the earlier of (i) receipt by the Trustee from the Depositor of written termination of such power of attorney and (ii) the termination of the Trust Fund.  The Depositor agrees to promptly furnish to the Trustee, from time to time upon request, such further information, reports and financial statements within its control related to this Agreement and the Home Equity Loans as the Trustee reasonably deems appropriate to prepare and file all necessary reports with the Commission.  The Trustee shall have no responsibility to file any items other than those specified in this Section.

ARTICLE V

THE CERTIFICATES

115

SECTION 5.01.   The Certificates.

(a)   The Certificates in the aggregate will represent the entire beneficial ownership interest in the Home Equity Loans and all other assets included in REMIC I.

The Certificates will be substantially in the forms annexed hereto as Exhibits A-1 through A-13. The Certificates of each Class will be issuable in registered form only, in denominations of authorized Percentage Interests as described in the definition thereof. Each Certificate will share ratably in all rights of the related Class.

Upon original issue, the Certificates shall be executed and delivered by the Trustee, and the Trustee shall cause the Certificates to be authenticated by the Certificate Registrar to or upon the order of the Depositor. The Certificates shall be executed and attested by manual or facsimile signature on behalf of the Trustee by an authorized signatory. Certificates bearing the manual or facsimile signatures of individuals who were at any time the proper officers of the Trustee shall bind the Trustee, notwithstanding that such individuals or any of them have ceased to hold such offices prior to the authentication and delivery of such Certificates or did not hold such offices at the date of such Certificates. No Certificate shall be entitled to any benefit under this Agreement or be valid for any purpose, unless there appears on such Certificate a certificate of authentication substantially in the form provided herein executed by the Certificate Registrar by manual signature, and such certificate of authentication shall be conclusive evidence, and the only evidence, that such Certificate has been duly authenticated and delivered hereunder. All Certificates shall be dated the date of their authentication.

(b)   The Class A Certificates and the Subordinated Offered Certificates shall initially be issued as one or more Certificates held by the Book-Entry Custodian or, if appointed to hold such Certificates as provided below, the Depository and registered in the name of the Depository or its nominee and, except as provided below, registration of such Certificates may not be transferred by the Trustee except to another Depository that agrees to hold such Certificates for the respective Certificate Owners with Ownership Interests therein. The Certificate Owners shall hold their respective Ownership Interests in and to such Certificates through the book-entry facilities of the Depository and, except as provided below, shall not be entitled to definitive, fully registered Certificates ("Definitive Certificates") in respect of such Ownership Interests. All transfers by Certificate Owners of their respective Ownership Interests in the Book-Entry Certificates shall be made in accordance with the procedures established by the Depository Participant or brokerage firm representing such Certificate Owner. Each Depository Participant shall only transfer the Ownership Interests in the Book-Entry Certificates of Certificate Owners it represents or of brokerage firms for which it acts as agent in accordance with the Depository's normal procedures. The Trustee is hereby initially appointed as the Book-Entry Custodian and hereby agrees to act as such in accordance herewith and in accordance with the agreement that it has with the Depository authorizing it to act as such. The Book-Entry Custodian may, and if it is no longer qualified to act as such, the Book-Entry Custodian shall, appoint, by a written instrument delivered to the Depositor, the Master Servicer, the Trustee (if the Trustee is not the Book-Entry Custodian) and any other transfer agent (including the Depository or any successor Depository) to act as Book-Entry Custodian under such conditions

116

as the predecessor Book-Entry Custodian and the Depository or any successor Depository may prescribe, provided that the predecessor Book-Entry Custodian shall not be relieved of any of its duties or responsibilities by reason of any such appointment of other than the Depository. If the Trustee resigns or is removed in accordance with the terms hereof, the successor trustee or, if it so elects, the Depository shall immediately succeed to its predecessor's duties as Book-Entry Custodian. The Depositor shall have the right to inspect, and to obtain copies of, any Certificates held as Book-Entry Certificates by the Book-Entry Custodian.

The Trustee, the Master Servicer and the Depositor may for all purposes (including the making of payments due on the Book-Entry Certificates) deal with the Depository as the authorized representative of the Certificate Owners with respect to the Book-Entry Certificates for the purposes of exercising the rights of Certificateholders hereunder. The rights of Certificate Owners with respect to the Book-Entry Certificates shall be limited to those established by law and agreements between such Certificate Owners and the Depository Participants and brokerage firms representing such Certificate Owners. Multiple requests and directions from, and votes of, the Depository as Holder of the Book-Entry Certificates with respect to any particular matter shall not be deemed inconsistent if they are made with respect to different Certificate Owners. The Trustee may establish a reasonable record date in connection with solicitations of consents from or voting by Certificateholders and shall give notice to the Depository of such record date.

If (i)(A) the Depositor advises the Trustee in writing that the Depository is no longer willing or able to properly discharge its responsibilities as Depository, and (B) the Depositor is unable to locate a qualified successor, (ii) the Depositor at its option advises the Trustee in writing that it elects to terminate the book-entry system through the Depository or (iii) after the occurrence of a Master Servicer Event of Default, Certificate Owners representing in the aggregate not less than 51% of the Ownership Interests of the Book-Entry Certificates advise the Trustee through the Depository, in writing, that the continuation of a book-entry system through the Depository is no longer in the best interests of the Certificate Owners, the Trustee shall notify all Certificate Owners, through the Depository, of the occurrence of any such event and of the availability of Definitive Certificates to Certificate Owners requesting the same. Upon surrender to the Trustee of the Book-Entry Certificates by the Book-Entry Custodian or the Depository, as applicable, accompanied by registration instructions from the Depository for registration of transfer, the Trustee shall issue the Definitive Certificates. Such Definitive Certificates will be issued in minimum denominations of $10,000, except that any beneficial ownership that was represented by a Book-Entry Certificate in an amount less than $10,000 immediately prior to the issuance of a Definitive Certificate shall be issued in a minimum denomination equal to the amount represented by such Book-Entry Certificate. None of the Depositor, the Master Servicer or the Trustee shall be liable for any delay in the delivery of such instructions and may conclusively rely on, and shall be protected in relying on, such instructions. Upon the issuance of Definitive Certificates all references herein to obligations imposed upon or to be performed by the Depository shall be deemed to be imposed upon and performed by the Trustee, to the extent applicable with respect to such Definitive Certificates, and the Trustee shall recognize the Holders of the Definitive Certificates as Certificateholders hereunder.

117