**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee of the Trusts listed in Exhibits 1-A and 1-B,

        Plaintiff,

      v.

FEDERAL DEPOSIT INSURANCE CORPORATION,
as receiver for Washington Mutual Bank; JPMORGAN
CHASE BANK, National Association; and
WASHINGTON MUTUAL MORTGAGE
SECURITIES CORPORATION,

        Defendants.

Case No.:  1:09-CV-1656-RMC

Hon. Rosemary M. Collyer

**PLAINTIFF DEUTSCHE BANK NATIONAL TRUST COMPANY'S MEMORANDUM**
**OF LAW IN OPPOSITION TO:**

**(I)**     **FDIC RECEIVER'S MOTION TO DISMISS;**

**(II)**    **JPMORGAN CHASE BANK, N.A. AND WASHINGTON MUTUAL**
       **MORTGAGE SECURITIES CORPORATION'S MOTION TO DISMISS; AND**

**(III)**   **JPMORGAN CHASE BANK, N.A. AND WASHINGTON MUTUAL**
       **MORTGAGE SECURITIES CORPORATION'S MOTION FOR PARTIAL**
       **SUMMARY JUDGMENT**

BOIES, SCHILLER & FLEXNER LLP

333 Main Street
Armonk, NY 10504
Phone: (914) 749-8200
Fax:   (914) 749-8300

TALCOTT FRANKLIN P.C.

208 North Market Street, Suite 200
Dallas, Texas 75202
Phone:  (214) 736-8730
Fax:    (877) 577-1356

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

PRELIMINARY STATEMENT ......................................................................................... 1

BACKGROUND .............................................................................................................. 3

    A. The Trusts and the Governing Documents .................................................. 3

    B. The Senate Subcommittee Investigation and Findings ................................ 4

    C. The Ongoing and Continuous Breach of the Repurchase and Notice Obligations
       and Of the Trustee's Access Rights .............................................................. 6

I.   JPMC IS IN CONTINUING BREACH OF ITS CONTRACTUAL OBLIGATION
    TOPROVIDE THE TRUSTEE ACCESS TO THE LOAN FILES ................................. 10

    A. JPMC – the Only Party With Possession of the Loan Files – Has Refused to
       Provide the Trustee With Access to the Loan Files .................................... 10

    B. JPMC Cannot Demand the Trustee Plead Loan-Level Breaches When JPMC
       Refuses to Honor the Trustee's Access Rights or Provide the Trustee with
       Contractually Required Notice .................................................................... 11

    C. JPMC's Refusal to Give the Trustee Access to the Loan Files Constitutes a
       Separate Breach of the Governing Documents ........................................... 12

II.  THE AMENDED COMPLAINT MORE THAN ADEQUATELY PLEADS A
    BREACH OF CONTRACT CLAIM ............................................................................. 13

    A. The Amended Complaint Alleges Breaches of the Representations and
       Warranties ..................................................................................................... 13

    B. The Trustee Has No Obligation to Provide Proof of Loan-Level Breaches .............. 15

    C. The Trustee Has Sufficiently Pled That WaMu's Breaches of its Representations
       and Warranties Had a Material and Adverse Effect on the Value of the Mortgage
       Loans in the Trusts ....................................................................................... 16

    D. WaMu's Repurchase Obligations Are Not Excused By the Trustee's Inability to
       Provide WaMu with Notice of Loan Level Breaches .................................. 18

III. THE TRUSTEE'S CLAIMS ARE NOT BARRED BY THE SOLE REMEDY
    PROVISION OR BY THE STATUTE OF LIMITATIONS ........................................... 19

    A. The Trustee's Claim is for WaMu's Independent Breaches of the Ongoing
       Repurchase and Notice Obligations ........................................................... 19

    B. The Sole Remedy Provision Does Not Bar The Trustee's Claim .............. 20

C.  The Trustee's Claims Are Not Barred by the Statute of Limitations ......................... 22

IV.  JPMC ASSUMED THE TRUST-RELATED LIABILITIES AS THEY WERE
REFLECTED ON THE BOOKS AND RECORDS OF WAMU ................................... 25

A.  Under the Plain Meaning of Section 2.1, JPMC Assumed All Trust-related
Liabilities, as They Were Reflected on WaMu's Books and Records as of
September 25, 2008 .................................................................................................... 27

B.  JPMC's Interpretation of Section 2.1 Would Render Entire Clauses and
Provisions of the PAA Superfluous or Repugnant ...................................................... 29

C.  Documentary Evidence of the PAA Parties' Negotiations Supports the Position
that  JPMC Knowingly Assumed Substantially All of WaMu's Liabilities
Reflected on the Books and Records ........................................................................ 31

D.  JPMC's Statements and Conduct Immediately After its Acquisition of WaMu –
and Until Recently – are Inconsistent with its Current Position ................................ 34

E.  The WaMu PAA is By Design Structurally and Fundamentally Different From
Other PAAs .............................................................................................................. 35

F.  Public Policy Supports a Finding that JPMC Assumed the Trust-related
Liabilities ................................................................................................................. 37

V.  THE TRUSTEE'S CLAIMS AGAINST THE FDIC RECEIVER BASED ON POST-
RECEIVERSHIP BREACHES SHOULD NOT BE DISMISSED ................................ 39

A.  The Trustee's Claims for Post-Receivership Breaches Are Not Barred by
FIRREA's Administrative Exhaustion Requirements. ................................................ 39

B.  The Trustee Has Properly Plead a Breach of Contract Claim Against the FDIC. ....... 41

C.  The FDIC's Post-Receivership Breaches Of The Governing Documents Entitle
The Trustee To Administrative Priority .................................................................... 43

CONCLUSION ........................................................................................................................ 43

## TABLE OF AUTHORITIES

### CASES

Aetna Cas. & Sur. Co. v. Namrod Dev. Corp.,
    140 B.R. 56 (S.D.N.Y. 1992)........................................................................12

Allen v. United Fin. Mortg. Corp.,
    No. 09-2507, 2010 WL 1135787 (N.D. Cal. Mar. 22, 2010) .....................................35

Allmon v. Fed. Bureau of Prisons,
    605 F. Supp. 2d 1 (D.D.C. 2009) ................................................................24

April Enters., Inc. v. KTTV,
    195 Cal. Rptr. 421 805 (Cal. App. 1983)...................................................25

Auction Co. of Am. v. FDIC,
    141 F.3d 1198 (D.C. Cir. 1998) ................................................................40

Aurora Loan Servs., LLC v. Cambridge Home Capital, LLC,
    No. 10591/05, 819 N.Y.S.2d 208, 2006 WL 1320741 (N.Y. Sup. Ct. Jan. 31,
    2006) ............................................................................................13

Badibanga v. Howard Univ. Hosp.,
    679 F. Supp. 2d 99 (D.D.C. 2010) ...............................................................15

Bank of N.Y. v. Tyco Int'l Grp.,
    545 F. Supp. 2d 312 (S.D.N.Y. 2008)...........................................................11

*Bankers Life Ins. Co. v. Credit Suisse First Boston Corp.,
    No. 8:07-CV-00690, 2008 WL 1817294 (M.D. Fla. Apr. 22, 2008)...........................15

Bell Atlantic Corp. v. Twombly,
    550 U.S. 544 (2007)............................................................................15

Branch v. FDIC,
    833 F. Supp. 56 (D. Mass. 1993) .............................................................39

Capitol Place I Assocs. L.P. v. George Hyman Const. Co.,
    673 A.2d 194 (D.C. 1996) .......................................................................24

Combs v. Int'l Ins. Co.,
    354 F.3d 568 (6th Cir. 2004) ..................................................................12

Crinks v. Torres,
    141 Wash. App. 1030, 2007 WL 3348449 (Nov. 13, 2007)........................................31

Dalal v. Goldman Sachs & Co.,
   575 F.3d 725 (D.C. Cir. 2009) ................................................................24

Deutsche Bank Nat'l Trust Co. v. FDIC,
   No. 09-3852 (C.D. Cal. Jan. 7, 2011) ..............................................42, 43

DLJ Mortg. Capital, Inc. v. Fairmont Funding, Ltd.,
   No. 0600714/2007, 2008 WL 347767 (N.Y. Sup. Ct. Jan. 28, 2008) ........16

EMC Mortg. Corp. v. MortgageIT, Inc.,
   No. 3:06-CV-0440-N, 2006 WL 4286676 (N.D. Tex. Oct. 12, 2006) ........15

FDIC v. Marine Midland Realty Credit Corp.,
   17 F.3d 715 (4th Cir. 1994) ....................................................................38

*Fed. Home Loan Bank of Pittsburgh v. JPMorgan Secs., LLC,
   No. GD09-016892 (Pa. Ct. Com. Pl. Nov. 29, 2010) ............................17, 21

First Bank Richmond v. Credit Suisse First Boston Corp.,
   No. 1:07-cv-1262, 2008 WL 4410367 (S.D. Ind. Sept. 24, 2008)..............15

First Ind. Fed. Sav. Bank v. FDIC,
   964 F.2d 503 (5th Cir. 1992) ..................................................................35

Freeman v. FDIC,
   56 F.3d 1394 (D.C. 1995) ........................................................................41

Gryczman v. 4550 Pico Partners, Ltd.,
   131 Cal. Rptr. 2d 680 (2003) ..................................................................25

Hayes-Broman v. JPMorgan Chase Bank,
   724 F. Supp. 2d 1003, (D. Minn. 2010)....................................................30

In re Enron Corp. Sec., Derivative & "ERISA" Litig.,  2005 WL 3504860 (S.D.
   Tex. Dec. 22, 2005)................................................................................32

Johnson v. Long Beach Mortg. Loan Trust 2001-4,
   451 F. Supp. 2d 16 (D.D.C. 2006) ..........................................................24

Johnson v. Wash. Mut.,
   No. 1:09-CV-929, 2010 WL 682456 (E.D. Cal. Feb. 24, 2010)................30

Juran v. Bron,
   No. CIV. A. 16464, 2000 WL 1521478 (Del. Ch. Oct. 6, 2000)................24

Lanigan v. RTC,
 No. 91-7216, 1993 WL 189884 (N.D. Ill. June 2, 1993)............................................39

LaSalle Bank v. Lehman Bros. Holdings,
 237 F. Supp. 2d 618 (D. Md. 2002) ........................................................................21

*LaSalle Bank v. Nomura Asset Capital Corp.,
 No. 0603339/2003, 2004 WL 5542322 (N.Y. Sup. Ct. Mar. 23, 2004) ......................8

*LaSalle Bank v. Nomura Asset Capital Corp.,
 No. 0603339/2003, 2005 WL 6069492 (N.Y. Sup. Ct. Oct. 27, 2005) ......................18

*LaSalle Bank v. Nomura Asset Capital Corp.,
 No. 0603339/2003, 2007 WL 4289338 (N.Y. Sup. Ct. Sept. 6, 2007).......................12

LaSalle Bank v. Citicorp Real Estate, Inc.,
 No. 02-CIV-7868-HB, 2003 WL 21671812 (S.D.N.Y. July 16, 2003)......................18

LaSalle Bank v. Citicorp Real Estate, Inc.,
 No. 01-CIV-4389, 2002 WL 181703 (S.D.N.Y. Feb. 5, 2002) ..................................16

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,
 No. 602825/08 (N.Y. Sup. Ct. Dec. 22, 2010)......................................................15, 18

MBIA Ins. Corp. v. Countrywide Home Loans, Inc.,
 No. 602825/2008 (N.Y. Sup. Ct. Apr. 27, 2009)......................................................17

Madison Real Estate Immobilien-Anlagegesellschaft Beschrankt Haftende Kg v.
 Kanam USA XIX L.P.,
 Civ. Action No. 2863-VCP, 2008 WL 1913237 (Del. Ch. May 1, 2008) ..................29

Mastrobuono v. Shearson Lehman Hutton,
 514 U.S. 52 (1995)...................................................................................................30

McCarthy v. FDIC,
 348 F.3d 1075 (9th Cir. 2003) ..................................................................................41

Mullin v. Wash. Free Weekly,
 785 A.2d 296 (D.C. 2001) ........................................................................................24

Nat'l Trust for Historic Pres. v. FDIC,
 995 F.2d 238 (D.C. Cir. 1993) ..................................................................................40

In re New Century,
 588 F. Supp. 2d 1206 (C.D. Cal. 2008) ....................................................................32

In re New Century TRS Holdings, Inc.,
    390 B.R. 140 (Bankr. D. Del. 2008) ....................................................32

O'Melveny & Meyers v. FDIC,
    512 U.S. 79 (1994)..........................................................................41

Old Republic Ins. Co. v. Emp'rs Reinsurance Corp.,
    144 F.3d 1077 (7th Cir. 1998) .........................................................21

Orix Real Estate Capital Mkts., LLC v. Superior Bank,
    127 F. Supp. 2d 981 (N.D. Ill. 2000) ................................................21

Papasan v. Allain,
    478 U.S. 265, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)...............................32

Payne v. Sec. Sav. & Loan Ass'n.,
    924 F.2d 109 (7th Cir. 1991) .......................................................36, 37

*In Re Pena,
    409 B.R. 847 (Bankr. S.D. Tex. 2009) ..................................27, 30, 35, 38

Punzalan v. FDIC,
    633 F. Supp. 2d 406 (W.D. Tex. 2009).................................................30

*RTC v. Key Fin. Servs. Inc.,
    280 F.3d 12 (1st Cir. 2002)........................................................20, 21

Roehm v. Horst,
    178 U.S. 1, 20 S. Ct. 780, 44 L. Ed. 953 (1900)........................................13

Segar v. Mukasey,
    508 F.3d 16 (D.C. Cir. 2007) .....................................................30, 31

Sharpe v. FDIC, 21 F.3d 469 (D.C. Cir. 1994)................................................40

Sharpe v. FDIC, 126 F.3d 1147 (9th Cir. 1997) ..................................40, 41, 42

