**EXHIBIT A**

## MEMORANDUM

To:     Members of the Permanent Subcommittee on Investigations

From:  Senator Carl Levin, Subcommittee Chairman
       Senator Tom Coburn, Ranking Member

Date:  April 13, 2010

Re:    **Wall Street and the Financial Crisis:  The Role of High Risk Loans**

On Tuesday, April 13, 2010, beginning at 9:30 a.m., the Permanent Subcommittee on Investigations will hold its first in a series of hearings examining some of the causes and consequences of the recent financial crisis. This hearing will focus on the role of high risk loans, using a case study involving Washington Mutual Bank.

**The Financial Crisis.** In July 2007, two Bear Stearns offshore hedge funds specializing in mortgage related securities collapsed; the credit rating agencies suddenly downgraded hundreds of subprime residential mortgage backed securities; and the formerly active market for buying and selling subprime residential mortgage backed securities went cold. Banks, mortgage brokers, securities firms, hedge funds, and others were left holding suddenly unmarketable mortgage backed securities whose value began plummeting.

Banks and mortgage brokers began closing their doors. In January 2008, Countrywide Financial Corporation, a $100 billion thrift specializing in home loans, was sold to Bank of America. That same month, one of the credit rating agencies downgraded nearly 7,000 mortgage backed securities, an unprecedented mass downgrade. In March 2008, as the financial crisis worsened, the Federal Reserve facilitated the sale of Bear Stearns to JPMorgan Chase. In September 2008, in rapid succession, Lehman Brothers declared bankruptcy; AIG required a $85 billion taxpayer bailout; and Goldman Sachs and Morgan Stanley converted to bank holding companies to gain access to Federal Reserve lending programs.

In this context, Washington Mutual Bank, the sixth largest depository institution in the country with $307 billion in assets, $188 billion in deposits, and 43,000 employees, found itself losing billions of dollars in deposits as customers left the bank, its stock price tumbled, and its liquidity worsened. On September 25, 2008, after a century in the lending business, Washington Mutual Bank was closed by its primary regulator, the Office of Thrift Supervision ("OTS"). On the same day, the Federal Deposit Insurance Corporation ("FDIC"), having been appointed receiver, facilitated sale of the bank to JPMorgan Chase. It was the largest bank failure in the history of the United States.

The sudden financial losses and forced sales of multiple financial institutions put the U.S. economy into a tailspin. The stock market fell; business loans dried up; and unemployment exploded. Hidden liabilities associated with financial firms' proprietary positions in mortgage backed securities, credit default swaps, collateralized debt obligations ("CDOs"), structured investment vehicles, and other complex financial instruments created concerns about the stability of major financial institutions. The contagion spread worldwide as financial institutions holding similar financial instruments lost value and curtailed transactions with other firms. In October

2008, Congress enacted the $700 billion Troubled Asset Relief Plan ("TARP") to stop the U.S. economy from falling off a cliff and taking the rest of the world economy with it. The United States and other countries are still recovering today.

**Subcommittee Investigation.** In November 2008, the Permanent Subcommittee on Investigations initiated a bipartisan investigation into some of the causes and consequences of the financial crisis. Since then, the Subcommittee has engaged in a wide-ranging inquiry, issuing subpoenas, conducting over 100 interviews and depositions, and consulting with dozens of government, academic, and private sector experts. The Subcommittee has also accumulated and initiated review of over -50 million pages of documents, including court pleadings, filings with the Securities and Exchange Commission, trustee reports, prospectuses for securities and private offerings, corporate board and committee minutes, mortgage transactions and analyses, memoranda, marketing materials, correspondence, and email. The Subcommittee has also reviewed documents prepared by or sent to or from banking and securities regulators, including bank examination reports, reviews of securities firms, enforcement actions, analyses, memoranda, correspondence, and email.

To provide the public with the results of its investigation, the Subcommittee plans to hold a series of hearings addressing aspects of the financial crisis, including the role of high risk home loans, regulators, credit rating agencies, and Wall Street. These hearings will examine issues related to mortgage backed securities, CDOs, credit default swaps, and other complex financial instruments. After the hearings, a report summarizing the investigation will be released.

