**EXHIBIT B**


Federal Deposit Insurance Corporation
Division of Supervision and Consumer Protection
San Francisco Regional Office
25 Ecker Street Suite 2300
San Francisco, California 94105
415.546.0160


State of Washington
Department of Financial Institutions
Division of Banks
PO Box 41200
Olympia, Washington 98504-1200
360.902-8704

January 13, 2004

Board of Directors
Washington Mutual Bank
1201 Third Avenue
Seattle, Washington 98101

Subject: Joint Visitation Dated October 14, 2003

Members of the Board:

We enclose the October 14, 2003, joint visitation report of Washington Mutual Bank. FDIC Examiner Kenneth J. Kroemer and State Examiner John Ransom prepared the visitation report. The purpose of the visitation was to review management's progress towards addressing examination findings resulting from the March 17, 2003, safety and soundness and information technology Reports of Examination and to prepare for the upcoming examinations that are scheduled to begin on March 15, 2004. In addition, three issues that arose since the examination were explored and discussed with management. These issues included the unanticipated negative gain on loan sale incurred by the company's consolidated mortgage banking operation during the third quarter of 2003, the disclosure of unsatisfactory underwriting practices at affiliate Long Beach Mortgage Company, and the realignment of management and the business units.

The examiners concluded that:
- Management's progress toward addressing safety and soundness and information technology examination findings is satisfactory.
- Financial performance was marred by problems during the third quarter, but the bank's financial condition remains satisfactory.
- Issues in the mortgage banking operation impacted the quality of earnings and the effectiveness of management.
- The culture, practices, and systems at Long Beach Mortgage Company are inconsistent with the lending activity of the bank.
- The abandonment of Optis 0.2 represents a significant management/technology failure.

We understand that a major corporate reorganization is in process and plans are being or have been implemented to address mortgage banking weaknesses, practices at Long Beach Mortgage Company, and information technology strategies.

The Board is encouraged to review the visitation report, although no formal response is requested. If you have any questions, please contact Assistant Regional Director J. George Doerr or Senior Examiner Stephen P. Funaro of the FDIC at (206) 284-1112 or Program Manager Michael Abe of the State of Washington Department of Financial Institutions at (360) 902-8704.

Sincerely,

Nancy E. Hall
Regional Director
Federal Deposit Insurance Corporation

David G. Kroeger
Director of Banks
State of Washington
Department of Financial Institutions

Permanent Subcommittee on Investigations
**EXHIBIT #8b**

PRIVILEGED

FDIC-EM_00102515

## Background

The FDIC and Washington State Department of Financial Institutions (DFI or State) visited Washington Mutual Bank (WMB) from 10/14/2003 to 12/11/2003. The visitation was conducted concurrently with representatives of the Office of Thrift Supervision (OTS). The purpose of the visitation was to perform an interim assessment of WMB's financial condition and performance, follow up on outstanding issues from the 3/17/2003 examinations, and prepare for the 3/15/2004 examination. In addition, three issues that arose since the examination were discussed with management:

- The unanticipated negative gain on loan sale incurred by Washington Mutual Inc.'s (WMI) consolidated mortgage banking operation during the third quarter of 2003;
- The disclosure of unsatisfactory underwriting practices at sub prime lending affiliate Long Beach Mortgage Company, Inc. (LBMC); and
- The resultant realignment of management and the business units.

## Summary

Like WMI, WMB's financial performance during the third quarter of 2003 was marred by problems, but the bank's condition remains satisfactory. Issues in WMI's mortgage banking operation and at LBMC impacted the quality of earnings, adequacy of capital, contingent liquidity, and the effectiveness of management throughout the entire organization. A major corporate reorganization is in process that is intended to address outstanding issues.

Management's progress toward addressing Examination Findings from the 3/17/2003 examination was reviewed and found to be satisfactory.

Redacted
by
Permanent Subcommittee
on Investigations

# Redacted by Permanent Subcommittee on Investigations

PRIVILEGED                                                                                                  FDIC-EM_00102517

**Redacted
by
Permanent Subcommittee
on Investigations**

LONG BEACH MORTGAGE COMPANY
LBMC is a non-bank affiliate of WMB and WMBFA. It securitizes and sells sub prime residential loans originated through brokers.

