**EXHIBIT E**



**WaMu**
Corporate Credit Review

Home Loans
# Wholesale Specialty Lending-FPD
## 2007 Targeted Review

**Distributed to Business Unit:** 08/28/07
**Response from Business Unit:** 09/28/07
**Report Published:** 09/28/07
**Review Rating:** Unsatisfactory

**Distribution**
Cynthia Abercrombie – Sr. Credit Review Officer
Mark Brown – Sr Mgr – Mortgage Underwriting
Ron Cathcart – Chief Enterprise Risk Officer
Debbie Dahl-Amundson – Sr. Manager – Audit
Randy Ennis – Mgr II – Credit Review
Cheryl Feltgen – Chief Risk Officer – Home Loans
Sandra Fields – Area Underwriting Mgr – Sub-prime Strategy
Michelle Hutchings – Area Underwriting Mgr – Sub-prime Ops
Gregg Imm – Senior Compliance Officer

Kerry Killinger – Chairman & Chief Executive Officer
Ernie Mortensen – Sr Mgr – Credit Risk
Cliff Rossi – Chief Credit Officer
Steve Rotella – President & Chief Operating Officer
David Schneider – President Home Loans
Melissa Sima – Mgr II – Compliance
Susan Sinn – Div Exec – Mtg Bank Operations
James Tiegen – Sr Mgr – Corporate Credit Review

Washington Mutual Inc. - Confidential

Confidential Treatment Requested by JPMC

Permanent Subcommittee on Investigations
**EXHIBIT #21**

JPM_WM04013923

*Corporate Credit Review*

**Review Rating: Unsatisfactory** – The overall system of credit risk management activities and process has major weaknesses resulting in unacceptable level of credit risk. Exposure is considerable and immediate corrective action is essential in order to limit or avoid considerable losses, reputation damage, or financial statement errors. Repeat findings, if any, are significant

## EXECUTIVE SUMMARY

The purpose of this review was to assess the effectiveness of the action plans developed and implemented by Home Loans to address previous review findings in the Corporate Credit Review of Wholesale Specialty Lending (WSL) First Payment Default (FPD) from 2Q2006. Subsequent to the draft report with initial management responses and actions being delivered to the Chief Risk Officer, CCR was informed of the Sub Prime Redesign Initiative. As a consequence, it was necessary to reassess the extent to which the findings would continue to apply in the new operating structure and what adjustments would be necessary to the actions that were proposed. This report reflects all of those considerations.

The review sample included FPD's from November 06 thru March 07 (see table below), evaluated to determine actual reasons for default and any correlation with underwriting deficiencies. Emphasis was placed on validating the implementation of new guidelines and processes, and isolating the impact of these changes on the credit quality of the loan originations.

| | |
|---|---|
| November FPD's | 50 |
| December FPD's | 49 |
| January FPD's | 38 |
| February FPD's | 25 |
| March FPD's | 25 |
| **Total Sample** | **187** |

Many of the action plans developed in response to the previous FPD review were not implemented until January 2007, making it difficult to assess their effectiveness. Although they were in place by the end of the time covered by this review, the impact of the actions has not yet been fully inculcated into the Home Loans credit culture and risk management processes. Therefore, where applicable we compared the guidelines in effect at the time so that the analysis would still be meaningful. The result was the identification of two High Risk Issues and one Medium Risk Issue:

Confidential Treatment Requested by JPMC

*Corporate Credit Review*

- (High) Ineffectiveness of fraud detection tools – 132 of the 187 (71%) files were reviewed by Risk Mitigation for fraud. Risk Mitigation confirmed fraud on 115 files and could not confirm on 17 of the files, but listed them as "highly suspect". This issue is a repeat finding with CCR.

- (High) Weak credit risk infrastructure impacting credit quality. Credit weakness and underwriting deficiencies is a repeat finding with CCR. It was also identified as a repeat finding and Criticism in the OTS Asset Quality memo 3 issued May 17, 2007. Internal Audit in their August 20, 2007 Loan Origination & Underwriting report identified it as a repeat issue. Findings from the CCR FPD review in relation to credit quality:

  - 132 of the 187 loans sampled were identified with red flags that were not addressed by the business unit

  - 80 of the 112 (71%) stated income loans were identified for lack of reasonableness of income

  - 87 files (47%) exceeded program parameters in place at the time of approval

  - 133 (71%) had credit evaluation or loan decision errors present

  - 25 (13%) had title report issues that were not addressed

  - 28 (14%) had income calculation errors and 35 (19%) had income documentation errors

  - 58 (31%) had appraisal discrepancies or issues that raised concerns that the value was not supported

- (Medium) Insufficient controls around Home Loans Credit Authority (HLCA) – 114 (61%) of the files reviewed were found to contain condition clearing errors. The majority of the time these are cleared by someone other than the underwriter that approved the loan. As part of the review, credit authority was tested for compliance. Of the 53 Senior Loan Coordinators (SLC) in the Anaheim office, 8 (19%) were identified as clearing conditions without loan authority to do so. This is a CCR repeat finding.

