**EXHIBIT F**

EXHIBIT

B

PURCHASE AND ASSUMPTION AGREEMENT

AMONG

FEDERAL DEPOSIT INSURANCE CORPORATION,
RECEIVER OF MAINE SAVINGS BANK,

FEDERAL DEPOSIT INSURANCE CORPORATION

and

## FLEET BANK OF MAINE

DATED AS OF
FEBRUARY 1, 1991

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| ARTICLE I | DEFINITIONS | 2 |
| ARTICLE II | ASSUMPTION OF LIABILITIES | 2 |
| § 2.1 | Liabilities Assumed by Assuming Bank | 2 |
| § 2.2 | Interest on Deposit Liabilities Assumed | 3 |
| § 2.3 | Unclaimed Deposits | 3 |
| § 2.4 | Employee Benefit Plans | 4 |
| ARTICLE III | PURCHASE OF ASSETS | 4 |
| § 3.1 | Assets Purchased by Assuming Bank | 4 |
| § 3.2 | Asset Purchase Price | 5 |
| § 3.3 | Manner of Conveyance; Limited Warranty; Nonrecourse; Etc. | 6 |
| § 3.4 | Assets Not Purchased by Assuming Bank | 6 |
| § 3.5 | Loans Essential to Receiver | 7 |
| ARTICLE IV | ASSUMPTION OF CERTAIN DUTIES AND OBLIGATIONS | 8 |
| § 4.1 | Continuation of Banking Business | 8 |
| § 4.2 | Agreement With Respect to Credit Card Business | 8 |
| § 4.3 | Agreement With Respect to Safe Deposit Business | 8 |
| § 4.4 | Agreement With Respect to Safekeeping Business | 9 |
| § 4.5 | Agreement With Respect to Trust Business | 9 |
| § 4.6 | Agreement With Respect to Certain Bank Premises | 9 |
| § 4.7 | Agreement With Respect to Leased Data Processing Equipment | 11 |
| § 4.8 | Agreement With Respect to Certain Service Agreements | 12 |
| § 4.9 | Informational Tax Reporting | 13 |
| § 4.10 | Insurance | 13 |
| § 4.11 | Office Space for Receiver and Corporation | 13 |
| ARTICLE V | DUTIES WITH RESPECT TO DEPOSITORS OF THE FAILED BANK | 14 |
| § 5.1 | Payment of Checks, Drafts and Orders | 14 |
| § 5.2 | Deposit Agreements | 14 |
| § 5.3 | Notice to Depositors | 14 |

                                                                        Page

ARTICLE VI        RECORDS.................................................  14

    § 6.1     Transfer of Records..........................  14
    § 6.2     Delivery of Assigned Records.................  15
    § 6.3     Preservation of Records......................  15
    § 6.4     Access to Records; Copies....................  16
    § 6.5     Certain Other Records........................  16

ARTICLE VII       BID; INITIAL PAYMENT.......................  16

    § 7.1     Initial Payment..............................  16
    § 7.2     Form of Payment..............................  16

ARTICLE VIII      THE ASSET POOL.............................  17

    § 8.1     Initial Pool Assets..........................  17
    § 8.2     Transfer of Additional Assets to the
                  Pool.....................................  19
    § 8.3     Treatment of Related Loans and
                  Undiscovered Assets......................  24
    § 8.4     Retransfers to Receiver......................  25
    § 8.5     Corporation Protection Against Loss..........  25
    § 8.6     Final Settlement of the Pool.................  29

ARTICLE IX        ADJUSTMENTS................................  29

    § 9.1     Pro Forma Statement; New Schedules...........  29
    § 9.2     Correction of Errors and Omissions;
                  Other Liabilities........................  29
    § 9.3     Payment and Transfer on Settlement Date......  30
    § 9.4     Interest.....................................  30
    § 9.5     Adjustments After Settlement Date............  30

ARTICLE X         CONTINUING COOPERATION.....................  3

    § 10.1    General Matters..............................  3
    § 10.2    Additional Title Documents...................  3
    § 10.3    Claims and Suits.............................  3
    § 10.4    Payment of Deposits..........................  3
    § 10.5    Withheld Payments............................  3
    § 10.6    Proceedings With Respect to Certain
                  Assets and Liabilities...................  3
    § 10.7    Corporation Funding..........................  

ARTICLE XI        CONDITION PRECEDENT........................  0

Page

ARTICLE XII       REPRESENTATIONS AND WARRANTIES.............    33

    § 12.1        Representations and Warranties of
                      the Corporation......................    33
    § 12.2        Representations and Warranties of the
                      Assuming Bank and the Servicer........    33

ARTICLE XIII      DISCRETIONARY PAYMENTS; DISTRIBUTIONS.......    36

    § 13.1        Discretionary Payments....................    36
    § 13.2        Distribution by Receiver..................    37

ARTICLE XIV       INDEMNIFICATION...........................    37

    § 14.1        Indemnification of Indemnitees............    37
    § 14.2        Actions of Indemnitees with
                      Respect to Claims.....................    40
    § 14.3        No Additional Warranty....................    41
    § 14.4        Indemnification of Corporation and Receiver..    41
    § 14.5        Obligations Supplemental..................    42
    § 14.6        Criminal Claims...........................    42
    § 14.7        Corporation Obligation....................    42

ARTICLE XV        CERTAIN COVENANTS OF THE ASSUMING BANK.......    43

    § 15.1        General Covenants.........................    43
    § 15.2        Tax Ruling................................    44
    § 15.3        Tax Benefits..............................    45
    § 15.4        Tax Returns...............................    45

ARTICLE XVI       MISCELLANEOUS.............................    45

    § 16.1        Entire Agreement..........................    45
    § 16.2        Headings..................................    45
    § 16.3        Counterparts..............................    46
    § 16.4        Governing Law.............................    46
    § 16.5        Successors................................    46
    § 16.6        Modification; Assignment..................    46
    § 16.7        Notice....................................    47
    § 16.8        Manner of Payment.........................    47
    § 16.9        Costs, Fees and Expenses..................    48
    § 16.10       Waiver....................................    48
    § 16.11       Severability..............................    48
    § 16.12       Term of Agreement.........................    48
    § 16.13       Survival of Covenants, Etc................    48

APPENDIX I - Definitions

SCHEDULES

2.1          Certain Deposits Assumed
3.1          Certain Acquired Assets

EXHIBITS

7.2          Form of Corporation Note
8.1(a)       Form of Service Agreement
8.1(e)       Form of Pool Asset Notice
8.2(c)       Loan Information Package
8.6(b)       Form of Purchase Agreement

## PURCHASE AND ASSUMPTION AGREEMENT

THIS AGREEMENT, made and entered into as of the <u>1ST</u> day of
<u>FEBRUARY</u>, 1991, by and among the FEDERAL DEPOSIT INSURANCE
CORPORATION, RECEIVER of MAINE SAVINGS BANK, Portland, Maine
(the "Receiver"), <u>FLEET BANK OF MAINE</u>, organized
under the laws of the <u>STATE OF MAINE</u>, and having
its principal place of business in <u>PORTLAND</u>, <u>MAINE</u> (the
"Assuming Bank"), and the FEDERAL DEPOSIT INSURANCE CORPORATION,
organized under the laws of the United States of America and
having its principal office in Washington, D.C. (the
"Corporation"):

### WITNESSETH:

WHEREAS, on Bank Closing (as hereinafter defined), the
Superintendent of Banking of the State of Maine declared Maine
Savings Bank (the "Failed Bank") insolvent pursuant to State law
and the Corporation accepted the appointment as Receiver thereof
pursuant to 12 U.S.C. Section 1821(c)(3)(A); and

WHEREAS, the Assuming Bank desires to purchase certain
assets and assume the deposit and certain other liabilities of
the Failed Bank on the terms and conditions set forth in this
Agreement; and

WHEREAS, pursuant to 12 U.S.C. Section 1823(c)(4)(A), the
Corporation may provide assistance to the Assuming Bank to
facilitate the transactions contemplated by this Agreement, which
assistance may include indemnification of the Indemnitees (as
defined herein, which term includes the Assuming Bank) under
Article XIV hereof; and

WHEREAS, the Board of Directors of the Corporation has
determined pursuant to 12 U.S.C. Section 1823(c)(4)(A) that
providing such assistance is not in an amount in excess of the
amount which the Corporation has determined to be reasonably
necessary to save the cost of liquidating, including paying the
insured accounts of, the Failed Bank; and

WHEREAS, the Board of Directors of the Corporation has
deemed it appropriate and has determined to provide assistance to
the Assuming Bank on the terms and subject to the conditions set
forth in this Agreement; and

WHEREAS, pursuant to 12 U.S.C. Section 1821(i)(3), the
Corporation, in its discretion, and in the interest of minimizing
its losses, may provide payments from the Bank Insurance Fund to
any claimant against the Receiver or the Failed Bank;

NOW THEREFORE, in consideration of the mutual promises
herein set forth and other valuable consideration, each of the
parties hereto agrees as follows:

# ARTICLE I
## DEFINITIONS

Capitalized terms used in this Agreement shall have the meanings set forth in Appendix I attached hereto and incorporated herein.

# ARTICLE II
## ASSUMPTION OF LIABILITIES

2.1 <u>Liabilities Assumed by Assuming Bank</u>. The Assuming Bank hereby expressly assumes at Book Value and agrees to pay, perform, and discharge all of the following liabilities of the Failed Bank as of Bank Closing, except as otherwise provided in this Agreement (such liabilities hereinafter referred to as "Liabilities Assumed"):

(a)   demand Deposits, including outstanding cashier's checks and other official checks, and time and savings Deposits, including without limitation those Deposits listed in Schedule 2.1 attached hereto and incorporated herein;

(b)   liabilities for indebtedness secured by mortgages, deeds of trust, chattel mortgages, security interests or other liens or indebtedness affecting or secured by any Acquired Assets, if any;

(c)   borrowings from Federal Home Loan Banks; and overdrafts, debit balances, service charges, reclamations, and adjustments to accounts with the Federal Reserve Banks as reflected on the books and records of any such Federal Reserve Bank within ninety (90) days after Bank Closing, if any;

(d)   ad valorem taxes applicable to any Acquired Asset, if any;

(e)   liabilities, if any, for federal funds purchased and overdrafts in accounts maintained with other banks, including any accrued and unpaid interest thereon computed to and including Bank Closing, but excluding any such liabilities owed to the parent holding company of the Failed Bank or to Affiliates of such parent holding company;

(f)   Treasury tax and loan note option accounts, if any;

(g)   liabilities on any acceptances or commercial letters of credit (other than "standby letters of credit" as defined in 12 C.F.R. 337.2(a));

- 2 -

(h)   liabilities, if any, for qualified financial contracts as defined in 12 U.S.C. Section 1821(e)(8)(D)(i); and

(i)   duties and obligations assumed pursuant to this Agreement, including without limitation, those relating to the Failed Bank's credit card plan, safe deposit, safekeeping business or trust business, if any.

Schedule 2.1 is based upon the best information available to the Receiver and may be adjusted as provided in Article IX.

2.2   **Interest on Deposit Liabilities Assumed**.   The Assuming Bank agrees that, from and after Bank Closing, it will accrue and pay interest on Deposit liabilities assumed pursuant to Section 2.1 in accordance with the terms of the respective deposit agreements between the Failed Bank and the depositors of the Failed Bank for a period of fourteen (14) days commencing the day after Bank Closing.   Thereafter, the Assuming Bank may pay interest with respect to such Deposit liabilities at rate(s) it shall determine; provided, that such rate(s) shall not be less than the rate of interest the Assuming Bank pays with respect to passbook savings Deposit accounts.   The Assuming Bank shall permit each such depositor to withdraw, without penalty for early withdrawal, all or any portion of such depositor's Deposit, whether or not the Assuming Bank elects to pay interest in accordance with such deposit agreement; provided, that if such Deposit has been pledged to secure an obligation of the depositor to the Failed Bank, any withdrawal thereof shall be subject to the terms of the agreement governing such pledge.   The Assuming Bank shall give notice to such depositors as provided in Section 5.3 of the rate(s) of interest which it has determined to pay after such fourteen (14)-day period, and of such withdrawal rights.

2.3   **Unclaimed Deposits**.   If, within eighteen (18) months after Bank Closing, any depositor of the Failed Bank does not claim or arrange to continue such depositor's Deposit assumed pursuant to Section 2.1 at the Assuming Bank, the Assuming Bank shall, within fifteen (15) Business Days after the end of such eighteen (18)-month period, (i) refund to the Corporation the amount of each such Deposit (without reduction for service charges), (ii) provide to the Corporation a schedule of all such refunded Deposits in such form as may be prescribed by the Corporation, and (iii) assign, transfer, convey and deliver to the Receiver all right, title and interest of the Assuming Bank in and to Records previously transferred to the Assuming Bank and other records generated or maintained by the Assuming Bank pertaining to such Deposits.

During such eighteen (18)-month period, at the request of the Corporation, the Assuming Bank promptly shall provide to the

- 3 -

Corporation schedules of unclaimed Deposits in such form as may be prescribed by the Corporation.

2.4 **Employee Benefit Plans**. The Assuming Bank shall have no liabilities, obligations or responsibilities under the Failed Bank's employee benefit plans, including without limitation medical, insurance, vacation, pension, profit sharing or stock purchase plans, if any, unless the Receiver and the Assuming Bank agree otherwise subsequent to the date of this Agreement.

## ARTICLE III
## PURCHASE OF ASSETS

3.1 **Assets Purchased by Assuming Bank**. Subject to Sections 3.4 and 3.5, the Assuming Bank hereby purchases from the Receiver, and the Receiver hereby sells, assigns, transfers, conveys, and delivers to the Assuming Bank, all right, title, and interest of the Receiver in and to all of the Acquired Assets, including but not limited to the following:

(a)  cash and receivables from banks, including cash items in the process of collection, plus any accrued interest thereon computed to and including Bank Closing;

(b)  securities (including Federal Home Loan Bank stock and the capital stock of those Subsidiaries of the Failed Bank listed on Schedule 3.1 but excluding the capital stock of or other equity interests in other Subsidiaries or Affiliates of the Failed Bank) that are not Classified, plus any accrued interest thereon computed to and including Bank Closing, if any;

(c)  federal funds sold, if any, including any accrued interest thereon computed to and including Bank Closing;

(d)  Small Loans;

(e)  Loans other than Small Loans;

(f)  owned Bank Premises, owned Fixtures, owned Furniture and Equipment and ORE;

(g)  credit card plans and other revolving credit plans, subject to Section 4.2 hereof;

(h)  Safe Deposit Boxes and related business, safekeeping business, and trust business, if any, subject to Sections 4.3, 4.4, and 4.5, hereof, respectively;

(i)  qualified financial contracts as defined in 12 U.S.C. Section 1821(e)(8)(D)(i); and

- 4 -

(j)   Records and other documents as provided in Section 6.1;

Schedule 3.1 attached hereto and incorporated herein sets forth certain Acquired Assets. Such schedule is based upon the best information available to the Receiver and may be adjusted as provided in Article IX. Assets are purchased hereunder by the Assuming Bank subject to all liabilities for indebtedness collateralized by security interests and/or Liens affecting such Assets.

3.2   **Asset Purchase Price.**

(a) All Acquired Assets, including the capital stock of Subsidiaries of the Failed Bank identified on Schedule 3.1 and Federal Home Loan Bank stock but excluding other securities, shall be purchased at Book Value; **provided, that** if the Book Value of any Fixtures or Furniture and Equipment located on or associated with any Bank Premises cannot be ascertained from Failed Bank records, such Assets shall be purchased at Fair Market Value. Notwithstanding the foregoing, and subject to the provisions of Section 9.1, any Loans or other Assets totally charged-off the books of the Failed Bank as of Bank Closing and any Undiscovered Assets shall be transferred at a purchase price of zero.

(b) The purchase price for securities (other than the capital stock of those Subsidiaries of the Failed Bank identified on Schedule 3.1 and Federal Home Loan Bank stock) purchased under Section 3.1 by the Assuming Bank shall be the market value thereof (including accrued interest or dividends) as of Bank Closing, which shall be (i) the quotation for the closing price of each such security effective on Bank Closing as published in The Wall Street Journal; (ii) **provided, that** if such closing price is not available for any such security, the market value thereof shall be determined by taking the average of the quotations for asked and bid prices for each such security effective on Bank Closing as published in The Wall Street Journal; and (iii) **further provided, that** if the closing price and asked and bid prices are not published in The Wall Street Journal, for determination of the market value for any such security as provided in clause (i) or (ii) of this sentence, the market value of each such security shall be determined by taking the average of the quotations for asked and bid prices for each such security as quoted by the National Association of Securities Dealers (exclusive of any brokerage commissions) or if unavailable from such source, then from three (3) independent brokers mutually acceptable to the Receiver and the Assuming Bank, in either case as in effect on Bank Closing. The value of such securities shall be calculated within sixty (60) days after Bank Closing. Any costs associated with such valuation shall be shared equally by the Receiver and the Assuming Bank.

- 5 -

**3.3  Manner of Conveyance; Limited Warranty; Nonrecourse; Etc.**  THE CONVEYANCE OF ALL ASSETS, INCLUDING REAL AND PERSONAL PROPERTY INTERESTS, PURCHASED BY THE ASSUMING BANK UNDER THIS AGREEMENT SHALL BE MADE, AS NECESSARY, BY RECEIVER'S DEED OR RECEIVER'S BILL OF SALE, "AS IS", "WHERE IS", WITHOUT RECOURSE AND, EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS AGREEMENT, WITHOUT ANY WARRANTIES WHATSOEVER WITH RESPECT TO SUCH ASSETS, EXPRESS OR IMPLIED, WITH RESPECT TO TITLE, ENFORCEABILITY, COLLECTIBILITY, DOCUMENTATION OR FREEDOM FROM LIENS OR ENCUMBRANCES (IN WHOLE OR IN PART), OR ANY OTHER MATTERS.

**3.4  Assets Not Purchased by Assuming Bank.**  The Assuming Bank does not purchase, or obtain an option to acquire under this Agreement:

(a)  any financial institution bonds, banker's blanket bonds, and public liability, fire, or extended coverage insurance policy or any other insurance policy of the Failed Bank, or premium refund, unearned premium derived from cancellation, or any proceeds payable with respect to any of the foregoing;

(b)  any interest, right, action, claim, or judgment against (i) any officer, director, employee, accountant, attorney, or any other Person employed or retained by the Failed Bank on or prior to Bank Closing arising out of any act or omission of such Person in such capacity, (ii) any underwriter of financial institution bonds, banker's blanket bonds or any other insurance policy of the Failed Bank, (iii) any shareholder or holding company of the Failed Bank, or (iv) any other Person whose action or inaction may be related to any loss (exclusive of any loss resulting from such Person's failure to pay on a Loan made by the Failed Bank) incurred by the Failed Bank; provided, that for purposes hereof, the acts, omissions or other events giving rise to any such claim shall have occurred on or before Bank Closing, regardless of when any such claim is discovered and regardless of whether any such claim is made with respect to a financial institution bond, banker's blanket bond, or any other insurance policy of the Failed Bank in force as of Bank Closing;

(c)  prepaid regulatory assessments of the Failed Bank, if any;

(d)  legal or equitable interest in tax receivables of the Failed Bank, if any, including any claims arising as a result of the Failed Bank having entered into any agreement or otherwise being joined with another Person with respect to the filing of tax returns or the payment of taxes;

- 6 -

(e)   amounts reflected on the books of the Failed Bank as of
      Bank Closing as a general loss reserve or contingency
      account, if any;

(f)   leased Bank Premises, leased Furniture and Equipment,
      leased Fixtures and leased data processing equipment
      (including hardware and software) located on Bank
      Premises, if any; provided, that the Assuming Bank does
      obtain an option under Section 4.6, Section 4.7, or
      Section 4.8, as the case may be, with respect thereto;

(g)   owned Bank Premises or ORE of the Failed Bank which the
      Receiver, in its discretion, determines may contain
      environmentally hazardous substances; and

(h)   capital stock or other equity interests in any
      Affiliate or Subsidiary of the Failed Bank other than
      the capital stock of those Subsidiaries of the Failed
      Bank identified on Schedule 3.1.

