# EXHIBIT I

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| FEDERAL HOME LOAN BANK OF PITTSBURGH, | CIVIL DIVISION |
| Plaintiff | NO. GD09-016892 |
| vs. | |
| J.P. MORGAN SECURITIES LLC, J.P. MORGAN MORTGAGE ACQUISITION CORP., J.P. MORGAN MORTGAGE ACCEPTANCE CORPORATION I, CHASE HOME FINANCE L.L.C., CHASE MORTGAGE FINANCE CORPORATION, JPMORGAN CHASE & CO., MOODY'S CORPORATION, MOODY'S INVESTORS SERVICE, INC., THE McGRAW-HILL COMPANIES, INC., and FITCH, INC., | OPINION AND ORDER OF COURT HONORABLE R. STANTON WETTICK, JR. |
| Defendants | |

FILED
10 NOV 29 PM 2:00
DEPT OF COURT RECORDS
CIVIL/FAMILY DIVISION
ALLEGHENY COUNTY PA

Counsel for Plaintiff, Federal Home Loan Bank of Pittsburgh:

Thomas B. Hatch, Esquire
Jennifer L. McKenna, Esquire
Jenny Gassman-Pines, Esquire
Margaret M. Lockner, Esquire
Bruce D. Manning, Esquire
Robins, Kaplan, Miller & Ciresi LLP
Suite 2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN  55402-2015

Counsel for Plaintiff, Federal Home Loan Bank of Pittsburgh:

Daniel P. Lynch, Esquire
William J. Wyrick, Esquire
501 Smith Drive
Suite 3 Cranberry Professional Park
Cranberry Township, PA  16066

Counsel for Defendants, J.P. Morgan Securities LLC, J.P. Morgan Mortgage
Acquisition Corp., JP Morgan Mortgage Acceptance Corporation I,
Chase Home Finance L.L.C., Chase Mortgage Finance Corporation,
and JPMorgan Chase & Co. ("J.P. Morgan Defendants"):

Samuel W. Braver, Esquire
Deborah A. Little, Esquire
20th Floor One Oxford Centre
301 Grant Street
Pittsburgh, PA  15219

Counsel for J.P. Morgan Defendants:

A. Robert Pietrzak, Esquire
Dorothy J. Spenner, Esquire
Owen H. Smith, Esquire
Sidley Austin LLP
787 Seventh Avenue
New York, NY  10019

Counsel for J.P. Morgan Defendants:

Dean J. Kitchens, Esquire
Gibson Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197

Counsel for J.P. Morgan Defendants:

Robert F. Serio, Esquire
Zachary S. Taylor, Esquire
Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, NY  10166-0193

Counsel for Defendants, Moody's Investors Service, Inc., and Moody's Corporation:

James J. Coster, Esquire
James Regan, Esquire
Joshua M. Rubins, Esquire
Satterlee Stephens Burke & Burke
230 Park Avenue
New York, NY  10169

Counsel for Defendants, Moody's Investors Service, Inc., and Moody's Corporation:

Mark A. Willard, Esquire
44th Floor U.S. Steel Tower
600 Grant Street
Pittsburgh, PA  15219

Counsel for Defendant, The McGraw-Hill Companies, Inc.:

Walter P. DeForest, Esquire
Suite 3000 Koppers Building
436 Seventh Avenue
Pittsburgh, PA  15219

Counsel for Defendant, The McGraw-Hill Companies, Inc.

Floyd Abrams, Esquire
Susan Buckley, Esquire
Tammy L. Roy, Esquire
Cahill Gordon & Reindel LLP
Eighty Pine Street
New York, NY  10005-1702

Counsel for Defendant, Fitch, Inc.:

William M. Wycoff, Esquire
Kerri L. Coriston, Esquire
14th Floor One Oxford Centre
301 Grant Street
Pittsburgh, PA  15219

Counsel for Defendant, Fitch, Inc.:

Martin Flumenbaum, Esquire
Roberta A. Kaplan, Esquire
Andrew J. Ehrlich, Esquire
Tobias J. Stern, Esquire
Paul, Weiss, Rifkind, Wharton & Garrison, LLP
128 Avenue of the Americas
New York, NY  10019

Counsel for Defendants, Countrywide Securities Corp.; Countrywide
Home Loans, Inc.; CWALT, Inc.; CWMBS, Inc.; and Countrywide
Financial Corp. ("Countrywide Defendants"):

Jack B. Cobetto, Esquire
Colin E. Wrabley, Esquire
Beth A. Thomas, Esquire
Suite 1200 Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA  15222

Counsel for Countrywide Defendants:

Brian E. Pastuszenski, Esquire
Goodwin Procter LLP
Exchange Place
53 State Street
Boston, MA  02109

# __INDEX__

I. Background ................................................................................................ 1

II. Preliminary Objections of Rating Agencies ............................................. 4

   A. Claims Based on Section 11 of the Securities Act ........................... 4

   B. Negligent Misrepresentation Claims ................................................ 7

      (1) Economic Loss Doctrine ........................................................ 8
      (2) First Amendment Protections .............................................. 12
      (3) Opinions Predicting the Future ........................................... 17

   C. Fraudulent Misrepresentation Claims ............................................ 19

III. Plaintiff's Claims Against the J.P. Morgan Defendants ......................... 21

   A. Misrepresentation Claims ............................................................. 21

      (1) Offering Materials ................................................................ 24
      (2) Defense of No Losses ......................................................... 27
      (3) Materiality ........................................................................... 28
      (4) Repurchase Provisions ....................................................... 29

   B. Sections 11 and 12(a)(2) of the Securities Act of 1933 ................. 30

   C. Section 15 of the Securities Act of 1933 ....................................... 32

   D. Section 501 of the Pennsylvania Securities Act ............................ 33

## OPINION AND ORDER OF COURT

WETTICK, J.

## I. BACKGROUND

Defendants' preliminary objections seeking dismissal of plaintiff's amended complaint are the subject of this Opinion and Order of Court.

In this litigation at GD09-016892, plaintiff purchased eight mortgage-backed security certificates issued by five separate trusts between May 2006 and December 2007. The total amount of the purchase price for these certificates exceeded $1.7 billion. According to plaintiff's amended complaint, the certificates are now worth approximately 60% of the purchase price. Plaintiff contends that it would not have purchased these certificates if defendants had provided complete and accurate information regarding the risks of nonpayment.

There are two groups of defendants: three rating agencies that gave their highest ratings to the certificates[1] (Moody's, McGraw-Hill, and Fitch)[2] and the "transactional entities" responsible for creating and selling the certificates (J.P. Morgan defendants).

---

[1]Securities with the highest quality are rated Aaa by Moody's and AAA by S&P and Fitch. These ratings will be referred to as *AAA* hereinafter.

[2]Standard & Poors is a division of McGraw-Hill.

This is one of four lawsuits filed by plaintiff in this court. In proceedings at GD09-016893, the same claims that are raised in this litigation are raised against the three rating agencies and the J.P. Morgan defendants with respect to an additional mortgage-backed security purchased by plaintiff.

In the proceedings at GD09-017818, plaintiff sued only the three rating agencies, raising the same claims it raised against the rating agencies in this litigation. The proceedings at GD09-017818 arise out of plaintiff's purchase of mortgage-backed securities in which entities of Lehman Brothers (now being liquidated) or of IndyMac (currently in bankruptcy) were the transactional entities.

