**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee for the Trusts listed in Exhibits 1-A and 1-B,<br><br>Plaintiff,<br><br>v.<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Washington Mutual Bank; JPMORGAN CHASE BANK, National Association; and WASHINGTON MUTUAL MORTGAGE SECURITIES CORPORATION,<br><br>Defendants. | Case No. 1:09-cv-1656 (RMC)<br><br>**UNDER SEAL**<br><br>**ORAL HEARING REQUESTED**<br><br>[REDACTED VERSION] |

**JPMORGAN CHASE BANK, N.A. AND**
**WASHINGTON MUTUAL MORTGAGE SECURITIES CORPORATION'S**
**MOTION FOR SUMMARY JUDGMENT**

Defendants JPMorgan Chase Bank, N.A. and Washington Mutual Mortgage Securities Corporation (together, "JPMC") hereby move this Court, pursuant to Federal Rule of Civil Procedure 56(a) and Local Civil Rules 7(h), to enter summary judgment in their favor. There is no genuine issue of material fact, and Defendants are entitled to judgment as a matter of law. In support of their Motion, Defendants rely upon: (i) their Memorandum of Points and Authorities in Support of Their Motion for Summary Judgment; (ii) their Statement of Material Facts as to Which There is No Genuine Issue in Support of Their Motion for Summary Judgment; and (iii) Exhibits thereto.

Defendants respectfully request an oral hearing on this Motion. A proposed order is attached.

Dated: June 20, 2014
Washington, D.C.

Respectfully submitted,

/s/ Brent J. McIntosh

Brent J. McIntosh (D.C. Bar No. 991470)
Mia Whang Spiker (D.C. Bar No. 1004939)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Suite 700
Washington, D.C. 20006
Telephone: (202) 956-7500
Facsimile: (202) 293-6330
Email: mcintoshb@sullcrom.com

Robert A. Sacks (D.D.C. Bar No. MI0069)
Ian D. McDonald (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel for Defendants JPMorgan Chase Bank, N.A. and Washington Mutual Mortgage Securities Corporation*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee for the Trusts listed in Exhibits 1-A and 1-B,

Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Washington Mutual Bank; JPMORGAN CHASE BANK, National Association; and WASHINGTON MUTUAL MORTGAGE SECURITIES CORPORATION,

Defendants.

Case No. 1:09-cv-1656 (RMC)

**UNDER SEAL**

**ORAL HEARING REQUESTED**

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF JPMORGAN CHASE BANK, N.A. AND WASHINGTON MUTUAL MORTGAGE SECURITIES CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

Robert A. Sacks (D.D.C. Bar No. MI0069)
Ian D. McDonald (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

Brent J. McIntosh (D.C. Bar No. 991470)
Mia Whang Spiker (D.C. Bar No. 1004939)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006
Telephone: (202) 956-7500
Facsimile: (202) 293-6330
Email: mcintoshb@sullcrom.com

*Counsel for Defendants*
*JPMorgan Chase Bank, N.A. and*
*Washington Mutual Mortgage*
*Securities Corporation*

June 20, 2014

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ....... 1

FACTS ....... 6

A. The FDIC Approaches JPMC About a Potential WMB Transaction. ....... 6

B. The FDIC Drafts the P&A Agreement. ....... 6

C. The FDIC Provides Bidders the Draft P&A Agreement. ....... 10

D. JPMC and the FDIC Discuss the Proposed P&A Agreement's Terms. ....... 11

E. JPMC Bids, and Regulators Close WMB. ....... 13

F. During the Closing Process, the FDIC Asserts That JPMC Did Not Assume Liabilities Not Reflected on WMB's Books. ....... 13

G. JPMC and [REDACTED] [REDACTED]. ....... 15

H. Following This Action's Filing, the FDIC Begins to Assert That "Books and Records" in Section 2.1 Refers to the Defined Term "Record." ....... 17

PROCEDURAL BACKGROUND ....... 20

LEGAL STANDARD ....... 22

A. Summary Judgment ....... 22

B. Contract Interpretation ....... 23

ARGUMENT ....... 25

I. JPMC ASSUMED WMB'S OBLIGATIONS—INCLUDING THE REPURCHASE OBLIGATIONS AT ISSUE HERE—ONLY TO THE EXTENT THEY WERE BOOKED AS LIABILITIES ON WMB'S BOOKS AND RECORDS. ....... 25

A. The P&A Agreement is Not Reasonably Susceptible to the FDIC's Excessively Broad Proposed Interpretation. ....... 25

**TABLE OF CONTENTS**
*(continued)*

**Page**


1. JPMC's Understanding Is Consistent with Section 2.1's Plain Meaning; the FDIC's Proposed Interpretation Is Not..........25

2. The Use of "Books and Records" in Other Provisions of the P&A Agreement Confirms JPMC's Understanding of Section 2.1..........29

3. JPMC's Understanding Accords with the Prevailing Meaning of "Books and Records" in the Context of Identifying Liabilities..........31

4. JPMC's Understanding Comports with Judicial Precedent on the Use of "Books and Records" in Purchase and Assumption Transactions..........33

5. JPMC's Understanding Honors the Rule Against Surplusage; the FDIC's Proposed Interpretation Offends It..........34

B. The Undisputed Extrinsic Evidence Uniformly Supports JPMC's Understanding and Contravenes the FDIC's Proposed Interpretation..........35

1. The Negotiation History Supports JPMC's Understanding..........35

2. Even If the FDIC Had the Subjective Intent It Now Claims, That Unexpressed Intention Is Irrelevant as a Matter of Law..........38

3. The Drafting History Supports JPMC's Understanding and Undermines the FDIC's Contention That It Had Formed Its Proposed Interpretation On or Before September 25, 2008..........38

4. The Parties' Conduct Comports with JPMC's Understanding..........40

II. WMB'S SELLER REPURCHASE OBLIGATIONS ARE NOT "MORTGAGE SERVICING RIGHTS AND OBLIGATIONS."..........43

CONCLUSION..........45

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

**Air Line Pilots Ass'n Int'l* v. *Pension Benefit Guar. Corp.*,
193 F. Supp. 2d 209 (D.D.C. 2002) .......... 34, 35

*Am. Nat'l Co.* v. *United States*,
274 U.S. 99 (1927) .......... 32

*Anderson* v. *Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 23

*Bowden* v. *United States*,
106 F.3d 433 (D.C. Cir. 1997) .......... 24

*Celotex Corp.* v. *Catrett*,
477 U.S. 317 (1986) .......... 22, 23

*Comm'r* v. *Indianapolis Power & Light Co.*,
493 U.S. 203 (1990) .......... 32

*Cole* v. *Burns Int'l Sec. Servs.*,
105 F.3d 1465 (D.C. Cir. 1997) .......... 24

*Colo. Interstate Gas Co.* v. *FERC*,
599 F.3d 698 (D.C. Cir. 2010) .......... 24

*Dauphin* v. *Crownbrook*,
2013 WL 1498363 (E.D.N.Y. Apr. 11, 2013) .......... 30

**Deutsche Bank Nat'l Trust Co.* v. *FDIC*,
784 F. Supp. 2d 1142 (C.D. Cal. 2011) .......... 43

*Duffy* v. *Mut. Benefit Life Ins. Co.*,
272 U.S. 613 (1926) .......... 32

*Farmland Indus., Inc.* v. *Grain Bd. of Iraq*,
904 F.2d 732 (D.C. Cir. 1990) .......... 23, 35

*Fox* v. *Office of Pers. Mgmt.*,
100 F.3d 141(Fed. Cir. 1996) .......... 38

*GECCMC 2005-C1 Plummer St. Office Ltd. P'ship* v. *JPMorgan Chase Bank, N.A.*,
671 F.3d 1027 (9th Cir. 2012) .......... 23, 24

**TABLE OF AUTHORITIES**
*(continued)*

**Page(s)**

**Green* v. *Obergfell*,
121 F.2d 46 (D.C. Cir. 1941) ....................................................................................40, 42

*Harbor Ins. Co.* v. *Schnabel Found. Co.*,
946 F.2d 930 (D.C. Cir. 1991) ............................................................................................23

*Hillside Metro Assocs., LLC* v. *JPMorgan Chase Bank, N.A.*,
747 F.3d 44 (2d Cir. 2014)..................................................................................................23

*Hood* v. *D.C.*,
211 F. Supp. 2d 176 (D.D.C. 2002) ...................................................................................38

*Horn & Hardart Co.* v. *Nat'l R.R. Passenger Corp.*,
Civ. A. No. 85-0820, 1985 WL 9426 (D.D.C. May 30, 1985) ..........................................38

*In re Collins Sec. Corp.*,
998 F.2d 551 (8th Cir. 1993) ..............................................................................................33

*Intel Corp.* v. *VIA Tech., Inc.*,
319 F.3d 1357 (Fed. Cir. 2003)...........................................................................................24

*Interface Kanner, LLC* v. *JPMorgan Chase Bank, N.A.*,
704 F.3d 927 (11th Cir. 2013) ............................................................................................24

*Maryland Cas. Co.* v. *W.R. Grace & Co.*,
128 F.3d 794 (2d Cir. 1997)................................................................................................30

*Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*,
475 U.S. 574 (1986)............................................................................................................22

*McLane & McLane* v. *Prudential Ins. Co. of Am.*,
735 F.2d 1194 (9th Cir. 1984) ............................................................................................30

*Nat'l Austl. Bank* v. *United States*,
452 F.3d 1321 (Fed. Cir. 2006)...........................................................................................38

*NRM Corp.* v. *Hercules, Inc.*,
758 F.2d 676 (D.C. Cir. 1985) ..............................................................................23, 24, 36

**NTA Nat'l, Inc.* v. *DNC Servs. Corp.*,
511 F. Supp. 210 (D.D.C. 1981) ......................................................................................5, 38

*Ohio Power Co.* v. *F.E.R.C.*,
744 F.2d 162 (D.C. Cir. 1984)............................................................................................25

**TABLE OF AUTHORITIES**
*(continued)*

**Page(s)**

*PCH Mut. Ins. Co., Inc.* v. *Cas. & Sur., Inc.*,
750 F. Supp. 2d 125 (D.D.C. 2010) ....................25

**Santopadre* v. *Pelican Homestead & Sav. Ass'n*,
937 F.2d 268 (5th Cir. 1991) ....................33

*Schultz* v. *Metro. Life Ins. Co.*,
872 F.2d 676 (5th Cir. 1989) ....................40

*Segar* v. *Mukasey*,
508 F.3d 16 (D.C. Cir. 2007) ....................24

*Serv. Emps. Int'l Union Local 32BJ* v. *Diversified Servs. Grp.*,
958 F. Supp. 2d 166 (D.D.C. 2013) ....................38

*Tax Analysts* v. *I.R.S.*,
217 F. Supp. 2d 23 (D.D.C. 2002) ....................34

**Tymshare, Inc.* v. *Covell*,
727 F.2d 1145 (D.C. Cir. 1984) ....................40

*United Mine Workers of Am. 1974 Pension* v. *Pittston Co.*,
984 F.2d 469 (D.C. Cir. 1993) ....................23, 24, 38, 39

*Valley Realty Co.* v. *United States*,
96 Fed. Cl. 16 (Fed. Cl. 2010) ....................24, 25

**Vernon* v. *RTC*,
907 F.2d 1101 (11th Cir. 1990) ....................33

**Village of Oakwood* v. *State Bank & Trust Co.*,
519 F. Supp. 2d 730 (N.D. Ohio 2007)....................33

**Viola* v. *Fleet Bank of Maine*,
1996 WL 498390 (D. Me. Feb. 27, 1996) .................... *passim*

*Watts* v. *Carlson*,
854 F.2d 528 (D.C. Cir. 1988) ....................38

**TABLE OF AUTHORITIES**
*(continued)*

**Page(s)**

**STATUTES**

12 U.S.C. § 1813 ....................................................................................................31

12 U.S.C. § 1821 ....................................................................................................16, 17

12 U.S.C. § 1831g ....................................................................................................32

**OTHER AUTHORITIES**

12 C.F.R. § 330.3 ....................................................................................................32

FDIC Resolutions Handbook (2003) ....................................................................7, 11, 32

FDIC Statement of Policy: Applications for Deposit Insurance,
63 Fed. Reg. 44752 (Aug. 20, 1998)....................................................................32

Fed. R. Civ. P. 1 ....................................................................................................22

Fed. R. Civ. P. 56 ....................................................................................................22, 23

Processing of Deposit Accounts in the Event of an Insured Depository Institution Failure,
74 Fed. Reg. 5797 (Feb. 2, 2009) ....................................................................32

*Restatement (Second) of Contracts (1981) .................................................... *passim*

Defendants JPMorgan Chase Bank, N.A. ("JPMC") and Washington Mutual Mortgage Securities Corporation ("WMMSC") respectfully submit this Memorandum of Points and Authorities in support of their Motion for Summary Judgment.

**PRELIMINARY STATEMENT**

On September 25, 2008, at the apex of the global financial crisis, federal regulators closed Washington Mutual Bank ("WMB"), and the Federal Deposit Insurance Corporation (the "FDIC") became its receiver. WMB was the largest bank failure in U.S. history, and its collapse came at a time of historic uncertainty in America's financial markets. The same day, JPMC agreed—at the FDIC Chairman's request—to undertake a transaction that allowed WMB's branches to continue serving the public. Under the Purchase and Assumption Agreement that effected that transaction—the "P&A Agreement"—JPMC took on *all* of WMB's deposit liabilities, saving the FDIC an estimated $41 *billion*. (Ex. 1 (P&A Agr.) § 2.1.)[1]

JPMC also agreed to purchase *all* of WMB's assets and to assume *certain* of WMB's other liabilities. JPMC acquired WMB's assets "whether or not reflected on the books" of WMB. (*Id*. § 3.1.) But as to WMB's liabilities, Section 2.1 of the P&A Agreement provides that JPMC "expressly ***assumes at Book Value*** . . . and agrees to pay, perform, and discharge, all of the liabilities of the Failed Bank ***which are reflected on the Books and Records of the Failed Bank as of Bank Closing***." (*Id*. § 2.1.) The highlighted language occasions this dispute.[2]

As detailed below, the FDIC has offered at least six different interpretations of Section 2.1. Fortunately, this Court need not sort out which of the FDIC's various competing interpretations is correct, as facts sufficient to grant summary judgment to JPMC are undisputed:

---

1 Citations to "Ex." refer to exhibits to the joint appendix to be submitted following the close of briefing.

2 Except where indicated, all emphasis in quotations is added.

- The FDIC drafted the P&A Agreement, including Section 2.1, and as such any ambiguity in it is construed against the FDIC.
- During discussions of the P&A Agreement's terms, FDIC attorneys [redacted]
- Though the FDIC now asserts that Section 2.1's reference to liabilities "reflected on the Books and Records" of WMB is intended to reach as broadly as the P&A Agreement's definition of "Record"—essentially all WMB documents and data anywhere—[redacted]
- On the contrary, [redacted]
- Following the transaction, the FDIC [redacted] that JPMC did not assume—rather, the FDIC retained—any liabilities other than or in excess of the liabilities shown on WMB's books.

