UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEUTSCHE BANK NATIONAL TRUST
COMPANY, as Trustee for the Trusts listed
in Exhibits 1-A and 1-B,

        Plaintiff,

   v.

FEDERAL DEPOSIT INSURANCE
CORPORATION, as receiver for
Washington Mutual Bank; JPMORGAN
CHASE BANK, National Association; and
WASHINGTON MUTUAL MORTGAGE
SECURITIES CORPORATION,

        Defendants.

Case No. 09-CV-1656-RMC

Hon. Rosemary M. Collyer

## DEFENDANT FDIC-RECEIVER'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO CHASE'S MOTION FOR SUMMARY JUDGMENT

Of Counsel:

Kathryn R. Norcross, D.C. Bar No. 398120
 Senior Counsel
Kaye A. Allison, Counsel
Anne M. Devens, Counsel
FEDERAL DEPOSIT INSURANCE
 CORPORATION
3501 Fairfax Drive, Room VS-D-7092
Arlington, Virginia 22226
Telephone:  (703) 562-2676
Facsimile:  (703) 562-2475
Email:  knorcross@fdic.gov
Email:  kallison@fdic.gov
Email:  adevens@fdic.gov

July 31, 2014

William R. Stein, D.C. Bar No. 304048
Scott H. Christensen, D.C. Bar No. 476439
Jason S. Cohen, D.C. Bar No. 501834
HUGHES HUBBARD & REED LLP
1775 I Street, N.W., Suite 600
Washington, D.C. 20006-2401
Telephone:  (202) 721-4600
Facsimile:  (202) 721-4646
Email:  stein@hugheshubbard.com
Email:  christensen@hugheshubbard.com
Email:  cohenj@hugheshubbard.com

*Attorneys for Federal Deposit Insurance
Corporation in its capacity as Receiver for
Washington Mutual Bank*

## TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................................1

ARGUMENT ..........................................................................................................................3

I.  CHASE'S INTERPRETATION IS CONTRADICTED BY THE
    UNDISPUTED MATERIAL FACTS. ......................................................................3

    A.  Chase Cannot Dispute That The FDIC-Receiver Told Bidders That
        The Acquirer Would Assume WaMu's Repurchase Liabilities. ...........................3

    B.  Chase Can Offer No Contemporaneous Evidence In Support Of Its
        Interpretation. ............................................................................................5

    C.  The Post Hoc Assertions of Chase's Lawyers Are Inadmissible. ..........................9

II.  "BOOKS AND RECORDS" IS AN EXPANSIVE PHRASE. ......................................14

    A.  Chase's Interpretation of "Books and Records" Is Inconsistent With
        The Language of Section 2.1. ....................................................................15

    B.  This Case Is Not About ███████████████████████
        ████████ . .......................................................................................17

    C.  The Drafting History of the P&A Agreement Does Not Support
        Chase's Interpretation of Section 2.1 ..........................................................18

III.  "BOOK VALUE" DOES NOT LIMIT THE SCOPE OF THE
      LIABILITIES ASSUMED BY CHASE. ...................................................................22

    A.  "Book Value" Establishes The Pricing Of Liabilities In Section 2.1. ..................23

    B.  Chase Indisputably Assumed Liabilities That Did Not Have A Book
        Value On WaMu's Balance Sheet. ...............................................................27

    C.  Other Contemporaneous Contracts Show That "Book Value" Does Not
        Limit The Scope Of Liabilities Assumed. .....................................................29

    D.  Chase's Interpretation Of "Book Value" Is Not Consistent With
        Chase's Post-Transaction Conduct. .............................................................31

IV.  THE REPURCHASE LIABILITIES WERE NEITHER "UNKNOWN"
     NOR "UNIDENTIFIED." ......................................................................................31

V.  CONTRA PROFERENTEM DOES NOT APPLY HERE. ...........................................34

# TABLE OF CONTENTS
(continued)

Page

A.   Contra Proferentem Is A Doctrine Of Last Resort.................................................35

B.   Contra Proferentem Does Not Apply Between Sophisticated Parties. ..................36

VI.   CHASE'S BRIEF OBFUSCATES THE ISSUE BEFORE THE COURT. ......................37

A.   The FDIC-Receiver's Interpretation of Section 2.1 Has Not Shifted...................38

B.   This Case Is Not About ███████████████████. ...........................40

C.   This Case Is Not About Liability For Tax Audits.................................................40

D.   The FDIC-Receiver Has Never Argued That Mortgage Seller And Servicer Obligations Are Indistinguishable. ..........................................................43

VII.   ALL WMMSC LIABILITIES INDISPUTABLY TRANSFERRED UNDER THE P&A AGREEMENT. ................................................................................44

CONCLUSION...................................................................................................................45

**TABLE OF AUTHORITIES**

**Page(s)**

C‌ASES

*In re A.P. Liquidating Co.*, 421 Fed. App'x 583 (6th Cir. 2011)....................................................17

*Bank One, N.A. v. Echo Acceptance Corp.*, Civ. No. 04-0318, 2008 U.S. Dist. LEXIS
    36046 (S.D. Ohio Apr. 11, 2008).........................................................................................12

*Beanstalk Grp., Inc. v. AM Gen. Corp.*, 283 F.3d 856 (7th Cir. 2002)..........................................36

*Carey Canada, Inc. v. Columbia Cas. Co.*, 940 F.2d 1548 (D.C. Cir. 1991)...............................35

*FDIC v. Ins. Co. of N. Am.*, 105 F.3d 778 (1st Cir. 1997) ..............................................................36

*Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348 (Fed. Cir. 2006)...........................35

*Gaull v. Wyeth Labs*, 687 F. Supp. 77 (S.D.N.Y. 1988)..................................................................12

*Grynberg v. FERC*, 71 F.3d 413 (D.C. Cir. 1995).........................................................................19

*Int'l Multifoods Corp. v. Comm. Union Ins. Co.*, 309 F.3d 76 (2d Cir. 2002)..............................35

*Jim Bouton Corp. v. Wm. Wrigley Jr. Co.*, 902 F.2d 1074 (2d Cir. 1990) ...................................19

*In re KB Toys, Inc.*, 340 B.R. 726 (D. Del. 2006) .........................................................................44

*McNeilab, Inc. v. North River Ins. Co.*, 645 F. Supp. 525 (D.N.J. 1986)......................................36

*Medtronic, Inc. v. Intermedics, Inc.*, 162 F.R.D. 133 (D. Minn. 1995).........................................11

*Mesa Air Grp. v. Dep't of Transp.*, 87 F.3d 498 (D.C. Cir. 1996) ...............................................35

*New Jersey v. Merrill Lynch & Co., Inc.*, 640 F.3d 545 (3d Cir. 2011) ........................................36

*In re Ocwen Loan Serv., LLC Mortg. Serv. Litig.*, 491 F.3d 638 (7th Cir. 2007) ........................15

*Permian Corp. v. United States,* 665 F.2d 1214 (D.C. Cir. 1981)................................................10

*Pitney-Bowes, Inc. v. Mestre*, 86 F.R.D. 444 (D.C. Fla. 1980) ....................................................12

*Record Club of Am. v. United Artists Records*, 890 F.2d 1264 (2d Cir. 1989).............................35

*Segar v. Mukasey*, 508 F.3d 16 (D.C. Cir. 2007).........................................................................16

*Stovall v. United States,* 85 Fed. Cl. 810 (2009).........................................................................11

*Terra Int'l, Inc. v. Miss. Chem. Corp.*, 119 F.3d 688 (8th Cir. 1997) ..........................................36

# TABLE OF AUTHORITIES
(continued)

Page(s)

*United States Fire Ins. Co. v. Gen. Reins. Corp.*, 949 F.2d 569 (2d Cir. 1991) ............................35

*United States v. Erickson Paving Co.*, 465 F.2d 396 (9th Cir. 1972) .............................................35

*United States v. Hamdi*, 432 F.3d 115 (2d Cir. 2005) ....................................................................19

*Viola v. Fleet Bank of Maine*, 94 F.3d 640 (1st Cir. 1996)............................................................26

*Viola v. Fleet Bank of Maine*, Civ. No. 95-141, 1996 WL 498390 (D. Me. Feb. 27, 1996) .........26

