Exhibit *784* for ID

Witness: ARNOLD

P. *1* of *46* PP. *4-9-14*

Lindsay Pinkham CSR 3716 CRR

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee for the Trusts listed in Exhibits 1-A and 1-B,

Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION,
as receiver for Washington Mutual Bank; JPMORGAN
CHASE BANK, National Association; and
WASHINGTON MUTUAL MORTGAGE
SECURITIES CORPORATION,

Defendants.

Case No.:  09-CV-1656-RMC

EXPERT REPORT OF PROFESSOR JERRY ARNOLD

December 12, 2013

TABLE OF CONTENTS

PAGE

I.      QUALIFICATIONS ...................................................................................1

II.     OVERVIEW OF OPINIONS AND RELEVANT ACCOUNTING STANDARDS ..........3

        A.    Context of Opinions.................................................................................3

        B.    Summary of Opinions and Structure of Report .....................................4

        C.    Relevant Accounting Standards...............................................................5

III.    FROM AN ACCOUNTING PERSPECTIVE, THE TERMINOLOGY USED IN
        THE PAA IS INCONSISTENT WITH JPMC'S POSITION THAT IT DID NOT
        ASSUME WAMU'S REPURCHASE LIABILITY...........................................................5

        A.    A Company's Records Play a Vital Role in the Accounting Process and
              Encompass a Broad Range of Business Documentation .........................6

        B.    The WaMu Securitization Transaction Agreements Are Records of the
              Bank That Reflect Repurchase Liabilities ..............................................7

IV.     JPMC'S POST-ACQUISITION TREATMENT OF THE WAMU MORTGAGE
        REPURCHASE LIABILITY, AS AUDITED BY PWC, CONFIRMS THAT
        JPMC ASSUMED THE ENTIRE REPURCHASE LIABILITY.......................................8

        A.    JPMC's Accounting for the WaMu Repurchase Liability Contradicts Its
              Assertion That It Did Not Assume That Liability ...................................8

        B.    JPMC's Accounting for the WaMu Repurchase Liability Contradicts Its
              Assertion That There Was a Book Value Cap on Its Assumption of That
              Liability...................................................................................................9

              1.    PwC Work Papers Make No Reference to a Book Value Cap and
                    Do Not Apply Such a Liability Cap..........................................9

              2.    JPMC Is Unable to Quantify the Book Value Cap for the WaMu
                    Repurchase Liability and Cannot Tie It to Any Book Value
                    Amount on WaMu's Accounting Records as of the Closing....................14

              3.    JPMC Did Not Follow the Accounting Standards for a Book Value
                    Cap ..........................................................................................17

              4.    JPMC's Accounting for Its ████████████ Was Inconsistent
                    With the Existence of a Book Value Cap ................................19

5.    JPMC's Accounting for Its Private Settlements Was Inconsistent
      With the Existence of a Book Value Cap ..................................................26

6.    JPMC's Inability to Quantify a Book Value Cap and Its Failure to
      Apply Such a Cap to Its Various Settlements Cannot be Explained
      Away Based on "Accounting Convenience" or Assertions That the
      Reserve Was "In Runoff" ........................................................................28

      a)    The ███████████ and Business Necessity..........................28
      b)    The "Runoff" Contention............................................................29

## I.   QUALIFICATIONS

I hold a Ph.D. in Business, with a concentration in accounting, from the University of Michigan in Ann Arbor. I hold bachelor's and master's degrees in accounting from the University of Missouri in Columbia. I have been a faculty member at the Leventhal School of Accounting, in the Marshall School of Business, at the University of Southern California ("USC") since 1979. Prior to joining the faculty at USC, I served for four years as a faculty member at the University of California at Los Angeles. During the 1988-89 academic year, I served as a Visiting Professor at the Wharton School at the University of Pennsylvania. I was the founding director in 1982 of USC's SEC and Financial Reporting Institute and served as director until 1988. I have written extensively in the area of accounting and SEC regulation. Since 1989, I have been instructing the SEC reporting and compliance course for the professional staff of a "Big Four" accounting firm. I have testified at deposition and trial in cases involving GAAP, SEC regulations, the role of management and the auditor regarding the preparation and presentation of financial statements, and other related issues. My complete curriculum vitae, including publications, is attached as Appendix 1. Appendix 2 lists the testimony I have given in other cases since January 1, 2009.

I have been retained by counsel to the Federal Deposit Insurance Corporation, as Receiver for Washington Mutual Bank ("FDIC Receiver"), and Deutsche Bank National Trust Company ("DBNTC") to apply my accounting expertise to analyze the extent to which JPMorgan Chase Bank, N.A. ("JPMC") acquired Washington Mutual Bank's ("WaMu") mortgage repurchase liability. I have been compensated as an expert witness on an hourly basis (at a rate of $750 per hour) and such compensation is not contingent on the outcome of this matter. My analysis includes (i) consideration of whether, based on financial reporting and accounting standards, JPMC's accounting treatment of WaMu's mortgage repurchase liability

was consistent with JPMC's claim that it did not assume that liability, and (ii) consideration of terminology and accounting principles bearing on this issue.[1]

In order to address the terminology that applies here, I have reviewed the September 25, 2008 Purchase and Assumption Agreement ("PAA") which governed the acquisition of substantially all of the assets and liabilities of WaMu by JPMC, and related documents.  In this regard, it is worth noting that the responsibilities of an accountant include reviewing and assessing contracts to determine whether the contract provisions result in assets or liabilities and then to determine the accounting for those assets and liabilities.  As it relates to an accountant's audit of financial statements, one of the generally accepted auditing standards ("GAAS") calls for the accountant to obtain and evaluate sufficient evidential matter including, for example, the contracts that govern a transaction.[2]  In other words, this standard requires the accountant to evaluate the accounting impact of a contract between two or more parties.

A complete list of materials that I have considered in preparing this report is provided in Appendix 3.  To the extent that additional information becomes available, I may amend or supplement my opinions as necessary.

---

[1] By "mortgage repurchase liability," I mean the liability arising from WaMu's obligations under the agreements governing the relevant securitizations to replace or buy back loans in certain circumstances when there has been a breach of the loan or underwriting related representations and warranties in those agreements.

[2] Public Company Accounting Oversight Board Interim Standard ("PCAOB AU") Section 326.

## II.      OVERVIEW OF OPINIONS AND RELEVANT ACCOUNTING STANDARDS

### A.      Context of Opinions

Section 2.1 of the September 25, 2008 PAA governing the acquisition of WaMu by JPMC states that:

> "Subject to Sections 2.5 and 4.8, the Assuming Bank expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) and agrees to pay, perform, and discharge, all of the liabilities of the Failed Bank which are reflected on the Books and Records of the Failed Bank as of Bank Closing . . ."

This section contains two clauses that use accounting-related terminology: the "Book Value Clause" which states that "the Assuming Bank expressly assumes at Book Value (subject to adjustment pursuant to Article VIII)," and the "Agrees to Pay Clause" which states that the Assuming Bank "agrees to pay, perform, and discharge, all of the liabilities of the Failed Bank which are reflected on the Books and Records of the Failed Bank as of Bank Closing."

I understand that JPMC has advanced at least two different interpretations of the PAA to argue it is not responsible for WaMu's contractual obligation to repurchase certain mortgages that WaMu or its affiliates sold or securitized (the "Repurchase Liability"). First, JPMC initially asserted that JPMC did not assume the Repurchase Liability at all because that liability was unquantifiable and therefore did not have a "Book Value as of the Closing."[3] JPMC made that assertion even though (a) WaMu had accrued as of the Closing a reserve of several hundred million dollars for its repurchase liability in the "Other Liabilities" line item on the WaMu balance sheet,[4] and (b) such a reserve necessarily accrues for only the probable and estimable

---

[3] Reply Memorandum in Further Support of JPMorgan Chase Bank, N.A. and Washington Mutual Mortgage Securities Corporation's Motion to Dismiss and Motion for Partial Summary Judgment at 24, Feb. 11, 2011.

[4] Exhibit 682, Washington Mutual Bank Unconsolidated Balance Sheet at 35.

portion of a potentially much larger liability.[5]  Second, JPMC has asserted that the liabilities

assumed should be limited to those that had a Book Value on WaMu's Accounting Records as of

September 25, 2008, when the transaction closed (the "Closing"), and that the amount of these

liabilities should be capped by those Book Values.[6]  JPMC also contends that the term "Books

and Records" in the Agrees to Pay Clause should be interpreted as limited to "Accounting

Records,"[7] even though (a) "Accounting Records," a defined term in the PAA, was not used in

Section 2.1, and (b) the PAA defines the term "Record" separately from the Accounting Records

and far more broadly.

### B.    Summary of Opinions and Structure of Report

I begin my analysis by reviewing the terminology used in the PAA from an accounting

perspective.  I find that, under accounting principles and practices, the terminology used is

inconsistent with JPMC's position that it did not assume WaMu's Repurchase Liability in full.

See Section III, below.

I then review JPMC's accounting treatment of the WaMu Repurchase Liability in its own

accounting records and published financial statements, which were audited by

PricewaterhouseCoopers LLP ("PwC").  I find that JPMC's accounting treatment is inconsistent

with JPMC's assertion that it either did not assume the Repurchase Liability or that it assumed

---

[5] Accounting for Contingencies, SFAS 5 (FASB 1975).

[6] Transcript of Deposition of JPMC 30(b)(6) Witness John Barren ("Barren Deposition") at 28:11 – 29:3.  See also Reply Memorandum in Further Support of JPMorgan Chase Bank, N.A. and Washington Mutual Mortgage Securities Corporation's Motion to Dismiss and Motion for Partial Summary Judgment at 20, Feb. 11, 2011.  "Book Value" is a defined term in the PAA.

[7] See, e.g., Transcript of Deposition of Michael Lipsitz at 109:19-110:15; Transcript of Deposition of Mitchell Eitel at 100:4-23.

that liability only at an amount capped by the Book Value of WaMu's mortgage repurchase reserve as of the Closing. See Section IV, below.

### C.    Relevant Accounting Standards

As of the Closing, the accounting standards governing the recognition and measurement of repurchase liabilities were:

1.    Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities: a replacement of FASB Statement No. 125, Statement of Financial Accounting Standards No. ("SFAS") 140 (Financial Accounting Standards Board ("FASB") 2000);

2.    Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others: an interpretation of FASB Statements No. 5, 57, and 107 and rescission of FASB interpretation No. 34, FASB Interpretation No. ("FIN") 45 (FASB 2002);

3.    Accounting for Contingencies, SFAS 5 (FASB 1975);

4.    Reasonable Estimation of the Amount of a Loss, an Interpretation of FASB Statement No. 5, FIN 14 (FASB 1976);

5.    Business Combinations, SFAS 141 (FASB 2001); and

6.    Offsetting of Amounts Related to Certain Contracts: an Interpretation of Accounting Principles Board ("APB") Opinion No. 10 and FASB Statement No. 105, FIN 39 (FASB 1992) and Environmental Remediation Liabilities, Statement of Position ("SOP") 96-1.