*Sterling Fed. Bank v. Credit Suisse First Boston Corp.,
    No. 1:07-CV-02922, 2008 WL 48924926 (N.D. Ill. Nov. 14, 2008) .............11, 15, 22

*Sun Am. Bank v. Fairfield Fin. Servs., Inc.,
    690 F. Supp. 2d 1342 (M.D. Ga. 2010) ..................................................22

Tanges v. Heidelberg N. Am.,
    93 N.Y.2d 48 (1999) ...................................................................24

Vernon v. RTC,
    907 F.2d 1101 (11th Cir.1990) .................................................................36

Viola v. Fleet Bank of Me.,
    No. 95-141, 1996 WL 498390 (D. Me. Feb. 27, 1996) ..............................37

Waterview Mgmt. Co. v. FDIC,
    105 F.3d 696 (D.C. Cir. 1997) .......................................................40, 41, 42

Wells Fargo Bank v. LaSalle Bank,
    No. 07-CV-449 (D. Ohio Oct. 21, 2009) ...................................................17

West Park Assocs. v. Butterfield Sav. & Loan Ass'n,
    60 F.3d 1452 (9th Cir. 1995) ....................................................................36

Wichita Falls Office Assocs. v. Banc One Corp.,
    No. 3:90-CV-1301 (N.D. Tex. Nov. 22, 1993)...........................................26

Williams v. FDIC,
    No. CIV 2:07-2418, 2009 WL 5199237 (E.D. Cal. Dec. 23, 2009) ...........31

## STATUTES AND RULES

12 U.S.C. § 1821(d)(5)(A)(i) ................................................................................1

12 U.S.C. § 1821(d)(9)(A)...................................................................................26

12 U.S.C. § 1821(d)(11) ......................................................................................42

12 U.S.C. § 1821(d)(20) .....................................................................................42

12 U.S.C. § 1821(e)(1).........................................................................................41

12 U.S.C. § 1821(e)(3).........................................................................................41

12 U.S.C. § 1821(e)(8)(D)(i) ...............................................................................41

12 U.S.C. § 1821(e)(9).........................................................................................41

Fed. R. Civ. P. 8 ..................................................................................................15

Fed. R. Civ. P. 9 ..................................................................................................16

Fed. R. Civ. P. 54(c) .....................................................................................21, 22

Financial Institutions Reform Recovery and Enforcement Act of 1989, Pub. L.
No. 101-73 (FIRREA) ...............................................................................................39, 42

## TREATISES

California Jurisprudence, 43 Cal. Jur. 3d Limitations of Actions § 45 ............................25

Restatement (Second) of Contracts § 203 CMT. C (1981).........................................28, 30

## OTHER SOURCES

Wall Street and the Financial Crisis, *Hearing before the Permanent Subcommittee
On Investigations of the Committee on Homeland Security and Governmental
Affairs United States Senate*, One Hundred Eleventh Congress, Second
Session, Volumes I and II, April 13, 2010 and April 16, 2010 (S. Hrg. 111-
673...................................................................................................................3, 6, 13

Plaintiff Deutsche Bank National Trust Company, as Trustee for the Trusts listed in Exhibits 1-A and 1-B of the Amended Complaint ("DBNTC" or the "Trustee") respectfully submits this memorandum of law in opposition to: (i) FDIC Receiver's Motion to Dismiss dated November 22, 2010; (ii) JPMorgan Chase Bank, National Association ("JPMC") and Washington Mutual Mortgage Securities Corporation's ("WMMSC") motion to dismiss dated November 22, 2010; and (iii) JPMC and WMMSC's motion for partial summary judgment dated November 22, 2010.

## PRELIMINARY STATEMENT[1]

A number of core facts are undisputed:

- The FDIC became receiver for Washington Mutual Bank on September 25, 2008.

- Pursuant to a Whole Bank Purchase and Assumption Agreement ("PAA" or "P&A") of that same date between JPMC and the FDIC, JPMC assumed all of Washington Mutual Bank's "mortgage servicing rights and obligations." PAA §§ 2.1, 3.1.

- The Trustee timely filed with the FDIC, as receiver for Washington Mutual Bank, a proof of claim, a copy of which is set forth as Exhibit 3 to the Amended Complaint, and the FDIC failed to make any determination to allow or disallow the claims asserted therein within the 180-day period mandated by 12 U.S.C. § 1821(d)(5)(A)(i).

- JPMC, as Servicer for the Trusts, is in sole possession of the over half million loan files owned by the Trusts.

---

[1] For ease of reference, all undefined terms follow the abbreviations in the Amended Complaint ("AC"). Citations to exhibits are to the Declaration of Jason S. Cohen dated November 22, 2010, submitted by the FDIC with its Motion ("Cohen Dec. Ex."), the Declaration of Brent J. McIntosh dated November 22, 2010, submitted by JPMC with its Motion ("McIntosh Dec. Ex.") or to the Declaration of Motty Shulman dated January 14, 2011, submitted by DBNTC with this Memorandum of Law ("Shulman Dec. Ex.").

- Pursuant to its contractual rights under the Governing Documents, the Trustee has made a written request to JPMC for access to, and review of, all the loan files and JPMC has to date refused that request.

- None of WaMu, JPMC, or the FDIC has provided DBNTC with contractually required notice of breaches of the Representations and Warranties set forth in the Governing Documents.

Against these facts, the present motions present three fundamental legal issues:  (i) do the breach of contract claims brought by the Trustee adequately state a claim on which relief could be granted; (ii) are the claims brought by the Trustee barred by the governing statute of limitations; and (iii) is it the FDIC or JPMC (or some combination of the two) that is responsible for any liability on the claims alleged?  JPMC alone raises the pleading and statute of limitations issues (the FDIC moved against the original complaint on pleading grounds, but has not renewed that motion against the Amended Complaint).  Each of the FDIC and JPMC contend that the PAA – which governs who is liable on the claims alleged – is unambiguous and directs that the other is liable.

As detailed below, JPMC's pleading and statute of limitations arguments are entirely baseless.  For the reasons set forth below, as well as in the Memorandum of Law accompanying the FDIC's motion to dismiss the claims against it, it is apparent that JPMC is the responsible party and that the litigation should proceed against it without delay.  In addition, until and unless this Court determines that JPMC has assumed *all* of the liabilities under the Governing Documents, the Trustee's claims against the FDIC, as receiver of Washington Mutual Bank, should not be dismissed because the proof of claim clearly asserts all claims set forth in the Amended Complaint and, to the extent any claims were not asserted, such claims would not be

subject to the administrative exhaustion requirement and would be entitled to priority because

they assert that the FDIC acted outside its statutory authority and continued and did not cure, or

cause JPMC as its successor to cure, WaMu's breaches.

**BACKGROUND**

A.      **The Trusts and the Governing Documents**

Washington Mutual Bank and its affiliates, including WMMSC, sponsored, originated,

sold and/or serviced 99 separate trusts (the "Primary Trusts") for which DBNTC serves as

Trustee and in various related capacities.[2]  AC ¶ 2.  Each Trust is governed by a set of

interrelated executory contracts and agreements memorializing the rights, interests, liabilities and

continuing obligations of the contracting parties (the "Governing Documents").  AC ¶¶ 29-30.

All of the Governing Documents were maintained in the books and records of WaMu, and were

transferred to JPMC in connection with its acquisition of WaMu.  AC ¶ 42.

The Governing Documents typically include a mortgage loan purchase agreement

("MLPA"), which effectuates and governs the conveyance of mortgage loans from the sponsor or

Seller to the Depositor, and/or a pooling and servicing agreement ("PSA"), which generally

governs the rights and obligations of, among others, the Trustee and Servicer of the Trusts.  AC ¶

29.  The MLPAs and/or PSAs for the Primary Trusts, and the relevant agreements for the

Secondary Trusts, contain representations, warranties and covenants made by WaMu, as Seller

and/or Depositor, regarding the nature, characteristics, history and quality of the mortgage loans

and the mortgage loan files sold to, and deposited in, the Trusts (the "Representations and

---

[2]  DBNTC also serves as indenture trustee or in other capacities for 28 secondary trusts or entities through which WMB issued mortgage-backed or derivative securities whose performance is dependent, in whole or in part, on the performance of the Primary Trusts or of other residential mortgage-backed securities issued by WMB (the "Secondary Trusts," and, collectively, with the Primary Trusts, the "Trusts").  AC ¶ 3.

Warranties"). AC ¶¶ 30, 45-48. A representative sample of the Representations and Warranties is set forth in Paragraph 46 and Exhibit 5 of the Amended Complaint. As detailed in Section C infra, the Governing Documents contain ongoing contractual obligations by WaMu to notify the Trustee upon discovery of loans that breach the Representations and Warranties and to repurchase any loans not in compliance with the Representations and Warranties. This case is about breaches of those ongoing notice and repurchase obligations, as well as the ongoing breach of the Trustee's contractual right to access the loan files.

**B.**     **The Senate Subcommittee Investigation and Findings**

Washington Mutual Bank was the largest bank failure in history. AC ¶ 10. In April, 2010, the U.S. Senate Subcommittee on Investigations initiated an investigation into "some of the causes and consequences of the financial crisis," focusing squarely on WaMu's origination and securitization of mortgage loans "as a case study in the role of high risk loans in the U.S. financial crisis." Shulman Dec. Ex. A (Wall Street and the Financial Crisis: Hearing before the Permanent Subcomm. On Investigations, April 13, 2010, Hearing Ex. 1a); AC ¶ 65.

The Senate Subcommittee found that "WaMu selected *and securitized* loans that it had identified as likely to go delinquent, *without disclosing its analysis to investors who bought the securities*," and that WaMu "*securitized* loans tainted by fraudulent information, *without notifying purchasers of the fraud that was discovered*." AC ¶ 69. The Senate Subcommittee report, associated hearings and related documents (collectively, the "Senate Record") reflect a pattern of non-compliance by WaMu with the Representations and Warranties. AC ¶¶ 70, 72, 75, 77.

The pervasiveness of WaMu's improper lending practices is encapsulated by the following excerpts from the Senate Subcommittee's report:

- "[B]oth Long Beach and Washington Mutual were the subject of repeated criticisms by the bank's internal auditors and reviewers, as well as its regulators, OTS and the FDIC, for deficient lending and securitization practices."  AC ¶ 75; Shulman Dec. Ex. A at 4.

- Washington Mutual received "repeated criticisms for unsatisfactory underwriting procedures, loans that did not meet credit requirements, and loans subject to fraud, appraisal problems, and errors.  For example, a 2005 internal investigation found that loans originated from two top loan producing offices in southern California contained an extensive level of fraud caused primarily by employees circumventing bank policies.  Despite fraud rates in excess of 58% and 83% at those two offices, no steps were taken to address the problems, *and no investors who purchased loans originated by those offices were notified in 2005 of the fraud problem*."  Id.  (emphasis added).

- In September 2008, an internal review found that "loans marked as containing fraudulent information had nevertheless been securitized and sold to investors, identifying ineffective controls that had existed for some time."  Id.

According to the Senate Subcommittee, between 2000 and 2007, Specialty Lending, WaMu's subprime lending unit, sponsored 46 securitizations with a total original collateral balance of approximately $77 billion.  AC ¶ 67.  The Primary Trusts at issue in this litigation are the securitizations investigated by the Senate Subcommittee and its findings are thus directly applicable here.[3]

Importantly, the Senate Subcommittee reviewed numerous internal documents, memoranda, emails and other forms of data relating to *specific* mortgage loans and mortgage loan files.  For example, according to one report upon which the Senate Subcommittee relied:

> A review of loans in the mortgage pipeline and warehouse commenced under the direction of EVP and Senior Legal Counsel Fay Chapman to determine the extent of the problems.  Approximately 4,000 of the 13,000 loans in the warehouse had been reviewed by the end of November 2003; of these, approximately 950 were

---

[3]  This conclusion is driven by the numbers:  the Primary Trusts include the vast majority – 43 out of 46, with an original collateral balance of approximately $73 billion – of the very subprime securitizations examined by the Senate Subcommittee.  See AC ¶ 67.  The remaining Primary Trusts, with a total original collateral balance of approximately $92 billion, account for nearly half of the securitizations of WaMu's Mutual Mortgage division between 2000 and 2007, analyzed by the Senate Subcommittee.  AC ¶ 68.  It is thus almost definitional that the Senate Subcommittee's findings apply to the Primary Trusts at issue in this litigation.

deemed saleable, 800 were deemed unsaleable, and the remainder contained deficiencies requiring remediation prior to sale.

It was reported separately that of 4,500 securitized loans eligible for foreclosure, 10% could not be foreclosed due to documentation issues.

Shulman Dec. Ex. B (April 13 Subcommittee Hearing, Hearing Ex. 8b).

That same report references another internal Long Beach residential quality assurance report for the first quarter of 2003, which "concluded that 40% (109 of 271) of loans reviewed were considered unacceptable due to one or more critical errors.  This raised concerns over LBMC's ability to meet the representations and warranty's [sic] made to facilitate sales of loan securitizations . . . ." Id.

### C. The Continuous Breaches of the Ongoing Repurchase and Notice Obligations and the Obligation to Provide the Trustee Access Rights

The Governing Documents generally impose upon the Depositor or Seller[4] the obligation to cure a defect in the mortgage loan file or a breach of the Representations and Warranties in all material respects, repurchase the mortgage loan at a specified repurchase price, or substitute the affected mortgage loan, upon discovery or receipt of notice of any breach of the Representations and Warranties that has a material and adverse effect on the value of the mortgage loans in the Trusts or the interests of the Trusts therein (the "Repurchase Obligation").  AC ¶¶ 43, 53-57.  Prior to the required discovery or notice, the Repurchase Obligation – which is ongoing for the life of the loan – does not accrue.