**Washington Mutual Case History.** This initial hearing in the series examines Washington Mutual Bank as a case study in the role of high risk loans in the U.S. financial crisis. Headquartered in Seattle, with offices across the country and over 100 years of experience in the home loan business, Washington Mutual Bank had grown to become the nation's largest thrift. Each year, it originated or acquired billions of dollars of home loans through multiple channels, including loans originated by its own loan officers, loans brought to the bank by third party mortgage brokers, and loans purchased in bulk from other lenders or firms. In addition, its affiliate, Long Beach Mortgage Company ("Long Beach"), originated billions of dollars in home loans brought to it by third party mortgage brokers specializing in subprime lending.

Washington Mutual kept a portion of these home loans for its own investment portfolio, and sold the rest either to Wall Street investors, usually after securitizing them, or to the Federal National Mortgage Association (Fannie Mae) or the Federal Home Loan Mortgage Corporation (Freddie Mac).

At first, Washington Mutual worked with Wall Street firms to securitize its home loans, but later built up its own securitization arm, Washington Mutual Capital Corporation, which gradually took over the securitization of Washington Mutual and Long Beach loans. In addition, from 2001 to 2007, Washington Mutual sold about $430 billion in loans to Fannie Mae and Freddie Mac, representing nearly a quarter of its loan production during those years.

**High Risk Home Loans.** Over a five-year period from 2003 to 2008, Washington Mutual Bank made a strategic decision to shift its focus from traditional 30-year fixed and government-backed loans to higher risk home loans. This shift included originating more home loans for higher risk borrowers, with increased loan activity at Long Beach, which was exclusively a subprime lender. Washington Mutual also financed subprime loans brought to the

bank by third party mortgage brokers through its "Specialty Mortgage Finance" and "Wholesale" channels, purchased subprime loans through its "Correspondent" channel, and purchased subprime loans in bulk through its "Conduit" channel.

Washington Mutual decided to shift to higher risk loans, because it had calculated those loans were more profitable. Higher risk loans typically charged borrowers a higher rate of interest and higher fees. Once securitized, a large percentage of the mortgage backed securities received AAA ratings, yet offered investors a higher rate of return than other AAA investments, due to the higher risk involved. As a result, mortgaged backed securities relying on higher risk loans typically fetched a better price on Wall Street than those relying on lower risk loans.

Washington Mutual's most common subprime loans were hybrid adjustable rate mortgages, known as "2/28," "3/27," or "5/25" loans. These 30-year mortgages typically had a low fixed "teaser" rate, which then reset to a higher floating rate after two years for the 2/28, three years for the 3/27, or five years for the 5/25. The initial payment was typically calculated to pay down the principal and interest at the initial low, fixed interest rate. In some cases, the payments covered only the interest due on the loan and not any principal. After the fixed period expired, the monthly payment was typically recalculated to cover both principal and interest at the higher floating rate. The suddenly increased monthly payments sometimes caused borrowers to experience "payment shock" and to default on their loans, adding to the risk.

In addition to subprime loans, Washington Mutual made a variety of high risk loans to "prime" borrowers, including its flagship product, the Option Adjustable Rate Mortgage ("Option ARM"). Washington Mutual's Option ARMs typically allowed borrowers to pay an initial teaser rate, sometimes as low as 1% for the first month, and then imposed a much higher floating interest rate linked to an index, but gave borrowers the choice each month of paying a higher or lower amount. These loans were called "Option" ARMs, because borrowers were typically given four options: (1) paying the fully amortizing amount needed to pay off the loan in 30 years; (2) paying an even higher amount to pay off the loan in 15 years; (3) paying only the interest owed that month and no principal; or (4) making a "minimum" payment that covered only a portion of the interest owed and none of the principal. If the minimum payment option were selected, unpaid interest would be added to the loan principal. If the borrower repeatedly selected the minimum payment, the loan principal would increase rather than decrease over time, creating a negatively amortizing loan.

After five years or when the loan principal reached 110% (sometimes 115% or 125%) of the original loan amount, the Option ARM would "recast." The borrower would then be required to make the fully amortizing payment needed to pay off the loan within the remaining loan period. The new monthly payment amount was typically much greater, causing payment shock and increasing loan defaults. For example, a borrower taking out a $400,000 loan, with a teaser rate of 1.5% and subsequent interest rate of 6%, could have a minimum payment of $1,333. If the borrower then made only the minimum payments until the loan recast, the new payment using the 6% rate would be $2,786, an increase of more than 100%. What began as a 30-year loan for $400,000 became a 25-year loan for $432,000. To avoid having the loan recast, Option ARM borrowers typically refinanced their loans. A significant portion of Washington Mutual's Option ARM business consisted of refinancing existing loans. Borrowers unable to refinance were at greater risk of default.