An internal residential quality assurance (RQA) report for LBMC's first quarter 2003 sub prime lending product was issued as of 7/31/2003. It concluded that 40% (109 of 271) of loans reviewed were considered unacceptable due to one or more critical errors. This raised concerns over LBMC's ability to meet the representations and warranty's made to facilitate sales of loan securitizations, and management halted securitization activity. A separate credit review report was completed by Corporate Credit Review on 8/29/2003 that reached similar conclusions and disclosed that LBMC's credit management and portfolio oversight practices were unsatisfactory.

The inability to securitize and sell new loan production caused LBMC's warehouse to increase by approximately $1 billion per month to $5 billion at the end of November 2003. The increase was funded through borrowing lines from affiliates and other creditors. LBMC President Troy Gotshall stated that he hoped a $3 billion securitization and sale transaction could occur during January. Unless a sale transpires soon, liquidity will be strained. One element of LBMC's contingent liquidity plan includes the potential sale of warehouse loans to the insured institutions.

A review of loans in the mortgage pipeline and warehouse commenced under the direction of EVP and Senior Legal Counsel Fay Chapman to determine the extent of the problems. Approximately 4,000 of the 13,000 loans in the warehouse had been reviewed by the end of November 2003; of these, approximately 950 were deemed saleable, 800 were deemed unsaleable, and the remainder contained deficiencies requiring remediation prior to sale.

It was reported separately that of 4,500 securitized loans eligible for foreclosure, 10% could not be foreclosed due to documentation issues.

President Gotshall stated that the problems were largely attributable to management's decision to integrate LBMC's sub prime loan origination and servicing operations into WMI's prime home lending program. This integration began in 2000 and continued through 2002. It now appears that some loans originated and securitized during that period may not have meet the representations and warranties made in the pooling and servicing agreements and therefore are contingent liabilities to LBMC since they could be put back by the investors. EVP Fay Chapman acknowledged the potential contingent liability, but stated that management has not quantified the exposure. The outstanding principal balances of loans securitized and sold during this time period totals approximately $11 billion.

Senior Vice President (SVP) John Robinson was appointed to LBMC's three member board of directors in December 2003. The other members are Chief Financial Officer Tom Casey and EVP Craig Chapman. The board met on 12/05/2003; the prior meeting was back in July. SVP Robinson acknowledged that oversight of LBMC had been inadequate. The culture, practices, and systems at LBMC are inconsistent with the lending activity of WMB, and it remains to be seen if LBMC can be effectively assimilated into WMI.

### Status of Findings from Prior Examinations

Management continues to monitor examination findings and responses through a "findings matrix" which is also used as the response to the Report of Examinations. Internal Audit reviews the responses to determine if the responses are sufficient to "close" the issue. We worked jointly with the OTS to review management's progress in addressing the findings.

Management has implemented action plans to address the Examination Findings from the 3/17/2003 examination. Satisfactory progress was noted, although many action plans are still in process. Internal Audit had not yet assessed the status of all of management's responses; this should be completed in the first quarter of 2004 and will be reviewed during the 2004 examination.

### 2004 Safety and Soundness Examination

The 2004 examination is scheduled to commence on 3/15/2004, and the onsite planning phase will begin on 2/17/2004. Coordinating efforts are underway for the joint examination of WMB and concurrent examinations by the OTS of WMI, WMBFA, and Washington Mutual Bank, fsb. In addition, joint Information Technology and concurrent Compliance examinations will be conducted.

A joint entry request package, or PERK, was presented to the bank in December 2003. The FDIC, State, and OTS continue to work together to present a joint request package to eliminate duplications and ease the burden of data collection.

PRIVILEGED

FDIC-EM_00102519

| Report of Visitation (Continued) | 09576 |
|---|---|

### Information Technology

The visitation included an Information Technology (IT) component. WMI's IT environment includes over 200 application systems, many of which were not integrated after acquisition. Many of these systems are relatively unique to WMI and operate in diverse locations with a variety of operating systems, application systems, and disaster recovery plans.

This visitation disclosed that management has made notable progress in addressing the Examination Findings from the 2003 IT examination. However, the issues encountered in the mortgage banking operation during the third quarter had a clear IT component and demonstrated the potential impacts of the current IT environment. Management announced its decision to abandon Optis 0.2 at the end of the visitation. The abandonment of Optis 0.2 represents a significant management/technology failure. Management has a plan to address mortgage technology needs, but until the plan is implemented, IT exposure will remain high.

### Visitation Findings

Visitation findings were discussed with SVP Robinson and Vice President Wedell on 12/9/03, and will be presented to executive management at the 1/22/04 Quarterly Regulators Meeting.

PRIVILEGED                                                                                          FDIC-EM_00102520