Although Wholesale Specialty Lending (WSL) Management has been very responsive in addressing issues, the deficiencies in controls and monitoring of adherence was felt to dilute the positive results from those action plans implemented. A summary of the issues and recommendations can be found below.

Confidential Treatment Requested by JPMC

JPM_WM04013925

*Corporate Credit Review*

**Issue:** **Fraud detection tools such as Dissco, Loan Safe, and HistoryPro are in place; however, these tools are not being utilized effectively by the Underwriters and Loan Coordinators.**

**Rating: High Risk**

The deployment of fraud tools was part of the action plan provided to CCR in response to the initial FPD review that was done. The deployment of these tools was verified to have taken place, but the current review identified that the effectiveness was diminished due to lack of controls around the process. 132 loans or 71% of the loan sample contained information or discrepancies that raised the suspicion of fraud or contained information that would have led the underwriter/loan coordinator to request more information that may have prevented the loan from closing. Risk Mitigation confirmed that 115 or 62% of the 132 loans were fraudulent and 17 others were "Highly Suspicious".

**Recommendation:** This area continues to require management's attention. We recommend the business unit revisit fraud controls to ensure that the training provided is effective and lending personnel are held accountable for non-compliance with processes in place. Strong reinforcement is needed in this area.

**Issue:** **Weak credit risk infrastructure continues to create credit decision and processing errors contributing to loan file deficiencies impacting the credit quality of the portfolio.**

**Rating: High Risk**

The implementation of new processes and guidelines to mitigate risk continues to be an important strategy. This cannot be effective, however, if the credit risk infrastructure is not adhering to the established process and controls. The error rates in credit evaluation and processing continues to be significant enough that the credit quality of the portfolio has been impacted. Only 9 of the 187 (4.81%) files reviewed were found to contain no deficiencies in evaluating and processing the loan.

**Recommendation:** The Business Unit should enforce controls to evaluate that individuals are qualified and trained appropriately to execute their roles, and ensure management as well as the individual is accountable for their results.

Confidential Treatment Requested by JPMC

*Corporate Credit Review*

| Issue: | Home Loans Credit Authority (HLCA) is not utilized effectively to ensure that loan decisions and conditions are being approved by individuals with the appropriate level of authority, skill set, and consistency needed to ensure credit quality. |
|---|---|
| **Rating: Medium Risk** | Action Item from Previous Review: The implementation of new HLCA policy and processes. HLCA is a critical control that ensures loans are approved by those individuals who have the appropriate training, skill sets, and authority to make credit decision for WaMu.   While the policy transition took place, complete execution and further refinement is still in process. HLCR testing results indicated on their July report that 62% of the errors cited under credit evaluation were not the fault of the underwriter, but someone else in the process. Team and LFC managers as well as Loan Coordinators cleared a majority of the conditions, and were responsible for the errors found. The quality control reviews that impact incentives, however, only impact the underwriter currently.<br><br>**Recommendation:** CCR recommends that these critical controls be implemented and deployed to ensure adherence to HLCA policies and processes. This should include tracking and data management initiatives in order to effectively make decisions around appropriate HLCA levels. |

## BACKGROUND

Rising FPD rates were evident in early 2006 and seen as an advance indicator of credit quality deterioration in originations. Based on this, Corporate Credit Review (CCR) had been monitoring the performance deterioration of the Held for Investment (HFI) assets that were originated by the then Long Beach Mortgage. In order to gain insight into the substantial increase in non-accrual assets and delinquency performance in recent vintages, CCR performed a targeted review of the 2Q06 First Payment Defaults (FPD). That review was rated "Requires Improvement" and noted deficiencies in credit risk management infrastructure, activities and processes requiring management attention and immediate corrective action. The current review was performed on 4Q06 and 1Q07 FPD loans to assess the effectiveness of management's action plan implementation.

Wholesale Specialty Lending (WSL) previously operated as a separate legal entity which was realigned under the Wholesale Channel of Home Loans and most of its operations have since been integrated into the Home Loans operating environment.  The transition

Confidential Treatment Requested by JPMC

*Corporate Credit Review*

brought several changes to the management structure, many of which took place in the later part of 2006 as the transition to Home Loans was effective July 1, 2006.

In response to challenging market conditions WSL has continued to adjust products and guidelines to meet the demands of external environments. These changes have resulted in significant declines in production which have led to the closure of 7 Loan Fulfillment Centers operating in 2006. In addition, the realignment has created a temporary negative impact on processes and consistency. With delinquency and foreclosure rates rising and homes for sale inventories increasing, credit spreads and investor demand has become unfavorable. These elements create further stress on the Home Loans credit infrastructure and only increase the pressure to originate loans with appropriate credit quality and risk-adjusted returns.