3.5   Loans Essential to Receiver.

     (a)   The Receiver may refuse to sell to the Assuming
Bank, and the Assuming Bank hereby agrees, at the request of the
Receiver, to promptly reassign, transfer, convey, and deliver to
the Receiver all of the Assuming Bank's right, title and interest
in and to, any Loan essential to the Receiver as determined by
the Receiver in its discretion (together with all Records
evidencing or pertaining thereto), which may include any Loan
that the Receiver determines to be:

          (i)   made to an officer, director, or other Person
     engaging in the affairs of the Failed Bank, its
     Subsidiaries or Affiliates or any related entities of
     any of the foregoing;

          (ii)   the subject of, or potentially the subject
     of, legal proceedings;

          (iii)   made to a Person who is an Obligor on a loan
     owned by the Receiver or by the Corporation in its
     corporate capacity or its capacity as receiver of any
     institution;

          (iv)   secured by collateral which also secures any
     asset owned by the Receiver; or

          (v)   related to any asset of the Failed Bank not
     purchased by the Assuming Bank under this Article III.

     (b)   Such Loans shall be purchased by the Receiver at
the Repurchase Price thereof.   The Assuming Bank agrees to

- 7 -

service and manage each such Loan in accordance with usual and prudent banking standards and practices, until each such Loan is purchased by the Receiver. All payments and transfers necessitated by the transfer of any Loan under this Section 3.5 or of any Acquired Asset under Section 8.4 shall be made within seven (7) days after the effective date of the notice by the Receiver with respect thereto. The Assuming Bank shall transfer all such Acquired Assets without recourse, and shall indemnify the Receiver against any and all claims of any Person claiming by, through or under the Assuming Bank with respect to any such Acquired Asset, as provided in Article XIV. In the event of any transfer of a Pool Asset to the Receiver pursuant to this Section 3.5 or Section 8.4, appropriate Adjustments shall be made to achieve the same economic result as would apply if such Pool Asset had never been transferred to the Pool.

## ARTICLE IV
### ASSUMPTION OF CERTAIN DUTIES AND OBLIGATIONS

The Assuming Bank hereby agrees with the Receiver and the Corporation as follows:

4.1  __Continuation of Banking Business__. The Assuming Bank agrees to provide full service banking in the trade area of the Failed Bank commencing on the first banking Business Day (including a Saturday) after Bank Closing. At the option of the Assuming Bank, such banking services may be provided at any or all of the Bank Premises, or at other premises within such trade area.

4.2  __Agreement with Respect to Credit Card Business__. The Assuming Bank hereby assumes and agrees to honor and perform from and after Bank Closing all duties and obligations with respect to the Failed Bank's credit card business, and/or processing related to credit cards, if any. Fees related to such credit card business shall be prorated between the Receiver and the Assuming Bank as of Bank Closing.

4.3  __Agreement with Respect to Safe Deposit Business__. The Assuming Bank hereby assumes and agrees to discharge from and after Bank Closing, in the usual course of conducting a banking business, the duties and obligations of the Failed Bank with respect to all Safe Deposit Boxes, if any, of the Failed Bank and to maintain all of the necessary facilities for the use of such boxes by the renters thereof during the period for which such boxes have been rented and the rent therefor paid to the Failed Bank, subject to the provisions of the rental agreements between the Failed Bank and the respective renters of such boxes. Fees related to such safe deposit business shall be prorated between the Receiver and the Assuming Bank as of Bank Closing.

**4.4** **Agreement With Respect to Safekeeping Business.** The Receiver hereby transfers, conveys, and delivers to the Assuming Bank and the Assuming Bank hereby accepts all securities and other items, if any, held by the Failed Bank in safekeeping for its customers as of Bank Closing. The Assuming Bank hereby assumes and agrees to honor and discharge from and after Bank Closing the duties and obligations of the Failed Bank with respect to such securities and other items held in safekeeping. The Assuming Bank shall be entitled to any right or benefit heretofore accrued or hereafter accruing with respect thereto. Fees related to such safekeeping business shall be prorated between the Receiver and the Assuming Bank as of Bank Closing.

**4.5** **Agreement With Respect to Trust Business.**

(a) The Assuming Bank shall, without further transfer, substitution, act or deed, to the full extent permitted by law, succeed to the rights, obligations, properties, assets, investments, deposits, agreements, and trusts of the Failed Bank under (i) trusts, executorships, administrations, guardianships, and agencies, and (ii) other fiduciary or representative capacities, all to the same extent as though the Assuming Bank had assumed the same from the Failed Bank prior to Bank Closing; provided, that any liability based on the misfeasance, malfeasance or nonfeasance of the Failed Bank, its directors, officers, employees or agents with respect to the trust business is not assumed hereunder.

(b) The Assuming Bank shall, to the full extent permitted by law, succeed to, and be entitled to take and execute, the appointment to all executorships, trusteeships, guardianships and other fiduciary or representative capacities to which the Failed Bank is or may be named in wills, whenever probated, or to which the Failed Bank is or may be named or appointed by any other instrument.

(c) In the event additional proceedings of any kind are necessary to accomplish the transfer of such trust business, the Assuming Bank agrees that, at its own expense, it will take whatever action is necessary to accomplish such transfer. The Receiver agrees to use reasonable efforts to assist the Assuming Bank in accomplishing such transfer.

(d) Such trust business fees shall be prorated between the Receiver and the Assuming Bank as of Bank Closing.

**4.6** **Agreement with Respect to Certain Bank Premises.**

(a) The Receiver hereby grants to the Assuming Bank an exclusive option for the period of one hundred seventy (170) days commencing the day after Bank Closing to cause the Receiver to assign to the Assuming Bank any or all lease agreements for (i)

- 9 -

leased Bank Premises, if any; which have been continuously occupied by the Assuming Bank from Bank Closing to the date of its exercise of such option, and (ii) leased Furniture and Equipment and leased Fixtures located on owned or leased Bank Premises, in each case to the extent that such lease agreements can be assigned; provided, that the exercise of this option with respect to any lease must be as to all premises and other property subject to such lease. If an assignment cannot be made of any such lease agreements, the Receiver may, in its discretion, enter into sublease agreements with the Assuming Bank containing the same terms and conditions provided under such existing lease agreements for such leased Bank Premises or other property. The Assuming Bank shall give written notice to the Receiver within the option period of its intent regarding acceptance or sublease of any or all lease agreements. The Assuming Bank hereby agrees to assume all leases assigned pursuant to this Section 4.6 and to enter into subleases provided for in this Section 4.6.

(b)  The Receiver agrees to facilitate the assumption, assignment or sublease of lease agreements or the negotiation of new lease agreements by the Assuming Bank; provided, that neither the Receiver nor the Corporation shall be obligated to engage in litigation or make payments to the Assuming Bank or to any third party in connection with facilitating any such assumption, assignment, sublease or negotiation of a new lease.

(c)  The Assuming Bank shall give the Receiver fifteen (15) days' prior written notice of its intention to vacate prior to vacating any leased Bank Premises with respect to which the Assuming Bank has not exercised the option provided for in (a) above. Any such notice shall be deemed to terminate the Assuming Bank's option with respect to such leased Bank Premises.

(d)  The Assuming Bank agrees, during the period of any occupancy by it of any leased Bank Premises, to pay to the Receiver or to appropriate third parties at the direction of the Receiver all operating costs with respect thereto and to comply with all relevant terms of applicable lease agreement(s) entered into by the Failed Bank, including without limitation the timely payment of all rent, taxes, fees, charges, utilities, insurance and assessments.

(e)  The Assuming Bank agrees during the period of occupancy by it of owned or leased Bank Premises to pay to the Receiver rent for the use of all leased Furniture and Equipment and leased Fixtures located on such Bank Premises for the period of such occupancy. Rent for such property shall be an amount equal to any and all rents and other amounts which the Receiver incurs or accrues as an obligation or is obligated to pay for such period of occupancy pursuant to all leases and contracts with respect to such property.

- 10 -

(f)  If the Assuming Bank exercises the option provided
for in (a) above with respect to any leased Bank Premises, or if
the Assuming Bank does not exercise such option but within twelve
(12) months following Bank Closing obtains the right to occupy
such premises (whether by assignment, lease, sublease, purchase
or otherwise), the Assuming Bank shall assume or accept an
assignment or a sublease of the lease agreements or negotiate new
lease agreements for all Furniture and Equipment and Fixtures
leased by the Failed Bank and located thereon.

(g)  If the Assuming Bank does not assume the lease or
accept an assignment or sublease of any leased Bank Premises, the
Assuming Bank shall vacate such Bank Premises and promptly
relinquish and release to the Receiver such premises and the
leased Furniture and Equipment and leased Fixtures located
thereon not later than one hundred eighty (180) days after Bank
Closing in the same condition as at Bank Closing, normal wear and
tear excepted.  By occupying any leased Bank Premises after such
one hundred eighty (180)-day period, the Assuming Bank shall be
deemed to have assumed all lease obligations and liabilities with
respect to such premises and all leased Furniture and Equipment
and leased Fixtures located thereon in accordance with this
Section.

4.7  <u>Agreement with Respect to Leased Data Processing</u>
<u>Equipment</u>.

(a)  The Receiver hereby grants to the Assuming Bank an
exclusive option for the period of one hundred ~~eighty~~ (170) days
commencing the day after Bank Closing to accept an assignment
from the Receiver of any or all lease and/or licensing agreements
for data processing equipment (including hardware and software)
leased by the Failed Bank, if any, to the extent that such
agreements can be assigned.

(b)  The Assuming Bank shall (i) give written notice to
the Receiver within the option period provided for in (a) above
of its intent to assume the lease and/or licensing agreements or
accept an assignment or sublease of any or all such agreements
with respect to leased data processing equipment (including
hardware and software), and promptly assume or accept an
assignment or sublease of such agreements, and (ii) give written
notice to the appropriate lessor(s) that it has accepted an
assignment or sublease of any such agreements.

(c)  The Receiver agrees to facilitate the assumption,
assignment or sublease of lease agreements or the negotiation of
new lease agreements by the Assuming Bank: <u>provided</u>, <u>that</u> neither
the Receiver nor the Corporation shall be obligated to engage in
litigation or make payments to the Assuming Bank or to any third
party in connection with facilitating any such assumption,
assignment, sublease or negotiation of a new lease.

- 11 -

(d)   The Assuming Bank agrees, during its period of use
of any leased data processing equipment (including hardware and
software), to pay to the Receiver or to appropriate third parties
at the direction of the Receiver all operating costs with respect
thereto and to comply with all relevant terms of the applicable
lease and/or licensing agreements entered into by the Failed
Bank, including without limitation, the timely payment of all
rent, taxes, fees, charges, utilities, insurance and assessments.

(e)   The Assuming Bank shall promptly relinquish and
release to the Receiver all leased data processing equipment
(including hardware and software) with respect to which it does
not assume the lease or accept an assignment or a sublease
agreement or negotiate a new lease agreement under this Section
4.7 in the same condition as at Bank Closing, normal wear and
tear excepted.

4.8   Agreement with Respect to Certain Service Agreements.

(a)   With respect to agreements existing as of Bank
Closing which provide for the rendering of services by or to the
Failed Bank (other than (i) those agreements that are subject to
the provisions of Sections 4.1 through 4.7, (ii) any insurance
policy or bond contemplated under Section 3.4(a), and (iii) those
agreements specified in Section 4.8(b)), within one hundred
twenty (120) days after Bank Closing, the Assuming Bank shall
give the Receiver written notice specifying whether it elects not
to assume each such service agreement. Except as otherwise
provided in this Article IV, the Assuming Bank agrees to comply
with the terms of each service agreement for a period of at least
one hundred twenty (120) days commencing the day after Bank
Closing and continuing thereafter until fifteen (15) days after
the Assuming Bank has given notice to the Receiver of its
election not to assume such service agreement; provided, that the
Receiver can reasonably make such service agreements available to
the Assuming Bank. The Assuming Bank shall be deemed to have
assumed every such agreement for which no such notification is
timely made. The Receiver agrees to assign, transfer, convey,
and deliver to the Assuming Bank all right, title and interest of
the Receiver, if any, in and to agreements the Assuming Bank
assumes hereunder. In the event the Assuming Bank does not
exercise its option with respect to any leased Bank Premises
under Section 4.6 and does not otherwise occupy such premises,
the provisions of this paragraph (a) shall not apply to service
agreements related to such leased Bank Premises. The Assuming
Bank agrees, during the period it has the use or benefit of any
such agreement, promptly to pay to the Receiver or to appropriate
third parties at the direction of the Receiver all operating
costs with respect thereto and to comply with all relevant terms
of such agreement for the period specified in the second sentence
of this paragraph (a).

- 12 -

(b)  The provisions of this Section 4.3 shall not apply
to consulting, management or employment agreements, if any,
between the Failed Bank and its employees or other Persons, and
the Assuming Bank does not assume any liabilities thereunder
pursuant to this Agreement.

4.9  <u>Informational Tax Reporting</u>.  The Assuming Bank agrees
to perform all obligations of the Failed Bank with respect to
Federal and State income tax informational reporting related to
the Acquired Assets and the Liabilities Assumed and to deposit
accounts that were closed prior to Bank Closing, including
obligations with respect to Forms 1099 and 1098 and back-up
withholding.

4.10  <u>Insurance</u>.  The Assuming Bank agrees to obtain
insurance coverage effective from and after Bank Closing,
including public liability, fire and extended coverage insurance
acceptable to the Receiver with respect to leased Bank Premises
that it occupies, and all leased Furniture and Equipment and
Fixtures and leased data processing equipment (including hardware
and software) located on leased or owned Bank Premises, in the
event such insurance coverage is not already in force and effect
with respect to the Assuming Bank as the insured as of Bank
Closing.  All such insurance shall, where appropriate, name the
Receiver as an additional insured.

4.11  <u>Office Space for Receiver and Corporation</u>.  For such
period as the Receiver and the Corporation may require, the
Assuming Bank agrees to provide to the Receiver and the
Corporation, without charge, adequate and suitable office space
(including parking facilities and vault space), furniture,
equipment (including photocopying and telecopying machines) and
utilities (including local telephone service) at the Bank
Premises occupied by the Assuming Bank for use in the discharge
of the respective functions of the Receiver and the Corporation
with respect to the matters contemplated by this Agreement.  The
Assuming Bank agrees that the Receiver and the Corporation may
place temporary structures on any such Bank Premises adjacent to
or near existing structures.  In the event the Receiver and the
Corporation determine that the space provided is inadequate or
unsuitable, the Receiver and the Corporation may relocate to
other quarters having adequate and suitable space and the cost of
relocation and any rental and utility costs for the balance of
the period of occupancy by the Receiver and the Corporation shall
be borne by the Assuming Bank.

- 13 -

ARTICLE V
DUTIES WITH RESPECT TO DEPOSITORS OF THE FAILED BANK

5.1  **Payment of Checks, Drafts and Orders**.  The Assuming
Bank agrees to pay all properly drawn checks, drafts and
withdrawal orders presented to it by mail, over its counters or
through clearing by depositors of the Failed Bank, whether drawn
on the check or draft forms provided by the Failed Bank or by the
Assuming Bank, to the extent that the Deposit balances to the
credit of the respective makers or drawers assumed by the
Assuming Bank under this Agreement are sufficient to permit the
payment thereof, and in all other respects to discharge, in the
usual course of conducting a banking business, the duties and
obligations of the Failed Bank with respect to the Deposit
balances due and owing to the depositors of the Failed Bank
assumed by the Assuming Bank under this Agreement.

5.2  **Deposit Agreements**.  Subject to the provisions of
Section 2.2, the Assuming Bank agrees to honor the terms and
conditions of each written agreement with respect to each Deposit
account transferred to the Failed Bank pursuant to this
Agreement, including but not limited to escrow and mortgage
servicing agreements.

5.3  **Notice to Depositors**.  Within seven (7) days after Bank
Closing, the Assuming Bank shall give (i) notice to depositors of
the Failed Bank of its assumption of the Deposit liabilities of
the Failed Bank, and (ii) any notice required under Section 2.2,
by mailing to each such depositor a notice with respect to such
assumption and by advertising in a newspaper of general
circulation in the county or counties in which the Failed Bank
was located.  In the event the Assuming Bank fails to mail the
required notices on or before the seventh (7th) day after Bank
Closing, the Assuming Bank shall continue to accrue and pay the
deposit agreement interest rate on any Deposit account with
respect to which such failure to provide notice occurs, until the
seventh (7th) day after mailing of the notice.  The Assuming Bank
agrees that it will obtain prior approval of all such notices and
advertisements from counsel for the Receiver and that such
notices and advertisements shall not be mailed or published until
such approval is received.

ARTICLE VI
RECORDS

6.1  **Transfer of Records**.

(a)  In accordance with Section 3.1, the Receiver
assigns, transfers, conveys and delivers to the Assuming Bank the
following Records pertaining to the Deposit liabilities of the
Failed Bank assumed by the Assuming Bank under this Agreement,
except as provided in Section 6.4:

- 14 -

(i)    signature cards, orders, contracts between
       the Failed Bank and its depositors and
       Records of similar character;

(ii)   passbooks of depositors held by the Failed
       Bank, deposit slips, cancelled checks and
       withdrawal orders representing charges to
       accounts of depositors;

and the following Records pertaining to Acquired Assets:

(iii)  records of deposit balances carried with
       other banks, bankers or trust companies;

(iv)   Loan and collateral records and credit files
       and other documents;

(v)    deeds, mortgages, abstracts, surveys, and
       other instruments or records of title
       pertaining to real estate or real estate
       mortgages;

(vi)   signature cards, agreements and records
       pertaining to Safe Deposit Boxes, if any; and

(vii)  records pertaining to the credit card, trust
       or safekeeping business of the Failed Bank,
       if any.

        (b)  The Receiver, at its option, may assign and
transfer to the Assuming Bank by a single blanket assignment or
otherwise, as soon as practicable after Bank Closing, any other
Records not assigned and transferred to the Assuming Bank as
provided in this Agreement, including but not limited to loan
disbursement checks, general ledger tickets, official bank
checks, proof transactions (including proof tapes) and paid out
loan files.

        6.2  Delivery of Assigned Records.  The Receiver shall
deliver to the Assuming Bank all Records described in (i) Section
6.1(a) as soon as practicable on or after the date of this
Agreement, and (ii) Section 6.1(b) as soon as practicable after
making any assignment described therein.

        6.3  Preservation of Records.  The Assuming Bank agrees that
it will preserve and maintain for the joint benefit of the
Receiver, the Corporation and the Assuming Bank, all Records of
which it has custody for such period as either the Receiver or
the Corporation in its discretion may require.  The Assuming Bank
shall have the primary responsibility to respond to subpoenas,
discovery requests and other similar official inquiries with
respect to Records of which it has custody.