In the proceedings at GD09-018482, the same claims that are raised in these proceedings are raised against the three rating agencies and other transactional entities (Countrywide defendants) with respect to five other certificates from five trusts.

The rulings made in this litigation will govern the preliminary objections of the rating agency defendants and the transactional entity defendants raised in the other three lawsuits.

In the present case, a J.P. Morgan entity ("sponsor") originated or acquired thousands of residential mortgages which it bundled and sold to another J.P. Morgan entity ("depositor") which assigned the mortgages to trusts created by a third J.P. Morgan entity. In exchange for the mortgages, the trusts issued certificates to the depositor, backed by the mortgage loans now held by the trusts. These certificates were acquired from the depositor by another J.P. Morgan entity serving as the underwriter or distributor. This entity serving as the underwriter sold the certificates to various institutional investors, including plaintiff. (See The Federal Home Loan Bank of

Pittsburgh's Brief in Opposition to the J.P. Morgan Defendants' Preliminary Objections ("Home Loan Bank Brief") at 10.)

Prior to placing the certificates on the market, the J.P. Morgan defendants worked with the rating agencies to structure the pool of mortgage loans by dividing the cash flow from the loans into tranches in order to cause some of the certificates to receive AAA ratings.[3]   AAA ratings are important because many potential investors could (or would) purchase only AAA-rated securities.[4]

For example, assume a trust owns 1,000 mortgage-backed loans with an aggregate principal balance of approximately $150 million.   If the trust issued certificates that placed the same risk of nonpayment on each certificate, the rating agencies would not rate any of the certificates as AAA.   In these circumstances, many institutional investors could not purchase these certificates, and the purchase price for all the certificates would be less than the purchase price for all certificates where a substantial portion of the pool would receive AAA ratings.

Rather than creating no AAA-rated certificates, frequently it would be possible for a trust or underwriter to achieve AAA ratings for a portion of the pool by creating groups of loans to back various certificates (tranches).   The highest tranch would be the first to receive its share of the mortgage proceeds and the last to absorb any losses if the mortgage proceeds were insufficient to pay each certificate holder because mortgage borrowers are in default.   The participation of the rating agency in the creation of the tranches was necessary because the trust or underwriter needed the rating agencies to

---

[3]Each certificate represents the right of the investor that purchased it to receive a portion of the cash flow, i.e., principal and interest paid on the mortgages, generated by the pool of mortgage loans underlying the certificate.

[4]Plaintiff alleges that it may purchase only AAA-rated securities.

indicate where lines could be drawn, based on credit enhancements, in order to maximize the number of certificates that would achieve AAA ratings.

## II. PRELIMINARY OBJECTIONS OF RATING AGENCIES

I initially consider the preliminary objections of the rating agencies.

Plaintiff's amended complaint raises the following counts against the rating agencies: fraud, negligent misrepresentation, and violations of § 11 of the Securities Act of 1933.

## A. CLAIMS BASED ON SECTION 11 OF THE SECURITIES ACT

Plaintiff's § 11 claims are based on allegations of untrue statements and omissions in registration statements. I will assume that the allegations in the amended complaint would support claims against the rating agencies under § 11, if § 11 reaches rating agencies.

Section 11 permits purchasers of securities to sue five categories of actors for untrue statements of a material fact in a registration statement or for the omission of a material fact necessary to make the statements therein not misleading. Plaintiff claims that rating agencies fall within the fifth category which reaches "underwriter[s] with respect to such security." 15 U.S.C. § 77k(a)(5). Section 77b(a)(11) defines *underwriter* as follows:

> any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking; but such term shall not include a person whose interest is limited to a commission from an

underwriter or dealer not in excess of the usual and customary distributors' or sellers' commission.

The rating agencies contend that even if their ratings could be characterized as misstatements of a material fact, they are not liable under § 11 because they are not underwriters. This is so because they did not participate in any transaction involving the public sale of the securities which they rated. Their involvement ended prior to the registration of the securities with the Securities and Exchange Commission and the subsequent offering of the securities for sale to the public.

Plaintiff does not, and cannot, allege that it made any purchases from a rating agency. It relies solely on its allegations that the securities could not have been registered and offered for sale to the public without a rating and the AAA rating for the securities which plaintiff purchased could not have been accomplished without the participation of the rating agencies in dividing the bundles of mortgages into different levels of risk.

The language of 15 U.S.C. § 77b(a)(11) does not support plaintiff's position that the participation in the transaction, as described in the above sentence, causes rating agencies to come within the definition of *underwriter*. This definition only covers the person who participates, directly or indirectly, in the "undertaking." The undertaking is the distribution of the securities. The rating agencies had no involvement in the distribution of the securities.

Rating agencies almost always participate in transactions that will eventually result in the distribution of securities governed by the Securities Act. Congress would have been aware that rating agencies are involved in rating securities prior to the sale

and that they perform a different role from the role of an underwriter.  Consequently, if Congress had sought to include rating agencies within the scope of § 11, it would have said so.  It would not have used the term *underwriter* to reach a category of persons (i.e., rating agencies) that are never described as underwriters.

Recent case law supports what I believe to be the only reasonable reading of § 11's definition of *underwriter.*

In an April 22, 2010 ruling in *In re Wells Fargo Mortgage-Backed Certificates Litigation*, 712 F.Supp.2d 958 (N.D. Cal. 2010), the Court granted the rating agencies' motion to dismiss plaintiff's § 11 claims.  In that case–as in the present case–the rating agencies were involved in multiple steps necessary to the distribution of the securities, including structuring the securities and assigning credit ratings.  However, they were not involved in any activities relating to the distribution and sale of the securities:

> Under these circumstances, permitting the Rating Agency Defendants to be sued as underwriters would conflict with the statutory definition of the term "underwriter" on its face.  Even assuming plaintiffs have adequately alleged that the Rating Agency Defendants' actions were necessary to the formulation and structuring of the Certificates, that alone is not sufficient to expose the Rating Agencies to liability as "underwriters."  The statutory definition makes clear that an underwriter's "participation" must be *related to the underwriting* of the securities at issue.
>
> . . .
>
> Based on the plain language of the statute, the Court must conclude that the Rating Agency Defendants' participation in the creation and structuring of securities, no matter how extensive, cannot give rise to underwriter liability.  Plaintiffs' Section 11 claims against the Rating Agency Defendants are therefore DISMISSED with prejudice. *Id.* at 968.

Another 2010 ruling (*In re Lehman Brothers Securities and ERISA Litigation*, 681 F.Supp.2d 495 (S.D.N.Y. 2010)), reached the same result.  In that case, the plaintiffs

based their claims against the rating agencies on the assertion that the term *underwriter* included not only those who have purchased securities from an issuer with a view to their resale but also those who engaged in steps necessary to the distribution.

The Court assumed that the rating agencies assisted in the drafting of the prospectus supplements, corroborated on credit enhancements, and used their models to structure deals to obtain the desired AAA ratings. It also assumed that the rating agencies' efforts were necessary to the formulation of the mortgage pools and the certificates that were ultimately issued and offered to the public. However, the Court stated that the § 11 claim against the rating agencies was insufficient because "there is nothing in the complaint to suggest that they participated in the relevant 'undertaking'– that of purchasing the securities here at issue, the Certificates–'from the issuer with a view to their resale.'" *Id.* at 499.