In short, this was both JPMC's understanding and the contemporaneously expressed understanding of the FDIC at the time of the P&A Agreement.

Only when Deutsche Bank National Trust Company ("Deutsche Bank") commenced this litigation against the FDIC nearly a year later—alleging mortgage repurchase obligations exceeding their September 25, 2008 book value by several billion dollars—did the FDIC reverse course. The FDIC now says that Section 2.1's phrase "reflected on the Books and Records" reaches as broadly as the defined term "Record," which means "any document, microfiche, microfilm and computer records (including but not limited to magnetic tape, disc storage, card forms and printed copy) of" WMB. (Ex. 901 (FDIC Resp. to JPMC Interrog. ("FDIC Resp.")) No. 4.) The FDIC thus asserts that rather than limiting JPMC's assumption of WMB liabilities to those that JPMC could have identified on WMB's books, [redacted] (*Id.* No. 3.) Similarly, although the P&A Agreement says JPMC "assumes at Book Value" WMB's liabilities, the FDIC says that "at Book Value" is meaningless, and Section 2.1



would mean the same if that phrase were omitted: The FDIC says (*Id.* No. 12.)

The FDIC's proposed interpretation is incorrect as a matter of law:

*First*, it cannot be reconciled with the plain language of the contract. The FDIC reads the word "Books" out of the phrase "Books and Records," because any WMB book is also a WMB "Record." The FDIC also insists that "Records" in "Books and Records" is correctly capitalized—even though and it immediately follows the capitalized but undefined term "Books," The FDIC also demands an interpretation of "Books and Records" in Section 2.1 that is patently inconsistent with other uses of the phrase in the very same agreement and in the FDIC's own governing laws and usage.

The FDIC's position also renders "assumes at Book Value" surplusage. A court has already considered the meaning of this phrase in Section 2.1 of a prior FDIC purchase and assumption agreement and granted summary judgment in favor of JPMC's understanding:

> In section 2.1 of the Agreement the defendant assumed liability for the outstanding [liabilities] measured at book value, which is defined as the dollar amount stated on [the failed bank's] accounting records at the close of business . . . . ***[T]here is nothing ambiguous about this language[, which] cannot reasonably be read to encompass liability beyond the book value*** . . . .

*Viola* v. *Fleet Bank of Maine*, 1996 WL 498390, at *3 (D. Me. Feb. 27, 1996), *aff'd*, 94 F.3d 640 (1st Cir. 1996). The FDIC was on notice of the judicially determined meaning of this phrase and included it anyway. It cannot evade responsibility for its drafting choice.

*Second*, extrinsic evidence developed in discovery requires rejection of the FDIC's position. Undisputed evidence shows that at the time of the WMB transaction, the FDIC



[redacted] (Ex. 66.) [redacted] is consistent with the contractual language and JPMC's understanding, but contradicts the FDIC's litigation-inspired interpretation. [redacted] (*See id.*; Ex. 902 (JPMC_DBNTC_0000006549-51); P&A Agr. § 12.1.)

Internal FDIC documents also demonstrate that [redacted] (Ex. 901 (FDIC Resp.) No. 1.) [redacted] (Ex. 253.) An internal FDIC email—which the FDIC initially withheld as privileged [redacted] (Ex. 903 (FDIC-DB0017573).) Shortly thereafter, [redacted] (Ex. 255.)

Even if the FDIC's current interpretation *were* consistent with its subjective understanding as of September 25, 2008, there is not a single piece of evidence that the FDIC expressed such an understanding to JPMC. Not one of the FDIC personnel involved in drafting and negotiating the P&A Agreement [REDACTED] "'[T]he subjective unexpressed, uncommunicated thoughts of a party are irrelevant to the material issue of the parties' intent.'" *NTA Nat'l, Inc.* v. *DNC Servs. Corp.*, 511 F. Supp. 210, 223 (D.D.C. 1981) (quoting *Union Bank* v. *Winnebago Indus., Inc.*, 528 F.2d 95, 99 (9th Cir. 1975)).

*Third*, the parties' treatment of analogous WMB liabilities in the immediate aftermath of WMB's failure shows the FDIC's pre-litigation public position was consistent with JPMC's understanding. For example, just days after WMB's closing, FDIC official Richard Peyster expressly informed JPMC in writing that "[w]ith regard to any tax liability arising out of an ongoing or future audit, *where no assessment had been made prior to the date of closing, such liability would not pass to [JP]Morgan*." (Ex. 29.) On the same day, Mr. Peyster told other FDIC senior managers—including those who dictated the terms of the transaction—that for "public consumption" the FDIC's position as to Section 2.1 was that "any tax liabilities on the books of Washington Mutual were transferred, and *any unknown liabilities, not reflected on the books were not transferred*." (Ex. 108.)

Similarly, in 2008 and 2009, FDIC accountant James Thormahlen drafted letters to taxing authorities that sought to have JPMC pay WMB tax liabilities, informing those authorities that "[t]he tax period on the attached return occurred prior to [WMB's] closure *and was not assumed by JP Morgan Chase Bank, NA*" and that "[t]he liability reflected on the attached return is a claim against the receivership." (Ex. 30; *see also* Exs. 404, 416.)

In short, despite its current litigating position, FDIC employees repeatedly expressed to JPMC, third parties, and the public precisely the opposite understanding during the months immediately following the transaction, and the FDIC publicly offered up its current position only *after* Deutsche Bank sued it. The FDIC now [REDACTED] (Ex. 901 (FDIC Resp.) Nos. 17 & 18.) Yet both the P&A Agreement's principal drafters at the FDIC *and* the FDIC officials who administered the WMB receivership [REDACTED]

There is only one viable interpretation of Section 2.1. The undisputed extrinsic evidence undermines the FDIC's later-proposed interpretation and confirms JPMC's understanding. And any ambiguity must be construed against the agreement's drafter, the FDIC. Because there is no genuine issue of fact here, JPMC is entitled to summary judgment.

## FACTS

### A. The FDIC Approaches JPMC About a Potential WMB Transaction.

In mid-September 2008, with WMB showing signs of distress and suffering a run on deposits, Sheila Bair, then-Chairman of the FDIC, reached out to Jamie Dimon, JPMorgan Chase & Co.'s CEO, to pitch JPMC on a WMB transaction. (Ex. 135; Docket Item ("D.I.") 54-1 at 5.) On September 22, FDIC officials [REDACTED] (*See* Exs. 142, 441; Wigand Deposition Transcript ("Tr.") at 109:10-12; Scharf Tr. at 37:3-38:15.)

### B. The FDIC Drafts the P&A Agreement.

At the same time, FDIC officials [REDACTED]



[redacted].[3] (Ex. 242; *see also* Ex. 901 (FDIC Resp.) No. 1; Ex. 904 (April 9, 2013 email from S. Christensen); Van Fleet Tr. at 21:4-8.) FDIC attorneys [redacted] (Ex. 901 (FDIC Resp.) No. 1.) In the afternoon of September 23—two days before WMB's closure— [redacted] (Ex. 253.) [redacted]

[redacted]

(*Id.*) That is, [redacted] (*Id.*)

Later that afternoon, [redacted]

[3] According to the FDIC, "whole bank" denotes a transfer of all of the failed bank's *assets* but does *not* mean the same for its *liabilities*. (*See* Ex. 767 (FDIC Resolutions Handbook) at 27-29; [redacted]

[4] [redacted] (Wigand Tr. at 71:13-14.) The FDIC [redacted] (*See*, *e.g.*, Ex. 255.) [redacted] (*See*, *e.g.*, Ex. 276.)



(Ex. 903 (FDIC-DB0017573) (line breaks removed); Foster Tr. at 57:16-21.)[5]

Shortly thereafter, [redacted] (Ex. 255.) [redacted]

[redacted]

(Ex. 256 (changes tracked to compare Ex. 255 to Ex. 253).) In this draft, [redacted] (Ex. 255.) The FDIC says [redacted] (Ex. 901 (FDIC Resp.) No. 1.)

[redacted]

5 The FDIC produced this email to JPMC only *after* JPMC had already deposed all of the participants in the email communication. [redacted] (Gearin Tr. at 108:16-109:2, 136:12-22.) JPMC wrote the FDIC on July 29, 2013 and again almost four weeks later to request the email's immediate production or identification of its corresponding entry on the FDIC's privilege log. (Ex. 905 (July 29, 2013 letter from B. McIntosh to S. Christensen); Ex. 906 (Aug. 23, 2013 email from B. McIntosh to S. Christensen).) On August 27, 2013, the FDIC withdrew its privilege assertion and produced the email to JPMC. The FDIC claimed that the "email was properly withheld as privileged" but was being produced "because [redacted] (Ex. 907 (Aug. 27, 2013 letter from S. Christensen to B. McIntosh).) Notably, though, the email [redacted] (Ex. 903 (FDIC-DB0017573).)

[redacted] (Gearin Tr. at 92:6-11.) Yet, asked how [redacted] (*Id*. at 99:9-21; *see also id*. at 100:15-101:3.)

Although the FDIC has made much of the capitalization of the phrase "Books and Records" in Section 2.1 and its supposed reference to the defined term "Record," there is no evidence the capitalization was intentional. [redacted] (Ex. 903 (FDIC-DB0017573); Gearin Tr. at 94:7-95:22; Van Fleet Tr. at 132:4-11.) Moreover, [redacted] (Gearin Tr. at 94:18-21 [redacted] Van Fleet Tr. at 137:6-13 [redacted]

[redacted]



(Gearin Tr. at 94:7-17.) [redacted] (*Id.* at 95:16-19.)

[redacted]

(Van Fleet Tr. at 131:22-132:11.)

The FDIC says [redacted] (Ex. 901 (FDIC Resp.) Nos. 1 & 2.) Yet [redacted] (Wigand Tr. at 153:3-6.) [redacted] (Held Tr. at 72:19-73:2; *cf.* P&A Agr. Arts. I (def'n of "Deposit"), VIII & §§ 3.4, 9.6 (lower-case uses).)

### C. The FDIC Provides Bidders the Draft P&A Agreement.

Over the weekend of September 20, 2008, the FDIC [redacted] (Foster Tr. at 22:17-22, 57:19-58:4.) Yet the FDIC [redacted] (Exs. 61, 149, 200.) On that day, the



FDIC (Ex. 157.) The FDIC also (Exs. 56, 57, 61, 422.) In receivership transactions, the FDIC typically provides bidders an "information package" that reflects "the amounts and types of assets and liabilities that the failing institution holds," but (Ex. 767 (FDIC Resolutions Handbook) at 8; Van Fleet Tr. at 108:17-20; Yore Tr. at 58:8-59:8.)

The FDIC (*See* Ex. 276; Ex. 908 (JPMC_DBNTC_0000015659).) (*See* Ex. 276.)

On September 24, 2008, the FDIC (Exs. 71, 129 (the "FAQs").)

**D. JPMC and the FDIC Discuss the Proposed P&A Agreement's Terms.**

Following the proposed agreement's release,



(Ex. 276 § 12.1.) On September 23, 2008, [redacted] (Eitel Tr. at 141:16-18.) JPMC [redacted] (*Id.* at 143:13-23.)

In connection with this discussion, [redacted] (Ex. 66.) [redacted] (*Id.*) [redacted] (*Id.*)

Mr. Eitel then provided the FDIC [redacted] (*See* Exs. 468, 469; Ex. 902 (JPMC_DBNTC_0000006549-51).) He proposed [redacted] (Ex. 902 (JPMC_DBNTC_0000006549-51).) The FDIC [redacted][6] (*See* P&A Agr. § 12.1.)

[6] Separately, JPMC also proposed [redacted] (Ex. 78.) The FDIC [redacted] (*See* P&A Agr. § 2.5.) [redacted] (Ex. 78; *see also* Cooney Tr. at 240:13-241:6.)

**E. JPMC Bids, and Regulators Close WMB.**

On the evening of September 24, 2008, JPMC bid $1.888 billion [REDACTED] the only conforming bid the FDIC received.[7] (Ex. 134 at 9; Ex. 599.) That same evening, the FDIC accepted JPMC's bid. (Ex. 910 (JPMC_DBNTC_0000007255).) The next day, the Office of Thrift Supervision ("OTS") closed WMB and placed it into receivership—the largest bank failure in U.S. history. (Ex. 911 (Order No. 2008-36, OTS No. 08551 (Sept. 25, 2008)); D.I. 54-1 at 5-6.) The FDIC Board approved the JPMC transaction that morning, and later that day the parties executed the P&A Agreement, "the legal, valid and binding obligation of the Assuming Bank." (Exs. 163, 274; P&A Agr. § 11(c).) The same day, FDIC staff [REDACTED] (Ex. 347.) Absent JPMC's intervention, WMB's failure would have cost the FDIC an estimated $41 billion.[8]

**F. During the Closing Process, the FDIC Asserts That JPMC Did Not Assume Liabilities Not Reflected on WMB's Books.**

Immediately following the P&A Agreement's execution, the parties began efforts to effectuate the transaction. (Fenton Tr. at 22:1-9, 23:9-22; Pruss Tr. at 28:1-11, 28:6-30:18; Lipsitz Tr. at 206:6-12, 221:2-10.) One issue that arose immediately was the allocation of liabilities arising from WMB tax audits that were not completed as of WMB's failure. (*See* Ex. 87.) On October 7, 2008, 12 days after that failure, FDIC officials Peyster, Thormahlen, and James Vordtriede discussed WMB tax matters with JPMC personnel. (*See* Exs. 29, 88.) The next day, Mr. Peyster emailed JPMC personnel, copying his FDIC colleagues, stating:

---

7 [REDACTED] (*See* Ex. 476; Ex. 909 (FDIC-DB0017510-11); Yore Tr. at 82:2-5, 88:12-15; Held Tr. at 108:16-19.)

8 (Ex. 912 (Statement of the FDIC before the Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs, of the U.S. Senate (April 16, 2010)), at 24.)

> With regard to what was and was not transferred to [JP]Morgan under the agreement, I do not think we have any dispute here . . . . With regard to any tax liability arising out of an ongoing or future audit, *where no assessment had been made prior to the date of closing, such liability would not pass to [JP]Morgan. Only liabilities on the books as of the date of the agreement pass.*



(Ex. 29.)