**STATUTES AND RULES**

12 U.S.C. §§ 1821(d)(2)(G)(i)(II)...................................................................................................43

12 U.S.C. § 1821(d)(13)(E)(i)..........................................................................................................43

Fed. R. Civ. P. 56(c)(2)....................................................................................................................10

**TREATISES AND PERIODICAL MATERIALS**

17A Am. Jur. 2d *Contracts* § 383 (2005) .......................................................................................19

*Corbin on Contracts* § 24.27 (Joseph M. Perillo ed., rev. ed.1993)..............................................35

*Farnsworth on Contracts* § 7.11 (3d ed. 2004) .............................................................................35

Restatement (Second) of Contracts § 201(2) .....................................................................................5

Restatement (Second) of Contracts, § 206.......................................................................................35

Restatement (Second) of Contracts § 235(1)....................................................................................28

**OTHER AUTHORITIES**

Bryan A. Garner, *The Redbook: A Manual on Legal Style* § 11.2(f) (2d ed. 2006) ......................15

## TABLE OF RELEVANT INDIVIDUALS[1]

**Richard Aboussie** – FDIC, Associate General Counsel, Large Bank Resolutions

**John Barren** – Chase, Controller and Senior Vice President, Home Lending (also Chase's Rule 30(b)(6) witness)

**Brian Bessey** – Chase, Managing Director and Senior Vice President, Corporate Mergers and Acquisitions

**Corinne Burger** – Chase, Senior Controller, Retail Financial Services

**Patrick Carr** – Chase, Vice President and Director of Accounting Policy and External Reporting, Retail Financial Services

**Michael Cavanagh** – Chase, Chief Financial Officer and Executive Vice President

**John Coffee** – Expert witness for the FDIC-Receiver

**Daniel Cooney** – Chase, General Counsel and Senior Vice President, Retail Financial Services

**Jamie Dimon** – Chase, Chairman and Chief Executive Officer

**Sally Durdan** – Chase, Chief Financial Officer, Retail Financial Services

**Mitchell Eitel** – Partner, Sullivan & Cromwell LLP, counsel for Chase

**Sheri Foster** – FDIC, Senior Franchise and Asset Marketing Specialist

**David Gearin** – FDIC, Senior Counsel, Special Issues Unit, Legal Division

**Mitchell Glassman** – FDIC, Director, Division of Resolutions and Receiverships

**Tod Gordon** – Chase, Managing Director, Treasury Department

**Robert Hartheimer** – Expert witness for Chase

**Herbert Held** – FDIC, Assistant Director, Institution Sales Unit, Franchise and Asset Marketing Branch, Division of Resolutions and Receiverships

**William Holder** – Expert witness for Chase

**Michael Lipsitz** – Chase, General Counsel and Senior Vice President, Consumer Banking

---

1. The job titles for FDIC and Chase employees are as of September 2008.

## TABLE OF RELEVANT INDIVIDUALS
(continued)

**Ryan McInerney** – Chase, Senior Vice President and Chief Risk Officer, Branch Banking

**Michelle Minier** – Expert witness for Chase

**George Oldfield** – Expert witness for the FDIC-Receiver

**Fernando Rivas** – Chase, Managing Director, Financial Institutions Group

**Charles Scharf** – Chase, Chief Executive Officer, Retail Financial Services

**Ravi Shankar** – Chase, Senior Vice President and Chief Financial Officer, Home Lending

**Lee Van Fleet** – FDIC, Senior Attorney, Legal Division

**James Wigand** – FDIC, Deputy Director, Franchise and Asset Marketing Branch, Division of Resolutions and Receiverships

64542484_1

## GLOSSARY

**Deutsche Bank** – Plaintiff Deutsche Bank National Trust Company

**DRR** – FDIC's Division of Resolutions and Receiverships

**FDIC-Receiver** – Defendant Federal Deposit Insurance Corporation, in its capacity as Receiver of Washington Mutual Bank

**GSE** – government sponsored entities such as the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac")

**Heritage WaMu or hWaMu** – terms denoting assets, liabilities, and personnel of WaMu that were transferred to Chase on September 25, 2008

**Chase** – Defendant JPMorgan Chase Bank, N.A.

**P&A Agreement** – Purchase and Assumption Agreement dated September 25, 2008 among Chase, the FDIC-Receiver, and the FDIC in its corporate capacity

**WaMu** – Washington Mutual Bank

**WMI** – Washington Mutual, Inc., WaMu's holding company

**WMMSC** – Defendant Washington Mutual Mortgage Securities Corporation

**INTRODUCTION**

In its motion for summary judgment, Chase focuses on conclusory assertions, distractions, and irrelevancies rather than addressing the question before the Court in this case: whether Chase assumed WaMu's mortgage repurchase liabilities, without cap or limitation, under Section 2.1 of the P&A Agreement.  Chase goes so far as to say that "there is not a single piece of evidence that the FDIC expressed" to Chase its understanding of the scope of liabilities being assumed prior to September 25, 2008.  Chase Br. at 5.  Chase ignores the Q&As, which informed Chase unequivocally that it would be assuming the repurchase liabilities, ██

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████

Instead of addressing these salient and critical facts, Chase's brief devotes significant space to issues that have no material bearing on this case.  Chase spends six pages on tax liabilities (*id.* at 5, 13-15, 40-42), four pages on the capitalization of "Books and Records" (*id.* at 9-10, 29-30), and four pages on mortgage servicer and seller obligations in a different agreement involving a different bank under different circumstances in response to an argument that the FDIC-Receiver does not make (*id.* at 19-20, 43-44).  Chase wants to make this a case about side issues such as the theoretical limits of "books and records" under Section 2.1 ███████

██████████████████████████████████████████████████

because any examination of whether the parties understood at the time that the mortgage

repurchase liabilities at issue in this case were assumed by Chase under the P&A Agreement

should be resolved resoundingly in the FDIC-Receiver's favor.

Chase's repeated attempts to change the subject underscore the weakness in its

arguments.  This is not a case about tax liabilities.  Nor is it a case about ██████████████

█████████████    This is a case about ongoing contractual liabilities that were an integral and

public part of one of WaMu's biggest business activities.  Yet Chase's only mention of the

Q&As, in which the FDIC-Receiver told Chase and all other prospective bidders that the

acquirer would assume exactly the kind of liabilities at issue here, is as an offhand reference to

one of the FDIC-Receiver's other answers in that document.  *See id.* at 11, 36.  █████████

█████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████    And while Chase attempts to paint a

picture of its limited time and resources to evaluate the transaction, this is belied by Chase's

exhaustive due diligence prior to its bid, due diligence that Chase's own CFO called "probably

one of the most thorough things we've ever done."  Chase's digressions and omissions cannot

obscure the fundamental fact that the FDIC-Receiver told Chase that the acquirer would assume

WaMu's repurchase liabilities, and Chase indisputably understood this fact when it bid.  Chase's

attempt to reshape the contours of this case should be rejected, and summary judgment should be

granted to the FDIC-Receiver.

## ARGUMENT

### I. CHASE'S INTERPRETATION IS CONTRADICTED BY THE UNDISPUTED MATERIAL FACTS.

Chase offers no material, admissible evidence from the time of the transaction that supports its post hoc interpretation of Section 2.1.  By contrast, the undisputed facts show that the FDIC-Receiver made it clear to Chase prior to Chase's bid that the acquirer would assume WaMu's repurchase liabilities under the P&A Agreement, and that Chase understood this when it submitted its bid.

#### A. Chase Cannot Dispute That The FDIC-Receiver Told Bidders That The Acquirer Would Assume WaMu's Repurchase Liabilities.

Chase asserts that the FDIC-Receiver never expressed its understanding of the scope of Section 2.1 to Chase prior to the transaction (Chase Br. at 5), while ignoring the undisputed fact that the FDIC-Receiver did just that in the Q&As and elsewhere.[2]  In so doing, Chase completely avoids discussing the clear contemporaneous evidence that WaMu's repurchase liabilities were assumed by the acquirer under Section 2.1.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████ Chase does not acknowledge that this document *also* unambiguously informed all prospective bidders that WaMu's mortgage securitization liabilities

---

2.    The FDIC-Receiver has detailed the numerous other ways in which Chase understood prior to the transaction that it would be assuming substantially all of WaMu's liabilities, including the repurchase liabilities, with no mention of a book value limitation on liabilities assumed.  *See* FDIC-R Br. at 5-9, 20-22, 23-27, 32-33, 36-41.