## III.    FROM AN ACCOUNTING PERSPECTIVE, THE TERMINOLOGY USED IN THE PAA IS INCONSISTENT WITH JPMC'S POSITION THAT IT DID NOT ASSUME WAMU'S REPURCHASE LIABILITY

I have been asked to apply my expertise in accounting and financial reporting to evaluate JPMC's position with specific reference to the terminology used in the WaMu PAA. The central question I address in this section is whether, from an accounting perspective, the Book Value Clause and the references to "Books and Records" in the Agrees To Pay Clause would be understood to apply in the manner JPMC suggests.

A.    A Company's Records Play a Vital Role in the Accounting Process and Encompass a Broad Range of Business Documentation

The Agrees To Pay Clause states that JPMC, the acquirer, "agrees to pay, perform, and discharge, all of the liabilities of the Failed Bank which are reflected on the Books and Records of the Failed Bank as of Bank Closing." From an accounting perspective, this indicates that JPMC agreed to "pay, perform, and discharge" the mortgage repurchase liabilities that arise from the WaMu securitization transaction agreements, which are records of the Failed Bank. If JPMC's application of the Book Value Clause were accepted, the Book Value Clause would conflict with the broad acquisition of "all liability" in the Agrees To Pay Clause and the generally accepted use of the term "records" in accounting practice.

Records are at the core of accounting and reporting systems. In accounting practice, the records of a business encompass a wide range of documents that confirm and provide evidence concerning transactions and facts that affect the financial status of the business. Even without reference to the broad definition of the term "Record" in the PAA here, accountants and auditors consider a "record" to include any document evidencing the activities of an enterprise or containing or supporting a transaction, accounting entry, or account. The term "records" is not limited to entries on the general ledger, subsidiary ledgers, and supporting schedules. Examples of "records" include any invoice, voucher, contract, correspondence, internal report, internal policy, memoranda, e-mails, or Board minutes.

The accounting process begins with the most basic of records. For example, an invoice provides the information to record a liability for payment upon the receipt of goods or services. A time record is used to determine the amount that is owed to hourly employees. A lease contract is used by accountants to determine if the lease should be recognized as an asset and liability or as a simple rental agreement. A loan contract is used by accountants to determine if

6

the receivable or payable should be classified as current or long-term on the balance sheet. Other executory contracts, such as a contract for ongoing professional services or the future delivery of a nonfinancial asset (e.g., furniture or equipment), result in an obligation to pay some amount after the future delivery of a service or asset. These typically do not result in a liability being recorded until the delivery of the service or non-financial asset. Consistent with the broad meaning of the term "records" in accounting practice, the PAA, at page 6, also defines the term "Record" broadly, as follows:

> "'Record' means any document, microfiche, microfilm and computer records (including but not limited to magnetic tape, disc storage, card forms and printed copy) of the Failed Bank generated or maintained by the Failed Bank that is owned by or in the possession of the Receiver at Bank Closing."

**B.     The WaMu Securitization Transaction Agreements Are Records of the Bank That Reflect Repurchase Liabilities**

In undertaking a mortgage loan securitization transaction, WaMu and the other relevant parties entered into a number of securitization transaction agreements for each transaction at issue. These agreements, all executed prior to September 25, 2008, are records that existed at the date of Closing and, in relevant part, created contingent and ongoing mortgage repurchase liabilities. The obligation to repurchase a securitized mortgage loan arises under the securitization transaction agreements when a securitized mortgage loan does not meet certain contractual representations and warranties.[8] Under governing accounting standards, those contract provisions presented the basis for WaMu's accountants to estimate a repurchase reserve to accrue for the estimated repurchase liability arising under the mortgage loan securitizations.[9]

---

[8] Transcript of Deposition of Corrine Burger ("Burger Deposition") at 20:9-14.

[9] Deposition Exhibit 308, WaMu Memorandum Re: Accounting Analysis – June 30, 2008 Repurchase Reserves at 1.

IV.   **JPMC'S POST-ACQUISITION TREATMENT OF THE WAMU MORTGAGE REPURCHASE LIABILITY, AS AUDITED BY PWC, CONFIRMS THAT JPMC ASSUMED THE ENTIRE REPURCHASE LIABILITY**

I have been asked to apply my knowledge and experience in accounting and financial reporting to determine if the way in which JPMC accounted for the WaMu Repurchase Liability is consistent with its claim that it either (a) did not assume that liability or (b) assumed that liability only up to the Book Value amount of the liability as of the Closing.

A.   **JPMC's Accounting for the WaMu Repurchase Liability Contradicts Its Assertion That It Did Not Assume That Liability**

As a general proposition, accounting for a transaction must reflect the economic reality of the transaction.[10]  Under SFAS 5, a reserve is only allowed if a loss associated with a liability is probable and estimable.[11]  Thus, if a company establishes a reserve in connection with a liability, that necessarily means the company's management believes the liability exists.  If there is no liability, no losses are probable, and SFAS 5 does not allow a reserve to be recorded.  The evidence in this case shows that JPMC established a reserve in connection with the WaMu Repurchase Liability at the date of Closing and subsequently adjusted that reserve to reflect JPMC's changing assessment of the probable losses resulting from that liability.[12]  Therefore, JPMC's accounting reflects the premise that JPMC assumed the WaMu Repurchase Liability through the acquisition.

The repurchase reserve account is both an estimate and a net amount representing the unpaid principal balance ("UPB") of the loans expected to be repurchased minus the collateral

---

[10] CON 2, ¶ 63-83. PCAOB AU Section 411, ¶ 6 and PCAOB AU Section 334, ¶ 2.

[11] SFAS 5, ¶ 8.

[12] *See* Section IV.B, below.

value of the defaulted loans.  WaMu analyzed and calculated the repurchase reserve on its

overall outstanding securitizations as opposed to performing the analysis on a loan by loan basis.

WaMu's accounting for the repurchase reserve account was guided by SFAS 5, which requires

recording a reserve for the obligation to repurchase a loan by starting with its UPB if a

repurchase payment is probable and the amount is estimable.[13]  WaMu's practice was to reduce

the UPB amount of the reserve by the estimated value of the underlying loan.[14]  In other words,

the accounting treatment results in two amounts being netted against each other to create the

balance for the repurchase reserve account.  One amount is the portion of the UPB of the loan

that is likely to be paid to the investors to satisfy their repurchase demands.  Offsetting this

amount is an asset representing the value of the loan and collateral (the resale value of the

mortgaged home and recoveries from others) that WaMu must repurchase.  This collateral value

offsetting the reserve does not reduce the amount that WaMu would be required to pay the

investor to repurchase the loan, but rather, only reduces the amount of the loss incurred upon

repurchase and thus the reserve balance that must be recorded.

> **B.** **JPMC's Accounting for the WaMu Repurchase Liability Contradicts Its Assertion That There Was a Book Value Cap on Its Assumption of That Liability**
>
> **1.** ███████████████████████████████████

The existence of a cap on any account would impact amounts included in JPMC's audited

financial statements.  Accordingly, it would be necessary for management to inform the auditor

---

[13] WaMu Walkthrough Memorandum: "Subprime/Prime Repurchase Reserves" dated August 22, 2008, at page 1 (JPMC_DBNTC_0008706744).

[14] Exhibit 308, WaMu Memorandum Re: Accounting Analysis – June 30, 2008 Repurchase Reserves at Appx. B.

of such a cap.  PwC served as JPMC's outside auditor and its audit encompassed JPMC's

accounting for the WaMu Repurchase Liability. 

[15]  This contradicts JPMC's litigation position

that there was such a cap.

[17]

---

[15]

[16]

[17] Barren Deposition at 203:18 – 204:4.



████████████████████████████████████████████ JPMC's consistent public position has been that the repurchase liabilities to the Agencies "remain with the FDIC receivership."[19]  Contrary to that stated position, ████████████████████████████████████████████

████████████████████████████████████

████

---

[19] Ex. 683, JPMC 2011 10-K at 287.

11

███████████████████████ █ ███████████████████████
██████████████████[20] █
███████████████████████████████████████████████████
███████████████████████████████████████████

Had JPMC and its auditor understood that JPMC was not responsible for WaMu's repurchase obligations, JPMC would not have recognized any repurchase reserve amount at Closing. Likewise, if JPMC and its auditor had understood that JPMC had assumed such liability but that the assumed liability was capped at the booked reserve amount as of the date of Closing, JPMC would not have recorded additions to the reserve account in the fourth quarter of 2008. Accounting standards require recognition of contingent reserves for losses only if it is probable that the losses will actually be realized.[21] The fact that JPMC recognized WaMu's $350 million repurchase reserve and subsequently added to the reserve account demonstrates, under governing accounting standards, that JPMC and its auditor believed that it was probable that such additional losses would, in fact, materialize and that JPMC would be liable for them.

As stated in Section IV.B.3 below, had JPMC believed the WaMu Repurchase Liability was capped, it would have not accrued any losses above this cap. In addition, it would have implemented tracking procedures to ensure it did not pay amounts above the cap. If, for some reason, it paid amounts in excess of the cap, JPMC would have needed to analyze whether that amount was recoverable from the FDIC Receiver and would have needed to consider whether to record a receivable for any recoverable amounts. I have seen no evidence of a tracking

---

[20] ████████████████████████████████████████████████

[21] SFAS 5, ¶8.

procedure or analysis of recoverability from the FDIC Receiver of amounts paid in excess of a cap.

While PwC did not produce work papers concerning how JPMC subsequently accounted for the WaMu Repurchase Liability as a part of its litigation reserve,[22] JPMC has made public statements about the litigation reserve accounts for the WaMu Repurchase Liability to private investors. Charlie Scharf, President of Retail Financial Services (a JPMC business unit), stated in a November 2010 presentation to bank industry analysts that there are additional WaMu repurchase obligations accounted for in JPMC's litigation reserves:

> "[W]e have resolved the repurchase risk on GSE loans for this group and we have a reserve that has been established and we have made a payment to them. So that liability, we believe, is behind us on GSEs. These numbers also do not include any litigation reserves. We have mentioned that we do have litigation reserves, predominately on the privates, but again these numbers are just repurchased reserves."[23]

Accounting standards for ongoing measurement of liabilities in litigation are the same as those for repurchase liabilities.[24]  As with the recognition of obligations related to repurchase reserves, governing accounting standards allow for the recognition of potential obligations in litigation reserves only when the realization of losses relating to such obligations is probable. This further contradicts JPMC's claim that it did not assume the WaMu Repurchase Liability or that its exposure is limited to the reserve account balance at Closing.

---

[22] Based on JPMC's assertion of work product protection, the PwC and JPMC document productions excluded material concerning the litigation reserve and the treatment of private repurchase liabilities in that reserve.

[23] Exhibit 485, Transcript of JPMorgan Chase at BancAnalysts Association of Boston Conference at 7, Nov 4, 2010 (JPMC_DBNTC_0008686127).

[24] The ongoing measurement of litigation reserves and repurchase reserves is guided by SFAS 5.