Importantly, the loan files – which contain the documents that would reflect any individual loan's compliance with the Representations and Warranties and enable the giving of notice on a loan-specific basis – have been and are in WaMu's (and since September 25, 2008,

---

[4] For many Trusts, generally those with a LB prefix, WaMu, as *Servicer*, is further obligated to "enforce the obligations of the Seller under the Mortgage Loan Purchase Agreement to repurchase such Mortgage Loan."  See, e.g., AC ¶ 55.

JPMC's) sole possession, custody and control since the date the Trusts were formed.  See AC ¶ 44.  Without access to those documents, no other party to the PSA can evaluate or provide notice of a breach on any particular loan.  The Governing Documents thus establish a contractual scheme that imposes upon WaMu, as Seller and Servicer, the duty to give prompt written notice to the Trustee and other parties upon discovery of any material breach of the Representations and Warranties (the "Notice Obligations").[5]  AC ¶¶ 43, 49-52.

The Governing Documents also impose upon WaMu, as Servicer, the duty to provide the Trustee, upon request, with access to "all records maintained by WaMu in respect of WaMu's rights and obligations under the Governing Documents, including information about the mortgage loans and the mortgage loan files" (the "Access Rights").  AC ¶ 59.  These Access Rights are unqualified and have been unequivocally breached by JPMC.  The Trustee has made written requests to JPMC for all the loan files precisely so that it could independently evaluate compliance with the Representations and Warranties and thus the existence of particular loan-level Repurchase Obligations.  AC ¶ 82; Shulman Dec. Ex. C (Letter from Robin A. Henry to WaMu, August 16, 2010 (the "August 16 Letter")).  JPMC refused the Trustee's request and continues to breach its ongoing contractual obligations.[6]  Shulman Dec. Ex. D (Letter from Stacey R. Friedman to Robin A. Henry, Aug. 25, 2010 (the "August 25 Letter")).

---

[5]  JPMC contends that the Trustee misidentified the Notice Obligation at issue with respect to the LB0602 Trust.  JPMC is wrong.  The Amended Complaint quotes in full the correct Notice Obligation at issue from Section 7(a) of the MLPA for the LB0602 Trust.  AC ¶ 51.  The MLPAs for the other Long Beach Trusts contain identical or substantially similar Notice Obligations, and the Trustee has provided all MLPAs as an electronic exhibit to the Amended Complaint.  The Trustee is further prepared to provide a corrected Exhibit 7 citing to the Notice Obligations contained in the MLPAs for each and every Trust.

[6]  JPMC evidently takes the position that it need not provide the Trustee with Access Rights absent an allegation that a specific loan is in breach of a specific Representation and Warranty.  This, of course, is circular in that the Trustee has no ability to reach any such conclusion without access to the loan files that JPMC is withholding.  Not surprisingly, the law

# ARGUMENT

JPMC's arguments in support of its motion to dismiss the Trustee's breach of contract claim can be summarized as follows:

1. The Amended Complaint fails because it does not identify specific loans that breach specific Representations and Warranties that materially and adversely affect the value of such loans.  JPMC Br. at 9-10, 13-21.

2. The Amended Complaint fails because it improperly seeks money damages for WaMu's breach of the Representations and Warranties.  JPMC Br. at 10, 22-23.

3. The Amended Complaint fails because the Trustee has sought access to only 61 of "more than a half a million loans owned by the underlying trusts."  JPMC Br. at 23-25.

4. The Amended Complaint is time barred because most of the Representations and Warranties were made more than six years ago.  JPMC Br. at 10-11, 25-26.

JPMC's arguments are premised on both factual misstatements and mischaracterizations of the Amended Complaint.

First, as discussed infra at pp. 10-11, it is simply untrue that the Trustee has only requested access to 61 loans.  On August 16, 2010, the Trustee requested that JPMC provide it with access to all the loans in the Trusts – a fact that JPMC simply omits from its papers.

Second, as discussed infra at pp. 11-12, JPMC appears to argue that – despite its failure to provide the Trustee access to all the loan files – the Amended Complaint nonetheless fails because of the Trustee's consequent inability to identify particular loan-level breaches for specific loans.  JPMC's position is entirely baseless.  Among other things, the law unsurprisingly

---

recognizes the illogic of JPMC's position.  See LaSalle Bank v. Nomura Asset Capital Corp., No. 603339/2003, 2004 WL 5542322, *8 (N.Y. Sup. Ct. Mar. 23, 2004) ("MLPSA § 1 does not include any obligation to specifically identify the breach of representation or warranty prompting a document demand.").

recognizes that JPMC cannot rely on the consequences of its own contractual breach to argue for dismissal of the Trustee's claims.

Third, as discussed infra at 13-14, JPMC simply ignores the Senate Subcommittee's 2010 factual findings of specific breaches with respect to specific loans in the Trusts. The allegations of the Amended Complaint are based on these findings and – contrary to JPMC's assertion – are in no way based on "guess[es]," "bald speculation" or "generalized misconduct." JPMC Br. at 9-10, 15, 19.

Finally, as discussed infra at 19-25, JPMC's statute of limitations and "sole remedy" arguments flow from a mischaracterization of the Trustee's claims. Contrary to the premise of JPMC's arguments, the Trustee is not suing for WaMu's breach of the Representations and Warranties, but rather for WaMu's ongoing breaches of its independent and continuing Repurchase Obligation, Notice Obligation and obligation to provide Access Rights.

The FDIC does not assert any of JPMC's arguments. Rather, the FDIC contradicts JPMC, grounding its motion to dismiss on the assertion that JPMC assumed all of the contractual liabilities under the Governing Documents and that any such claims against the FDIC were thus extinguished. While the Trustee agrees that JPMC assumed such liabilities from the FDIC, if and to the extent that the Court determines that the PAA did not transfer *all* such liabilities – without *any* limitation on amount – to JPMC, the FDIC retained the remaining liabilities as it never repudiated any of the Governing Documents.

The FDIC secondarily asserts that the Amended Complaint should be dismissed against it because: (a) the Trustee failed to exhaust the administrative claims process with respect to its claims of post-receivership breach, and (b) the Amended Complaint fails to state a claim of post-

receivership breach against the FDIC.  For reasons set forth in Section V below, both of these assertions are incorrect.

## I.    JPMC IS IN CONTINUING BREACH OF ITS CONTRACTUAL OBLIGATION TO PROVIDE THE TRUSTEE ACCESS TO THE LOAN FILES

### A.    JPMC – the Only Party With Possession of the Loan Files – Has Refused to Provide the Trustee With Access to the Loan Files

JPMC does not – and cannot – deny that since September 25, 2008, it has had sole possession of the loan-specific records and data necessary to make loan-specific repurchase demands.[7]  It is also undeniable that the Governing Documents provide for unconditional Access Rights.  AC ¶¶ 43, 58-59, 62.  Indeed, the only limitation on a request for access is that the Trustee provide "reasonable notice" of its request, which is to be carried out during "normal business hours."  AC ¶¶ 59, 62.  The Trustee made precisely such a request, which to this point JPMC has denied.  AC ¶ 82; Shulman Dec. Ex. C (August 16 Letter); Shulman Dec. Ex. D (August 25 Letter).

JPMC mischaracterizes the Trustee's access request, stating that it has not "sought access to more than a tiny group of loans" – specifically, "just 61 loans in only three trusts."  JPMC Br. at 23-24.  In support of this inaccurate position, JPMC selectively attached *only* the requests relating to those 61 loans, omitting the Trustee's subsequent and most recent request in which the Trustee wrote that "JPMC has failed to comply with its contractual obligation to provide loan files and data" relating to all 159 trusts referenced in the original Complaint, and "demand[ing] that [JPMC] provide immediate access to these files."  Shulman Dec. Ex. C.  On the eve of this

---

[7]  While the Trustee generally takes possession of the mortgage and note, the documents and information necessary to determine whether a particular mortgage loan breaches the Representations and Warranties remain with the Servicer.  These documents include origination and underwriting files, servicing records, borrower statements made during the origination of the loan, payment histories, and borrower correspondence.  See AC ¶ 44.

filing, JPMC for the first time made available the 61 loan files requested by the Trustee.

Shulman Dec. Ex. K.  JPMC's letter does not purport to justify – because no justification exists –

its wholesale refusal to honor the Trustee's Access Rights to this point.  Nor does JPMC offer

any explanation – again because none exists – for its failure to produce loan files in response to

the August 16 Letter.  Indeed, JPMC's tactical production on the eve of the Trustee's filing with

this court is an implicit admission that its failure to honor the Trustee's Access Rights has been

improper.

> B.  JPMC Cannot Demand the Trustee Plead Loan-Level Breaches When JPMC Refuses
>     to Honor the Trustee's Access Rights or Provide the Trustee with Contractually
>     Required Notice

JPMC cannot, as a matter of law, claim the benefit of any purported lack of loan-level

detail in the Amended Complaint because JPMC's failure to give the Trustee Access Rights or

comply with its Notice Obligation prevents the Trustee from identifying individual mortgage

loans subject to repurchase.  See Sterling Fed. Bank v. Credit Suisse First Boston Corp., No. 07-

C-2922, 2008 WL 4924926, at *11 (N.D. Ill. Nov. 14, 2008) (rejecting a similar argument for

dismissal on the grounds that plaintiff "allege[d] no facts regarding the underlying mortgage

loans or even the identity of those loans" because "that is the very information that Plaintiff

contends has not been provided to it, in breach of Defendants' obligations to do so").

Indeed, it is axiomatic that JPMC cannot deny the Trustee access to the loan files and

refuse to provide the Trustee with contractually required notice of breaches of the

Representations and Warranties, and at the same time contend that the Trustee's failure to

provide JPMC such loan-specific information – which can be gleaned only from those loan files

– is somehow fatal to the Amended Complaint.  See Bank of N.Y. v. Tyco Int'l Grp., 545 F.

Supp. 2d 312, 324 n.81 (S.D.N.Y. 2008) (noting that "it has been established for over a century

that a party may not insist upon performance of a condition precedent when its non-performance has been caused by the party [it]self") (internal quotations omitted).  This is particularly true here where allowing JPMC to defeat a repurchase claim in this manner would frustrate the entire contractual scheme established by the Governing Documents.  As explained above, the Trustee relies on the Notice Obligation and its Access Rights to gather information necessary to provide notice of repurchase claims.  If JPMC could simply defeat such requests by requiring loan-level detail while simultaneously denying access to the loan files containing such detail and refusing to provide contractually required notice, it would be impossible for the Trustee to ever enforce the Repurchase Obligations.

> C. JPMC's Refusal to Give the Trustee Access to the Loan Files Constitutes a Separate Breach of the Governing Documents

JPMC argues that its failure to provide the Trustee with Access Rights should be ignored and cannot form the basis of a separate breach of contract claim because – it argues – breach of the Trustee's Access Rights does not result in harm independent of the underlying breaches of the Representations and Warranties.  JPMC Br. at 23.  JPMC is wrong as a matter of law.  Whether the delay in remedying the breaches and the costs associated with JPMC's refusal to honor the Trustee's Access Rights resulted in independent injury to the Trusts, at the very least, presents a question of fact for trial.  See, e.g., LaSalle Bank v. Nomura Asset Capital Corp., No. 603339/2003, 2007 WL 4289338, slip op. at 74-77 (N.Y. Sup. Ct. Sept. 6, 2007).  In addition, if the Trustee could not enforce the Repurchase Obligations because of JPMC's failure to comply with its contractual obligations, the Trustee would, in fact, have an independent breach of contract claim for damages caused by the Trustee's inability to enforce the Repurchase Obligations.  Combs v. Int'l Ins. Co., 354 F.3d 568, 599 (6th Cir. 2004) (As the Supreme Court explained, "[i]t has always been the law that where a party deliberately incapacitates himself or

renders performance of his contract impossible, his act amounts to an injury to the other party, which gives the other party a cause of action for breach of contract." (quoting Roehm v. Horst, 178 U.S. 1, 18, 20 S.Ct. 780, 44 L.Ed. 953 (1900))); Aetna Cas. & Sur. Co. v. Namrod Dev. Corp., 140 B.R. 56, 62 (S.D.N.Y. 1992) ("Under New York law, a contract can be breached if one party intentionally makes performance by the other party impossible.").

## II.   THE AMENDED COMPLAINT MORE THAN ADEQUATELY PLEADS A BREACH OF CONTRACT CLAIM

Wholly apart from the fact that the Trustee cannot provide loan-level detail because of JPMC's breach of its Notice Obligation and its refusal to comply with its contractual obligation to provide the Trustee with Access Rights, the factual findings of the Senate Subcommittee (summarized above) support even the incorrect standard advanced by JPMC.

### A.   The Amended Complaint Alleges Breaches of the Representations and Warranties

The Senate Subcommittee's investigation included a substantial percentage of the mortgage loans at issue in the Amended Complaint, and its findings thus necessarily apply to most, if not all, of the mortgage loans in the Trusts. See supra, at 5.   Moreover, the documentary evidence relied on by the Senate Subcommittee – namely, the internal WaMu documents enumerating the practices that breached the Representations and Warranties – is based on WaMu's own internal reviews, as well as external audits, of its loan files on a loan-specific basis.[8]   The Senate Record contains findings that the mortgage loan files in the Trusts were rife

---

[8]   JPMC argues that the Senate Subcommittee could not have relied on loan-specific data because the "Subcommittee did not subpoena loan files or documents concerning specific loans." JPMC Br. at 20 & n.13.   What JPMC evidently fails to appreciate is that the Senate Subcommittee did not need to subpoena loan-specific files to find loan-specific breaches of Representations and Warranties because it had access to the internal reviews and external audits of those loan-specific files, as well as the internal reports produced in connection with those reviews.   Moreover, JPMC's argument effectively concedes that the Trustee cannot be expected

with cases of "confirmed fraud," including – in 31 percent of one random sampling of such

Loans – "appraisal discrepancies or issues that raised concerns."  Shulman Dec. Ex. E (April 13

Subcommittee Hearing, Hearing Ex. 21).