        Washington Mutual and Long Beach sold or securitized most of the subprime home loans
they acquired.  Initially, Washington Mutual kept most of its Option ARMs in its proprietary
investment portfolio, but eventually began selling or securitizing those loans as well.  From 2000
to 2007, Washington Mutual and Long Beach securitized at least $77 billion in subprime home
loans.  Washington Mutual sold or securitized at least $115 billion of Option ARM loans, as well
as billions more of other types of high risk loans, including hybrid adjustable rate mortgages, Alt
A, and home equity loans.  According to its internal documents, by 2006, Washington Mutual
was the second largest Option ARM originator and the eleventh largest subprime loan originator
in the country.

        **Lending and Securitization Deficiencies.**  Over the years, both Long Beach and
Washington Mutual were the subject of repeated criticisms by the bank's internal auditors and
reviewers, as well as its regulators, OTS and the FDIC, for deficient lending and securitization
practices.  Long Beach loans repeatedly suffered from early payment defaults, poor under-
writing, fraud, and high delinquency rates.  Its mortgage backed securities were among the worst
performing in the marketplace.  In 2003, for example, Washington Mutual stopped Long Beach's
securitizations and sent a legal team for three months to address problems and ensure its
securitizations and whole loan sales were meeting the representations and warranties in Long
Beach's sales agreements.

        In 2005, Long Beach had to repurchase over $875 million of nonperforming loans from
investors, suffered a $107 million loss, and had to increase its repurchase reserve by nearly $75
million.  As a result, Long Beach's senior management was removed, and Long Beach's
subprime lending operations were made subject to oversight by Washington Mutual's Home
Loans Division.  Despite those changes, early payment defaults and delinquencies surged again
in 2006, and several 2007 reviews identified multiple lending, credit, and appraisal problems.
By mid-2007, Washington Mutual shut down Long Beach as a separate entity and took over its
subprime lending operations.  At the end of the year, a Long Beach employee was indicted for
having taken kickbacks to process fraudulent or substandard loans.

        In addition to problems with its subprime lending, Washington Mutual suffered from
lending and securitization deficiencies related to its own mortgage activities.  It received, for
example, repeated criticisms for unsatisfactory underwriting procedures, loans that did not meet
credit requirements, and loans subject to fraud, appraisal problems, and errors.  For example, a
2005 internal investigation found that loans originated from two top loan producing offices in
southern California contained an extensive level of fraud caused primarily by employees
circumventing bank policies.  Despite fraud rates in excess of 58% and 83% at those two offices,
no steps were taken to address the problems, and no investors who purchased loans originated by
those offices were notified in 2005 of the fraud problem.  In 2006, securitizations with elevated
delinquency rates were found to contain lower quality loans that did not meet the bank's credit
standards.  In 2007, fraud problems resurfaced at the southern California offices, and another
internal review of one of the offices found a fraud rate of 62%.  In 2008, the bank uncovered
evidence that employees at still another top producing loan office were "manufacturing" false
documentation to support loan applications.  A September 2008 internal review found that loans
marked as containing fraudulent information had nevertheless been securitized and sold to
investors, identifying ineffective controls that had "existed for some time."

        **Compensation.**  The Long Beach and Washington Mutual compensation systems
contributed to these problems by creating misplaced incentives that encouraged high volumes of

risky loans but little or no incentives to ensure high quality loans that complied with the bank's credit requirements. Long Beach and Washington Mutual loan officers, for example, received more money per loan for originating higher risk loans and for exceeding established loan targets. Loan processing personnel were compensated according to the speed and number of the loans they processed. Loan officers and their sales associates received still more compensation if they charged borrowers higher interest rates or points than required in bank rate sheets specifying loan prices, or included prepayment penalties in the loan agreements. That added compensation created incentives to increase loan profitability, but not loan quality.

A second problem related to compensation was the millions of dollars paid to Washington Mutual senior executives even as their higher risk lending strategy began to lose money and increase the risk in the bank's own investment portfolio. Washington Mutual's chief executive officer, Kerry Killinger, for example, received each year a base salary of $1 million, cash bonuses, stock options, and multiple stock awards. He also received benefits from four pension plans, a deferred bonus plan, and a separate deferred compensation plan. In 2008 alone, the year he was asked to leave the bank, he received $21 million, including a $15 million severance payment. Altogether, from 2003 to 2008, Washington Mutual paid Mr. Killinger nearly $100 million, on top of multi-million-dollar corporate retirement benefits.