The following chart provides historical data across the period covered by both reviews.

| Month | May 06 | June 06 | July 06 | Aug 06 | Sept 06 | Oct 06 | Nov 06 | Dec 06 | Jan 07 | Feb 07 | Mar 07 | April 07 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| FPD rate | 2.46% | 2.63% | 2.85% | 2.73% | 2.06% | 3.23% | 3.38% | 2.76% | 2.15% | 1.68% | 1.96% | 1.81% |
| Fraud loss | $0.19M | $0.60M | $0.83M | $2.39M | $2.41M | $1.23M | $2.20M | $0.29M | $2.36M | $2.42M | $3.49M | $4.38M |
| Repurchase | $38.7M | $34.8M | $48.4M | $47.0M | $49.8M | $43.4M | $122.7M | $57.9M | $16.2M | $36.7M | $35.4M* | $17.8M |
| Non Accrual | $1.68B | $1.80B | $2.0B | $2.21B | $2.48B | $2.68B | $3.07B | $3.38B | $3.76B | $4.18B | $4.41B | $4.73B |
| 2&3 PPD | $1.61B | $1.89B | $2.01B | $1.96B | $2.18B | $2.34B | $2.59B | $2.80B | $2.89B | $2.76B | $2.57B | $2.74B |
| Volume | $1.8B | $1.7B | $1.6B | $1.7B | $1.5B | $1.5B | $1.3B | $1.1B | $0.9B | $0.6B | $0.7B | $0.6B |

Data obtained from the following sources: 2007Q4 Credit Risk Review, 2007 HL–Front end guidance, Credit Information and Analytics database-May 2007 Portfolio Repurchase pivot, HL–LBM update–OTS meeting 5/10/07, Risk Mgt. Forum analysis and scorecard-7/17/07. Data obtained includes both HFS and HFI. *Reduced $90M to account for a sale that was rolled back and based on the way coded incorrectly reflects in the totals on the pivot table used as repurchase.

CCR acknowledges that WSL Management continues to adjust to meet current demands. During the course of this review a comprehensive plan to improve credit quality was provided which includes changes and action steps that have already taken place, as well as additional initiatives that are currently under development or in varying stages of implementation. Below is the list of those items implemented within the last 60 days. The additional pending initiatives are incorporated as action plans into the issues that they support, beginning on page 7. All of these initiatives are dependent on the reinforcement of the credit risk management infrastructure within Home Loans and the success of the control environment and quality assurance measures to generate quality lending product.

* Effective August 1st, 2007 reduced the number of loan fulfillment centers processing sub prime wholesale transactions to 2; Anaheim, CA and Denver, CO
* Effective July 20th, 2007 began requiring escrow accounts for taxes and insurance on all sub prime originations
* Effective July 20th, 2007 made the following underwriting guideline changes:
  o Elimination of all stated income transactions and reduced documentation programs for sub prime

Confidential Treatment Requested by JPMC

*Corporate Credit Review*

- o Elimination of adjustable products with less than a 5 year initial fixed rate term
  - o Minimum credit score of 540
  - o Maximum cash out is $100,000
  - o Elimination of all piggyback second lien products
  - o Maximum CLTV for non-owner occupied transactions is 80%
  - o Maximum LTV/CLTV for all owner occupied transactions is 90%
  - o Maximum loan amount is $1,000,000
- Effective July 16th, 2007 implemented a new underwriter collateral review checklist to provide additional guidance to our underwriters as they review appraisals
- Effective July 1st, 2007 implemented a standard template for use in completing the underwriter decision summary within the LOS
- Effective June 28th, 2007 implemented a monthly sub prime senior management quality call. The purpose of the call is to review current progress on underwriting and origination quality and discuss opportunities for continued improvement
- To help identify and track errors related to condition clearing and rental income calculation, added the following new events to the Home Loans Credit Review (HLCR) process on June 29th, 2007:
  - o All set conditions were not cleared properly
  - o There was an error in the calculation of rental income
- To further advance the culture change they are promoting within the sub prime organization and leverage the WaMu brand, they have eliminated the name Long Beach Mortgage and renamed the sub prime wholesale business to WaMu® Wholesale Specialty Lending effective August 1, 2007.

Confidential Treatment Requested by JPMC

*Corporate Credit Review*

# DETAILED ISSUES AND MANAGEMENT RESPONSE

The following issues contain management's written response and, where appropriate, a Corrective Action Plan with target completion date and name of responsible party.

## ISSUE

**Fraud detection tools such as Dissco, Loan Safe, and HistoryPro are in place; however, these tools are not being utilized effectively by the Underwriters and Loan Coordinators.**

The deployment of fraud tools was previously identified in the action plan provided to Corporate Credit Review (CCR) in response to the initial FPD review that was done. In March, 2006 Long Beach Mortgage implemented DISSCO screening for loan submissions to minimize fraud related to incorrect applicant information and property overvaluation. Beginning January 5, 2007, Core Logic Loan Safe was fully deployed and ran on each new loan submission. Previously it was run only for designated high risk markets. HistoryPro was implemented October 2005 and in November 2006 was updated as to what programs it is required for. It is a tool used in the appraisal review process which includes the use of an AVM as well as property records to identify potential issues with the collateral. CCR has observed that the underwriters and or loan coordinators failed to properly review these tools and utilize their results in the loan decision.