- 15 -

**6.4  Access to Records; Copies.**  The Assuming Bank agrees to permit the Receiver and the Corporation access to all Records of which the Assuming Bank has custody, and to use, inspect, make extracts from or request copies of any such Records in the manner and to the extent requested, and to duplicate, in the discretion of the Receiver or the Corporation, any Record in the form of microfilm or microfiche pertaining to Deposit account relationships; _provided_, _that_ in the event that the Failed Bank maintained one or more duplicate copies of such microfilm or microfiche Records, the Assuming Bank hereby assigns, transfers, and conveys to the Corporation one such duplicate copy of each such Record without cost to the Corporation, and agrees to deliver to the Corporation all Records assigned and transferred to the Corporation under this Article VI as soon as practicable on or after the date of this Agreement and the Corporation hereby accepts such Records.  The party requesting a copy of any Record shall bear the cost (based on standard accepted industry charges to the extent applicable, as determined by the Receiver) for providing such duplicate Records.  A copy of each Record requested shall be provided as soon as practicable by the party having custody thereof.

**6.5  Certain Other Records.**  The Receiver agrees that it will retain, for the period required by the Corporation's record retention policy, possession and custody of all of the files, books of account, records, minute books, and similar documents which are not transferred to the Assuming Bank under this Agreement for the benefit of the Corporation and that the Corporation shall have access to such documents for any lawful purpose.

## ARTICLE VII
## BID; INITIAL PAYMENT

**7.1  Initial Payment.**  The Assuming Bank has submitted to the Receiver a bid (which may be negative) of $(19,100,000.00) for the Acquired Assets and Liabilities Assumed hereunder (the "Bid Amount").  On the Payment Date, the Assuming Bank will pay to the Corporation, or the Corporation will pay to the Assuming Bank, as the case may be, the Initial Payment, together with interest on such amount (if the Payment Date is not the day following Bank Closing) from and including the day following Bank Closing to and including the day preceding the Payment Date at a rate per annum as set forth in Section 9.4.

**7.2  Form of Payment.**  Any payment made by the Corporation pursuant to Section 7.1 shall, at the election of the Corporation, be made in the form of (i) immediately available funds (or a check if permitted by Section 16.8), (ii) a promissory note of the Corporation with the terms and in the form of Exhibit 7.2, payable on the first anniversary of the Payment Date, or (iii) a combination of the foregoing.  Any payment made

- 16 -

by the Assuming Bank pursuant to Section 7.1 shall be made in
immediately available funds on the Payment Date.

ARTICLE VIII
THE ASSET POOL

8.1    Initial Pool Assets.

(a)    The Pool: Service Agreement.    On the Commencement
Date, the Assuming Bank shall (i) establish on its books the Pool
for purposes of the separate recording of activity pertaining to
the Pool Assets in accordance with the terms of this Agreement
and the Service Agreement, and (ii) execute and deliver, and
cause the Servicer to execute and deliver, the Service Agreement.

(b)    Transfer of Initial Pool Assets.    On the
Commencement Date the following Acquired Assets shall be
transferred, by means of accounting entries on the books of the
Assuming Bank, to the Pool:    (i) all Classified Loans that were
transferred to the Assuming Bank pursuant to Section 3.1 and that
are listed on a schedule prepared by the Receiver and delivered
to the Assuming Bank prior to or on the Commencement Date, (ii)
all Loans and other Acquired Assets that were totally charged-off
the accounting records of the Failed Bank, (iii) all Other Real
Estate that was transferred to the Assuming Bank pursuant to
Section 3.1, (iv) the capital stock of those Subsidiaries of the
Failed Bank designated on Schedule 3.1 as being "ORE
Subsidiaries," together with all amounts reflected on the
accounting records of the Failed Bank as being receivable from or
payable to such Subsidiaries at Bank Closing and (v) any other
Asset which has been otherwise approved for designation as a Pool
Asset by the Corporation.

(c)    Exclusions from Initial Pool Assets.    The
Assuming Bank shall not transfer to the Pool pursuant to this
Section 8.1 (i) any Asset that the Corporation and the Assuming
Bank have mutually agreed to exclude from the Initial Pool Assets
without regard to whether such Asset is Classified or (ii) any
Small Loan.

(d)    Value of Initial Pool Assets.    Initial Pool Assets
shall be transferred to the Pool at a value equal to the Base
Pool Value of such Assets.

(e)    Initial Pool Asset Notice.    Not later than ninety
(90) days after the Commencement Date, the Assuming Bank shall
deliver to the Corporation both a written notice and a notice in
machine readable format acceptable to the Corporation (such
notice, together with any notices provided pursuant to Section
8.2(c), referred to herein as a "Pool Asset Notice") which shall
include:

- 17 -

(i) a list of all Assets designated as Initial
Pool Assets;

(ii) a list of all Commitments arising under the
Credit Documents relating to Loans so
designated as Initial Pool Assets
(notwithstanding that such Commitments were
not assumed by the Assuming Bank); and

(iii) a list of all Related Loans with respect to
the Initial Pool Assets identified pursuant
to (i) above, specifying (A) the Loan to
which each such Related Loan is related and
(B) whether the Assuming Bank believes that
any such Related Loan should not be
transferred to the Pool and the reasons
therefor.

The Pool Asset Notice shall be in the form of Exhibit 8.1(e) or
in such other form approved by the Corporation, and shall set
forth all information specified in Exhibit 8.1(e).

(f)  Option to Remove Assets from Pool.  The Assuming
Bank may, at its option exercisable by notice to the Corporation
from time to time within thirty (30) days after the Commencement
Date, remove one or more Initial Pool Assets from the Pool.  Such
notice shall also designate all Pool Related Loans with respect
to the Loans which the Assuming Bank has so elected to remove
from the Pool.  The Asset or Assets designated in such notice,
together with all such Pool Related Loans, shall cease to be Pool
Assets upon the Corporation's receipt of such notice, and
appropriate Adjustments shall be made to achieve the same
economic result as would apply if such Asset or Assets (including
such Pool Related Loans) had never been transferred to the Pool.
Notwithstanding any other provision of this Agreement to the
contrary, the Assuming Bank shall have no right to retransfer to
the Pool any Asset or Assets removed from the Pool pursuant to
this Section 8.1(f).  No removal of an Asset from the Pool
pursuant to this Section 8.1(f) shall preclude the Corporation
from subsequently exercising its option under Section 8.3(a) with
respect to such Asset if at the time of such exercise it
constitutes a Related Loan.  No notice by the Assuming Bank
pursuant to this Section 8.1(f) shall be effective unless
received by the Corporation on or prior to the thirtieth (30th)
day after the Commencement Date.

8.2  Transfer of Additional Assets to the Pool.

(a)  Transfers Within 180 Days After Commencement Date.
During the one hundred eighty (180)-day period following the
Commencement Date, and only during such period, the Assuming Bank
may designate for transfer to the Pool in accordance with this

- 18 -

Section 8.2 the following Assets, to the extent such Assets were transferred to the Assuming Bank pursuant to Section 3.1 and as of the applicable Notice Date have not been retransferred to the Receiver pursuant to Section 3.5: (i) any Abandoned Bank Premises and any Abandoned Fixtures, Furniture and Equipment and (ii) any Asset as to which there is a material defect with respect to the Assuming Bank's title thereto (other than such an Asset as to which the Assuming Bank is fully protected against such defect by title insurance or other protection).

    (b)  <u>Transfers Within Two Years After Commencement Date</u>.  During the period ending on the second anniversary of the Commencement Date, and only during such period, the Assuming Bank will be entitled, subject to the provisions of Section 8.2(h), to make additional monthly transfers to the Pool of any Loan (other than a Small Loan), provided, that:

    (i)  (A) the Loan is a Classified Loan, or the Assuming Bank determines that it should be a Classified Loan, on the applicable Notice Date; (B) the Loan was transferred to the Assuming Bank pursuant to Section 3.1 and as of the applicable Notice Date has not been retransferred to the Receiver pursuant to Section 3.5; (C) the Assuming Bank has not entered into, agreed to make or grant or made or granted any modification or amendment to, or any waiver or extension with respect to, or any renewal, refinancing or refunding of, such Loan or related Credit Documents other than a Permitted Amendment; and (D) the Assuming Bank notifies the Corporation of its intention to transfer the Loan to the Pool within ninety (90) days from the earlier of (1) the date upon which the Loan is first designated as a Classified Loan on the internal written records of the Assuming Bank and (2) the date the Loan is so designated on a written notice given to the Assuming Bank by an examiner of the Assuming Bank's Chartering Authority; or

    (ii)  the Loan has been otherwise specifically approved for designation by the Corporation in writing.

    (c)  <u>Notices to the Corporation</u>.  On each Notice Date with respect to transfers of Loans pursuant to this Section 6.2, the Assuming Bank shall deliver to the Corporation a Pool Asset Notice which shall include:

    (i)  a list of all Assets designated as Additional Pool Assets, specifying in appropriate detail the basis for such designation, including the applicable eligibility criteria specified in Section 8.2(a) or (b);

    (ii)  to the extent available on the date of the Pool Asset Notice, a list of all Commitments arising under the Credit Documents relating to Loans so designated as

Additional Pool Assets (notwithstanding that such Commitments were not assumed by the Assuming Bank); and

> (iii)   a list of all Related Loans with respect to all Pool Assets, including but not limited to the Additional Pool Assets identified pursuant to (i) above, which Related Loans have not previously been identified in a Pool Asset Notice and have not been transferred to the Pool, specifying (A) the Loan to which each such Related Loan is related and (B) whether the Assuming Bank believes that any such Related Loan should not be transferred to the Pool pursuant to Section 8.3(a) and the reasons therefor.

> Unless the Corporation shall otherwise agree, the Assuming Bank shall deliver the Pool Asset Notices pursuant to this Section 8.2 only on the first Monday of any month and on the day prior to the second anniversary of the Commencement Date (or, if any such day is not a Business Day, then on the next preceding Business Day). Each such notice shall be in the form of Exhibit 8.1(e) or in such other form to which the Corporation shall have consented, and shall set forth all information specified in such Exhibit. Thereafter, the Assuming Bank will promptly provide to the Corporation a Loan Information Package for each Loan included in a Pool Asset Notice which was not classified substandard, doubtful or loss by the Chartering Authority of the Failed Bank or of the Assuming Bank and, at the option of the Corporation, copies of the Credit Files, records generated by computer or other electronic data processing records, journals of transaction history and such additional information relating to the subject matter of the Pool Asset Notice as the Corporation may request in writing and will provide to representatives of the Corporation full access to all other relevant books and records (all information referred to in this sentence being herein referred to collectively as the "Supporting Documentation"). No purported transfer of Loans to the Pool pursuant to this Section 8.2 shall be effective except by means of a Pool Asset Notice which complies with the provisions of this Section 8.2(c).

> (d)   _Date of Designation_.   All determinations to be made with respect to Additional Pool Assets (including, but not limited to, determination of eligibility for transfer to the Pool or valuation) will be made as of the Notice Date with respect to such Additional Pool Assets, and the transfer of such Additional Pool Assets to the Pool shall be effective for all purposes on such Notice Date.

> (e)   _Valuation_.   Additional Pool Assets shall be transferred to the Pool at a value equal to the Base Pool Value of such Assets, subject to the provisions of Section 8.2(i).

> (f)   _Corporation Notice_.   Within sixty (60) days after the Corporation receives the Supporting Documentation related to

- 20 -

a Pool Asset Notice listing Additional Pool Assets submitted
prior to or concurrently with such Supporting Documentation, the
Corporation will deliver to the Assuming Bank a written notice
setting forth its concurrence or non-concurrence as to the
eligibility for transfer to the Pool pursuant to Section 8.2(a)
or (b) of each Asset specified in such Pool Asset Notice. If the
Corporation indicates in its notice its non-concurrence with the
Assuming Bank's determination that a Loan should be a Classified
Loan, and if the Assuming Bank notifies the Corporation in
writing within fifteen (15) days after the Assuming Bank receives
such Corporation notice that the Assuming Bank disputes such
determination by the Corporation, the dispute will be referred to
the Assuming Bank's Chartering Authority for determination in
accordance with such Chartering Authority's then current written
examination procedures and criteria.  If the Corporation
indicates in its notice its non-concurrence with the Assuming
Bank's determination that a Loan satisfies the other criteria for
transfer to the Pool specified in Section 8.2(b), and if the
Assuming Bank notifies the Corporation in writing within fifteen
(15) days after the Assuming Bank receives such Corporation
notice that the Assuming Bank disputes such determination by the
Corporation, the dispute will be referred to the Review Board
pursuant to Section 8.2(j).  The Corporation's determination as
to any Loan as provided in its notice shall be conclusive and
binding on the parties to this Agreement and not subject to
further dispute except to the extent the Assuming Bank indicates
it disputes such determination in a notice given within the
period specified above.  Any determination made by the Assuming
Bank's Chartering Authority pursuant to this Section 8.2(f) shall
be conclusive and binding on the parties to this Agreement and
not subject to further dispute, and judgment may be entered on
said determination in accordance with applicable arbitration law
in any court having jurisdiction thereof.

          (g)  Adjustments.  In the event that it is determined
by the Corporation that an Asset was improperly transferred to
the Pool as an Additional Pool Asset, the Assuming Bank shall
make Adjustments to reflect such determination.

          (h)  Limitations on Transfer of Additional Pool Assets.
During the period beginning on the Commencement Date and ending
on the day prior to the first anniversary date of the
Commencement Date, there shall be no limitation on the aggregate
Base Pool Value of Assets that may be transferred to the Pool.
During the period beginning on the first anniversary of the
Commencement Date and ending on the second anniversary of the
Commencement Date, no Loan may be transferred to the Pool
pursuant to this Section 8.2 if, after giving effect to such
transfer, the aggregate Base Pool Value of all Loans transferred
to the Pool during such period would exceed $50,000,000.  In the
event that it is at any time determined by the Corporation or the
Assuming Bank that the transfer of one or more Loans to the Pool

                              - 21 -

caused such limitation to be exceeded, then any such Loan or
Loans shall be transferred out of the Pool and appropriate
Adjustments shall be made.  The Assuming Bank shall keep records
of the transfer of Assets to the Pool pursuant to this Section
8.2 which are sufficient to enable the Corporation to monitor the
Assuming Bank's compliance with the provisions of this Section
8.2(h).

    (i)    <u>Discount Rates for Transfers to the Pool</u>.  The
Base Pool Value of any Loan transferred to the Pool pursuant to
Section 8.2(b) shall (except for purposes of Section 4.1 of the
Service Agreement) be reduced by a discount amount equal to a
percentage of the Base Pool Value of the Loan so transferred, as
follows:

      (i)  no discount for transfers made no later than
one hundred eighty (180) days from the Commencement Date; or

      (ii)  a discount of three percent (3%) for
transfers made 181 days to 365 days after the Commencement
Date; or

      (iii)  a discount of five percent (5%) for
transfers made 366 days to 545 days after the Commencement
Date; or

      (iv)  a discount of seven percent (7%) for
transfers made 546 days after the Commencement Date to the
last day for transfer to the Pool as provided in Section
8.2(b).

    (j)    <u>Dispute Resolution</u>.

    (i)  Except for disputes as to whether a Loan
should be a Classified Loan (which disputes shall be
resolved by the Assuming Bank's Chartering Authority
pursuant to Section 8.2(f)), any dispute arising under this
Section 8.2 and pertaining to whether an Acquired Asset may
be transferred to the Pool shall be resolved by
determination of a review board established pursuant to (ii)
and (iii) below (a "Review Board").  Resolution of disputes
by a Review Board under this Section 8.2(j) shall be
specifically enforceable under applicable arbitration law.
All determinations by a Review Board shall be conclusive and
binding on the parties to this Agreement and not subject to
further dispute, and judgment may be entered on said
determination in accordance with applicable arbitration law
in any court having jurisdiction thereof.

    (ii)  A Review Board shall consist of three
members, each of whom shall have such expertise as the
parties agree is relevant to the dispute to be resolved by

- 22 -

such Review Board. One member will be selected by the
Corporation, one member will be selected by the Assuming
Bank and the third member (the "Neutral Member") will be
selected by the other two members. The member of the Review
Board selected by either party may be removed at any time by
such party upon two days' written notice to the other party
of the selection of a replacement member. The Neutral
Member may be removed by unanimous action of both of the
members appointed by the Corporation and the Assuming Bank
upon two days' written notice to the Corporation and the
Assuming Bank of the selection of a replacement Neutral
Member.

(iii)  No dispute may be submitted to a Review
Board by the Corporation unless the Corporation has provided
to the Assuming Bank a written notice of its intention to do
so.  No dispute may be submitted to a Review Board by the
Assuming Bank with respect to any purported transfer of any
Acquired Asset to the Pool unless the Assuming Bank shall
have provided to the Corporation the notice required by
Section 8.2(f) within the time period specified therein (any
such notice provided by the Assuming Bank and any notice
provided by the Corporation pursuant to the first sentence
of this Section 8.2(j)(iii) being referred to herein as a
"Notice of Dispute").  During the fifteen (15)-day period
following the giving of a Notice of Dispute, the parties to
the dispute will make every effort in good faith to resolve
the dispute by mutual agreement.  If the parties have not
agreed to a resolution of the dispute by the end of such
fifteen (15)-day period, then on the first day following the
end of such period each of the Corporation and the Assuming
Bank shall notify the other of its selection of its member
of the Review Board and such members shall be instructed to
promptly select the Neutral Member of the Review Board.  If
the members appointed by the Corporation and the Assuming
Bank are unable to agree upon the selection of the Neutral
Member, or a replacement Neutral Member, the two appointed
members shall apply to the American Arbitration Association
("AAA"), and such member shall be appointed in accordance
with the Commercial Arbitration Rules of the AAA.

(iv)  The resolution of a dispute pursuant to this
Section 8.2(j) shall be governed by the Commercial
Arbitration Rules of the AAA to the extent that such Rules
are not inconsistent with this Section 8.2(j).  The Review
Board may modify the procedures set forth in such Rules from
time to time with the prior approval of the Corporation and
the Assuming Bank.

(v)  Within fifteen (15) days after the last to
occur of the final written submissions of both parties, the
presentation of witnesses, if any, and oral presentations,

- 23 -

if any, the Review Board shall adopt the position of one of the parties and shall present to the parties a written statement of its determination regarding the dispute. The determination of any two members of a Review Board will constitute the determination of such Review Board.

(vi) The Corporation and the Assuming Bank will each pay the fees and expenses of the member of the Review Board selected by it. The Corporation and the Assuming Bank will share equally the fees and expenses of the Neutral Member. No such fees or expenses paid by the Assuming Bank shall be subject to reimbursement by the Pool or by the Corporation.

(vii) Each party will bear all costs and expenses incurred by it in connection with the submission of any dispute to a Review Board. No such costs or expenses paid by the Assuming Bank shall be subject to reimbursement by the Pool or by the Corporation.

8.3  <u>Treatment of Related Loans and Undiscovered Assets</u>.

(a) <u>Related Loans</u>. Related Loans which have not been transferred to the Pool in accordance with Section 8.1 or 8.2 may, at the option of the Corporation, be transferred to the Pool in accordance with the following:

(i) The Corporation shall have the option, exercisable by notice to the Assuming Bank, of requiring the Assuming Bank to transfer to the Pool, at any time prior to the second anniversary of the Commencement Date, any such Related Loans required to be identified in any notice to the Corporation pursuant to Section 8.1(e) or 8.2(c).

(ii) A Related Loan that the Corporation has designated for transfer to the Pool pursuant to this Section 8.3(a) shall be transferred as of the date of the Assuming Bank's receipt of the Corporation's notice with respect to such Related Loan. Each such Related Loan shall be transferred to the Pool at its Base Pool Value.