Also see *In re Refco, Inc. Securities Litigation*, No. 05 Civ. 8626 (GEL), 2008 WL 3843343 at *3 (S.D.N.Y. Aug. 14, 2008) ("Plaintiffs do not cite any case in which a court has held that a party that participated in the drafting of a registration statement, but who was not identified to the public as endorsing the truth of representations contained therein, has been held liable under § 11 as an underwriter").

## B. NEGLIGENT MISREPRESENTATION CLAIMS

Even assuming that the amended complaint will support findings that the rating agencies, when working with the transactional defendants to structure the tranches and assign credit ratings, should have known that the certificates should have been classified as "junk bonds" rather than as AAA-rated securities, and that plaintiff

sustained losses as a result of its justifiable reliance on the AAA ratings, I am denying plaintiff's negligent misrepresentation claims for two reasons:  (1) they are barred by the economic loss doctrine, and (2) they are barred by the First Amendment protections afforded public speech.

### (1) ECONOMIC LOSS DOCTRINE

Under the economic loss doctrine, where there is no direct contractual relationship, no cause of action exists for negligence that results solely in economic damages unaccompanied by physical injury or property damage.  *Adams v. Copper Beach Townhouse Communities*, 816 A.2d 301 (Pa. Super. 2003).  The rating agencies contend that the economic loss doctrine applies to plaintiff's negligent misrepresentation claims because their alleged negligence caused only economic losses.

Plaintiff contends that its negligent misrepresentation claims come within the exception to the economic loss doctrine which the Pennsylvania Supreme Court created in *Bilt-Rite v. Architectural Studio*, 866 A.2d 270 (Pa. 2005).  In *Bilt-Rite*, the Court held that the economic loss doctrine does not apply to claims of negligent misrepresentation sounding under the *Restatement (Second) of Torts* § 552 (1977).  866 A.2d at 288.  The Court stated:

> [W]e hereby adopt Section 552 as the law in Pennsylvania in cases where information is negligently supplied by one in the business of supplying information, such as an architect or design professional, and where it is foreseeable that the information will be used and relied upon by third persons, even if the third parties have no direct contractual relationship with the supplier of information.  In doing so, we emphasize that we do not view Section 552 as supplanting the common law tort of negligent misrepresentation, but rather, as clarifying the contours of the tort as it applies to those in the business of providing information to others.  *Id.* at 287.

The rating agencies correctly state that § 552 limits its scope to transactions that are identifiable at the time the false information is supplied to the recipient. The language of § 552(1) reaches any person who is subject to pecuniary loss caused by justifiable reliance on one supplying false information for guidance by others:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

However, § 552(2) significantly limits the scope of the persons who may recover:

> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
>
> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
>
> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

The parties disagree as to the meaning of the language of § 552(2)(a) limiting liability to loss suffered "by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information . . . ." Plaintiff contends that the "limited group of persons" should include any person whom the rating agency would expect to rely on the information. The rating agencies contend that if a "limited group" includes persons, unknown to the rating agency, who purchase securities offered to the public, the provisions of § 552(2) become meaningless.

The manner in which § 552(2)(a) restricts recovery is discussed in comment h to § 552. This comment supports the rating agencies' construction of § 552(2)(a).

In this case, the rating agencies knew that the ratings would be relied upon by investors. However, the ratings were made for the benefit of the J.P. Morgan defendants. This situation is addressed in the first paragraph of § 552 cmt. (h) (emphasis added):

> *h. Persons for whose guidance the information is supplied.* The rule stated in this Section subjects the negligent supplier of misinformation to liability only to those persons for whose benefit and guidance it is supplied. In this particular [sic] his liability is somewhat more narrowly restricted than that of the maker of a fraudulent misrepresentation (see § 531), which extends to any person whom the maker of the representation has reason to expect to act in reliance upon it.

Also, the second paragraph of § 552 cmt. (h) (emphasis added) supports the rating agencies:

> Under this Section, as in the case of the fraudulent misrepresentation (see § 531), it is not necessary that the maker should have any particular person in mind as the intended, or even the probable, recipient of the information. In other words, it is not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied. It is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it.

Plaintiff seeks to extend *Bilt-Rite* to a fact situation that is far more expansive than the *Bilt-Rite* fact situation (representations of an architect relied on by the building contractor) which, according to the Court's Majority Opinion, justified the application of § 552. Nothing in the Court's Opinion suggested that the Court would broadly apply

§ 552. To the contrary, the language of the Court's Opinion suggests that it was not the purpose of the Pennsylvania Supreme Court to drastically change the existing landscape. See, for example, the final sentence of the Majority Opinion which states that the Court does not view § 552 as supplementing the common law tort of negligent misrepresentation but rather as clarifying the contours of the tort as it applies to those in the business of providing information to others. 866 A.2d at 287.

*Excavation Technologies, Inc. v. Columbia Gas Co.*, 936 A.2d 111, 116 (Pa. Super. 2007), is the only Pennsylvania appellate court case that has considered the scope of *Bilt-Rite*; in dicta, it limited *Bilt-Rite* to design professionals:

> We view the Supreme Court's adoption of Section 552 as drawing a narrow exception to the application of the economic loss rule in the particular set of circumstances that were present in *Bilt-Rite*. The Supreme Court made clear in its rationale that application of Section 552 liability for economic loss was limited to design professionals, such as architects, because they have a contractual relationship with some party to the construction project, typically the owner, from which a duty flows to foreseeable third parties to that contract.

In *WM High Yield Fund v. O'Hanlon*, No. Civ.A. 04-3423, 2005 WL 1017811 at *16 (E.D. Pa. April 29, 2005) (decided prior to *Bilt-Rite*), the Court, applying its view of Pennsylvania case law, dismissed a negligent misrepresentation claim based on § 552 on the ground that § 552 does not reach public disclosures made pursuant to federal securities laws because the limited group requirement would be meaningless if any member of the public who might choose to invest could qualify as part of the protected class. The Opinion concluded that "the Pennsylvania Supreme Court would not permit Plaintiffs, a group of bondholders, to maintain a cause of action for Negligent

Misrepresentation absent a showing that Defendants disclosed information specifically to Plaintiffs' limited group, as opposed to the securities market or the public as a whole."

Also see *Securities Investor Protection Corp. v. BDO Seidman, LLP*, 222 F.3d 63 (2$^d$ Cir. 2000); *Rice v. Charles Schwab*, No. SACV-10-00398-CJC (MLG), slip op. (C.D. Cal. Oct. 22, 2010); *National Mulch & Seed, Inc. v. Rexius Forest-by-Products, Inc.*, No. 2:02-cv-1288, 2007 WL 894833 (S.D. Ohio Mar. 22, 2007); *Ginsburg v. Agora*, 915 F.Supp. 733 (D. Md. 1995); and *Nycal Corp. v. KPMG Peat Marwic, LLP*, 688 N.E.2d 1368 (Mass. 1998).

In this case, the three rating agencies did not participate in any of the transactions involving the sales of the certificates which they rated. The ratings were made available to the public through filings with the SEC by the recipient of the ratings. When the rating agencies made the ratings, there was no specific investor or small group of investors for whom the ratings were being prepared. If under the facts of this case the rating agencies would come within the scope of § 552(2)(a), this provision would be rendered almost meaningless. Section 552 claims would, instead, be governed only by the foreseeability standard of § 552(1).