Mr. Peyster

(Ex. 108.)

(*Id.*)

(*Id.*) (*Id.*) There is no evidence that any recipient disagreed

In the months that followed, at the FDIC's behest, JPMC received tax assessments directed to WMB by state and local taxing authorities and processed WMB tax returns for tax periods prior to WMB's closure. (*See*, *e.g.*, Exs. 407, 408, 410.) On October 20, 2008, JPMC employee James Fergus (Ex. 409.) The FDIC had instructed that,



(*Id.*)

(*Id.*) Finally,

(*Id.*)

That same day, Mr. Thormahlen provided JPMC with two FDIC form letters addressed to "State Tax Agency" for JPMC to send along with WMB tax returns. (Exs. 30, 404; Ex. 901 (FDIC Resp.) No. 18.) One letter read, in pertinent part:

> Washington Mutual Bank was closed by the Office of Thrift Supervision on 9/25/2008 and the Federal Deposit Insurance Corporation (FDIC) was appointed as Receiver for the failed institution. The tax period on the attached return occurred prior to the banks [*sic*] closure and *was not assumed by JP Morgan Chase Bank, NA*. The liability reflected on the attached return is *a claim against the receivership*.

(Ex. 30.) The other letter was substantially similar, and both noted the December 30, 2008 receivership claims bar date and provided instructions for filing a claim. (*See id.*; Ex. 404.) On December 31, 2008, JPMC personnel asked whether Mr. Thormahlen would be "providing a new letter for [JPMC] to send out with billing notices for liabilities that JPMorgan did not assume," as the claims bar date had passed. (Ex. 416.) Two days later, Mr. Thormahlen sent JPMC another letter with language virtually identical to the October 20, 2008 letters, now explaining that the bar date had passed. (*Id.*)

**G. JPMC and the**

Another issue that arose immediately after WMB's closure was the assertion by



[redacted] Mortgage servicing rights—the right to collect and process mortgage payments in return for servicing fees and other compensation—are a valuable asset, and [redacted] (Ex. 324 at 94; *see also* Barren Tr. at 37:16-38:15.) [redacted] as to this major WMB asset understandably concerned JPMC, which had "specifically purchase[d] all [WMB] mortgage servicing rights" from the FDIC. (P&A Agr. § 3.1.)

In October and November 2008, [redacted]

- [redacted]
- [redacted]
- [redacted]

(Ex. 388; Ex. 913 (JPMC_DBNTC_0009148532-43).) In short, each of the GSEs [redacted] (*See* Exs. 614-617.)

JPMC and the GSEs [redacted] (Ex. 914 (JPMC_DBNTC_0005099679-

[9] Under 12 U.S.C. § 1821(d)(2)(G)(1)(ii), the FDIC "may . . . transfer any asset or liability . . . without any approval . . . or consent . . . to such transfer." According to the FDIC, [redacted] (Gearin Tr. at 270:4-7.)

703).) [REDACTED] (Ex. 915 (JPMC_DBNTC_0008788640-54).) [REDACTED] (Ex. 324 at 94; Barren Tr. at 37:16-38:15.)

**H. Following This Action's Filing, the FDIC Begins to Assert That "Books and Records" in Section 2.1 Refers to the Defined Term "Record."**

Under the P&A Agreement, JPMC could give the FDIC notice whether it would assume certain WMB contracts. (P&A Agr. § 4.8.) In turn, the FDIC can, pursuant to 12 U.S.C. § 1821(e), "repudiate any contract or lease" of a failed bank. On October 16, 2008, in connection with the above-described discussions between JPMC and the GSEs, [REDACTED] (Ex. 513.) FDIC Receiver-in-Charge Robert Schoppe [REDACTED] (*Id.*) [REDACTED] (Ex. 82.) By all accounts, this is the first time the FDIC had informed JPMC of this position.

Three things about Mr. Gearin's position are notable:

*First*, [REDACTED] (*Id.*)

*Second*, [REDACTED]

[redacted] (Ex. 356 at 3.)

*Third*, when the time came to reject JPMC's notice that it would not assume the repurchase obligations in WMB's loan-sales contracts—even up to their Book Value on WMB's books—the FDIC did *not* argue that the repurchase obligations had transferred pursuant to Section 2.1's provision covering "liabilities . . . reflected on the Books and Records of the Failed Bank." Rather, FDIC personnel explained [redacted] (Ex. 28.) As explained below, this rationale is no longer viable, as the FDIC has acknowledged in other litigation that it can transfer a contract's mortgage servicing rights without also transferring seller repurchase obligations imposed by the same contract. (*See infra* Part II.)

On September 3, 2009—that is, eight months later, and *after Deutsche Bank filed the instant action*—the FDIC suddenly changed its rationale. [redacted] (Ex. 519.) Rather, [redacted] the FDIC adopted the position that WMB's seller repurchase obligations [redacted] (*Id.*) In support, the FDIC claimed that [redacted]



(*Id.*) In short, the FDIC first publicly adopted its proposed interpretation of Section 2.1 nearly a year after WMB failed.

FDIC attorney Thaddeus Fenton, who said (Fenton Tr. at 238:21-22.) (*Id.* at 239:1-240:21, 241:2-18.) Asked whether (*Id.* at 241:19-242:13.) As to whether (*Id.* at 243:6-244:3.)

Later, in litigation that Deutsche Bank brought over seller repurchase obligations in IndyMac-issued RMBS, the FDIC explained that in private-label RMBS—like those at issue here—seller repurchase obligations are *not* mortgage servicing obligations:

> Before its failure in 2008, [IndyMac] had issued and sold mortgage-backed securities. These securities consisted of mortgage pools established by "Pooling and Servicing Agreements" ("PSAs") . . . . *Although each PSA is contained in a single document, the document contains two agreements IndyMac entered into in two different capacities: as "Seller" and as "Master Servicer."* . . . In its capacity as "Seller" IndyMac also made certain "representations and warranties" about the quality of the loans. The PSAs further provide that if any party discovered a breach of any of those representations and warranties, IndyMac *in its capacity as "Seller"* had to . . . substitute or repurchase the

> affected mortgage loan or loans. In its capacity as "Master Servicer," IndyMac agreed to collect and process mortgage payments in return for servicing fees and other compensation. *The PSAs do not require IndyMac, in its capacity as Master Servicer, to substitute or repurchase non-performing mortgages.* The PSAs further provide that the Master Servicer shall only be liable for obligations imposed "specifically" on it by the PSAs, which means that *the Master Servicer shall not be liable for obligations imposed on other contracting parties, such as the Seller*.

(Ex. 916 (FDIC Principal Br., *Deutsche Bank Nat'l Trust Co.* v. *FDIC*, 744 F.3d 1124 (9th Cir. 2014) (No. 11-56339), ECF No. 8111464 ("FDIC Ninth Circuit Brief")) at 2-3 (record citations and quotation marks omitted).)

**PROCEDURAL BACKGROUND**

On December 30, 2008, Deutsche Bank filed a proof of claim in the WMB receivership, claiming WMB had breached representations and warranties in pooling and servicing agreements for private-label RMBS trusts. (D.I. 1 (Complaint) ¶ 10.) The FDIC failed to respond to the proof of claim, so on August 26, 2009, Deutsche Bank sued the FDIC. (*Id.* ¶¶ 10, 15-17.) The FDIC moved to dismiss the Complaint, claiming that "all risk of liability to [Deutsche Bank] is borne by JPMC," not the FDIC. (D.I. 20-1 at 18-19.) In doing so, the FDIC relied on its new theory that "liabilities . . . reflected on the Books and Records" of WMB meant not just "booked liabilities"—as Mr. Gearin had told JPMC—but instead was much broader:

> [A]ll Trust-related liabilities and obligations that were originally WaMu's—including any loan repurchase or indemnification liabilities that may have arisen prior to the receivership as a result of WaMu's seller obligations—were transferred to, and expressly assumed by, JPMC under Section 2.1 of the P&A Agreement.

(*Id.* at 20.) In response, Deutsche Bank amended its complaint to add as defendants JPMC and WMMSC, a former WMB subsidiary that JPMC now owns. (*See* D.I. 32.)

JPMC and WMMSC moved to dismiss, arguing "that any liabilities from this litigation that were not on WMB's general ledger, subsidiary ledgers, and supporting schedules as of September 25, 2008"—that is, that were not "booked liabilities" as of WMB's closure—

"remained with the FDIC." (D.I. 55-1 at 27.) As it does here, JPMC explained its understanding that Section 2.1 means "the FDIC retained all liabilities of the failed bank except those that had a 'Book Value' as of September 25, 2008," defined as the "dollar amount stated on the Accounting Records of the Failed Bank"—WMB's general ledger, subsidiary ledgers, and supporting schedules. (*Id.* at 28; P&A Agr. Art. I (def'n of "Book Value").)

The FDIC also moved to dismiss, espousing yet another argument, this time based on the transfer of WMB's "mortgage servicing rights and obligations": The FDIC asserted that the disputed repurchase obligations arise from "*[a]ssets* that transferred to JPMC under Section *3.1* and its related provisions." (D.I. 54-1 at 25.) It claimed that "[t]he P&A Agreement states that JPMC 'specifically assume[d]' (under Section 2.1) and 'specifically purchase[d]' (under Section 3.1) 'all mortgage servicing rights and obligations of [WaMu].'" (*Id.*) Thus, the FDIC claimed, "[b]ecause '[t]he mortgage servicing rights and obligations of WaMu with respect to the Trusts arose under the Governing [Agreements],' . . . the Governing Agreements . . . transferred to WaMu [*sic*] under Section 3.1 of the P&A Agreement." (*Id.*) The FDIC explained:

> Sections 2.1 and 3.1 provide that "[n]otwithstanding Section 4.8," JPMC "specifically assume[d]" and "specifically purchase[d]" "all mortgage servicing rights and obligations" of WaMu, thereby exempting these rights and obligations from Section 4.8. Because Section 4.8 applies to "agreements," this carveout in Sections 2.1 and 3.1 necessarily reflects JPMC's *irrevocable assumption of the entire agreements containing "all the mortgage servicing rights and obligations"*—*i.e.*, the Governing Agreements, including all the rights and obligations thereunder.
>
> . . . By expressly excluding "all mortgage servicing rights and obligations" from the scope of Section 4.8, the P&A Agreement ensured that the "agreements" containing these rights and obligations—*i.e.*, the Governing Agreements—would be transferred in their entirety to JPMC.

(*Id.* at 28-29.) The FDIC now appears to have abandoned this argument. (*See infra* Part II.) The FDIC had a fallback argument as well: that "[t]he transfer to JPMC of WaMu's [repurchase obligations] also was effected by Section 2.1," because "[t]he *only* limitation on JPMC's

assumption of WaMu's liabilities is that the liability be 'reflected' on WaMu's 'Books and Records' as of September 25, 2008." (D.I. 54-1 at 29 (emphasis in original).)[10]

The Court denied the parties' respective motions to dismiss on April 5 and August 17, 2011. (April 5, 2011 Minute Order Denying JPMC's Motion; August 17, 2011 Minute Order Denying FDIC's Motion.) The Court set a bifurcated schedule: first, on the allocation of liability under the P&A Agreement as between the FDIC and JPMC; then on the merits of Deutsche Bank's repurchase claims. (May 11, 2011 Scheduling Conf. Tr. at 24.) The parties have completed fact and expert discovery as to the first item, and JPMC now moves for summary judgment that it bears no liability for Deutsche Bank's claims as to WMB repurchase obligations other than any Book Value for repurchase liabilities reflected on WMB's general ledger, subsidiary ledger, and supporting schedules as of September 25, 2008.[11]

## LEGAL STANDARD

### A. Summary Judgment

Summary judgment is required where "there is no genuine issue as to any material fact," so the "moving party is entitled to a judgment as a matter of law." *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 327 (1986); Fed. R. Civ. P. 1, 56. Once the movant identifies the absence of a genuine issue of material fact as to a necessary element, the other party must "do more than simply show that there is some metaphysical doubt as to the material facts": it "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e));

10 Deutsche Bank has no rights under the P&A Agreement and lacks standing to interpret that agreement; its interpretation of Section 2.1 is therefore legally irrelevant. (D.I. 106 at 6-9 (citing, *e.g.*, *GECCMC 2005-C1 Plummer St. Office Ltd. P'ship* v. *JPMorgan Chase Bank, N.A.*, 671 F.3d 1027, 1035 (9th Cir. 2012)).)

11 Section 2.1's meaning is also at issue in *North Carolina Dep't of Revenue* v. *FDIC*, No. 10-cv-505-RMC (D.D.C. filed Mar. 26, 2010); *JPMorgan Chase Bank, N.A.* v. *FDIC*, No. 12-cv-450 (RMC) (D.D.C. filed March 23, 2012); and *JPMorgan Chase Bank, N.A.* v. *FDIC*, No. 13-cv-1997 (RMC) (D.D.C. filed December 17, 2013).

*Celotex*, 477 U.S. at 324. It must do so by admissible evidence, not by supposition, conjecture, or "[t]he mere existence of a scintilla of evidence" in support of its position. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see also* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. 317. Neither evidence that is "merely colorable or is not significantly probative" nor disputes regarding immaterial facts can defeat summary judgment. *Anderson*, 477 U.S. at 247-50.

The interpretation of a contract is a question of law for the court. *See NRM Corp.* v. *Hercules, Inc.*, 758 F.2d 676, 682 (D.C. Cir. 1985) (citing *Pennsylvania Ave. Dev. Corp.* v. *One Parcel of Land in D.C.*, 670 F.2d 289, 292 (D.C. Cir. 1981)). In "divining the meaning of contract terms, the court is not limited to the four corners of the agreement: the party moving for summary judgment may submit . . . extrinsic evidence that gives color to the words of the agreement or otherwise reveals the intent of the contracting parties at the time of the agreement." *United Mine Workers of Am. 1974 Pension* v. *Pittston Co.*, 984 F.2d 469, 473 (D.C. Cir. 1993). Thus, "if a contract is facially ambiguous but extrinsic evidence as to the meaning of the ambiguous term demonstrates only one view is reasonable, a district judge may grant summary judgment." *Harbor Ins. Co.* v. *Schnabel Found. Co.*, 946 F.2d 930, 934 n.1 (D.C. Cir. 1991). "If [extrinsic] evidence demonstrates that only one view is reasonable—notwithstanding the facial ambiguity—the court must decide the contract interpretation question as a matter of law." *Farmland Indus., Inc.* v. *Grain Bd. of Iraq*, 904 F.2d 732, 736 (D.C. Cir. 1990).