– which include the repurchase liabilities at issue here – would be assumed by the acquirer under the terms of the proposed transaction.  *See* FDIC-R Br. at 23-24.  ████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████ ▬

████████  Chase claims that "there is no evidence that [this understanding] was expressed to [Chase]" prior to the execution of the P&A Agreement, but Chase's claim is flatly contradicted by the undisputed contemporaneous evidence.  Chase Br. at 38 n.14.  The FDIC-Receiver objectively manifested this understanding ██████████████████████████████████ ████████████████████  by informing prospective bidders that they would be assuming WaMu's mortgage securitization liabilities ██████████████████

———————————————

3.  ███████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████

████████████████████████████████████ Chase can take its position only by

disregarding this evidence.

It is not surprising that Chase acts as though the FDIC-Receiver never expressed its

understanding of the P&A Agreement regarding the liabilities at issue in this case to all

prospective bidders prior to the transaction, because acknowledging this would be fatal to

Chase's motion.  As a matter of law, if a contracting party is told the other party's understanding

of a contractual provision and does not offer a contrary understanding before entering into the

contract, *then that contracting party is bound by the other party's expressed understanding* in the

event that the meaning of the provision is subsequently disputed.[4]  *See* FDIC-R Br. at 27-28.

When the FDIC-Receiver told Chase in the Q&As that the acquirer would assume WaMu's

mortgage securitization liabilities, Chase did not express a contrary understanding.  Instead,

Chase's only response to the Q&As was to ████████████████████████████

████████████████ further demonstrating Chase's knowledge that these liabilities were being

assumed under the terms of the transaction.  The Restatement makes it clear that, under such

circumstances, any attempt by Chase after the transaction to assert that it was interpreting the

P&A Agreement differently from the FDIC-Receiver's expressed understanding must fail.

**B.      Chase Can Offer No Contemporaneous Evidence In Support Of Its
         Interpretation.**

Chase offers no material and admissible evidence from the time of the WaMu transaction

that is consistent with any of the interpretations of Section 2.1 that Chase has offered in this

litigation.  *See* Chase Br. at 35-37.  As the FDIC-Receiver has demonstrated (FDIC-R Br. at 18-

---

4.      Restatement (Second) of Contracts § 201(2).

- 5 -

22, 32-34), nowhere in the documents produced by Chase is there any indication that Chase believed it was assuming anything other than "substantially all" of WaMu's liabilities when it submitted its bid.  Dep. Ex. 1 at 1; ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

64542484_1

████████████████████████████████████████████████

████████████████████████████████████████████████

  ██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

In addition, Chase gave no indication at the time that it interpreted the P&A Agreement in the manner it now claims. ███████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

5. ██████████████████████████████████████████
   ████████████████████████████████████████
   ████████████████████████████████████

6. ██████████████████████████████████████████
   ████████████████████████████████████████
   ████████████████████████████████████████

- 7 -



### C.     The Post Hoc Assertions of Chase's Lawyers Are Inadmissible.



Chase offers no contemporaneous documents purporting to shed light on Chase's understanding of the terms of the transaction when it bid. Instead, Chase relies entirely on its lawyers' post hoc and inadmissible testimony as to how Chase interpreted Section 2.1 when entering into the P&A Agreement. But Chase cannot offer the professed understanding of its attorneys as evidence of Chase's supposed interpretation of the P&A Agreement at the time that it bid, because it has shielded all internal documents reflecting the contemporaneous impressions of those attorneys from disclosure.

Chase also has withheld any documents reflecting substantive internal discussions by its business people regarding their understanding of the P&A Agreement prior to Chase's bid, likely because

---

7.

all such discussions also involved Chase's lawyers.  Despite this, Chase now seeks to rely on the purportedly contemporaneous impressions of these attorneys – as expressed in deposition testimony almost five years later – as evidence of Chase's understanding of the scope of Section 2.1 at the time of the transaction.  Chase may not claim privilege over core documents from the individuals most directly involved in assessing the terms of the P&A Agreement for Chase and then selectively offer the testimony of those individuals regarding their purported contemporaneous understanding.  Without reviewing the withheld documents, the FDIC-Receiver has had no meaningful opportunity to test the accuracy of the post hoc testimony of Chase's attorneys regarding their account of Chase's interpretation of the P&A Agreement prior to its bid.  This testimony is inadmissible, and Chase should be precluded from relying on it.[8]

The law is clear that a party may not invoke the attorney-client privilege selectively in order to obtain a tactical advantage in litigation.  Courts have been particularly vigilant about preventing a party from claiming the attorney-client privilege to shield the disclosure of documents, while otherwise offering testimony or other extrinsic evidence to support its interpretation of a contract.[9]

> Indeed, a veritable Niagara of opinions have concluded that where a party affirmatively reserves the right to use parol evidence to bolster its interpretation of a contract, it may not, via the attorney-client privilege, withhold from discovery attorney-client communications that also form the extrinsic context for the agreement, particularly those that occurred in negotiating or interpreting the agreement. . . .  And fairness particularly compels

---

8.   *See* Fed. R. Civ. P. 56(c)(2).

9.   *See, e.g., Permian Corp. v. United States,* 665 F.2d 1214, 1221 (D.C. Cir. 1981) ("courts have been vigilant to prevent litigants from converting the privilege into a tool for selective disclosure").

this result when the party seeking to support its interpretation of an agreement with parol evidence indicates that it might rely on evidence taken from its own attorneys.[10]

In these circumstances, courts have instructed that a litigant must choose between (1) offering extrinsic evidence from or relating to attorney negotiators to aid interpretation of an agreement or (2) withholding its contemporaneous communications on the subject as privileged. For example, in *Medtronic, Inc. v. Intermedics, Inc.*, Intermedics invoked the attorney-client privilege to withhold documents relevant to its understanding and interpretation of an agreement with Medtronic.[11]   The court held that Intermedics could not maintain its privilege assertion while also relying on extrinsic evidence to support its interpretation of the agreement.[12]

This Court has already raised this issue with Chase.   In a February 21, 2013 telephone conference, the Court permitted Chase's assertion of privilege over contemporaneous internal communications involving the attorneys engaged in negotiating the terms of the transaction, but cautioned Chase that withholding these documents could impede Chase's ability to offer evidence of its understanding and intent at the time it entered into the P&A Agreement.[13]   The Court stated that "if JPMorgan Chase cannot produce a witness or a series of witnesses to clarify what it intended, what it thought, what it thought the language meant ***by its business people***, then it's left with nothing on that point."[14] ████████████████████████

---

10.   *Stovall v. United States,* 85 Fed. Cl. 810, 816 (2009).

11.   *Medtronic, Inc. v. Intermedics, Inc.*, 162 F.R.D. 133, 135 (D. Minn. 1995).

12.   *See id.*  The court elaborated that "[e]xtrinsic evidence is *any* evidence beyond the four corners of the Agreement, including testimony or documents, relevant to Intermedics' understanding or interpretation of the Agreement."  *Id.* (emphasis in original).

13.   *See* 2/21/13 Tr. 46:17-21 (Dkt. No. 132).

14.   *Id.* (emphasis added).

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ Chase has not

offered any countervailing testimony in support of its motion, other than the self-serving,

unsubstantiated, and inadmissible statements of its lawyers.  By contrast, the FDIC-Receiver has

provided ample extrinsic evidence regarding how its own business people understood and

interpreted the P&A Agreement at the time of the transaction.  *See FDIC-R Br. at 20-27.*  For

this reason alone, the FDIC-Receiver's motion for summary judgment should be granted, and

Chase's motion should be denied.

Chase has asserted the attorney-client privilege over the entirety of its substantive,

internal consideration of the P&A Agreement and its analysis of the terms of the WaMu

transaction in the days prior to Chase's bid.  In light of that broad claim of privilege, Chase may

not now offer testimonial evidence from its lawyers of its understanding and intent on that same

subject matter.[15]  Indeed, to allow Chase to invoke privilege to withhold the most relevant

internal documents from the time it was negotiating, evaluating, and executing the agreement,

and then present self-serving parol evidence on these issues through the testimony of its lawyers

would be fundamentally unfair and highly prejudicial to the FDIC-Receiver.