2. **JPMC Is Unable to Quantify the Book Value Cap for the WaMu Repurchase Liability and Cannot Tie It to Any Book Value Amount on WaMu's Accounting Records as of the Closing**

Mr. Barren was unable to identify or quantify a Book Value cap for the private securitizations. Mr. Barren admitted that, before the Closing, WaMu never distinguished between private and Agency repurchase liabilities in its repurchase reserve.[25] ███████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████[26]

For the repurchase liability arising from the securitization of subprime mortgages, Mr. Barren was unable to state the amount of the Book Value cap and admitted that he did not know if the subprime reserve was included in the Book Value cap.[27] That admission is significant, as the subprime mortgages were sold almost exclusively to private investors, not the Agencies.[28] It appears that JPMC did not establish or quantify a Book Value cap for the WaMu Repurchase Liability to private investors who invested in securitizations of subprime mortgages. Mr. Barren further acknowledged that JPMC's accounting for the subprime Repurchase Liability did not distinguish between the Repurchase Liability where the obligor was Washington Mutual Mortgage Securities Corporation ("WMMSC") and where the obligor was WaMu.[29] That is significant because JPMC has acknowledged that it assumed the full Repurchase Liability where

---

[25] Barren Deposition at 34:19-23; 124:10-16; 134:23 – 135:15.

[26] Barren Deposition at 43:13 – 44:15.

[27] Barren Deposition at 125:23 – 126:17.

[28] Exhibit 583, Jan. 9, 2009 email from R. Jurgens, "Subprime is all private and there are private deals in the prime repurchase reserve."

[29] Barren Deposition at 73:2-10, 90:9 – 92:4.

the obligor was WMMSC.[30]  Yet, JPMC has no means of identifying how much of the subprime

reserve is capped (the non-WMMSC securitizations) and how much is not capped (the WMMSC

securitizations).[31]  When, in the second quarter of 2010, JPMC transferred the subprime reserve

to the heritage JPMC subsidiary ledger, it did so in full, and thus, JPMC accountants comingled

supposedly capped liabilities with uncapped WMMSC and heritage JPMC liabilities.[32]  From an

accounting perspective, this comingling demonstrates a belief that there is no difference in

JPMC's responsibility for these various repurchase liabilities.

Mr. Barren testified that it was possible to derive a $25 million cap on the liability

associated with the securitization of non-agency prime mortgages based on JPMC's own fourth

quarter upward adjustments of the prime repurchase reserve in its post-acquisition accounting for

the reserve.  However, this was not based on any Book Value amount on WaMu's Accounting

Records as of the Closing.  Mr. Barren admitted that the JPMC reserve analysis does not identify

the prime reserve applicable to securitizations sold to private investors.[33]  Instead, Mr. Barren

arrived at the $25 million figure by ███████████████████████████████

████████████████████████████████████████████

████████████████.[34]  Mr. Barren could not point to any Book Value amount on WaMu's

---

[30] ████████████████████████████████████

████████████████████████████████████████████

███████████████████████████

[31] Barren Deposition at 72:21 – 73:10.

[32] Exhibit 685, Chase Home Loans Repurchase Reserves Rollforward at 5.

[33] Barren Deposition at 131:9-17 (referencing Exhibit 642).

[34] Barren Deposition at 132:17-23.

Accounting Records as of the Closing that corresponded to that $25 million figure.[35]  The $25 million amount appears not to have been based on any analysis or support in the WaMu Accounting Records or even WaMu's Books and Records that existed as of Closing.[36] Contemporaneous documents and exchanges between WaMu accountants refer to Corrine Burger of JPMC (a heritage JPMC executive) as the individual who allocated the prime reserve in that way.[37]  Further, there is no evidence that JPMC has actually treated that amount as a cap and there is no reference to a $25 million cap in any of the JPMC or PwC materials.[38]

JPMC's inability to quantify a Book Value cap based on WaMu's Accounting Records for either the prime or subprime Repurchase Liability to private investors confirms that JPMC did not consider or implement a Book Value cap and did not operate on the belief that there was such a cap on JPMC's exposure.  Mr. Barren testified that there was no clear understanding among JPMC employees as to what liabilities were assumed in the transaction.[39]  He also testified that as late as November 10, 2008, JPMC accounted for the WaMu Repurchase Liability as though it had been assumed.[40]  This testimony comports with JPMC's accounting for the

---

[35] Barren Deposition at 133:10 – 135:15.

[36] Mr. Barren was not certain who would even be responsible for such an analysis, first naming heritage WaMu Home Loans Controller, Rolly Jurgens, and then Ravi Shankar, the JPMC Home Loans CFO.  Barren Deposition at 241:4-21.

[37] See e-mail from R. Jurgens to C. Gyure, J. Barren *et. al.*, Feb. 19, 2009 (JPMC_DBNTC_0009245331) ("Brooks can provide support for the subprime and Wells Fargo indemnification but the recourse and Prime reserves came from Corrine Burger."); JPMC_DBNTC_0009245637 ("Per Corrine Burger, the $800 million prime repurchase reserve is comprised of the following components: FHLMC - $600 million, FNMA - $175 million, Private investors - $25 million.").

[38] ███████████████████████████

[39] Barren Deposition at 178:12 – 179:3; 182:8-9.

[40] Barren Deposition at 181:16 – 182:20.

WaMu Repurchase Liability, in the purchase accounting and subsequent treatment, which was done in a manner consistent with JPMC having assumed that liability in full.

### 3. JPMC Did Not Follow the Accounting Standards for a Book Value Cap

The principle underlying the financial reporting for contingent liabilities is that a contingent liability may not be recorded unless it is probable that a liability will be paid in an estimable amount. SFAS 5 requires that, if a loss contingency is probable and estimable, a related reserve shall be recorded on the financial statements. If the company can only calculate a range of estimates, rather than a spot estimate, FIN 14 provides that the lower end of the range should be recorded on the financial statements. Therefore, if JPMC believed that its WaMu Repurchase Liability was capped by an agreement with the FDIC Receiver and that it was not probable that JPMC incurred a liability above this cap, it would be inappropriate, according to SFAS 5, for JPMC to accrue for a liability in excess of the cap.[41]

Another approach to implementing a cap would have been to make repurchase payments in full but then offset those payments with an indemnification receivable. JPMC has asserted that liabilities in excess of the purported Book Value cap would remain with the FDIC Receiver and, thus, such an approach would be consistent with JPMC's litigation position. But there is no evidence that JPMC ever even considered establishing such an indemnification receivable. If

---

[41] According to SFAS 5, an estimated loss from a loss contingency must be accrued by a charge to income if both of the following conditions are met: (1) information available prior to issuance of the financial statements indicates that it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements; and (2) the amount of loss can be reasonably estimated. Further, if no accrual is made for a loss contingency because one or both of these conditions are not met, or if an exposure to loss exists in excess of the amount accrued, disclosure of the contingency must be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred. The disclosure must indicate the nature of the contingency and must give an estimate of the possible loss or range of loss or state that such an estimate cannot be made. SFAS 5, ¶ 8-10.

JPMC was in fact convinced that the FDIC Receiver had agreed to indemnify JPMC for repurchase obligations above a certain dollar threshold (or cap), one would expect to see an analysis executed or discussed with the auditor to determine if it was appropriate to recognize an indemnification receivable from the FDIC Receiver for amounts paid above the cap. An accounting procedure tracking repurchase expenditures incurred by JPMC for potential recovery would certainly be expected.[42] █████████████████████████████████████████

███████████████████.[43] I saw no evidence that JPMC considered including an indemnification receivable in the accounting documents that JPMC and PwC produced during discovery, which I would expect to exist if JPMC believed that the WaMu Repurchase Liability was capped.

In spite of these accounting requirements, the evidence indicates that personnel at JPMC did not consider or reference a Book Value cap when it would have been logical or necessary to do so. For example, ██████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████[44] ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

███████.[45] Mr. Shankar, then-JPMC Home Loans CFO, indicated that he never discussed with

---

[42] At a minimum, in light of its position in this litigation, JPMC would be expected to assess the propriety of recording such an indemnification receivable.

[43] ████████████████████████████

[44] ██████████████████████████████████████████

[45] ███████████ ██ █████████████████████████████████████

████████████████████████████████████████████████

██████████

anyone how a cap on the WaMu Repurchase Liability would operate.[46]  Mr. Heft of PwC could

not recall any document reflecting or mentioning a liability cap with respect to the WaMu

Repurchase Liability.[47]  He also testified that he did not know whether there was any difference

between how JPMC actually accounted for the WaMu Repurchase Liability and how it would

have accounted for that liability if JPMC acquired it in full.[48]  According to the relevant

accounting standards, JPMC's accounting for the repurchase liability reflected that it had

assumed the liability in full.  The lack of the necessary documentation or discussion concerning

any such cap on the WaMu Repurchase Liability, combined with the fact that JPMC accounted

for the liability in accordance with GAAP as if it had been assumed in full, demonstrates that

JPMC's approach to accounting for the WaMu Repurchase Liability did not contemplate a Book

Value cap at all.

     In summary, there is no contemporaneous evidence that JPMC's accounting department

ever knew about or considered the possibility that the acquired WaMu repurchase reserve

account was capped at its September 25, 2008 balance.  Instead, subsequent adjustments were

made to that date of Closing balance as if no such cap existed.

    **4.**     ████████████████████████████████
████████████████████████████

████████████████████████████████████

████████████████████████████████████████

---

[46] Transcript of Deposition of Ravi Shankar ("Shankar Deposition") at 314:24 – 315:22.

[47] Heft Deposition at 84:20 – 86:2.

[48] Heft Deposition at 65:6 – 66:2.



The accounting standards relevant to JPMC's accounting for ███████████████ ███████████████████ are SFAS 5 and SFAS 141.  According to SFAS 5, two tests must be met before companies can recognize contingent loss reserves:

1.  An event must have occurred that could cause an obligation.  As to WaMu's and JPMC's contingent repurchase obligations, this test was met at the September 25, 2008 date of closing because any breaches of the representations and warranties would have occurred prior to that date.

2.  It must be probable that a future event will occur that will confirm the existence and amount of a loss.  Subsequent settlements can be used to confirm information about this probability.

Both SFAS 5 and SFAS 141 establish that subsequent settlements can be used to provide information about the probability that contingencies will result in losses.  The difference in how subsequent settlements can be used in the two accounting standards is a matter of timing.  SFAS 5 allows for the use of information provided by settlements to establish ledger balances only if that information becomes available prior to the issuance of the financial statements that include



the contingencies.[52]  SFAS 141 allows for the use of information provided by ████████ to adjust acquisition accounting entries as long as that information becomes available within one year from the date of acquisition.[53]

SFAS 5 applied to WaMu's date of Closing ledger balances.  In addition, SFAS 141 applied to the contingent repurchase reserve included in JPMC's date of Closing purchase entry. Pursuant to SFAS 5, the WaMu Closing ledger balance for its repurchase reserve could only consider subsequent settlements that occurred prior to the date that JPMC published its financial statements (between Closing on September 25, 2008 and November 6, 2008, when JPMC's third quarter Form 10-Q that included WaMu was filed).  ████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████  Pursuant to SFAS 141, ████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████

Because of the timing differences between SFAS 5 and SFAS 141, JPMC's assumed repurchase reserve balances as reported in its public filings could not equal WaMu's date of closing repurchase reserve ledger.  Although SFAS 141 allowed JPMC to adjust the repurchase reserve upward to reflect ████████████████████████, these subsequent adjustments did not change the Book Value of the WaMu repurchase reserve at Closing, which was determined around the time of the Closing in accordance with SFAS 5.  JPMC's Book Value cap argument is

---

[52] See SFAS 5, ¶ 8.a. and PCAOB AU 560, *Subsequent Events*, ¶ 3.  These provisions were not changed with the May 2009 issuance of SFAS 65, *Subsequent Events*.