The Senate Subcommittee findings, and the reviews and reports on which they are based,

focus in large part on the Long Beach subprime mortgage loans, the overwhelming majority of

which are contained in the Trusts.  In other words, virtually all the evidence referring to Long

Beach subprime lending practices specifically – indeed, almost *exclusivel*y – applies to the

mortgage loans in the Trusts.  Thus, the only question of fact remaining after the Senate

Subcommittee's uncontroverted findings is not *whether* WaMu's breaches of the Representations

and Warranties triggered its Notice and Repurchase Obligations, but rather *to what extent*, or

with respect to what specific mortgage loans, they were triggered.[9]

JPMC's assertion that "the Amended Complaint is dedicated to allegations of generalized

misconduct at Washington Mutual in 2007 and 2008," JPMC Br. at 15, is simply incorrect.  To

the contrary, the Trustee's allegations – and the Senate Record on which those allegations are

based – are factually detailed and very specific.  See AC ¶¶ 67-79.

---

to allege loan-specific breaches of Representations and Warranties because the Trustee, like the
Senate Subcommittee, does not have access to loan-specific data.

[9]  Despite, or perhaps because of, the insurmountable weight of the evidence in the
Senate Record, JPMC tries to hide behind WaMu's blanket disclaimer that "[i]t is expected that a
substantial number of the Mortgage Loans to be included in the Mortgage Pool will represent
exceptions to the underwriting guidelines."  JPMC Br. at 16 (quoting LB05W02, Prospectus
Supplement, attached as Exhibit A to JPMC Br.).  This argument is similarly unavailing.  The
Trustee does not dispute that WaMu disclosed to potential purchasers that it might, in
appropriate circumstances and on appropriate documentation, grant exceptions to its
underwriting guidelines.  But such a disclosure does not somehow excuse or inoculate the
conduct exposed by the findings of the Senate Subcommittee, i.e. wholesale improper breaches
of the Representations and Warranties.

B.  <u>The Trustee Has No Obligation to Provide Proof of Loan-Level Breaches</u>[10]

Federal Rule of Civil Procedure 8(a) requires no more than a "short and plain statement of the claim."  The Amended Complaint thus need only "'give a defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  <u>Badibanga v. Howard Univ. Hosp.</u>, 679 F. Supp. 2d 99, 101 (D.D.C. 2010) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)).  Federal courts have uniformly held, as a matter of law, that Rule 8 does not require the level of specificity and detail that JPMC demands.  For example, in <u>Sterling Federal Bank</u>, the court rejected the same argument advanced by JPMC holding that "under Rule 8, Plaintiff need only provide a short and plain statement of the claim showing that the pleader is entitled to relief, sufficient to provide the defendant with fair notice of the claim and its basis."  <u>Sterling Fed. Bank</u>, 2008 WL 4924926, at *11 (internal quotations omitted).  The court concluded that setting forth the contractual provision that the defendant breached and facts to demonstrate how the defendant breached its duties "is sufficient under the notice pleading standard of Rule 8(a)(2)." <u>Id.</u>; <u>see also</u> <u>Bankers Life Ins. Co. v. Credit Suisse First Boston Corp.</u>, No. 8:07-CV-00690-EAK-MSS, 2008 WL 1817294, at *7 (M.D. Fla. Apr. 22, 2008) (rejecting similar argument for dismissal because it "essentially graft[s] an improper heightened pleading requirement"); <u>First Bank Richmond v. Credit Suisse First Boston Corp.</u>, No. 1:07-cv-1262-LJM-TAB, 2008 WL 4410367, at *12 (S.D. Ind. Sept. 24, 2008) (same); <u>EMC Mortg. Corp. v. MortgageIT, Inc.</u>, No. 3:06-CV-0440-N, 2006 WL 4286676, at *1 (N.D. Tex. Oct. 12, 2006) ("[T]he pleading standard

---

[10]  Though not properly subject to adjudication on a motion to dismiss, not only is JPMC wrong regarding its assertion that the Trustee is required to plead loan-level breaches and damages at *this* stage, but the Trustee may, as a matter of law, use sampling evidence and extrapolation to prove every element of its prima facie case *at trial*, and need not conduct over 500,000 mini-trials on breach, causation and damages.  <u>See</u> <u>MBIA Ins. Corp. v. Countrywide Home Loans, Inc.</u>, No. 602825/2008, slip op. at 15 (N.Y. Sup. Ct. Dec. 22, 2010) (granting plaintiff's motion in a mortgage-backed securities case "to use statistical sampling to present evidence to prove its causes of action for fraud and breach of contract and to prove damages").

of Rule 8(a) is a starting point for litigation designed merely to provide the defendant with adequate notice of the basis for the complaint.").

    C.   The Trustee Has Sufficiently Pled That WaMu's Breaches of its Representations and Warranties Had a Material and Adverse Effect on the Value of the Mortgage Loans in the Trusts

JPMC argues that – because the Trustee is not able to identify specific breaches tied to specific loans – it cannot establish whether any such breaches had the required "material and adverse effect." JPMC Br. at 18. Once again, JPMC's argument fails.

The standard advocated by JPMC improperly imposes a Rule 9-style heightened pleading requirement on a breach of contract claim. See supra, Section II.B. LaSalle Bank v. Citicorp Real Estate, Inc., No. 01-CIV- 4389 (AGS), 2002 WL 181703 (S.D.N.Y. Feb. 5, 2002) – a decision in the very case on which JPMC relies (JPMC Br. at 18-19) – rejected a similar argument. The defendant in LaSalle Bank, much like JPMC, argued that because breaches of the PSA's representations and warranties must "materially and adversely affect[] the value" of the mortgage loans to be actionable, the plaintiff, to state a repurchase claim, must allege with particularity the material and adverse effect of the breaches on the loans. 2002 WL 181703, at *3. The court rejected that argument holding that a material and adverse effect need not be pled at all, but "may be inferred" from the pleadings. Id. at *4; see DLJ Mortg. Capital, Inc. v. Fairmont Funding, Ltd., No. 0600714/2007, 2008 WL 347767, slip op. at 4 (N.Y. Sup. Ct. Jan. 28, 2008) ("[To] alleg[e] adverse effect, it is sufficient if the complaint contains allegations from which injury attributable to breach may be inferred." (internal citations omitted)); Aurora Loan Servs., LLC v. Cambridge Home Capital, LLC, No. 10591/05, 819 N.Y.S.2d 208 (table) 2006 WL 1320741 *2 (N.Y. Sup. Ct. Jan. 31, 2006) (rejecting defendant's argument "that the pleading is inadequate because it fails to allege that the defendant's breach 'materially and adversely

affected the value of the mortgage loans' as set forth in the agreements" because "the complaint

allege[d] that plaintiffs have incurred 'substantial losses and damages as a result of Cambridge's

above referenced breaches, omissions, and other improper actions'"). Cf. Fed. Home Loan Bank

of Pittsburgh v. JPMorgan Secs., LLC, No. GD09-016892 at 28 (Pa. Ct. Com. Pl. Nov. 29, 2010)

("[I]t becomes a matter of evidence – and not pleading – as to whether the number of

noncomplying loans has reached material levels relative to the entire number of loans in the

pools.").

Moreover, contrary to JPMC's assertion, the Trustee has in fact alleged and demonstrated

that the breaches had a material and adverse effect on the value of the mortgage loans. See, e.g.,

AC ¶¶ 65, 66, 74, 81, 84, 93. The breaches of the Representations and Warranties are neither

isolated nor "technical," but rather are pervasive, extensive, and systemic. Indeed, many of the

Representations and Warranties are expressly deemed under the Governing Documents to

materially and adversely affect the value of the mortgage loans. By way of example, of the 14

Representations and Warranties for the LB0602 Trust quoted in the Amended Complaint, five

Representations and Warranties are contractually "deemed to materially and adversely affect the

interest of the Certificateholders in the related Mortgage Loan."[11] AC ¶ 55.

_____

[11] JPMC asserts that the Trustee must "plead that its losses were caused by breaches of representations and warranties as opposed to other factors, such as the nationwide mortgage crisis" and "prove causation on a loan-by-loan basis." JPMC Br. at 20, 21. Apart from raising fact issues that may not be resolved on a motion to dismiss, JPMC's arguments are wrong as both a matter of pleading and proof. Neither the Governing Documents nor common law requires the Trustee to plead or prove the "cause" of any repurchase losses resulting from the application of the Purchase Price formula. See Wells Fargo Bank v. LaSalle Bank, No. 07-CV-449 (D. Ohio Nov. 21, 2009) (Decision and Order re: "Mention of Economic Downturn" at 2 (Docket #287)) (Shulman Dec. Ex. H); Fed. Home Loan Bank of Pittsburgh v. JPMorgan Secs., LLC et al., No. GD09-016892, at 28 (Pa. Ct. Com. Pl. Nov. 29, 2010) ("recovery is not dependent upon whether factors other than the declining housing market contributed to the decline in the value of the certificates"); MBIA Ins. Corp. v. Countrywide Home Loans, Inc., No. 602825/2008, at 16 (N.Y. Sup. Ct. Apr. 27, 2009) ("On a motion addressed to the pleadings in

    D.  WaMu's Repurchase Obligations Are Not Excused By the Trustee's Inability to
        Provide WaMu with Notice of Loan Level Breaches

Finally, JPMC argues that because "the Seller's repurchase obligation only arises 90 days after the *Trustee's* delivery of notice of breaches," it cannot be held accountable for breaching the Repurchase Obligation.  JPMC Br. at 16-17.  JPMC is simply wrong.  The Repurchase Obligation requires the Seller, i.e., WaMu, to repurchase mortgage loans within 90 days of discovering or receiving notice that the mortgage loans breach the Representations and Warranties.

Section 7(a) of the MLPA states in relevant part as follows:

> *Within ninety (90) days of the earlier of the discovery or* the Seller's receipt of notice of any such missing documentation . . . or materially defective documentation or any such breach of a representation and warranty, the Seller promptly shall deliver such missing document or cure such defect or breach in all material respects, or in the event the Seller cannot deliver such missing document or such defect or breach cannot be cured the Seller shall, *within 90 days of its discovery or* the receipt of notice, either (i) repurchase the affected Mortgage Loan [or (ii) substitute the loans]."  AC, Ex. 5; (emphasis added).[12]

---

this highly complex action, it would be premature to make a determination as to whether the economic downturn constituted an intervening cause in the link between Countrywide's alleged conduct and MBIA's alleged injury.").  Additionally, JPMC is incorrect in its suggestion that – as a matter of proof – the Trustee is required to establish the Trust's Repurchase Rights for each loan individually.  It is within this Court's discretion to determine an appropriate approach to trial at the proper time.  See MBIA Ins. Corp. v. Countrywide Home Loans, Inc., No. 602825/08, slip op. at 15 (N.Y. Sup. Ct. Dec. 22, 2010) (Shulman Dec Ex J) (granting plaintiff's motion in a mortgage-backed securities case "to use statistical sampling to present evidence to prove its causes of action for fraud and breach of contract and to prove damages").

[12]  As noted in Note 5, supra, the Amended Complaint quotes in full Section 7(a) of the MLPA for the LB0602 Trust.  The MLPAs for the other Long Beach Trusts contain identical or substantially similar provisions, and the Trustee has provided all MLPAs as an electronic exhibit to the Amended Complaint.  The Trustee is further prepared to provide an amended Exhibit 7 citing additional relevant repurchase provisions for each Trust.  Moreover, any alleged obligation on the part of the Trustee to provide notice to JPMC also has no bearing on WaMu's independent Notice and Repurchase Obligations.  LaSalle Bank v. Citicorp Real Estate, Inc., No. 02-CIV-7868-HB, 2003 WL 21671812, at *3 (S.D.N.Y. July 16, 2003) (holding that, under New York law, the requirement that the plaintiff give notice is not a condition precedent to the defendant's repurchase obligation); LaSalle Bank v. Nomura Asset Capital Corp., No. 603339/2003, 2005

Similarly, Section 2.08 of the PSA for the WMMSC trusts provides that "*[w]ithin 90 days of its discovery or its receipt of notice of breach*, the Company [WaMu] shall repurchase, subject to the limitations set forth in the definition of "Purchase Price" or substitute for the affected Mortgage Loan or Mortgage Loans."  AC ¶ 54 (emphasis added).  Thus, it is WaMu's discovery of breaches of the Representations and Warranties – not "the *Trustee's* delivery of notice of breaches" – that triggers the Repurchase Obligation.

## III.   THE TRUSTEE'S CLAIMS ARE NOT BARRED BY THE SOLE REMEDY PROVISION OR BY THE STATUTE OF LIMITATIONS

JPMC argues that the Trustee's claims for breach of the Representations and Warranties are barred by the Governing Document's sole remedy provision and the relevant statutes of limitation.  This is a classic straw man argument.  The Amended Complaint does not allege a claim of breach of the Representations and Warranties, but rather of the independent and continuing Repurchase and Notice Obligations and obligation to provide Access Rights, none of which are precluded by the arguments that JPMC advances.

### A.   The Trustee's Claim is for WaMu's Independent Breaches of the Ongoing Repurchase and Notice Obligations

The Amended Complaint alleges that WaMu's Repurchase and Notice Obligations were triggered by its knowledge and discovery of breaches of the Representations and Warranties, AC ¶¶ 65-80, and that WaMu breached these obligations as well as its obligation to provide Access Rights.  AC ¶ 93.  The Amended Complaint also alleges that as a result of these breaches the Trusts have been injured in an amount estimated at approximately 6 to 10 billion dollars.  AC ¶ 85.  These allegations more than adequately allege a claim for breach of contract.

---

WL 6069492, slip op. at 10 (N.Y. Sup. Ct. Oct. 27, 2005) (rejecting defendant's argument that the prompt notice required in PSA § 2.03(e) was "an express condition precedent").