**Failure of Washington Mutual.** In July 2007, after the Bear Stearns hedge funds collapsed and the rating agencies downgraded hundreds of mortgaged backed securities, including over 40 Long Beach securities, the secondary market for subprime loans dried up. By September 2007, Washington Mutual had discontinued its subprime lending. It also became increasingly difficult for Washington Mutual to sell its high risk loans and related mortgage backed securities, including its Option ARMs. By the end of the year, Washington Mutual began to incur significant losses, reporting a $1 billion loss in the fourth quarter of 2007, and another $1 billion loss in the first quarter of 2008.

In February 2008, based upon increasing deterioration in the bank's asset quality, earnings, and liquidity, OTS lowered the bank's safety and soundness rating to a 3 on a scale of 1 to 5, signaling that it was a troubled institution. In April, the bank closed multiple offices, firing thousands of employees. That same month, Washington Mutual's parent holding company raised $7 billion in new capital, providing $3 billion of those funds to the bank.

In July 2008, a $30 billion mortgage lender, IndyMac, failed and was placed into receivership by the government. In response, depositors became concerned about Washington Mutual and withdrew over $9 billion in deposits, putting pressure on the bank's liquidity. After the bank disclosed a $3.2 billion loss for the second quarter, its stock price continued to drop, and more deposits left.

On September 15, 2008, Lehman Brothers declared bankruptcy. Three days later, on September 18, OTS and the FDIC lowered Washington Mutual's rating to a "4," indicating that a bank failure was a distinct possibility. The credit rating agencies also downgraded the bank's credit ratings. Over the span of eight days starting on September 15th, nearly $17 billion in deposits left the bank. At that time, the federal Deposit Insurance Fund contained about $45 billion, an amount which could have been exhausted by the failure of a $300 billion institution like Washington Mutual. As the financial crisis worsened each day, regulatory concerns about the bank's liquidity and viability intensified.

On September 25, 2008, OTS placed Washington Mutual Bank into receivership, and the FDIC facilitated its immediate sale to JPMorgan Chase for $1.9 billion. The sale eliminated the need to draw upon the federal Deposit Insurance Fund.

**Findings.** Washington Mutual was not the only mortgage lender to fail during the financial crisis. Nor was its high risk lending practices unusual. To the contrary, the Subcommittee investigation indicates that Washington Mutual was emblematic of practices at a number of financial institutions that originated, sold, and securitized high risk home loans from 2004 to 2008. Based upon the Subcommittee's investigation to date, we make the following findings of fact related to Washington Mutual Bank and its parent holding company, Washington Mutual Inc.

(1) **High Risk Lending Strategy.** Washington Mutual ("WaMu") executives embarked upon a high risk lending strategy and increased sales of high risk home loans to Wall Street, because they projected that high risk home loans, which generally charged higher rates of interest, would be more profitable for the bank than low risk home loans.

(2) **Shoddy Lending Practices.** WaMu and its affiliate, Long Beach Mortgage Company ("Long Beach"), used shoddy lending practices riddled with credit, compliance, and operational deficiencies to make tens of thousands of high risk home loans that too often contained excessive risk, fraudulent information, or errors.

(3) **Steering Borrowers to High Risk Loans.** WaMu and Long Beach too often steered borrowers into home loans they could not afford, allowing and encouraging them to make low initial payments that would be followed by much higher payments, and presumed that rising home prices would enable those borrowers to refinance their loans or sell their homes before the payments shot up.

(4) **Polluting the Financial System.** WaMu and Long Beach securitized over $77 billion in subprime home loans and billions more in other high risk home loans, used Wall Street firms to sell the securities to investors worldwide, and polluted the financial system with mortgage backed securities which later incurred high rates of delinquency and loss.

(5) **Securitizing Delinquency-Prone and Fraudulent Loans.** At times, WaMu selected and securitized loans that it had identified as likely to go delinquent, without disclosing its analysis to investors who bought the securities, and also securitized loans tainted by fraudulent information, without notifying purchasers of the fraud that was discovered.

(6) **Destructive Compensation.** WaMu's compensation system rewarded loan officers and loan processors for originating large volumes of high risk loans, paid extra to loan officers who overcharged borrowers or added stiff prepayment penalties, and gave executives millions of dollars even when its high risk lending strategy placed the bank in financial jeopardy.

# # #