During the course of this review, CCR identified *132 (71%)* loan files that contained information or discrepancies that raised the suspicion of fraud or contained information that would have led the underwriter / loan coordinator to request more information that may have prevented the loan from closing, many based on information in the DISSCO and or Loan Safe reports. The training for these tools clearly indicates the appropriate process to be followed. It appears the user was solely focused on reviewing the final score to ensure policy was met rather than review the entire report for red flags that could reveal fraudulent activity when resolved. In addition, alerts were cleared to increase the score to acceptable levels with no explanation of how this was done. Of the files reviewed by Risk Mitigation they confirmed fraud on **115 (62%)** of them, with the other **17** noted as highly suspect even though unable to confirm.   It is CCR's opinion that had the field properly utilized the tools provided, (Loan Safe, DISSCO, and HistoryPro) fraud and a subsequent first payment default could have been avoided on many of these files.

FPD loan reviews were completed by Risk Mitigation and Corporate Credit Review (CCR) that had been previously completed by Home Loans Credit Review (HLCR) in their post funding or underwriter credit quality reviews. Of the 187 loans in the FPD review, CCR identified that **9 (4.8%)** had previously been reviewed by HLCR. Data provided by Risk Mitigation for their April FPD reviews shows that **11** out of 37 **(29.7%)** files reviewed by them had previously been reviewed by HLCR. The observations on those 20 loans are found below:

- Of the 20 files reviewed 10 were confirmed with fraud and 2 were identified as suspect by Risk Mitigation.

Confidential Treatment Requested by JPMC

JPM_WM04013930

*Corporate Credit Review*

- Of the 12 files felt to contain fraud, there were 2 referred to Risk Mitigation by HLCR and the additional files were not. The 10 files not referred were felt to contain red flags that would have warranted being sent to Risk Mitigation.
- 12 of the 20 files in common did not have any events cited by HLCR.

The data shows there is inconsistency between how the files are tested in HLCR and Risk Mitigation results and if the groups can collaborate in order to eliminate the gap between findings there would be a large benefit to the business unit.

**Recommendation:**

Controls to ensure that training in the use of fraud tools and/or accountability for non-compliance of processes need to be implemented.

- If reviews reveal that processes are not followed, employees need to be assessed to determine the cause and appropriate course of action. This could result in the following actions being taken for habitual offenders:
  - The training provided appears sufficient, but validation that the training was performed and understood may be needed. Additional types of training, such as seminars or web casts may be required to further explain processes
  - Review of errors and counseling
  - Verbal or written notice of concern
  - Home Loans Credit Authority (HLCA) suspended or revoked
  - Termination
- Team managers need to share in the accountability for the actions of their employees. It is their responsibility to assess and recommend appropriate courses of action to resolve issues.
- Enhance collaboration between Risk Mitigation and HLCR by communicating fraud findings on all loans that were included in the HLCR test population
  - When HLCR becomes aware of errors or discrepancies on their reviews, that data should be captured in their database in order to identify the flaws in the original review if warranted
  - Feedback to HLCR is critical in order for them to performance manage and correct deficiencies present
  - The feedback from Risk Mitigation provides the opportunity to adjust the HLCR test criteria to make sure the correct information is being assessed. It would allow level setting to make sure that the results meet the expectations of those utilizing the data and provide consistency
  - With the amount of reviews in common there is the opportunity to use the HLCR data as an early warning for delinquency and fraud detection as well as provide the necessary feedback to the underwriters at a more timely point to impact changes. Based on the large percentage of the population confirmed to be misrepresented, this should have the benefit of helping to reduce the FPD's by catching the issues prior to funding

Confidential Treatment Requested by JPMC

| **Response – Wholesale Specialty Lending concurs with the finding.** | |
|---|---|
| **Action Plan –** Removal of HLCA from all non-underwriting employees. – Effective September 1st, 2007 sub prime employees that are not in an underwriting role will no longer have the authority to make underwriting decisions, clear and/or waive underwriting credit conditions. | |
| **Target Date:** 9/1/07 | **Responsible Party:** Mark Brown/Ernie Mortensen |
| **Action Plan –** Mandatory Fraud and Red Flag Training/Certification – During the 4th quarter of 2007 all operations employees involved in the credit decision process will be required to complete training on red flags and fraud. | |
| **Target Date:** 12/31/07 | **Responsible Parties:** Mark Brown |
| **Action Plan –** Improved fraud detection and management tools – We have decided to implement a new fraud detection tool, Data Verify. Our internal testing of several fraud detection tools showed that the most accurate and comprehensive tool available was the Data Verify tool. The new tool has a planned release date of October 31st, 2007. Employees who fail to utilize the tool as instructed will be placed on performance improvement plans. | |
| **Target Date:** 10/31/07 | **Responsible Parties:** Rich McCoppin/Chris Johnson |