(b) <u>Undiscovered Assets</u>.

(i) <u>Notices</u>. On each Notice Date relating to the transfer of Loans to the Pool under Section 8.2, and on each anniversary of the Commencement Date, the Assuming Bank shall deliver to the Corporation a notice identifying any Undiscovered Assets discovered or received by the Assuming Bank since the Commencement Date (or in the case of the second and any subsequent such notice, since the previous such notice). The notice delivered pursuant to this Section 8.3(b) shall set forth (A) all amounts that would have constituted Collections if such

- 24 -

Undiscovered Asset had been a Pool Asset since the Commencement
Date and received by the Assuming Bank prior to such Notice Date
with respect to such Undiscovered Asset, and all credits or
similar items included in Undiscovered Assets and utilized by the
Assuming Bank prior to such Notice Date, (B) expenses incurred in
connection with the collection or utilization of amounts referred
to in (A) above which would have been reimbursable under Section
4.2 of the Service Agreement if such Undiscovered Asset had been
a Pool Asset since the Commencement Date and (C) such other
information as the Corporation may request.  Thereafter, the
Assuming Bank will, if requested by the Corporation, promptly
provide to the Corporation the Supporting Documentation related
to such Undiscovered Asset.

          (ii)  **Transfers of Undiscovered Assets**.  The
Corporation shall have the option of requiring the Assuming Bank
to transfer to the Pool, at any time prior to the Pool Settlement
Date, any Undiscovered Asset.  The Base Pool Value of any
Undiscovered Asset which is transferred to the Pool shall be
zero.  Upon transfer of such Undiscovered Asset, an amount (not
less than zero) equal to the collections, payments and credits
described in clause (A) of the second sentence of Section
8.3(b)(i), less expenses described in clause (B) thereof, shall
be remitted to the Corporation through a posting to the Current
Settlement Account.

          (iii)  **Corporation Notice**.  The Corporation shall
notify the Assuming Bank in writing of its election to transfer
an Undiscovered Asset to the Pool.  Such transfer shall be deemed
to have been made as of the date such notice is received by the
Assuming Bank.

     8.4   **Retransfers to Receiver**.  In the event that any
Acquired Asset constituting Bank Premises or ORE that has been
transferred or is proposed to be transferred to the Pool pursuant
to this Article VIII is determined by the Corporation in its sole
discretion to contain environmentally hazardous substances, the
Corporation shall so notify the Receiver, and the Receiver may at
its option repurchase such Acquired Asset from the Assuming Bank
at its Repurchase Price.

     8.5   **Corporation Protection Against Loss**.

          (a)   The Assuming Bank shall establish as part of the
Pool Records an asset account (the "Deferred Settlement
Account"), which may have a positive or negative value.  Amounts
due to the Corporation shall be applied to reduce the balance of
the Deferred Settlement Account and amounts due from the
Corporation shall be applied to increase the balance of the
Deferred Settlement Account.

- 25 -

(b)  The Assuming Bank shall post to the Deferred Settlement Account as an amount due to the Corporation:

(i) any excess of

(A) the aggregate amount of Collections with respect to any Pool Asset, (excluding (1) amounts received with respect to such Pool Asset that would be characterized as interest for financial reporting purposes, (2) late fees received with respect to such Pool Asset, and (3) rental income on Other Real Estate, in each case only to the extent that accruals of such interest, late fees or rental income are not reflected in the Base Pool Value of such Asset) over

(B) the sum of (1) the Base Pool Value of such Pool Asset plus (2) if such Pool Asset is a Loan, the amount of Permitted Advances made with respect to such Loan in accordance with the Service Agreement after its transfer to the Pool; and

(ii) the amount of any Collections with respect to a Pool Asset after Final Disposition of such Pool Asset.

(c)  In the event that the amount of Collections (excluding (i) amounts received with respect to such Pool Asset that would be characterized as interest for financial reporting purposes, (ii) late fees received with respect to such Pool Asset, and (iii) rental income on Other Real Estate, in each case only to the extent that accruals of such interest, late fees or rental income are not reflected in the Base Pool Value of such Asset) received upon Final Disposition of a Pool Asset is less than the Adjusted Pool Value of such Pool Asset immediately prior to such Final Disposition, the Assuming Bank shall post to the Deferred Settlement Account as an amount due from the Corporation the excess of such Adjusted Pool Value over such amount of Collections.

8.6  **Final Settlement of the Pool.**

(a)  The Corporation and the Assuming Bank shall finally settle the Pool on the date (the "Pool Settlement Date") which is the earliest to occur of (i) the Early Termination Date in the case of a termination of the Service Agreement pursuant to Section 6.2 thereof, (ii) thirty (30) days after the date on which there shall no longer be any Pool Assets, Final Disposition having occurred as to all such Assets, or (iii) the Termination Date.

(b)  (i)  Not later than fifteen (15) days prior to the Pool Settlement Date (the "Final Settlement Notice Date"), the Corporation shall provide to the Assuming Bank in

- 26 -

writing a notice specifying as to each Initial Pool Asset and Additional Pool Asset remaining in the Pool an amount (the "Final Pool Value") determined by the Corporation, in its sole discretion, to be the value of such Pool Asset as of such Final Settlement Notice Date. Not later than three (3) days prior to the Pool Settlement Date, the Assuming Bank shall specify in a written notice to the Corporation which Pool Assets the Assuming Bank wishes to retain (the "Retained Assets") and which Pool Assets it wishes to sell to the Corporation.

       (ii) Effective as of the Pool Settlement Date:

          (A)   the Corporation shall purchase all of the Pool Assets identified in Section 8.6(b)(i) (and all Assets that would constitute Pool Assets but for the fact that Final Disposition has occurred with respect to such Assets) other than the Retained Assets at a purchase price equal to the aggregate Adjusted Pool Value of such Pool Assets, determined as of the Pool Settlement Date;

          (B) with respect to the Retained Assets,

            (1) if the aggregate Adjusted Pool Value of the Retained Assets as of the Pool Settlement Date exceeds the aggregate Final Pool Value (as such Final Pool Value is adjusted to reflect any Final Dispositions of and Collections with respect to such Retained Assets during the period from and including the Final Settlement Notice Date to and including the Pool Settlement Date) the Corporation shall pay to the Assuming Bank an amount equal to such excess, or

            (2) if the Final Pool Value of such Retained Assets (as adjusted in accordance with the parenthetical clause in (1) above) exceeds the aggregate Adjusted Pool Value of such Retained Assets as of the Pool Settlement Date, the Assuming Bank shall pay to the Corporation an amount equal to such excess; and

          (C)   (1) if the combined results of postings to the Deferred Settlement Account pursuant to Section 8.5 of this Agreement reflect a net amount due from the Corporation, then the Corporation shall pay to the Assuming Bank such net amount; or

            (2) if the combined results of postings to the Deferred Settlement Account pursuant to Section 8.5 of this Agreement reflect a net amount

due to the Corporation, then the Assuming Bank shall pay to the Corporation such net amount.

(iii) For purposes of calculating the purchase price to be paid by the Corporation pursuant to clause (A) of Section 8.6(b)(ii), Assets referred to in the parenthetical clause in such clause (A) shall be deemed to have an Adjusted Pool Value of zero.

(iv) The obligation of the Corporation to purchase Pool Assets pursuant to this Section 8.6(b) will be subject to the fulfillment, on or prior to the Pool Settlement Date, of the following conditions:

(A) the Assuming Bank and the Corporation shall have executed and delivered an agreement (the "Purchase Agreement") substantially in the form of Exhibit 8.6(b) and the Assuming Bank shall have tendered instruments of conveyance and transfer which effect to the Corporation's satisfaction the transfer of the Pool Assets contemplated by this Section 8.6(b) and the Purchase Agreement; and

(B) the Corporation shall have received such opinions of counsel (with respect to the organization and power of the Assuming Bank, the due authorization, execution and delivery of the Purchase Agreement and related documents, the validity and enforceability of such documents, the absence of violation of or conflict with respect to laws and instruments binding upon the Assuming Bank and other matters typically addressed in similar transactions (but not including the title of the Assuming Bank to the assets sold) and such other customary closing documentation as it shall have requested, all in form and substance satisfactory to it in its reasonable judgment.

(v) Any amount payable by the Corporation pursuant to this Section 8.6(b), together with interest thereon at the Cost of Carry from the Pool Settlement Date to the date of payment, shall be paid not later than one hundred eighty (180) days following the Pool Settlement Date. Any amount payable by the Assuming Bank pursuant to this Section 8.6(b) shall be paid on the Pool Settlement Date.

(c) On the Pool Settlement Date, if the combined results of postings to the Current Settlement Account pursuant to Section 3.3 of the Service Agreement reflect a net amount due from the Corporation, then the Corporation shall pay to the Assuming Bank such net amount; provided, that the Assuming Bank shall have given the Corporation at least ten (10) days' prior written notice of the amount to be paid. If the combined results

of postings to the Current Settlement Account pursuant to Section
3.3 of the Service Agreement reflect a net amount due to the
Corporation, the amount due shall be applied to reduce any amount
payable by the Corporation under Section 8.6(b) or shall be paid
to the Corporation by the Assuming Bank on the Pool Settlement
Date. For the purposes of computing the amount payable under
this Section 8.6(c), the amounts of expenses or Collections not
yet finally determined may be estimated, and the Corporation and
the Assuming Bank agree to make such adjusting payments as may be
appropriate from time to time thereafter when such amounts shall
be finally determined.

<h2 style="text-align:center">ARTICLE IX<br>ADJUSTMENTS</h2>

9.1  <u>Pro Forma Statement; New Schedules</u>.  It is understood
that the descriptions of the Liabilities Assumed and the Acquired
Assets and the schedules hereto may not be complete as of Bank
Closing and that certain liabilities or assets of a nature
similar to those contemplated by Section 2.1 or Section 3.1 have
not been included in such schedules.  The Receiver, as soon as
practicable after Bank Closing, in accordance with the best
information then available, shall provide to the Assuming Bank an
updated pro forma statement and new schedules reflecting any
adjustments of such liabilities and assets as may be necessary.
Such pro forma statement and new schedules shall take into
account, to the extent possible, (i) liabilities and assets of a
nature similar to those contemplated by Section 2.1 or Section
3.1, respectively, and set forth in the schedules related thereto
which at Bank Closing were carried in the Failed Bank's suspense
accounts, and (ii) accruals as of Bank Closing for all income
related to the assets and business of the Failed Bank acquired by
the Assuming Bank hereunder, whether or not such accruals were
reflected on the books of the Failed Bank in the normal course of
its operations.

9.2  <u>Correction of Errors and Omissions; Other Liabilities</u>.

(a)  In the event any omissions or errors are
discovered in preparing the pro forma statement or the schedules
referred to in Section 9.1 or in completing the transfers and
assumptions contemplated by this Agreement, the parties agree to
correct such errors and omissions.

(b)  If the Receiver discovers at any time subsequent
to the date of this Agreement that any claim exists against the
Failed Bank which is of such a nature that it would have been
included in the liabilities assumed under Article II had the
existence of such claim or the facts giving rise thereto been
known as of Bank Closing, the Receiver may, in its discretion, at
any time, require that such claim be assumed by the Assuming Bank
in a manner consistent with the intent of this Agreement.

- 29 -

9.3  **Payment and Transfer on Settlement Date**.  The Receiver agrees to cause to be paid to the Assuming Bank, or the Assuming Bank agrees to pay to the Receiver, as the case may be, on the Settlement Date, a payment in an amount which reflects net adjustments (including any costs, expenses and fees associated with determinations of value as provided in this Agreement) made pursuant to Section 9.1 or Section 9.2, plus interest as provided in Section 9.4.  The Assuming Bank and the Receiver agree to effect on the Settlement Date any further transfer of assets to or assumption of liabilities or claims by the Assuming Bank as may be necessary in accordance with Section 9.1 or Section 9.2.

9.4  **Interest**.  Any amounts paid on the Settlement Date under Section 9.3 shall bear interest for the period from and including the day following Bank Closing to and including the day preceding the Settlement Date.  The interest rate per annum, determined by the Receiver, for the first calendar quarter or portion thereof during which interest accrues shall be a rate equal to the equivalent coupon issue yield on twenty-six (26)-week United States Treasury Bills in effect as of Bank Closing as published in The Wall Street Journal; provided, that if no such equivalent coupon issue yield is available as of Bank Closing, the equivalent coupon issue yield for such Treasury Bills most recently published in The Wall Street Journal prior to Bank Closing shall be used.  Thereafter, the rate shall be adjusted to equal the equivalent coupon issue yield on such Treasury Bills in effect as of the first day of each succeeding calendar quarter during which interest accrues as published in The Wall Street Journal.

9.5  **Adjustments After Settlement Date**.  In the event that the Assuming Bank or the Receiver discovers after the Settlement Date any errors or omissions as contemplated by Section 9.2 or any error with respect to the payment made on the Settlement Date under Section 9.3, the Assuming Bank and the Receiver agree to promptly correct any such errors or omissions, make any payments and effect any transfers or assumptions as may be necessary to reflect any such correction; provided, that interest shall not be paid with respect to any such payments.

ARTICLE X
CONTINUING COOPERATION

10.1  **General Matters**.  The parties hereto agree that they will, in good faith and with their best efforts, cooperate with each other to carry out the transactions contemplated by this Agreement and the Service Agreement and effect the purposes hereof and thereof.

10.2  **Additional Title Documents**.  The Receiver, the Corporation and the Assuming Bank each agree, at any time, and from time to time, upon the request of either of the other

- 30 -

parties, to execute and deliver such additional instruments and documents of conveyance as shall be reasonably necessary to vest in such other party its full legal or equitable title in and to the property transferred pursuant to this Agreement or to be transferred in accordance herewith.

10.3  Claims and Suits.

(a)  The Receiver shall have the right, in its discretion, to (i) defend or settle any claim or suit against the Assuming Bank with respect to which the Corporation has indemnified the Assuming Bank, in the same manner and to the same extent as provided in Article XIV and in Section 5.4 of the Service Agreement, and (ii) defend or settle any claim or suit against the Assuming Bank with respect to any Liability Assumed which claim or suit may result in a loss to the Receiver arising out of or related to this Agreement, or which existed against the Failed Bank on or before Bank Closing.  The exercise by the Receiver of any rights under this Section 10.3(a) shall not release the Assuming Bank with respect to any of its obligations under this Agreement.

(b)  In the event any action at law or in equity shall be instituted by any Person against the Receiver and the Corporation as codefendants with respect to any asset of the Failed Bank retained or acquired pursuant to this Agreement by the Receiver, the Receiver agrees, at the request of the Corporation, to join with the Corporation in a petition to remove the action to the United States District Court for the proper district.  The Receiver agrees to institute, with or without joinder of the Corporation as coplaintiff, any action with respect to any such retained or acquired asset or any matter connected therewith whenever notice requiring such action shall be given by the Corporation to the Receiver.

10.4  Payment of Deposits.  In the event any depositor does not accept the obligation of the Assuming Bank to pay any Deposit liability of the Failed Bank assumed by the Assuming Bank pursuant to this Agreement and asserts a claim against the Receiver for all or any portion of any such Deposit liability, the Assuming Bank agrees on demand to provide to the Receiver funds sufficient to pay such claim in an amount not in excess of the Deposit liability reflected on the books of the Assuming Bank at the time such claim is made.  Upon payment by the Assuming Bank to the Receiver of such amount, the Assuming Bank shall be discharged from any further obligation under this Agreement to pay to any such depositor the amount of such Deposit liability paid to the Receiver.

10.5  Withheld Payments.  At any time, the Receiver or the Corporation may, in its discretion, determine that all or any portion of any deposit balance assumed by and transferred to the

- 31 -

Assuming Bank pursuant to this Agreement does not constitute a "Deposit", and may direct the Assuming Bank to withhold payment of all or any portion of any such deposit balance. Upon such direction, the Assuming Bank agrees not to make any payment of such deposit balance to or on behalf of the depositor, or to itself, whether by way of transfer, set-off, or otherwise. The Assuming Bank agrees to maintain the "withheld payment" status of any such deposit balance until directed in writing by the Receiver or the Corporation as to its disposition. At the direction of the Receiver or the Corporation, the Assuming Bank shall return all or any portion of such deposit balance to the Receiver or the Corporation, as appropriate, and thereupon the Assuming Bank shall be discharged from any further liability to such depositor with respect to such deposit balance, and shall be indemnified and held harmless by the Corporation from any and all claims of such depositor, including claims for consequential damages. If such deposit balance has been paid to the depositor prior to a demand for return by the Corporation or the Receiver, and payment of such deposit balance had not been previously withheld pursuant to this Section, the Assuming Bank shall not be obligated to return such deposit balance to the Receiver or the Corporation. The Assuming Bank shall be obligated to reimburse the Corporation or the Receiver, as the case may be, for the amount of any deposit balance or portion thereof paid by the Assuming Bank in contravention of any previous direction to withhold payment of such deposit balance or return such deposit balance, the payment of which was withheld pursuant to this Section.

10.6  Proceedings with Respect to Certain Assets and Liabilities.  In connection with any investigation, proceeding or other matter with respect to any asset or liability of the Failed Bank retained by the Receiver, or any asset of the Failed Bank acquired by the Receiver pursuant to this Agreement, the Assuming Bank shall cooperate to the extent reasonably required by the Receiver.  In addition to its obligations under Section 6.4 of this Agreement, the Assuming Bank shall provide representatives of the Receiver access at reasonable times and locations without other limitation or qualification to (i) its directors, officers, employees and agents and those of Failed Bank Subsidiaries the capital stock of which it has acquired under this Agreement, if any, and (ii) its books and Records and the books and records of Failed Bank Subsidiaries the capital stock of which it has acquired under this Agreement, if any, and copies thereof.  Such copies shall be provided by the Assuming Bank and the costs of duplication thereof shall be borne by the Receiver.

10.7  Corporation Funding.  The Corporation agrees to make available to the Receiver, at the request of the Receiver, such funds as may be necessary to enable the Receiver to (i) purchase Loans or other Assets pursuant to Section 7.5 or 8.4, (ii) make payments pursuant to Section 9.2, 9.3, 9.4, 9.5 or 10.6 and (iii) payments pursuant to Section

- 32 -

pay costs, fees and expenses of the Receiver as contemplated by
Section 10.3(a) or Section 16.9.

## ARTICLE XI
## CONDITION PRECEDENT

The obligations of the parties hereto are subject to the
Receiver and the Corporation having received, on or before the
date of this Agreement, evidence reasonably satisfactory to each
of any necessary approval, waiver or other action by any
governmental authority, the board of directors of the Assuming
Bank, or other third party, with respect to this Agreement, the
Service Agreement and the transactions contemplated hereby and
thereby, the closing of the Failed Bank and the appointment of
the Receiver, the chartering of the Assuming Bank, and any
agreements, documents, matters or proceedings contemplated hereby
or thereby.

## ARTICLE XII
## REPRESENTATIONS AND WARRANTIES

12.1  <u>Representations and Warranties of the Corporation</u>.
The Corporation hereby represents and warrants to the Assuming
Bank and the Servicer that:

(a)  <u>Power</u>.  The Corporation has legal power and
authority to enter into and perform this Agreement and the
Service Agreement and to carry out the terms hereof and thereof.
The execution, delivery, and performance by the Corporation of
this Agreement and the Service Agreement does not violate any
provision of Federal law administered by the Corporation.