For these reasons, I find that the economic loss doctrine bars plaintiff's negligent misrepresentation claims.

## (2) FIRST AMENDMENT PROTECTIONS

There is a second reason for dismissing plaintiff's negligent misrepresentation claims against the rating agencies: if state law allowed plaintiff to pursue negligent misrepresentation claims against the rating agencies under the facts of this case, state

law would infringe upon the First Amendment protections afforded public speech regarding matters of public concern.

With respect to the First Amendment issues, both parties cite *Abu Dhabi Commercial Bank v. Morgan Stanley & Co.*, 651 F.Supp.2d 155 (S.D.N.Y. 2009), where two institutional investors brought a class action to recover losses stemming from the liquidation of notes issued by a structured investment vehicle.

In response to the argument of the rating agencies that the plaintiffs had not pled an actionable negligent misrepresentation cause of action because they were entitled to immunity under the First Amendment, the *Abu Dhabi* Court stated:   "It is well-established that under typical circumstances, the First Amendment protects rating agencies, subject to an 'actual malice' exception, from liability arising out of their issuance of ratings and reports because their ratings are considered matters of public concern." *Id.* at 175 (footnote omitted).[5]

---

[5]At footnote 119, the Court cited three cases in support of its statement that under typical circumstances, the First Amendment protects rating agencies subject to an actual malice exception: *Compuware Corp. v. Moody's Investment Services, Inc.*, 499 F.3d 520, 529 (6th Cir. 2007); *Jefferson County School District No. R-1 v. Moody's Investment Services, Inc.*, 175 F.3d 848, 856 (10th Cir. 1999); and *First Equity Corp. v. Standard & Poor's Corp.*, 690 F.Supp. 256, 260 (S.D.N.Y. 1988).

In *Compuware Corp. v. Moody's Investment Services, Inc.*, *supra*, 499 F.3d 520, in 1999, Compuware asked Moody's to rate its ability to repay funds borrowed under a $900 million revolving bank credit facility.  It responded with a letter confirming that it had a rating of Baa2 which is the second lowest rating in Moody's ten investment grade ratings.

As part of its contracted-for services, Moody's continued to monitor Compuware's financial situation.  In 2002, it reduced the rating, even though Compuware had significantly reduced its debt, because it had filed a lawsuit against IBM, an important customer.

Compuware brought suit against Moody's alleging, *inter alia*, breach of contract and defamation.  The trial court ruled that Compuware, as a publicly-held corporation, is a public figure for purposes of First Amendment defamation analysis.   Thus, recovery requires a showing of actual malice.  The Court of Appeals affirmed the ruling of the trial court that the evidence was insufficient to establish actual malice.   (Footnote continued on next page.)

However, the Court, relying on case law cited in footnote 120, stated that this general rule does not apply "where a rating agency has disseminated its ratings to a select group of investors rather than to the public at large . . . .[120]" *Id.* at 176. Footnote 120 reads as follows:

> *Compare Dunn & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761-62, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985) (holding that a credit report published to five subscribers did not involve a matter of public concern because it was intended for a "specific business audience") and *In re Nat'l Century Fin. Enters., Inc., Inv. Litig.*, 580 F.Supp.2d 630, 640 (S.D.Ohio 2008) (refusing to apply the First

---

(Footnote continued from prior page.)

The Court's rulings were not limited to the defamation claims. The actual malice standard was also applied to the breach of contract claim (breach of an implied covenant to perform skillfully and diligently). The Court cited case law holding that the actual malice standard required for an actionable defamation claim must also be met for tort claims of intentional infliction of emotional distress and tortious interference with contractual and business relationships.

In *Jefferson County School District No. R-1 v. Moody's Investment Services, Inc., supra*, 175 F.3d 848, the school district retained rating agencies other than Moody's to rate its bonds. Within less than two hours after the school district brought the bonds to market, Moody's published an article regarding the bonds in its "Rating News," an electronically distributed information service sent to subscribers and news services. The article stated that the outlook on the district's general obligation debt is negative. As a result, the school district was forced to re-price its bonds at a higher interest rate.

The school district brought claims for intentional interference with contract, intentional interference with business relations, and publication of an injurious falsehood based on allegations that Moody's statements were based on information that was more than a year old.

Citing several United States Supreme Court Opinions holding that a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation shall receive full First Amendment protections, the Court of Appeals ruled that the trial court properly entered judgment in favor of Moody's on the ground that courts may not constitutionally allow recovery on any showing less than malice.

In *First Equity Corp. v. Standard & Poor's Corp., supra*, 690 F.Supp. 256, another judge in a prior proceeding in this litigation had ruled that S&P could not be liable for negligent misrepresentation. In these proceedings at 690 F.Supp. 256, the sole issue was whether summary judgment should be granted with respect to the fraud claim. The Court granted summary judgment because the evidence would not establish that Standard & Poor's had actual knowledge of the alleged falsity.

Amendment where Moody's ratings had been disseminated to a "select class of institutional investors") *with Compuware Corp.*, 499 F.3d at 525-29 (applying the First Amendment where Moody's had rated a publicly-held corporation). *Abu Dhabi*, 651 F.Supp.2d at 176 n.120.

In *Dunn & Bradstreet, supra*, 472 U.S. 749–the first case cited in footnote 120–a report of a credit reporting agency was sent to five subscribers indicating that a construction contractor had filed a voluntary petition for bankruptcy. The report was false and grossly misrepresented the contractor's assets and liabilities. In a defamation action brought in the Vermont State Courts, the jury returned a verdict awarding $50,000 in compensatory or presumed damages and $300,000 in punitive damages. The trial court granted the defendants' motion for a new trial. On appeal, the Vermont Supreme Court upheld the jury verdict, and the United States Supreme Court affirmed. *Id.* at 751-52.

The Opinion of Justice Powell, in which two other Justices joined,[6] stated that speech on matters of public concern is at the heart of First Amendment protections. *Id.* at 758-59. Speech on matters of purely private concern is less of a First Amendment concern. *Id.* at 759. The controlling issue for Justice Powell was whether a credit report furnished to only five persons involved a matter of public concern. Since the credit report was made available to only five subscribers who, under the conditions of the subscription agreement could not disseminate it further, Justice Powell's Opinion concluded that it cannot be said that the report involved any strong interest in the flow of commercial information.[7] *Id.* at 762.

---

[6] Also, the Chief Justice and one other Justice concurred in the judgment.

[7]The Dissenting Opinion of Judge Brennan, joined in by three other Justices, agreed with Justice Powell's analysis which recognized that speech on public issues is governed by a

*In re National Century Financial Enterprises, Inc., Inv. Litig.*, *supra*, 580 F.Supp.2d 630–the second case cited in footnote 120– the Court described the case law as follows:   misrepresentations to the public at large are not actionable but misrepresentations to a person or limited category of people whom the speaker or supplier intends to benefit or guide are actionable.   *Id.* at 639-40.   The plaintiff's complaint, according to the Court, did not allege that the ratings of the notes were published to the investing public at large.   *Id.* at 640, 648.   To the contrary, the notes were issued by a privately-held company; the note offering was targeted to a select class of institutional investors with the resources to invest tens of millions of dollars in the notes; and the only place the ratings are alleged to have appeared are in offering materials given to this select class of investors.   *Id.*   The Court, following *Dunn & Bradstreet*, ruled that the misrepresentation claim could proceed because the rating agency prepared the bond ratings "knowing that its ratings would be seen on the offering documents given to only a select class of qualified investors, of whom Lloyd's was one."   580 F.Supp.2d at 648.