**B. Contract Interpretation**

The P&A Agreement is "governed and construed in accordance with the federal law of the United States of America." (P&A Agr. ¶ 13.4.) Accordingly, federal common law controls here. *Hillside Metro Assocs., LLC* v. *JPMorgan Chase Bank, N.A.*, 747 F.3d 44, 49 (2d Cir. 2014) (federal common law governs interpretation of the P&A Agreement); *GECCMC 2005-C1 Plummer St. Office Ltd. P'ship* v. *JPMorgan Chase Bank, N.A.*, 671 F.3d 1027, 1032-

33 (9th Cir. 2012) (same). "Under federal common law, the court looks to general contract principles in interpreting the P&A Agreement." *Interface Kanner, LLC* v. *JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 932 (11th Cir. 2013); *see also NRM Corp.*, 758 F.2d at 681 (federal common law "dovetails precisely with general principles of contract law"). Those principles accord with the Restatement (Second) of Contracts (1981) (the "Restatement"). *E.g.*, *Bowden* v. *United States*, 106 F.3d 433, 439 (D.C. Cir. 1997) ("[W]e look to . . . the principles of the [Restatement], . . . since those principles represent a 'prevailing view' among the states . . . .").

Under these principles of contract law, courts begin with a contract's text, using interpretive canons that give "reasonable, lawful, and effective meaning to all [its] terms." *Colo. Interstate Gas Co.* v. *FERC*, 599 F.3d 698, 703 (D.C. Cir. 2010) (quoting Restatement § 203(a)). Such an interpretation is "preferred to an interpretation which leaves a part [of the contract] of no effect." *Id.* If the contract is ambiguous, courts turn to "extrinsic evidence that gives color to the words of the agreement or otherwise reveals the intent of the contracting parties *at the time of the agreement*." *United Mine Workers*, 984 F.2d at 473 (affirming grant of summary judgment). This evidence can include negotiation and drafting history, as well as the parties' subsequent conduct. (*See infra* Section I(B) and cases cited.)

Any ambiguity in a contract "must be construed against the drafter." *Segar* v. *Mukasey*, 508 F.3d 16, 25 (D.C. Cir. 2007); *see also Cole* v. *Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1486 (D.C. Cir. 1997). This doctrine—*contra proferentum*—"places the risk of latent ambiguity, lack of clarity, or absence of proper warning on the drafting party." *Valley Realty Co.* v. *United States*, 96 Fed. Cl. 16, 31 (Fed. Cl. 2010). It applies at summary judgment. *E.g.*, *id*. at 34; *Intel Corp.* v. *VIA Tech., Inc.*, 319 F.3d 1357, 1363 (Fed. Cir. 2003) (district court "properly granted summary judgment . . . relying on *contra proferentum*").

## ARGUMENT

### I. JPMC ASSUMED WMB'S OBLIGATIONS—INCLUDING THE REPURCHASE OBLIGATIONS AT ISSUE HERE—ONLY TO THE EXTENT THEY WERE BOOKED AS LIABILITIES ON WMB'S BOOKS AND RECORDS.

The P&A Agreement's text, its drafting and negotiation history, and the parties' course of conduct immediately following its execution all demonstrate that under the relevant provision of the P&A Agreement, JPMC agreed to assume WMB obligations only to the extent WMB had booked them as liabilities as of September 25, 2008.

#### A. The P&A Agreement Is Not Reasonably Susceptible to the FDIC's Excessively Broad Proposed Interpretation.

When "construing the terms of a contract, a court should begin with the text of the agreement itself, giving the language chosen by the parties—which is presumed to be the most reliable indicator of the parties' intent—its plain meaning." *PCH Mut. Ins. Co., Inc.* v. *Cas. & Sur., Inc.*, 750 F. Supp. 2d 125, 142 (D.D.C. 2010); *see also Ohio Power Co.* v. *F.E.R.C.*, 744 F.2d 162, 168 (D.C. Cir. 1984). "Where language has a generally prevailing meaning, it is interpreted in accordance with that meaning." Restatement § 202.

By the plain terms of Section 2.1 and the P&A Agreement more broadly, JPMC assumed only those WMB liabilities that had a Book Value as of September 25, 2008. Insofar as the obligations alleged by Deutsche Bank were not reflected as liabilities on WMB's books and records, or exceeded the Book Value reflected there, JPMC did not assume them. We address here the most natural reading of the P&A Agreement before explaining how all material extrinsic evidence confirms that reading of the P&A Agreement.

##### 1. JPMC's Understanding Is Consistent with Section 2.1's Plain Meaning; the FDIC's Proposed Interpretation Is Not.

Section 2.1 of the P&A Agreement provides:

> **2.1 <u>Liabilities Assumed by Assuming Bank</u>.** Subject to Sections 2.5 and 4.8, *the Assuming Bank expressly assumes at Book Value* (subject to adjustment pursuant to Article VIII) and *agrees to pay, perform, and discharge, all of the liabilities of the Failed Bank which are reflected on the Books and Records of the Failed Bank as of Bank Closing*, including the Assumed Deposits and all liabilities associated with any and all employee benefit plans, except as listed on the attached Schedule 2.1, and as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumed"). Notwithstanding Section 4.8, the Assuming Bank specifically assumes all mortgage servicing rights and obligations of the Failed Bank.

(P&A Agr. § 2.1.) Thus, JPMC assumed only WMB liabilities that were "reflected on the Books and Records" of WMB—*a specific source*—"as of Bank Closing"—*a specific date*—and only "at Book Value"—*a specific amount*. The P&A Agreement defines "Book Value" to mean "*with respect to . . . any Liability Assumed*, the dollar amount thereof stated on the Accounting Records of the Failed Bank." (P&A Agr. Art. I.) It defines "Accounting Records" in turn as "the general ledger and subsidiary ledgers and supporting schedules which support the general ledger balances." (*Id.*)

The most natural reading of these terms, read together and in context, is that what JPMC agreed to assume—and thus agreed to "pay, perform and discharge"—was the "Book Value" amounts of WMB liabilities that WMB had "reflected on" its books and records. To find that list of liabilities and their corresponding "Book Value[s]," one would naturally look to the defined source for "Book Value," *the place where WMB booked its liabilities*: WMB's general ledger, subsidiary ledger, and supporting schedules as of its closing. After all, for "*any* Liability Assumed," there is—*literally by definition*—a "Book Value": the "dollar amount thereof stated on" WMB's "general ledger and subsidiary ledgers and supporting schedules."

The FDIC has a different—and breathtakingly expansive—view of what it means for a liability to be "reflected on" WMB's "Books and Records," which requires it to ignore the reference to "Book Value" in the very same sentence: Section 2.1's reference to "Books and Records" was *not* meant to reference official corporate documents identifying WMB's booked



liabilities, but rather [redacted] (Ex. 901 (FDIC Resp.) No. 3.) To support this capacious reading, the FDIC claims that "Books and Records" means *any* document and *any* data *anywhere* at WMB, even in the most obscure corner of WMB's thousands of locations and petabytes of data: It says that phrase "refer[s] to 'any document, microfiche, microfilm and computer records (including but not limited to magnetic tape, disc storage, card forms and printed copy) of the Failed Bank generated or maintained by the Failed Bank that is owned by or in the possession of the Receiver at Bank Closing.'" (*Id*. Nos. 3 & 4; *see also* Van Fleet Tr. at 129:5-6, 134:10-13.)

The testimony of the FDIC's own witnesses demonstrates the remarkable breadth of its proposed interpretation. Mr. Van Fleet, [redacted] testified under oath [redacted] (Van Fleet Tr. at 134:19-135:11; *see also* Fenton Tr. at 103:6-14 (same).) [redacted] Mr. Gearin, testified [redacted] (Gearin Tr. at 140:11-22.) These frivolous assertions do not rise to the level of *genuine* issues of *material* fact.

The FDIC also claims that "assumes at Book Value" provides no context for "Books and Records," leaving unanswered [redacted] could possibly have a Book Value "stated on the Accounting Records" of WMB. More fundamentally, the FDIC maintains that [redacted] (Ex. 901 (FDIC Resp.) No. 12.) But

that position too runs counter to judicial precedent explaining the plain meaning of the disputed term. In *Viola* v. *Fleet Bank of Maine*, a federal district court confronted that very phrase, "assumes at Book Value," in Section 2.1 of a prior FDIC purchase and assumption agreement. *See* 1996 WL 498390 (D. Me. Feb. 27, 1996). In a decision affirmed by the First Circuit, the court there granted summary judgment in favor of the understanding JPMC has here and against the interpretation the FDIC now tenders. *Id*. at *3, *aff'd*, 94 F.3d 640 (1st Cir. 1996).

In *Viola*, a bank employee embezzled funds from a customer's account, reducing its book value on the bank's accounting records. *Id.* at *1-4. The bank was placed into an FDIC receivership, and the assuming bank entered into an FDIC purchase and assumption agreement under which it "assume[d] at Book Value" the failed bank's liabilities.[12] *Id.* at *3. The customer sued, arguing that the assuming bank had assumed liabilities beyond just the book value of his account. *Id.* at *3-4. The court rejected this argument, holding that the assuming bank owed only the amounts reflected on the failed bank's accounting records: "In section 2.1 of the Agreement the defendant assumed liability for the outstanding [liabilities] measured at book value, which is defined as the dollar amount stated on [the failed bank's] accounting records at the close of business. . . . *There is nothing ambiguous about this language[, which] cannot reasonably be read to encompass liability beyond the book value of the [liabilities]*." *Id*. at *3.

The language at issue here is equally clear—because it is substantively identical. As in *Viola*, JPMC only assumed and is "only obligated to pay" the "Book Value[s]" of WMB

---

12 Section 2.1 of the purchase and assumption agreement at issue in *Viola* reads, in pertinent part:

> The [Assuming Bank] hereby expressly *assumes at Book Value and agrees to pay, perform, and discharge* all of the following liabilities of [the Failed Bank] as of Bank Closing, except as otherwise provided in this Agreement (such liabilities hereinafter referred to as "Liabilities Assumed"): (a) demand Deposits, including outstanding cashier's checks and other official checks, and time and savings Deposits . . . .

*Id.* at *2.

liabilities shown on WMB's closing-day accounting records. *Id*. at *3. The FDIC was on notice of this decision as to the plain meaning of the "assumes at Book Value" language—and put it in the WMB P&A Agreement anyway. It cannot now claim a different meaning for that phrase.

### 2. The Use of "Books and Records" in Other Provisions of the P&A Agreement Confirms JPMC's Understanding of Section 2.1.

Although capitalized in Section 2.1, the term "Books and Records" is not defined in the P&A Agreement. The FDIC maintains—with no factual support—and relies on the notion that "Records" in "Books and Records" is correctly capitalized. But this is the sort of unsupported contention that cannot suffice to prevent summary judgment. Neither the P&A Agreement's drafters nor the FDIC principals who set the terms of the transaction recalled [REDACTED] and it immediately follows the *capitalized but undefined* term "Books," [REDACTED] (*See supra* Facts Section B.) The FDIC has identified no other purchase and assumption agreement [REDACTED] [REDACTED] (*See* Ex. 901 (FDIC Resp.) No. 10.) On the contrary, the term "Record" is used in every purchase and assumption agreement of which JPMC is aware—but only to *define the assuming institution's obligations to maintain and preserve the failed bank's documents and data* for the FDIC's use in administering the receivership. (*E.g.*, P&A Agr. Art. VI; Ex. 242 Art. VI.) The only plausible explanation is that the capitalization of "Books and Records" is a scrivener's error—albeit one on which the FDIC has hung its hat.

In contrast, the uncapitalized term "books and records" appears in the P&A Agreement a number of times, and "[t]erms in a document, especially terms of art, normally have the same meaning throughout the document in the absence of a clear indication that different

meanings were intended." *E.g.*, *Maryland Cas. Co.* v. *W.R. Grace & Co.*, 128 F.3d 794, 799 (2d Cir. 1997).[13] No such "clear indication" is evident here, so Section 2.1's "Books and Records" must be interpreted in light of the P&A Agreement's other uses of "books and records." Yet the FDIC's proposed interpretation of that phrase in Section 2.1 conflicts with the phrase's plain meaning in the two other provisions of the agreement that employ it in the context of identifying the failed bank's liabilities. Article VIII, for one, states in pertinent part:

> The Assuming Bank, as soon as practical after Bank Closing, in accordance with the best information then available, shall provide to the Receiver a Proforma Statement of Condition indicating all assets and liabilities of the Failed Bank *as shown on the Failed Bank's books and records as of Bank Closing and reflecting which assets and liabilities are passing to the Assuming Bank* and which assets and liabilities are to be retained by the Receiver.

The FDIC concedes that [REDACTED] (Ex. 901 (FDIC Resp.) No. 7; *see also* Gearin Tr. at 111:7-11; Held Tr. at 72:4-73:8.) Yet Article VIII plainly refers to some corporate listing of WMB's assets and liabilities; it does not, as the FDIC's proposed interpretation suggests, require JPMC to search high and low through all WMB documents and data to locate every contingent asset or liability WMB had yet to book. (*See* P&A Agr. Art. VIII.)

The other provision of the P&A Agreement that uses "books and records" in a similar context is the definition of "Deposit," which includes "all uncollected items included in the depositors' balances and *credited on the books and records* of the Failed Bank." (P&A Agr. Art. I.) The "credit[ing]" of items on "books and records" unambiguously connotes a specific

[13] *See also McLane & McLane* v. *Prudential Ins. Co. of Am.*, 735 F.2d 1194, 1195 (9th Cir. 1984) ("[W]e may presume that words have the same meaning throughout the contract."); *Dauphin* v. *Crownbrook*, 2013 WL 1498363, at *5 (E.D.N.Y. Apr. 11, 2013) ("[g]enerally, a word used by the parties in one sense will be given the same meaning throughout the contract in the absence of countervailing reasons").

subset of documents on which assets and liabilities—including deposit liabilities—are recorded, not just any "Record" of the bank as that term is defined in the P&A Agreement.

**3. JPMC's Understanding Accords with the Prevailing Meaning of "Books and Records" in the Context of Identifying Liabilities.**

The common meaning of the widely used phrase "books and records," when used in reference to an institution's assets and liabilities, also validates JPMC's understanding. The FDIC has gone to great lengths to demonstrate that "books and records" means various things in various contexts. (*See*, *e.g.*, Ex. 748 (Coffee Report).) But there can be no dispute as to the context in which that phrase is used *here*: It identifies liabilities. How federal regulators such as the FDIC—and the statutes and regulations that govern them—use the phrase "books and records" in similar contexts illuminates the meaning of that phrase here.

The FDIC's own governing laws, regulations, and guidance often use the phrase "books and records" to reference documents reflecting a depository institution's liabilities, just as the phrase is used here. When they do, it is perfectly clear that the phrase means not any "Record" but rather the documents on which the institution records its liabilities.