---

15.   *See Bank One, N.A. v. Echo Acceptance Corp.*, Civ. No. 04-0318, 2008 U.S. Dist. LEXIS
      36046, at *16 (S.D. Ohio Apr. 11, 2008) ("A litigant is 'free to stand behind its attorney-
      client privilege, and refuse to produce the opinions.  As a consequence, however, [the
      litigant] will be precluded from introducing the opinion or testimony of its counsel' as to
      questions which he previously refused to answer.") (internal citations omitted); *see also
      Gaull v. Wyeth Labs*, 687 F. Supp. 77, 83 (S.D.N.Y. 1988); *Pitney-Bowes, Inc. v. Mestre*,
      86 F.R.D. 444, 447 (D.C. Fla. 1980).

64542484_1

In its brief, Chase both expressly and implicitly relies on its attorneys' professed understanding of how Chase interpreted the P&A Agreement at the time that it bid. ███

████████████████████████████████████████████████████

█████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████  Therefore, if there is evidence that Chase did – or did not – understand the P&A Agreement at the time to mean what its lawyers now claim, such evidence is purely internal.  But Chase has elected to withhold all internal communications that would permit the FDIC-Receiver to meaningfully challenge the testimony on which Chase relies.



As a result, any extrinsic evidence from Chase or Chase's attorneys regarding those motivations is also inadmissible.

## II.    "BOOKS AND RECORDS" IS AN EXPANSIVE PHRASE.

Contrary to Chase's assertions, the FDIC-Receiver has demonstrated that "Books and Records," as used in Section 2.1 of the P&A Agreement, is commonly understood in the financial industry – and would have been understood by the parties at the time of the transaction – to encompass more than simply WaMu's accounting records.  *See* FDIC-R Br. at 14-17.



16.

17.

███████████████████████████████████████████ Chase, however, contends that "Books and Records" must refer to a bank's accounting records and nothing more – i.e., its "general ledger, subsidiary ledger, and supporting schedules" (Chase Br. at 26), ███████ ████████████████████████████. Chase resorts to absurd hypotheticals and pages of digressions on the use of capital letters in order to avoid the inescapable fact that "Books and Records," in this context, would indisputably include the multi-billion dollar securitization agreements that were an integral and public part of WaMu's mortgage banking operations. Chase's argument badly misses the mark.

> **A.    Chase's Interpretation of "Books and Records" Is Inconsistent With The Language of Section 2.1.**

Chase argues that the FDIC-Receiver's understanding of "Books and Records" is so broad as to make the word "Books" entirely superfluous, because "Books" is a subset of the defined term "Records."  Chase Br. at 34.  In fact, it is Chase's interpretation that is inconsistent with the language of Section 2.1.

The FDIC-Receiver's interpretation of "Books and Records" renders no part of the phrase superfluous.  Rather, "books and records" is one of the many legal "doublets" used in the corporate context, in which two overlapping terms are used together.[18]  As Professor Coffee, the FDIC-Receiver's expert, opined, "books and records" is commonly understood within the financial industry to denote a wide array of corporate documents.  *See* Dep. Ex. 748, Coffee Rep.

---

18.   *See In re Ocwen Loan Serv., LLC Mortg. Serv. Litig.*, 491 F.3d 638, 646 (7th Cir. 2007) (stating that "good faith and fair dealing" is "what is called a 'doublet,' a form of redundancy in which lawyers delight, as in 'cease and desist' and 'free and clear'") (citing Bryan A. Garner, *The Redbook: A Manual on Legal Style* § 11.2(f) (2d ed. 2006)).  Other examples, commonly used in law and the P&A Agreement itself, include "terms and conditions," "duties and obligations," and "right, title, and interest."

at 6-7; FDIC-R Br. at 17.  This would certainly include multi-billion dollar contractual

arrangements that could have been, and were, easily discernible by a sophisticated bank like

Chase during its extensive due diligence.  *See* FDIC-R Br. at 38-41.

Chase, on the other hand, contends that "Books and Records" means nothing more than a

bank's accounting records.  *See* Chase Br. at 26.  This interpretation does not comport with the

rest of Section 2.1.  To begin with, "Records" is a defined term in the P&A Agreement that

means far more than simply a bank's general ledger, subsidiary ledger, and supporting schedules.

*See* Dep. Ex. 1 at 6 (defining "Record").  Chase's interpretation reads the term "Records"

entirely out of the phrase "Books and Records" in Section 2.1, thereby conveniently excluding

from the scope of "Books and Records" the mortgage securitization contracts at issue here.[19]

According to Chase, the fact that "Record" is defined in the P&A Agreement has no

bearing whatsoever on the meaning of the phrase "Books and Records."  *See* Chase Br. at 38.

Chase asserts, without basis, that "[n]o draft of the agreement included a definition of the plural

term 'Records'" (Chase Stmt. ¶ 43), despite the fact that the P&A Agreement states plainly at the

beginning of its Definitions section that defined terms "imparting the singular include the plural

and vice versa."  Dep. Ex. 1 at 2.  In service of this position, Chase spends multiple pages of its

brief arguing about whether "Books and Records" in Section 2.1 is properly capitalized (*see*

Chase Br. at 9-10, 29-30), a meaningless elevation of form over substance given the many

reasons articulated by the FDIC-Receiver that "Books and Records" must necessarily be far

broader than Chase asserts.  *See* FDIC-R Br. at 14-17.

---

19.   *See Segar v. Mukasey*, 508 F.3d 16, 22 (D.C. Cir. 2007) ("[I]t is a cardinal principle of
       contract construction that a document should be read to give effect to all its provisions and
       to render them consistent with each other.").

Chase asserts that "Books and Records" refers to WaMu's accounting records, but "Accounting Records" is already a defined term in the P&A Agreement.[20]  Dep. Ex. 1 at 2. Chase even quotes the definition of "Accounting Records," Chase Br. at 26, but fails to acknowledge the implications: if the FDIC-Receiver had intended "Books and Records" to be interchangeable or synonymous with "Accounting Records," then it would have used the phrase "Accounting Records" in Section 2.1 of the P&A Agreement.  The fact that the Section 2.1 instead used different words is conclusive evidence that "Books and Records" and "Accounting Records" are not intended to have the same meaning.[21]

> **B.**    **This Case Is Not About** ███████████████████████████████

Chase would have the Court believe that this is a dispute about liabilities that are located "in the most obscure corner of [WaMu's] thousands of locations and petabytes of data."  Chase Br. at 27.  Nothing could be further from the truth.  Chase would rather focus on inapplicable hypotheticals to test the outer limits of "Books and Records" than address the issue in this case, because any close examination of whether Chase assumed WaMu's mortgage repurchase liabilities under the language of Section 2.1 supports the FDIC-Receiver's interpretation.  This case is not about ████████████████████████████████████████  Nor is it about ███████████ ████████████████████████████████████████████████████████

Rather, this case is about ongoing liabilities arising from express contractual provisions in the

---

20.   The P&A Agreement defines "Accounting Records" as "the general ledger and subsidiary ledgers and supporting schedules which support the general ledger balances."  Dep. Ex. 1 at 2.  Chase claims that "Books and Records" in Section 2.1 is equivalent to WaMu's "general ledger and subsidiary ledgers and supporting schedules."  Chase Br. at 26.

21.   *See In re A.P. Liquidating Co.*, 421 Fed. App'x 583, 589 (6th Cir. 2011) ("[O]rdinarily, one presumes that drafters who choose different words have intended to implement different concepts.") (internal quotation marks and citation omitted).

securitization agreements that constituted the core business of WaMu's mortgage banking operations. *See* FDIC-R Br. at 36-38. Chase's hypotheticals do not create genuine issues of material fact about the issue before the Court: namely, which party bears responsibility for WaMu's mortgage repurchase liabilities under the terms of the P&A Agreement.

**C.     The Drafting History of the P&A Agreement Does Not Support Chase's Interpretation of Section 2.1.**

Chase's narrative is misleading.