[53] See SFAS 141, ¶ 40 and the SFAS 141 definition of the "allocation period."

essentially an assertion that the liability represented by the repurchase reserve is frozen at its ledger balance at the date of Closing, meaning that JPMC would not be responsible for any changes after that date. This position does not allow for the consideration of ███████ ███████ of uncertain obligations to adjust Book Value as of Closing. The accounting recognition ████████████████████████████████████ ████████████████████████████ is at odds with the underlying premise of a Book Value cap, as demonstrated below.

As noted above, the ███████████████████ could not have been included in the date of Closing repurchase reserve balance as of September 30, 2008. The subsequent increase that was made to that balance during the fourth quarter of 2008 was the result of subsequent decisions and actions on the part of JPMC. It was JPMC's choice to increase the repurchase reserve balance beyond what was that balance was on September 30, 2008. JPMC now wants to claim that it was not responsible for its own subsequent decisions and actions, in spite of the fact that it recognized the consequences of those decisions and actions in its financial statements after the date of Closing.

Figure 1 below shows ████████████████████████



████████████████████[57] ████████████████████████████

████████████████████████████████████████████

████████████████████████

███████████████████████████████

████████████████████████████████████

████████████████████████████████

█████████████████████████████████████

████████████████████████████████ These actions subsequent to Closing caused the recognition of an increase to

the original September 25, 2008 repurchase reserve ledger balance.

███████████████████████████████████

████████████████████████████ By doing so, JPMC measured its

WaMu repurchase obligations based on events that occurred after the date of Closing and that are

not reflected in the WaMu repurchase reserve as of Closing. Pursuant to SFAS 141, JPMC

recorded the impact of the settlement as a component of its accounting for the WaMu

transaction. Such accounting treatment is appropriate only if management believes that this

liability existed at Closing and management, based on the settlement value, now has a better

estimate of the value of the assumed liability. Further ████████████████████████

███████████████████████████████

█████████████████████████████

---

[57] ████████████████████████████



.[58] Such subsequent adjustments to the reserve balance are also inconsistent with JPMC's Book Value cap position.

[59]

[60]

[61] Thus, the accounting demonstrates that JPMC did not treat the WaMu Repurchase Liability as if it was capped.

If JPMC believed that it had only assumed the WaMu Repurchase Liability up to a specified cap, then it either (a) would not have paid amounts in excess of that cap or (b) upon making payments greater than that cap, would have established or at least considered establishing an indemnification receivable for amounts paid in excess of the cap. Further, upon paying amounts equal to the cap, JPMC would have subtracted those amounts from the



[58]

[59]

[60]

[??] Barren Deposition at 56:12-16.

repurchase reserve to bring the WaMu reserve to a zero balance. Even if JPMC had a compelling business or contractual reason ████████████████████████, JPMC's subsequent upward reserve adjustments and failure to establish or consider an indemnification receivable are fundamentally at odds with JPMC's litigation position (and publicly stated position) that it did not assume the WaMu Repurchase Liability beyond some unspecified capped amount.[62]

As discussed earlier, JPMC's recognition of the additions to the repurchase reserve account during the fourth quarter of 2008 necessarily acknowledged that it was primarily liable for the additional obligations beyond the date of Closing balance of $350 million. If JPMC firmly believed that the FDIC Receiver was the party that was primarily liable for those obligations, accounting standards suggest that those obligations would be recovered by the alleged indemnification claims that JPMC might assert against the FDIC Receiver.

### 5. JPMC's Accounting for Its Private Settlements Was Inconsistent With the Existence of a Book Value Cap

Following the ██████████████, JPMC also settled its WaMu-related mortgage repurchase liabilities with several private financial institutions. Because ██████████ occurred more than one year after Closing, JPMC could not account for them through purchase accounting.

---

[62] JPMC has argued that ████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████████████████



[63]

Additionally, in the first quarter of 2010, JPMC publicly attributed a portion of a $2.3 billion increase in the litigation reserve for representations and warranties liabilities relating to WaMu.[64] Following this litigation reserve increase, in May 2010, ████████████████ ████████████████████████████████████████ ███████████████████████████████████ ██████████████████████████.[65] This is

───────────────────

[63] ████████████████████████████████
████████████████████████████████████
████████████████████████████████████
██████████████████

[64] In April 2010, Michael Cavanaugh, JPMC's CFO, stated, "One other noisy item in the quarter, . . . **we added $2.3 billion to litigation reserves** in corporate for the firm largely related to mortgage-related matters, so think about that as we have **repurchase reserves** that we've talked about related to the GSEs as an ongoing expense that we've been reserving for. This relates to the broader question of all other ideas for claims against us **from private investors** and others related to whether it's a good portion of **WaMu related**." Exhibit 701, JPMC Q1 2010 Earnings Call at 5 (emphasis added).  He continued, "In the Investment Bank, Retail and Corporate, we've put up reps and warranty reserves and litigation reserves for GSEs and all other mortgages, including private securities. . . . **A lot of the numbers in corporate relate to WaMu.**" Id. at 9 (emphasis added).

[65] ██████████████████████████████

the last point at which I can identify changes to the reserve relating to the WaMu private

Repurchase Liability as subsequent material has not been produced.

Accounting for the private settlements in this way contradicts the concept of a capped

liability.  If the liability was capped, JPMC would have simply reduced the reserve in the amount

of the settlements to represent a charge against the capped amount.  By expensing the reserve to

cover the settlements, JPMC acknowledges that a payment related to a private WaMu

Repurchase Liability was not included in the date of Closing repurchase reserve account and it

could not have been capped.  JPMC's accounting in this manner is consistent with a reserve

amount that is based on an underlying liability that is not capped, not on a Book Value cap set by

the WaMu repurchase reserve balance at the Closing.

> **6.    JPMC's Inability to Quantify a Book Value Cap and Its Failure to Apply Such a Cap to Its Various Settlements Cannot be Explained Away Based on "Accounting Convenience" or Assertions That the Reserve Was "In Runoff"**

Mr. Barren repeatedly sought to explain JPMC's accounting treatment of the WaMu

Repurchase Liability based on "accounting convenience" and other considerations.  None of his

explanations change the inconsistency between JPMC's litigation position and its accounting

treatment.

> **a)    The** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████████████████████████████████████

███████████████████████████ Given JPMC's assertion that there was an overall

Book Value cap limiting its acquisition of the WaMu Repurchase Liability, and assuming that

JPMC was convinced that it had an indemnification claim against the FDIC Receiver, the

consistent approach from an accounting perspective would have been to apply the settlement

amount to the cap (thereby creating a negative balance in the repurchase reserve account) and

then establish an indemnification receivable due from the FDIC Receiver for amounts paid by

JPMC in excess of the cap.[66]

███████████████████████████████████████

███████████████████████████████████████████

██████████████████████ █ ██████████████████████

███████████████████████████████████████████

██████████████████████████[68]

### b)     The "Runoff" Contention

Mr. Barren testified that the WaMu repurchase reserve was transferred to the JPMC

books at the closing balances and that the private reserve was "in runoff," meaning payments for

---

[66] FIN 39 at ¶ 5; see also SFAS 141(R) at ¶ 29. This accounting rule was effective for transactions in JPMC's calendar year 2009, so was not effective yet for the WaMu transaction. However, this rule only highlighted the requirement to show an indemnification asset separately from the indemnified item (in this case, the indemnified item is the Repurchase Liability). Under the accounting rule effective in 2008, these two items could be netted, but nonetheless an indemnification asset would need to be considered in determining the amount of the indemnified liability to record, as liabilities were to be recorded based on the amounts to be paid. SFAS 141 at ¶ 37-1. See also, SFAS 141(R) at Summary Section titled "Assets and Liabilities Arising from Contingencies."

[67] █

[68] Exhibit 683, JPMC 2011 10-K at 287.

repurchases would come out of the reserve until it was exhausted.[69]  This process would be

consistent with JPMC's cap argument if this was how JPMC actually accounted for its private

repurchase reserve.  However, as described above, JPMC accounted for repurchase obligations

as though it had fully assumed the WaMu Repurchase Liability.  JPMC not only paid for

settlements out of the reserve, but it also built up the reserve to maintain an adequate amount to

cover the entire remaining liability.

Further, Mr. Barren explained that JPMC considered the reserve to be "in runoff" not

because it was capped, but because there was little to no demand activity against that reserve and

████████████████████████████████████████.[70]  Contrary to Mr. Barren's

explanation, ████████████████████████████████████████

████████████████ ███.[71]  As of the end of the second quarter of 2009, ████████████

████████████████████████████████████████████

████████████████████████████.[72]  Ultimately, the WaMu private

Repurchase Liability reserve did not run off over time.  Rather, JPMC simply eliminated the

reserve and then later treated the WaMu Repurchase Liability as part of the JPMC litigation

reserve.[73]  In the documentation relating to the eventual elimination of the WaMu repurchase

---

[69] Barren Deposition at 186:17-22.

[70] Barren Deposition at 186:17-19.

[71] ████████████████████████████████████████

[72] ████████████████████████████████████████

[73] Barren Deposition at 118:12-23 (referring to Exhibit 688 at JPMC_DBNTC_0009224001),
218:24 – 220:10; Carr Deposition at 82:15 – 83:15; Heft Deposition at 96:15 – 97:8.  This would also be
inconsistent with a cap on liability.  If there was such a cap, a ████████████████████████████
████████████████████would simply be applied against the reserve until the cap was met.

reserve, there is no mention anywhere of a cap on the WaMu Repurchase Liability.[74] Again, JPMC evaluated the WaMu Repurchase Liability and accounted for it as though it were any other fully assumed, uncapped liability.

Under governing accounting principles and standards, JPMC's accounting for the WaMu Repurchase Liability contradicts JPMC's assertion that there was a Book Value cap on its acquisition of the WaMu Repurchase Liability.