B.  <u>The Sole Remedy Provision Does Not Bar The Trustee's Claim</u>

The sole remedy provision relied upon by JPMC applies only to claims for breach of the Representations and Warranties, not to claims for breach of the ongoing Repurchase Obligations, Notice Obligations and obligation to provide Access Rights.

<u>First</u>, a plain reading of the sole remedy provision makes clear that it applies only to claims for breach of the Representations and Warranties.  <u>See</u> LB0602 MLPA § 7(b) ("It is understood and agreed that the obligations of the Seller set forth in this Section 7 to cure, repurchase or substitute for a defective Mortgage Loan constitute the sole remedies of the Purchaser against the Seller *respecting a missing or defective document or a breach of the representations and warranties contained in Section 5 or Section 6*.") (emphasis added); LB0602 PSA §2.03(a) ("It is understood and agreed that the obligation of the Seller to cure or to repurchase (or to substitute for) any Mortgage Loan as to which a document is missing, a material defect in a constituent documents exists or as to which such a breach has occurred and is continuing shall constitute the *sole remedy respecting such omission, defect or breach* available to the Certificateholders, the Trustee on behalf of the Certificateholders and the NIMS Insurer.") (emphasis added).

<u>Second</u>, as a matter of law, the sole remedy provision does not limit the Trustee's claims. <u>RTC v. Key Fin. Servs., Inc.</u>, 280 F.3d 12 (1st Cir. 2002).  In <u>Key Financial</u>, the defendants, like JPMC, argued that the sole remedy provision precluded the court from awarding the plaintiffs compensatory damages in lieu of the defendants' repurchase obligation.  The defendants argued that allowing compensatory damages would grant the plaintiffs an uncontracted-for "windfall." <u>Id</u>. at 18.  The court noted in response that "Key appears to be the party that is trying to take advantage of whatever 'windfall' will result."  <u>Id</u>.  Furthermore, the "sole remedy" provision

does not, as a matter of law, preclude the court from awarding damages to the Trustee, either for

JPMC's independent breach of the Repurchase Obligations, or "in light of the fact that the pre-

negotiated remedy provision had failed in its purpose."  Id. at 18 n.16; see LaSalle Bank v.

Lehman Bros. Holdings, 237 F. Supp. 2d 618, 638 (D. Md. 2002) ("Under New York law, a loan

seller's failure to repurchase non-conforming loans upon demand as required by a contract is an

independent breach of the contract entitling the plaintiff to pursue general contract remedies for

breach of contract." (citing Key Fin. Servs., supra)); see also Fed. Home Loan Bank of

Pittsburgh v. JPMorgan Secs., LLC, No. GD09-016892, slip op. at 29 (Pa. Ct. Com. Pl. Nov. 29,

2010) (rejecting JPMorgan's argument that the sole remedy provision precluded the plaintiff

from bringing a misrepresentation claim because the plaintiff had "no ability to trigger a

repurchase" and "courts will not enforce contractual remedies where the remedy fails to provide

any meaningful relief.").

     Third, courts are instructed under Federal Rule of Civil Procedure 54(c) to "'grant

whatever relief is appropriate . . ., even if the parties have not specifically requested it.'"  Orix

Real Estate Capital Mkts., LLC v. Superior Bank, 127 F. Supp. 2d 981, 983 (N.D. Ill. 2000)

(quoting Old Republic Ins. Co. v. Emp'rs Reinsurance Corp., 144 F.3d 1077, 1081 (7th Cir.

1998)).  In Orix, the defendant argued that the breach of warranty claim should be dismissed

because of a "sole remedy" provision, which provided only for repurchase of the loans and

barred compensatory damages.  In addition to citing Rule 54(c), the court explained that "[t]he

payment of the liquidation price of a loan is a payment of an amount of money, which is

completely fungible:  it does not matter whether the money comes from the sale of a mortgage

on a particular property or from another source."  Id. at 983.  The court concluded, therefore, that

"[t]here is no practical difference between this 'repurchase' remedy and compensatory

damages." Id.; see also Sun Am. Bank v. Fairfield Fin. Servs., Inc., 690 F. Supp. 2d 1342, 1368

(M.D. Ga. 2010) (finding the sole remedy of repurchase "is enforceable either as specific

performance or as liquidated damages," because "the end result is essentially the same").

Similarly, in this case, the Trustee's structuring of the claim as one for breach of contract and

declaratory judgment rather than one for specific performance is of no moment.[13]

Finally, the Trustee is attempting to do nothing more than enforce the sole remedy – i.e.,

repurchase – contained in the Governing Documents.

C.   The Trustee's Claims Are Not Barred by the Statute of Limitations

JPMC's statute of limitations argument is also based on a straw man claim for which the

Trustee does not seek relief.  Specifically, JPMC argues that the claims are barred because the

representations and warranties were breached at the time of securitization.  See JPMC Br. at 25-

26.  Again, JPMC misstates the nature of the Amended Complaint.

First, the Trustee's claims are based on WaMu's ongoing Repurchase and Notice

Obligations[14] and obligation to provide Access Rights, not on a breach of the initial

---

[13]   Sterling Fed. Bank v. Credit Suisse First Boston Corp., (No. 1:07-CV-2922), 2008 WL 4924926 (N.D. Ill. Nov. 14, 2008) – which JPMC cites in support of its argument that the "sole remedy" provision bars the Trustee's claims – is inapposite.  The Sterling plaintiffs sought relief for the defendant's failure to *cure* the breaches of representations and warranties (Second Amended Complaint ¶ 104, Sterling Fed. Bank, 2008 WL 4924926 (No. 1:07-CV-02922)) – an action expressly barred by the sole remedy provision at issue in that case.  The Trustee, by contrast, asserts claims for JPMC's failure to perform its ongoing Notice and Repurchase Obligations and the obligation to honor the Trustee's Access Rights.  These breaches are *independent* of the Representations and Warranties covered by the sole remedy provision, and thus give rise to independent and actionable breaches of the Governing Documents.

[14]   The repurchase claim – the actual claim the Trustee asserts – did not accrue upon securitization, but rather at the time WaMu failed to meet its contractual obligation to repurchase loans in accordance with the Governing Documents, which JPMC argues accrues upon its receipt of as yet received notice.  JPMC Br. at 7.  JPMC thus argues that this claim is both too early (because the Trustee has not provided the required loan-specific notice) and too late (because the claims are time-barred).

Representations and Warranties.  By way of example, the Repurchase Obligation set forth in Section 2.03(a) of the PSA for the LB0602 Trust states, in pertinent part:  "Upon discovery or receipt of notice of . . . the breach by the Seller of any representation, warranty or covenant under the Mortgage Loan Purchase Agreement in respect of any Mortgage Loan which materially and adversely affects the value of such Mortgage Loan or the interest therein of the Certificateholders," the Seller must repurchase such mortgage loan.  AC ¶ 55.  Both JPMC and the FDIC have acknowledged that the Repurchase Obligations are ongoing;[15] indeed, they contend (incorrectly) that the Repurchase Obligation depends upon how the breach of Representation or Warranty impacted the mortgage loan *after* securitization.[16]  JPMC thus seeks to run the statute of limitations clock from the wrong date, long before the Trustee's claims actually began to accrue.

Furthermore, the precise point of WaMu's discovery of its breach of the Representations and Warranties, which in turn triggered its Repurchase and Notice Obligations, is a

---

[15] See, e.g., JPMC Br. at 12; JPMC 2008 Form 10-K, Mar. 21, 2009, at 168 (JPMC included principal balances of the loans in securitizations sponsored by WaMu in a table displaying "the total unpaid principal amount of assets held in JPMorgan Chase-sponsored securitization entities . . . *to which the Firm has continuing involvement*," such as ongoing repurchase or indemnification obligations) (emphasis added); FDIC Br., Ex. 10, at 5 (JPMC Form 10-Q, Nov. 9, 2010, at 59) (noting that "repurchase demands may be made for as long as the loan is outstanding"); id., Ex. 11, at 9 (JPMC Rule 424(b)(7) Preliminary Prospectus Supp., Dec. 8, 2009, at S-7) ("Our obligations with respect to these representations and warranties are generally outstanding for the life of the loan[.]").

[16] See, e.g., WaMu 2007 Form 10-K, Mar. 21, 2008, at 25 ("The degree of credit risk and level of credit losses is highly dependent on the economic environment that unfolds subsequent to originating or acquiring assets."); FDIC Br. at 27 ("[T]o the extent WaMu had made and breached a loan-related representation or warranty, WaMu had a contingent liability under its express Repurchase and Indemnification Obligation; whether and when the contingent liability would mature into a current payment demand would depend on whether the loan goes into default, whether the breach or defect was material, whether the breach or defect actually caused the loss, whether notice is given, and whether the breach or defect cannot be cured.").

quintessential question of fact and not subject to adjudication on a motion to dismiss.[17] <u>Allmon</u> <u>v. Fed. Bureau of Prisons</u>, 605 F. Supp. 2d 1, 5 (D.D.C. 2009) (Collyer, J.) (accepting as true plaintiff's allegations of when his claim accrued and therefore denying defendant's motion to dismiss). JPMC's motion should thus be denied. Even if, *arguendo*, JPMC could demonstrate that WaMu became aware of its repurchase obligation outside the limitations period, the Amended Complaint would not be time-barred. WaMu's failure to provide the Trustee notice of the breach, as well as its failure to honor the Trustee's Access Rights, tolls any statute of limitations.[18] <u>See</u> AC ¶ 48.

Simply put, there are only two possibilities: (1) WaMu discovered the breaches of the Representations and Warranties; or (2) WaMu did not discover the breaches of the Representations and Warranties. If WaMu did in fact discover such breaches – which would trigger the accrual of claims arising from WaMu's Repurchase and Notice Obligations – then it

---

[17] Because JPMC's arguments raise factual issues that may not be resolved on a motion to dismiss, the Court need not determine which state's statute of limitations applies. For example, JPMC's conclusory assertion that Delaware and New York's statute of limitations apply ignores that District of Columbia courts: (i) do *not* give effect to contractual choice of law provisions for statute of limitations purposes unless the provisions *expressly* include statute of limitations law; and (ii) only apply the chosen state's law of limitations if it is considered substantive in *that* state. <u>See</u> <u>Dalal v. Goldman Sachs & Co.</u>, 575 F.3d 725, 726 (D.C. Cir. 2009) ("New York statute of limitations was not incorporated into the parties' choice of law provision" because "New York law provides that a statute of limitations is not jurisdictional and not substantive."). Both New York and Delaware consider its respective statutes of limitations procedural, not substantive for choice of law purposes. <u>See</u> <u>Tanges v. Heidelberg N. Am., Inc.</u>, 93 N.Y.2d 48, 54 (1999); <u>Juran v. Bron</u>, No. CIV. A. 16464, 2000 WL 1521478, at *11 (Del. Ch. Oct. 6, 2000).

[18] <u>See</u> <u>Johnson v. Long Beach Mortg. Loan Trust 2001-4</u>, 451 F. Supp. 2d 16, 41 (D.D.C. 2006) ("The D.C. Court of Appeals deemed the discovery rule appropriate in [] cases [where] 'the *fact* of an injury [was] not readily apparent.'" (quoting <u>Mullin v. Wash. Free Weekly, Inc.</u>, 785 A.2d 296, 298 (D.C. 2001)); <u>Capitol Place I Assocs. L.P. v. George Hyman Const. Co.</u>, 673 A.2d 194, 199 (D.C. 1996) ("Central to our application of the exception is either a finding of justifiable reliance upon the transgressor or other circumstances indicating that the party seeking shelter under the statute of limitations has played a significant role in the harm not coming to light.").

wrongfully concealed it from the Trustee by failing to perform its Repurchase and Notice

Obligation.  If, on the other hand, WaMu did not discover such breaches, then the clock on those

claims has not begun to run.  In either event, the Trustee's claims for breach of WaMu's ongoing

obligation are not time-barred.[19]

## IV.  JPMC ASSUMED THE TRUST-RELATED LIABILITIES AS THEY WERE REFLECTED ON THE BOOKS AND RECORDS OF WAMU

On September 25, 2008, the Office of Thrift Supervision closed Washington Mutual

Bank and named the FDIC as Receiver.  Shortly thereafter, the FDIC, in its corporate and

receivership capacities, and JPMC entered into a PAA to transfer substantially all of the assets

and liabilities of Washington Mutual Bank from the FDIC to JPMC.

The PAA described the assets purchased by JPMC as:

> **3.1 Assets Purchased by Assuming Bank**.  Subject to Sections 3.5, 3.6 and 4.8, the Assuming Bank hereby purchases from the Receiver, and the Receiver hereby sells, assigns, transfers, conveys, and delivers to the Assuming Bank, all right, title, and interest of the Receiver in and to all of the assets (real, personal and mixed, wherever located and however acquired) including all subsidiaries, joint ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated, of the Failed Bank whether or not reflected on the books of the Failed Bank as of Bank Closing.  Assets are purchased hereunder by the Assuming Bank subject to all liabilities for indebtedness collateralized by Liens affecting such Assets to the extent provided in Section 2.1. The subsidiaries, joint ventures, partnerships, and any and all other business combinations or arrangements, whether active, inactive, dissolved or terminated being purchased by the Assuming Bank includes, but is not limited to, the entities listed on Schedule 3.1a.  Notwithstanding Section 4.8, the Assuming Bank specifically purchases all mortgage servicing rights and obligations of the Failed Bank.

PAA § 3.1 (emphasis added).

_____

[19]  With respect to the three Trusts that JPMC asserts provide for the application of California law (see JPMC Br. at 9 n.5), the result is the same.  California law provides that the statute of limitations is tolled if "the breach can be, and is, committed in secret, and . . . the harm flowing from the breach will not be reasonably discoverable by the plaintiff until a future time." 43 Cal. Jur. 3d Limitations of Actions § 45; see Gryczman v. 4550 Pico Partners, Ltd., 131 Cal. Rptr. 2d 680, 681 (Cal. App. 2003) (same); April Enters., Inc. v. KTTV, 195 Cal. Rptr. 421 (Cal. App. 1983).