## ISSUE

**Credit decision and processing errors contribute to loan file deficiencies impacting the credit quality of the portfolio.**

The implementation of new guidelines to address specific loan default issues was previously identified in the action plan provided to Corporate Credit Review (CCR) in response to the initial FPD review. In the course of this follow up review, credit decision and processing errors by Underwriters and Loan Coordinators was identified as a key contributor to the First Payment Defaults that were reviewed. The conclusion drawn is guideline changes will not be an effective tool to address default rates if there is not corresponding adherence and execution to allow these changes to be implemented as intended.

Training was identified as an action plan on the previous FPD review as well as for many of the issues cited by Home Loans Credit Review (HLCR). CCR feels training has not proven to be the solution by itself, as can be seen by some of the issues that have had training as their action plan for 6-12 months without reducing the issue below threshold. The root cause is seen to be more systemic and appears to be driven by either lack of controls or insufficient skill sets.

Confidential Treatment Requested by JPMC

*Corporate Credit Review*

Post closing reviews performed by Home Loans Credit Review (HLCR) indicate that WSL credit decision error rates have reduced to 18.4% in April 2007 from a high of 34.2% in 4Q06. Although this represents positive trending, it is still over the materiality thresholds established at 8%. CCR observed during this review of FPD files that these errors occurred at a higher rate in this adverse sample. The LBM Deep Dive Summary and Analysis done on 2/1/07 FPD files by LBM underwriting supports this. The root cause analysis in this report shows that only 10.6% of the time would they do the loan again; and 73.7% of the time there were red flags missed, underwriting errors, or condition clearing errors found in the files. The CCR file review found similar errors impacting the overall quality of the transaction and potentially whether the loan should have been made. The results of these items tested are:

- 87 of the 187 files tested (47%) had errors that caused the loan to exceed program parameters or guidelines.
- Reasonableness of stated income – 112 of the files tested were stated income and 80 (71%) of those had issues that were not addressed which raised the question of the reasonableness of that stated income.
- Condition clearing – 61% of the files reflected conditions that were cleared inappropriately or without documentation that met the condition.
- Credit evaluation and loan decision - 72% of the files had credit decision errors and 52% did not have all the appropriate conditions set. There were 132 files found to have risk factors that were not addressed.
- Red flag detection - Loan Safe results were not evaluated correctly in 32% of the files. Dissco report issues were not appropriately addressed in 41% of the files. Red flags were found in the file and not addressed in 130 files reviewed.
- Net tangible benefit - It was observed during the FPD review that the Net Tangible Benefit (NTB) was not properly evaluated. From a credit perspective the concern was more than just completing the form correctly, but actually analyzing why the loan would make sense to the borrower. In many of these transactions we saw borrowers willing to pay large fees, pre-pay penalties, increased rates and many times with no payment reductions. Aside from the legal and reputation risks that come from this, understanding the motivation behind some of the transactions or requesting additional information would have helped to make a better loan decision. WaMu feels strongly enough to incorporate into their responsible mortgage lending principles the statement that "we do not refinance any loan secured by the borrower's home unless the new loan offers a net tangible benefit to the borrower."

A segment of the sample population was selected to specifically look at the benefit of the transaction to the borrower. The 187 loan FPD population included 52 owner occupied refinances. Within that population there were 12 loans identified where WaMu held the underlying loan that was being refinanced. These were selected based on the assumption that data would be readily available in order to properly analyze. The results of that review provided the following data:

- o   12 WaMu to WaMu refinances were identified representing 23% of the 52 Owner Occupied (O/O) refinances within the sample
- o   7 of the 12 transactions were refinancing within 12 months of the previous WaMu transaction
- o   6 had prepays to WaMu ranging from $3166 to $18,000, and of those with prepays 3 were loans opened <12 months
- o   8 were adjustable rate mortgages (arm) refinanced to an arm, 2 fixed to arm, and 1 arm to fixed

Confidential Treatment Requested by JPMC

JPM_WM04013933

*Corporate Credit Review*

○ 4 of the 12 (33.3%) transactions reviewed were identified as not having a benefit to the borrower. These were validated by the responsible lending group in compliance as failing the net tangible benefit test, which by policy should have resulted in a decline

○ 10 had net payment increases while only 2 had net payment decreases

○ 7 had cash out of <5% while 5 had cash out of >5%

Although the test for NTB is done by the compliance review group, key to the credit decision is the consideration of the borrower's motivation on the transaction and willingness to repay. Separate from whether a form or test was completed correctly, the underwriter needs to identify whether the transaction makes sense. The guidelines specify that "a Credit Approver reviewing this type of transaction must understand the WaMu Wholesale Specialty Lending guidelines and also make their own subjective evaluation whether a loan presents a benefit to the applicant and an appropriate level of risk to the company."