(b)  <u>Authorization, Execution and Enforceability</u>.  The
execution and delivery by the Corporation of this Agreement and
the Service Agreement and the performance by the Corporation of
its obligations hereunder and thereunder have been duly
authorized by all necessary action on the part of the
Corporation.  This Agreement and the Service Agreement have been,
and the Service Agreement will be, duly executed and delivered by
the Corporation, and upon the due authorization, execution, and
delivery of this Agreement by the Assuming Bank and the Receiver
and of the Service Agreement by the Assuming Bank and the
Servicer, this Agreement and the Service Agreement will be the
legal, valid, and binding obligations of the Corporation,
enforceable in accordance with their respective terms.

12.2  <u>Representations and Warranties of the Assuming Bank
and the Servicer</u>.  The Assuming Bank hereby represents and
warrants to the Corporation and the Receiver that:

(a)  <u>Corporate Existence</u>.  Each of the Assuming Bank
and the Servicer is duly organized, validly existing and in good

- 33 -

standing under the laws of the jurisdiction in which it is incorporated and has full power and authority to own and operate its properties and to conduct its business as now conducted.  The Assuming Bank owns, beneficially and of record, all of the outstanding capital stock of the Servicer.

(b)  Authorization.  The Assuming Bank has full power and authority to execute and deliver this Agreement, and the Assuming Bank and the Servicer have full power and authority to execute and deliver the Service Agreement and to perform this Agreement and the Service Agreement in accordance with their respective terms.  Each of the Assuming Bank and the Servicer has taken all necessary corporate action to authorize the execution, delivery and performance of this Agreement and the Service Agreement and the performance of the transactions contemplated hereby and thereby.

(c)  Third Party Consents.  No governmental authority or other third party consents (including but not limited to approvals, licenses, registrations or declarations) are required in connection with execution, delivery or performance by the Assuming Bank or the Servicer of this Agreement or the Service Agreement, other than such consents as have been duly obtained and are in full force and effect.

(d)  Execution and Enforceability.  This Agreement and the Service Agreement have been duly executed and delivered by the Assuming Bank and the Servicer and, when duly authorized, executed and delivered by the Corporation and, in the case of this Agreement, the Receiver, this Agreement and the Service Agreement will constitute the legal, valid and binding obligations of the Assuming Bank and the Servicer, enforceable in accordance with their respective terms.

(e)  Compliance with Law.

(i)  None of the Assuming Bank, the Servicer or any of their respective Subsidiaries is in violation of any statute, regulation, order, decision, judgment or decree of, or any restriction imposed by, the United States of America, any state, municipality or other political subdivision or any agency of any of the foregoing, or any court or other tribunal having jurisdiction over the Assuming Bank or the Servicer, or any of their respective Subsidiaries, or any assets of any such Person, or any foreign government or agency thereof having such jurisdiction, or any securities exchange or securities quotation system on which the Assuming Bank's securities are listed or quoted, with respect to the conduct of the business of the Assuming Bank or the Servicer or of any of their respective Subsidiaries, or the ownership of the properties of the Assuming Bank or the Servicer or any of their respective Subsidiaries, which,

- 34 -

either individually or in the aggregate with all other such violations, would materially and adversely affect the business, operations or condition (financial or otherwise) of the Assuming Bank or the Servicer or the ability of the Assuming Bank or the Servicer to perform, satisfy or observe any obligation or condition under this Agreement or the Service Agreement.

(ii)  Neither the execution and delivery nor the performance by the Assuming Bank or the Servicer of this Agreement or the Service Agreement will result in any violation by the Assuming Bank or the Servicer of, or be in conflict with, any provision of any applicable law or regulation, or any order, writ or decree of any court or governmental authority.

(f)  Compliance with Obligations.

(i)  None of the Assuming Bank, the Servicer or any Subsidiary of the Assuming Bank or the Servicer is in violation or breach of or in default under (A) any obligation, agreement, covenant or condition contained in its charter or organizational documents, articles of incorporation or by-laws or (B) any contract, lease or other instrument to which the Assuming Bank or the Servicer, or any of their respective Subsidiaries is a party (or which is binding on the Assuming Bank or the Servicer, or any of their respective Subsidiaries, or any assets of any such Person), which violation, breach or default, either individually or in the aggregate with all such other violations, breaches and defaults, would materially and adversely affect the business, operations or condition (financial or otherwise) of the Assuming Bank or the Servicer, or the Assuming Bank's or the Servicer's ability to perform, satisfy or observe any obligation or condition under this Agreement or the Service Agreement.

(ii)  Neither the execution and delivery nor the performance by the Assuming Bank or the Servicer of this Agreement or the Service Agreement will result in a violation, breach of or default under or be in conflict with: (A) its charter or organizational documents, articles of incorporation or by-laws, or (B) any other agreement or instrument to which the Assuming Bank or the Servicer, or any of their respective Subsidiaries, is a party, or which is binding on the Assuming Bank or the Servicer, or any of their respective Subsidiaries, or the assets of any such Person, or (C) any order, decree, award or judgment issued by any court or other tribunal which is binding on the Assuming Bank or the Servicer, or any of their respective Subsidiaries, or any assets of any such Person, and will not result in the creation of any Lien on the assets of the

- 35 -

Assuming Bank or the Servicer or any of their respective Subsidiaries.

(g) **Litigation.** There is no legal action, suit, investigation or proceeding (whether or not the Assuming Bank or the Servicer, or any of their respective Subsidiaries is a party thereto) pending or threatened against the Assuming Bank or the Servicer, or any of their respective Subsidiaries, or any assets of any such Person, which questions the validity of this Agreement or the Service Agreement or any of the transactions contemplated hereby or thereby or which would, if adversely determined, either individually or in the aggregate with all such other actions, suits, investigations or proceedings if adversely determined, materially and adversely affect the business, operations or condition (financial or otherwise) of the Assuming Bank or the Servicer or the ability of the Assuming Bank or the Servicer to perform, satisfy or observe any obligation or condition under this Agreement or the Service Agreement.

(h) **Compensation.** Neither the Assuming Bank nor the Servicer has any agreement or arrangement to receive any compensation, fee, reimbursement, discount or commission in connection with the transactions contemplated by this Agreement or the Service Agreement, except for the fees for the collection, liquidation, and management of the Pool Assets as provided for in the Service Agreement.

(i) **Contingent Fees, etc.** Neither the Assuming Bank nor the Servicer has any agreement or arrangement to pay the fees of any Person contingent upon the approval or receipt of payments from the Corporation of financial assistance under this Agreement. No Person has acted on behalf of the Assuming Bank or the Servicer in such manner as to give rise to any valid claim by any Person for a finder's fee, brokerage commission or other similar payment contingent upon the approval or receipt of payments from the Corporation hereunder and which is payable by the Assuming Bank or the Servicer or any of their respective Subsidiaries, or any successors thereof, the Corporation or the Receiver.

ARTICLE XIII
DISCRETIONARY PAYMENTS; DISTRIBUTIONS

13.1 <u>Discretionary Payments</u>. Except as specifically provided otherwise in this Agreement, the Corporation shall not be obligated to assume or discharge any liability of the Failed Bank; <u>provided</u>, <u>that</u> nothing herein shall be construed as a limitation upon any right of the Corporation on behalf of the Receiver to make or effect any payment, settlement or compromise, which may be in excess of aggregate pro rata payments to any creditor as provided in 12 U.S.C. Section 1821(i), with respect to any claim and upon such payment, the Corporation shall be

subrogated to the rights of such claimant against the Receiver. Any such payment under this Section 13.1 may be made by the Receiver as paying agent for the Corporation. The funds constituting any such payment made through the Receiver shall not be deemed to be assets of the receivership estate of the Failed Bank.

13.2  Distribution by Receiver.  Upon termination of the receivership with respect to the Failed Bank, the Receiver shall transfer to the Corporation all assets remaining in the receivership at a purchase price equal to the estimated fair market value thereof determined by the Receiver as of the date of termination of the receivership.  The Receiver shall distribute the net proceeds to Persons (including the Corporation) having proved claims in accordance with the Corporation's policies and procedures regarding payment of receivership dividends.

ARTICLE XIV
INDEMNIFICATION

14.1  Indemnification of Indemnitees.  From and after the Commencement Date and subject to compliance by the Indemnitees with the provisions of Section 14.2, the Corporation hereby agrees to indemnify and hold harmless the Indemnitees against any and all costs, losses, liabilities, expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred in connection with claims against any Indemnitee based on liabilities of the Failed Bank that are not assumed by the Assuming Bank pursuant to this Agreement or subsequent to the execution hereof by the Assuming Bank, which unassumed liabilities remain with the Receiver.  Such claims for which indemnification is provided hereunder include, without limitation, the following claims set forth in paragraphs (1) through (12), subject to certain exclusions as provided in paragraphs (a) through (k) of this Section 14.1:

(1)  claims based upon the rights of any shareholder or former shareholder as such of (x) the Failed Bank or (Y) any Subsidiary or Affiliate of the Failed Bank;

(2)  claims based upon the rights of any creditor as such of the Failed Bank, or any creditor as such of any director, officer, employee or agent of the Failed Bank, with respect to any indebtedness or other obligation of the Failed Bank arising prior to Bank Closing;

(3)  claims based upon the rights of any present or former director, officer, employee or agent as such of the Failed Bank or any Subsidiary or Affiliate of the Failed Bank;

(4)  claims based upon any action or inaction prior to Bank Closing of the Failed Bank, its directors, officers,

- 37 -

employees or agents as such, or any Subsidiary or Affiliate of
the Failed Bank, or the directors, officers, employees or agents
as such of such Subsidiary or Affiliate;

    (5)   claims based upon any determination of insolvency
and the closing of the Failed Bank by the appropriate regulatory
authority;

    (6)   claims based on the execution and delivery of this
Agreement and the consummation of the transactions contemplated
hereby;

    (7)   claims based on any malfeasance, misfeasance or
nonfeasance of the Failed Bank, its directors, officers,
employees or agents with respect to the trust business of the
Failed Bank;

    (8)   claims based upon any failure or alleged failure
(not in violation of law) by the Assuming Bank to continue to
perform, any service or activity previously performed by the
Failed Bank which the Assuming Bank is not required to perform
pursuant to this Agreement or which arise under any contract to
which the Failed Bank was a party which the Assuming Bank elected
not to assume under this Agreement and which the Assuming Bank
has not assumed subsequent to the execution hereof;

    (9)   claims arising from any action or inaction of any
Indemnitee which is taken upon the specific written direction of
the Corporation or the Receiver (either directly or acting
through the Oversight Committee by the affirmative vote of the
Corporation's two representatives thereon), other than any action
or inaction taken in a manner constituting gross negligence or
willful misconduct; and

    (10)   claims arising from any action or inaction of the
Corporation in connection with the administration of a Pool Asset
following the transfer to the Corporation of responsibility for
such administration under Section 6.3 of the Service Agreement;
and

    (11)   claims arising in connection with a refusal of
the Assuming Bank, acting pursuant to instructions given in
writing by the Oversight Committee pursuant to Section 5.6 of the
Service Agreement, to advance funds under a Commitment to an
Obligor on any Loan included in the Pool; and

    (12)   claims based upon the rights of any depositor of
the Failed Bank whose deposit has been accorded "withheld
payment" status and/or returned to the Receiver or the
Corporation at the written direction of the Receiver or the
Corporation in accordance with Section 10.5;

provided, that with respect to this Agreement, except
for paragraph (9), (10), (11) or (12) of this Section 14.1:

(a)    no indemnification will be provided hereunder
for any judgment or fine against, or any amount paid in
settlement (without the approval of the Corporation) by, any
Indemnitee in connection with any action that seeks damages
against any Indemnitee (a "counterclaim") arising with respect to
any Acquired Asset and based on any action or inaction of either
the Failed Bank, its directors, officers, employees or agents as
such prior to Bank Closing unless any such judgment, fine or
amount paid in settlement exceeds the greater of (i) the
Repurchase Price of such Acquired Asset, or (ii) the monetary
recovery sought on such Acquired Asset by such Indemnitee in the
cause of action from which the counterclaim arises; and in such
event the Corporation will provide indemnification only in the
amount of such excess; and no indemnification will be provided
for any costs or expenses other than any costs or expenses
(including attorneys' fees) which, in the determination of the
Corporation, have been actually and reasonably incurred by such
Indemnitee in connection with the defense of any such
counterclaim; and it is expressly agreed that the Corporation
reserves the right to intervene, in its discretion, on its behalf
and/or on behalf of the Receiver or the Bank, in the defense of
any such counterclaim;

(b)    no indemnification will be provided hereunder
for any claims with respect to any liability or obligation of the
Failed Bank that is expressly assumed by the Assuming Bank
pursuant to this Agreement or subsequent to the execution hereof
by the Assuming Bank;

(c)    no indemnification will be provided hereunder
for any claims with respect to any liability of the Failed Bank
to any present or former employee as such of the Failed Bank or
of any Subsidiary or Affiliate of the Failed Bank which liability
is expressly assumed by the Assuming Bank pursuant to this
Agreement or subsequent to the execution hereof by the Assuming
Bank;

(d)    no indemnification will be provided hereunder
for any claims based upon the failure of any Indemnitee to seek
recovery of damages from the Receiver for any claims based upon
any action or inaction of the Failed Bank, its directors,
officers, employees or agents as fiduciary, agent or custodian
prior to Bank Closing;

(e)    no indemnification will be provided hereunder
for any claims based upon any violation or alleged violation by
any Indemnitee of the antitrust, branching, banking or bank
holding company or securities laws of the United States of
America or any State thereof;

- 39 -

(f)   no indemnification will be provided hereunder for any claims based upon the rights of any present or former creditor, customer, or supplier as such of the Assuming Bank or its Subsidiaries or Affiliates;

(g)   no indemnification will be provided hereunder for any claims based upon the rights of any present or former shareholder as such of the Assuming Bank or of any of its Subsidiaries or Affiliates regardless of whether any such present or former shareholder is also a present or former shareholder of the Failed Bank;

(h)   no indemnification will be provided hereunder if the Corporation determines that the effect of providing such indemnification would be to (i) expand or alter the provisions of Section 14.3, or of any warranty or disclaimer thereof provided in Section 3.3 or any other provision of this Agreement, or (ii) create any warranty not expressly provided under this Agreement;

(i)   no indemnification will be provided hereunder with respect to any claims which could have been enforced against any Indemnitee had the Assuming Bank not entered into this Agreement;

(j)   no indemnification will be provided hereunder for any claims based upon any liability for taxes or fees assessed with respect to the consummation of the transactions contemplated by this Agreement, including without limitation any subsequent sale and/or transfer of any Acquired Assets and/or Liabilities Assumed, respectively, to any Subsidiary or Affiliate of the Assuming Bank;

(k)   except as expressly provided in this Article XIV, no indemnification will be provided under this Agreement for any action or inaction of any Indemnitee after Bank Closing; and nothing in this Agreement shall be construed to provide indemnification for (i) the Failed Bank, (ii) any Subsidiary or Affiliate of the Failed Bank, or (iii) any present or former director, officer, employee or agent of the Failed Bank or its Subsidiaries or Affiliates; provided, that the Corporation, in its discretion, may provide indemnification hereunder for any present or former director, officer, employee or agent of the Failed Bank or its Subsidiaries or Affiliates who is also or becomes a director, officer, employee or agent of the Assuming Bank or its Subsidiaries or Affiliates.

14.2   Actions of Indemnitees with Respect to Claims.   With respect to any claim made or threatened against any Indemnitee for which such Indemnitee is or may be entitled to indemnification under this Article XIV, such Indemnitee shall:

(1)   give written notice to the Associate General Counsel (Regional Affairs) of the Corporation and the Regional Counsel (Liquidation) in the manner and at the address set forth

in Section 16.7 of such claim as soon as practicable after such claim is made or threatened;

(2) provide to the Corporation such information and cooperation with respect to such claim as the Corporation may reasonably require;

(3) cooperate and take all steps, as the Corporation may reasonably require, to preserve and protect any defense to such claim;

(4) in the event suit is brought with respect to such claim, upon reasonable prior notice, afford to the Corporation the right, which the Corporation may exercise in its sole discretion, to conduct the investigation, control the defense and effect settlement of such claim, including without limitation, the right to designate counsel and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of any such claim, all of which shall be at the expense of the Corporation; provided, that the Corporation shall have notified the Indemnitee in writing that such claim is a claim with respect to which the Indemnitee is entitled to indemnification under this Article XIV;

(5) not incur any costs or expenses in connection with any response or suit with respect to such claim, unless such costs or expenses were incurred upon the written direction of the Corporation; provided, that the Corporation shall not be obligated to reimburse the amount of any such costs or expenses unless such costs or expenses were incurred upon the written direction of the Corporation; and

(6) not release or settle such claim or make any payment or admission with respect thereto, unless the Corporation consents in writing thereto, which consent shall not be unreasonably withheld; provided, that the Corporation shall not be obligated to reimburse the amount of any such settlement or payment unless such settlement or payment was effected upon the written direction of the Corporation.

14.3  No Additional Warranty.  Nothing in this Article XIV shall be construed or deemed to (i) expand or otherwise alter any warranty or disclaimer thereof provided under Section 3.3 or any other provision of this Agreement with respect to, among other matters, the title, value, collectibility, genuineness, enforceability or condition of any asset of the Failed Bank purchased by the Assuming Bank pursuant to this Agreement or subsequent to the execution hereof by the Assuming Bank, or (ii) create any warranty not expressly provided under this Agreement with respect to any such asset.

14.4  Indemnification of Corporation and Receiver.  From and after the Closing Date, the Assuming Bank agrees to indemnify and hold harmless the Corporation and the Receiver and their respective directors, officers, employees and agents from and

against any and all costs, losses, liabilities, expenses
(including attorneys' fees), judgments, fines and amounts paid in
settlement incurred in connection with the following:

(1)   claims based upon any and all liabilities or
obligations of the Failed Bank assumed by the Assuming Bank
pursuant to this Agreement or subsequent to the execution hereof
by the Assuming Bank, whether or not any such liabilities
subsequently are sold and/or transferred, other than any claim
based upon any action or inaction of any Indemnitee as provided
in paragraph (9), (10), (11) or (12) of Section 14.1; and

(2)   claims based upon any act or omission of any
Indemnitee (including but not limited to claims of any Person
claiming any right or title by or through the Assuming Bank with
respect to Assets retransferred to the Receiver pursuant to
Section 3.5 or 8.4), other than any action or inaction of any
Indemnitee as provided in paragraph (9), (10), (11) or (12) of
Section 14.1.

14.5   Obligations Supplemental.  The obligations of the
Corporation under Section 14.1 are to supplement any amount
payable by any Primary Indemnitor to the Indemnitee.  Consistent
with that intent, the Corporation agrees only to make payments
pursuant to such indemnification to the extent not payable by a
Primary Indemnitor.  If the aggregate amount of payments by the
Corporation and all Primary Indemnitors with respect to any item
of indemnification under such Section 14.1 exceeds the amount
payable with respect to such item, such Indemnitee shall notify
the Corporation thereof and, upon the request of the Corporation,
shall promptly pay to the Corporation the amount of the
Corporation's payments to the extent of such excess.

14.6   Criminal Claims.  Notwithstanding any provision of
this Article XIV to the contrary, in the event that any
Indemnitee shall become involved in any criminal action, suit or
proceeding, whether judicial, administrative or investigative,
the Corporation shall have no obligation hereunder to indemnify
such Indemnitee for liability with respect to any criminal act or
to the extent any costs or expenses are attributable to the
defense against the allegation of any criminal act, unless (a)
the Indemnitee is successful on the merits or otherwise in the
defense against any such action, suit or proceeding, or (b) such
action, suit or proceeding is terminated without the imposition
of liability on such Indemnitee.