In *Abu Dhabi*, *supra*, 615 F.Supp.2d at 155, the controlling issue for the Court was whether the rating agencies' First Amendment defense should be governed by the line of cases cited in footnote 119, supporting the general rule that under typical circumstances the First Amendment protects rating agencies, or the line of cases cited in footnote 120, denying First Amendment protections where ratings were provided only to a select group of investors.   The Court concluded that the allegations within the complaint brought this lawsuit within the line of cases cited in footnote 120, because the

malice standard.   These four Justices would have given First Amendment protections to the issuer of the credit report.

rating agencies had disseminated their ratings to a select group of investors rather than to the public at large. *Id.* at 175-76.

Plaintiff contends that the factual situation described in its amended complaint comes within the exception recognized in *Abu Dhabi* where a rating agency has disseminated its ratings to a select group of investors. It relies on allegations in the Amended Complaint ¶143 that the certificates were sold to a limited group of institutional investors who either by mandate, as in the case of plaintiff, or by policy, invest in only AAA-rated bonds; and on allegations contained in the Amended Complaint ¶¶387, 403, and 419, that the ratings were distributed to a limited audience of institutional investors for the purpose of demonstrating a likelihood of default and/or loss.

These allegations do not bring this case within the exception recognized in *Abu Dhabi* because the "limited number" of investors that plaintiff describes in its complaint could be in the hundreds or the thousands. Furthermore, the ratings were included in the offering documents filed with the SEC and were made available to the world. Thus, the ratings were not being provided in connection with a private placement to a select small group of investors, but instead, were intended to be included in offering documents available to all potential investors.

### (3) OPINIONS PREDICTING THE FUTURE

To this point, I have assumed that any AAA rating is a statement of fact similar to a statement of an accountant in an audit that "the company is solvent." However, there is another line of cases upon which the rating agencies rely to support their contention

that there can be no recovery for negligent misrepresentation. Under this line of cases, the ratings are characterized as opinions predicting the future that do not contain a provable false connotation. Opinions predicting the future relating to matters of public concern cannot be the basis of a negligent misrepresentation claim. Such opinions are protected by the First Amendment as long as they genuinely reflect the opinions of the speaker at the time of speech. However, there is no First Amendment protection if the giver of the opinion regarded his or her opinion as false or misleading at the time it was issued.[8]  See *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) (defendant must have entertained "serious doubts" as to the truth of the statement); *Rice v. Charles Schwab, supra*, No. SACV 10-00398-CJL (MLG); *In re IndyMac Mortgage-Backed Securities Litigation*, No. 09 Civ. 4583 (LAK), 2010 WL 2473243 (S.D.N.Y. June 21, 2010); and *Abu Dhabi Commercial Bank v. Morgan Stanley & Co., supra*, 651 F.Supp.2d at 176.

For example, in *Freidus v. Ing Groep N.V.*, No. 09 Civ. 1049 (LAK), 2010 WL 3554097 at *12 (S.D.N.Y. Sept. 14, 2010), the Court stated that ratings are opinions and that an opinion can be false or misleading only if the opinion giver–here the rating agency–did not truly believe it to be the case at the time it was issued. *Freidus* cited *Tsereteli v. Residential Asset Securitization Trust, 2006-A8*, 692 F.Supp.2d 387, 393 (S.D.N.Y. 2010) ("A subjective opinion is actionable under the Securities Act only if the amended complaint alleges that the speaker did not truly have the opinion at the time it was made public"); and *In re Lehman Brothers Securities and ERISA Litigation*, 684 F.Supp.2d 485, 495 (S.D.N.Y. 2010) (a rating is a statement of opinion by the rating

---

[8] The test is not whether the maker of the opinion should have known that the ratings were false and misleading–this is a negligence standard, the use of which is barred by the First Amendment.

agency that it believed that the amount and form of credit enhancement built into each certificate, was sufficient to support the rating; an opinion is actionable only if the complaint alleges that the speaker did not truly believe the opinion at the time it was issued).

Under this line of cases, AAA ratings given by a rating agency to securities are representations of the rating agency that at the time it gave the ratings, the rating agency genuinely believed its opinion.

In summary, plaintiff's negligent misrepresentation claims are based on allegations that, at the time the ratings were assigned, the rating agencies should have known that the AAA ratings were not reliable.  For the reasons I have discussed (the economic loss doctrine, the First Amendment, and predictions–not statements of fact), plaintiff's negligent misrepresentation claims are dismissed as to the rating agencies.

## C. FRAUDULENT MISREPRESENTATION CLAIMS

Plaintiff's amended complaint also includes allegations that the rating agencies did not genuinely believe the ratings.  See Amended Complaint ¶¶316, 334, and 352.[9] These allegations will support a fraudulent misrepresentation claim.[10]

The absence of privity does not prevent plaintiff from pursuing its fraudulent misrepresentation claims.   Where a fraudulent misrepresentation claim to recover

---

[9]The amended complaint also alleges that it was unreasonable for the rating agencies to believe the ratings accurately predicted the risk of nonpayment.  This would only constitute a negligent misrepresentation claim.

[10]Pa.R.C.P. No. 1019(b) provides that malice, intent, knowledge, and other conditions of mind may be averred generally.  It appears that the pleading requirements for securities litigation instituted in the federal courts require more than general averments.

economic losses is brought by a person who has no privity with the maker, this claim is governed by the *Restatement (Second) of Torts* § 531 which reads as follows:

### § 531.  General Rule

One who makes a fraudulent misrepresentation is subject to liability to the persons or class of persons whom he intends or has reason to expect to act or to refrain from action in reliance upon the misrepresentation, for pecuniary loss suffered by them through their justifiable reliance in the type of transaction in which he intends or has reason to expect their conduct to be influenced.

As the second sentence of § 552 cmt. h recognizes, the liability of the negligent supplier of misinformation "is somewhat more narrowly restricted than that of a maker of a fraudulent representation (see § 531), which extends to any person whom the maker of the representation has reason to expect to act in reliance upon it."  Consequently, my first reason for dismissing the negligent misrepresentation claim (limited group requirement of § 552) does not apply because plaintiff can prevail under a foreseeability standard.

Also, the First Amendment does not restrict state tort law from allowing recovery based on fraud.

As I previously stated, fraud may be established upon a showing that the rating agencies did not truly believe that the credit quality of the mortgage pool underlying each certificate plus credit enhancement, if any, was sufficient to support its AAA ratings at the time the ratings were assigned.  For these reasons, the preliminary objections of the rating agencies seeking dismissal of plaintiff's fraudulent misrepresentation claims are overruled.[11]

---

[11]I will address the absence of damages and the repurchase defenses (even assuming that the rating agencies could make use of the repurchase provisions in an agreement to which

## III. PLAINTIFF'S CLAIMS AGAINST THE J.P. MORGAN DEFENDANTS

### A. MISREPRESENTATION CLAIMS

There is privity of contract between plaintiff and the J.P. Morgan entity which served as the underwriter.  Consequently, plaintiff may pursue against the underwriter common law fraudulent representation claims based on what the underwriter knew, and common law negligent misrepresentation claims based on what the underwriter should have known.