The Federal Deposit Insurance Act, for example, uses the phrase "books and records" to define what obligations do and do not qualify as "deposits":

> (A) any obligation of a depository institution which *is carried on the books and records* of an office [of a bank] located outside any State unless—
>
> (i) such obligation would be a deposit if it were *carried on the books and records* of the depository institution, and would be payable at, an office located in any State; and
>
> (ii) *the contract evidencing the obligation* provides by express terms, and not by implication, for payment at an office of the depository institution located in any State.

12 U.S.C. § 1813(*l*)(5)(A). *First*, this provision shows that a depository institution and its out-of-state office have different sets of "books and records" on which obligations are "carried"—an obvious reference to financial accounting documents. *Second*, contrary to the FDIC's position

here, this provision of the FDIC's own organic statute expressly differentiates "books and records" on which obligations are "carried" from "contract[s] evidencing the obligation[s]."

Similarly, Section 1831g of the law provides that if a bank enters into certain contracts that adversely impact its financial soundness, the FDIC can require it to "reflect the transaction on its books and records." 12 U.S.C. § 1831g. That is, the mere existence of a transaction or contract does not mean the associated obligations are "reflect[ed]" on the bank's "books and records"—that is a separate step the FDIC may mandate.

The FDIC's own usage is in accord:

- The FDIC's own "Resolutions Handbook" describes how it was once FDIC practice to reveal to bidders "only the *book value* of the assets, which is the *principal amount* shown on the failing institution's *books or records*." (Ex. 767 (FDIC Resolutions Handbook) at 9.) This description self-evidently refers to accounting documents.

- FDIC regulation 12 C.F.R. § 330.3(e)(2) refers to deposit liabilities being "carried" on a bank's "books and records." Deposit liabilities are invariably "carried" on banks' accounting ledgers. *See*, *e.g.*, *Duffy* v. *Mut. Benefit Life Ins. Co.*, 272 U.S. 613, 619 (1926) (for liabilities to be "carried on the books as a liability" is a "form of bookkeeping to balance assets"); *see also Comm'r* v. *Indianapolis Power & Light Co.*, 493 U.S. 203, 205 (1990) ("deposits were carried on [respondent's] books as current liabilities"); *Am. Nat'l Co.* v. *United States*, 274 U.S. 99, 102 (1927) ("total amount of [a company's] liability on [] bonus contracts was carried on its general ledger under a control account").

- In providing guidance on FDIC practices for determining liability account balances at a failed insured depository institution—a context directly relevant here—the FDIC has explained that certain values "will be determined as they rest on the *books and records* of the depository institution *as reflected in its end-of-day ledger balances*." Processing of Deposit Accounts in the Event of an Insured Depository Institution Failure, 74 Fed. Reg. 5797, 5799 (Feb. 2, 2009).

- More broadly, the FDIC has stated that it "will make its claims determinations based on deposit and other *account balances reflected on the books and records* of the depository institution after all normal end-of-day processing has been completed." *Id.* at 5800.

- The FDIC requires certain institutions to "maintain [their] books and records in accordance with the principles of accrual accounting." FDIC Statement of Policy: Applications for Deposit Insurance, 63 Fed. Reg. 44752, 44758 (Aug. 20, 1998).

- Even FDIC personnel less involved in the transaction [redacted]

[redacted] (Yore Tr. at 134:2-15.)

FDIC's own usage of "books and records" directly conflicts with its litigation position here but confirms that the "books and records" reflecting liabilities are financial accounting documents.

### 4. JPMC's Understanding Comports with Judicial Precedent on the Use of "Books and Records" in Purchase and Assumption Transactions.

Courts have consistently ruled that assuming banks in purchase and assumption transactions do *not* assume unliquidated or contingent liabilities. *See*, *e.g.*, *Santopadre* v. *Pelican Homestead & Sav. Ass'n*, 937 F.2d 268, 272 (5th Cir. 1991) (even where "agreement purports to transfer all the closed bank's liabilities," unliquidated litigation liabilities were not "on the books and records" of the failed bank and thus not transferred).

The reason for this line of precedent is telling: Assuming banks do not assume unliquidated liabilities precisely so that the parties are "able to rely on the *books and records* of the [failed bank] in determining its net worth," thus allowing a transaction to "take place in [a] timely fashion." *Id.*; *cf. In re Collins Sec. Corp.*, 998 F.2d 551, 554-55 (8th Cir. 1993) (treating "books and records" and "account records" as synonymous). "Undoubtedly very few, if any, banks would enter into purchase and assumption agreements with a federal receiver if the successor banks had to assume [] latent claims of unknown magnitude." *Vernon* v. *RTC*, 907 F.2d 1101, 1109 (11th Cir. 1990); *see also Village of Oakwood* v. *State Bank & Trust Co.*, 519 F. Supp. 2d 730, 738 (N.D. Ohio 2007) ("[A]n assuming bank would rarely be inclined to enter a P&A agreement with the FDIC knowing that it could be taking on unidentified liabilities of undefined dimensions that could arise at some uncertain date in the future."), *aff'd*, 539 F.3d 373 (6th Cir. 2008). Here, though, the FDIC claims that contingent and unliquidated liabilities were *on* WMB's books and records, which would render nonsensical these courts' distinction between "latent claims of unknown magnitude" and those liabilities "on the books and records."

**5. JPMC's Understanding Honors the Rule Against Surplusage; the FDIC's Proposed Interpretation Offends It.**

It is a fundamental tenet of contract interpretation that "an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect"—courts assume no part is "superfluous." Restatement § 203 & cmt. b; *see also*, *e.g.*, *Air Line Pilots Ass'n Int'l* v. *Pension Benefit Guar. Corp.*, 193 F. Supp. 2d 209, 218 n.4 (D.D.C. 2002) ("It is a well-established principle that when interpreting statutes or contractual provisions, a court should 'absent a clear indication to the contrary, . . . read the statute [or provision] so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless or nugatory.'"), *aff'd*, 334 F.3d 93 (D.C. Cir. 2003); *Tax Analysts* v. *I.R.S.*, 217 F. Supp. 2d 23, 28 (D.D.C. 2002) (same).

Here, though, the FDIC would read *two* phrases out of a single sentence:

*First*, the FDIC reads "Books" right out of the phrase "Books and Records," because "Record" is defined to include virtually any information generated or maintained by WMB. (*See* Ex. 901 (FDIC Resp.) Nos. 3 & 4.) [redacted]

*Second*, the FDIC reads the phrase "at Book Value" out of Section 2.1. Mr. Gearin, [redacted] (Gearin Tr. at 134:2-7.) Likewise, Mr. Held [redacted]

[redacted] (Held Tr. at 80:13-18.) The FDIC Receiver-in-Charge and the P&A Agreement's other [redacted] (Schoppe Tr. at 248:11-249:19; Van Fleet Tr. at 49:18-22, 154:11-18.) There is no evidence that anyone at the FDIC ever informed JPMC that the "at Book Value" qualifier—though construed in *Viola* as an important limitation on liabilities assumed—was a vestigial mistake that meant *nothing at all* here. That suggestion offends fundamental principles of contract interpretation, which mandate "that no word, clause, sentence, or phrase is rendered . . . meaningless." *Air Line Pilots Ass'n Int'l*, 193 F. Supp. 2d at 218 n.4.

**B. The Undisputed Extrinsic Evidence Uniformly Supports JPMC's Understanding and Contravenes the FDIC's Proposed Interpretation.**

Like the plain meaning of the P&A Agreement, the undisputed extrinsic evidence is consistent with JPMC's understanding and inconsistent with the FDIC's proposed interpretation. Where extrinsic evidence "demonstrates that only one view is reasonable . . . the court must decide [a] contract interpretation question as a matter of law." *Farmland Indus., Inc.*, 904 F.2d at 736 (citing three D.C. Court of Appeals decisions in accord). Here, if the Court deems such an analysis necessary, undisputed extrinsic evidence concerning the P&A Agreement's creation and execution, and the parties' course of conduct immediately after the transaction, shows that the parties acted according to JPMC's understanding in drafting, entering into, and carrying out the P&A Agreement.

**1. The Negotiation History Supports JPMC's Understanding.**

"[N]egotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish . . . the meaning of the writing, whether or not integrated."

Restatement § 214; *see*, *e.g.*, *NRM Corp.*, 758 F.2d at 682-83 ("Courts construing federal contracts . . . consistently have examined all the circumstances surrounding the [contract] negotiations to determine the intent of the parties."). Here, the FDIC [redacted] (*See* Ex. 129 (FAQs); Bessey Tr. at 25:8-11, 179:3-180:7, 312:18-22; Eitel Tr. at 106:5-25.) That said, JPMC and the FDIC did discuss some of the P&A Agreement's terms in the two days before its execution. (*See supra* Facts Section D.)

Remarkably, [redacted] (*See* Ex. 66.) [redacted] (*See id.*) [redacted] (*Id.*)

In particular, Mr. Gearin, [redacted] (*Id.*) [redacted] (*See* Cooney Tr. at 190:7-12.) [redacted] (*Id.* at 190:7-9.) [redacted]

[redacted] (*Id.* at 191:19-20.) [redacted] (Eitel Tr. at 142:8-10; *see also* Ex. 466.) [redacted] (*See*, *e.g.*, Bessey Tr. at 185:8-187:15; Lipsitz Tr. at 108:21-110:15, 114:5-11; Rivas Tr. at 146:11-15.) [redacted]

[redacted] (Ex. 66) [redacted] (*Id.*) [redacted] (*See id.*)

What Mr. Gearin did next is telling: [redacted] (*Id.*; Ex. 902 (JPMC_DBNTC_0000006549-51); P&A Agr. § 12.1.) There is no evidence that at any time during discussions of the P&A Agreement, the FDIC [redacted]

**2. Even If the FDIC Had the Subjective Intent It Now Claims, That Unexpressed Intention Is Irrelevant as a Matter of Law.**

Extrinsic evidence contradicts the FDIC's claim that its intent in September 2008 was that "reflected on the Books and Records" should reach as broadly as the term "Record."[14] But even if that *were* the FDIC's subjective intent, there is no evidence that anyone there communicated that intent to JPMC. Such a "subjective unexpressed, uncommunicated" intent creates no genuine issue of material fact. *See*, *e.g.*, *NTA Nat'l, Inc.*, 511 F. Supp. at 223; *see also Horn & Hardart Co.* v. *Nat'l R.R. Passenger Corp.*, Civ. A. No. 85-0820, 1985 WL 9426, at *4 (D.D.C. May 30, 1985). The FDIC gave JPMC "objective manifestations of intent" to the contrary, so its supposed unexpressed interpretation is of no legal consequence. *See Hood* v. *District of Columbia*, 211 F. Supp. 2d 176, 180 (D.D.C. 2002); *see also Serv. Emps. Int'l Union Local 32BJ* v. *Diversified Servs. Grp.*, 958 F. Supp. 2d 166, 172 (D.D.C. 2013).

**3. The Drafting History Supports JPMC's Understanding and Undermines the FDIC's Contention That It Had Formed Its Proposed Interpretation On or Before September 25, 2008.**

A contract's "meaning" can be "further made clear by other circumstances surrounding [its] drafting." *Fox* v. *Office of Pers. Mgmt.*, 100 F.3d 141, 144 (Fed. Cir. 1996); *see also Watts* v. *Carlson*, 854 F.2d 528, at *2 (D.C. Cir. 1988); *Nat'l Austl. Bank* v. *United States*, 452 F.3d 1321, 1329 (Fed. Cir. 2006); *see generally United Mine Workers*, 984 F.2d at

---

14 The FDIC claims its position is supported by [REDACTED] (Ex. 901 (FDIC Resp.) No. 3 (quoting Ex. 79).) [REDACTED] (Ex. 79; *see also supra* note 6.) [REDACTED] Even assuming this were Mr. Wigand's intent, there is no evidence that it was expressed to JPMC, and thus it has no bearing on the meaning of the P&A Agreement. *See*, *e.g.*, *NTA Nat'l Inc.*, 511 F. Supp. at 223 ("[T]he subjective unexpressed, uncommunicated thoughts of a party are irrelevant to the material issue of the parties' intent." (quoting *Union Bank* v. *Winnebago Indus., Inc.*, 528 F.2d 95, 99 (9th Cir. 1975))); Restatement § 212, cmt. a ("[T]he relevant intention of a party is that manifested by him rather than any different undisclosed intention.").

473. Here, objective extrinsic evidence concerning the FDIC's insertion of the disputed phrase "which are reflected on the Books and Records of the Failed Bank" contravenes the FDIC's proposed interpretation of Section 2.1.

As described above, on September 23, 2008, (Ex. 253.) Instead, (*Id.*) Soon thereafter, the FDIC's (Ex. 903 (FDIC-DB0017573).) The answer was clearly yes, as the next draft of the P&A Agreement circulated featured a version of Section 2.1 that had been modified as follows:



(Ex. 256 (changes tracked to compare Ex. 255 to Ex. 253).) (*See* Ex. 255; Ex. 903 (FDIC-DB0017573); *compare* Ex. 253 § 2.1 *with* P&A Agr. § 2.1.) And why? Mr. Gearin said

[redacted] (Gearin Tr. at 92:6-11.) [redacted] (*Id.* at 99:18-21.)

**4. The Parties' Conduct Comports with JPMC's Understanding.**

If there were any doubt as to the parties' shared understanding of the liabilities JPMC assumed, it is dispelled by the parties' post-transaction course of dealing. The FDIC's actions in regard to analogous liabilities immediately following the transaction conflict directly with the position it now advances. Although this dispute centers on RMBS repurchase liabilities, Section 2.1 is not RMBS-specific. Rather, with exceptions irrelevant here, it covers "all of the liabilities reflected on the Books and Records of the Failed Bank as of Bank Closing." How the parties treated liabilities analogous to RMBS repurchase obligations, such as tax liabilities, and what they said about those liabilities, is clearly probative of the parties' understanding of the contract. *See*, *e.g.*, *Tymshare, Inc.* v. *Covell*, 727 F.2d 1145, 1150 (D.C. Cir. 1984) (Scalia, J.) ("historical interpretation given to a contract" through the parties' course of dealing "is strong evidence of its meaning"). The D.C. Circuit and other courts have long held that "the practical interpretation of a contract by the parties to it for any considerable period of time *before it comes to be the subject of controversy* is deemed of great, if not controlling, influence." *Green* v. *Obergfell*, 121 F.2d 46, 59 n.39 (D.C. Cir. 1941) (quoting *Old Colony Trust Co.* v. *Omaha*, 230 U.S. 100, 118 (1913)); *see also Schultz* v. *Metro. Life Ins. Co.*, 872 F.2d 676, 679 (5th Cir. 1989) ("[C]onduct of the parties *before the advent of a controversy* may be relied upon to discover the parties' understanding of the contract.").