22.



23. It is well-settled that "[a]lthough the 'Whereas' clauses of a contract do not determine its operative effect, they do furnish a background in relation to which the meaning and intent of the operative provisions can be determined." *Jim Bouton Corp. v. Wm. Wrigley Jr. Co.*, 902 F.2d 1074, 1077 (2d Cir. 1990); *see also*, *e.g.*, *Grynberg v. FERC*, 71 F.3d 413, 416 (D.C. Cir. 1995) (whereas clauses may be "useful as an aid to interpretation"); *United States v. Hamdi*, 432 F.3d 115, 123 (2d Cir. 2005) ("[C]ontracts may, and frequently do, include recitals of the purposes and motives of the contracting parties, which may shed light on . . . the contract's operative promises to perform.") (citing 17A Am. Jur. 2d *Contracts* § 383 (2005)).

██████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████

████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████ Chase cannot dispute that the liabilities at issue in this case – that is, ongoing contractual obligations memorialized in public, multi-billion dollar securitization agreements – could be (and were) easily discerned in the course of due diligence.

█████████████████████████████████ Chase never denies that a thorough due diligence process would be sufficient for bidders to understand and assess the scope of the liabilities being assumed under Section 2.1, even if some of these liabilities (such as ongoing contractual obligations) were not reducible to a dollar amount on WaMu's balance sheet. ██

█████████████ And Michael Cavanagh, Chase's then-CFO, described Chase's due diligence for the WaMu transaction as "probably one of the most thorough things we've ever done."  Dep. Ex. 483 at 10. █████████████████████████████████████

███████████████████████████████████

████████████████



*see* Ex. 804, WaMu 2007 Form 10-K (3/21/08) at 15-16 ("Repurchase and indemnification liabilities are recorded within other liabilities in the Consolidated Statements of Financial Condition.").

24.

64542484_1

███████████████████████████████████████████████

███████████████

### III.   "BOOK VALUE" DOES NOT LIMIT THE SCOPE OF THE LIABILITIES ASSUMED BY CHASE.

Chase contends that under the FDIC-Receiver's construction of Section 2.1, the phrase "at Book Value" is surplusage.  Chase Br. at 34-35.  This is not only wrong, but backwards: Chase's own position on the meaning of "Book Value" and "Books and Records" necessarily fails to give effect to all parts of Section 2.1.  The FDIC-Receiver, on the other hand, explains that while the phrase "at Book Value" serves a useful purpose in purchase and assumption agreements, including the P&A Agreement, it does not operate as a limitation on the scope of the liabilities assumed.

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

64542484_1

Thus, the undisputed evidence demonstrates that neither the FDIC-Receiver nor Chase could have interpreted the Book Value clause at the time of the transaction to have the effect that Chase now claims.

A.    **"Book Value" Establishes The Pricing Of Liabilities In Section 2.1.**

Section 2.1 provides that Chase assumes WaMu's liabilities "at Book Value (subject to adjustment pursuant to Article VIII)."  Dep. Ex. 1 § 2.1.

The reference to Book Value in Section 2.1 parallels references to Book Value and Market Value in Section 3.2 and Schedule 3.2, which address the "price" of the assets transferred under Section 3.1.  *See* Dep. Ex. 1 §§ 2.1, 3.2 and at 35 ("Purchase Price of Assets").  Here, Chase did not pay specific prices for specific assets, but rather bid and paid a lump sum of $1.888 billion "for the Assets purchased and Liabilities Assumed hereunder."  *Id.* at 20.  Nevertheless, the Book Value of the assets and liabilities transferred in the WaMu transaction is useful for pricing purposes, as explained below.

In this P&A Agreement, the Book Value pricing is relevant to the FDIC-Receiver's right under Section 3.6 to reacquire from Chase particular assets and their related liabilities, and the calculation of the amount the FDIC-Receiver must pay Chase for such returned assets.  *See* Dep. Ex. 1 § 3.6; ███████████████  Section 3.6 provides that the FDIC-Receiver may choose to retain certain assets of the failed bank, along with their related liabilities, by purchasing the assets from Chase "at a price equal to the Repurchase Price thereof less the Related Liability Amount with respect to any Related Liabilities related to such Asset or asset."  Dep. Ex. 1 § 3.6.  "Repurchase Price" is defined by reference to "the dollar amount . . . stated on the Accounting Records of the Assuming Bank" (i.e., the book value) of the asset at the time the FDIC-Receiver desires to reacquire it.  *Id.* at 7.  "Related Liability Amount" is similarly defined as "the amount of such Related Liability as stated on the Accounting Records of the Assuming Bank" at the date this amount is being determined.  *Id.* at 6.

The line item values of these assets and related liabilities at whatever point after the transaction the FDIC-Receiver determines to reacquire them under Section 3.6 are derived from their Book Values at the time of WaMu's closure.  In order to calculate the "Repurchase Price" and the "Related Liability Amount" for the purposes of Section 3.6, it is necessary for Chase to

- 24 -

have recorded the Book Values (and, where applicable for assets under Schedule 3.2, Market

Values) of WaMu's assets and liabilities at the time of the transaction.  Thus, the reference to

Book Value in Section 2.1 has application in the event the FDIC-Receiver decides to reacquire

some WaMu asset from Chase for which the related liability must be offset to determine how

much the FDIC-Receiver should pay under Section 3.6.

The parenthetical "(subject to adjustments pursuant to Article VIII)" that follows directly

after "assumes at Book Value" in Section 2.1 highlights another general purpose of the Book

Value phrase, which is to deal with the purchase price adjustments that are common in Article

VIII of purchase and assumption agreements governing many other failed bank transactions, but

not included in the WaMu P&A Agreement.  The WaMu P&A Agreement did not include a

purchase price adjustment section in Article VIII, because Chase was paying a flat price without

any post-closing adjustments to the purchase price.[25]  *See* Dep. Ex. 1 at 20.

In short, nothing in the phrase "at Book Value" or in the rest of Section 2.1 suggests that

these three words were intended to define or limit the scope of the liabilities assumed by Chase.

Section 2.1 does not provide that Chase "will pay, perform, and discharge liabilities only to the

extent of their Book Value," or that Chase "assumes liabilities up to the amount of their Book

Value."  The FDIC-Receiver's interpretation gives effect to all words in Section 2.1 as they are

written.  Chase's interpretation does not.

---

25.   The reference to Article VIII in the parenthetical is also an indication that the Book Values
      of assumed liabilities, to the extent the assumed liabilities have Book Values, can be used
      in the preparation of a Proforma Statement of Condition. *See* Dep. Ex. 1 at 21.  The
      definition of "Proforma" states that the purpose of the Proforma Statement of Condition is
      to provide a "reasonably accurate financial statement of the Failed Bank through the date of
      closing" that "serve[s] as a basis for the opening entries of both the Assuming Bank and the
      Receiver."  *Id.* at 6.

Because the facts do not support its argument, Chase cites *Viola v. Fleet Bank of Maine*,[26] an unpublished magistrate's decision from 1996, in an effort to convince the Court that the FDIC-Receiver was "on notice" at the time of the transaction that Chase's interpretation of "at Book Value" was the correct one.  Chase Br. at 28-29.  But *Viola* has no bearing here.  *Viola* concerned the assumption of fraudulently uncredited deposit liabilities under a purchase and assumption agreement that transferred only specified liabilities to the assuming bank, in a case to which the FDIC was not even a party.  *See id.* at 28 n.12.  By contrast, the question here is whether Chase assumed WaMu's mortgage repurchase liabilities under an "everything-but" P&A Agreement that both Chase and the FDIC-Receiver agree transferred "substantially all" of WaMu's liabilities to Chase.  *See* Dep. Ex. 1 at 1; ████████████████████████  Neither the magistrate's perfunctory opinion in *Viola* nor the First Circuit's one-sentence, *per curiam* affirmance contains any analysis or reasoning on the issue for which Chase cites them.[27]  *Viola* is inapposite and does not compel the Court to decide that Section 2.1 of the P&A Agreement imposes a book value cap, in the face of all evidence to the contrary.