Respectfully submitted,

Jerry Arnold

December 12, 2013

---

[74] ███████████████████████████████████████████. JPMC has stated publicly that it has reserved for the WaMu private Repurchase Liability in its litigation reserve after determining that private repurchase claims would most likely manifest through securities litigation. Exhibit 485, Transcript of JPMorgan Chase at BancAnalysts Association of Boston Conference at 7-8, Nov 4, 2010 (JPMC_DBNTC_0008686127-28). █████████████████████████████
██████████████████████████████████████████████████████
███████████████████████

## CERTIFICATE OF SERVICE

Defendant Federal Deposit Insurance Corporation, in its capacity as Receiver for

Washington Mutual Bank, hereby certifies that a true and correct copy of the foregoing Expert

Report of Professor Jerry Arnold, was served on the 12th day of December 2013, by email and

overnight delivery (FedEx) to:

Brent J. McIntosh
SULLIVAN & CROWMWELL LLP
1701 N.W. Suite 600
Washington, DC 20006-2401

Robin A. Henry
BOIES, SCHILLER & FLEXNER LLP
333 Main Street
Armonk, NY 10504

Talcott J. Franklin
TALCOTT FRANKLIN P.C.
208 North Market Street, Suite 200
Dallas, TX 75202
(via email only by consent)

By _____
/s/ Jason S. Cohen

## Appendix 1

## CURRICULUM VITAE
## JERRY L. ARNOLD

### I.   GENERAL INFORMATION

A.   Personal Data

    1.   Home Address:



    2.   Business Address:

       School of Accounting
       University of Southern California
       Los Angeles, CA 90089-1421
       ███████

    3.   Date of Birth: 03-11-47

B.   Formal Education

    1.   University of Michigan, Doctor of Philosophy (Ph.D), 1975.  Major - Accounting. Dissertation Title - "Accounting for the Investment Tax Credit as a Potential Causal Factor in the Corporate Equipment Investment Decision:  An Empirical Analysis."

    2.   University of Missouri-Columbia, Masters of Arts in Accountancy, 1972.

    3.   University of Missouri-Columbia, Bachelor of Science in Business Administration (Accounting), 1969.

C.   Certification

Certified Public Accountant, currently licensed in Missouri.

D.   Experience

    1.   Academic

       a.   University of Pennsylvania, Wharton School
          Visiting Professor of Accounting, 1988-1989.

1

    b.    University of Southern California
                Professor, 2001-present
                Accounting Associates Professor, 1995-2001
                Price Waterhouse Professor, 1990-1995
                Professor of Accounting, 1988-1995
                Associate Professor of Accounting (with tenure), 1982-1987
                Founding Director, SEC and Financial Reporting Institute, 1981-1988
                Assistant Professor of Accounting, 1979-1982.

    c.    University of California, Los Angeles
                Assistant Professor of Accounting, 1975-1979.

    d.    University of Michigan
                Graduate Teaching Fellow, Graduate School of Business Administration, 1972-1975.

    e.    University of Missouri
                Graduate Teaching Assistant, School of Accountancy, 1971-1972.

2.    Other

    a.    Academic Fellow, Office of the Chief Accountant, Securities and Exchange Commission, Washington, D. C., Summer 1981.  Contributed to Accounting Series Release No. 299 on management's discussion and analysis of financial condition and results of operations, which was adopted September 1981.

    b.    Staff Accountant, Ernst & Young, 1970-1971.

    c.    Only academic among five finalists for the position of Chief Accountant, Securities and Exchange Commission, 1988.

## II.   BUSINESS AND CONSULTING ACTIVITIES

A.   Litigation Support

I have been engaged numerous times as an expert witness in commercial litigation and in cases involving the SEC.  The commercial cases have focused on SEC and accounting issues, as well as on matters involving valuation and assessment of damages.  I have also been retained on several occasions by the SEC to serve as an expert witness on accounting and disclosure issues, as well as by the Department of Justice.  I recently testified in federal court for the defense in a high-profile criminal case.  In addition, I prepared a report in a Wells submission on behalf of a large, public company being investigated by the SEC for possible accounting and disclosure violations.

B.   Instructing KPMG SEC Reporting and Compliance Course

Since 1989, I have instructed a comprehensive two-day seminar for KPMG professionals and clients.  On average, I have conducted this course more than ten times per year.  The

2

course involves detailed discussion and interpretation of SEC rules and activities. During the conduct of the course, I provide recommendations and insights regarding implications of various reporting and capital formation strategies. My activities have included instructing a comparable course in Canada, Brazil and in Europe for the Firm and for selected international clients.

C.   Consulting for Specific Companies on SEC Compliance and Capital Formation

I have been engaged by several companies to offer advice and recommendations on specific SEC-related issues. Recent efforts have included compliance with SOX 404. My efforts have involved entities ranging from the start-up phase to large, multi-nationals.

## III.   SEC AND FINANCIAL REPORTING INSTITUTE

A.   I was the founding director of the Institute in 1981 and served in that capacity from its inception until 1988. Serving as director required that I devote a majority of my time to administering Institute activities. The purpose of the Institute is to promote interaction between policy setters, their constituencies, and researchers in academia. The Institute is a unique organization. Its research efforts have resulted from requests from the SEC and the National Commission on Fraudulent Financial Reporting as well as from national calls for proposals. I created a management structure for the Institute that includes an Executive Committee and Advisory Council. I worked closely with these groups and the administration of the Schools of Accounting and Business in formulating and implementing Institute policies. The advisory groups include representatives from the SEC, at both the Commission and staff level, as well as the chairman of the Financial Accounting Standards Board and other private-sector policy setters, and senior executives from the business and accounting communities.

B.   I was responsible for all fundraising activities of the Institute. In addition to the annual conference, these activities include seeking annual Institute membership from corporations and CPA firms and larger individual donations. As a result of these activities, the Institute raised over four hundred thousand dollars during my directorship and has been self-sustaining financially from its inception.

C.   I was responsible for planning, developing, and managing the Institute's annual major conference in Los Angeles. Twenty-four such conferences have been held to date. Average attendance is six hundred, drawn largely from corporate financial and CPA communities. Program participants have included SEC Chairmen, Commissioners and senior staff, leaders from private-sector policy-setting units, senior financial executives, prominent attorneys and financial analysts. The keynote address at one conference was delivered by Walter Wriston, then chairman of Citicorp. The annual conference attracts national attention and recognition.

D.   I was responsible for planning and overseeing all research activities of the Institute, including topic identification, selection of researchers, generating funding, and project management.

## IV.  RESEARCH AND PUBLICATIONS

A.  Works Published

1.  Research Monographs

a.  "Corporate Financial Policies: A Review and Analysis of Existing Literature," *Financial Executives Research Foundation*, Fall 1989 (with Michael A. Diamond).

b.  "Proceedings of the October 8, 1987 Roundtable Discussion on Generally Accepted Accounting Principles and Regulatory Accounting Practices," *SEC and Financial Reporting Institute*, January 1988.

(i)  Project included roundtable discussion on the use of regulatory accounting practices vs GAAP primarily for financial institutions.  Those in attendance included the Comptroller General of the United States, who directs the GAO, the Comptroller of the Currency, a member of the Federal Home Loan Bank Board, the Chairman and Vice Chairman of the FASB, the then Chief Accountant of the SEC and twenty other business and government executives.

(ii)  Report was sent by the Comptroller General to all members of Congress.  I was responsible for all aspects of the project, including preparation of the discussion paper, inviting attendees, moderating the session, and editing the final report.  Report was referenced in numerous financial publications.

c.  "The Impact of Electronic Technology at the S.E.C.: An Analysis of Policies Governing the Content and Dissemination of Corporate Disclosures," *Financial Executives Institute and SEC and Financial Reporting Institute*, July 1987, (with Edward F. Greene and Earl C. Keller).

(i)  Project included a blue-ribbon roundtable discussion on key issues of regulation and financial reporting.  Those participating included four SEC Commissioners (other Commissioner was ill), private-sector policy setters, and leaders from the CPA, business, legal, financial analysis, and academic communities.  The discussion paper for this session was written by my co-authors and me and is included in the final report.

(ii)  The Director of the Division of Corporation Finance at the SEC recently cited the monograph as very important as a predictor of the future disclosure system.

(iii)  Results presented to Financial Executives Institute's Committee on Corporate Reporting, December 1986 and March, 1987.

d.   "EDGAR: The SEC's Pilot Program and Its Impact," *Financial Executives Research Foundation*, January 1987 (with Michael A. Diamond).

Report is widely cited by SEC personnel and was referenced in their testimony before Congress.

e.   "Impact of Statement 52 on Decisions, Financial Reports, and Attitudes," *Financial Executives Research Foundation*, July 1986 (with William W. Holder).

f.   "The Market for Compilation, Review, and Audit Services," *Auditing Research Monograph 4*, American Institute of Certified Public Accountants, December 1981 (with Michael A. Diamond).  Citations include:

   (i)     Rocky Mountain News, Denver, 4/8/81.

   (ii)    Denver Post, 4/8/81.

   (iii)   The Executive, Orange County Edition, 3/81.

   (iv)   Journal of Accountancy, 2/81 and 10/80.

   (v)    The Los Angeles Business Journal, 1/5/81.

   (vi)   Financial Times, World Accounting Report, 1/81.

   (vii)  The CPA Journal, 11/80.

   (viii) Midlands Business Journal, 9/26/80.

   (ix)   The American Banker, 8/18/80.

   (x)    Wall Street Journal, 8/15/80.

g.   "Public Accounting Report," 2/80.

   (i)     Presented to the National American Institute of CPAs Accounting and Auditing Conference, August, 1981.

   (ii)    Presented to bank executives and media in New York and Newport Beach, August 1980 and January 1981, respectively.

h.   "Accounting Policy Formulation: A Study of User Preferences," *California Society of Certified Public Accountants*, Summer 1980 (with Durwin Sharp).