JPMC also assumed nearly all of the liabilities of WaMu:

> **2.1 <u>Liabilities Assumed by Assuming Bank.</u>**  Subject to Sections 2.5 and 4.8, the Assuming Bank expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) <u>and agrees to pay, perform, and discharge, all of the liabilities of the Failed Bank</u> which are reflected on the Books and Records of the Failed Bank as of Bank Closing, including the Assumed Deposits and all liabilities associated with any and all employee benefit plans, except as listed on the attached Schedule 2.1, and as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumed").  <u>Notwithstanding Section 4.8, the Assuming Bank specifically assumes all mortgage servicing rights and obligations of the Failed Bank.</u>

PAA § 2.1 (emphasis added).

Other than the enumerated exceptions, the only difference between the scope of liabilities assumed as compared to the assets purchased under the PAA is that JPMC purchased assets "*whether or not* reflected on the books of the Failed Bank as of Bank Closing," while it only assumed liabilities "*which are* reflected on the Books and Records of the Failed Bank as of Bank Closing."  Aside from enumerated exceptions, and the statutorily provided exclusion of unrecorded liabilities,[20] JPMC acquired all of WaMu's assets and liabilities.

JPMC does not – and cannot – dispute that the Governing Documents were reflected on WaMu's official books and records on September 25, 2008.  AC ¶ 42.  Instead, JPMC contends that "[b]ecause Deutsche Bank is not a party to the PAA, its opinion on the scope of 'books and records' under the P&A Agreement is irrelevant."  JPMC Br. at 29 n.20.[21]  Yet, in its motion to

---

[20]  To protect the public from unknowable risk, when the FDIC takes control of a bank as receiver, it is only liable for obligations that were maintained on the "official record" of the failed bank.  12 U.S.C. §§ 1821(d)(9)(A), 1823(e).  Because the FDIC Receiver cannot transfer liabilities that are beyond its statutory power, JPMC only assumed liabilities co-extensive with the FDIC-Receiver's powers – namely, liabilities reflected on official records of the failed bank.

[21]  JPMC relies on one inapposite case for this assertion:  <u>Wichita Falls Office Assocs. v. Banc One Corp.</u>, No. 3:90-CV-1301, slip op. at 12 (N.D. Tex. Nov. 22, 1993).  The portion of <u>Wichita Falls</u> referenced by JPMC stands only for the limited proposition that a purported third-party beneficiary's "assertion" of its status as such "is to be determined by 'the terms of the

dismiss, JPMC contends that "to the extent there is an actual controversy, it is ripe for immediate summary judgment because this claim involves the interpretation of one unambiguous provision of the P&A Agreement."  JPMC Br. at 27.  That argument assumes that the PAA can be read objectively without relying on extrinsic evidence of the parties' intent.  If, as JPMC contends, the Court can decide JPMC's motion to dismiss "without further inquiry" based solely on the words of the PAA, then the inquiry into the meaning of the PAA is an objective one.  JPMC Br. at 28. The Trustee demonstrates that JPMC's offered interpretation is incorrect from an objective viewpoint, as well as from a legal one.  Moreover, the Trustee's interpretation is consistent with that of the FDIC, which is a party to the PAA.  See FDIC Br. at 2, 13.

A.  Under the Plain Meaning of Section 2.1, JPMC Assumed All Trust-related Liabilities, as They Were Reflected on WaMu's Books and Records as of September 25, 2008

Under the plain meaning of Section 2.1, JPMC did in fact assume all Trust-related liabilities, as they were "reflected on the Books and Records" of WaMu as of its closing.  PAA § 2.1.  Section 2.1 of the PAA states that JPMC "expressly assumes at Book Value . . . and agrees to pay perform, and discharge, *all of the liabilities* of [WaMu] which are *reflected on the Books and Records* of [WaMu] as of Bank Closing."  (emphasis added).  See In Re Pena, 409 B.R. 847, 859 (Bankr. S.D. Tex. 2009) (finding with respect to the WaMu PAA that it "expressly sets forth that JPMorgan Chase would assume *all of WaMu's liabilities* except for liabilities for 'borrower claims'") (emphasis added).

JPMC would have the Court read into the PAA a limitation as to the scope of liabilities assumed based on each individual liability's "Book Value."[22]  "Book Value" is defined in the

---

contract.'"  Id.  The Wichita Falls court was thus merely repeating a basic tenet of contract interpretation:  that the terms of the contract govern. (JPMC McIntosh Dec. Ex. H.)

[22]  Where the FDIC intended to cap the liability transferred to the assuming bank it did so in no uncertain terms by stating:  "provided, that the assumption of any liability pursuant to this

PAA to be "the dollar amount . . . stated on the Accounting Records of the Failed Bank."  PAA at 3.  JPMC thus contends that it assumed only those liabilities which had been "reduced to a dollar amount on WMB's 'general ledger and subsidiary ledgers and supporting schedules which support the general ledger balances.'"  JPMC Br. at 27.

But the stated value for accounting purposes at which JPMC assumes a non-deposit liability is irrelevant to the question of *which* liabilities they assumed.  In other purchase and assumption agreements, the "Book Value" could impact the price an acquiring bank paid for the combined assets and liabilities of a failed bank, but would not change which liabilities were actually assumed.[23]  As the FDIC points out, this was not a transaction where the price paid for the failed bank could be adjusted, because "JPMC bid and paid a lump sum of approximately $1.9 billion 'for the Assets purchased and Liabilities Assumed.'"  FDIC Br. at 32.  The "Book

---

paragraph shall be limited to the market value of the Assets securing such liability as determined by the Receiver."  See, e.g., Exam. Report (defined infra) Ex. JPMCD 000001550.00115 (Transaction #4), JPMCD 000001550.00161 (Transaction #5) (emphasis in original).

[23]  The first clause in Section 2.1 of the WaMu PAA is standard PAA language:  "The Assuming Bank expressly assumes at Book Value (*subject to adjustment pursuant to Article VIII*) . . . ."  (emphasis added).  See, e.g., Ameribank PAA, at 13; Main Street Bank PAA at 9.  For simplicity, the Trustee offers the PAAs for the FDIC's transactions immediately surrounding the WaMu PAA:  Ameribank PAA, Sept. 19, 2008, available at http://www.fdic.gov/bank/individual/failed/Ameribank-Citizens_P_and_A.pdf; Main Street Bank PAA, Oct. 10, 2008, available at http://www.fdic.gov/bank/individual/failed/mainstreet_P_and_A.pdf.  In those agreements, Article VIII (titled "Adjustments") provides for an updated accounting, corrections of errors and omissions, adjustments to payments (either increases or refunds), and for subsequent adjustments as needed.  See, e.g., Ameribank PAA, at 31-32; Main Street Bank PAA, at 28-29.  By contrast, because the WaMu transaction was a lump-sum bid for *all* assets and liabilities (with enumerated exceptions), Article VIII in the PAA is titled "Pro Forma," and makes no provision for adjustments.  As a result, references to Article VIII "adjustments" are inconsequential in Section 2.1 of the WaMu PAA.  To the extent that the term "Book Value" is simply a vestige of other PAAs and has no application here, it should not be given effect.  See Restatement (Second) of Contracts § 203 (1981) ("[A] standard form may include provisions appropriate only to some of the transactions in which the form is to be used; or the form may be used for an inappropriate transaction.").

Value" assigned to items merely established a reference point for accounting for the transaction

pursuant to the purchase accounting requirements of the Financial Accounting Standards (FAS)

No. 141.[24]   Indeed, JPMC disclosed this accounting process in its December 31, 2008 SEC Form

10-K, stating:  "[t]he $1.9 billion purchase price was allocated to the Washington Mutual assets

acquired and liabilities assumed using preliminary allocated values as of September 25, 2008,

which resulted in negative goodwill."  Cohen Dec. Ex. 8.

> B.  JPMC's Interpretation of Section 2.1 Would Render Entire Clauses and Provisions of
>     the PAA Superfluous or Repugnant

JPMC's strained reading of the "Book Value" clause effectively reads the entire "Books

and Records" clause out of the PAA.  Though "Books and Records" is not defined in the PAA,

"Records" is defined to include "any document, microfiche, microfilm and computer records . . .

of [WaMu] generated or maintained by [WaMu] that is owned by or in the possession of the

Receiver at Bank Closing."  PAA at 6.  It is undisputed and indisputable that "Books and

Records" encompasses more than merely the "Accounting Records" of WaMu.  See Madison

Real Estate Immobilien-Anlagegesellschaft Beschrankt Haftende Kg v. Kanam USA XIX L.P.,

Civ. Action No. 2863-VCP, 2008 WL 1913237, at *11-12 (Del. Ch. May 1, 2008)

(distinguishing the term "books of account" from the term "books and records," and describing

"books of account" as a "less expansive term," encompassing "only a limited range of financial

documents, such as the general ledger and the financial statements derived from it, *e.g.,* the

balance sheet").  Thus, JPMC's interpretation of the "Book Value" phrase – as confining liability

to what was posted on the Accounting Records rather than what was reflected on the "Books and

---

[24] The purchase accounting rule, known as FAS 141, establishes the process of recording an acquisition.  This process utilizes the acquiree's basis in the acquired assets and assumed liabilities as a starting point, which is then compared to a fair value measurement of the assets and liabilities and the resultant difference between the two is referred to as goodwill, or if negative, then negative goodwill.

Records" – improperly reads the entire "Books and Records" clause out of the PAA.  See Segar v. Mukasey, 508 F.3d 16, 22 (D.C. Cir. 2007) ("[I]t is a 'cardinal principle of contract construction [] that a document should be read to give effect to all its provisions and to render them consistent with each other.'"(quoting Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 63 (1995))); Crinks v. Torres, No. 59213-1-I, 141 Wash. App. 1030, at *2 (Nov. 13, 2007) ("When interpreting an agreement, the preferred interpretation gives meaning to all provisions and does not render some superfluous."); Restatement (Second) of Contracts § 203 cmt. a (1981) ("Where an integrated agreement has been negotiated with care and in detail and has been expertly drafted for the particular transaction, an interpretation is very strongly negated if it would render some provisions superfluous.").

JPMC's interpretation of Section 2.1 is further strained when read together with Section 2.5 of the PAA.[25]  In Section 2.5 of the Agreement, the FDIC and JPMC specifically exempted "borrower claims" from liabilities that would otherwise transfer.  Section 2.5 excludes any liability to borrowers for:

> payment . . . monetary relief . . . or any other form of relief to any borrower, *whether or not* such liability is reduced to judgment, liquidated or *unliquidated*, fixed or *contingent*, matured or *unmatured*, *disputed* or undisputed, legal or equitable, judicial or extra-judicial, secured on unsecured, . . . related in any way to a loan or commitment to lend made by the Failed Bank . . . (emphasis added).

---

[25]  Indeed, other Courts have read Section 2.5 and Section 2.1 of the PAA together to "allocate [WaMu's] lender liability to the FDIC and . . . transfer [WaMu's] servicing liability to [JPMC]." Johnson v. Wash. Mut., No. 1:09-CV-929, 2010 WL 682456, at *4 (E.D. Cal. Feb. 24, 2010) (quoting In re Pena, 409 B.R. at 861); see also Hayes-Broman v. J.P. Morgan Chase Bank, 724 F. Supp. 2d 1003, 1015 (D. Minn. 2010) (adopting the reasoning of Johnson and Pena); Punzalan v. FDIC, 633 F. Supp. 2d 406, 409-10 (W.D. Tex. 2009) ("Chase Bank purchased Washington Mutual on the condition that FDIC remain responsible for any 'Borrower Claims' . . . in connection with Washington Mutual's lending or loan purchase activities. In exchange . . . Chase Bank promised to assume responsibility for all other liabilities, specifically including all mortgage servicing rights and obligations of [Washington Mutual].") (internal quotations omitted).

Section 2.5's exclusions of "unliquidated," "contingent," "unmatured," or "disputed" borrower claims – none of which would have been assigned a Book Value – would be superfluous if *all* claims that were not reduced to a specific dollar amount on the accounting records of WaMu were not assumed by JPMC.  See Segar, 508 F.3d at 22; Crinks, 141 Wash. App. 1030, at *2; Williams v. FDIC, No. CIV 2:07-2418, 2009 WL 5199237, at *5 (E.D. Cal. Dec. 23, 2009) (refusing to interpret Section 4.5 of the PAA in a manner that would "effectively nullify section 2.5").

C. Documentary Evidence of the PAA Parties' Negotiations Supports the Position that JPMC Knowingly Assumed Substantially All of WaMu's Liabilities Reflected on the Books and Records

If the contract is ambiguous, and discovery is required to determine the parties' intent, then dismissal on the pleadings is improper.  To the extent there is any ambiguity, the recently filed Examiner's Report in the Washington Mutual, Inc. bankruptcy proceedings supports the FDIC's argument that the parties intended to transfer the liabilities.  See Final Report of the Examiner, In re Washington Mutual, Inc., No. 08-12229 MFW (Bankr. D. Del. Nov. 1, 2010) (Dkt. No. 5735) (filed publicly with exhibits on Nov. 22, 2010 (Dkt. No. 6049) ("Exam. Report").

First, the FDIC offered five different structures for the PAA transaction.  JPMC elected to bid on what was described as "Transaction #3":

Under this transaction, the Purchase and Assumption (Whole Bank), the Potential Acquirer whose Bid is accepted by the Corporation assumes the Assumed Deposits of the Bank *and all other liabilities* but specifically excluding the preferred stock, non-asset related defensive litigation, subordinated debt and senior debt, and purchases all of the assets of the Bank, excluding those assets identified as excluded assets in the Legal Documents and subject to the provisions thereof.