As a result of the findings above, CCR elevated the concerns regarding high cost and NTB calculations of these WaMu to WaMu loans to Corporate Compliance to validate that policy sufficiently addresses how these transactions should be handled.

**Recommendation:**

Controls need to be put in place to evaluate that individuals are qualified and trained appropriately to execute their roles, and ensure management as well as the individual is accountable for their results.

• Proper accountability and processes in place to appropriately performance manage is needed. This should include suspension or removal of HLCA until appropriate training and verification of adherence to guidelines and processes is found. This should not only require feedback on a timely basis, but accountability for the manager and/or person signing behind their work.

• An underwriter quality review and scorecard was identified in the action plan on the previous FPD review, and was rolled out at the end of 2006. This specifically is designed to performance manage through compensation impacts and coaching/training. It should be noted that this would not have had time to impact the results of many of the files CCR reviewed, but this process has not eliminated the same types of underwriting and processing errors found in other channels that already had it in place. Continuous monitoring of the quality review process to ensure results match the portfolio credit quality needs to be implemented, so that timely adjustments can be made as needed.

• Messaging from management to reinforce the appropriate credit culture and support the controls in place will be crucial to effectively bringing focus and impact results.

• CCR feels that much of the focus around benefit to the borrower is from the regulatory perspective of trying to complete the NTB form to pass the test, while analyzing motivation of the borrower in addition to confirming benefit should be a key component of every credit decision. Education regarding the risk impacts and understanding why it is an important part of the credit decision needs to be

Confidential Treatment Requested by JPMC

*Corporate Credit Review*

developed. Since policy already exists that the approver is responsible to assess the benefit and risk of the transaction, Home Loans Credit Review (HLCR) testing of the credit approval should include effectiveness of this assessment by the approver within their testing criteria to monitor and provide feedback. Collaboration with compliance to eliminate any concerns over duplicative testing will be needed.

| Response – Wholesale Specialty Lending concurs with the finding. |
|---|

**Action Plan** – Sub Prime Redesign Initiative – We have announced the closures of all of our Wholesale sub prime loan fulfillment centers. We will complete a full integration of our sub prime process into our Wholesale prime loan fulfillment centers.

| **Target Date:** 10/09/07 | **Responsible Party:** Mark Brown/Bill Steinmetz |
|---|---|

**Action Plan** – Home Loans Credit Authority (HLCA) Recertification – All employees within sub prime operations will be required to retest and pass a recertification test. Any employee that fails to pass the recertification after 2 attempts will have their HLCA revoked. Employees in positions which require HLCA who fail to pass the recertification by December 15th, 2007 may be terminated. The recertification process will begin on August 1st, 2007. Completion of the project has been completed.

| **Target Date:** Complete | **Responsible Parties:** Mark Brown/Ernie Mortensen |
|---|---|

**Action Plan** – Removal of HLCA from all non-underwriting employees – Effective September 1st, 2007 sub prime employees that are not in an underwriting role will no longer have the authority to make underwriting decisions, clear and/or waive underwriting credit conditions.

| **Target Date:** Complete | **Responsible Parties:** Mark Brown/Ernie Mortensen |
|---|---|

**Action Plan** – Clarification and consolidation of underwriting guidelines and policy – We are in the process of consolidating our multiple manuals, announcements, and job aids into one underwriting guidelines manual. In addition, we will review our sub prime underwriting guidelines and wherever possible, we will adopt prime policy in sub prime. This process is scheduled to be completed by October 1st, 2007.

| **Target Date:** 10/01/07 | **Responsible Parties:** Denise Smith-McCrainey |
|---|---|

Confidential Treatment Requested by JPMC

JPM_WM04013935

*Corporate Credit Review*

## ISSUE

**Home Loans Credit Authority (HLCA) is not utilized effectively to ensure that loan decisions and conditions are being approved by individuals with the appropriate skill set and consistency needed to ensure credit quality.**

The implementation of new HLCA, policy and processes was previously identified in the action plan provided to Corporate Credit Review (CCR) in response to the initial FPD review that was done. The action plan indicated HLCA would be granted based on experience and results of specific non-prime test cases. To date those test cases have not yet been implemented and training required as part of the new process was grandfathered on current employees and only applies to new hires or if assigned.

During the file review done by CCR there were 8 files of the 187 reviewed (4.3%) that did not have the appropriate HLCA on the approval or exception. In addition, two LFC's (Anaheim and Denver) were tested to see if conditions were cleared or waived by appropriate HLCA. In Denver there were no Senior Loan Coordinators (SLC) found to be clearing conditions without appropriate HLCA. In Anaheim, there were eight SLC's that cleared conditions and either had no HLCA or an inappropriate level. This indicates either a lack of understanding, or a lack of controls around the HLCA process. HLCA is felt to be a critical control to validate only people with the appropriate skill set and training are making decisions and clearing conditions. Without this control in place credit quality is impacted as well as increased exposure to rep and warrant violations with investors.