14.7   Corporation Obligation.  Nothing in this Article XIV
is intended or shall be construed to create in any way any
liability or obligation on the part of the United States of
America or any department or agency thereof (other than the
Corporation) under or with respect to this Article XIV, or any
provision hereof, it being the intention of parties hereto that
the obligations undertaken by the Corporation hereunder are the
sole and exclusive responsibility of the Corporation and no other
Person or entity.

- 42 -

ARTICLE XV
CERTAIN COVENANTS OF THE ASSUMING BANK

15.1 General Covenants. Except as otherwise provided
herein, the Assuming Bank hereby covenants and agrees, for the
benefit of the Corporation and the Receiver, that for the term of
this Agreement as set forth in Section 16.13:

(a) Maintenance of Corporate Existence. The Assuming
Bank shall, and shall cause the Servicer to, do or cause to be
done at all times all things necessary to maintain and preserve
and keep in full force and effect their respective corporate
existence, and all rights and franchises material to the business
of the Assuming Bank or the Servicer.

(b) Foreign Qualification. The Assuming Bank shall,
and shall cause the Servicer to, do all things necessary to be
duly qualified to do business and to remain in good standing as
foreign corporations in each jurisdiction where their ownership
of property or the nature of their respective businesses makes
such qualification necessary or where the failure to be so
qualified might have a material adverse effect on the business,
operations or condition (financial or otherwise) of the Assuming
Bank or the Servicer.

(c) Books and Records. The Assuming Bank shall, and
shall cause the Servicer to, at all times keep books and records
which fairly present all dealings and transactions carried out in
connection with their respective business and affairs. Except as
otherwise provided for in this Agreement or the Service
Agreement, all financial books and records shall be kept in
accordance with generally accepted accounting principles,
consistently applied for the periods involved and in a manner
such that information necessary to determine compliance with any
requirement of this Agreement or the Service Agreement will be
readily obtainable, and in a manner such that the purposes of
this Agreement and the Service Agreements may be effectively
accomplished. Without the prior written approval of the
Corporation, neither the Assuming Bank nor the Servicer shall
make any change in its accounting principles affecting the Pool
Assets or Collections on Pool Assets, except as required by a
change in generally accepted accounting principles.

(d) Information. The Assuming Bank shall, and shall
cause the Servicer to, promptly provide to the Corporation such
other information, including financial statements and
computations, relating to the performance of the provisions of
this Agreement or the Service Agreement or otherwise relating to
their respective business and affairs, as the Corporation or the
Receiver may request from time to time.

(e) Ownership of the Servicer, etc. The Assuming Bank
(i) shall continue to own, beneficially and of record, all the
outstanding capital stock of the Servicer, (ii) shall not permit
the Servicer to consolidate or merge with or into any other

- 49 -

Person, (iii) shall not permit the Servicer to sell or distribute all or substantially all of its assets and (iv) shall not permit the Servicer to liquidate or dissolve: provided, that this Section 15.1(f) shall not prohibit the consolidation or merger of the Servicer with or into any other Person in accordance with Section 8.1 of the Service Agreement or the sale of any Pool Asset in accordance with the terms of this Agreement or the Service Agreement.

(f)  Fees.  The Assuming Bank shall not, and shall not permit any of its Subsidiaries to enter into any arrangement to pay the fees of any attorney, accountant, investment banker, consultant or other advisor pursuant to which the fees are contingent upon receipt of, or the amount of the fees is determined by reference to the amount of, payments from the Corporation.

(g)  Promissory Notes.  The Assuming Bank shall not, without the prior written consent of the Corporation, transfer, assign, pledge or otherwise dispose of any promissory note issued by the Corporation to the Assuming Bank pursuant to this Agreement.

15.2  Tax Ruling.  The Assuming Bank shall not at any time, without the Corporation's prior written consent, seek a private letter ruling or other determination from the Internal Revenue Service or otherwise seek to qualify for any special tax treatment or benefits associated with any payments made by the Corporation pursuant to this Agreement.

15.3  Tax Benefits.

(a)  For purposes of calculating any tax, the Assuming Bank shall take a basis in each Acquired Asset equal to the Book Value of such Acquired Asset.  To the extent that an Acquired Asset on the books of the Failed Bank represents multiple assets to each of which a tax basis must be separately allocated, the Assuming Bank shall allocate tax basis among such multiple assets so that the aggregate tax basis of such multiple assets shall not exceed the Book Value of the Acquired Asset which represents such multiple assets.  If the Assuming Bank claims a tax basis for an asset in excess of its Book Value, or proportionate part thereof as determined above, then, in each taxable year in which such excess tax basis, or any part thereof, is amortized, deducted or recovered for tax purposes, the Assuming Bank shall make a payment to the Corporation, on the date upon which the tax return for the year in which the amortization, deduction or recovery arises is filed, in an amount equal to the tax benefit realizable as a result of such amortization, deduction or recovery plus the deduction, if permitted, of such payment to the Corporation.

(b)  If the Assuming Bank claims a deduction in calculating any tax with respect to (i) any item for which it has received, or is entitled to receive, a payment from the Corporation, and if such payment is not included in the income of

- 44 -

the Assuming Bank for such purpose, or (ii) any payment required
to be made to the Corporation which represents a repayment of
amounts previously paid to the Assuming Bank which amounts were
not included in the gross income of the Assuming Bank for
purposes of calculating such tax, then the Assuming Bank shall
make a payment to the Corporation, on the date upon which the tax
return in which such deduction is claimed is filed, in an amount
equal to the tax benefit realizable as a result of such
deduction, plus the deduction, if permitted, of such payment to
the Corporation.

        (c)   In the event that, for purposes of calculating any
tax, an amortized, deducted or recovered amount described in (a)
above is required to be included in income, or a deduction
described in (b) above is disallowed, then within five (5) days
after the Assuming Bank notifies the Corporation that such
inclusion or disallowance is final and unappealable, the
Corporation shall make a payment to the Assuming Bank such that
the net amount retained by the Assuming Bank, after remittance of
any tax, either required to be paid by reason of receipt of the
payment or that would be required to be paid if the Assuming Bank
did not eliminate such tax with unrelated deductions or credits,
is equal to the amount paid to the Corporation.

    15.4  Tax Returns.  The Assuming Bank shall, upon the
request of the Corporation, provide copies of all tax filings,
including but not limited to, consolidated Federal income tax
returns (including amended returns) for the affiliated group of
which the Assuming Bank is a member, and such other related
materials as the Corporation may request.

                        ARTICLE XVI
                        MISCELLANEOUS

    16.1  Entire Agreement.  This Agreement and the Service
Agreement embody the entire agreement of the parties hereto in
relation to the subject matter herein and therein and supersede
all prior understandings or agreements, oral or written, between
the parties.

    16.2  Headings.  The headings and subheadings of the Table
of Contents, Articles and Sections contained in this Agreement,
except the terms identified for definition in Appendix I and
elsewhere in this Agreement, are inserted for convenience only
and shall not affect the meaning or interpretation of this
Agreement or any provision hereof.

    16.3  Counterparts.  This Agreement may be executed in any
number of counterparts and by the duly authorized representative
of a different party hereto on separate counterparts, each of
which when so executed shall be deemed to be an original and all
of which when taken together shall constitute one and the same
Agreement.

16.4  GOVERNING LAW.  THIS AGREEMENT AND THE RIGHTS AND
OBLIGATIONS HEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN
ACCORDANCE WITH THE FEDERAL LAW OF THE UNITED STATES OF AMERICA,
AND IN THE ABSENCE OF CONTROLLING FEDERAL LAW, IN ACCORDANCE WITH
THE LAWS OF THE STATE OF MAINE.

16.5  Successors.  All terms and conditions of this
Agreement shall be binding on the successors and assigns of the
Receiver, the Corporation and the Assuming Bank.  Except as
otherwise specifically provided in this Agreement, nothing
expressed or referred to in this Agreement is intended or shall
be construed to give any Person other than the Receiver, the
Corporation and the Assuming Bank any legal or equitable right,
remedy or claim under or with respect to this Agreement or any
provisions contained herein, it being the intention of the
parties hereto that this Agreement, the obligations and
statements of responsibilities hereunder, and all other
conditions and provisions hereof are for the sole and exclusive
benefit of the Receiver, the Corporation and the Assuming Bank
and for the benefit of no other Person.

16.6  Modification; Assignment.  No amendment or other
modification, rescission, release, or assignment of any part of
this Agreement shall be effective except pursuant to a written
agreement subscribed by the duly authorized representatives of
the parties hereto.

16.7  Notice.  Any notice, request, demand, consent,
approval or other communication to any party hereto shall be
effective when received and shall be given in writing, and
delivered in person against receipt therefor, or sent by
certified mail, postage prepaid, courier service, telex or
facsimile transmission to such party at its address set forth
below or at such other address as it shall hereafter furnish in
writing to the other parties.  All such notices and other
communications shall be deemed given on the date received by the
addressee.

Assuming Bank

_Fleet Bank of Maine_

_ONE CITY CENTER_

_Portland, Maine  04101_

Attention:  Mike McNamara

with a copy to:  William C. Mutterperl

- 46 -

Receiver

Federal Deposit Insurance Corporation,
Receiver of Maine Savings Bank
452 Fifth Avenue, 21st Floor
New York, New York  10018

Attention: Regional Director
           (Liquidation)

with a copy to: Regional Counsel
                (Liquidation)

Corporation

Notices pursuant to Sections 8.1 and 8.2:

Federal Deposit Insurance Corporation
Regional Director, Division of Supervision
160 Gould Street
Needham, Massachusetts  02194

All other notices:

Federal Deposit Insurance Corporation
550 17th Street, N.W.
Washington, D.C.  20429

Attention:  Director,
            Division of Liquidation

With a copy to:  Associate General Counsel
                 (Regional Affairs)


     16.8  Manner of Payment.  Except as otherwise specifically
provided in this Agreement, all payments due under this Agreement
shall be in lawful money of the United States of America in
immediately available funds as each party hereto may specify to
the other parties; provided, that in the event the Receiver or
the Corporation is obligated to make any payment hereunder in the
amount of $25,000.00 or less, such payment may be made by check.

     16.9  Costs, Fees and Expenses.  Except as otherwise
specifically provided herein or in the Service Agreement, each
party hereto agrees to pay all costs, fees and expenses which it
has incurred in connection with or incidental to the matters
contained in this Agreement, including without limitation any
fees and disbursements to its accountants and counsel; provided,
that the Assuming Bank shall pay all fees, costs and expenses
(other than attorneys' fees incurred by the Receiver) incurred in
connection with the transfer to it of any Acquired Assets or
Liabilities Assumed hereunder.

16.10  *Waiver*.  The Receiver, the Corporation and the Assuming Bank may waive their respective rights, powers or privileges under this Agreement; *provided*, *that* such waiver shall be in writing; *and further provided*, *that* no failure or delay on the part of the Receiver, the Corporation or the Assuming Bank to exercise any right, power or privilege under this Agreement shall operate as a waiver thereof, nor will any single or partial exercise of any right, power or privilege under this Agreement preclude any other or further exercise thereof or the exercise of any other right, power or privilege by the Receiver, the Corporation, or the Assuming Bank under this Agreement, nor will any such waiver operate or be construed as a future waiver of such right, power or privilege under this Agreement.

16.11  *Severability*.  If any provision of this Agreement is invalid or unenforceable then, to the extent possible, all of the remaining provisions of this Agreement shall remain in full force and effect and shall be binding upon the parties hereto.

16.12  *Term of Agreement*.  This Agreement shall continue in full force and effect until the Termination Date; *provided*, *that* the provisions of Article XIV of this Agreement shall survive the expiration of the term of this Agreement.  Expiration of the term of this Agreement shall not affect any claim or liability of any party with respect to (i) any amount which is payable under Section 8.6, (ii) any other amount which is owing at the time of such expiration, regardless of when such amount becomes payable and (iii) any breach of this Agreement occurring prior to such expiration, regardless of when such breach is discovered.

16.13  *Survival of Covenants, Etc*.  The covenants, representations, and warranties in this Agreement shall survive the execution of this Agreement and the consummation of the transactions contemplated hereunder to occur on the Commencement Date.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorized representative as of the date first above written.

FEDERAL DEPOSIT INSURANCE CORPORATION, RECEIVER OF MAINE SAVINGS BANK

BY: _Mitchell J. Biles_

TITLE: _MANAGING   LIQUIDATOR_

Attest: _____

FEDERAL DEPOSIT INSURANCE CORPORATION

BY: _____

TITLE: _Assistant Regional Director_

Attest: _____

[ASSUMING BANK]  FLEET BANK OF MAINE

BY: _____
     N. Jay Sarles
TITLE: _Attorney-In-Fact_

Attest: _____
William C. Mutterperl

APPENDIX I — Definitions

This Appendix sets forth the definitions of certain terms used in the Purchase and Assumption Agreement and the Service Agreement (as defined herein). Some of these terms are used in both of such Agreements while others are used in only one of such Agreements.

"AAA" shall have the meaning provided in Section 8.2(j) of the Purchase and Assumption Agreement.

"Abandoned Bank Premises" means Bank Premises owned by the Failed Bank at Bank Closing and identified by the Assuming Bank by written notice to the Corporation not later than 120 days after Bank Closing, as to which (i) the use and occupancy will be terminated by the Assuming Bank on or prior to 180 days after Bank Closing or (ii) the Assuming Bank has proposed to transfer such Bank Premises to the Pool and the Corporation and the Assuming Bank have, prior to such transfer, agreed in writing to terms for the continued use and occupancy by the Assuming Bank after such transfer.

"Abandoned Fixtures, Furniture and Equipment" means all owned Fixtures and owned Furniture and Equipment located on (i) Abandoned Bank Premises or (ii) leased Bank Premises with respect to which the Assuming Bank's option to accept an assignment of the lease or to enter into a sublease agreement with the Receiver in accordance with Section 4.6 of the Purchase and Assumption Agreement has expired unexercised or has been irrevocably waived in writing by the Assuming Bank.

"Acquired Assets" means all assets of the Failed Bank as of Bank Closing, whether or not reflected on the books of the Failed Bank as of such time, except for the assets referred to in Section 3.4 of the Purchase and Assumption Agreement.

"Additional Pool Assets" means (i) the Assets from time to time transferred to the Pool in accordance with Section 8.2 or 8.3 of the Purchase and Assumption Agreement and (ii) any property derived from Additional Pool Assets or which may serve as security or collateral therefor; provided, that there shall be excluded from this clause (ii) any property which constitutes a Collection. Assets with respect to which Final Disposition has occurred shall cease to be treated as Additional Pool Assets as of the date of such Final Disposition.

"Adjusted Pool Value" of any Pool Asset means an amount (not less than zero) equal to the sum of:

(i)   the Base Pool Value of such Asset as adjusted to reflect any adjustments made with respect to such Pool Asset pursuant to Article IX of the Purchase and Assumption Agreement after its transfer to the Pool; plus

(ii)   the aggregate amount of any Permitted Advances that are made with respect to such Pool Asset after

its transfer to the Pool and that are made in accordance
with the Service Agreement; minus

(iii) the aggregate amount of all Collections
with respect to such Asset after its transfer to the Pool
(excluding (A) amounts received with respect to such Asset
that would be characterized as interest for financial
reporting purposes, (B) late fees received with respect to
such Asset, and (C) rental income on Other Real Estate, in
each case only to the extent that accruals thereof are not
reflected in the Base Pool Value of such Asset).

"Adjustment" with respect to any Asset removed from the
Pool pursuant to Section 8.1(f) of the Purchase and Assumption
Agreement or any Asset improperly transferred to the Pool means
all necessary entries in the Pool Records to reflect such removal
or the reversal of such transfer, including but not limited to
appropriate reversals of expenses incurred and Collections with
respect to such Asset.

"Affiliate" of any Person means any director, officer,
or employee of that Person and any other Person (i) who is
directly or indirectly controlling, or controlled by, or under
direct or indirect common control with, such Person or (ii) who
is an affiliate of such Person as the term "affiliate" is defined
in Section 2 of the Bank Holding Company Act of 1956, as amended,
12 U.S.C. Section 1841.

"Annual Business Plan and Budget" means an annual
business plan and budget, as described in Section 2.5 of the
Service Agreement and approved by the Oversight Committee, used
for the Servicer's management and operation of the Pool,
containing such additional information as may be prescribed by
the Oversight Committee.

"Appraiser" means the Person retained under a provision
of the Service Agreement with responsibility for completing
certain valuations and other appraisal services required by the
Service Agreement and the Purchase and Assumption Agreement.

"Assets" means all (i) Acquired Assets, (ii) Permitted
Advances and (iii) Related Loans.

"Assuming Bank" shall have the meaning provided in the
preamble to the Purchase and Assumption Agreement.

"Bank Closing" means the close of business of the
Failed Bank on the date on which the appropriate governmental
authority closed such institution.

- 2 -

"**Bank Premises**" means the banking houses, drive-in banking facilities and teller facilities (staffed or automated) together with appurtenant parking, storage and service facilities and structures connecting remote facilities to banking houses, and land on which the foregoing are located, that are owned or leased by the Failed Bank and that are occupied by the Failed Bank as of Bank Closing.

"**Base Pool Value**" of any Pool Asset means:

(i) if such Asset is an Initial Pool Asset, the Book Value thereof as adjusted to reflect any adjustment made with respect to such Asset pursuant to Article IX of the Purchase and Assumption Agreement prior to the Commencement Date; and

(ii) if such Asset is an Additional Pool Asset,

(A) with respect to a Loan or Related Loan, an amount equal to the sum of (1) (a) in the case of a Loan or a Related Loan outstanding at Bank Closing, the Book Value thereof, as adjusted to reflect any adjustments made with respect to such Loan or Related Loan pursuant to Article IX of the Purchase and Assumption Agreement prior to the applicable Notice Date, plus the amount of any Permitted Advance made with respect to such Loan or Related Loan prior to the applicable Notice Date, less the amount of principal payments with respect to such Loan or Related Loan subsequent to Bank Closing and prior to the applicable Notice Date, or (b) in the case of a Related Loan made after Bank Closing, the outstanding principal amount thereof at the applicable Notice Date, <u>plus</u> (2) to the extent not included in the Book Value of such Loan or Related Loan or reflected in adjustments made pursuant to Article IX of the Purchase and Assumption Agreement, (x) unpaid interest (as it relates to the "rule of 78s" or add-on interest loans, as applicable) accrued on the books of the Assuming Bank as of the applicable Notice Date, not exceeding the amount thereof accrued during the 90-day period ending on the day prior to such Notice Date, and (y) the amount of unpaid taxes, earned credit life and/or disability insurance premiums related to such Loan or Related Loan and similar charges (if any) payable by the Obligor with respect to such Loan or Related Loan and accrued on the books of the Assuming Bank as of the applicable Notice Date, not exceeding the amount thereof accrued during the 90-day period ending on the day prior to such Notice Date, <u>less</u> (4) the amount of all charge-offs by the Assuming Bank with respect to such Loan or Related Loan prior to the applicable Notice Date;

(B) with respect to Abandoned Bank Premises and Abandoned Fixtures, Furniture and Equipment, the Book Value thereof, as adjusted to reflect any adjustments made with

- 3 -

respect to such Asset pursuant to Article IX of the Purchase
and Assumption Agreement, (or, in the case of any Abandoned
Fixtures, Furniture and Equipment purchased by the Assuming
Bank at the Fair Market Value thereof pursuant to Section
3.2 of the Purchase and Assumption Agreement, such Fair
Market Value); and

      (C) with respect to Undiscovered Assets, an amount
equal to zero.