The J.P. Morgan defendants correctly state that the offering documents accurately described the ratings which the rating agencies had assigned to the certificates which plaintiff purchased.  Or, in other words, the offering documents correctly answered the question of what ratings did the rating agencies assign to these certificates.

Thus, the J.P. Morgan defendants' description of the ratings is an accurate representation as long as the J.P. Morgan defendants believed that these were accurate ratings.  However, the inclusion of AAA ratings in the offering documents, without an appropriate disclaimer that expressly repudiated these ratings, would constitute a misrepresentation if the J.P. Morgan defendants knew or should have known that the ratings should not be relied upon because the J.P. Morgan defendants

---

they are not a party) in my consideration of plaintiff's claims against the J.P. Morgan defendants.

knew or should have known that the rating agencies were not capable of predicting the likelihood of default for the pools of mortgages that are the subject of this litigation.[12]

Since the J.P. Morgan defendants' inclusion of the AAA ratings in the offering documents accurately described the ratings so long as the J.P. Morgan defendants believed these to be valid ratings, the allegations in plaintiff's amended complaint support only the following misrepresentation claim:   at a time when the J.P. Morgan entity responsible for preparing and filing the offering documents knew or should have known that the rating process was flawed and that no weight should be given to the AAA ratings, this entity prepared and filed offering documents that included the AAA ratings without also including an explicit statement that these ratings should be ignored, with a full and complete explanation of its reasons for including this disclaimer.

The allegations in the amended complaint will support a finding that what the J.P. Morgan defendants knew (and plaintiff did not know) was that the underwriting standards of the originators had been abandoned and that no reliable estimate could be made concerning the level of enhancement necessary to ensure that the top tranches were of AAA quality.  By including the AAA ratings in the offering statements without an explicit disclaimer that these ratings should be ignored, the J.P. Morgan underwriter made a representation that the J.P. Morgan underwriter actually believed that the AAA ratings were an accurate reflection of the credit quality of the certificates.   This representation would be a fraudulent representation if this J.P. Morgan entity actually believed that this was not a reliable rating and this representation would be a negligent

_____

[12]The amended complaint alleges that the J.P. Morgan defendants did not genuinely or reasonably believe the ratings. See Plaintiff's Amended Complaint ¶¶235, 245, and 433.  See footnote 10.

misrepresentation if this J.P. Morgan entity should have known that this was not a reliable rating.

The J.P. Morgan defendants contend that I should dismiss the misrepresentation claims against those J.P. Morgan entities whose involvement ended prior to activities relating to the preparation and filing of the offering documents. I agree.

There are no allegations that any of the J.P. Morgan entities, whose involvement ended prior to the issuance of the rating, induced any J.P. Morgan entity responsible for preparing and filing the offering documents to include the AAA ratings without appropriate disclaimers.[13] Thus, the only wrongdoing would be the underwriter's use of the ratings in the offering documents while believing that certificates should not have received this rating; none of the other J.P. Morgan defendants were responsible for this use of the ratings in the offering materials.

For these reasons, I am dismissing the fraudulent representation claims against J.P. Morgan Mortgage Acquisition Corp., J.P. Morgan Mortgage Acceptance Corporation I, Chase Home Finance L.L.C., and Chase Mortgage Finance Corporation.

The J.P. Morgan entity that served as the underwriter (J.P. Morgan Securities LLC) raises several grounds for dismissal even if the amended complaint can be construed to allege that J.P. Morgan Securities knew or should have known that the ratings should not be relied upon.

---

[13]Paragraph 304 of Plaintiff's Amended Complaint is a nondescriptive conclusory allegation.

## (1) OFFERING MATERIALS

J.P. Morgan Securities contends that the inclusion of the AAA ratings in the offering documents did not convey a message that J.P. Morgan Securities believed that certificates had the characteristics of AAA securities because of the detailed description in the offering materials of the mortgages which supported the certificates. Furthermore, because of this detailed description, plaintiff could not have reasonably relied on the AAA ratings.

At oral argument (Transcript of 8/25/10 Oral Argument at 32-36), counsel for J.P. Morgan described, as illustrative, information within the offering materials for a pool consisting of 2,464 loans that included the certificates that are the subject of the proceedings at GD09-016893.

According to counsel, the offering materials disclosed that 88.3% of the 2,464 loans were interest only for a period of up to ten years;[14] that two-thirds of the mortgage loans in this pool were originated with a second lien and for these loans the loan-to-value ratio was 97.9;[15] that of the 2,464 loans in the pool, only seven had more than six months' payment history; that 48.6% of the loans originated in California and economic conditions in California may affect the ability of the borrowers to repay the loans; that 22.41% of the loans were cash-out; and that 85% of the loans in this particular mortgage pool were originated under low or no-doc programs. Transcript at 34-35.

---

[14]Counsel stated that the Prospectus Supplement at page 20 expressly disclosed "interest only loans may have higher risk of default and were issued to borrowers who may not have otherwise qualified for a fully amortized loan." Transcript at 32.

[15]Counsel stated that the Prospectus Supplement at page S-23 warned that when mortgage properties are secured by second liens, foreclosure frequently may be increased because the mortgagors have less equity. Transcript at 34.

If, in a hypothetical fact situation, the offering documents state that a particular package of mortgages includes only borrowers with a solid track record and if the offering statement also says that 60% of the borrowers are first-time homeowners who purchased their homes within the past six months, the specific statement should control the general. Consequently, a court should rule, as a matter of law, that there was no misrepresentation because the representation includes all relevant information within the offering documents. Also, the court should rule, as a matter of law, that the holder of the certificate cannot establish reliance on the general representation that the borrowers have a solid track record because this opinion is inconsistent with the specific information concerning the borrowers.

The J.P. Morgan defendants contend that this hypothetical fact situation and the fact situation in this litigation are almost identical. They contend that, as a matter of law, they did not make any misrepresentations because the robust disclosures in the offering documents disclosed to plaintiff and other investors that these AAA-rated securities contained large numbers of high-risk mortgages. Furthermore, plaintiff could not reasonably rely on the AAA ratings because of the detailed information within the offering documents describing the extremely relaxed underwriting policies coupled with disclosures that the certificates were backed by a high percentage of what must be regarded by any sophisticated investor as risky mortgages.

Plaintiff states that while it knew that many of the mortgage transactions were based on the relaxed underwriting standards described in the offering materials, it also knew that the AAA ratings of its certificates took into account the structuring of the pool of mortgage loans into tranches such that only purchasers of lesser rated certificates

would assume the actual risks of mortgage defaults.  Thus, plaintiff believed that the

disclosures in the offering documents were describing risks that would be assumed by

holders of lesser-rated securities.  On the other hand, plaintiff believed that the AAA

ratings meant that the rating agencies and underwriters believed that the risks of

nonpayment were minimal as to holders of certificates with AAA ratings.