Here, just as it did prior to the parties' entering into the P&A Agreement, the FDIC gave JPMC explicit assurances immediately after the transaction that comport with JPMC's understanding and contravene the interpretation the FDIC now proposes. The FDIC repeatedly and categorically informed JPMC and third parties that pre-closure WMB tax

liabilities asserted for the first time only after WMB's closure—and thus, not "reflected on the Books and Records of [WMB] as of Bank Closing"—did not transfer to JPMC but instead remained with the FDIC.[15] Less than two weeks after the P&A Agreement was executed, the FDIC's Mr. Peyster expressly informed JPMC that, "[w]ith regard to any tax liability arising out of an ongoing or future audit, where no assessment had been made prior to the date of closing, *such liability would not pass to [JP]Morgan*." (Ex. 29.) That same day, [REDACTED] (Ex. 108.) Similarly, as early as October 2008 and as late as January 2009, the FDIC's Mr. Thormahlen wrote letters to state taxing authorities informing them that any pre-closure tax period "*was not assumed by JP Morgan Chase Bank, NA*" and that "[t]he liability reflected on the attached return *is a claim against the receivership*." (Ex. 30; *see also* Exs. 404, 416.)

Only *after* Deutsche Bank commenced this action—and after the end of the financial crisis—did the FDIC abruptly change its tune. In January 2010, for example, the FDIC disallowed a proof of claim from the North Carolina Department of Revenue regarding post-closure WMB taxes on the ground that liability had "transferred to JPMorgan Chase" under the P&A Agreement. (D.I. 1-3, No. 10-cv-505 (RMC).) When North Carolina sued the FDIC and JPMC over that assessment, the FDIC unilaterally settled North Carolina's claims against *both*

---

[15] In addition to tax liabilities, JPMC suspects that the FDIC's course of conduct with respect to other similarly situated liabilities also supports JPMC's position. In 2012, though, the FDIC sought to limit the scope of discovery, arguing that "the discovery of other specific liabilities that are not at issue in this case will not resolve the issues alleged" by Deutsche Bank. (D.I. 113 at 16.) The Court cabined JPMC's ability to inquire as to other liabilities to "limited discovery on tax liabilities" under the P&A Agreement. (D.I. 124; *see also* D.I. 125 at 65-66.)

the FDIC *and JPMC*.[16] (*See* D.I. 57, No. 10-cv-505 (RMC).)

The FDIC's own words best illustrate its reversal:

| **Immediately Following WMB Transaction** | **After Deutsche Bank Files Suit** |
|---|---|
| FDIC to "State Tax Agency" on October 20, 2008 (Ex. 30): The tax period on the attached return occurred prior to [WMB's] closure and was not assumed by JP Morgan Chase Bank, NA. The liability reflected on the attached return is a claim against the receivership. | FDIC to Ohio on July 3, 2012 (Am. Compl. Ex. LL, No. 12-cv-450 (RMC)): [A]ny tax obligation that WMB owed to Ohio for tax periods prior to WMB's closure was reflected on WMB's books and records when WMB was closed and, therefore, was transferred to and assumed by JPMC under Section 2.1 of the P&A Agreement. |

The FDIC now claims that this body of consistent external communications [redacted] [redacted] and is [redacted] (Ex. 901 (FDIC Resp.) Nos. 17 & 18.) Yet the P&A Agreement's principal architects at the FDIC *and* the FDIC officials charged with administering the receivership [redacted] *and yet no one at the FDIC informed JPMC of the FDIC's current interpretation until almost a year later*. (*See* Exs. 29, 108, 519.) There is no plausible explanation why, if the FDIC's understanding in the *weeks and months* following the transaction were the same as the FDIC's *current* position, the FDIC failed to inform JPMC that the FDIC's *actual* understanding of the contract was the opposite of the FDIC's prior assurances. The FDIC's course of dealing concerning other, similarly situated WMB liabilities prior to Section 2.1's becoming "the subject of controversy" merits "great, if not controlling, influence" on the evaluation of the parties' intentions. *See Green*, 121 F.2d at 59 n.39. It is yet another reason that the FDIC's implausible, made-for-litigation interpretation of Section 2.1 should be rejected.

---

[16] Not only did the FDIC suddenly begin denying responsibility for post-closure assessments for WMB taxes, it also began actively encouraging taxing authorities to pursue JPMC for those assessments *even if the claims in question were barred because taxing authorities had not filed a timely claim with the FDIC receivership*. (*See* D.I. 23 at 7-15, No. 12-cv-450 (RMC).) This FDIC tactic the Court called "irresponsible." (March 21, 2013 Oral Argument Tr. at 39:10, No. 12-cv-450 (RMC).)

## II. WMB'S SELLER REPURCHASE OBLIGATIONS ARE NOT "MORTGAGE SERVICING RIGHTS AND OBLIGATIONS."

In its motion to dismiss the Amended Complaint, the FDIC asserted that JPMC assumed WMB's repurchase obligations pursuant to the last sentence of Section 2.1 of the P&A Agreement, saying JPMC "'specifically assume[d]' . . . 'all *mortgage servicing rights and obligations*'" of WMB. (D.I. 54-1 at 28; *see also* Am. Compl. ¶¶ 38.) The FDIC claimed that Section 2.1 and its asset-purchase analog, Section 3.1, "necessarily reflect[] JPMC's irrevocable assumption of the entire agreements containing 'all the mortgage servicing rights and obligations'" and that those same agreements imposed seller repurchase obligations on WMB. (D.I. 54-1 at 28 (citing Am. Compl. ¶ 43).) The FDIC appears to have abandoned this argument, its own witnesses largely disavowed it, and no evidence was adduced in support of it.

As noted above, the FDIC explained to the Ninth Circuit that an entity may enter into an RMBS PSA "in two different capacities": seller and servicer. (Ex. 916 (FDIC Ninth Circuit Brief) at 2.) The servicer and the seller bear distinct obligations, even if they are the same party. (*Id*. at 3.) The FDIC successfully argued in that action that, in such a situation, seller repurchase obligations are *not* mortgage servicing obligations. *See Deutsche Bank Nat'l Trust Co.* v. *FDIC*, 784 F. Supp. 2d 1142, 1154 (C.D. Cal. 2011).

The FDIC made the same argument in this very District in another IndyMac matter. (*See* Ex. 917 (FDIC-Receiver Reply Mem. in Support of Mot. to Dismiss, *MBIA Ins. Corp.* v. *IndyMac Fed. Bank, F.S.B.*, 816 F. Supp. 2d 81 (D.D.C. 2011) (No. 09-cv-1011 (ABJ)), ECF No. 32 ("FDIC *IndyMac* Reply")) at 14.) Section 2.1 of the IndyMac purchase and assumption agreement transferred to a bridge bank all "duties and obligations under any contract pursuant to which the Failed Bank provides mortgage servicing for others" and "duties and obligations under any contract pursuant to which the Failed Bank holds mortgage servicing

rights." (Ex. 918 (IndyMac purchase & assumption agreement) § 2.1.) Section 3.1 there transferred "mortgage servicing rights and related contracts." (*Id.* at § 3.1.) Despite this language—which is broader than the language here transferring just "mortgage servicing rights and obligations"—the FDIC argued in *IndyMac* that the agreement there "did *not* transfer to [the bridge bank] any 'non-servicing obligations and liabilities as a result of [the failed bank's] acts or omissions in connection with the origination or sale of [mortgage] loans.'" (Ex. 919 (FDIC-Receiver Mem. in Support of Mot. to Dismiss, *IndyMac*, ECF No. 26-1) at 9 (emphasis in original).) Rather, "all seller obligations . . . were not passed on to [the bridge bank], but remained with the . . . receivership estate." (Ex. 917 (FDIC *IndyMac* Reply) at 14.)

WMB was both seller and servicer for certain RMBS at issue, but there is no disputing that its obligations were bifurcated by capacity—seller vs. servicer—just as IndyMac's were. The FDIC's key personnel conceded [REDACTED] (*See*, *e.g.*, Wigand Tr. at 277:18-278:2; Gearin Tr. at 242:19-243:2.) [REDACTED] Neither the FDIC nor the person it proffered as an RMBS expert pointed to any contrary evidence. Indeed, the FDIC's putative expert [REDACTED] (Oldfield Tr. at 53:19-21.)

As such, there is no material fact suggesting that the seller repurchase obligations at issue here are "mortgage servicing . . . obligations," so those obligations cannot have been transferred to JPMC pursuant to the second sentence of Section 2.1 of the P&A Agreement.

## CONCLUSION

JPMC and WMMSC respectfully request that the Court grant them summary judgment that JPMC assumed liability for the disputed repurchase obligations only to the extent that WMB's liability was reflected at a Book Value on WMB's financial accounting records and that any liability exceeding the Book Value reflected there remained with the FDIC.

Dated: June 20, 2014
Washington, D.C.

Respectfully submitted,

/s/ Brent J. McIntosh

Brent J. McIntosh (D.C. Bar No. 991470)
Mia Whang Spiker (D.C. Bar No. 1004939)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006
Telephone: (202) 956-7500
Facsimile: (202) 293-6330
Email: mcintoshb@sullcrom.com

Robert A. Sacks (D.D.C. Bar No. MI0069)
Ian D. McDonald (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel for Defendants JPMorgan Chase Bank, N.A. and Washington Mutual Mortgage Securities Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a true and correct copy of JPMorgan Chase Bank, N.A. and Washington Mutual Mortgage Securities Corporation's Motion for Summary Judgment and Memorandum in Support of Their Motion for Summary Judgment to be served via electronic mail, with consent, on June 20, 2014 on the following:

Robin A. Henry
Motty Shulman
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, New York 10504
Telephone: (914) 749-8200
Facsimile: (914) 749-8300

*Counsel for Plaintiff Deutsche Bank National Trust Company, as Trustee for the Trusts listed in Exhibits 1-A and 1-B, for all claims except with respect to paragraph 97 of the Complaint*

Talcott J. Franklin
TALCOTT FRANKLIN P.C.
208 North Market Street, Suite 200
Dallas, Texas 75202
Telephone: (214) 736-8730
Facsimile: (877) 577-1356

*Counsel for Plaintiff Deutsche Bank National Trust Company, as Trustee for the Trusts listed in Exs. 1-A and 1-B*

Scott H. Christensen
William Robert Stein
Jason Samuel Cohen
HUGHES HUBBARD & REED, LLP
1775 I Street, N.W.
Suite 600
Washington, D.C. 20006
Telephone: (202) 721-4644
Facsimile: (202) 721-4646

Anne M. Devens
FEDERAL DEPOSIT INSURANCE CORPORATION
3501 Fairfax Drive
Room VS-D-7062
Arlington, Virginia 22207
Telephone: (703) 562-2204

*Counsel for Defendant Federal Deposit Insurance Corporation as Receiver for Washington Mutual Bank*

/s/ Mia Whang Spiker
Mia Whang Spiker

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee for the Trusts listed in Exhibits 1-A and 1-B,

Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for Washington Mutual Bank; JPMORGAN CHASE BANK, National Association; and WASHINGTON MUTUAL MORTGAGE SECURITIES CORPORATION,

Defendants.

Case No. 1:09-cv-1656 (RMC)

**UNDER SEAL**

**STATEMENT OF MATERIAL FACTS**
**AS TO WHICH THERE IS NO GENUINE ISSUE**
**IN SUPPORT OF JPMORGAN CHASE BANK, N.A. AND**
**WASHINGTON MUTUAL MORTGAGE SECURITIES CORPORATION'S**
**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h), JPMorgan Chase Bank, N.A. ("JPMC") and Washington Mutual Mortgage Securities Corporation set out below their Statement of Material Facts as to Which There Is No Genuine Issue in support of their Motion for Summary Judgment.

**A. The FDIC Approached JPMC About a Potential WMB Transaction.**

**1.** Washington Mutual Bank ("WMB") was a federally chartered savings and loan institution. (*See* Ex. 163.)[1]

**2.** In September 2008, at the apex of the global financial crisis, WMB showed signs of financial distress, including suffering a run on deposits. (*See* Docket Item ("D.I.") 54-1 at 5.)[2]

---

[1] Citations to "Ex." refer to exhibits to the joint appendix to be submitted following the close of briefing.

**3.** On or about September 16, 2008, Sheila Bair, then-Chairman of the Federal Deposit Insurance Corporation (the "FDIC"), reached out to Jamie Dimon, JPMorgan Chase & Co.'s CEO, to "pitch[] an open bank transaction" for WMB. (Ex. 135.)

**4.** Open bank transactions are "normally stock sales," so the acquiring bank "assumes or acquires the business," not just its assets and liabilities. (*See* [redacted] Ex. 767 (FDIC Resolutions Handbook) at 47.)

**5.** On September 22, 2008, FDIC officials [redacted] (*See* Ex. 142; Wigand Tr. at 109:12; Scharf Tr. at 37:6-38:15.)

**6.** Mr. Wigand was then Deputy Director of the FDIC's Franchise and Asset Marketing Branch. (Wigand Tr. at 17:9-10.)

**7.** Mr. Held was then Assistant Director of the FDIC's Division of Resolutions and Receiverships. (Held Tr. at 18:4-5.)

**8.** Mr. Gearin was then [redacted] (Gearin Tr. at 21:18-20.)

**B. The FDIC Drafted the P&A Agreement.**

**9.** [redacted] FDIC [redacted], "principally drafted" the purchase and assumption agreement that governed the WMB transaction (the "P&A Agreement"). (Ex. 901 (FDIC Response to JPMC Interrogatory ("FDIC Resp.")) No. 1.)

**10.** [redacted] drafted the P&A Agreement "based on instructions" from [redacted] (*Id.*)

**11.** FDIC attorneys and managers prepared the P&A Agreement based on [redacted] (Ex. 242; *see also* Ex. 901 (FDIC Resp.) No. 1; Ex. 904 (April 9, 2013 email from S. Christensen); Van Fleet Tr. at 21:4-8.)

**12.** According to the FDIC, "whole bank" denotes a transfer of all of a failed bank's assets but does not mean the same for its liabilities. (*See* Ex. 767 (FDIC Resolutions Handbook) at 27-29; [redacted]

**13.** [redacted] (Wigand Tr. at 71:13-14.)

**14.** The FDIC offered bidders five alternative transaction structures. The FDIC prepared a [redacted]

---

2 Unless otherwise indicated, "D.I." refers to docket items in this action, *Deutsche Bank National Trust Co. v. FDIC*, No. 09-cv-1656 (RMC) (D.D.C.).