Chase claims that the holding in *Viola* controls the interpretation of "at Book Value" in Section 2.1 of the P&A Agreement because "[t]he FDIC was on notice of the judicially determined meaning of this phrase" as a result of that 18-year-old, unpublished decision in a case to which the FDIC was not a party.  Chase Br. at 3.  The irony of this logic should be clear, as the FDIC-Receiver has demonstrated indisputably that Chase was "on notice" at the time that it

---

26.   Civ. No. 95-141, 1996 WL 498390 (D. Me. Feb. 27, 1996).
27.   *See id.*; *Viola v. Fleet Bank of Maine*, 94 F.3d 640 (1st Cir. 1996).

- 26 -

bid that the P&A Agreement transferred all of WaMu's repurchase liabilities to the acquiring

institution, without cap or limitation.  *See* Dep. Ex. 153; ████████████████████████

**B.      Chase Indisputably Assumed Liabilities That Did Not Have A Book Value
On WaMu's Balance Sheet.**

Chase argues that it assumed WaMu's liabilities only up to their book value on WaMu's

balance sheet.  However, Chase assumed numerous liabilities under the P&A Agreement where

the true amount of the liability that Chase assumed exceeded the amount recorded in WaMu's

accounting records.  For example, by their nature, many contractual obligations do not have

specific book values, ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████  Dep. Ex. 540,

Chase 2008 Form 10-K (3/2/09) at 136 (assuming WaMu's "executory contracts and other

commitments"); ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

In addition, Section 2.1 provides that Chase "expressly assumes . . . and *agrees to pay,

perform, and discharge*" all liabilities reflected on WaMu's books and records at the time of its

closing.  Dep. Ex. 1 § 2.1 (emphasis added).  One does not "perform" or "discharge" line items

on accounting records; rather, these words refer to ongoing contractual obligations, like the

mortgage repurchase liabilities at issue here.[28]  To interpret Section 2.1 to mean that Chase assumed liabilities only to the extent they had a book value would allow the phrase "at Book Value" to nullify the words "perform and discharge."  Thus, Chase's interpretation is illogical and reads those words out of Section 2.1.

Section 4.8 further demonstrates that Chase assumed ongoing contractual obligations under the P&A Agreement that are not necessarily reducible to a line item book value amount.  *See* Dep. Ex. 1 § 4.8.  Section 4.8 provides a mechanism for Chase to elect not to assume individual "agreements existing as of Bank Closing which provide for the rendering of services by or to the Failed Bank."  *Id.*  Those agreements that are not or cannot be put back under Section 4.8 are assumed by Chase if they are not excluded under Schedule 2.1's list of "Certain Liabilities Not Assumed."  *Id.*  Agreements providing for the rendering of services by WaMu do not necessarily have a book value that reflects the ongoing contractual obligation, yet any of WaMu's service agreements not put back under Section 4.8 were assumed by Chase.

Chase also concedes, as it must, that it assumed WaMu's "mortgage servicing rights and obligations" under Sections 2.1 and 3.1.  Dep. Ex. 1 §§ 2.1, 3.1; *see id.* at 36 (Chase took on "rights of [WaMu] to provide mortgage servicing . . . and related contracts"); Chase Br. at 16, 43-44.  In assuming WaMu's mortgage servicing obligations, Chase became obligated to perform WaMu's ongoing duties under its mortgage servicing contracts.  Chase cannot point to a line item book value dollar amount that represents a liability arising from these ongoing duties at the time the bank closed, because such ongoing duties are not reducible to a dollar amount. ■

---

28.  *See* Restatement (Second) of Contracts § 235(1) ("Full performance of a duty under a contract discharges the duty.").

- 28 -

███████████████████████████████████████████████████

████████████████████████████████████ Yet Chase assumed

WaMu's contractual duties to service mortgage loans, just as it assumed WaMu's contractual

duties to repurchase mortgage loans from the securitization trusts.

As these examples illustrate, the "at Book Value" language in Section 2.1 simply cannot

be stretched to support the broad proposition that Chase only assumed liabilities up to a stated

book value.  Given the large range of liabilities and obligations that Chase indisputably assumed

that cannot be reduced to a book value, it turns the P&A Agreement inside out to assert that the

reference to "at Book Value" is somehow determinative of what liabilities were assumed.

### C. Other Contemporaneous Contracts Show That "Book Value" Does Not Limit The Scope Of Liabilities Assumed.

The FDIC is fully capable of structuring a transaction so that the liabilities assumed by

the acquirer are capped at a certain amount, and it did not do so in this P&A Agreement.  Most

simply, the FDIC can propose a transaction structure in which the acquirer assumes only a

limited and enumerated subset of the failed institution's liabilities. ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████

The FDIC has demonstrated in other purchase and assumption agreements that it can

craft language expressly capping liabilities that are being assumed by the acquirer if it intends to

do so.  For example, the "Assumption of Liabilities" section of the Security Pacific Bank

purchase and assumption agreement transferred to the acquirer only the nine categories of

- 29 -

liabilities enumerated in that Section 2.1.  Dep. Ex. 39 at 9.  Of those enumerated and assumed liabilities, three of the categories specifically state that "the assumption of any liability pursuant to this paragraph *shall be limited to the market value*" of the related assets.  *Id.* (sections (b), (d), (e)) (emphasis added).  Had the FDIC intended to cap the value of the liabilities transferred in the WaMu transaction, it would have used language such as this.[29]  It did not.[30]

Moreover, Section 2.1 of the Security Pacific purchase and assumption agreement, like the WaMu P&A Agreement and many other purchase and assumption agreements,[31] states that the liabilities assumed are being "expressly assume[d] at Book Value (subject to adjustment pursuant to Article VIII)."  *Id.*  If this language were intended to function as a cap – as opposed to a mechanism to compute the initial payment and for other purposes explained in section III.A above – then the cap-limiting language in subsections (b), (d), and (e) of the Security Pacific agreement would be meaningless at best and contradictory at worst.  If "at Book Value" means what Chase says it does, then Section 2.1 of the Security Pacific agreement would contain two conflicting liability caps: the book value at bank closure, and the market value of related assets.  This cannot be the case.  Chase's interpretation is plainly untenable, because it compels the conclusion that the FDIC used the phrase "at Book Value" to impose a cap in Section 2.1 of one

---

29  *See also*, *e.g.*, Ex. 826 (Silver State Bank P&A Agreement) § 2.1; Dep. Ex. 27 (Bank of Lincolnwood P&A Agreement) § 2.1.

30.  The March 2009 agreements between OneWest Bank and the FDIC as conservator for IndyMac Federal Bank are another example of the FDIC expressly retaining in the receivership a bank's mortgage seller obligations when it chooses to do so.  *See* Ex. 827, Servicing Business Asset Purchase Agreement §§ 2.03, 2.04(l) (excluding from transfer "any liabilities or obligations, imposed on the seller of loans . . . including, without limitation, any repurchase obligations for breaches of loan level representations").

31.  *See*, *e.g.*, Ex. 826 (Silver State Bank P&A Agreement) § 2.1; Dep. Ex. 27 (Bank of Lincolnwood P&A Agreement) § 2.1.

transaction while using the same phrase to mean something completely different in Section 2.1

of a separate transaction, despite "Book Value" having the same definition in both transactions.

> **D.    Chase's Interpretation Of "Book Value" Is Not Consistent With Chase's Post-Transaction Conduct.**

Although Chase now claims that it assumed WaMu's repurchase liability only up to the

amount of the reserves recorded on WaMu's balance sheet (*see* Chase Br. at 15, 26), there is no

evidence that Chase ever treated the WaMu repurchase reserves as a fixed cap on the liability

assumed by Chase.  *See* FDIC-R Br. at 30-36; ██████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████    In short, Chase's litigation position that "Book Value" imposes a cap is not rooted in fact.

> **IV.   THE REPURCHASE LIABILITIES WERE NEITHER "UNKNOWN" NOR "UNIDENTIFIED."**

Chase asserts that it could not possibly have assumed the WaMu repurchase liabilities,

because no acquiring institution (it says) would ever agree to take on "unliquidated or contingent

- 31 -

liabilities" in a purchase and assumption agreement.  Chase Br. at 33.  In support of this line of

reasoning, Chase cites cases observing that assuming banks would be disinclined to acquire

"latent claims of unknown magnitude" and "unidentified liabilities of undefined dimensions" in

transactions with a federal receivership.  *Id.*  Chase's argument is flawed in multiple respects.