2.   Articles

 a.  "Reducing the Risk of Violating FCPA Accounting Provision," *Financial Executive,* May 2013 (with J. Duggan and N. Morgan).

 b.  "Dealing with the Implications of Accounting Change," *Financial Executive,* November 2012 (with J. Duggan).

 c.  "Improving Pro Forma Financial Information," *Financial Executive*, May 2002 (with J. Duggan).

 d.  "What Foreign Filers Need to Know," *Financial Executive*, May 2001 (with W. Holder and J. Duggan, KPMG).

 e.  "Disclosure of Measurement Uncertainties: Guide to a Financial Reporting Evolution in Progress," *Journal of Accountancy*, 1999 (with W. Holder).

 f.  "The SEC's Audit Requirements for Companies Acquired And Equity Investees," *Research in Accounting Regulation*, 1997 (with W. Holder).

 g.  "Electronics Opens a New Door to SEC Filings," *Financial Executive*, January/February 1988, (with Edward F. Greene and Earl C. Keller).

 h.  "SEC Form S-18:  A Boon to Small Business," *Journal of Accountancy*, May 1986 (with James G. Manegold and Michael A. Diamond).

 i.  "An Easier Way to Go Public," *Harvard Business Review*, January/February 1986 (with James G. Manegold).

 j.  "Small Firm Securities Registration in the S-18 ERA: Perceptions of Professionals," *The Corporation Law Review*, February 1985 (with Merle W. Hopkins).

 k.  "The Exempt Offering: An Alternative to Going Public," *Harvard Business Review*, January/February 1985.

 l.  "Small Business: An Area Ripe for Practice Development," cover article in *Journal of Accountancy*, August 1984 (with Alan A. Cherry, Michael A. Diamond and James A. Walker).  Study, sponsored by Peat Marwick Main & Co. was cited in over one hundred periodicals.

 m.  "The FASB Should Establish An Accounting Laboratory," *Management Accounting*, March 1983 (with William W. Holder and Jan R. Williams).

 n.  "The Accounting Review: A Happy Compromise," *Harvard Business Review*, May/June 1982 (with Michael A. Diamond).

o.  "Loan Officers' Experiences With and Reactions to Compilation and Review of Financial Statements," *Journal of Commercial Bank Lending*, December 1981 (with Michael A. Diamond and Earl C. Keller).

p.  "International Reporting Aspects of Segment Disclosures," *The International Journal of Accounting*, Fall 1980 (with William W. Holder and Herschel Mann).

q.  "Competition in Public Accounting: Issues and Controversies," *Georgia Journal of Accounting*, Spring 1980 (with Doyle Z. Williams).

r.  "The Influence of Accounting Rules on Tax Policy Objectives: An Empirical Investigation," *Journal of the American Taxation Association*, Winter 1980 (with Earl C. Keller).

s.  "Using Replacement Cost Data in the Bank Lending Decision," *Journal of Commercial Bank Lending*, November 1979 (with Michael A. Diamond).

t.  "Accounting for Oil and Gas:  The FASB Faces Political Realities," *California CPA Quarterly*, June 1979 (with Michael A. Diamond).

u.  "Guidelines for Computer Software Selection," *California CPA Quarterly*, June 1977 (with Bennet P. Lientz).

3.  Study Commissioned by SEC

a.  "A Report on a Survey Conducted for the Government-Business Forum," *SEC Government-Business Forum on Small Business Capital Formation:  Final Report*, November 1982.

Study was requested by SEC and served as basis for selection of issues discussed at session, which was mandated by Congress.  Final report, including study, was submitted to Congress.

4.  Proceedings

a.  "The SEC's Disclosure System: Its Objective, Its Evolution, and Its Future," *A Profession in Transition: The Ethical and Legal Responsibilities of Accountants*, Belverd E. Needles, Jr., Editor, DePaul University, 1988.

b.  "An Analysis of the Nature and Quality of Services Provided by CPAs to Middle-Market Clients," *Proceedings of the DePaul University Research Symposium on the Accounting Profession and the Middle Market*, September 1985, (with Michael A. Diamond and Alan A. Cherry).

c.  "The SEC's Preferability Rule and Managements' Consistency in the Selection of Accounting Alternatives: An Empirical Investigation," *Proceedings of the Southwest American Accounting Association*, March 1981 (with Earl C. Keller).

     d.     "Toward Knowledge-Based Accounting Policy," *Proceedings of the UCLA Accounting - Information Systems Conference, Accounting Research: Bridging the Gap Between Theory and Practice*, May 1976 (with Earl C. Keller).

5.     Journal Articles Reprinted

     a.     "SEC Form S-18: A Boon to Small Business," reprinted from *Journal of Accountancy*, May 1986, reprinted in *Accounting in Action: New Opportunities, Developments, and Challenges for the Professional Accountant*, American Institute of CPAs, 1986 (with James G. Manegold  and Michael A. Diamond).

     b.     "Small Business: An Area Ripe for Practice Development," reprinted from *Journal of Accountancy*, August 1984, reprinted in *New Approaches to Accounting Success*, American Institute of CPAs, 1984 (with Alan A. Cherry, Michael A. Diamond, and James A. Walker).

     c.     "The Accounting Review: A Happy Compromise," reprinted from *Harvard Business Review*, May/June 1982, reprinted in *Growing Concerns: Building and Managing the Smaller Business*, edited by David E. Gumpert for the *Harvard Business Review*, John Wiley & Sons 1984 (with Michael A. Diamond).

     d.     "Using Replacement Cost Data in the Bank Lending Decision," reprinted from *Journal of Commercial Lending*, November 1979, reprinted in *The Development of SEC Accounting*, edited by Gary John Previts, Addison-Wesley, 1981 (with Michael A. Diamond).

B.     Invited Testimony Before Governmental Authorities

1.     September 1983 - Before Joint SEC - NASAA (State Securities Administrator) Hearing.

Discussed findings of study into Form S-18 Companies (with Merle W. Hopkins).

3.     February 1983 - Before U.S. Senate Small Business Committee.

Discussed findings of study into needs of small companies, sponsored by Peat Marwick.

3.     September 1982 - Before SEC Government-Business Forum.

Discussed findings of study commissioned by SEC to identify key issues facing small business.

8

## V.   SERVICE

A.   Professional

1.   Member, Executive Committee, Sixteenth Annual SEC Government-Business Forum on Small Business Capital Formation.

2.   Managing Editor, *Accounting Horizons*, 1992-1994.

3.   Member, AICPA Committee on SEC Regulations, 1989-1992.

4.   Member, American Accounting Association's Subcommittee to respond to the FASB Discussion Memorandum on "Employers' Accounting for Pensions and Other Postemployment Benefits."

5.   Member, American Accounting Association's SEC Liaison Committee, 1983-1985.

6.   Member, American Institute of Certified Public Accountants.

7.   Member, California Society of Certified Public Accountants.

8.   Member, Editorial Board, *Research in Accounting Regulation*, JAI Press, 1986-1991.

9   Ad Hoc Reviewer, *Accounting Review, Accounting Horizons*.

10.   I have made numerous presentations before professional and academic audiences on a wide variety of financial reporting and regulatory topics, 1976-Present.

11.   I was interviewed on KNBC - TV in Los Angeles in April 1987 regarding insider-trading issues.

12.   Reviewer, *Methodological Foundations of Central Standardsetting for Corporate Financial Reporting* by James C. Gaa, published in the American Accounting Association's *Studies in Accounting Research Series* (No. 28).

13.   Consultant to National Commission on Fraudulent Financial Reporting (Treadway Commission) 1986.

B.   University of Southern California, Schools of Accounting/Business

1.   Member, MBA-PM Task Force, 1997.

2.   Coordinator/Instructor, GSBA 514-Foundations of Business I & II, 1997-2003.

3.   Chairman, School of Accounting Personnel Committee, 1994-1997.

4.   Member, School of Accounting Personnel Committee, 1989-1997.

9

5.  Member, School of Business Personnel Committee, 1994-1997.

6.  Chairman, Masters Task Force, 1989-1991.

7.  Member, School of Business Strategic Planning Committee, 1984-1991.

8.  Chairman, School of Accounting Strategic Planning Committee, 1989-1992.

9.  Chairman, Two Faculty Review and Promotion Committees, November, 2002.

## Appendix 2

### Jerry L. Arnold
### Testimony Since January 1, 2009

| Case | Jurisdiction | Dates | |
|---|---|---|---|
| | | Deposition | Trial |
| *SEC v. Retail Pro, Inc.* | U.S. District Court, Southern District of California | July, 2009 | March, 2010 |
| *In Re Fannie Mae Securities Litigation* | U.S. District Court, District of Columbia | March, 2011 | |

1

**Appendix 3**

**List of Documents Considered**

Depositions

- Deposition of Robert C. Schoppe, December 5, 2012.
- Deposition of Daniel P. Cooney, December 12, 2012.
- Deposition of Richard I. Peyster, December 20, 2012.
- Deposition of Brian Bessey, January 10, 2013.
- Deposition of James R. Wigand, January 23, 2013.
- Deposition of William Betz, February 20, 2013.
- Deposition of Timothy Finneran, February 22, 2013.
- Deposition of Herbert Held, March 12, 2013.
- Deposition of Ryan McInerney, April 3, 2013.
- Deposition of Lee A. Van Fleet, April 10, 2013.
- Deposition of Sally Durdan, April 11, 2013.
- Deposition of Stephen J. Pruss, April 17, 2013.
- Deposition of Kenneth Blincow, April 23, 2013.
- Deposition of David Lowman, April 30, 2013.
- Deposition of James A. Thormahlen, May 1, 2013.
- Deposition of Michael Lipsitz, May 3, 2013.
- Deposition of Michael Eitel, May 9, 2013.
- Deposition of Mitchell L. Glassman, May 7, 2013.
- Deposition of Sharon L. Yore, May 14, 2013.
- Deposition of Charles Scharf, May 17, 2013.
- Deposition of Thaddeus G. Fenton, June 5, 2013.
- Deposition of Michael Cavanagh, June 11, 2013.
- Deposition of Sheri Foster, June 14, 2013.
- Deposition of James Oroho, June 25, 2013.
- Deposition of Ravi Shankar, June 27, 2013.
- Deposition of David Gearin, July 11, 2013.
- Deposition of Fernando Rivas, July 31, 2013.
- Deposition of Corrine Burger, August 7, 2013.
- Deposition of Kathleen M. Russo, August 21, 2013.
- Deposition of David Wall, August 23, 2013.
- Deposition of Tod Gordon, September 5, 2013.
- 30(b)(6) Deposition of John Barren, JPMorgan Chase Bank, N.A., September 10, 2013.
- 30(b)(6) Deposition of Bryan Heft, Pricewaterhouse Coopers, LLP, September 17, 2013.
- Deposition of Patrick Carr, September 19, 2013.
- Deposition of Susan Brown, September 25, 2013.

<u>Deposition Exhibits</u>
- Exhibits 1 – 742.

<u>Company Filings</u>
1. JPMorgan Chase & Co.
   - 2008 Third Quarter Form 10-Q, filed November 7, 2008.
   - 2008 Form 10-K, filed February 27, 2009.
   - 2009 First Quarter Form 10-Q, filed May 7, 2009.
   - 2009 Second Quarter Form 10-Q, filed August 10, 2009.
   - 2009 Third Quarter Form 10-Q, filed November 9, 2009.
   - 2009 Form 10-K, filed February 24, 2010.
   - 2010 Form 10-K, filed February 28, 2011.
   - 2011 Second Quarter Earnings Release Financial Supplement.
   - 2011 Form 10-K, filed February 29, 2012.
   - 2012 First Quarter Form 10-Q, filed May 10, 2012.
2. WMI Holdings Corp.
   - Prospectus Dated May 20, 2003 and Prospectus Supplement for WaMu Mortgage Pass-Through Certificates, Series 2003-AR8.
   - Pooling and Servicing Agreement between Washington Mutual Securities Corp. and Deutsche Bank National Trust Company and Deutsche Bank Trust Company Delaware for WaMu Mortgage Pass-Through Certificated Series 2003-AR8.
   - 2007 Third Quarter Form 10-Q, filed November 9, 2007.
   - 2007 Form 10-K, filed February 29, 2008.
   - 2007 Form 10-K/A, filed May 22, 2008.
   - 2008 First Quarter Form 10-Q, filed May 12, 2008.
   - 2008 Second Quarter Form 10-Q, filed August 11, 2008.
3. Federal Home Loan Mortgage Corp.
   - 2008 Third Quarter Form 10-Q, filed November 14, 2008.
   - 2009 Form 10-K, filed March 11, 2009.