Exam. Report Ex. JPMCD 000001550.00009 (description); JPMCD_000002773.0001 (JPMC Bid Form).[26]  This is in contrast to other transactions which offered JPMC the option of assuming "only certain other liabilities" (Transactions #4 and #5).  Id.  The FDIC used a different initial draft PAA for Transactions #1, #2, and #3 (transferring "all other liabilities except . . .") than it did for Transactions #4, and #5.  Compare Exam. Report Ex. JPMCD 000001550.00026 (Draft for Transactions #1, #2, #3), with Exam. Report Ex. JPMCD 000001550.00115 (Transaction #4), JPMCD 000001550.00161 (Transaction #5).

Second, JPMC itself knew and expressed concern about the implication of Section 2.1 as written – namely, that it is assuming all of WaMu's contractual liabilities because they are by definition "reflected on the Books and Records" of WaMu.  Between drafts of the PAA (September 23 and September 24), JPMC wrote in an email to the FDIC:

> Let's say there is a contract between the thrift and the Parent and that is included in the Books and Records (not something like "accrued for on the books of the Failed Bank," which probably would fix the problem) of the thrift at the time of closing.  *Any liability under that contract is then arguably a liability reflected in the Books and Records.  Therefore one would most likely conclude that liabilities under that contract are assumed under 2.1. . . .*  In a normal P&A between commercial parties this is not something a buyer would ever assume and it really doesn't make sense (nor frankly is it fair) here.

---

[26]  The exhibits to the Examiner's Report – each of which is in the public record – can properly be considered by this court on the instant motions.  See Papasan v. Allain, 478 U.S. 265, 302, 106 S. Ct. 2932, 2953, 92 L. Ed. 2d 209 (1986) ("Although this case comes to us on a motion to dismiss under Federal Rule of Civil Procedure 12(b), we are not precluded in our review of the complaint from taking notice of items in the public record[.]").  In re New Century, 588 F. Supp. 2d 1206, 1219 (C.D. Cal. 2008) (finding that a bankruptcy examiner's report is "a document subject to judicial notice"); In re Enron Corp. Sec., Derivative & "ERISA" Litig., MDL-1446, 2005 WL 3504860, at * 11 (S.D. Tex. Dec. 22, 2005) (holding that an "Examiner's report, like other papers, once filed with the Bankruptcy Court become public records," and that "any documents underlying the report, on which the report is based, if [] filed, are [] part of the court record and are [] subject to public access"); In re New Century TRS Holdings, Inc., 390 B.R. 140, 147 n.10 (Bankr. D. Del. 2008) rev'd on other grounds, 407 B.R. 576 (D. Del. 2009) (taking judicial notice of bankruptcy examiner's report).

Exam. Report Ex. JPM_EX00034958, e-mail from Dan Cooney (JPMC) to David Gearin

(FDIC), Sept. 23, 2008 9:28 PM (emphasis added).  The FDIC did not alter that language,

despite JPMC's protestations.[27]

Moreover, during the drafting process, the FDIC posted a "Q&A" for potential acquirers

with respect to the WaMu transaction.  Directly relevant to this dispute is the FDIC's

unequivocal position that mortgage securitization obligations passed to the acquirer:

> 9.  Are the off-balance sheet credit card portfolio and mortgage securitizations
> included in the transaction?  Do you expect the acquirer to assume the servicing
> obligations?  If there are pricing issues associated with the contracts (e.g., the
> pricing is disadvantageous to the assuming institution), can we take advantage of
> the FDIC's repudiation powers to effect a repricing?
>
> Answer:  *The bank's interests and obligations associated with* the off-balance
> sheet credit card portfolio *and mortgage securitizations pass to the acquirer.*
> Only contracts and obligations remaining in the receivership are subject to
> repudiation powers.

Exam. Report Ex. JPMCD 000001550.00212 - JPMCD 000001550.00213 (emphasis added).

See also FDIC31888- FDIC31889.

Despite JPMC's own concession as to the "most likely" meaning of Section 2.1 – and

despite its ultimate acceptance of such terms and knowing assumption of such liabilities – JPMC

now contends that not only is an inapposite reading of Section 2.1 *plausibl*e – but that it is so

*unambiguous* as to be suitable for summary judgment.  This reversal is stunning.

---

[27]  With respect to other sections of the PAA, JPMC was more successful in negotiating
its terms.  JPMC requested what had been Section 4.8(b) be clarified so that there was no
ambiguity as to JPMC's rights "particularly with respect to mortgage servicing agreements
which are absolutely critical to operating the business."  Exam. Report Ex. JPM_EX00004135
(E-mail from Dan Cooney to David Gearin, Sept. 24, 2008 7:17 AM).  In response, Section
4.8(b) was removed from the agreement, and the final sentence of both Section 2.1 and Section
3.1 was added, which provides:  "Notwithstanding Section 4.8, the Assuming Bank specifically
assumes all mortgage servicing rights and obligations of the Failed Bank."

D.  JPMC's Statements and Conduct Immediately After its Acquisition of WaMu – and Until Recently – are Inconsistent with its Current Position

JPMC's public statements and conduct immediately following its acquisition of WaMu, and until fairly recently, are inconsistent with its current position, which is little more than a post-hoc attempt to rewrite the PAA.

JPMC's SEC filings immediately after its purchase and assumption of WaMu continued to advance the same plain reading of the PAA – that JPMC assumed the Trust-related liabilities, specifically including the Repurchase Obligations.  See FDIC Br. at 20-22.  In fact, JPMC's most recent Rule 424(b)(7) Preliminary Prospectus Supplement, filed on December 8, 2009 (at p. S-7), cautions that "repurchase and/or indemnity obligations arising in connection with the sale and securitization of loans by . . . Washington Mutual and other transactions, could materially increase our costs and lower our profitability, and could materially and adversely impact our results of operations and financial condition."  (See, JPMC Cohen Affidavit Ex. 11) This statement flatly contradicts JPMC's assertion that it did not assume any liability for these obligations.  JPMC Br. at 3-4, passim.

Furthermore, JPMC, by its own post-acquisition actions, evidenced an understanding that it is liable for all other liabilities reflected on WaMu's books and records – whether or not reduced to a dollar amount on WaMu's Accounting Records.  For example, JPMC has litigated and defended its liability for PAA-related claims *at least* 66 times.  To the Trustee's knowledge, JPMC did not advance its "Book Value" argument before it did so recently in this Court.  JPMC also assumed the defense in multiple premises liability cases filed *after* JPMC's acquisition of WaMu for injuries that occurred on WaMu's premises *before* JPMC's acquisition thereof on

September 25, 2008.[28]  Such injuries and the resulting damage awards could not have appeared

on WaMu's Accounting Records as WaMu's Accounting Records were closed out *before* those

suits were filed.  Notwithstanding, JPMC appeared and defended those suits.

In fact, JPMC's "Book Value" argument, in any form, seemingly appeared for the first

time in this Court on June 21, 2010 – *nearly 21 months after JPMC's acquisition of WaMu*.  See

Memo. of Points and Auths. in Support of JPMC's Mot. to Dismiss at 10, N.C. Dep't of Rev. v.

FDIC, No. 10-cv-505 (RMC) (D.D.C. filed Mar. 26, 2010).  Until that time, however, JPMC's

own statements and actions were inconsistent with its current position, but very much consistent

with the plain reading of the PAA advanced by the FDIC and the Trustee.

E.   The WaMu PAA is By Design Structurally and Fundamentally Different From Other
      PAAs

The WaMu PAA's assumption of liabilities is different from other PAAs.  This

distinction was made clear in Pena where the Court distinguished the WaMu PAA from the PAA

in First Ind. Fed. Sav. Bank v. FDIC, 964 F.2d 503 (5th Cir. 1992).  The Pena court found that

First Indiana was distinguishable for two reasons:

> First, . . . the P & A Agreement only excepted liabilities for 'borrower claims'
> from the transfer to JPMorgan Chase, not as in *First Indiana*-all unsecured
> liabilities.  Second, the P & A Agreement expressly sets forth that JPMorgan
> Chase would assume *all of WaMu's liabilities except for* liabilities for 'borrower
> claims,'; whereas, in *First Indiana*, the agreement provided that the purchasing
> entity would assume *none of the failed bank's liabilities except for* those that "are
> secured by the assets purchased."

409 B.R. 847, 859 (internal citations omitted); see also Allen v. United Fin. Mortg. Corp., No.

09-2507 SC, 2010 WL 1135787, at *3 (N.D. Cal. Mar. 22, 2010) ("The PAA explicitly does not

relieve JPMorgan from any liability that it has incurred in its role as a loan servicer.").

---

[28]  See, e.g., Chebukina v. Wash. Mut. Bank, No. BC433323, (Cal. Super. Ct. filed Mar.
9, 2010); Valdovinos v. Wash. Mut. Bank, No. 00408703-CU-PO-CJC (Cal. Super. Ct. 2010);
Villalta v. Wash. Mut. Bank, No. BC 445432 (Cal. Super. Ct. filed Sept. 13, 2010).

Like <u>First Indiana</u>, most other purchase and assumption "whole bank" agreements limit the assumption of liabilities to those that are specifically enumerated.  <u>See, e.g.</u>, <u>West Park Assocs. v. Butterfield Sav. & Loan Ass'n</u>, 60 F.3d 1452, 1458 (9th Cir. 1995) (liabilities for shareholder suits expressly retained by PAA which otherwise transferred liabilities to acquiring entity); <u>Payne v. Sec. Sav. & Loan Ass'n</u>, 924 F.2d 109, 111 (7th Cir. 1991) (refusing to join purchaser of failed bank in employment discrimination suit where PAA provided that only enumerated liabilities would transfer to the acquirer, and "[l]itigation liabilities were not mentioned in the agreement"); <u>Vernon v. RTC</u>, 907 F.2d 1101, 1109 (11th Cir. 1990) (acquisition agreement between the purchasing entity and the FSLIC excepted from the transfer all liabilities of the failed bank to its stockholders).  That option was presented to JPMC (as Transactions #4 or #5).  The initial draft PAAs posted by the FDIC for WaMu for that option had the following Section 2.1:

> **2.1 Liabilities Assumed by Assuming Bank.** The Assuming Bank expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) and agrees to pay,  perform, and discharge all of the following liabilities of the Failed Bank as of Bank Closing, except as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumed"):
>
> [followed by 11 subsections of liabilities assumed, as well as Schedule 2.1 which set forth categories of liabilities assumed].

Exam. Report Ex. JPMCD 000001550.00126-27 (Transaction #4), JPMCD 000001550.00172-73 (same) (Transaction #5).  Instead, JPMC opted to acquire WaMu in the form that it did – by assuming substantially all liabilities except for preferred debt, unsecured debt, and non-asset related defensive litigation liabilities.

JPMC would prefer that this court read the WaMu PAA as if it were the same as a PAA in factually dissimilar cases.  To that end, JPMC inaccurately describes the holding of <u>Viola v. Fleet Bank of Me.</u>, No. 95-141, 1996 WL 498390, at *3 (D. Me. Feb. 27, 1996).  JPMC contends

that <u>Viola</u> held "that a functionally identical provision [to Section 2.1 of the WaMu PAA] did not

transfer liability beyond book value as stated on the failed bank's accounting records." JPMC Br.

at 29.  In <u>Viola</u>, however, the relevant provisions of the PAA provided that the acquiring bank

assumed "at Book Value" only "the following liabilities" before enumerating the specific

liabilities that transferred.  Shulman Dec. Ex. F.  No such provision exists here.

As is the case with most other PAAs, in <u>Viola</u>, the acquiring bank sought to "purchase

*certain* assets and assume the deposit and *certain* other liabilities," but the WaMu transaction

was for the "Whole Bank."  Where a PAA specifies that an acquiring institution is "assuming

only those liabilities enumerated in the agreement" then "[b]y default, all other liabilities

remain[] the responsibility of [FDIC]."  <u>Payne</u>, 924 F.2d at 111.  This case is different – the

default rule in this case was that JPMC acquired those liabilities on the books and records, with

only enumerated exceptions.[29]

F.  <u>Public Policy Supports a Finding that JPMC Assumed the Trust-related Liabilities</u>

JPMC's purported construction of the PAA seeks to leave all mortgage repurchase

obligations with the FDIC.  The <u>Pena</u> court cautioned against reflexively construing purchase

and assumption agreements against the transfer of liabilities in the manner advocated by JPMC.

> [P]laintiffs – like the Debtors in the suit at bar – with potentially meritorious
> causes of action against a failed bank will often be left without recourse if the
> purchasing entity did not assume the failed bank's liabilities and the plaintiff is

---

[29]  Indeed, where the parties intended to exclude certain liabilities that would otherwise
transfer, they did so clearly.  In Section 2.5, all "borrower claims" were retained by the FDIC
(whether or not they could have had a dollar value reflected on the books and records of WaMu).
Furthermore, the parties created Schedule 2.1 ("Certain Liabilities Not Assumed") which was
consistent with what was to be excluded by "Transaction #3", i.e. preferred stock, pending
defensive litigation, subordinated and senior debt; as well as items related to employee benefits
and compensation.  All of this is consistent with the parties' intent, as provided in the opening of
the PAA: "WHEREAS, [JPMC] desires to purchase substantially all of the assets and assume all
deposits and substantially all other liabilities of the Failed Bank on the terms and conditions set
forth in this Agreement."  PAA at 1.

> required to sue the FDIC.  This reasoning provides a strong incentive for courts to
> carefully scrutinize the language of purchase and assumption agreements
> executed between the FDIC and a purchaser of a failed bank's assets and
> obligations.  Courts that are quick to conclude that the purchasing entity did not
> assume any liabilities will likely be leaving plaintiffs who may have been
> wronged without a remedy.

Pena, 409 B.R. at 862; see FDIC v. Marine Midland Realty Credit Corp., 17 F.3d 715, 720 (4th

Cir. 1994) ("Given the potentially inequitable nature of such a transfer, the power to so separate

claims should only be permitted upon a perfectly clear intent to do so.").