## Recommendation:

CCR recommends that controls be implemented to ensure adherence to HLCA policy and processes. In addition provide support to administrators to allow for effective use as a tool to support credit quality initiatives.
- System enhancements that block exceptions, approvals and condition clearing by individuals without the appropriate HLCA.
- Provide a centralized resource to monitor quality by adding data from the quality reviews that are performed into the HLCA database. It should also include documentation and trending from additional sources such as delinquency, Risk Mitigation, Internal Audit, and CCR.
- Utilization of all data and resources available should be incorporated into the HLCA decision process along with appropriate management support for enforcement.
- Finalization of the test cases used to evaluate HLCA as well as training requirements evaluated and updated for approvers not meeting quality targets.
- A control around the quality review testing criteria needs to include a process to match results against actual performance to ensure effectiveness. As gaps are found then criteria should be altered.

Confidential Treatment Requested by JPMC

*Corporate Credit Review*

---

**Response – Wholesale Specialty Lending concurs with the finding.**

**Action Plan** – Home Loans Credit Authority (HLCA) Recertification – All employees within sub prime operations will be required to retest and pass a recertification test. Any employee that fails to pass the recertification after 2 attempts will have their HLCA revoked. Employees in positions which require HLCA who fail to pass the recertification by December 15th, 2007 may be terminated. The recertification process will begin on August 1st, 2007. Completion of the project has been completed.

**Target Date:** Completed                              **Responsible Party:** Mark Brown/Ernie Mortensen

**Action Plan** – Removal of HLCA from all non-underwriting employees – Effective September 1st, 2007 sub prime employees that are not in an underwriting role will no longer have the authority to make underwriting decisions, clear and/or waive underwriting credit conditions

**Target Date:** Completed                              **Responsible Parties:** Mark Brown/Ernie Mortensen

**Action Plan** – Elimination of exceptions to underwriting guidelines for all wholesale transactions– Effective September 1st, 2007 no exceptions to underwriting guidelines will be allowed in wholesale by anyone other than a site underwriting manager. In addition, we have developed a comprehensive list of exceptions that will not be allowed under any circumstances and established a 5% tolerance for exceptions.

**Target Date:** 09/01/07                              **Responsible Parties:** Mark Brown

**Action Plan** – Sub Prime Redesign Initiative – We have announced the closures of all of our Wholesale sub prime loan fulfillment centers. We will complete a full integration of our sub prime process into our Wholesale prime loan fulfillment centers.

**Target Date:** 10/09/07                              **Responsible Parties:** Mark Brown/Bill Steinmetz

---

Confidential Treatment Requested by JPMC

JPM_WM04013937

Corporate Credit Review

# REVIEW RATING DEFINITIONS

**Satisfactory** -- The overall system of credit risk management activities and process is effective and well-documented. Few minor deficiencies exist with minimal resulting exposure. Credit risk has been managed at an acceptable level. Repeat findings, if any, are not significant.

**Satisfactory with Qualification** -- The overall system of credit risk management activities and process is generally adequate and functions effectively; however, isolated deficiencies require management attention. While these isolated deficiencies create some exposure, credit risk has been managed at an acceptable level. Repeat findings, if any, are not significant.

**Requires Improvement** -- The overall system of credit risk management activities and process has deficiencies related to multiple business activities. Exposure is considerable and immediate corrective action is essential in order to limit or avoid considerable losses, reputation damage, or financial statement errors. Repeat findings, if any, are significant.

**Unsatisfactory** -- The overall system of credit risk management activities and process has major weaknesses resulting in unacceptable level of credit risk. Exposure is considerable and immediate corrective action is essential in order to limit or avoid considerable losses, reputation damage, or financial statement errors. Repeat findings, if any, are significant

Confidential Treatment Requested by JPMC

*Corporate Credit Review*

## APPENDIX

### Details of WaMu to WaMu transactions with no benefit to the borrower

Tuavao, Salesi and Wailupe (0729494211)

- Funded 9/26/06. Paid off existing WAMU loan opened 1/06 (0697403335)
- 3 incomplete/inaccurate NTB forms found in file. The 9/11 was the final one
- Collected pre-pay penalty of $18,000
- Paid Ford judgment on title with no payments (Nelson and Kennard are atty)
- Paid MaryAnn Salt $31,303 at close per HUD 1. She is listed as processor on credit and per Risk Mitigation owns the submitting Broker
- Payment increase of $100 on new payment vs old payment
- Borrower brought cash to close of $5241.81, and besides broker paid current years taxes and insurance and FORD judgment
- ARM to ARM, 40 yr to 40 yr term

Hernandez, Edmundo (0729529024)

- Funded 10/26/06. Paid off existing WAMU loan opened 1/06 (0697331874 and 0697331858)
- 3 incomplete/inaccurate NTB forms found in file
- Collected pre-pay penalty of $12,030 between 1st and 2nd WAMU loans paid off
- Paid 2 accounts with payments totaling $526, current year taxes, and collection accounts with no payments.
- Payments from $3121 to $3739, but with debt payoff the net increase was $92.
- Going from a 30 yr to 40 yr term, arm to arm, 8% rate on 1st and 11.69% on 2nd to 9.975%
- Borrower cash out of $1546 besides debt payoff and current year taxes paid.