The Base Pool Value of Assets transferred to the Pool pursuant to
Section 8.2 are subject to discount as provided in Section
8.2(i). Loans or other Assets which were totally charged-off the
books of the Failed Bank as of Bank Closing shall have a Base
Pool Value of zero. For purposes of determining, in accordance
with clause (ii)(A) above, the amount of unpaid interest which
accrued during the 90-day period ending on the day prior to the
applicable Notice Date with respect to a variable-rate Loan or
Related Loan, all collections of interest shall be deemed to be
applied to unpaid interest in the chronological order in which
such interest accrued.

    "**Basic Consideration**" means the amount (which may be
negative) determined by the Receiver (based on the best
information available as of Bank Closing) equal to the aggregate
Book Value of the Liabilities Assumed pursuant to Section 2.1 of
the Purchase and Assumption Agreement <u>minus</u> the aggregate
purchase price of the Acquired Assets determined pursuant to
Section 3.2 of the Purchase and Assumption Agreement.

    "**Bid Amount**" shall have the meaning provided in Section
7.1 of the Purchase and Assumption Agreement.

    "**Book Value**" means the dollar amount stated on the
accounting records of the Failed Bank as of Bank Closing
(regardless, in the case of a Loan, of the Legal Balance thereof)
after adjustments made by the Receiver for differences in
accounts, suspense items, unposted debits and credits, and other
similar adjustments or corrections. Without limiting the
generality of the foregoing, (i) the Book Value of a liability
shall include all accrued and unpaid interest thereon as of Bank
Closing and (ii) the Book Value of a Loan shall reflect
adjustments for earned or unearned interest (as it relates to the
"rule of 78s" or add-on-interest loans, as applicable), if any,
as of Bank Closing, and adjustments for the Failed Bank's portion
of earned or unearned loan-related credit life and/or disability
insurance premiums, if any, as of Bank Closing, in each case as
determined for financial reporting purposes. Book Value shall be
net of any amount reflected as a specifically allocated reserve
on the books of the Failed Bank.

- 4 -

"**Business Day**" means a day other than (i) a Saturday, Sunday, Federal legal holiday or legal holiday under the laws of the State where the Failed Bank is located, (ii) a day on which the principal office of the Corporation is closed or (iii) for the purposes of the Service Agreement, a day on which either the purposes of the Service Agreement, a day on which either the Dallas or the Boston Regional Office of the Corporation is closed.

"**Calendar Quarter**" means a quarterly period, but beginning on _FEBRUARY 1 1991_ and ending on _MARCH 31, 1991_ for the first period, and for quarterly periods thereafter each successive three-month period ending on March 31, June 30, September 30, or December 31, of any year until the last quarterly period during the term of the Service Agreement which shall include the period from the first day after the last day of the last full quarterly period during the term of the Service Agreement to the Servicing Termination Date.

"**Cause**" means the circumstances that permit the Corporation to replace a member of the Senior Staff as described in Section 5.2 of the Service Agreement.

"**Chartering Authority**" means (i), with respect to a national bank, the Office of the Comptroller of the Currency and (ii), with respect to a bank chartered by a state, the agency of such State charged with primary responsibility for regulating banks chartered by such State.

"**Classified**" means, with respect to any Loan or other Asset:

     (i) that such Loan or Asset is at the time in question classified as "substandard," "doubtful" or "loss" under the written examination criteria customarily employed by (A) in the case of the determination of whether a Loan is eligible to be an Initial Pool Asset, the Chartering Authority for the Failed Bank, or (B) in the case of any subsequent determination with respect to a Loan, the Chartering Authority for the Assuming Bank; or

     (ii) in the case of any Loan, that such Loan is or was sixty (60) days or more past due as to payment of principal or interest as of Bank Closing and remains so as of the time in question.

"**Collection Period**" means (i) the period from and including the Commencement Date to and including March 31, 1991, (ii) each quarterly period ending on any March 31, June 30, September 30 or December 31 thereafter that falls on or prior to the Servicing Termination Date and (iii) if the Servicing Termination Date does not fall on a March 31, June 30, September 30 or December 31, the period beginning the day following the end

- 5 -

of the last Collection Period described in clause (ii) and ending
on the Servicing Termination Date.

"Collections" means, subject to the limitations set
forth below in this definition, all cash or monetary revenues
such as payments of principal and interest, fees, rent, proceeds
of sale, proceeds of collateral liquidation, and insurance
proceeds:

      (i) derived from a Pool Asset or an Asset which would
otherwise constitute a Pool Asset except for the fact that
Final Disposition of such Asset has occurred; and

      (ii) received, including by offset or similar exchange,
by the Assuming Bank or the Servicer, or any of their
Affiliates --

         (A) on or after the Commencement Date, in the case
of an Initial Pool Asset; or

         (B) on or after the applicable Notice Date, in the
case of an Additional Pool Asset.

The following receipts, exchanges, or transactions do not
constitute Collections:

      (X) the receipt of property with respect to any Pool
Asset whether by foreclosure, deed in lieu of foreclosure,
seizure of collateral, assignment or other legal process;

      (Y) the receipt of any promissory note, guarantee, or
other obligation; and

      (Z) the receipt of any payments, fees, or other amounts
for which the Assuming Bank or the Servicer is paid, or
compensated, under the Service Agreement or the Purchase and
Assumption Agreement.

For purposes of Section 4.1 of the Service Agreement, (i) cash or
monetary revenues that emanate from a Loan that consists of
revolving advances, revolving credit facilities, or similar
credit arrangements, that are received prior to the Final
Disposition of such Loan and that would otherwise constitute
Collections shall not constitute Collections until the earlier of
(A) Final Disposition of such Loan, or (B) the Pool Settlement
Date, and (ii) the amount of such cash or other monetary revenues
that shall be deemed to constitute Collections for such purpose
shall be limited to the excess of the highest Adjusted Pool Value
of such Loan after its transfer to the Pool over the Adjusted
Pool Value of such Loan immediately prior to Final Disposition or
at the Pool Settlement Date, as the case may be.

"**Commencement Date**" means the first calendar day following Bank Closing.

"**Commitment**" means an unfunded commitment to make an extension of credit (or additional advances in respect of a Loan).

"**Computer Systems**" means (i) computer hardware and equipment, (ii) computer programs, including software, application programs, operating systems, files and utilities, (iii) supporting documentation for such computer programs, including input and output formats, program listings, narrative descriptions, operating instructions, environmental specifications and programming instructions, and (iv) the tangible media upon which such programs are recorded, including chips, tapes, disks, and diskettes.

"**Corporation**", shall have the meaning provided in the preamble to the Purchase and Assumption Agreement.

"**Cost of Carry**" means, for any period, a rate of interest per annum determined by the following arithmetic calculation: $X = ((I+N)Y) \div D$, where X = the Cost of Carry for such period; I = interest expense of the Assuming Bank on its interest bearing deposit liabilities for such period; N = number of days in such period; Y = number of days in the applicable calendar year; and D = daily average balance of the interest bearing deposit liabilities of the Assuming Bank during the applicable period. For purposes of the Purchase and Assumption Agreement, in the event that the applicable period falls in two calendar years, one of which has 366 days, then N shall be the number of days in the year in which the larger portion of such period falls. In calculating the Cost of Carry, interest expense and interest-bearing deposit liabilities will be determined by reference to the books and records of the Assuming Bank maintained in accordance with generally accepted accounting principles.

"**Credit Documents**" mean the agreements, instruments, certificates or other documents at any time evidencing or otherwise relating to, governing or executed in connection with or as security for, a Loan, including without limitation notes, bonds, loan agreements, letter of credit applications, lease financing contracts, banker's acceptances, drafts, interest protection agreements, currency exchange agreements, repurchase agreements, reverse repurchase agreements, guarantees, deeds of trust, mortgages, assignments, security agreements, pledges, subordination or priority agreements, lien priority agreements, undertakings, security instruments, certificates, documents, legal opinions, participation agreements and intercreditors agreements, and all amendments, modifications, renewals,

extensions, rearrangements, and substitutions with respect to any of the foregoing.

"Credit File" means all Credit Documents and the records of all other credit, collateral, or insurance documents, in the possession or custody of the Assuming Bank or the Servicer, or any of their Affiliates, relating to a Pool Asset or a Loan included in a Pool Asset Notice, or copies of any thereof.

"Cumulative Net Collections" means, for any applicable period, the aggregate amount of Net Collections (as hereinafter defined) from and including the Commencement Date through and including the last day of each calendar month calculated for purposes of Incentive Fee arrangements under Section 4.1 of the Service Agreement.

"Current Incentive Fee" means, for any applicable period, the amounts to be added to or deducted from the Current Settlement Account for purposes of Incentive Fee arrangements under Section 4.1(b) of the Service Agreement.

"Current Settlement Account" means an account established by the Servicer for purposes of recording certain payables or receivables due to or from the Corporation pursuant to the Service Agreement or the Purchase and Assumption Agreement.

"Deferred Settlement Account" means an account established by the Assuming Bank pursuant to Section 8.5 of the Purchase and Assumption Agreement for purposes of recording certain payables or receivables due to or from the Corporation pursuant to the Purchase and Assumption Agreement.

"Deposit" means a deposit as defined in 12 U.S.C. Section 1813(1), including without limitation all uncollected items included in the depositors' balances and credited on the books of the Failed Bank; provided, that the term "Deposit" shall not include all or any portion of those deposit balances which, in the discretion of the Receiver or the Corporation, (i) may be required to satisfy it for any liquidated or contingent liability of any depositor arising from an unauthorized or unlawful transaction, or (ii) may be needed to provide payment of any liability of any depositor to the Failed Bank or the Receiver, including the liability of any depositor as a director or officer of the Failed Bank, whether or not the amount of the liability is or can be determined as of Bank Closing.

"Early Termination Date" means the date that the Corporation elects to terminate the Service Agreement under Section 6.2(a) thereof prior to the time that the Service Agreement would otherwise expire. The Termination Date shall be the last day of a calendar month and shall be no fewer than 120

days after the date upon which the Termination Notice is given by
the Corporation pursuant to Section 6.2(a) of the Service
Agreement.

"Early Termination Fee" shall have the meaning provided
in Section 6.4 of the Service Agreement.

"ECR Forecast" means the Servicer's estimate of
expected cash flows, cash recoveries, and Collections with
respect to the Pool, as required by Section 2.6 of the Service
Agreement.

"Failed Bank" shall have the meaning provided in the
preamble to the Purchase and Assumption Agreement.

"Fair Market Value" means, with respect to Bank
Premises, Fixtures and Furniture and Equipment, the fair market
value thereof as of Bank Closing, determined in accordance with
The Appraisal of Real Estate, 8th Ed., The Appraisal Institute,
1983, p. 33, by an appraiser mutually acceptable to the Receiver
and the Assuming Bank.

"FDIA" means the Federal Deposit Insurance Act, as
amended.

"Final Disposition" means any event evidencing a legal
or economic inability to produce further Collections for a Pool
Asset, including full payment of the Legal Balance due under a
Credit Document, or, to the extent the following are effected in
accordance with the procedures provided for in the Operations
Manual, a complete performance of final settlement agreements
with Obligors, the sale of Loans or Other Real Estate to the
Receiver, the Corporation or any third party, or, with the
approval of the Oversight Committee, the voluntary and knowing
abandonment of efforts to obtain further Collections.

"Final Pool Value" shall have the meaning provided in
Section 8.6(b) of the Purchase and Assumption Agreement.

"Final Settlement Notice Date" shall have the meaning
provided in Section 8.6(b) of the Purchase and Assumption
Agreement.

"Fixtures" means those leasehold improvements and
additions, alterations and installations constituting all or a
part of Bank Premises and which were acquired, added, built,
installed or purchased at the expense of the Failed Bank,
regardless of the holder of legal title thereto as of Bank
Closing.

"Funding Costs" shall have the meaning provided in
Section 4.2(a) of the Service Agreement.

- 9 -

"Furniture and Equipment" means the furniture and equipment (other than leased data processing equipment, including hardware and software), leased or owned by the Failed Bank and reflected on the books of the Failed Bank as of Bank Closing, including without limitation, automated teller machines, carpeting, furniture, office machinery, shelving, office supplies, Safe Deposit Boxes, telephone, surveillance and security systems, artwork, and motor vehicles (which motor vehicles shall be deemed located at Bank Premises owned by the Failed Bank).

"Government-sponsored enterprises" shall have the meaning provided in Section 1404(e) of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, P.L. 107-73, 103 Stat. 553.

"Gross Pool Value" at any time means an amount equal to the sum of (i) the aggregate Base Pool Values of all Assets transferred to the Pool on or after the Commencement Date (regardless of whether Final Disposition thereof has occurred), as adjusted to reflect any adjustments made with respect to such Assets pursuant to Article IX of the Purchase and Assumption Agreement after their transfer to the Pool, but without giving effect to the discounts provided for in Section 8.2(i) of the Purchase and Assumption Agreement, plus (ii) the amount of any Permitted Advances made with respect to such Pool Assets after their transfer to the Pool.

"Incentive Fee" means, for any applicable period, the amounts calculated in accordance with Section 4.1(a) of the Service Agreement.

"Indemnitees" means, except as provided in paragraph (k) of Section 14.1 of the Purchase and Assumption Agreement, (i) the Assuming Bank, (ii) the Subsidiaries and Affiliates of the Assuming Bank, other than any Subsidiaries of Affiliates of the Failed Bank that are or become Subsidiaries or Affiliates of the Assuming Bank, and (iii) the respective directors, officers, employees and agents of the Assuming Bank and its Subsidiaries or Affiliates who are not also present or former directors, officers, employees or agents of the Failed Bank or of any Subsidiary or Affiliate of the Failed Bank; and "Indemnitee" means any one of the foregoing.

"Initial Payment" means the payment made pursuant to Section 7.1 of the Purchase and Assumption Agreement, the amount of which shall be derived from the Bid Amount and the Basic Consideration. A positive Bid Amount and a negative Basic Consideration shall each represent an amount payable by the Assuming Bank to the Corporation. A negative Bid Amount and a positive Basic Consideration shall each represent an amount payable by the Corporation to the Assuming Bank. Accordingly,

- 10 -

the Bid Amount and the Basic Consideration shall be added
together or offset against one another, as applicable, to
determine a single amount constituting the Initial Payment.

"Initial Pool Assets" means (i) the Assets designated
for transfer to the Pool on the Commencement Date in accordance
with Section 8.1 of the Purchase and Assumption Agreement and
(ii) any property derived from Initial Pool Assets or which may
serve as security or collateral therefor; provided, that there
shall be excluded from this clause (ii) any property which
constitutes a Collection. Assets with respect to which Final
Disposition has occurred shall cease to be treated as Initial
Pool Assets as of the date of such Final Disposition.

"Legal Balance" means the amount of indebtedness or
liability legally due and owed by an Obligor, including principal
and accrued and unpaid interest, late fees, legal fees and
expenses, taxes, insurance premiums, and similar charges (if
any).

"Liabilities Assumed" shall have the meaning provided
in Section 2.1 of the Purchase and Assumption Agreement.

"Lien" means any mortgage, lien, pledge, charge,
assignment for security purposes, security interest, or
encumbrance of any kind with respect to an Asset, including any
conditional sale agreement or capital lease or other title
retention agreement relating to such Asset.

"Loans" means:

(i) all of the following owed to Failed Bank as of Bank
Closing (including any of the following fully or partially
charged off the books and records of the Failed Bank): loans,
overdrafts of customers (including but not limited to overdrafts
made pursuant to an overdraft protection plan or similar
extensions of credit in connection with a demand deposit
account), revolving commercial lines of credit, home equity lines
of credit, United States and/or State-guaranteed student loans,
loans charged-off (in whole or in part), extensions of credit
pursuant to a credit card plan or debit card plan, and lease
financing contracts; provided, that amounts owing under
"qualified financial contracts" as such term is defined in 12
U.S.C. Section 1821(e)(8)(D)(i) shall not constitute "Loans";

(ii) all Liens, rights (including rights of set-off),
remedies, powers, privileges, demands, claims, priorities,
equities and benefits owned, held, accruing and to accrue to and
for the benefit of the holder of the obligations or instruments
referred to in paragraph (i) above, including, but not limited
to, those arising under or based upon the Credit Documents,
casualty insurance policies and binders, standby letters of

- 11 -

credit, mortgagats title insurance policies and binders, payment bonds and performance bonds at any time and from time to time existing with respect to any of the obligations or instruments referred to in paragraph (i) above; and

(iii)  all amendments, modifications, renewals, extensions, refinancings, and refundings of or for any of the foregoing; provided. that there shall be excluded from the definition of Loans any portion of the foregoing which the Assuming Bank holds not for its own account but solely as agent or fiduciary for, or otherwise as representative of, any other Person; and provided further, that "Loans" shall not include any Commitment; and "Loan" means any of such Loans.  For purposes of the Service Agreement, "Loans" shall include all Related Loans.

"Loan Information Package" with respect to any Loan means the information pertaining to such Loan specified in Exhibit 8.2(c) of the Purchase and Assumption Agreement.

"Managing Attorney" means the Corporation's Managing Attorney, Bridge Banks — Assistance Transactions (Division of Liquidation) or any designee thereof.

"Monthly Report" means the report prepared and maintained by the Servicer and delivered to the Corporation, describing, for the applicable monthly period, the financial condition and operations of the Pool, including balance sheets, statements of income, cash flow statements, explanations of variances and comparisons to budgeted and past monthly activities of the Servicer, invoices as required by Section 3.3(b) of the Service Agreement and additional reports as specified by the Oversight Committee, and reports of Collections, as required by Section 3.1 of the Service Agreement.  The report immediately following a Calendar Quarter shall include a qualitative analysis discussing the progress made in liquidating, collecting, and managing the Pool Assets, including a current evaluation of the strategies for the liquidation of each class or category of Pool Assets that was contained in the Annual Business Plan and Budget covering such Calendar Quarter.

"Net Collections" means, with respect to each calendar month, the amount of Collections less the sum of:

(i) Funding Costs reimbursed by the Corporation under Section 4.2(a) of the Service Agreement; provided that, solely for purposes of determining Net Collections, the interest rate determined as the Cost of Carry to be used for calculating Funding Costs shall not exceed ten percent (10%) on an annualized basis; and

- 12 -

(ii) twice the amount of expenses reimbursed by the Corporation for such period pursuant to Section 4.2(b) of the Service Agreement, excluding the following:

(A) payments to first Lien holders;

(B) expenses reimbursed under Section 2.8(d) of the Service Agreement;

(C) as approved by the Oversight Committee, that portion of actual direct salaries and benefits of employees reimbursed under Section 4.2(b)(1) of the Service Agreement, relating directly to internal audits of the Pool; and

(D) actual fees paid to consultants, including accountants and attorneys, which fees were incurred at the specific written direction of the Corporation to oversee, monitor or audit the performance of the Servicer under the Service Agreement.

"Neutral Member" shall have the meaning provided in Section 8.2(j) of the Purchase and Assumption Agreement.