At the preliminary objection stage of these proceedings, I cannot conclude that

the information and warnings in the offering statements bar plaintiff's misrepresentation

claims.[16]

---

[16]A contention running throughout the briefs of the J.P. Morgan defendants is that plaintiff, as a very sophisticated investor, knows good mortgages from bad mortgages, and that it is clear from the descriptions of the underlying collateral in the offering documents that the pools include too many bad mortgages (i.e., loans made without any real effort to determine the financial status of the borrower).  However, under Pennsylvania case law, once plaintiff alleges that it relied on the AAA ratings (see Amended Complaint ¶¶99 and 123), questions as to whether it in fact did so and whether reliance was reasonable cannot be resolved at the preliminary objection stage of the proceedings.

In my Opinion in *Half v. Metropolitan Life Ins. Co.*, 65 D.&C.4th 246, 269-77 (C.P. Allegheny 2003), I considered a motion for summary judgment seeking dismissal of claims raised by Mr. and Ms. Drelles based on misrepresentations of an insurance agent.

In 1988, Mr. Drelles purchased a whole life policy in the amount of $100,000.  He testified that he purchased this policy based on the agent's representations that upon payment of $4,092 per year for eight years, he  would have a fully paid policy.  The policy, in fact, provided for a monthly payment of $369 for as many as forty-one years. *Id.* at 271.

In 1990, Mr. and Ms. Drelles purchased another whole life insurance policy in the amount of $500,000 payable on the second death.  They testified that they purchased the policy on the basis of the agent's representations that the policy would be fully paid if they made annual payments of approximately $6,700 for ten years.  The policy, in fact, provided for annual payments payable to the second death or to age 99. *Id.* at 271-72.

The insurance company sought dismissal on the ground that the suit was not brought within two years of the misrepresentations.  Mr. Drelles contended that the statute of limitations was tolled because of the concealment doctrine.

While he could have easily  determined that the agent's representations were inconsistent with the terms of the policies by briefly reviewing the policies, Mr. Drelles testified that he did not review these policies. (Footnote continued on next page.)

## (2) DEFENSE OF NO LOSSES

The J.P. Morgan defendants contend that the misrepresentation claims should be dismissed because plaintiff did not (and cannot) allege that it has failed to receive any pass-through payments from its certificates. Consequently, it has not experienced any damages. Damages are an essential element of a misrepresentation claim.

However, nonpayment is not the only measure of damages that the law recognizes. Upon a showing of fraud, plaintiff may seek the difference between what it paid to acquire what it believed to be AAA-rated securities and what an investor would have paid for these securities without AAA ratings or with AAA ratings with a disclaimer.[17] Thus, recovery is not dependent upon whether or not factors other than the declining housing market contributed to the decline in the value of the certificates.

---

(Footnote continued from prior page.)

I ruled in favor of the insurance company because Mr. Drelles was an extremely sophisticated investor who would have seriously questioned whether the agent's representations were too good to be true. Mr. Drelles' background included twenty-five years of employment at Pittsburgh National Bank, where he served as director of equity research; director of investment research and investment strategies; vice president responsible for all investment functions; and vice president responsible for the investment function of the entire trust department. Thereafter, for several years, he was the director of pension assets management at Eastern Airlines. He then took positions managing the financial affairs of very wealthy people. I concluded that Mr. Drelles knew the difference between term life and whole life insurance and he would be expected to question a proposed investment package (which was not an annuity) that did not appear to be dependent upon interest rates or the performance of the stock market. *Id.* at 269-70.

In *Drelles v. Manufacturers Life Ins. Co.*, 881 A.2d 822 (Pa. Super. 2005), the Pennsylvania Superior Court reversed my ruling. It ruled that whether Mr. and Mrs. Drelles relied on the agent's representations made in the insurance context is a question for the jury.

[17]See *Restatement (Second) of Torts* § 549(1)(a); see also *Skurnowicz v. Lucci*, 798 A.2d 788, 795 (Pa. Super. 2002).

The J.P. Morgan defendants rely on the warnings in the offering materials regarding a weak or nonexistent secondary market. However, the risks of a less than robust secondary market for persons holding certificates that are properly rated AAA are different from the risks anticipated by persons holding certificates that should have received much lower ratings.

## (3) MATERIALITY

The J.P. Morgan defendants contend that the certificates, as senior bonds of their respective trusts, were protected against losses by various forms of credit enhancement. Because of such protection, a small number of noncomplying loans could not have had a material effect on the certificates. Because plaintiff failed to allege facts showing that the pools include so many noncomplying loans as to negate any credit enhancement, plaintiff has not alleged materiality and thus has not stated a claim.

This argument is the opposite side of the J.P. Morgan defendants' argument that the offering statements' pictures of the pools were so dire as to preclude plaintiff from reasonably believing that the certificates, as senior bonds of their respective trusts, would be paid.

My difficulty with this argument is that the allegations in the amended complaint that the pools contain substantial numbers of noncomplying loans are sufficient to support a finding of materiality. Thus, it becomes a matter of evidence—and not pleading—as to whether the number of noncomplying loans has reached material levels relative to the entire number of loans in the pools.

## (4) REPURCHASE PROVISIONS

The J.P. Morgan defendants contend that plaintiff is bound by the provision in the offering documents which creates a mechanism for repurchase or substitution of noncomplying loans: A "repurchaser or substitute" provision, under which the trustee may cause its seller to repurchase any noncomplying loans or to substitute qualified loans in their place.[18]   The J.P. Morgan defendants further assert that the offering documents advise investors that this "repurchaser substitute provision" constitutes the sole remedy available to certificate holders for noncomplying loans.[19]

This is not a remedy available to the certificate holders because they have no control over the loans and no ability to trigger a repurchase.   Only the J.P. Morgan defendants may do so.[20]   Courts will not enforce contractual remedies where the remedy fails to provide any meaningful relief.   See *Barrack v. Kolea*, 651 A.2d 149, 153 (Pa. Super. 1994).

The J.P. Morgan defendants rely on a ruling of the Court of Appeals for the Fifth Circuit in *Loan Star Fund V (U.S.), LP v. Barclays Bank, PLC*, 594 F.3d 383 (5th Cir. 2010).   Even if I find this Opinion to have merit, the facts of the present case are very

---

[18]The June 14, 2006, Prospectus Supplement describes the mechanism for repurchase and substitution of noncomplying loans:  the trustee reviews each loan and may cause the seller to repurchase or substitute any defective loans within a limited time after closing.   June 14, 2006, Pros. Supp. at S-43-44.   Therefore, what the J.P. Morgan defendants characterize as the "repurchase or substitute" provision as plaintiff's "sole remedy," is not a remedy available to plaintiff, because plaintiff is not the trustee and only the trustee may demand repurchase or substitution from the seller.

[19]June 14, 2006, Pros. Supp. at S-44, June 14, 2006, Pros. at 37.

[20]Plaintiff's complaint alleges that the pool contains substantial numbers of noncomplying loans.   It appears that none of these loans has been repurchased and there has not been a substitute of qualified loans in place of the noncomplying loans.

different.  In *Loan Star*, there was an arm's length relationship between the purchaser of the securities and the seller, meaning that in *Loan Star*, unlike the present case, the investors were not left with a remedy that depends upon one transactional entity suing a related transactional entity.