3 [redacted] (*Id.*)



(*See*, *e.g.*, Ex. 255.) (*See*, *e.g.*, Ex. 276.) (Ex. 255.)

**15.** On September 23, 2008, (Ex. 253.) Section 2.1 of this draft read:

(*Id.*) This version of the agreement proposed (*See id.*)

**16.** Sheri Foster was then an she testified that she (Foster Tr. at 31:18-20, 57:16-21.)

**17.** Later on September 23, 2008,

(Ex. 903 (FDIC-DB0017573) (line breaks removed).)

**18.** The FDIC produced this email to JPMC only after JPMC had deposed all of the participants in the email communication. The existence of this email was first revealed to JPMC at (Gearin Tr. at 108:16-109:2, 136:12-22.) JPMC wrote the FDIC on July 29, 2013 and again on August 23, 2013 to request the email's production or identification of its corresponding entry on the FDIC's privilege log. (Ex. 905 (July 29, 2013 letter from B. McIntosh to S. Christensen); Ex. 906 (Aug. 23, 2013 email from B. McIntosh to S. Christensen).) On August 27, 2013, the FDIC withdrew its privilege assertion and produced the email to JPMC. The FDIC stated that the "email was properly withheld as privileged" but was



being produced [redacted] (Ex. 907 (Aug. 27, 2013 letter from S. Christensen to B. McIntosh).)

**19.** Later on September 23, 2008, [redacted] (Ex. 255.) Section 2.1 of this draft had been revised to read:

> [redacted]

(*Id.*) In this draft, the liabilities to be assumed were [redacted] (*Id.* (emphasis added).) Schedule 2.1 in this version of the agreement, in contrast to prior versions, [redacted] (*Id.*)

**20.** The FDIC has stated that the [redacted] (Ex. 901 (FDIC Resp.) No. 1.)

**21.** Mr. Gearin testified that this limitation was [redacted] (Gearin Tr. at 92:6-11.)

**22.** When they were deposed, neither [redacted] (Gearin Tr. at 94:7-95:22; Van Fleet Tr. at 131:22-132:11.)

**23.** Both Messrs. Gearin and Van Fleet stated that [redacted] (Gearin Tr. at 94:18-21 [redacted] Van Fleet Tr. at 137:6-13 [redacted]

**24.** Mr. Gearin said [redacted]

> [redacted]



[redacted]

(Gearin Tr. at 94:7-17.)

**25.** [redacted] (*Id*. at 95:16-19.)

**26.** Mr. Van Fleet [redacted] (Van Fleet Tr. at 127:10-12; Gearin Tr. at 94:7-11.)

**27.** Mr. Van Fleet also did not recall [redacted]

[redacted]

(Van Fleet Tr. at 131:22-132:11.)

**28.** Mr. Wigand does not recall [redacted] (*See* Wigand Tr. at 153:3-6.)

**29.** Mr. Wigand testified, [redacted] (*Id.*)

**30.** The capitalization of "Books and Records" is [redacted] (*See* Ex. 901 (FDIC Resp.) No. 10.)

**31.** Mr. Held does not recall [redacted] (Held Tr. at 72:19-73:2.)

**32.** Mr. Held professed ignorance as to [redacted] (*Id.*)

## C. The FDIC Provided Bidders the Draft P&A Agreement.

**33.** Over the weekend of September 20, 2008, Ms. Foster [redacted] (Foster Tr. at 22:17-22, 57:19-58:4.)

**34.** As of the afternoon of September 23, 2008, JPMC did not have access to the FDIC IntraLinks site. [redacted]

**35.** Later on during September 23, 2008, [redacted] (Ex. 55.)

**36.** Also on September 23, 2008, [redacted] (Ex. 157.)

**37.** Also on September 23, 2008, the FDIC provided bidders [redacted] (Exs. 56, 57, 61, 422.)

**38.** In receivership transactions, the FDIC typically provides bidders an "information package" that reflects "the amounts and types of assets and liabilities that the failing institution holds." (Ex. 767 (FDIC Resolutions Handbook) at 8.)

**39.** The FDIC did not provide [redacted] (Van Fleet Tr. at 107:16-108-20; *see also* Yore Tr. at 58:8-59:8.)

**40.** The FDIC first provided bidders [redacted] (*See* Exs. 257, 276; Ex. 908 (JPMC_DBNTC_ 0000015659).)

**41.** The posted version of the agreement [redacted] (*See* Ex. 276.)

**42.** No draft of the agreement included [redacted] (*See* Ex. 8 (Sept. 24, 2008 draft); Ex. 270 (Sept. 25, 2008 final pre-execution copy).)

**43.** No draft of the agreement included [redacted] (*See* Ex. 8 (Sept. 24, 2008 draft); Ex. 270 (Sept. 25, 2008 final pre-execution copy).)



**44.** On September 24, 2008, the FDIC (Exs. 71, 129 (the "FAQs").)

**D. JPMC and the FDIC Discussed the P&A Agreement's Terms.**

**45.** Section 12.1

(Ex. 276 § 12.1.)

**46.** On September 23, 2008, JPMC outside counsel Mitchell Eitel (*Id.* at 143:13-23.)

**47.** Mr. Gearin wrote

**48.** Later on during September 23, 2008, Mr. Cooney responded to Mr. Gearin's email as follows:

(*Id.*)

**49.** Later on September 23, 2008, Mr. Gearin responded: [redacted] (*Id.*)

**50.** Mr. Cooney testified that:

[redacted]

(Cooney Tr. at 183:19-184:12.)

**51.** On September 24, 2008, JPMC proposed [redacted] (Ex. 78.) The FDIC did not accept this change. (*See* Ex. 1 (P&A Agr.) § 2.5.) [redacted] (*See* Ex. 78; *see also* Cooney Tr. at 240:9-241:6.)

**52.** Mr. Eitel provided the FDIC [redacted] (*See* Exs. 468, 469; Ex. 902 (JPMC_DBNTC_0000006549-51).)

**53.** On September 25, 2008, Mr. Eitel proposed [redacted] (Ex. 902 (JPMC_DBNTC_0000006549-51).)

**54.** The FDIC incorporated this proposed change into the P&A Agreement. (*See* P&A Agr. § 12.1.)

**E. JPMC Submitted a Bid, and Regulators Closed WMB.**

**55.** On the evening of September 24, 2008, JPMC submitted a bid [redacted] in the amount of $1.888 billion. (*See* Ex. 58.)

**56.** JPMC's bid was the only conforming bid the FDIC received. (*See* Ex. 134 at 9; Ex. 599.)

**57.** [redacted] (*See* Ex. 476; Ex. 909 (FDIC-DB0017510-11); Yore Tr. at 82:2-5, 88:12-15; Held Tr. at 108:18-19.)

**58.** Later on September 24, 2008, the FDIC accepted JPMC's bid. (Ex. 910 (JPMC_DBNTC_0000007255).)

**59.** The Office of Thrift Supervision ("OTS") was WMB's primary regulator. (Ex. 912 (Statement of the FDIC before the Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs, of the U.S. Senate (April 16, 2010)), at 1.)

**60.** On September 25, 2008, the OTS closed WMB and placed it into an FDIC receivership. (Ex. 911 (Order No. 2008-26, OTS No. 08551 (Sept. 25, 2008)).)

**61.** WMB's failure was the largest bank failure in U.S. history. (D.I. 54-1 at 6.)

**62.** The FDIC Board approved the JPMC transaction [redacted] (Ex. 163.)

**63.** Later on during September 25, 2008, the FDIC and JPMC executed the purchase and assumption agreement. (Ex. 274.)

**64.** If the FDIC had been forced to liquidate WMB, the FDIC estimates it would have suffered approximately $41 billion in losses to the FDIC-administered Deposit Insurance Fund. (Ex. 912 (Statement of the FDIC before the Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs, of the U.S. Senate (April 16, 2010)), at 24.)

**65.** On September 25, 2008, FDIC staff [redacted] (Ex. 347.)

**66.** The FDIC and JPMC [redacted] (*See*, *e.g.*, Ex. 277.) [redacted]

**67.** On Monday, September 29, 2008, the parties [redacted] (Ex. 277.) This is the document referred to herein as the P&A Agreement. (*See* Ex. 279; P&A Agr.)

## F. The Terms of the P&A Agreement.

**68.** The P&A Agreement provides that it "will constitute the legal, valid and binding obligation of the Assuming Bank." (P&A Agr. § 11(c).)

**69.** There is no definition of "Books and Records" in the P&A Agreement. (*See* P&A Agr. Art. I.)

**70.** There is no definition of "Books" in the P&A Agreement. (*See id.*)

**71.** There is a definition of "Book Value" in the P&A Agreement. (*See id.* (def'n of "Book Value").)

**72.** There is a definition of "Accounting Records" in the P&A Agreement. (*See id.* (def'n of "Accounting Records").)

**73.** There is a definition of "Record" in the P&A Agreement. (*See id.* (def'n of "Record").)

**74.** The defined term "Record" is typically used in FDIC purchase and assumption agreements. [redacted]

**75.** FDIC purchase and assumption agreements typically have a set of provisions under the heading "Records," typically Article VI. [redacted]

**76.** The set of provisions under the heading "Records" that typically appears in FDIC purchase and assumption agreements generally governs the transfer, delivery, and preservation of, and access to, a failed bank's documents and data. [redacted]

**77.** The primary function of the defined term "Record" that is typically used in FDIC purchase and assumption agreements is to set forth the set of documents and data that are covered by the set of provisions that appear under the heading "Records." [redacted]

**78.** Section 2.1 of the P&A Agreement provides that:

> Subject to Sections 2.5 and 4.8, the Assuming Bank expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) and agrees to pay, perform, and discharge, all of the liabilities of the Failed Bank which are reflected on the Books and Records of the Failed Bank as of Bank Closing, including the Assumed Deposits and all liabilities associated with any and all employee benefit plans, except as listed on the attached Schedule 2.1, and as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumed"). Notwithstanding Section 4.8, the Assuming Bank specifically assumes all mortgage servicing rights and obligations of the Failed Bank.

(P&A Agr. § 2.1.)

**79.** Section 3.1 of the P&A Agreement governs the purchase of assets by JPMC. (*See* P&A Agr. § 3.1.)

**80.** Under Section 3.1 of the P&A Agreement, JPMC purchased WMB assets "whether or not reflected on the books of the Failed Bank as of Bank Closing." (*Id.*)

**81.** Pursuant to the last clause of Section 3.1 of the P&A Agreement, JPMC "specifically purchase[d] all mortgage servicing rights and obligations" of WMB. (*Id.*)

**82.** Section 4.8 of the P&A Agreement provides, in part, that "[w]ith respect to agreements existing as of Bank Closing which provide for the rendering of services by or to the Failed Bank . . . the Assuming Bank shall give the Receiver written notice specifying whether it elects to assume or not to assume each such agreement." (*See* P&A Agr. § 4.8.)

**83.** Article VIII of the P&A Agreement provides that JPMC:

> in accordance with the best information then available, shall provide to the Receiver a Proforma Statement of Condition indicating all assets and liabilities of the Failed Bank as shown on the Failed Bank's books and records as of Bank Closing and reflecting which assets and liabilities are passing to the Assuming Bank and which assets and liabilities are to be retained by the Receiver.

(P&A Agr. Art. VIII.)

**84.** The P&A Agreement [REDACTED] (*See*, *e.g.*, Schoppe Tr. at 55:1-4, 121:17-122:9; Van Fleet Tr. at 119:16-21; Glassman Tr. at 188:17-20.)

**85.** No FDIC witness identified [REDACTED] (*See*, *e.g.*, Held Tr. at 67:11-68:16; Fenton Tr. at 90:4-18; Pruss Tr. at 46:2-15.)

**86.** The FDIC has identified [REDACTED] (*See* Ex. 901 (FDIC Resp.) No. 10.)

**87.** Other than in Section 2.1, the term "books and records" lacks initial capitals—that is, is lower-case—in all other uses in the P&A Agreement. (*See* P&A Agr. Arts. I (def'n of "Deposit"), VIII & §§ 3.4, 9.6 (lower-case uses).)

**88.** The FDIC [REDACTED] (Ex. 901 (FDIC Resp.) No. 7; *see also* Gearin Tr. at 111:7-11; Held Tr. at 72:4-73:8.)

**89.** According to FDIC witnesses, [REDACTED] (Van Fleet Tr. at 137:2-3; *see also id.* at 137:11-13, 140:17-20; Fenton Tr. at 89:7-8 [REDACTED] 244:19-20 [REDACTED] Gearin Tr. at 102:6-7 [REDACTED] 138:4-5 [REDACTED]

**90.** FDIC witnesses [REDACTED]



(*See*, *e.g.*, Held Tr. at 80:13-18 [redacted]

**91.** One FDIC witness, a principal drafter of the P&A Agreement [redacted] (Gearin Tr. at 134:2-7.)

**92.** The FDIC Receiver-in-Charge and the P&A Agreement's other principal drafter testified [redacted] (Schoppe Tr. at 248:11-249:19; Van Fleet Tr. at 49:18-22, 154:11-18.)

**G. During the Closing Process, the FDIC Asserted That JPMC Did Not Assume Liabilities Not Reflected on WMB's Books.**

**93.** Thaddeus Fenton [redacted] and Stephen Pruss, [redacted] (Fenton Tr. at 23:14-15; Pruss Tr. at 27:19-21.)

**94.** JPMC made Michael Lipsitz its settlement designee. [redacted]

**95.** On October 7, 2008, [redacted] (*See* Exs. 29, 88.)

**96.** On October 8, 2008, FDIC official Richard Peyster sent an email to JPMC's Allen Friedman and Benjamin Lopata, copying FDIC officials Wayne Green, James Vordtriede, and James Thormahlen, stating:

> With regard to what was and was not transferred to [JP]Morgan under the agreement, I do not think we have any dispute here. . . . With regard to any tax liability arising out of an ongoing or future audit, where no assessment had been made prior to the date of closing, such liability would not pass to [JP]Morgan. Only liabilities on the books as of the date of the agreement pass.

(Ex. 29.)

**97.** [redacted] (Ex. 108.)

**98.** [redacted] (*See id.*)

**99.** [redacted]



(*Id.*)

**100.** (*Id.*) There is no evidence that any recipient of the above-referenced communications expressed disagreement

**101.** In the months that followed, JPMC received tax assessments directed to WMB by state and local taxing authorities and processed WMB tax returns for tax periods prior to WMB's closure pursuant to FDIC-granted powers of attorney. (*See*, *e.g.*, Exs. 407, 408, 410.)