First, as the FDIC-Receiver detailed at length in its brief (FDIC-R Br. at 22-27), Chase

knew when it bid that it would be assuming WaMu's off-balance sheet mortgage securitization

liabilities, including its repurchase liabilities, under the terms of this transaction.  *See* Dep. Ex.

153 at 2.  It is thus immaterial whether acquirers generally might or might not assume contingent

or unliquidated liabilities, because Chase knowingly assumed the liabilities in dispute here.

Second, the WaMu repurchase liabilities were neither "unknown" nor "unidentified" at

the time of the WaMu transaction.  When it entered into the P&A Agreement, Chase was fully

aware not only of the existence of WaMu's ongoing mortgage repurchase liabilities, but also

their nature and scope.  *See* FDIC-R Br. at 36-38.  Chase was a sophisticated participant in the

mortgage securitization industry and had repurchase liabilities of its own.  *See id.*  WaMu and its

holding company repeatedly disclosed and discussed WaMu's repurchase liabilities in their

public filings, ███████████████████████████ *See id.* at 36-41.  ████████

███████████████████████████████████████████████████████

███████████████████████████████████████████  Chase was

aware that WaMu's exposure from its repurchase liabilities was not limited to the estimated

amount recorded in its reserves.  *See* FDIC-R Br. at 38.  Chase also knew that WaMu faced

sharply increasing repurchase requests from investors in the months leading up to the transaction,

which in turn caused increases in WaMu's repurchase reserves and its assessment of its future

exposure.  *See id.* at 37.  ███████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

   ██████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

        Third, Chase cannot credibly dispute that it assumed WaMu's contingent liabilities,

because the evidence to the contrary is clear.  Chase acknowledges that even under its own

theory, it assumed contingent liabilities to the extent they were reflected as line items on

WaMu's pre-closure balance sheet.  *See* Chase Br. at 26.  ██████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████  Chase's assertion that it did not assume WaMu's

"unliquidated or contingent liabilities" is flatly untrue.  Chase Br. at 33.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████   Nor is there any indication anywhere in the millions of pages of materials

produced by Chase that such a book value cap existed.  *See id.* at 33-35.

Section 2.5 offers additional confirmation that the scope of liabilities assumed by Chase

under the P&A Agreement is broader than Chase contends.  Section 2.5 provides that Chase did

not assume:

> any liability associated with borrower claims for payment of or
> liability to any borrower for monetary relief, or that provide for
> any other form of relief to any borrower, *whether or not such
> liability is reduced to judgment, liquidated or unliquidated, fixed
> or contingent, matured or unmatured, disputed or undisputed . . .
> whether asserted affirmatively or defensively. . . .*

Dep. Ex. 1 § 2.5 (emphasis added).  If Chase had assumed only liabilities with stated dollar book

values on WaMu's accounting ledgers, the italicized language would have been unnecessary, as

many unliquidated, contingent, unmatured, and disputed claims are not so recorded.  In other

words, if Chase (as it claims) did not assume any contingent or unliquidated liabilities, then

Section 2.5 would not have specified that the FDIC-Receiver was retaining such liabilities with

respect to borrower claims.

## V.    CONTRA PROFERENTEM DOES NOT APPLY HERE.

Tellingly, the very first bullet point Chase cites in support of its argument is a doctrine of

last resort that does not apply to sophisticated parties like Chase.  *See* Chase Br. at 2.  Chase

begins its brief by asserting that "[t]he FDIC drafted the P&A Agreement . . . and as such any

ambiguity in it is construed against the FDIC."  *Id.*; *see also id.* at 24.  Known as contra

proferentem, this doctrine is, as a matter of law, a "rule of last resort" that courts will not turn to

- 34 -

if other evidence sheds light on the meaning of the contract.  Moreover, this doctrine does not apply when both contracting parties are sophisticated.  In this case, the undisputed evidence shows the FDIC-Receiver's understanding is the only reasonable interpretation of the P&A Agreement, and there is no question that the parties are sophisticated.

### A.    Contra Proferentem Is A Doctrine Of Last Resort.

The overwhelming weight of authority recognizes that contra proferentem is a "rule of last resort" that "is applied only when other approaches to contract interpretation have failed."[32] Courts will not employ contra proferentem unless, "after examining the entire contract, the relation of the parties, their intention, and the circumstances under which they executed the contract, the [contractual] ambiguity remains unresolved."[33]  In short, contra proferentem does not apply if the parties' intention can be discerned by other methods of interpretation, including examination of extrinsic evidence.[34]  Here, the language of the P&A Agreement and the extrinsic evidence demonstrate that Chase assumed WaMu's mortgage repurchase liabilities under Section 2.1.  *See generally* FDIC-R Br. at 14-44.  Accordingly, contra proferentem has no place.

---

32.  *Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1352-53 (Fed. Cir. 2006); *see also*, *e.g.*, *Int'l Multifoods Corp. v. Comm. Union Ins. Co.*, 309 F.3d 76, 88 n.7 (2d Cir. 2002); *United States Fire Ins. Co. v. Gen. Reins. Corp.*, 949 F.2d 569, 573 (2d Cir. 1991); *Record Club of Am. v. United Artists Records*, 890 F.2d 1264, 1271 (2d Cir. 1989); 5 Margaret N. Kniffin, *Corbin on Contracts* § 24.27 at 297 (Joseph M. Perillo ed., rev. ed.1993); 2 E. Allan Farnsworth, *Farnsworth on Contracts* § 7.11 at 304 & n.33 (3d ed. 2004) (citing cases); Restatement (Second) of Contracts, § 206, cmt. a (1993)).

33.  *United States v. Erickson Paving Co.*, 465 F.2d 396, 400 (9th Cir. 1972).

34.  *See*, *e.g.*, *Gardiner*, 467 F.3d at 1352; *Mesa Air Grp. v. Dep't of Transp.*, 87 F.3d 498, 506 (D.C. Cir. 1996); *Carey Canada, Inc. v. Columbia Cas. Co.*, 940 F.2d 1548, 1554 (D.C. Cir. 1991) (citing state law that "contra proferentem 'is inferior . . . to extrinsic proof of the parties' agreement, or to other authority revealing that understanding'").

**B.** **Contra Proferentem Does Not Apply Between Sophisticated Parties.**

The contra proferentem doctrine also does not apply to an agreement between sophisticated parties, such as Chase and the FDIC-Receiver. There is no reason to interpret ambiguities against the drafter when the contractual language "results from the bargaining between sophisticated commercial parties of similar bargaining power."[35] This is because the non-drafting party, "if commercially sophisticated and represented by counsel, will insist on clarification" before it signs if the drafting party obscures the meaning of the agreement by shading the language to advance its own interests.[36] Chase is indisputably a sophisticated commercial party represented by experienced counsel who were able and willing to seek clarification regarding the terms of the transaction.[37]



---

35. *FDIC v. Ins. Co. of N. Am.*, 105 F.3d 778, 786-87 (1st Cir. 1997); *see also, e.g., New Jersey v. Merrill Lynch & Co., Inc.*, 640 F.3d 545, 550 (3d Cir. 2011); *Beanstalk Grp., Inc. v. AM Gen. Corp.*, 283 F.3d 856, 858 (7th Cir. 2002); *Terra Int'l, Inc. v. Miss. Chem. Corp.*, 119 F.3d 688, 692-93 (8th Cir. 1997).

36. *Beanstalk Grp.*, 283 F.3d at 858.

37. *See McNeilab, Inc. v. North River Ins. Co.*, 645 F. Supp. 525, 547 (D.N.J. 1986) ("Concededly a sophisticated insured, Johnson & Johnson cannot seek refuge in the doctrine of contra proferentem . . . . *Cessante ratione legis, cessat et ipsa lex* — 'where the reason stops, there stops the rule.'").

64542484_1

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████  Chase cannot now expect to have the language of Section 2.1 construed in its

favor simply because it did not draft the agreement.