<u>Accounting Standards and Guidance</u>
- Accounting Research Manager Interpretations and Examples - Contingencies and Commitments - Interpretive Guidance at Section B-2 (CCH Incorporated).
- AICPA Audit and Accounting Guide, Depository and Lending Institutions: Banks and Savings Institutions, Credit Unions, Finance Company, and Mortgage Companies.
- Related Parties, AU Section 334 (PCAOB 1983).
- The Meaning of Present Fairly in Conformity With Generally Accepted Accounting Principles, AU Section 411 (PCAOB 1992).
- Subsequent Events, AU Section 560 (PCAOB 1972).

- Qualitative Characteristics of Accounting Information, Statement of Financial Accounting Concepts No. 2 (FASB 1980).
- Elements of Financial Statements (A Replacement of FASB Concepts Statements No. 3 – Incorporating an Amendment of FASB Concepts Statement No. 2), Statement of Financial Accounting Concepts No. 6 (FASB 1985).
- Reasonable Estimation of the Amount of a Loss, an Interpretation of FASB Statement No. 5, FASB Interpretation No. 14 (FASB 1976).
- Offsetting of Amounts Related to Certain Contracts, an Interpretation of APB Opinion No. 10 and FASB Statement No. 105, FASB Interpretation No. 39 (FASB 1992).
- Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Guarantees of Indebtedness of Others, an Interpretation of FASB Statements No. 5, 57, and 107 and Rescission of FASB Interpretation No. 34, FASB Interpretation No. 45 (FASB 2002).
- Accounting for Contingencies, Statement of Financial Accounting Standards No. 5 (FASB 1975).
- Disclosure of Long-Term Obligations, Statement of Financial Accounting Standards No. 47 (FASB 1981).
- Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities, a Replacement of FASB Statement 124, Statement of Financial Accounting Standards No. 140 (FASB 2000).
- Business Combinations, Statement of Financial Accounting Standards No. 141 (FASB 2001).
- Business Combinations, Statement of Financial Accounting Standards No. 141 (R) (FASB 2007).
- Reporting on Advertising Costs, Statement of Position 93-7 (AICPA 1993).
- Environmental Remediation Liabilities, Statement of Position 96-1 (AICPA 1996).

Other Documents
- United States Senate Permanent Subcommittee on Investigations Committee on Homeland Security and Governmental Affairs. "Wall Street and the Financial Crisis: Anatomy of a Financial Collapse" April 13, 2011.

Documents Produced in These Proceedings
- Amended Complaint and Exhibits, September 8, 2010.
- Reply Memorandum in Further Support of JPMorgan Chase Bank, N.A. and Washington Mutual Mortgage Securities Corporation's Motion to Dismiss and Motion for Partial Summary Judgment, February 11, 2011.

- DT-DB 0000001
- DT-DB 0000002
- DT-DB 0000090

- DT-DB 0000091
- DT-DB 0000140
- DT-DB 0000141

3

- DT-DB 0000209
- DT-DB 0000210
- DT-DB 0000263
- DT-DB 0000264
- DT-DB 0000267
- DT-DB 0000268
- DT-DB 0000360
- DT-DB 0000361
- DT-DB 0000483
- DT-DB 0000490
- DT-DB 0000491
- DT-DB 0000547
- DT-DB 0000548
- DT-DB 0000556
- DT-DB 0000560
- DT-DB 0000565
- DT-DB 0000576
- DT-DB 0000580
- DT-DB 0000582
- DT-DB 0000590
- DT-DB 0000606
- DT-DB 0000609
- DT-DB 0000614
- DT-DB 0000620
- DT-DB 0000629
- DT-DB 0000632
- DT-DB 0000634
- DT-DB 0000636
- DT-DB 0000640
- DT-DB 0000654
- DT-DB 0000655
- DT-DB 0000657
- DT-DB 0000660
- DT-DB 0000667
- DT-DB 0000669
- DT-DB 0000672
- DT-DB 0000674
- DT-DB 0000676

- DT-DB 0000679
- DT-DB 0000688
- DT-DB 0000692
- DT-DB 0000704
- DT-DB 0000705
- DT-DB 0000711
- DT-DB 0000712
- DT-DB 0000713
- DT-DB 0000714
- DT-DB 0000715
- DT-DB 0000775
- DT-DB 0000776
- DT-DB 0000783
- DT-DB 0000784
- DT-DB 0000789
- DT-DB 0000790
- DT-DB 0000796
- DT-DB 0000797
- DT-DB 0000838
- DT-DB 0000839
- DT-DB 0000863
- DT-DB 0000864
- DT-DB 0000865
- DT-DB 0000866
- DT-DB 0000905
- DT-DB 0000906
- DT-DB 0000928
- DT-DB 0000929
- DT-DB 0000941
- DT-DB 0000942
- DT-DB 0000949
- DT-DB 0000950
- DT-DB 0001381
- DT-DB 0001382
- DT-DB 0001386
- DT-DB 0001387
- DT-DB 0001389
- DT-DB 0001390

4

- DT-DB 0001396
- DT-DB 0001397
- DT-DB 0001398
- DT-DB 0001480
- DT-DB 0001481
- DT-DB 0001487
- DT-DB 0001488
- DT-DB 0001492
- DT-DB 0001493
- DT-DB 0001512
- DT-DB 0001513
- DT-DB 0001543
- DT-DB 0001544
- DT-DB 0001584
- DT-DB 0001585
- DT-DB 0001602
- DT-DB 0001603
- DT-DB 0001630
- DT-DB 0001631
- DT-DB 0001650
- DT-DB 0001651
- DT-DB 0001656
- DT-DB 0001657
- DT-DB 0001669
- DT-DB 0001670
- DT-DB 0001675
- DT-DB 0001676
- DT-DB 0001695
- DT-DB 0001696
- DT-DB 0001713
- DT-DB 0001714
- DT-DB 0001720
- DT-DB 0001721
- DT-DB 0001724
- DT-DB 0001725
- DT-DB 0001729
- DT-DB 0001730
- DT-DB 0001738

- DT-DB 0001739
- DT-DB 0001743
- DT-DB 0001744
- DT-DB 0001881
- DT-DB 0001882
- DT-DB 0001892
- DT-DB 0001893
- DT-DB 0001920
- DT-DB 0001921
- DT-DB 0001932
- DT-DB 0001933
- DT-DB 0001943
- DT-DB 0001944
- DT-DB 0001968
- DT-DB 0001969
- DT-DB 0001978
- DT-DB 0001979
- DT-DB 0001998
- DT-DB 0001999
- DT-DB 0002016
- DT-DB 0002027
- DT-DB 0002039
- DT-DB 0002051
- DT-DB 0002062
- DT-DB 0002081
- DT-DB 0002098
- DT-DB 0002101
- DT-DB 0002120
- DT-DB 0002161
- DT-DB 0002203
- DT-DB 0002221
- DT-DB 0002417
- DT-DB 0002486
- DT-DB 0002494
- DT-DB 0002568
- DT-DB 0002576
- DT-DB 0002593
- DT-DB 0002611

- DT-DB 0002627
- DT-DB 0002642
- DT-DB 0002654
- DT-DB 0002669
- DT-DB 0002671
- DT-DB 0002673
- DT-DB 0002692
- DT-DB 0002712
- DT-DB 0002716
- DT-DB 0002731
- DT-DB 0002746
- DT-DB 0002762
- DT-DB 0002779
- DT-DB 0002796
- DT-DB 0002814
- DT-DB 0002838
- DT-DB 0002860
- DT-DB 0002862
- DT-DB 0002875
- FDIC-DB0001734
- JPMC_DBNTC_0000010655
- JPMC_DBNTC_0000010822
- JPMC_DBNTC_0000011973
- JPMC_DBNTC_0000012832
- JPMC_DBNTC_0000016752
- JPMC_DBNTC_0001298381
- JPMC_DBNTC_0001355031
- JPMC_DBNTC_0001701662
- JPMC_DBNTC_0001701663
- JPMC_DBNTC_0001701664
- JPMC_DBNTC_0001701665
- JPMC_DBNTC_0004091405
- JPMC_DBNTC_0004620675
- JPMC_DBNTC_0005103485
- JPMC_DBNTC_0008571662
- JPMC_DBNTC_0008571675
- JPMC_DBNTC_0008572460
- JPMC_DBNTC_0008572522

- JPMC_DBNTC_0008572523
- JPMC_DBNTC_0008585720
- JPMC_DBNTC_0008589492
- JPMC_DBNTC_0008594377
- JPMC_DBNTC_0008653928
- JPMC_DBNTC_0008656511
- JPMC_DBNTC_0008656516
- JPMC_DBNTC_0008664942
- JPMC_DBNTC_0008667261
- JPMC_DBNTC_0008668382
- JPMC_DBNTC_0008668467
- JPMC_DBNTC_0008673277
- JPMC_DBNTC_0008673603
- JPMC_DBNTC_0008679710
- JPMC_DBNTC_0008679804
- JPMC_DBNTC_0008682412
- JPMC_DBNTC_0008686079
- JPMC_DBNTC_0008686278
- JPMC_DBNTC_0008686279
- JPMC_DBNTC_0008686378
- JPMC_DBNTC_0008690453
- JPMC_DBNTC_0008692570
- JPMC_DBNTC_0008706744
- JPMC_DBNTC_0008711770
- JPMC_DBNTC_0008711774
- JPMC_DBNTC_0008711779
- JPMC_DBNTC_0008711783
- JPMC_DBNTC_0008711787
- JPMC_DBNTC_0008711792
- JPMC_DBNTC_0008711899
- JPMC_DBNTC_0008719704
- JPMC_DBNTC_0008719709
- JPMC_DBNTC_0008719715
- JPMC_DBNTC_0008719721
- JPMC_DBNTC_0008719726
- JPMC_DBNTC_0008719730
- JPMC_DBNTC_0008719734
- JPMC_DBNTC_0008719739