Moreover, the interpretation suggested by JPMC – that it only acquired liabilities with a

"book value" and its liability is therefore limited to the amounts reflected on WaMu's accounting

records – necessarily leads to the conclusion that with respect to any such liability, JPMC would

be responsible for a certain amount of the liability and the FDIC as Receiver of the failed bank

would retain any remaining portion of the liability above and beyond the "book value."[30]  Such a

result would place claimants in the untenable position of having to guess who was responsible

for what portion of a liability and whether and to what extent it should file a claim in the

receivership proceedings.  Such a result is illogical, inequitable and would plainly precipitate

protracted and unnecessary litigation.

---

[30]  The Trustee is unaware of any instance in the hundreds of PAA transactions
undertaken by the FDIC where a liability was split in such a fashion.  In instances where the
FDIC seeks to provide a backstop to an acquiring institution to protect it against future losses it
uses a variety of mechanisms to reach such a result, including loss sharing agreements, which
were not made part of the PAA used in the WaMu transaction.  See FDIC Resolutions
Handbook, p. 29 available at http://www.fdic.gov/bank/historical/ reshandbook/ch3pas.pdf.

## V.  THE TRUSTEE'S CLAIMS AGAINST THE FDIC RECEIVER BASED ON POST-RECEIVERSHIP BREACHES SHOULD NOT BE DISMISSED

### A.  The Trustee's Claims for Post-Receivership Breaches Are Not Barred by FIRREA's Administrative Exhaustion Requirements

The FDIC contends that the Trustee failed to administratively exhaust its claims for post-receivership breaches of contract against the FDIC, specifically breaches of the Access Rights and Repurchase Obligation (the FDIC omits any reference to the Notice Obligation).  When considering whether claims are administratively exhausted, courts focus on notice to the FDIC of those claims.  See, e.g., Branch v. FDIC, 833 F. Supp. 56, 59-62 (D. Mass. 1993) (holding that claimant "provided the particular FDIC receiverships with adequate notice of the challenged claims and with sufficient information and detail about the claims to enable the FDIC to expeditiously and fairly allow or disallow the claims" even without specific reference to the challenged transactions); Lanigan v. RTC, No. 91-7216, 1993 WL 189884, at *1-2 (N.D. Ill. June 2, 1993) (granting leave to amend complaint to add a new claim that was based on the same conduct as a previously asserted claim).

In its Proof of Claim, the Trustee provided the FDIC with notice of its claim for post-receivership breaches of contract.  See AC, Ex. 3, ¶ 8.[31]  The Trustee asserted that "to the extent that the FDIC purports to have assumed and assigned to JPMC any rights and benefits of WAMU to service Mortgage Loans under the Governing Documents for any Trust, the FDIC must make provision to perform fully all of WAMU's obligations under the Governing Documents for that Trust."  See id.  Further, the Trustee stated its claims for breach of such obligations if WaMu (or its successors) failed to notify the Trustee of breaches of representations and warranties and if defective loans were not repurchased or replaced.  See id.  The Trustee also

---

[31] The Proof of Claim was incorporated by reference in the Amended Complaint.  See AC ¶ 14.

provided the FDIC with notice of its claim for administrative priority:  "Nothing contained in this Proof of Claim shall be deemed or construed as . . . a waiver or release of, or any other limitation on DBNTC's or the Securitization Trusts', right to assert that any portion of the claims asserted herein are entitled to treatment as priority claims."  See id. ¶ 26.  Thus, the Trustee's Proof of Claim clearly notified the FDIC of the facts and circumstances giving rise to its damages claims, as well as the amount, nature and potential priority of those claims.[32]

Further, although the Trustee complied with the administrative exhaustion requirements, it did not need to do so.  Claims against the FDIC for breaches of a pre-receivership contract are not subject to the administrative exhaustion requirement.  See Sharpe v. FDIC, 126 F.3d 1147, 1156-57 (9th Cir. 1997) (holding that claims against FDIC for breaches of pre-receivership contracts are not "claims" under § 1821(d)); Deutsche Bank Nat'l Trust Co. v. FDIC, No. 09-3852, at 16-17 (C.D. Cal. Jan. 7, 2011) (Shulman Dec. Ex G.).  FIRREA does not allow the FDIC to breach a pre-receivership contract; rather the FDIC can only assume or repudiate those contracts.  See Sharpe, 126 F.3d at 1155; see also Waterview Mgmt. Co. v. FDIC, 105 F.3d 696, 699 (D.C. Cir. 1997).  When the FDIC acts outside of its statutorily prescribed powers it is not entitled to the protections of FIRREA.  See Sharpe, 126 F.3d at 1155-57; Nat'l Trust for Historic Pres. v. FDIC,  995 F.2d 238, 240 (D.C. Cir. 1993), vacated, 5 F.3d 567 (D.C. Cir. 1993), and reinstated in relevant part, 21 F.3d 469 (D.C. Cir. 1994) (stating that FIRREA's anti-injunction provision applies only when the FDIC acts within its statutorily prescribed powers); see also Auction Co. of Am. v. FDIC, 141 F.3d 1198, 1201-02 (D.C. Cir. 1998) (refusing to apply exhaustion requirement when FDIC was not acting as receiver for a particular depository

---

[32]  It is undisputed that the FDIC did not respond to the Proof of Claim or issue any notice of disallowance to the Trustee.  AC ¶¶ 14-19, 36, 37.  Nor did the FDIC make any attempt to fulfill the Notice or Repurchase Obligations, or to allow the Trustee Access Rights.  AC ¶¶ 66, 75, 81, 84.

institution).  Accordingly, the Trustee's claim that the FDIC breached the Governing Documents is not subject to the administrative exhaustion requirement.[33]

    B.  <u>The Trustee Has Properly Pled a Breach of Contract Claim Against the FDIC</u>

    The FDIC complains that the Trustee indiscriminately uses the term "WaMu" to refer to the FDIC and JPMC.  However, when the FDIC is appointed receiver it "steps into the shoes" of the failed institution, which means that it assumes all of the rights and obligations of the defunct bank.  <u>See</u> <u>O'Melveny & Meyers v. FDIC</u>, 512 U.S. 79, 86-87 (1994).  The FDIC succeeds to only the same interests held by the failed institution, nothing more or less.  <u>See, e.g.</u>, <u>Waterview Mgmt.</u>, 105 F.3d at 701.  WaMu had ongoing obligations and liabilities under the Governing Documents, and "by operation of law" the FDIC assumed all of those obligations and liabilities.  <u>See</u> 1821(d)(2)(A); <u>see</u> <u>also</u> AC ¶ 93.  The FDIC had the option, within a reasonable time, to repudiate the Governing Documents and pay damages.  <u>See</u> 12 U.S.C. §§ 1821(e)(1)-(3).[34] In this case, however, it is indisputable that the FDIC chose not to repudiate the Governing Documents.  <u>See, e.g.</u>, AC ¶¶ 14-17, 96.  If the FDIC had repudiated the Governing Documents, it could not have sold the related assets to JPMC as it now claims.  If and to the extent that the Court determines that the PAA did not transfer all of the obligations and liabilities under the

---

[33]  The cases cited by the FDIC are inapplicable as they do not include allegations that the FDIC acted outside of its statutorily prescribed powers.  <u>See, e.g.</u>, <u>Freeman v. FDIC</u>, 56 F.3d 1394, 1398-99 (D.C. 1995) (determining that the FDIC acted within its statutorily prescribed powers as receiver); <u>see also</u> <u>McCarthy v. FDIC</u>, 348 F.3d 1075, 1078 (9th Cir. 2003) (explaining its decision in <u>Sharpe</u> that administrative exhaustion did not apply "turned on the claimants being aggrieved parties to a contract that the FDIC had not repudiated").

[34]  If the Governing Documents had been repudiated, claims for damages thereunder would have been claims in the estate of Washington Mutual Bank and would have been addressed under 12 U.S.C. § 1821(e)(3).

Governing Documents to JPMC without limitation, then the FDIC remains liable for those breaches.[35]

If the FDIC did not repudiate and retained WaMu's obligations and liabilities under the Governing Documents, it is not only liable for WaMu's breaches, but it is also responsible for any breaches of the Governing Documents that arose after it became receiver.  FIRREA does not authorize the FDIC to breach contracts.  See, e.g., Waterview Mgmt., 105 F.3d at 701; Sharpe, 126 F.3d at 1155.  The FDIC discovered and/or had notice of WaMu's breaches and, during its brief capacity as WaMu's successor-in-interest, owed Notice Obligations to the Trustee for those breaches.  See AC ¶¶ 49, 75, 95.  Further, even if JPMC now possesses the records, the FDIC is still liable, as successor to WaMu, for failing to perform the Notice Obligations or honor the Trustee's Access Rights or to require and cause JPMC, as the FDIC's successor, to do so.   See AC ¶ 98.  Finally, the FDIC must fulfill WaMu's Repurchase Obligations under the Governing Documents, including any such obligations that arose on its watch.  See AC ¶ 99.  In this instance, the FDIC did not do so, and the Trustee has properly pled a breach of contract claim against the FDIC.

---

[35] Neither the FDIC nor JPMC dispute that the Governing Documents, which provide for the sale of an interest in a mortgage loan in the secondary market as well as the repurchase of a loan, constitute qualified financial contracts pursuant to 12 U.S.C. § 1821(e)(8)(D)(i).[35]  AC ¶¶ 26, 29, 31-34. 12 U.S.C. § 1821(e)(8)(D)(i).  FIRREA provides that "[i]n making any transfer of assets or liabilities of a depository institution in default which includes any qualified financial contract, the conservator or receiver for such depository institution **shall . . . [transfer] all** qualified financial contracts between any person . . . and the depository institution in default . . . **or transfer none** of the qualified financial contracts."  See 12 U.S.C. § 1821(e)(9) (emphasis added).  Having assumed, and not repudiated, all of WaMu's rights under the Governing Documents in order to sell them to JPMC, the FDIC now must cause WaMu's obligations under those same Governing Documents to be performed or pay damages in lieu thereof.  See Sharpe, 126 F.3d at 1155-57; Deutsche Bank, No. 09-3852, at 11-14.

C.  The FDIC's Post-Receivership Breaches of the Governing Documents Entitle the
Trustee's Claims to Administrative Priority

Claims against the FDIC for acting outside its statutory powers are not subject to the

distribution priority scheme.  See, e.g., Sharpe, 126 F.3d at 1157; see also Deutsche Bank, No.

09-3852, at 16-17 (holding that damages resulting from the FDIC's breach of a pre-receivership

contract are not subject to the § 1821(d)(11) distribution priority scheme).[36]  Although FIRREA

does not address what happens when the FDIC breaches a pre-receivership contract (or authorize

the FDIC to do so), FIRREA does provide that the FDIC can breach post-receivership contracts,

but requires the resulting damages to be treated as administrative expenses of the estate.  See §

1821(d)(20).  There is no reason to treat the FDIC's breach of a pre-receivership contract any

differently, especially when the FDIC acted outside its statutory powers because it is not

empowered by statute to simply breach contracts – it must either repudiate or honor them.  As

noted above, the FDIC acted outside its statutory powers in several respects, including its failure

to satisfy or cause JPMC to satisfy its Notice Obligations under the Governing Documents with

respect to WaMu's breaches of which it had notice and/or discovered.  Accordingly, any

damages to the Trustee resulting from the FDIC's breach of the Governing Documents should be

entitled to administrative priority.  See, e.g., Deutsche Bank, No. 09-3852, at 17.

## CONCLUSION

For the foregoing reasons, DBNTC respectfully requests that this Court deny the FDIC

Receiver's motion to dismiss, JPMC and WMMSC's motion to dismiss and JPMC and

WMMSC's motion for partial summary judgment.  In the alternative, to the extent that this Court

---

[36] Section 1821(d)(11) provides that the FDIC, as receiver, must pay claims in the
following order: "(i) [a]dministrative expenses of the receiver[,] (ii) [a]ny deposit liability of the
institution[,] (iii) [a]ny other general or senior liability of the institution. . . ."

grants some or all of JPMC's motion to dismiss, DBNTC requests leave to replead its claims

against JPMC.

Dated:  January 14, 2011
        Armonk, NY

Respectfully submitted,

BOIES, SCHILLER & FLEXNER LLP

By:  /s/ Robin A. Henry
Robin A. Henry (admitted pro hac vice)
Michael Endler (admitted pro hac vice)
Motty Shulman (admitted pro hac vice)
333 Main Street
Armonk, NY 10504
Phone: (914) 749-8200
Fax:    (914) 749-8300

Tanya S. Chutkan (D.C. Bar No. 420478)
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave. NW #800
Washington, DC 20015
Phone:  (202) 237-2727
Fax:    (202) 237-6131

*Counsel for Plaintiff Deutsche Bank National Trust
Company, as Trustee for the Trusts listed in
Exhibits 1-A and 1-B, for all arguments except with
respect to those principally set forth in Section V.C.*

- and -

TALCOTT FRANKLIN P.C.

Talcott J. Franklin (D.D.C. Bar No. TX0078)
208 North Market Street, Suite 200
Dallas, Texas 75202
Phone:  (214) 736-8730
Fax:    (877) 577-1356

*Counsel for Plaintiff Deutsche Bank National Trust
Company, as Trustee for the Trusts listed in
Exhibits 1-A and 1-B.*

**Certificate of Service**

This is to certify that on January 14, 2011, the foregoing memorandum of law in opposition to:  (i) FDIC Receiver's Motion to Dismiss dated November 22, 2010; (ii) JP Morgan Chase Bank, National Association ("JPMC"), and Washington Mutual Mortgage Securities Corporation's ("WMMSC") motion to dismiss dated November 22, 2010; and (iii) JPMC and WMMSC's motion for partial summary judgment dated November 22, 2010, and Declaration of Motty Shulman in support of same was filed via ECF with the Clerk of the Court and served via ECF on all appearing parties and Counsel of record.

By:  /s/ Sara Clinton