Smolly, Shana (0729851246)

- Funded 1/8/07. Paid off existing WAMU loan opened 3/06 (0697808145 and 0697808152)
- 3 NTB forms in file appear accurately completed, but then show as pass
- Collected pre-pay of $16,028 between 1st and 2nd WAMU loans paid off
- Cash out was $16,968 (2.74%) and paid existing years taxes
- Payments from $3874 to $5350
- Going from 30 yr to 40 yr term, 2/28 with 3 yr pre-pay, rate from 7% arm and 10.8 fixed to 10.175% arm.

Belkhouribchia, Khadija (0729805986)

- Funded 11/29/06. Paid off existing WAMU loan opened 11/05 (0696888833)
- 1 NTB form found in file

Confidential Treatment Requested by JPMC

JPM_WM04013939

*Corporate Credit Review*

- No pre-pay on WAMU existing loan and new loan has 2 yr pre-pay
- Converted from 1st to $1^{st}/2^{nd}$ Piggy and paid $10,088 fees between 1st and 2nd. YSP $10,560.
- Payments from $3114 to $3761
- Rate from 8.0% to 9.25% on 1st and 11.0% on 2nd, with arm to arm on 1st and fixed to arm for 2nd.

### Sample Profile-Doc Type

| Sample Month | Nov 06 | Dec 06 | Jan 07 | Feb 07 | Mar 07 | Total | % of sample |
|---|---|---|---|---|---|---|---|
| Stated | 26 | 34 | 23 | 15 | 14 | 112 | 59.89% |
| Standard | 24 | 13 | 13 | 6 | 9 | 65 | 34.76% |
| Limited | 0 | 2 | 2 | 4 | 2 | 10 | 5.35% |
| Total* | 50 | 49 | 38 | 25 | 25 | 187 | |

*The monthly sample was reduced down to 25 at the point it was determined the smaller sample would not impact results and action plans could not be evaluated for trending based on execution timelines.

### Sample Profile-Occupancy

| Sample Month | Nov 06 | Dec 06 | Jan 07 | Feb 07 | Mar 07 | Total | % of sample |
|---|---|---|---|---|---|---|---|
| Owner occupied | 39 | 39 | 29 | 16 | 21 | 144 | 77.01% |
| Investment | 10 | 9 | 9 | 9 | 4 | 41 | 21.93% |
| 2nd Home | 1 | 1 | 0 | 0 | 0 | 2 | 1.07% |
| Total | 50 | 49 | 38 | 25 | 25 | 187 | |

### Sample Profile-Purpose

| Sample Month | Nov 06 | Dec 06 | Jan 07 | Feb 07 | Mar 07 | Total | % of sample |
|---|---|---|---|---|---|---|---|
| Purchase | 28 | 34 | 27 | 19 | 11 | 119 | 63.64% |
| Refinance | 22 | 15 | 11 | 6 | 14 | 68 | 36.36% |
| Total | 50 | 49 | 38 | 25 | 25 | 187 | |

### Review Result data

- 132 of the 187 (71%) files were reviewed by risk mitigation for fraud. Risk mitigation confirmed fraud on 115 files and could not confirm on 17 of the files, but listed them as highly suspect

*Washington Mutual, Confidential*
*Last Updated 09/28/2007*

Confidential Treatment Requested by JPMC

JPM_WM04013940

*Corporate Credit Review*

- 80 of the 112 (71%) stated income loans were identified for reasonableness of income
- 132 of the 187 loans were identified with red flags that were not addressed
- Bank statement analysis was identified as a key contributor in the risk factors not addressed. This was based on not addressing numerous NSF and overdrafts as well as transfers and large deposits that would indicate a discrepancy in the income being used to qualify.
- 87 (47%) files exceeded program parameters in place at the time of approval due to errors
- 133 (71%) had credit evaluation or loan decision errors present
- Only 9 of the 187 files (5%) were found to have no errors
- 114 (61%) had condition clearing errors and 96 (51%) had condition setting errors
- 19 (10%) were approved at an incorrect credit grade. Usually due to intervening payments not obtained that would have changed the grade if it had been, or demands showing delinquency that was not available at initial underwrite
- 25 (13%) had title report issues that were not addressed
- 28 (15%) had income calculation error and 35 (19%) had income documentation errors
- Appraisal discrepancies or issues that raised concerns that the value was not supported was found in 58 (31%) files

Confidential Treatment Requested by JPMC