"Notice Date" means (i) for purposes of the Purchase and Assumption Agreement, (A) as to any Asset transferred to the Pool pursuant to Section 8.2 of the Purchase and Assumption Agreement, the date that the Corporation receives notice, as required by such Section 8.2, of the Assuming Bank's intention to effect such transfer, and (B) as to any Related Loan transferred to the Pool pursuant to Section 8.3(a) of the Purchase and Assumption Agreement, the effective date of such transfer as specified in such Section 8.3(a) and (ii) with respect to the Service Agreement, the earliest date that a party must receive notice under the Service Agreement or the Purchase and Assumption Agreement before action contemplated by such notice may take effect.

"Notice of Dispute" shall have the meaning provided in Section 8.2(j) of the Purchase and Assumption Agreement.

"Obligor" means each Person liable for the full or partial payment or performance of any Loan or Related Loan, whether such Person is obligated directly, indirectly, primarily, secondarily, jointly or severally.

"Operations Manual" means the manuals prepared by the Servicer and approved by the Oversight Committee pursuant to Section 2.7 of the Service Agreement, setting forth, at minimum, in form and content satisfactory to the Oversight Committee, the policies, procedures and rules governing the organization, operations, credit (including mortgages, pledges, liens, and other security devices used to secure repayment of credit),

- 13 -

litigation, Other Real Estate, asset services, audits and reports (including reports required from time to time by the Corporation) and accounting systems of the Pool (including the policies, procedures and rules relating to compliance by the Senior Staff and Servicer Staff with the provisions of such manual).

"Other Real Estate" or "ORE" means all of the following that (i) are owned by the Failed Bank as of Bank Closing or (ii) have arisen from the collection or settlement of a Loan that is a Pool Asset:

    (A) All interests in real estate (other than Bank Premises and Fixtures), including all mineral rights, lease-hold rights, condominium and cooperative interests, air rights, development rights, and the Assuming Bank's investments in the Subsidiaries designated in Schedule 1.1 as "ORE Subsidiaries" and in any other Subsidiaries organized by the Assuming Bank to service, manage, and liquidate such interests;

    (B) All other assets (whether real or personal property) acquired by foreclosure or in full or partial satisfaction of judgments or indebtedness; and

    (C) For purposes of the Service Agreement only, Abandoned Bank Premises and Abandoned Fixtures, Furniture and Equipment.

"Oversight Committee" means the committee established pursuant to Section 5.3 of the Service Agreement to review and approve (i) certain matters specified in the Purchase and Assumption Agreement and (ii) the operations of the Servicer, and to implement the provisions of the Service Agreement regarding permissible activities of the Servicer.

"Payment Date" means the first Business Day after the date of the Purchase and Assumption Agreement.

"Permitted Advance" means an advance by the Assuming Bank (i) made pursuant to a Permitted Amendment or (ii) made in accordance with the terms of a Commitment that was legally binding on the Failed Bank as of Bank Closing to make additional advances with respect to a Loan outstanding at Bank Closing, but only if (A) the advance under such Commitment (1) was made in good faith to preserve or secure the value of collateral of the Loan to which such Commitment relates or to preserve or enhance the collectibility of such Loan, (2) was made in accordance with the then effective internal credit policy guidelines of the Assuming Bank and (3) was supported at the time of such advance by documentation maintained in the Credit File with respect to such Loan which conforms to the requirements of such internal guidelines and demonstrates in reasonable detail the basis for

- 14 -

such conclusion or (B) the advance under such Commitment is made within 30 days after the Commencement Date and the Assuming Bank shall have used its best efforts to assure that the making of such advance met the standards set forth in clause (A) of this definition.

"Permitted Amendment" of a Loan means an action:

(i) that results in:

(A) an amendment, other modification, or waiver by the Assuming Bank of any term, right, or remedy under a Credit Document relating to such Loan;

(B) any renewal, refinancing or refunding of such Loan; or

(C) an additional advance of funds or any making of or any increase in the amount of a Commitment relating to such Loan; and

(ii) that was taken after Bank Closing and that meets the following criteria:

(A) such action was taken in good faith to preserve or secure the value of collateral for such Loan or to preserve or enhance the ability to collect such Loan and was in accordance with the then effective written internal credit policy guidelines of the Assuming Bank;

(B) such action was supported at the time it was taken by documentation maintained in the Credit File for such Loan and such supporting documentation both conforms to the requirements of the then effective written internal credit policy guidelines of the Assuming Bank and demonstrates in reasonable detail the basis for such conclusion; and

(C) in the case of any additional advance, Commitment or increase in the amount of a Commitment, such advance, Commitment, or increase shall not cause the sum of (1) the then Legal Balance of such Loan plus (2) the unused amount of any Commitment related thereto to exceed the greater of:

(a) $100,000 over the sum of the Legal Balance plus the unused amount of such Commitment; or

(b) 110% of the Legal Balance plus the unused amount of the Commitment;

- 15 -

in either case as determined immediately prior to the making of the first such additional advance, Commitment or increase in Commitment after the Commencement Date.

"**Person**" means any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof, excluding the Corporation.

"**Pool**" means the separate asset pool created and established on the books of the Assuming Bank pursuant to Section 8.1 of the Purchase and Assumption Agreement.

"**Pool Asset Notice**" shall have the meaning provided in Section 8.1(e) of the Purchase and Assumption Agreement.

"**Pool Assets**" means (i) Initial Pool Assets and (ii) Additional Pool Assets.  Assets with respect to which Final Disposition has occurred shall cease to be treated as Pool Assets as of the date of such Final Disposition.

"**Pool Records**" means the books and records of the Pool established and maintained as provided in Section 3.1 of the Service Agreement.

"**Pool Related Loans**" shall mean Related Loans which constitute Pool Assets.

"**Pool Settlement Date**" shall have the meaning provided in Section 8.6(a) of the Purchase and Assumption Agreement.

"**Primary Indemnitor**" means any Person (other than the Corporation, the Assuming Bank or any of their Affiliates) who is obligated to indemnify or insure, or otherwise make payments (including payments on account of claims made against) to or on behalf of any Person in connection with the claims covered under Article XIV of the Purchase and Assumption Agreement, including without limitation any insurer issuing any directors and officers liability policy or any Person issuing a financial institution bond or banker's blanket bond.

"**Purchase Agreement**" shall have the meaning provided in Section 8.6(b) of the Purchase and Assumption Agreement.

"**Purchase and Assumption Agreement**" means the Purchase and Assumption Agreement, dated as of _February 1_, 1991, by and among the Assuming Bank, the Corporation, in its corporate capacity, and the Corporation as receiver for the Failed Bank.

"**Receiver**" shall have the meaning provided in the preamble to the Purchase and Assumption Agreement.

- 16 -

"Record" or "Records" includes all documents, microfiche, microfilm and computer records (including but not limited to, magnetic tape, disc storage, card forms and printed copy) of the Failed Bank generated or maintained by the Failed Bank that are owned by or in the possession of the Receiver at Bank Closing.

"Related Loan" means, with respect to any Loan to any Person which is designated as an Initial Pool Asset or Additional Pool Asset hereunder, any other Loan or other extension of credit held by the Assuming Bank (including but not limited to a Small Loan) existing at any time on or after the Commencement Date and prior to the Final Disposition of such Loan or the second anniversary of the Commencement Date, whichever shall first occur, that is (i) to the same Person or any other Obligor on such Loan or (ii) that is attributable to the same Person under the rules of the Assuming Bank's Chartering Authority concerning the legal lending limits of banks organized under its jurisdiction as in effect on the Commencement Date.

"Repurchase Price," which shall be determined by the Receiver, means:

(i)  with respect to a Loan that is a Pool Asset, the Adjusted Pool Value thereof;

(ii)  with respect to a Loan that is not a Pool Asset, an amount equal to the Book Value thereof reduced by the amount of any money received with respect thereto from and after Bank Closing; and if such Loan is a performing Loan, such resulting amount then shall be increased or decreased, as the case may be, by interest or discount (whichever is applicable) accrued from and after Bank Closing at the lower of:  (A) the contract rate with respect to such Loan, or (B) the one-year U.S. Treasury Bill discount rate in effect as of Bank Closing, less one hundred (100) basis points (1.0%); or

(iii)  with respect to an Acquired Asset other than a Loan, an amount equal to the purchase price attributed to such Asset in accordance with Section 3.2 of the Purchase and Assumption Agreement.

"Resolution Trust Corporation" means the instrumentality of the United States of America, whether in its receivership, conservatorship, or corporate capacity, created by Section 21A(b) of the Federal Home Loan Assuming Bank Act, as amended.

"Retained Assets" shall have the meaning provided in Section 8.6(b) of the Purchase and Assumption Agreement.

- 17 -

"**Review Board**" shall have the meaning provided in Section 8.2(j) of the Purchase and Assumption Agreement.

"**Safe Deposit Boxes**" means the safe deposit boxes of the Failed Bank, if any, including the removable safe deposit boxes and safe deposit stacks in the Failed Bank's vault(s), all right and benefit accrued on or before the date of the Purchase and Assumption Agreement, under rental agreements with respect to such safe deposit boxes and all keys and combinations thereto.

"**Senior Staff**" means the positions listed on Appendix B to the Service Agreement and the individuals who at any time occupy such positions.

"**Service Agreement**" means the Service Agreement, dated as of the Commencement Date, by and among the Corporation, the Assuming Bank and the Servicer, in the form of Exhibit 8.1(a) to the Purchase and Assumption Agreement, as amended or otherwise modified from time to time.

"**Servicer**" means FBM Properties Inc., a Rhode Island corporation and a wholly-owned Subsidiary of the Assuming Bank.

"**Servicer Staff**" means all employees of the Servicer other than the Senior Staff.

"**Servicing Termination Date**" means the earlier of (i) the Pool Settlement Date, (ii) the Early Termination Date, or (iii) the date of Final Disposition of all Pool Assets.

"**Settlement Date**" means the first Business Day immediately prior to the day which is one hundred eighty (180) days after Bank Closing, or such other date prior thereto as may be agreed upon by the Receiver and the Assuming Bank. The Receiver, in its discretion, may extend the Settlement Date.

"**Small Loans**" means:

(1) Loans that (a) are recorded in the general ledger of the Failed Bank in the accounts numbered 12501, 12503, 12504, 12505, 12510 and 12602 and (b) have balances of $50,000 or less in outstanding principal amount on the books of the Failed Bank as of Bank Closing; and

(2) Loans that (a) are recorded in the general ledger of the Failed Bank in the accounts numbered 11100, 11504, 11505, 11506, 11601, 11801, 11951, 11952, 11953 and 12509, and (b) have balances of $75,000 or less in outstanding principal amount on the books of the Failed Bank as of Bank Closing.

- 18 -

"**Subsidiary**" has the meaning set forth in Section 2 of the Bank Holding Company Act of 1956, as amended, 12 U.S.C. Section 1841.

"**Supporting Documentation**" shall have the meaning provided in Section 8.2(c) of the Purchase and Assumption Agreement.

"**Termination Costs**" means the actual costs incurred by the Assuming Bank or the Servicer as a direct result of the exercise of the Corporation's right to terminate the Service Agreement under the circumstances provided in Section 6.2(a) of the Service Agreement, but shall not include, and the Corporation shall not reimburse the following:

    (i) costs incurred in connection with leases and other contracts to the extent that such costs, including penalties or similar charges, result from the cancellation or modification of any remaining period of tenancy or performance under such leases or contracts that extends beyond the fifth anniversary of the Commencement Date;

    (ii) costs incurred for severance, out-placement, relocation, or other personnel termination expenses relating to employees of the Servicer; or

    (iii) any losses of future revenues, income, or other benefits, whether tangible or intangible, by the Assuming Bank or the Servicer due to the termination of the Service Agreement.

"**Termination Date**" means the fifth anniversary of the Commencement Date.

"**Termination for Default**" means the exercise of the Corporation's right under Section 6.2(b) of the Service Agreement to terminate the Service Agreement on the grounds of the Servicer's actual or anticipated failure to perform its contractual obligations under the Service Agreement, including a failure to (i) perform the services within the time specified in the Service Agreement, (ii) perform any other obligation of the Service Agreement, or (iii) make progress in carrying out its duties where such failure endangers performance of the Service Agreement.

"**Termination Notice**" means a written notice by the Corporation stating that it wishes to exercise its authority to terminate the Service Agreement prior to the period that the Service Agreement would otherwise expire, as provided in Section 6.2 of the Service Agreement.

"Undiscovered Assets" means (i) any and all assets
(including but not limited to contingent rights but excluding
assets referred to in Section 3.4) of the failed bank existing as
of Bank Closing that are not reflected on the books of the Failed
Bank as of Bank Closing, including but not limited to any value
realized by the Assuming Bank upon credits, refunds, overpayments
or similar items attributable to the Failed Bank and any other
accounts, contract rights and general intangibles and
(ii) proceeds of the foregoing.

- 20 -

MAINE SAVINGS BANK

SCHEDULE 2.1 - LIABILITIES ASSUMED

October 31, 1990

($000's Omitted)

| | |
|---|---:|
| (a) DEPOSITS | 1,319,347 |
| ACCRUED INTEREST ON DEPOSITS | 4,434 |
| TOTAL DEPOSITS | 1,323,781 |
| (b) MORTGAGE PAYABLE | 30 |
| (c) FEDERAL HOME LOAN BANK BORROWINGS | 92,780 |
| (e) OVERDRAFTS WITH OTHER BANKS | 222 |
| (f) TREASURY TAX & LOAN NOTE OPTION | 355 |
| (h) REPURCHASE AGREEMENTS AND OTHER QUALIFIED FINANCIAL CONTRACTS | 2,567 |
| TOTAL LIABILITIES ASSUMED | 1,419,735 |

MAINE SAVINGS BANK

SCHEDULE 3.1 - ASSETS PURCHASED

October 31, 1990

($000's Omitted)

| | |
|---|---|
| (a) CASH AND RECEIVABLES FROM BANKS | 20,988 |
| (b) SECURITIES | 225,738 |
| INVESTMENT IN SUBSIDIARY (MUTUAL COMMUNICATIONS, INC.) | 1,290 |
| TOTAL SECURITIES | 226,528 |
| (c) FEDERAL FUNDS SOLD | 86,400 |
| (d) SMALL LOANS | 319,582 |
| (e) OTHER LOANS | 330,533 |
| COLLECTION POOL ASSETS | 313,430 |
| (f) OWNED FIXED ASSETS | 13,268 |
| INCOME EARNED NOT COLLECTED | 25,176 |
| TOTAL ASSETS PURCHASED | 1,335,903 |

schedule 3.1

CERTAIN ACQUIRED ASSETS

Maine Savings Bank, Portland, Maine

## Subsidiary Companies

1. ORE Subsidiaries

   CRE I Real Estate Corporation

   KLP I Real Estate Corporation

   MCP II Real Estate Corporation

   Merreal Corporation

2. Other

   Mutual Communications, Inc.

**EXHIBIT 7.2 - Corporation Note**

FEDERAL DEPOSIT INSURANCE CORPORATION
NON-NEGOTIABLE PROMISSORY NOTE

$ [Principal amount]

[City] , [State]

, 1991

FEDERAL DEPOSIT INSURANCE CORPORATION, a corporation duly
organized under the laws of the United States of America
("Corporation"), for value received, receipt of which is hereby
acknowledged, hereby promises to pay to [Assuming Bank] ,
duly organized under the laws of the [United States of
America] [State of ] and having its principal place of
business in [City] , [State] ("Payee"), the sum of
MILLION DOLLARS ($ ), as such amount may
be adjusted pursuant to Article IX of the Agreement (as defined
below), plus interest on the unpaid principal amount hereof
pursuant to the terms and conditions as hereinafter set forth.
This Promissory Note is issued pursuant to and as provided in
that certain Purchase and Assumption Agreement dated
19 , by and among the Payee, the Corporation and the
Corporation as Receiver of Maine Savings Bank, Portland, Maine
(the "Agreement") and is subject to the terms and conditions set
forth in the Agreement.

(1)  Principal Payment.  Principal of this Promissory Note shall
be due and payable on [first aniversary of Payment Date] ,
1992.

(2)  Interest.  Interest will accrue on the unpaid principal
amount of this Promissory Note from Bank Closing until such
principal amount hereof has been paid in full.

    (a)  Interest Rate.  The interest rate for payment of
interest on this Promissory Note shall be determined and
calculated by the Corporation and shall be, to the extent legally
permissible, equal to the average equivalent coupon issue yield
in effect on thirteen (13)-week United States Treasury Bills as
published in the United States Department of Treasury's Treasury
News ("Results of Weekly Bill Auctions") (i) in effect
immediately prior to Bank Closing for the first calendar quarter
during the term hereof, plus twenty-five (25) basis points
(0.25%), and (ii) in effect on the last Business Day of the
immediately preceding calendar quarter for subsequent calendar
quarters, plus twenty-five (25) basis points (0.25%).

    (b)  Payment of Interest.  Interest will be calculated on
simple interest basis using the actual number of days elapsed
during each calendar year or portion thereof and a calendar year
of 365 or 366 days, as applicable.  Interest payments for

interest accrued shall be due and payable on the same date that the principal is due and payable under paragraph (1) hereof.

(3) Prepayment. This Promissory Note shall be prepayable, in whole or in part, by the Corporation on five days' notice to the Payee without premium. Interest accrued and unpaid on the principal prepaid shall be due and payable at the time of such prepayment.

(4) Manner of Payment. All payments of principal and interest payable shall be made in lawful money of the United States of America in immediately available funds.

(5) Replacement of Lost, Stolen, Destroyed or Mutilated Note. Upon receipt by the Corporation of the Payee's written notice of the loss, theft, destruction or mutilation of this Promissory Note and, in case of any such loss, theft, or destruction, upon receipt of an indemnity agreement in form and substance reasonably satisfactory to the Corporation or, in the case of any such mutilation, upon surrender of the mutilated Promissory Note for cancellation by the Corporation, the Corporation will (at its expense) issue and deliver to the Payee, in lieu of or in exchange for such lost, stolen, destroyed or mutilated Promissory Note, a new Promissory Note of like tenor. Every new Promissory Note issued by the Corporation pursuant to the provisions of this paragraph shall be the legal, valid and binding obligation of the Corporation and shall evidence the same obligations as the Promissory Note in substitution for which it is issued.

(6) Governing Law. THIS PROMISSORY NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE FEDERAL LAW OF THE UNITED STATES OF AMERICA AND IN THE ABSENCE OF CONTROLLING FEDERAL LAW, IN ACCORDANCE WITH THE LAWS OF THE STATE OF MAINE.

(7) Binding on Successors. This Promissory Note shall be binding upon the Corporation and its successors and assigns.

(8) Negotiability and Assignability. This Promissory Note is not negotiable and may not be assigned (except by operation of law) or hypothecated.

(9) Unsecured. This Promissory Note is unsecured.

(10) Modification. No amendment or other modification of this Promissory Note shall be effective except pursuant to a written agreement executed by the duly authorized representatives of the Corporation and the Payee.

(11) Definitions. For the purpose of this Promissory Note, capitalized terms used in this Promissory Note shall have the meaning ascribed to such terms in the Agreement unless otherwise specified herein.

- 2 -

(12) **Headings**.  The headings of the paragraphs and subparagraphs
of this Promissory Note are for convenience only and shall not
affect the meaning or interpretation of this Promissory Note or
any provision hereof.

**THIS OBLIGATION IS NOT A DEPOSIT AND IS NOT INSURED BY THE
FEDERAL DEPOSIT INSURANCE CORPORATION.**

        IN WITNESS WHEREOF, the Corporation has caused this
Promissory Note to be executed by its duly authorized officer on
the day and year first written above.

                          FEDERAL DEPOSIT INSURANCE CORPORATION


                  BY:    _____
                          ITS ATTORNEY IN FACT

- 3 -