In *Loan Star*, shortly after the purchases, the purchaser discovered that several hundred mortgages were delinquent.  The Court read the prospectus and warranties as providing that if some mortgages were delinquent, Barclays would either repurchase them or substitute performing mortgages into the trusts.  Barclays had, in fact, done so.  Thus, since the purchaser received what it was promised in the offering documents, there were no actionable misrepresentations.  See *Boilermakers National Annuity Trust Fund v. WAMU Mortg. Pass Through Certificates*, No. C09-0037MJP, slip op. (W.D. Wash. Sept. 28, 2010), which distinguished *Loan Star* on the ground that it was based on a representation about the absence of delinquent loans.

## B.  SECTIONS 11 AND 12 (a)(2) OF THE SECURITIES ACT OF 1933

I next consider the J.P. Morgan defendants' preliminary objections seeking dismissal of plaintiff's claims based on §§ 11 (15 U.S.C. § 77k) and 12(a)(2) (15 U.S.C. § 77*l*) of the Securities Act of 1933.[21]

Section 11 applies to registration statements.  The relevant provision reads as follows:

---

[21]As the J.P. Morgan defendants recognized in subsequent pleadings, where the plaintiff files a preliminary objection raising lack of conformity to law, the defense that claims based on §§ 11 and 12 are barred by the statute of limitations may not be raised through preliminary objections.  See Pa.R.C.P. Nos. 1028 and 1030.

(a) Persons possessing cause of action; persons liable

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue--

Section 12 applies to prospectuses and oral communications. The relevant provision imposes liability on:

Any person who--

. . .

(2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraphs (2) and (14) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission . . . .

In their preliminary objections to § 11 claims, the J.P. Morgan defendants seek dismissal of plaintiff's claims against each of the J.P. Morgan defendants other than J.P. Morgan Securities because the complaint does not allege facts showing that these entities were issuers or underwriters of the certificates. I am granting these preliminary objections. See 15 U.S.C. §77k(a) and Section II.A of this Opinion.

In order to state a claim under § 12(a)(2), a plaintiff must allege facts sufficient to demonstrate that the defendant is a "seller" within the meaning of the legislation. Under § 12(a)(2), a "seller" is either (1) one who passes title to the buyer for value (a "direct

seller)" or (2) "one who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities' owner (a solicitor seller)."[22]   J.P. Morgan Securities, as the underwriter, sold the certificates directly to the individual investors, including plaintiff.  The amended complaint does not describe any activities that would bring the other J.P. Morgan entities as "sellers" into the scope of § 12(a)(2).   Consequently, I am sustaining the preliminary objections of the J.P. Morgan defendants seeking dismissal of plaintiff's claims against each of the J.P. Morgan defendants other than J.P. Morgan Securities.

## C.  SECTION 15 OF THE SECURITIES ACT OF 1933

The relevant portion of this Section, 15 U.S.C. §77o, reads as follows:

(a) Controlling persons.--

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

The allegations that support plaintiff's common law tort claims support recovery against J.P. Morgan Securities under §§ 11 and 12.[23]   Plaintiff has alleged a parent-child relationship (i.e., a relationship which JPMorgan Chase & Co. can control).  The

---

[22]See Pinter v. Dahl, 486 U.S. 622, 643-45 (1988) ("seller" liability reaches direct sellers as well as persons or entities who solicit the sale of securities for financial gain).

[23]A controlling person claim under § 15 requires a violation of § 11 or § 12(a)(2).

pleading requirements are met through allegations of parental control. *Marrari v. Medical Staff Network Holdings, Inc.*, 395 F.Supp.2d 1169, 1181 (S.D. Fla. 2005). Thus, plaintiff may pursue a claim based on Section 15 against JPMorgan Chase & Co.

## D. SECTION 501 OF THE PENNSYLVANIA SECURITIES ACT

In Count IX, plaintiff seeks recovery for violations of § 501 of the Pennsylvania Securities Act of 1972 (70 P.S. § 1-501). The relevant portion of the Act reads as follows:

> (a) *Any person* who: . . . (ii) offers or sells a security in violation of section[ ] 401 . . . or otherwise by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, the purchaser not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know and in the exercise of reasonable care could not have known of the untruth or omission, shall be liable to the person purchasing the security from him, who may sue either at law or in equity to recover the consideration paid for the security . . . .

I find no merit to the contention of the J.P. Morgan defendants that § 501(a) applies only to a person who offers or sells a security in violation of §§ 401, 403, or 404. This contention ignores the language "or otherwise." Several courts have reached the same result. See *Gilliland v. Hergert*, No. 2:05-cv-01059, 2008 WL 2682587, at *7 (W.D. Pa. 2008) ("The statutory text of § 1-501 expressly imposes liability on a person who 'otherwise' sells a security by means of a misleading statement or omission."); and *Kronenberg v. Katz*, 872 A.2d 568, 595 (Del. Ch. 2004).

For these reasons, I enter the following Order of Court:

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
CIVIL DIVISION

FEDERAL HOME LOAN BANK
OF PITTSBURGH,

              Plaintiff

     vs.

J.P. MORGAN SECURITIES LLC,
J.P. MORGAN MORTGAGE
ACQUISITION CORP., J.P.
MORGAN MORTGAGE
ACCEPTANCE CORPORATION I,
CHASE HOME FINANCE L.L.C.,
CHASE MORTGAGE FINANCE
CORPORATION, JPMORGAN CHASE
& CO., MOODY'S CORPORATION,
MOODY'S INVESTORS SERVICE,
INC., THE McGRAW-HILL
COMPANIES, INC., and
FITCH, INC.,

              Defendants

NO. GD09-016892

## ORDER OF COURT

I.

On this _29_ day of November, 2010, upon consideration of the preliminary

objections of the rating agencies, it is hereby ORDERED that:

    (1) plaintiff's claims based on Section 11 of the Securities Act of 1933 are

dismissed;

(2) plaintiff's negligent misrepresentation claims are dismissed; and

(3) defendants' preliminary objections seeking dismissal of plaintiff's fraudulent misrepresentation claims are overruled.

II.

Upon consideration of the preliminary objections of the J.P. Morgan defendants, it is hereby ORDERED that:

(1) defendants' preliminary objections seeking dismissal of plaintiff's fraudulent and negligent misrepresentation claims are overruled as to J.P. Morgan Securities and are sustained as to the remaining J.P. Morgan defendants, and these claims are dismissed as to all J.P. Morgan defendants other than J.P. Morgan Securities;

(2) defendants' preliminary objections seeking dismissal of plaintiff's claims based on Sections 11 and 12(a)(2) of the Securities Act of 1933 are sustained as to all J.P. Morgan defendants other than J.P. Morgan Securities and these claims are dismissed as to all J.P. Morgan defendants other than J.P. Morgan Securities;

(3) it appearing that plaintiff is raising claims based on Section 15 of the Securities Act of 1933 only as to JPMorgan Chase & Co., the preliminary objections of JPMorgan Chase & Co. seeking dismissal of these claims are overruled; and

(4) the preliminary objections of the J.P. Morgan defendants seeking dismissal of plaintiff's claims based on Section 501 of the Pennsylvania Securities Act are overruled.

III.

It is ORDERED that the parties shall contact me when the pleadings are closed so that I may schedule a status conference. I will schedule a status conference on an earlier date if requested, in writing, by any party.

BY THE COURT:

_____

WETTICK, J.