**102.** On October 20, 2008, JPMC employee James Fergus



(Ex. 409.) (*Id.*) (*Id.*) (*Id.*)

**103.** On October 20, 2008, Mr. Thormahlen provided FDIC letters addressed to "State Tax Agency" for JPMC to send along with WMB tax returns. (Exs. 30, 404; Ex. 901 (FDIC Resp.) No. 18.) One such letter read, in part:

> Washington Mutual Bank was closed by the Office of Thrift Supervision on 9/25/2008 and the Federal Deposit Insurance Corporation (FDIC) was appointed as Receiver for the failed institution. The tax period on the attached return occurred prior to the banks [*sic*] closure and was not assumed by JP Morgan Chase Bank, NA. The liability reflected on the attached return is a claim against the receivership.

(Ex. 30.) The other letter read, in part:

> Washington Mutual Bank was closed by the Office of Thrift Supervision on 9/25/2008 and the Federal Deposit Insurance Corporation (FDIC) was appointed as Receiver for the failed institution. The tax liability reflected on the attached return occurred prior to the banks [*sic*] closure and part of this liability was not assumed by JP Morgan Chase Bank,

NA. The unpaid portion of the liability reflected on the attached return is a claim against the receivership.

(Ex. 404.) The letters also noted the December 30, 2008 receivership claims bar date and provided instructions for filing a claim. (*Id.*; Ex. 30.)

**104.** On December 31, 2008, the claims bar date had passed, and JPMC personnel asked whether Mr. Thormahlen would be "providing a new letter for [JPMC] to send out with billing notices for liabilities that JPMorgan did not assume." (Ex. 416.)

**105.** On January 2, 2008, Mr. Thormahlen sent JPMC another letter, which explained that the bar date had passed but otherwise made substantially the same points about the allocation of liabilities as between JPMC and the FDIC as in Mr. Thormahlen's prior letters. (*See id.*)

**H. JPMC and [redacted]**

**106.** [redacted] (Ex. 685; Ex. 769 (Blake Report) at 10.)

**107.** On the actual date September 25, 2008, [redacted] (Ex. 682; Ex. 769 (Blake Report) at 19; Ex. 921 (JPMC_DBNTC_0009282253).)

**108.** The definition of "Book Value" in the P&A Agreement contemplates that there will be "adjustments made by the Assuming Bank for normal operational and timing differences." (P&A Agr. Art. I (def'n of "Book Value").)

**109.** As Assuming Bank, JPMC [redacted] (*See* Ex. 769 (Blake Report) at 10-13, 19-20; Barren Tr. at 45-46.)

**110.** [redacted] (*See* Ex. 753 (Kothari Report) ¶ 24; Ex. 769 (Blake Report) at 10-13, 19-20; Blake Tr. at 11:13-12:3; Arnold Tr. at 131:4-5.)

**111.** [redacted] (Ex. 324 at 94; *see also* Barren Tr. at 37:16-38:15.)

**112.** On October 8, 2008, [redacted] (Ex. 913 (JPMC_DBNTC_0009148532-43).) [redacted]



[redacted] (*Id.*)

**113.** On November 6, 2008, [redacted] (Ex. 388.)

**114.** Under 12 U.S.C. 1821(d)(2)(G)(1)(ii), the FDIC "may . . . transfer any asset or liability . . . without any approval . . . or consent . . . to such transfer."

**115.** The FDIC [redacted] (*Id.*)

**116.** [redacted] (*See* Exs. 614-617.)

**117.** [redacted] (Ex. 914 (JPMC_DBNTC_0005099679-703).)

**118.** [redacted] (Ex. 915 (JPMC_DBNTC_0008788640-54).)

**119.** [redacted] (*See* Ex. 922 (JPMC_DBNTC_0009217687); Ex. 769 (Blake Rebuttal) at 8 n.37.)

**120.** In the third quarter of 2010, [redacted] (Ex. 702.)

**121.** [redacted] (*See* Ex. 770 (Blake Rebuttal) at 12-13.) [redacted] (*See* Shankar Tr. at 242-46; Ex. 770 (Blake Rebuttal) at 12-14.)

**122.** [redacted] (*See*, *e.g.*, Ex. 685 [redacted]

[redacted]

**123.** One person the FDIC proffered as an accounting expert in this action claimed [redacted] (*See* Arnold Tr. at 169:13-171:4.)

**124.** Within weeks of the transaction, JPMC instructed personnel responsible for repurchasing loans based on violations of seller representations and warranties in RMBS [redacted] (*See* Betz Tr. at 54:4-19; Shankar Tr. at 154:6-155:11.)

**I. Following This Action's Filing, the FDIC Asserted That "Books and Records" in Section 2.1 Refers to the Defined Term "Record."**

**125.** Section 4.8 of the P&A Agreement provides that, within 120 days of Bank Closing, JPMC must give the FDIC notice whether it will assume certain WMB contracts. (P&A Agr. § 4.8.)

**126.** Pursuant to 12 U.S.C. § 1821(e), the FDIC as "conservator or receiver for any insured depository institution may repudiate any contract or lease" of a failed bank.

**127.** On October 16, 2008, in connection with the above-described discussions between JPMC and the GSEs, [redacted] (Ex. 513.)

**128.** On October 16, 2008, [redacted]

[redacted]

(*Id.*)

**129.** On October 16, 2008, [redacted] (*Id.*)

**130.** On October 28, 2008, [redacted] (Ex. 82.) There is no evidence that the FDIC had previously informed JPMC [redacted]



**131.** The next day, [redacted] (Ex. 356 at 3.)

**132.** On December 30, 2008, Deutsche Bank filed a proof of claim in the WMB receivership, claiming WMB had breached representations and warranties in Pooling and Servicing Agreements for private-label RMBS trusts (the "Governing Agreements"). (D.I. 1 ¶ 10.)

**133.** On January 21 and January 22, 2009, [redacted] (Exs. 28, 436.)

**134.** The FDIC failed to respond to Deutsche Bank's proof of claim within 180 days of its filing. On August 26, 2009, Deutsche Bank commenced this action against the FDIC alone. (D.I. 1 ¶¶ 10, 15-17.)

**135.** On September 3, 2009, [redacted] (Ex. 519.)

**136.** In the September 3, 2009 [redacted] (*Id.*)

**137.** The September 3, 2009 [redacted] (*Id.*)

**138.** FDIC attorney Mr. Fenton said [redacted] (Fenton Tr. at 235:5-16.)

**139.** Mr. Fenton was asked [redacted] (*Id.* at 238:21-22.) Mr. Fenton said [redacted] (*Id.* at 239:1-241:18.)

**140.** [redacted] (*Id.* at 241:19-242:13.)

**141.** [redacted] (*Id.* at 243:6-244:3.)

**142.** In January 2010, the FDIC disallowed a proof of claim from the North Carolina Department of Revenue ("North Carolina") seeking pre-receivership WMB taxes on the ground that its "claim and liability for that claim transferred to JPMorgan Chase" under the P&A Agreement. (D.I. 1-3, No. 10-cv-505 (RMC).)

**143.** When North Carolina sued the FDIC and JPMC over that assessment, the FDIC unilaterally settled North Carolina's claims against both the FDIC and JPMC, without JPMC's involvement or, prior to the settlement's announcement, awareness. (*See* D.I. 57, No. 10-cv-505 (RMC).)

**144.** Taxing authorities continued to submit to JPMC assessments for WMB tax liability, often seeking payment from JPMC. (*See*, *e.g.*, D.I. 18 Exs. E, O, S, U, AA, No. 12-cv-450 (RMC).)

**145.** The FDIC encouraged taxing authorities to pursue JPMC for those assessments even if the claims in question were barred because taxing authorities had not filed a timely claim with the FDIC receivership. (*See* D.I. 23 at 7-15, No. 12-cv-450 (RMC).)

**146.** This Court called this FDIC tactic "irresponsible." (March 21, 2013 Oral Argument Tr. at 39:10, No. 12-cv-450 (RMC).)

**J. Characteristics of RMBS.**

**147.** The parties to a private-label RMBS transaction (an "RMBS Trust"), although not identical across all RMBS Trusts, are fairly standard and generally perform similar roles and responsibilities from RMBS Trust to RMBS Trust. [redacted]

**148.** RMBS Trusts are typically governed by documents such as Mortgage Loan Purchase Agreements ("MLPAs"), Sales and Servicing Agreements ("SSAs"), PSAs, Prospectus Supplements and other ancillary documents and agreements (collectively, "Governing Documents"). ([redacted]; D.I. 32 ¶ 29.)

**149.** The key Governing Documents for an RMBS Trust identify the duties and responsibilities of each of the parties, including the duties and responsibilities specific to each capacity in which a party serves. The Governing Documents typically reflect that the responsibilities and associated representations and warranties for each party are separate and distinct, and as such, the remedies for a breach of a representation and warranty that materially and adversely affects the interests of the RMBS certificateholders ("Certificateholders") in the loan differ depending upon the maker and nature of the promise or obligation. ([redacted]; *see also* D.I. 32 ¶ 29.)

**150.** The Seller is the party that originates the mortgage loans or purchases them from the originator and sells them to the purchaser. [redacted]

**151.** Under the Governing Documents, Sellers typically make certain representations and warranties about the loans and the origination of the loans, which may vary from RMBS Trust to RMBS Trust. [redacted]

**152.** Upon discovery of a breach of a representation and warranty that materially and adversely affects the interests of the Certificateholders in the loan, the Seller is typically required to cure the defect, repurchase the defective mortgage loan, or remove the defective mortgage loan and substitute in its place a similar mortgage loan. [redacted]

**153.** The Servicer is responsible for the collection and application of mortgage loan payments and related functions such as accurate record keeping, ensuring tax and insurance payments are made timely, protecting the priority of the lien, and appropriately managing delinquent mortgages including collections, bankruptcies, foreclosures, short-sales, and the management and liquidation of REO properties. [redacted]; D.I. 32 ¶ 28(d).)

**154.** The Servicer typically makes representations and warranties in the PSA, which may vary from RMBS Trust to RMBS Trust. Unlike the representations and warranties made by the Seller, which generally will relate to the loans, the representations and warranties made by the Servicer generally will relate to the Servicer itself and to servicing practices. [redacted]

**155.** While the Seller of a mortgage loan typically makes certain representations and warranties that, if breached, may result in the obligation to repurchase the loan [redacted] the Servicer is responsible for collecting and applying mortgage loan payments and is not typically obliged to repurchase loans. [redacted]

**156.** Mortgage seller and servicer obligations can be distinct in private-label securitizations—that is, a mortgage seller may make representations and warranties that may obligate it to repurchase loans, while not obligating the mortgage servicer to do so. [redacted]

**157.** Both sides proffered experts on mortgage securitizations, and neither expert [redacted]

**158.** No evidence was adduced that a seller's repurchase obligations become "mortgage servicing obligations" merely because the seller and servicer are the same entity. [redacted]

**159.**

**160.** There is no evidence that in the transactions at issue here, the governing contracts impose on the servicer any seller repurchase obligations.

**161.** In a purchase and assumption transaction between the FDIC and IndyMac Federal Bank, FSB, Section 2.1 of the applicable purchase and assumption agreement transferred "duties and obligations under any contract pursuant to which the Failed Bank provides mortgage servicing for others, or mortgage servicing is provided to the Failed Bank by others" and "duties and obligations under any contract pursuant to which the Failed Bank holds mortgage servicing rights." (Ex. 918 (IndyMac purchase & assumption agreement) § 2.1.) Section 3.1 thereof transferred "mortgage servicing rights and related contracts." (*Id.* at § 3.1.)

**162.** The FDIC argued in *MBIA Insurance Corp.* v. *IndyMac Federal Bank, F.S.B.*, 816 F. Supp. 2d 81 (D.D.C. 2011), that the IndyMac purchase and assumption agreement "did *not* transfer to [the bridge bank] any 'non-servicing obligations and liabilities as a result of [the failed bank's] acts or omissions in connection with the origination or sale of [mortgage] loans.'" (Ex. 919 (FDIC-Receiver Mem. in Support of Mot. to Dismiss, *IndyMac*, 816 F. Supp. 2d 81 (D.D.C. 2011) (No. 09-cv-1011 (ABJ)), ECF No. 26-1) at 9.) The FDIC argued that "all seller obligations . . . were not passed on to [the bridge bank], but remained with the . . . receivership estate." (Ex. 917 (FDIC-Receiver Reply Mem. in Support of Mot. to Dismiss, *IndyMac*, 816 F. Supp. 2d 81 (D.D.C. 2011) (No. 09-cv-1011 (ABJ)), ECF No. 32) at 14.)

**163.** In litigation that Deutsche Bank brought over seller repurchase obligations in IndyMac-issued RMBS, the FDIC wrote in a brief submitted to the U.S. Court of Appeals for the Ninth Circuit the following:

> Before its failure in 2008, [IndyMac] had issued and sold mortgage-backed securities. These securities consisted of mortgage pools established by "Pooling and Servicing Agreements" ("PSAs") . . . . Although each PSA is contained in a single document, the document contains two agreements IndyMac entered into in two different capacities: as "Seller" and as "Master Servicer." . . . In its capacity as "Seller" IndyMac also made certain "representations and warranties" about the quality of the loans. The PSAs further provide that if any party discovered a breach of any of those representations and warranties, IndyMac in its capacity as "Seller" had to . . . substitute or repurchase the affected mortgage loan or loans. In its capacity as "Master Servicer," IndyMac agreed to collect and process mortgage payments in return for servicing fees and other compensation. The PSAs do not require IndyMac, in its capacity as Master Servicer, to substitute or repurchase non-performing mortgages. The PSAs further provide that the Master Servicer shall only be liable for obligations imposed "specifically" on it by the PSAs, which means that the Master Servicer shall not be liable for obligations imposed on other contracting parties, such as the Seller.

(Ex. 916 (FDIC Principal Br., *Deutsche Bank Nat'l Trust Co.* v. *FDIC*, 744 F.3d 1124 (9th Cir. 2014) (No. 11-56339), ECF No. 8111464) at 2-3 (record citations and quotation marks omitted).)

Dated: June 20, 2014
Washington, D.C.

Respectfully submitted,

/s/ Brent J. McIntosh

Brent J. McIntosh (D.C. Bar No. 991470)
Mia Whang Spiker (D.C. Bar No. 1004939)
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Suite 700
Washington, D.C. 20006-5215
Telephone: (202) 956-7500
Facsimile: (202) 293-6330
Email: mcintoshb@sullcrom.com

Robert A. Sacks (D.D.C. Bar No. MI0069)
Ian D. McDonald (admitted *pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588

*Counsel for Defendants JPMorgan Chase Bank, N.A. and Washington Mutual Mortgage Securities Corporation*