## VI.    CHASE'S BRIEF OBFUSCATES THE ISSUE BEFORE THE COURT.

Chase fills the bulk of its brief with an assortment of irrelevancies in an effort to avoid

substantive discussion of the mortgage repurchase liabilities at issue here.  None of Chase's

digressions have any bearing on this case.

---

38.   ████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████████████████  Section 12.1(b) states that "no indemnification will
be provided under this Agreement" for costs incurred in connection with claims against
Chase for any "claims with respect to any liability or obligation of the Failed Bank that is
*expressly assumed* by the Assuming Bank pursuant to this Agreement."  *Id.* § 12.1(b)(3)
(emphasis added).  Under Section 2.1, Chase "expressly assumes" all liabilities reflected on
WaMu's pre-closure books and records, with specified exceptions.  *Id.* § 2.1.  Therefore,
there are no liabilities that Chase assumed under Section 2.1 for which it is entitled to be
indemnified under Section 12.1.

**A.      The FDIC-Receiver's Interpretation of Section 2.1 Has Not Shifted.**

███████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

█████████ As explained *supra* at 28, only agreements providing "for the rendering of services by or to the Failed Bank" are covered by Section 4.8, and Chase is deemed to have assumed agreements for which no timely notice is given.  Dep. Ex. 1 § 4.8.

██████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████



64542484_1



**B.**     **This Case Is Not About** ▮▮▮▮▮▮▮▮▮▮▮**.**

**C.**     **This Case Is Not About Liability For Tax Audits.**

In devoting half a dozen full pages of its brief to post-transaction statements about

WaMu's tax liabilities (*see* Chase Br. at 5, 13-15, 40-42), Chase focuses at length ▮▮▮▮▮▮

---

39.

██████████████████████████████████████████████████████████

████████████ and on liabilities that are not at issue in this case.  Chase contends that the

FDIC-Receiver's post-transaction treatment of WaMu tax liabilities is instructive because tax

liabilities are somehow "analogous to RMBS repurchase obligations."  Chase Br. at 40.  But this

case is not about ████████████████████████████████████████████

████████████████████  There is no need to discuss supposedly "analogous" liabilities

given the clear and undisputed evidence that Chase assumed the repurchase liabilities *actually at*

*issue* here.

   In any event, Chase's account of the tax issue is itself demonstrably inaccurate.  Chase

claims that the "pre-litigation public position" of an "FDIC official" on tax liabilities was

consistent with Chase's understanding of the P&A Agreement.  Chase Br. at 5.  This is incorrect.

███████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████  The FDIC-Receiver's

pre-litigation – and, indeed, pre-transaction – position, as communicated to Chase, was that

Chase assumed "substantially all" of WaMu's liabilities, Dep. Ex. 1 at 1, and that the P&A

Agreement was understood by all prospective bidders to transfer "[t]he bank's interests and

obligations associated with the off-balance sheet . . . mortgage securitizations," Dep. Ex. 153.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

64542484_1

████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████ As the FDIC-Receiver has

detailed, there is nothing about WaMu's repurchase liabilities that could reasonably have been

considered "unknown" to Chase at the time of the transaction. *See supra* at 31-33.

████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ Chase was responsible for

preparing returns under Section 4.9 of the P&A Agreement. ██████████████ *see* Dep. Ex. 1

§ 4.9. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

**D.     The FDIC-Receiver Has Never Argued That Mortgage Seller And Servicer Obligations Are Indistinguishable.**

Chase spends the final pages of its brief asserting that mortgage seller obligations and mortgage servicer obligations are distinct, even where the same entity plays both seller and servicer roles under a given securitization agreement.  *See* Chase Br. at 43-44.  Chase correctly recognizes that the FDIC-Receiver is not arguing this point, but then devotes considerable space responding to an argument that is not being made.  *See id.*  Chase's citations to cases arising from the July 2008 closure of IndyMac Bank, which addressed different issues arising out of a different receivership that entered into different transactions under a materially different set of purchase and assumption agreements, are completely irrelevant.

The FDIC-Receiver has never argued in this case that the repurchase liabilities under the Governing Agreements are servicer obligations.  Nor has the FDIC-Receiver argued in this case that the seller and servicer obligations under the pre-closure securitization agreements of a failed financial institution cannot be severed.  To the contrary, the FDIC-Receiver has simply maintained that it can effect a transaction that transfers all of the failed bank's obligations (including both seller and servicer obligations) under the governing agreements for mortgage loan securitizations, as it did in the WaMu transaction.[40]  Here, the FDIC-Receiver unequivocally informed Chase prior to the transaction (and Chase did not then contest) that Chase would be assuming WaMu's "interests and obligations associated with the off-balance sheet . . . mortgage securitizations" under Section 2.1, which Chase cannot dispute include WaMu's repurchase

---

[40].    *See* 12 U.S.C. §§ 1821(d)(2)(G)(i)(II), (d)(13)(E)(i).

- 43 -

liabilities.  Dep. Ex. 153; ███████     Any discussion of the terms of the IndyMac agreements

is thus beside the point.

## VII.    ALL WMMSC LIABILITIES INDISPUTABLY TRANSFERRED UNDER THE P&A AGREEMENT.

Chase's brief makes no distinct argument as to why summary judgment should be

granted in favor of Defendant WMMSC, which serves as the seller and depositor for 44 of the 99

Primary Trusts at issue in this case.  *See* Am. Compl., Ex. 1-A.  To the extent that WMMSC

relies on the arguments made by Chase in its brief, its motion also should be denied for the

reasons stated herein.  WMMSC is not entitled to summary judgment for the separate reason

that, under the P&A Agreement, the FDIC-Receiver indisputably did not retain any liabilities of

former WaMu subsidiaries.  *See* Dep. Ex. 1 § 3.1; ███████████████████████

███████     WMMSC is a "former Washington Mutual Bank subsidiar[y] that [is] now [a]

subsidiar[y] of JPMorgan Chase Bank, N.A."  Dep. Ex. 540, Chase 2008 Form 10-K (3/2/09)

at 14.  When Chase purchased "all right, title, and interest" in and to "all subsidiaries" of WaMu,

it acquired the capital stock of these subsidiaries.  Dep. Ex. 1 § 3.1; *see id.* at 35.  Under basic

principles of corporate law, a change in stock ownership for a corporation transfers all of that

corporation's assets and liabilities.[41] ████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████

████████████████████████████

---

41.    *See In re KB Toys, Inc.*, 340 B.R. 726, 728 (D. Del. 2006).

Chase has not disputed this. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████ Moreover, former WaMu subsidiaries that became subsidiaries of Chase are not

"Indemnitees" entitled to indemnification under Section 12.1 of the P&A Agreement. *See* Dep.

Ex. 1 at 4 (defining "Indemnitees" to exclude subsidiaries acquired by Chase); *see also id.* § 12.1

(limiting indemnification to "Indemnitees").  There is thus no dispute that Chase and WMMSC

bear all repurchase liability for WMMSC securitization trusts.

## CONCLUSION

Chase's motion for summary judgment should be denied, and summary judgment should

be granted in favor of the FDIC-Receiver.

Dated:  July 31, 2014

Of Counsel:

Kathryn R. Norcross, D.C. Bar No. 398120
   Senior Counsel
Kaye A. Allison, Counsel
Anne M. Devens, Counsel
FEDERAL DEPOSIT INSURANCE
   CORPORATION
3501 Fairfax Drive, Room VS-D-7092
Arlington, Virginia 22226
Telephone:  (703) 562-2676
Facsimile:  (703) 562-2475
Email:  knorcross@fdic.gov
Email:  kallison@fdic.gov
Email:  adevens@fdic.gov

Respectfully submitted,

  /s/ William R. Stein
William R. Stein, D.C. Bar No. 304048
Scott H. Christensen, D.C. Bar No. 476439
Jason S. Cohen, D.C. Bar No. 501834
HUGHES HUBBARD & REED LLP
1775 I Street, N.W., Suite 600
Washington, D.C. 20006-2401
Telephone:  (202) 721-4600
Facsimile:  (202) 721-4646
Email:  stein@hugheshubbard.com
Email:  christensen@hugheshubbard.com
Email:  cohenj@hugheshubbard.com

*Attorneys for Federal Deposit Insurance
Corporation in its capacity as Receiver for
Washington Mutual Bank*