- JPMC_DBNTC_0008719802
- JPMC_DBNTC_0008719807
- JPMC_DBNTC_0008719811
- JPMC_DBNTC_0008719815
- JPMC_DBNTC_0008719820
- JPMC_DBNTC_0008720971
- JPMC_DBNTC_0008720976
- JPMC_DBNTC_0008720983
- JPMC_DBNTC_0008726876
- JPMC_DBNTC_0008726881
- JPMC_DBNTC_0008726885
- JPMC_DBNTC_0008726889
- JPMC_DBNTC_0008726893
- JPMC_DBNTC_0008726897
- JPMC_DBNTC_0008726901
- JPMC_DBNTC_0008726905
- JPMC_DBNTC_0008726909
- JPMC_DBNTC_0008726913
- JPMC_DBNTC_0008726917
- JPMC_DBNTC_0008726922
- JPMC_DBNTC_0008726927
- JPMC_DBNTC_0008726931
- JPMC_DBNTC_0008726935
- JPMC_DBNTC_0008726939
- JPMC_DBNTC_0008726943
- JPMC_DBNTC_0008726947
- JPMC_DBNTC_0008726951
- JPMC_DBNTC_0008726956
- JPMC_DBNTC_0008726960
- JPMC_DBNTC_0008726964
- JPMC_DBNTC_0008726968
- JPMC_DBNTC_0008726980
- JPMC_DBNTC_0008726984
- JPMC_DBNTC_0008726996
- JPMC_DBNTC_0008727000
- JPMC_DBNTC_0008727004
- JPMC_DBNTC_0008727023
- JPMC_DBNTC_0008727027
- JPMC_DBNTC_0008727039
- JPMC_DBNTC_0008727043
- JPMC_DBNTC_0008727055
- JPMC_DBNTC_0008727059
- JPMC_DBNTC_0008727071
- JPMC_DBNTC_0008727075
- JPMC_DBNTC_0008727087
- JPMC_DBNTC_0008727092
- JPMC_DBNTC_0008727096
- JPMC_DBNTC_0008781639
- JPMC_DBNTC_0008781640
- JPMC_DBNTC_0008781649
- JPMC_DBNTC_0008781658
- JPMC_DBNTC_0008781682
- JPMC_DBNTC_0008782352
- JPMC_DBNTC_0008783069
- JPMC_DBNTC_0008784180
- JPMC_DBNTC_0008784654
- JPMC_DBNTC_0008785474
- JPMC_DBNTC_0008792348
- JPMC_DBNTC_0008812346
- JPMC_DBNTC_0009082281
- JPMC_DBNTC_0009089059
- JPMC_DBNTC_0009089231
- JPMC_DBNTC_0009089685
- JPMC_DBNTC_0009100230
- JPMC_DBNTC_0009123129
- JPMC_DBNTC_0009124024
- JPMC_DBNTC_0009124682
- JPMC_DBNTC_0009145457
- JPMC_DBNTC_0009203528
- JPMC_DBNTC_0009203529
- JPMC_DBNTC_0009222960
- JPMC_DBNTC_0009224300
- JPMC_DBNTC_0009224404
- JPMC_DBNTC_0009224642
- JPMC_DBNTC_0009226034
- JPMC_DBNTC_0009226035

- JPMC_DBNTC_0009226041
- JPMC_DBNTC_0009226275
- JPMC_DBNTC_0009226475
- JPMC_DBNTC_0009227171
- JPMC_DBNTC_0009227436
- JPMC_DBNTC_0009227781
- JPMC_DBNTC_0009228079
- JPMC_DBNTC_0009228080
- JPMC_DBNTC_0009228355
- JPMC_DBNTC_0009229186
- JPMC_DBNTC_0009229205
- JPMC_DBNTC_0009229213
- JPMC_DBNTC_0009229379
- JPMC_DBNTC_0009231407
- JPMC_DBNTC_0009231549
- JPMC_DBNTC_0009231648
- JPMC_DBNTC_0009231785
- JPMC_DBNTC_0009232324
- JPMC_DBNTC_0009232624
- JPMC_DBNTC_0009232947
- JPMC_DBNTC_0009233393
- JPMC_DBNTC_0009233676
- JPMC_DBNTC_0009233723
- JPMC_DBNTC_0009234190
- JPMC_DBNTC_0009236970
- JPMC_DBNTC_0009237067
- JPMC_DBNTC_0009237869
- JPMC_DBNTC_0009239879
- JPMC_DBNTC_0009241587
- JPMC_DBNTC_0009241608
- JPMC_DBNTC_0009241636
- JPMC_DBNTC_0009241874
- JPMC_DBNTC_0009242299
- JPMC_DBNTC_0009242420
- JPMC_DBNTC_0009242685
- JPMC_DBNTC_0009243304
- JPMC_DBNTC_0009244380
- JPMC_DBNTC_0009244393

- JPMC_DBNTC_0009244627
- JPMC_DBNTC_0009244687
- JPMC_DBNTC_0009244791
- JPMC_DBNTC_0009244883
- JPMC_DBNTC_0009245023
- JPMC_DBNTC_0009245127
- JPMC_DBNTC_0009245140
- JPMC_DBNTC_0009245277
- JPMC_DBNTC_0009245331
- JPMC_DBNTC_0009245354
- JPMC_DBNTC_0009245636
- JPMC_DBNTC_0009245637
- JPMC_DBNTC_0009245656
- JPMC_DBNTC_0009245924
- JPMC_DBNTC_0009246356
- JPMC_DBNTC_0009246675
- JPMC_DBNTC_0009246676
- JPMC_DBNTC_0009246764
- JPMC_DBNTC_0009246802
- JPMC_DBNTC_0009246892
- JPMC_DBNTC_0009247003
- JPMC_DBNTC_0009247045
- JPMC_DBNTC_0009247142
- JPMC_DBNTC_0009247143
- JPMC_DBNTC_0009247364
- JPMC_DBNTC_0009247668
- JPMC_DBNTC_0009247671
- JPMC_DBNTC_0009247672
- JPMC_DBNTC_0009247673
- JPMC_DBNTC_0009249379
- JPMC_DBNTC_0009250095
- JPMC_DBNTC_0009250096
- JPMC_DBNTC_0009250097
- JPMC_DBNTC_0009250130
- JPMC_DBNTC_0009250131
- JPMC_DBNTC_0009250202
- JPMC_DBNTC_0009250203
- JPMC_DBNTC_0009251189

- JPMC_DBNTC_0009252185
- JPMC_DBNTC_0009271484
- JPMC_DBNTC_0009271503
- JPMC_DBNTC_0009271986
- JPMC_DBNTC_0009272292
- JPMC_DBNTC_0009272332
- JPMC_DBNTC_0009272345
- JPMC_DBNTC_0009276667
- PWC_JPMC_WAMU00000011
- PWC_JPMC_WAMU00000018
- PWC_JPMC_WAMU00000068
- PWC_JPMC_WAMU00000072
- PWC_JPMC_WAMU00000089
- PWC_JPMC_WAMU00000152
- PWC_JPMC_WAMU00000153
- PWC_JPMC_WAMU00000185
- PWC_JPMC_WAMU00000186
- PWC_JPMC_WAMU00000294
- PWC_JPMC_WAMU00000522
- PWC_JPMC_WAMU00000531
- PWC_JPMC_WAMU00000685
- PWC_JPMC_WAMU00000767
- PWC_JPMC_WAMU00015092
- PWC_JPMC_WAMU00029788
- PWC_JPMC_WAMU00029803
- PWC_JPMC_WAMU00029806
- PWC_JPMC_WAMU00029807
- PWC_JPMC_WAMU00029811
- PWC_JPMC_WAMU00029949
- PWC_JPMC_WAMU00030220
- PWC_JPMC_WAMU00030226
- PWC_JPMC_WAMU00030232
- PWC_JPMC_WAMU00056389
- PWC_JPMC_WAMU00073552
- PWC_JPMC_WAMU00073557
- PWC_JPMC_WAMU00075092
- PWC_JPMC_WAMU00092054
- PWC_JPMC_WAMU00092058
- PWC_JPMC_WAMU00092079
- PWC_JPMC_WAMU00092080
- PWC_JPMC_WAMU00092081
- PWC_JPMC_WAMU00092083
- PWC_JPMC_WAMU00092094
- PWC_JPMC_WAMU00092135
- PWC_JPMC_WAMU00108479
- PWC_JPMC_WAMU00108903
- PWC_JPMC_WAMU00111878
- PWC_JPMC_WAMU00115971
- PWC_JPMC_WAMU00118953
- PWC_JPMC_WAMU00125106
- PWC_JPMC_WAMU00125190
- PWC_JPMC_WAMU00132039
- PWC_JPMC_WAMU00132041
- PWC_JPMC_WAMU00132043
- PWC_JPMC_WAMU00132044
- PWC_JPMC_WAMU00132053
- PWC_JPMC_WAMU00132055
- PWC_JPMC_WAMU00132058
- PWC_JPMC_WAMU00132069
- PWC_JPMC_WAMU00132070
- PWC_JPMC_WAMU00132094
- PWC_JPMC_WAMU00132098
- PWC_JPMC_WAMU00134718
- PWC_JPMC_WAMU00134725
- PWC_JPMC_WAMU00134892
- PWC_JPMC_WAMU00135040
- PWC_JPMC_WAMU00135258
- PWC_JPMC_WAMU00135478
- PWC_JPMC_WAMU00135680
- PWC_JPMC_WAMU00135887
- PWC_JPMC_WAMU00136094
- PWC_JPMC_WAMU00136298
- PWC_JPMC_WAMU00136527
- PWC_JPMC_WAMU00136550
- PWC_JPMC_WAMU00136600
- PWC_JPMC_WAMU00136620

- PWC_JPMC_WAMU00136693
- PWC_JPMC_WAMU00136914
- PWC_JPMC_WAMU00137124
- PWC_JPMC_WAMU00137353
- PWC_JPMC_WAMU00137575
- PWC_JPMC_WAMU00137798
- PWC_JPMC_WAMU00138023
- PWC_JPMC_WAMU00138238
- PWC_JPMC_WAMU00138457
- PWC_JPMC_WAMU00138461
- PWC_JPMC_WAMU00138462
- PWC_JPMC_WAMU00138469
- PWC_JPMC_WAMU00138472
- PWC_JPMC_WAMU00138474
- PWC_JPMC_WAMU00150927
- PWC_JPMC_WAMU00150931
- PWC_JPMC_WAMU00151150
- PWC_JPMC_WAMU00155682
- PWC_JPMC_WAMU00155687
- PWC_JPMC_WAMU00155688
- PWC_JPMC_WAMU00155689
- PWC_JPMC_WAMU00155713
- PWC_JPMC_WAMU00155717
- PWC_JPMC_WAMU00155723
- PWC_JPMC_WAMU00155969
- PWC_JPMC_WAMU00155994
- PWC_JPMC_WAMU00156004
- PWC_JPMC_WAMU00156246
- PWC_JPMC_WAMU00156488
- PWC_JPMC_WAMU00156730
- PWC_JPMC_WAMU00156830
- PWC_JPMC_WAMU00156840
- PWC_JPMC_WAMU00156852
- PWC_JPMC_WAMU00156912
- PWC_JPMC_WAMU00156955
- PWC_JPMC_WAMU00156964
- PWC_JPMC_WAMU00157027
- PWC_JPMC_WAMU00157085
- PWC_JPMC_WAMU00157094
- PWC_JPMC_WAMU00157107
- PWC_JPMC_WAMU00157144
- PWC_JPMC_WAMU00157152
- PWC_JPMC_WAMU00159467
- PWC_JPMC_WAMU00159664
- PWC_JPMC_WAMU00159712
- PWC_JPMC_WAMU00166252
- PWC_JPMC_WAMU00166322
- PWC_JPMC_WAMU00168724
- PWC_JPMC_WAMU00171910
- PWC_JPMC_WAMU00175717
- PWC_JPMC_WAMU00176817
- PWC_JPMC_WAMU00176877
- PWC_JPMC_WAMU00176878
- PWC_JPMC_WAMU00176895