**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DEUTSCHE BANK NATIONAL TRUST COMPANY, )<br><br>Plaintiff, )<br><br>v. )<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION, *et al.*, )<br><br>Defendants. ) | Civil Action No.  09-1656 (RMC) |

**AMENDED MEMORANDUM OPINION**

This is a contract action of some moment.  Washington Mutual Bank (WaMu), the largest savings and loan (or "thrift") in the country, failed in a spectacular way when the housing bubble burst in 2007-08.  On September 25, 2008, the Office of Thrift Supervision seized WaMu and transferred ownership of the thrift to the Federal Deposit Insurance Corporation (FDIC).  FDIC in turn immediately sold all of WaMu's assets and substantially all of its liabilities to JPMorgan Chase Bank, National Association (JPMC).  The acquisition of WaMu was governed by a Purchase and Assumption Agreement (P&A Agreement or Agreement), drafted by FDIC, which defined the "Liabilities Assumed" by JPMC to mean those "reflected on the Books and Records" of WaMu.

Plaintiff Deutsche Bank National Trust Company (Deutsche Bank) seeks to enforce WaMu's contractual obligation to repurchase hundreds of faulty mortgage-backed securities that have since collapsed.  Before addressing the merits of Deutsche Bank's case, the Court must first determine which defendant—JPMC or FDIC—is responsible for WaMu's

1

repurchase liabilities.  Specifically, the present litigation concerns interpretation of the P&A

Agreement and the question of whether FDIC transferred liabilities beyond their "Book Value"

as reflected on WaMu's "Books and Records" (i.e., unbooked liabilities) to JPMC or whether

those liabilities remained with FDIC.[1]  The answer to this question will likely affect other

pending cases.[2]  Ultimately, the Court finds that JPMC did not assume WaMu's unbooked

mortgage repurchase liabilities and will grant summary judgment in part to JPMC, finding that

JPMC assumed liability for the disputed mortgage repurchase liabilities only to the extent that

such liabilities were reflected at a stated Book Value on WaMu's financial accounting records as

of September 25, 2008.  The Court will also grant summary judgment in part to FDIC, because it

is not liable for mortgage repurchase obligations of Washington Mutual Mortgage Securities

Corporation (WMMSC), which JPMC acquired in its entirety.

## I.  FACTS

### A.    Residential Mortgage-Backed Securities

WaMu, its subsidiaries, and Deutsche Bank all participated in securitizing and

servicing residential mortgage loans.  In mortgage loan securitization transactions, securities

backed by thousands of residential mortgage loans are created and sold to investors; these are

known as Residential Mortgage-Backed Securities or RMBS.  Ex. 778 (Expert Rebuttal Report

---

[1] JPMC does not dispute that it assumed a certain amount of WaMu's mortgage repurchase liabilities, but argues that it only assumed such obligations up to their "Book Value" as reflected on WaMu's accounting records at the time of closing.  JPMC Mem. in Support of Mot. for Summ. J. (JPMC Mem.) [Dkt. 142] at 25-28.

[2] *See North Carolina Dept. of Revenue v. FDIC*, Civil Case No. 10-505 (RMC); *JPMorgan Chase Bank, N.A. v. FDIC*, Civil Case No. 12-450 (RMC); *JPMorgan Chase Bank, N.A. v. FDIC*, Civil Case No. 13-1997 (RMC).

of George S. Oldfield (Oldfield Report)) [Dkt. 166-9], ¶¶ 14-16.[3]  In the securitization process,

the seller—the entity sponsoring the transaction (typically a bank or bank subsidiary)—

originates or acquires a pool of residential mortgage loans and sells them to the depositor—an

intermediate entity—which then places the loans into an investment trust as collateral for the

securities.  *Id.* ¶¶ 14, 20; Ex. 775 (Expert Report of Michelle Minier (Minier Report)) [Dkt. 166-

8], ¶¶ 14-16.  The process also includes an underwriter, which buys the mortgage-backed

securities issued by the trust and sells them to investors as RMBS.  Oldfield Report, ¶ 14; Minier

Report, ¶¶ 17, 21.  The trust is run by a trustee, which directs payments to investors in accord

with the terms of trust agreements and reports to investors about the performance of the trust's

assets.  Oldfield Report, ¶ 14, 24; Minier Report, ¶¶ 17, 20.  The originator, seller, underwriter,

and depositor may be the same entity or subsidiaries of the same institution.  Minier Report,

¶ 10; Oldfield Report, ¶ 21.  The seller may also play the role of servicer, which has various

responsibilities, including collecting principal and interest payments from residential mortgagors

and sending the funds to the trust.  Minier Report, ¶¶ 10, 18-19; Oldfield Report, ¶¶ 14, 21.  In

contractual agreements between the trustee and the seller, the seller makes certain

representations and warranties about the quality of the residential mortgage loans sold to the

investment trust.  Oldfield Report, ¶ 26; Minier Report ¶ 14.  The trustee usually has the ability

to return defective residential mortgage loans to the seller, and the seller warrants that it will

repurchase non-compliant loans.  Oldfield Report, ¶ 26; Minier Report ¶ 14.  The securitization

process creates vast profit potential for the depositor, seller, servicer, and underwriter, providing

---

[3] The exhibits referred to herein are part of a joint appendix of exhibits and deposition transcripts
cited in the parties' cross-motions for summary judgment.  *See* Dkts. 158-169, 176.

a source of capital to the banks that approve residential mortgage loans for home buyers and subsequently sell the mortgages. Oldfield Report, ¶ 15.

    **B.**    **Relevant Parties and Procedural Background**

        WaMu was a federally chartered savings and loan institution that engaged in residential mortgage lending and participated in the mortgage-backed securitization market.  In the spring of 2008, it was the largest savings and loan association in the United States.  Am. Compl. [Dkt. 32], ¶ 10.  Its business operations consisted of Washington Mutual, Inc. (WMI), a parent holding company, WaMu, a wholly-owned subsidiary, and various subsidiaries of WaMu.  In early 2008, WaMu had over 42,000 employees, 2,200 branch offices in 15 states, and $188.3 billion in deposits.  Ex. 327 [Dkt. 163-26] at 8;[4] Ex. 819 [Dkt. 162] at 1.

        WaMu's collapse on September 25, 2008 was the largest thrift failure in the nation's history as measured by dollar value.  A significant part of WaMu's business focused on the sale and servicing of securitized residential mortgage loans through large-scale financial transactions.  Ex. 801 [Dkt. 161-16] at 132-33.  WaMu sold two types of loans.  The first type involved loans that met the standards of federal mortgage agencies, such as the Federal National Mortgage Association (FNMA, commonly known as Fannie Mae) and the Federal Home Loan Mortgage Corporation (FHLMC, commonly known as Freddie Mac).  Oldfield Report, ¶ 17.  Both Fannie Mae and Freddie Mac are government sponsored enterprises (GSEs) that are not agencies of the federal government.  Residential mortgage loans that complied with Fannie Mae or Freddie Mac standards were sold into securitization trusts sponsored by those entities.  *Id.*  The second kind of residential mortgage loans that were sold and securitized by WaMu were

---

[4] Page citations within this exhibit are to the ECF page number.

sold to "private label" trusts sponsored by private sector institutions, like WaMu, and were administered by private sector trustees such as Deutsche Bank. *Id.* ¶ 18.

Deutsche Bank serves as Trustee for 99 "Primary Trusts" and 28 "Secondary Trusts" (collectively the Trusts) at issue in this case. Am. Compl. ¶¶ 2, 3. The Primary Trusts were created, sponsored, and/or serviced by WaMu and its subsidiaries, their predecessors-in-interest, and their affiliates; the Primary Trusts issued RMBS and other securities, holding as collateral mortgage loans originated or acquired by WaMu and sold into the Primary Trusts. *Id.* ¶ 2. WaMu also issued securities through 28 Secondary Trusts, which are express or implied third-party beneficiaries of the Primary Trusts, and whose performance is allegedly dependent, in whole or in part, on the performance of the Primary Trusts or other RMBS issued by WaMu. *Id.* ¶ 3. Defendant WMMSC, now a subsidiary of JPMC, serves as the seller and depositor for 44 of the 99 Primary Trusts. *Id.* WaMu served as the seller and depositor (or assumed similar roles) for the remaining Trusts. *See id.*

Each Trust is governed by a series of agreements memorializing the rights and obligations of the contracting parties (the Governing Agreements). *See, e.g.*, Ex. 802 (WaMu Series 2007-HE1 Trust) [Dkts. 161-17—161-21]. Specifically, the Governing Agreements imposed various obligations upon WaMu in its capacity as seller, including the obligation to cure, repurchase, or substitute new mortgage loans for any that were materially defective or in material breach of their representations or warranties. *See id.*[5] WaMu accounted for the

---

[5] This opinion interprets the P&A Agreement in order to determine which defendant—JPMC or FDIC—is responsible for obligations arising under the Governing Agreements in the underlying case brought by Deutsche Bank. However, the Court's finding as to the transfer of WaMu's liabilities under the P&A Agreement has no bearing on those Trusts for which WMMSC served as a seller and depositor, or had other obligations. As JPMC acknowledges, "WMMSC is an 'entit[y] acquired by [JPMC] as part of . . . the Washington Mutual . . . transaction[].'" JPMC Opp. to FDIC Mot. for Summ. J. (JPMC Opp.) [Dkt. 150] at 41 (alterations in original); *see also*

possibility that it would have to repurchase loans by recording on its balance sheet a reserve for the liabilities associated with repurchasing loans. *See* Ex. 753 (Expert Report of S.P. Kothari) [Dkt. 167-1], ¶¶ 17-18; Ex. 769 (Expert Report of Thomas Blake) [Dkt. 167-3] at 9. That reserve balance "at any given point in time reflects a dollar estimate of future resources that could be needed to satisfy this contingent liability." Ex. 753, ¶ 21; Ex. 769 at 9 ("WMB's repurchase reserve was based on an estimate because in many cases the liability had not yet been identified, meaning that a claim had not been made, or a determination had not been made by WMB that a representation or warranty had been breached and that the breach caused a material adverse effect on the value of a particular loan.").

The Office of Thrift Supervision (OTS) was an agency within the U.S. Department of the Treasury, established by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), Pub. L. No. 101-73, 103 Stat. 183 (1989), on August 9, 1989. *See* Ex. 767 (FDIC Resolution Handbook) [Dkt. 161-12] at 96.[6] It was the primary regulator of all federal and many state chartered thrift institutions. *Id.* As WaMu's primary regulator, Ex. 912

---

Ex. 1 (P&A Agreement) [Dkt. 158-1], § 3.1 (JPMC assumes "all right, title, and interest" in all subsidiaries of WaMu). Because JPMC assumed all of the stock of WMMSC, it cannot now disclaim WMMSC liabilities, whatever they turn out to be. *See* Ex. 498 (Internal JPMC December 2008 presentation) [Dkt. 164-12] at 7 ("JPMC[ ] cannot avoid repurchase liability under the terms of the FDIC agreement for transactions in which Washington Mutual Mortgage Securities Corp. (WMMSC) maintains the liability. This is because JPMC[ ] bought the stock of WMMSC."); *see also* FDIC Opp. to JPMC's Mot. for Summ. J. (FDIC Opp.) [Dkt. 148] at 44-45. WMMSC does not dispute that it is responsible for its own liabilities, and thus summary judgment will be entered in favor of FDIC with respect to all trusts for which WMMSC was the seller or depositor.

[6] Under Title III of the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010), OTS's oversight responsibilities related to federal savings and loan associations were subsumed into the Office of the Comptroller of the Currency, a bureau within the Treasury Department that charters, regulates, and supervises national banks. *See* Ex. 767 at 95-96; 12 U.S.C. §§ 5412(b)(2)(B), 5414(a)(2)(B). On July 21, 2011, OTS became a part of OCC.

[Dkt. 162-16] at 1, OTS determined that the bank had "insufficient liquidity to meet its obligations" and thus was in an "unsafe and unsound condition to conduct business." Ex. 819 at 1. On September 25, 2008, OTS closed WaMu and placed it into an FDIC receivership. *See* Ex. 911 [Dkt. 162-15].

FDIC is an independent federal agency established by the Banking Act of 1933, Pub. L. 73-86, 48 Stat. 162 (establishing temporary FDIC), and the Banking Act of 1935, Pub. L. 74-305, 49 Stat. 684 (making FDIC permanent), to provide insurance for depositors in U.S. banks. *See* Ex. 767 at 1. FDIC maintains a Deposit Insurance Fund by assessing insurance premiums against banks and savings and loan associations. *See* Federal Deposit Insurance Reform Act of 2005, Pub. L. 109-71, 110 Stat. 9 (merging the Bank Insurance Fund and the Savings Association Insurance Fund into the Deposit Insurance Fund). FDIC's "primary mission is to maintain stability and public confidence in the United States financial system by insuring deposits up to the legal limit and promoting sound banking practices." Ex. 767 at 1 (footnote omitted). "Whenever a federally insured depository institution fails, the FDIC pays off insured deposits or, more frequently, it arranges for the transfer of accounts from the failed institution to a healthy one." *Id.* In this process, FDIC operates as two distinct legal entities: (1) FDIC-Receiver (FDIC-R), which assumes control of the failed bank, closes it, liquidates any assets, and distributes the proceeds of the liquidation to, among others, FDIC-Corporate, certain customers of the failed bank, and general creditors, all with the goal of avoiding costs to the Deposit Insurance Fund, and (2) FDIC-Corporate (FDIC-C), which values the failed institution, markets it to potential acquirers, solicits and accepts bids, decides which bid is least costly to the Deposit Insurance Fund, and works with the acquirer(s) through the closing process. *Id.* at 2. "In its role as receiver for a failed depository institution, the [FDIC-R] has a statutory obligation generally to

maximize the return on the sale or disposition of the receivership estate's assets. The receiver distributes any funds realized from its liquidation efforts to the failed institution's creditors and shareholders in accordance with the FDIC's priority scheme." *Id.* (footnote omitted).

FDIC-R received WaMu from OTS and closed WaMu momentarily after its seizure. FDIC-C and FDIC-R jointly sold all of WaMu's assets and most of its liabilities to JPMC on September 25, 2008, the same date on which OTS seized WaMu. Ex. 911.

On December 30, 2008, Deutsche Bank filed a proof of claim with FDIC-R based on WaMu's alleged breach of various obligations under the Governing Agreements relating to the mortgage-backed securities held by the various Trusts for which Deutsche Bank is the Trustee. Am. Compl. ¶ 14. FDIC failed to respond and Deutsche Bank subsequently sued FDIC-R on August 26, 2009, alleging, *inter alia*, that WaMu had breached its contractual obligations by selling "defective" mortgage loans and failing to repurchase those loans. *See* Compl. [Dkt. 1]. When FDIC answered that the claims asserted by Deutsche Bank had been assumed by JPMC, Deutsche Bank added JPMC as a defendant and now seeks a money judgment from WaMu and its "successors or successors-in-interest, whoever they are adjudicated to be." Am. Compl. ¶ 13. FDIC and JPMC engaged in discovery on the question of liability under the P&A Agreement and have filed cross-motions for summary judgment on the scope of the Agreement.

### C.    Context for JPMC's Purchase of Washington Mutual Bank

In 2008, the United States was undergoing one of the most severe financial crises in the nation's history. The deteriorating housing market caused an increased delinquency rate among residential borrowers who defaulted on their mortgages, which in turn increased demands that WaMu repurchase at-risk securitized loans. In early March 2008, OTS and FDIC pressured

WaMu to raise more capital or find a buyer.  *See* Ex. 327 at 3.  JPMC, other banks, and various private equity groups were invited to participate in the potential transaction.  *Id.*  JPMC engaged in "an exhaustive due diligence process," *id.*, of which "the most critical component . . . was the assessment of losses in WaMu's consumer loan portfolios, particularly home lending" *id.* at 4.  On March 31, 2008, JPMC offered to purchase WaMu at $5/share plus a contingent $3/share dependent "on the magnitude of losses realized on certain WaMu loan portfolios."  *Id.* at 5.  It was contemplated that any acquisition would be via an open bank transaction.[7]  *See* Ex. 486 [Dkt. 164-10].  However, WaMu obtained a capital infusion from a private equity firm and remained independent.  Ex. 327 at 5.

In early September of 2008, as WaMu's financial status continued to weaken, OTS and FDIC again demanded that WaMu raise additional capital or engineer a sale.  *Id.*  Advised by FDIC that FDIC was closely monitoring WaMu and anticipated a seizure of its assets and a quick sale, JPMC (and others) began a new round of due diligence, "including updating the loan portfolio loss estimates."  *Id.*  In mid-September, Sheila Bair, then-Chairman of the FDIC, contacted Jamie Dimon, Chairman and CEO of JPMC, to "pitch[ ] an open bank transaction." Ex. 135 [Dkt. 159-15].  However, FDIC officials changed course soon thereafter and asked various potential acquiring banks to prepare bids in the event WaMu were seized by federal regulators.  *See* Ex. 327 at 5.  On September 22, 2008, FDIC representatives Jim Wigand, Herb

---

[7] Open bank transactions are "normally stock sales," so the acquiring bank "assumes or acquires the business," including all assets and liabilities.  *See* Deposition of James Wigand (Wigand Dep.) [Dkt. 169-5] at 135; Ex. 767 at 47.

Held, and David Gearin[8] met with various prospective bidders, including JPMC, to discuss a potential WaMu transaction.  *See* Ex. 54 [Dkt. 158-9]; Ex. 142 [Dkt. 159-16].

    **D.**    **FDIC's Internal Drafting of the Purchase and Assumption Agreement**

        FDIC began drafting a purchase and assumption agreement for WaMu in mid-September 2008.  *See* Deposition of David Gearin (Gearin Dep.) [Dkt. 169-24] at 18-21.  FDIC attorneys David Gearin and Lee Van Fleet, Counsel, Division of Resolutions and Receiverships, "principally drafted" what would ultimately become the September 25, 2008 P&A Agreement at issue here, "based on instructions from Jim Wigand, Herb Held, and Richard Aboussie."[9]  Ex. 901 (FDIC Interrogatory Responses) [Dkt. 162-5] at 6.  Mr. Van Fleet testified that the "P&A was a completely one-off deal.  It had several unique provisions that were never seen in a prior P&A and some of them have never been seen since."  Deposition of Lee Van Fleet (Van Fleet Dep.) [Dkt. 169-9] at 37; *see also id.* at 46 ("Article 2 was totally different than any other one we've done before or since."); Wigand Dep. at 37 (WaMu transaction "was unique in that it was different from the standard transactions in which only identified liabilities and identified assets pass to the acquirer.").  Nonetheless, Messrs. Van Fleet and Gearin started with FDIC's pre-existing template for a whole-bank purchase and assumption agreement, originally crafted in the 1990s by an FDIC attorney, and modified the template in various ways for the WaMu receivership transaction.  Ex. 901 at 6-7.  The template contained pre-existing definitions for "Record" and "Accounting Records."  *Id.* at 7; *see also* Ex. 242 [Dkt. 163-20] at 6, 12.

---

[8] James Wigand was then-Deputy Director of Franchise and Asset Marketing Branch, Division of Resolutions and Receiverships; Herb Held was Assistant Director Institution Sales Unit, Franchise and Asset Marketing Branch, Division of Resolutions and Receiverships; and David Gearin was Senior Counsel, Special Issues Unit, Legal Division.

[9] Richard Aboussie was Associate General Counsel, Large Bank Resolutions.  He is now deceased.

On September 22, 2008, Mr. Van Fleet sent an internal-FDIC email to Mr. Gearin, Sheri Foster,[10] and other FDIC officials, attaching drafts of two different options for whole-bank purchase and assumption agreements.  Ex. 248 [Dkt. 159-25].  The first "all deposit version" would "convey all assets and all liabilities, including all deposits, except those liabilities specifically excluded on the attached Schedule 2.1."  *Id.*  The second was described as "a 'standard' whole bank P&A" that would pass to the acquirer "all assets and only the insured and other certain liabilities listed in section 2.1."  *Id.*

On the morning of September 23, 2008,[11] in response to Mr. Van Fleet's email, Mr. Gearin asked if Mr. Van Fleet could send the "current draft of the all deposit version."  Ex. 253 [Dkt. 160] at 1.  Later that day, Mr. Van Fleet forwarded a draft agreement.  *Id.*  The relevant sections of that draft stated:

> § 2.1: Subject to Section 2.5, the Assuming Bank expressly assumes at Book Value (subject to adjustment pursuant to Article VII) and agrees to pay, perform, and discharge, all of the liabilities of the Failed Bank as of Bank Closing, including the Assumed Deposits and all liabilities associated with any and all employee benefit plans, except as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumed").
>
> Schedule 2.1 attached hereto and incorporated herein sets forth certain categories of Liabilities Assumed and the aggregate Book Value of the Liabilities Assumed in such categories.  Such schedule is based upon the best information available to the Receiver and may be adjusted as provided in Article VIII.

---

[10] Ms. Foster was an FDIC Marketing Specialist, Franchise and Asset Marketing Branch, Division of Resolutions and Receiverships; she testified that she "facilitated" the WaMu transaction. Deposition of Sheri Foster (Foster Dep.) [Dkt 169-22] at 31, 57.

[11] The Court does not reference the specific times indicated in the cited exhibits because the emails originated in varying time zones.  *See* JPMC Opp. at 10 n.7.

*Id.* at 12.  At the beginning of this draft, the second introductory clause stated:  "WHEREAS, the Assuming Bank desires to purchase certain assets and assume certain deposit and other liabilities of the Failed Bank on the terms and conditions set forth in this Agreement . . . ."  *Id.* at 4.

In the afternoon of September 23, 2008, Ms. Foster sent an email to Messrs. Wigand and Held, forwarding a question from Mr. Van Fleet: "Lee Van Fleet called with the following questions: Can we limit liabilities assumed to just the 'liabilities on the books and records' and then give the options to take out the different categories of liabilities? Initial Payment = Bid Amount? These are coming from David Gearin."  Ex. 903 [Dkt. 162-7].  A positive answer presumably came very soon thereafter, because Mr. Van Fleet immediately sent an email to Mr. Gearin and other FDIC representatives, attaching a revised draft P&A Agreement.  *See* Ex. 255 [Dkt. 160-1].  In that draft, Section 2.1 was amended as follows:

> Subject to Section 2.5, the Assuming Bank expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) and agrees to pay, perform, and discharge, all of the liabilities of the Failed Bank which are reflected on the Books and Records of the Failed Bank as of Bank Closing, including the Assumed Deposits and all liabilities associated with any and all employee benefit plans, except as listed on the attached Schedule 2.1, and as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumed").
>
> ~~Schedule 2.1 attached hereto and incorporated herein sets forth certain categories of Liabilities Assumed and the aggregate Book Value of the Liabilities Assumed in such categories. Such schedule is based upon the best information available to the Receiver and may be adjusted as provided in Article VIII~~.

Ex. 256 (changes tracked to compare updated version of agreement) [Dkt. 160-2].  The second introductory clause in this draft was changed to "WHEREAS, the Assuming Bank desires to purchase *substantially all* of the assets and assume *all* deposit and *substantially all* other

liabilities of the Failed Bank on the terms and conditions set forth in this Agreement . . . ."  Ex. 255 at 6 (emphasis added).[12]

### E.      External Bidding Process

As it internally drafted and redrafted a purchase and assumption agreement, FDIC was also putting together a "Transaction Recap" for potential bidders.  Ex. 151 [Dkt. 159-18]; *see also* Ex. 56 [Dkt. 158-11].  The Transaction Recap outlined five alternative possible transaction structures from which bidders could choose:

(1) All liabilities are assumed except the preferred stock;

(2) All liabilities are assumed, except the preferred stock and the subordinated debt;

(3) All liabilities are assumed, except the preferred stock, the subordinated debt, and the senior debt;

(4) All deposits and secured liabilities are assumed by the acquirer; and

(5) All insured deposits and secured liabilities are assumed.

Ex. 56 at 2.[13]  According to FDIC, different proposed structures were offered in order to provide options for prospective acquirers that did not want to assume all liabilities.  Wigand Dep. at 116 (The bidding "structure was set up intentionally to allow bidders to make the election of which liabilities they felt had to be assumed in order to . . . make the transaction move forward.").  The Transaction Recap emphasized that "[t]he legal documents will be the governing documents for this transaction."  Ex. 56 at 2.

---

[12] Page citations within this exhibit are to the ECF page number.

[13] Page citations within this exhibit are to the ECF page number.

In connection with the Transaction Recap, the FDIC also prepared a set of bid instructions for potential bidders. Ex. 57 [Dkt. 158-12]. The instructions described Transaction Option 3 (on which JPMC ultimately bid) as a "Whole Bank, All Deposits" transaction and stated that:

> Under this transaction, the Purchase and Assumption (Whole Bank), the Potential Acquirer whose Bid is accepted by the Corporation assumes the Assumed Deposits of the Bank and all other liabilities but specifically excluding the preferred stock, non-asset related defensive litigation, subordinated debt and senior debt, and purchases all the assets of the Bank, excluding those assets identified as excluded assets in the Legal Documents. . . .

*Id.* at 3.[14] Transaction Options 1 and 2 also provided that the assuming bank would take "the Assumed Deposits of the Bank and all other liabilities." *Id.* Under Transaction Options 4 and 5, the assuming bank would take "the Assumed Deposits of the Bank and only certain other liabilities," subject to certain excluded categories of liabilities. *Id.* at 3-4. The Transaction Recap and bid instructions were subsequently provided to potential bidders, including JPMC, later in the day on September 23, 2008. Exs. 56 and 57.[15]

Also on September 23, 2008, FDIC officially invited JPMC to bid on WaMu. *See* Ex. 55 [Dkt. 158-10]. The invitation came via Ms. Foster, who sent an email to Dan Cooney and Mike Cavanagh[16] of JPMC advising: "The FDIC is offering select financial institutions, such as

---

[14] Page citations within this exhibit are to the ECF page number.

[15] While there were five alternate transaction structures, Ex. 56, FDIC had only three different draft purchase and assumption agreements. There was a draft purchase and assumption agreement for transactions 1, 2, and 3, in which the only difference was that Schedule 2.1 listed different categories of liabilities that were categorically excluded. *See, e.g.*, Ex. 255. For transactions 4 and 5, Section 2.1 of the draft purchase and assumption agreements specifically listed the liabilities assumed. *See, e.g.*, Ex. 276 [Dkt. 160-8].

[16] Dan Cooney was JPMC's General Counsel and Senior Vice President of Retail Financial Services. Mike Cavanaugh was JPMC's Chief Financial Officer and Executive Vice President.

14

yours, an opportunity to bid on a depository institution. . . . If you have any questions about this process, please contact me at any time." *Id.*  The invitation included a link to a web site known as IntraLinks, which contained additional information about WaMu and the potential acquisition. *Id.*

FDIC first provided drafts of the various proposed agreements to potential bidders, including JPMC, during the evening of September 23, 2008.  *See* FDIC Opp. to JPMC Statement of Facts [Dkt. 148-1], Undisputed JPMC Fact ¶ 40, at 11 (citing Ex. 257 [Dkt. 160-3]; Ex. 276 [Dkt. 160-8]; Ex. 908 [Dkt. 162-12]).   In the proposed P&A Agreement for Transaction Options 1-3, Section 2.1 provided that

> Subject to Section 2.5, the Assuming Bank expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) and agrees to pay, perform, and discharge, all of the liabilities of the Failed Bank which are reflected on the Books and Records of the Failed Bank as of Bank Closing, including the Assumed Deposits and all liabilities associated with any and all employee benefit plans, except as listed on the attached Schedule 2.1, and as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumed").

Ex. 276 at 60.[17]

Section 12.1 provided for various situations in which FDIC would indemnify the assuming bank.  *See id.* at 77.  Specifically, Section 12.1 stated that:

> . . . the Receiver agrees to indemnify and hold harmless the Indemnitees against any and all costs, losses, liabilities, expenses (including attorneys' fees) incurred prior to the assumption of defense by the Receiver pursuant to paragraph (d) of Section 12.2, judgments, fines and amounts paid in settlement actually and reasonably incurred in connection with claims against any Indemnitee based on liabilities of the Failed Bank that are not assumed by the Assuming Bank pursuant to this Agreement. . . .

---

[17] Page citations within this exhibit are to the ECF page number.

*Id.*

According to the testimony of Mitchell Eitel,[18] after JPMC received the draft P&A Agreement, email discussion ensued between JPMC and FDIC regarding Mr. Eitel's concern that there was a disconnect between Sections 2.1 and 12.1 of the draft agreement. Deposition of Mitchell Eitel (Eitel Dep.) [Dkt. 169-17] at 140-41.[19]  Mr. Eitel testified that JPMC wanted to make sure that the indemnity provision did not "undermine the limitation" that JPMC was only taking "booked liabilities," that is, only liabilities entered on WaMu's accounting books and underlying records.  *Id.* at 143.  Mr. Gearin similarly recalled that JPMC and FDIC had discussions about the indemnification provisions in the P&A Agreement and stated his belief that Mr. Eitel was trying to discern what liabilities were covered by Section 12.1.  Gearin Dep. at 175-177.

During the evening of September 23, 2008, Mr. Gearin wrote to Mr. Cooney of JPMC, under the subject line "Indemnity Question," stating that "the liabilities assumed are described as booked liabilities which should address the concern raised by Mitch [Eitel]."  Ex. 66 [Dkt. 158-16] at 2.  Mr. Cooney again addressed the scope of the indemnity provision in his response:

---

[18] Mitchell Eitel is a partner at Sullivan & Cromwell LLP, outside counsel for JPMC.

[19] FDIC contends that testimony from Mr. Eitel and Mr. Cooney is inadmissible, arguing that JPMC "cannot offer the professed understanding of its attorneys as evidence of [its] supposed interpretation of the P&A Agreement at the time that it bid, because it has shielded all internal documents reflecting the contemporaneous impressions of those attorneys from disclosure." FDIC Opp. at 9.  JPMC responds that it only withheld documents protected by the attorney-client privilege (which this Court found were properly withheld, *see* Order [Dkt. 129]), and that the cited testimony involves non-privileged documents.  JPMC Reply [Dkt. 152] at 4-5. The Court overrules FDIC's objection because representatives of JPMC may provide testimony on discussions with FDIC and because the Court does not rely on the testimony of Messrs. Eitel or Cooney as "evidence" that might shed light on the meaning or interpretation of the P&A Agreement.  Rather, the Court relies on their testimony to provide context for the exchange of non-privileged emails between JPMC and FDIC on the subject of Sections 2.1 and 12.1.

> I don't think your suggestion solves the problem. Let's say there is a contract between the thrift and the Parent and that is included in the Books and Records (not something like "accrued for on the books of the Failed Bank," which probably would fix the problem) of the thrift at the time of closing. Any liability under that contract is then arguably a liability reflected in the Books and Records. Therefore one would most likely conclude that liabilities under that contract are assumed under 2.1.
>
> So the way that 12.1 reads is we are indemnified for a claim by Wamu (shareholder of Failed Bank) with respect to that contract only to the extent the liability was not assumed -- indeed they are free to sue us for a breach by the Failed Bank that occurred before the closing.
>
> In a normal P&A between commercial parties this is not something a buyer would ever assume and it really doesn't make sense (nor frankly is it fair) here.

*Id.* at 1. Mr. Gearin wrote back: "Ok I will look at [sic] again." *Id.*

On the morning of September 24, 2008, JPMC met with rating agencies to present an overview of the proposed transaction. *See* Ex. 62 [Dkt. 163-2]; Ex. 678 [Dkt 164-29].[20] A presentation slide with the heading "Key terms of transaction" stated that JPMC would acquire "[a]ll the deposits and substantially all liabilities excluding senior and subordinated debt." Ex. 62 at 20. Also on that morning, JPMC senior executives met with the JPMC Board of Directors to present the details of the proposed transaction. Ex. 63 [Dkt. 163-3]; Ex. 64 [163-4]. Similarly, the "Key terms of transaction" slide stated that JPMC would acquire "[a]ll the deposits and substantially all liabilities excluding senior and subordinated debt." Ex. 63 at 20.

Throughout the bid process, FDIC had been working on a document to be posted on Intralinks that addressed various bidder questions about the proposed transaction. *See* Ex.

---

[20] Specifically, JPMC met with Moody's Investors Service and Standard & Poor's. *See id.*

153 [Dkt 159-19].  Among the "Frequently Asked Questions" (FAQs)[21] was the following

question and answer:

> [Question:] Are the off-balance sheet credit card portfolio and
> mortgage securitizations included in the transaction? Do you expect
> the acquirer to assume the servicing obligations? If there are pricing
> issues associated with the contracts (e.g., the pricing is
> disadvantageous to the assuming institution), can we take advantage
> of the FDIC's repudiation powers to effect a repricing?

> Answer: The bank's interests and *obligations associated with the
> off-balance sheet* credit card portfolio and *mortgage securitizations
> pass to the acquirer*.  Only contracts and obligations remaining in
> the receivership are subject to repudiation powers.

*Id.* at 4 (emphasis added).[22]  The FAQs were posted on Intralinks and distributed among various

JPMC officials in the afternoon of September 24, 2008.  Ex. 71 [Dkt. 158-21]; Ex. 129 [Dkt.

159-12].  The FAQs further stated that "the Purchase & Assumption agreement language is not

negotiable."  Ex. 71 at 3.

 Later in the afternoon of September 24, 2008, Mr. Eitel for JPMC proposed a

revision to Section 2.5 ("Borrower Claims") to David Gearin of FDIC.  Ex. 78 [Dkt. 159-2].  Mr.

Eitel's proposal sought to exclude from "Liabilities Assumed" all claims by any "direct or

indirect purchaser of securities of any mortgage loan securitization vehicle that was owned or

sponsored by the Failed Bank or any of its Subsidiaries or Affiliates prior to the Bank

Closing. . . . "  *Id.*  Mr. Gearin forwarded the email to Richard Aboussie of FDIC, reporting that

"[t]he [JPMC] lawyers say that the provision doesn't cover liability for assets in securitizations

and suggest this markup—I made no representations that we would be making any changes."

Ex. 79 [Dkt. 159-3].  Mr. Aboussie responded to Mr. Gearin that "Jim Wigand [also of FDIC]

---

[21] FDIC refers to this document as the "Q&As."

[22] This question came from an email sent by Citibank employee Andrew Felner to FDIC's
Herbert Held.  Ex. 83 [Dkt. 159-7] at 4.

has stated that he understood and intended that all liabilities associated with loan sales (i.e., rep and warrant/repurchase claims) are to be passed to the assuming bank." *Id.* Mr. Gearin then answered Mr. Eitel's email, stating "I don't believe that you will see a revised agreement—to the extent we make adjustments to the transaction that will be covered in updated Q&As." Ex. 80 [Dkt 159-4]. Mr. Eitel wrote back: "[A] revised contract was just posted. We discussed this morning that the indemnity provision does not work and we understood you were re-drafting it. There are no changes to the indemnity section (which is also not dealt with in the FAQs.) What should we be assuming from that?" *Id.*[23] If there was a reply to that email, it is not reflected in the record.

On the evening of September 24 and morning of September 25, 2008, Mr. Eitel provided FDIC with additional suggested changes to Section 12.1 (Indemnification of Indemnitees). *See* Ex. 902 [Dkt. 162-6]. FDIC accepted the proposed changes. *See* Ex. 1 (P&A Agr.) § 12.1.[24] None of these revisions changed the language in Section 12.1 providing that the FDIC would indemnify the acquiring bank only for liabilities the acquiring bank did not assume under the P&A Agreement. *See* Ex. 902 at 5 (stating that FDIC would indemnify only for "liabilities of the Failed Bank that are not assumed by the Assuming Bank . . . .").

On the evening of September 24, 2008, JPMC submitted a bid of $1.888 billion for the Transaction Option 3. *See* Ex. 58 [Dkt. 158-13] at 5;[25] Ex. 59 [Dkt. 158-14].   In its cover letter, JPMC stated that "[w]e understand that you may be considering revisions to the

---

[23] Questioned about this email exchange in deposition, Mr. Eitel could not recall conversations surrounding the email or declined to answer on the grounds of attorney-client privilege.  Eitel Dep. at 232-233.

[24] Section 12.1 provided for various scenarios in which FDIC agreed to indemnify JPMC.

[25] Page citations within this exhibit are to the ECF page number.

indemnification provisions in Section 12.1.  We understand that these do not relate to Section 2.5

and 12.1(b)(xv)[26] which we accept as drafted by the FDIC."  *Id.*  Almost immediately thereafter,

FDIC accepted JPMC's bid.  Ex. 910 [Dkt. 162-14].  On September 25, 2008, OTS closed

WaMu and placed it into an FDIC receivership.  Ex. 911.

   The speed of this transaction must be appreciated: OTS and FDIC decided to

close WaMu in mid- or late-September of 2008; FDIC met with potential bidders on September

22 in New York City; FDIC posted the Transaction Recap in the late afternoon or early evening

on September 23; FDIC circulated the P&A Agreement in draft form during the evening of

September 23; FDIC posted answers to frequently asked questions late in the day on September

24; bids were received during the evening on September 24.  On September 25, the FDIC Board

approved the JPMC transaction, Ex. 163 [Dkt. 159-21], and that same day FDIC and JPMC

executed the P&A Agreement, Ex. 274 [Dkt. 160-7].  FDIC and JPMC revised the P&A

Agreement between September 26 and 28, 2008, *see*, *e.g.*, Ex. 277 [Dkt. 160-9], but none of the

changes pertained to Section 2.1 or is at issue here.  On September 29, 2008, the parties executed

the final agreement, marked "Execution Copy," which was "effective . . . as of 6pm [sic] Pacific

Time, September 25, 2008."  *Id.*; *see also* Ex. 279 [Dkt. 160-10].

**F.  The P&A Agreement**

   **1.  Relevant Provisions**

- Section 2.1 of the P&A Agreement, titled "Liabilities Assumed by Assuming Bank,"

  provides:

> Subject to Sections 2.5 and 4.8, the *Assuming Bank expressly*
> *assumes at Book Value* (subject to adjustment pursuant to Article
> VIII) *and agrees to pay, perform, and discharge, all of the liabilities*
> of the Failed Bank *which are reflected on the Books and Records of*

---

[26] Section 12.1(b)(xv) is not in the final P&A Agreement.

> the Failed Bank as of Bank Closing, including the Assumed
> Deposits and all liabilities associated with any and all employee
> benefit plans, except as listed on the attached Schedule 2.1, and as
> otherwise provided in this Agreement (such liabilities referred to as
> "Liabilities Assumed"). Notwithstanding Section 4.8, the Assuming
> Bank specifically assumes all mortgage servicing rights and
> obligations of the Failed Bank.

Ex. 1 [Dkt. 158-1], Art. II, § 2.1 (emphasis added).

- Section 2.5 of the P&A Agreement, entitled "Borrower Claims," specifies that JPMC did

  not assume borrower claim-related liabilities. *Id.*, Art. II, § 2.5.

- Article VIII of the P&A Agreement provides that JPMC, "in accordance with the best

  information then available, shall provide to the Receiver a Pro Forma Statement of

  Condition indicating all assets and liabilities of the Failed Bank as shown on the Failed

  Bank's books and records as of Bank Closing and reflecting which assets and liabilities

  are passing to the Assuming Bank and which assets and liabilities are to be retained by

  the Receiver." *Id.*, Art. VIII.

- Schedule 2.1 of the P&A Agreement carves out "Certain Liabilities Not Assumed,"

  without any reference to liabilities arising under the Governing Agreements. *Id.* at 34.

- Section 3.1 of the P&A Agreement states that JPMC purchased all assets of WaMu,

  "whether or not reflected on the books of the Failed Bank as of Bank Closing." *Id.*, Art.

  III, § 3.1.

### 2. Relevant Definitions

- "Record" is defined to mean "any document, microfiche, microfilm and computer records

  (including but not limited to magnetic tape, disc storage, card forms and printed copy) of

  the Failed Bank generated or maintained by the Failed Bank that is owned by or in the

  possession of the Receiver at Bank Closing." *Id.*, Art. I.

- "Book Value" is defined to mean (in relevant part): "with respect to any Asset and any Liability Assumed, the dollar amount thereof stated on the Accounting Records of the Failed Bank.  The Book Value of any item shall be determined as of Bank Closing after adjustments made by the Assuming Bank for normal operations and timing differences in accounts, suspense items, unposted debits and credits, and other similar adjustments or corrections and for setoffs, whether voluntary or involuntary." *Id.*

- "Accounting Records" is defined to mean "the general ledger and subsidiary ledgers and supporting schedules which support the general ledger balances." *Id.*

- The phrase "Books and Records" is not defined in Article I or elsewhere in the P&A Agreement, nor is it capitalized in any other section of the Agreement.

### G. Post-Transaction Questions on WaMu's Liabilities

After the transaction closed, questions arose regarding WaMu's federal income tax audit and whether WaMu's tax liabilities were transferred to JPMC.  *See, e.g.*, Ex. 87 [Dkt. 159-8].  On October 8, 2008, Richard Peyster, an FDIC tax attorney, sent an email to JPMC employees Allen Friedman and Ben Lopata.  Mr. Peyster wrote:

> With regard to what was and was not transferred to Morgan under the agreement, I do not think we have any dispute here.  All assets whether or not on the books were transferred.  In my view, that clearly includes pending tax refunds, and future refunds based on losses generated up to the date of failure.  With regard to any tax liability arising out of an ongoing or future audit, where no assessment had been made prior to the date of closing, such liability would not pass to Morgan. *Only liabilities on the books as of the date of the agreement pass.*

Ex. 29 [Dkt. 159-10] at 1 (emphasis added).

Also on October 8, 2008, Andrew Gray, FDIC's director of public affairs, received an email from an attorney for a third party asking whether the "tax claims of

Washington Mutual Bank reside with the receivership or were transferred to [JPMC]?"  Ex. 108

[Dkt. 159-11] at 3.  After forwarding through Messrs. Wigand, Gearin, and Aboussie, the

question was referred to Mr. Peyster.  *Id.*  A series of privileged emails ensued, on which Messrs.

Wigand, Gearin and Aboussie were all copied, ending with Mr. Peyster's final response to Mr.

Gray:

> For public consumption I think the following should be adequate:
>
> Tax claims, whether assets or liabilities are treated as any other
> assets and liabilities under the Purchase and Assumption
> Agreement. Section 3.1 transfers all assets, whether or not reflected
> on the books and records of Washington Mutual. Therefore, any tax
> assets would have transferred to JPMorgan Chase.
>
> Section 2.1 transfers all liabilities reflected on the books and records
> of Washington Mutual to JPMorgan Chase. Therefore, any tax
> liabilities on the books of Washington Mutual were transferred, and
> *any unknown liabilities, not reflected on the books were not*
> *transferred*.

*Id.* at 1 (emphasis added).

Following JPMC's acquisition of WaMu, JPMC also began to receive tax

assessments from state and local taxing authorities and processed WaMu's tax returns for tax

periods prior to the thrift's closure.  *See*, *e.g.*, Ex. 407 [Dkt. 160-16], Ex. 408 [Dkt. 160-17], Ex.

410 [Dkt. 160-18].  On October 20, 2008, JPMC employee James Fergus recounted a

conversation he had had with FDIC tax accountant James Thormahlen and another FDIC

employee, James Vordtriede.  Ex. 409 [Dkt. 164-6].  Mr. Fergus summarized various items

discussed on the call including that "[f]or the items . . . which have yet to appear on a return, the

information will be provided to the FDIC and it will be their liability."  *Id.* at 2.  Mr. Fergus

further noted that based on "specific comments from the FDIC, it would seem that JPMC's

liability would be limited to the reserves booked at 9/25/08 and once those were exceeded it would be the FDIC's liability." *Id.*

Also on October 20, 2008, Mr. Thormahlen of FDIC provided JPMC with a form letter for WaMu branch offices to send to "State Tax Agenc[ies]," informing "State Tax Agenc[ies]" that WaMu was closed by OTS on September 25, 2008, that FDIC was appointed as Receiver, and advising that because "[t]he tax period on the attached return occurred prior to the bank[']s closure and was not assumed by [JPMC]," the "liability reflected on the attached return is a claim against the receivership." Ex. 30 [Dkt. 158-5] at 1. Mr. Thormahlen continued to send out such letters instructing that unassessed tax liabilities were a claim against the FDIC-Receiver, not JPMC, throughout 2008 and into 2009. *See* Ex. 404 [Dkt. 160-15], Ex. 416 [Dkt. 160-19].

On October 28, 2008, David Gearin wrote to Mr. Aboussie and Richard Osterman of FDIC, stating that he "just got off the phone with Dan Cooney, the JPMC in-house attorney who no[w] understands that we are of the view that the repurchase obligations did pass to JPMC and cannot be put back to the receiver for repudiation. Unfortunately what I said was inconsistent from what they had heard over time from three different FDIC representatives in Seattle." Ex. 82 [Dkt. 159-6] at 1. The record further includes an October 29, 2008 email in which Mr. Gearin described a conversation he had had with Dan Cooney of JPMC on the previous evening in which Mr. Gearin advised Mr. Cooney that "under the terms of 2.1 and 3.1 JPMC acquired the seller repurchase obligations related to the mortgage servicing assets they acquired." Ex. 356 [Dkt. 160-14] at 2-3.[27]

---

[27] FDIC notes that it does *not* take the position (as it did before this lawsuit) that mortgage servicing rights, which JPMC clearly acquired under Section 2.1, necessarily include liabilities for repurchase of defective mortgages. *See* FDIC Opp. at 43 ("The FDIC-Receiver has never argued *in this case* that the repurchase liabilities under the Governing Agreements are servicer obligations. Nor has the FDIC-Receiver argued *in this case* that the seller and servicer

Deutsche Bank filed this lawsuit on August 26, 2009, seeking recovery for WaMu's alleged breach of its contractual obligations regarding the "defective" mortgage loans. That dispute remains pending while JPMC and FDIC contest which of them is liable.

## II.  LEGAL STANDARDS

### A.  Federal Rule of Civil Procedure 56

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  Moreover, summary judgment is properly granted against a party who "after adequate time for discovery and upon motion . . . fails to make a

---

obligations under the pre-closure securitization agreements of a failed financial institution cannot be severed.  To the contrary, the FDIC-Receiver has simply maintained that it can effect a transaction that transfers all of the failed bank's obligations (including both seller and servicer obligations) under the governing agreements for mortgage loan securitizations, as it did in the WaMu transaction.") (emphasis added).  As its accurate but careful language conveys, FDIC previously argued that the mortgage repurchase liabilities at issue here transferred automatically to JPMC because they were an obligation related to the mortgage servicing rights assumed by JPMC.  *See* FDIC Mem. in Support of Mot. to Dismiss Am. Compl. [Dkt. 54-1] at 25-28.

Indeed, this was the position taken by the GSEs Fannie Mae and Freddie Mac following JPMC's acquisition of WaMu; specifically, the GSEs maintained that the mortgage servicing rights associated with loans held in GSE-sponsored trusts were not severable from their mortgage repurchase liabilities.  *See* Ex. 387 [Dkt. 164-2] at 3-4; Ex. 388 [Dkt. 164-3] at 3-4.  In order to retain the servicing rights associated with the GSE mortgage loans, JPMC entered into settlement agreements with the GSEs wherein JPMC assumed various GSE repurchase liabilities.  *See* Ex. 822 [Dkt. 165-17]; Ex. 823 [Dkt. 165-18]; *see also* JPMC Mem. at 16; JPMC Opp. to FDIC Statement of Facts [Dkt. 150], Undisputed FDIC Fact ¶ 126, at 81 ("Because [JPMC] did not want to lose mortgage servicing rights that it valued at $5 billion, it entered into negotiations to settle the repurchase liability arising from WaMu's agreements with the GSEs.").  FDIC also argues that JPMC assumed WaMu's repurchase liabilities to the GSEs by virtue of the P&A Agreement.  FDIC Opp. at 40.  However, FDIC now concedes on summary judgment that seller repurchase obligations are not inherently tied to mortgage servicing obligations.  The Court makes no finding here as to GSE seller and servicing obligations because that dispute is long-since resolved.

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255.

When evaluating cross-motions for summary judgment, each motion is reviewed "separately on its own merits to determine whether [any] of the parties deserves judgment as a matter of law." *Family Trust of Mass., Inc. v. United States*, 892 F. Supp. 2d 149, 154 (D.D.C. 2012) (internal quotation marks and citation omitted). Neither party is deemed to "concede the factual assertions of the opposing motion." *Competitive Enter. Inst. Wash. Bureau, Inc. v. Dep't of Justice*, 469 F.3d 126, 129 (D.C. Cir. 2006) (citation omitted). "[T]he court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed." *Am. Ins. Ass'n v. United States HUD*, 2014 WL 5802283, at *5 (D.D.C. Nov. 7, 2014*)* (internal quotation marks and citation omitted). A genuine issue exists only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

## B.  Federal Common Law of Contracts

The parties agree that federal common law applies to the construction of the P&A Agreement. FDIC Mem. in Support of Mot. for Summ. J. (FDIC Mem.) [Dkt. 145] at 11; JPMC Mem. at 23. The federal common law of contracts largely "dovetails" with "general principles of contract law." *NRM Corp. v. Hercules, Inc.*, 758 F.2d 676, 681 (D.C. Cir. 1985). Additionally, courts should look to the Restatement (Second) of Contracts when analyzing questions of federal common law. *See Curtin v. United Airlines, Inc.*, 275 F.3d 88, 94 (D.C. Cir.

2001); *Bowden v. United States*, 106 F.3d 433, 439 (D.C. Cir. 1997) (explaining that the

Restatement principles are those "from which we would be inclined to fashion a federal

common-law rule since those principles represent the 'prevailing view' among the states").

   "Under general contract law, the plain and unambiguous meaning of an

instrument is controlling." *WMATA v. Mergentime Corp.*, 626 F.2d 959, 960-61 (D.C. Cir.

1980).  "Where the language of a contract is clear and unambiguous on its face, a court will

assume that the meaning ordinarily ascribed to those words reflects the intentions of the parties."

*NRM Corp.*, 758 F.2d at 681; *accord Mesa Air Grp., Inc. v. Dep't of Transp.*, 87 F.3d 498, 503

(D.C. Cir. 1996).  If the court determines as a matter of law that a contract is ambiguous, it may

look to extrinsic evidence of intent to guide the interpretive process.  *NRM Corp.*, 758 F.2d at

682.  "[I]n divining the meaning of contract terms, the court is not limited to the four corners of

the agreement: the party moving for summary judgment may submit affidavits and other

extrinsic evidence that gives color to the words of the agreement or otherwise reveals the intent

of the contracting parties at the time of the agreement."  *United Mine Workers 1974 Pension v.

Pittston Co.*, 984 F.2d 469, 473 (D.C. Cir. 1993).

   In determining the ambiguity of a contract, "reliance upon certain aids to

construction is proper."  *United States v. I.T.T. Continental Baking Co.*, 420 U.S. 223, 238

(1975); *see United Mine Workers 1974 Pension*, 984 F.2d at 473.  "Such aids include the

circumstances surrounding the formation of the [contract], any technical meaning words used

may have had to the parties, and any other documents expressly incorporated in the [contract]."

*I.T.T. Continental Baking Co.*, 420 U.S. at 238.  Courts may also consider such extrinsic

evidence as "statements, course of conduct, and contemporaneous correspondence, aimed at

discerning the intent of the parties" when the meaning of a contract provision is facially

uncertain. *Farmland Industries, Inc. v. Grain Bd. of Iraq*, 904 F.2d 732, 736 (D.C. Cir. 1990).

The Restatement provides the following in regard to a document's ambiguity:

(1) Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight.

(2) A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together.

(3) Unless a different intention is manifested,
    a) where language has a generally prevailing meaning, it is interpreted in accordance with that meaning;
    b) technical terms and words of art are given their technical meaning when used in a transaction within their technical field.

(4) Where an agreement involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection is given great weight in the interpretation of the agreement.

(5) Wherever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade.

Restatement (Second) of Contracts, § 202 (1981).  It is a cardinal principal of contract

construction that "a document should be read to give effect to all of its provisions and render

them consistent with each other." *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52,

63 (1995).

A contract is not rendered ambiguous merely because the parties later disagree

over its proper interpretation; it is ambiguous only when it can reasonably be construed to have

two or more different meanings.  *See Segar v. Mukasey*, 508 F.3d 16, 22 (D.C. Cir. 2007);

*Bennett Enterprises, Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 497 (D.C. Cir. 1995).

### C.  Contract Interpretation on a Rule 56 Motion

Whether an agreement is clear or ambiguous is a question of law for the court.

*See NRM Corp.*, 758 F.2d at 682.  "[S]ummary judgment is appropriate where a contract is

unambiguous since, absent such ambiguity, a written contract duly signed and executed speaks

for itself and binds the parties without the necessity of extrinsic evidence." *Angulo v.*

*Gochnauer*, 772 A.2d 830, 834 (D.C. 2001). "The mere presence of ambiguity, however, does

not preclude summary judgment." *Holland v. Freeman United Coal Mining Co.*, 574 F. Supp.

2d 116, 130 (D.D.C. 2008).  The question for the district court is whether "there exists more than

one reasonable interpretation of the contract." *Farmland Indus.*, 904 F.2d at 736; *see also*

*United Mine Workers 1974 Pension*, 984 F.2d at 473 (To "avoid summary judgment, the

evidence submitted by the non-moving party must show that more than one reasonable

interpretation exists.").  To be sure, summary judgment is improper if extrinsic evidence supports

more than one reasonable interpretation. *See Farmland Indus.*, 904 F.2d at 736.  But if extrinsic

evidence "demonstrates that only one view is reasonable—notwithstanding the facial

ambiguity—the court must decide the contract interpretation question as a matter of law." *Id.*;

*America First Inv. Corp. v. Goland*, 925 F.2d 1518, 1522 (D.C. Cir. 1991) (Even if a contract is

ambiguous, summary judgment may be appropriate "so long as there is no evidence that would

support a conflicting interpretation of the agreement.").

## III. ANALYSIS

**A.  Plain Language: Section 2.1 of the P&A Agreement is Unambiguous**

The disputed provision of the P&A Agreement, Section 2.1, provides that JPMC

expressly assumes at Book Value (subject to adjustment pursuant to Article VIII) and agrees to pay, perform, and discharge*, all of the liabilities of the Failed Bank which are reflected on the Books and Records of the Failed Bank as of Bank Closing*, including the Assumed Deposits and all liabilities associated with any and all employee benefit plans, except as listed on the attached Schedule 2.1, and as otherwise provided in this Agreement (such liabilities referred to as "Liabilities Assumed").

Ex. 1, § 2.1 (emphasis added).  Though JPMC and FDIC dispute the meaning of the phrase "reflected on the Books and Records," the plain language of Section 2.1 is not reasonably subject to multiple interpretations.  Therefore, the Court finds that Section 2.1 is unambiguous in that it only transfers to JPMC the liabilities of WaMu to the extent they were reflected at a stated Book Value on WaMu's accounting records.  Given the straight-forward language, summary judgment will be granted in favor of JPMC.

The choice of language and construction of the phrase "reflected on the Books and Records" make clear that the liabilities assumed by JPMC do not extend beyond the amounts listed WaMu's financial accounting records.  To start with the simplest point, "reflected" is not a legal word mired in common law precedents.  We can turn to a modern dictionary, Merriam Webster, which defines "reflect" (as relevant here) as "to show (something)," "to make (something) known," or "to make manifest or apparent: show."  *See* Merriam-Webster Online Dictionary, http://www.merriam-webster.com/dictionary/reflect (last visited on May 28, 2015).  Thus, in assuming liabilities *reflected on* WaMu's "Books and Records," JPMC assumed an identifiable quantity of liability: the amounts shown on WaMu's accounting records.  FDIC argues that because the Trusts' Governing Agreements were part of WaMu's business records

and imposed potential mortgage repurchase obligations on WaMu without regard to ultimate

cost, JPMC assumed all such liabilities without regard to ultimate cost under the P&A

Agreement.  However, Section 2.1 does not state that JPMC assumed all liabilities *arising out of*

any records at WaMu.  Rather, it specifies that liabilities passing to JPMC were those *reflected*

*on* WaMu's books and records at the time of WaMu's closing.  FDIC's interpretation does not

square with the word "reflect," which, at its core, connotes visibility; under FDIC's proposed

construction and argument, the P&A Agreement would transfer potential WaMu liabilities to

JPMC of an unknowable monetary value and of any imaginable variety.  *See* Ex. 901 (FDIC

Interrogatory Responses) at 8 (asserting that "Books and Records" conveyed all liabilities except

those that JPMC "could not have possibly imagined").

FDIC's primary argument in construing "Books and Records" is that the Court

should apply the P&A Agreement's definition of "Records" in Article I, that is, "any document,

microfiche, microfilm and computer records (including but not limited to magnetic tape, disc

storage, card forms and printed copy) of the Failed Bank generated or maintained by the Failed

Bank that is owned by or in the possession of the Receiver at Bank Closing."  Ex. 1, Art. I.

Relying on this extensive definition, FDIC contends that the "Records" referenced in Section 2.1

of the P&A Agreement necessarily encompassed all of WaMu's internal records of its potential

repurchase liabilities, including the Governing Agreements, whether or not recorded on the

"Books."  *See* FDIC Mem. at 15 (arguing that Records "included any document, paper or

electronic, that [WaMu] generated or that was maintained by [WaMu] at the time of closure");

*see also* Ex. 901 at 8 ("FDIC-Receiver used 'Books and Records' in Section 2.1 to convey to

JPMC, as the assuming bank, all liabilities of [WaMu] that could be discovered by performing

due diligence, and *the language excluded only those liabilities that the acquiring institution*

31

*could not have possibly imagined*." (emphasis added)).   FDIC further notes the P&A

Agreement's provision that capitalized terms "have the meanings set forth in [ ] Article I, or

elsewhere in this Agreement."  Ex. 1, Art. I.

Viewed in isolation, the definition of "Records" in Article I of the P&A

Agreement might support FDIC's argument.  However, a closer examination of the Agreement

in its entirety reveals that "Records," as used in Section 2.1, cannot have the broad meaning

advanced by the FDIC because such an interpretation would make the use of the word "Records"

inconsistent with its use in the rest of the Agreement.  Furthermore, FDIC's argument reads

"Books" out of Section 2.1 altogether because "Records" would encompass all "imagin[able]"

documents, including WaMu's "Books."  Finally, the fact that "Books," despite its capitalization,

is not defined in the P&A Agreement undercuts FDIC's assertion that the "Records" discussed in

Section 2.1 must refer to the broad definition of "Records" in Article I.  Indeed, the phrase

"Books and Records" is not capitalized anywhere else in the P&A Agreement besides Section

2.1.

The meaning and usage of the capitalized term "Records" in the P&A Agreement

is illuminated by the use of the word in Article VI of the P&A Agreement (titled "Records").

Ex. 1, Art. VI.   In Article VI, liability for the "Records" in question refers only to records of

WaMu's liabilities to its depositors.  *See id.*, §§ 6.1(i), (ii) ("[T]he Receiver assigns, transfers,

conveys and delivers to the Assuming Bank the following Records pertaining to the Deposit

liabilities of the Failed Bank . . . (i) signature cards, orders, contracts between the Failed Bank

and its depositors and Records of similar character; [and] (ii) passbooks of depositors held by the

Failed Bank, deposit slips, cancelled checks and withdrawal orders representing charges to

accounts of depositors.").  The word is further used to define JPMC's obligations to maintain and

preserve WaMu's business records for FDIC's use in managing the receivership. *See id.*, § 6.3 ("Preservation of Records"); *id.*, § 6.4 ("Access to Records"). FDIC ignores the one section of its own P&A Agreement, adopted from its predecessor agreements, which *does* give meaning to the term "Records" with a capital "R" and which clarifies the term's application to depositor records that represent potential liabilities to the Deposit Insurance Fund. Notably, FDIC does not address Article VI in its briefing.[28]

The fact that the P&A Agreement defines "Records" and does not define "Books" or "Books and Records" does not necessarily mean that the disputed phrase is susceptible of different constructions. *See Holland*, 574 F. Supp. 2d at 129 (citing *Carey Canada, Inc., v. Columbia Casualty Co.*, 940 F.2d 1548, 1556 (D.C. Cir. 1991)). Rather, when considered in the context of Section 2.1 and read in a manner consistent with the rest of the P&A Agreement, it is clear that Section 2.1's reference to liabilities on the "Books and Records" did not transfer to JPMC liabilities that were not shown on, or exceeded the book value of amounts on, WaMu's accounting records at the time of closing. WaMu was a sprawling institution with hundreds of branches in 15 states that employed over 40,000 persons; each of WaMu's offices and each employee could have had some "Record" in a desk drawer. In that context, FDIC's argument that the defined term "Records"—apparently used to help FDIC protect depositor accounts— should be stretched beyond its purpose to impose liability on JPMC for *any* potential liability written down on *any* medium in *any* WaMu office fails from its own sheer hyperbole. Of course, at issue here is the scope of WaMu's potential repurchase liabilities as of September 25, 2008,

---

[28] Extrinsic evidence suggesting FDIC had no intent to capitalize "Records," *see infra* Part III.B.1, further confirms the Court's conclusion that "Records" in § 2.1 was not meant to have the broad meaning now attributed to it by FDIC. The only time "Books and Records" is capitalized is in Section 2.1.

not liability arising from any record in any WaMu office; however, FDIC's argument on the expanse of "Records" makes no distinction between obvious and unknown potential liabilities.  It proves too much to be accepted.

Indeed, other defined terms in Section 2.1 shed light on the meaning of "Books and Records," as used in that section.  Section 2.1 provides that liabilities transfer to JPMC at their "Book Value," defined as the dollar amounts stated on WaMu's Accounting Records at the time of its closing (subject to standard adjustments to be made by JPMC).  The "Accounting Records" are defined as WaMu's "general ledger and subsidiary ledgers and supporting schedules which support the general ledger balances."  Ex. 1, Art. I.  Thus, the P&A Agreement provided that JPMC would assume liabilities at an identifiable and certain dollar value.  FDIC's proposed interpretation, which would have JPMC assume liabilities that were unquantifiable at the time of WaMu's closing and excluded only those that a bidder "could not have possibly imagined," Ex. 901 at 8, would render meaningless the inclusion of the limitation "at Book Value."

FDIC responds that Section 2.1's use of the phrase "at Book Value" was in the off-the-shelf template for a whole-bank purchase and assumption transaction in use when FDIC drafted the P&A Agreement and predated insertion of the phrase "reflected on the Books and Records" in the Agreement.  FDIC Opp. at 22.  Thus, according to FDIC, if "at Book Value" were generally considered a limit on the scope of liabilities assumed by an acquiring institution "to the line item book value on the bank's accounting records," there would have been no need for FDIC to have added the disputed language.  FDIC Opp. at 22-23.  In support of this argument, FDIC cites other transactions where the phrase did not ostensibly limit liabilities assumed.  *See id.* at 23.  But the instant dispute focuses on the language of the P&A Agreement,

34

not the meaning of the same phrase in agreements between FDIC and other parties, who may or may not have been able to negotiate terms or had a carve-out for liabilities assumed.  How the phrase "at Book Value" may be used elsewhere *by FDIC* is irrelevant.  The question is whether the P&A Agreement at issue here, which clearly states that a bidder would assume liabilities at their Book Value as of WaMu's closing, limited JPMC's exposure.

Equally unpersuasive is FDIC's argument that the language "at Book Value" in Section 2.1 merely sets a pricing scheme for WaMu's assets and liabilities, helping to calculate the amount FDIC must pay JPMC if FDIC seeks to reacquire certain assets and their related liabilities under Section 3.6.  *Id.* at 23-24.  But even if the "at Book Value" language somehow serves as a pricing mechanism related to another section of the Agreement, it operates in Section 2.1 as a means of quantifying the liabilities acquired by JPMC.  Specifically, it clarifies that liabilities will not transfer to JPMC in excess of their Book Value.[29]

FDIC also argues that the directive in Section 2.1 that JPMC "pay, perform, and discharge" all liabilities on WaMu's "Books and Records," Ex. 1, § 2.1, means that JPMC assumed liabilities beyond those on the balance sheet because one cannot "perform" or "discharge" line items on accounting records, *see* FDIC Opp. at 27.  To the contrary, JPMC is

---

[29] FDIC's argument about the meaning of "Book Value" is severely undercut by the testimony of FDIC representatives, who uniformly failed to give the term any intentional meaning.  Mr. Van Fleet testified that "Book Value "should have been stricken" and was "purely vestigial."  Van Fleet Dep. at 49, 154.  Mr. Gearin, the other principal drafter, testified that the phrase "probably serves no purpose" and "could actually be surplusage."  Gearin Dep. at 134, 136.  Mr. Held believed that the phrase "really doesn't have . . . any meaning" in Section 2.1.  Deposition of Herbert Held (Held Dep.) [Dkt. 169-7] at 80.  There is no corresponding testimony that bidders were advised that "Book Value" in Section 2.1 was unintended, irrelevant, or meaningless.  Whether FDIC purposefully included the phrase is contradicted by FDIC itself.  Nonetheless, the term is in the FDIC-drafted P&A Agreement for all bidders to see and rely upon in quantifying potential liability and, thus, the proposed bid price.  The Court is not persuaded it can be ignored.

required to "pay, perform, and discharge" WaMu's liabilities, but only up to their Book Value as reflected on WaMu's accounting records.

Finally, the facts that the phrase "books and records" is used elsewhere in the P&A Agreement in varying circumstances, is only capitalized in Section 2.1, and is not consistently used to refer to a broad set of documents further undercut FDIC's reliance on a capacious definition of "Records."[30]  When analyzing each different use of the phrase in the Agreement, the Court relies on its context.  In many instances, "books and records" in the P&A Agreement connotes a limited set of documents.  Article I defines "Deposit" to include "all uncollected items included in the depositors' balances and credited on the books and records of the Failed Bank."  Ex. 1, Art. I.  This language describes the accounting documents recording WaMu's depositor assets and liabilities; it is not a reference to just *any* document in WaMu's files.  Similarly, "Commitment" in the same Article is defined as "the unfunded portion of a line of credit or other commitment reflected on the books and records of the Failed Bank to make an extension of credit . . . that was legally binding on the Failed Bank as of Bank Closing . . . ."  *Id.*

Nor does Article VIII use "books and records" as shorthand for all of WaMu's internal records.  Article VIII states that JPMC shall provide to FDIC a "Proforma Statement of Condition indicating all assets and liabilities of [WaMu] as shown on [WaMu's] books and records as of Bank Closing and reflecting which assets and liabilities are passing to [JPMC] and which assets and liabilities are to be retained by [FDIC]."  *Id.*, Art. VIII.  This language clearly

---

[30] The Court recognizes its obligation to construe the P&A Agreement "to give effect to all of its provisions and render them consistent with each other."  *Mastrobuono*, 514 U.S. at 63.  But it is undeniable that "Records" and "books and records" reference different kinds of financial records in different parts of the Agreement.  Variation in use for specific purposes does not support FDIC's expansive proposed definition, however, because even if there were ambiguity in Section 2.1, contrary to the Court's finding, the Court's interpretation of the Agreement is still fully satisfied by confirming extrinsic evidence.  *See infra* Part III.B.

contemplates some discrete set of records discernible to the acquiring bank by looking at

WaMu's financial records.  However, still other sections of the Agreement use "books and

records" in a broad "catch-all" manner.  *See e.g., id.*, Art. III, § 3.4(c) (describing situation in

which JMPC might elect to have FDIC purchase certain assets and requiring JPMC to furnish a

notice including a list of assets and related liabilities and to provide FDIC "full access to all other

relevant books and records"); *id.*, Art. IX, § 9.6(b)(ii) (requiring JPMC to provide FDIC with

access to WaMu's "books and records, the books and records of such Subsidiaries and all Credit

Files, and copies thereof").

### B.  Extrinsic Evidence Supports JPMC's Interpretation of the P&A Agreement

Extrinsic evidence confirms that the disputed language can be reasonably

understood only as transferring to JPMC WaMu's liabilities to the extent they were booked on

the accounting records.  Therefore, summary judgment in favor of JPMC is appropriate.

#### 1.  Unintentional Capitalization of "Records"

Despite FDIC's argument about the broad scope of the term "Records,"

uncontroverted deposition testimony from FDIC drafters reveals that "Records," as used in the

phrase "Books and Records" in Section 2.1, had no intended definition and was not meant to

refer to the defined term in Article I.  Mr. Gearin attributed the decision to capitalize "Books and

Records" to Mr. Van Fleet, Gearin Dep. at 94, and did not know whether a conscious decision

was made to capitalize "Records."  *Id.* at 95.  Mr. Van Fleet was the immediate drafter who

inserted the phrase into Section 2.1 of the P&A Agreement but he could not recall inserting it or

intending any special meaning.  Van Fleet Dep. at 131-32.  FDIC does not dispute these

statements.  *See* FDIC Opp. to JPMC Statement of Facts [Dkt. 148-1], ¶¶ 22-27, at 7-9.[31]  Nor

does FDIC dispute that Mr. Wigand could not recall intending the word "Records" to be

capitalized or to refer to the defined term "Record."  *See* FDIC Opp. Facts, ¶¶ 28-29.  In

addition, Mr. Held had no such intention and had no explanation for the phrase.  *Id.* ¶¶ 31-32.[32]

Contrary to after-the-fact arguments made by FDIC lawyers, testimony from FDIC individuals

contemporaneously involved makes it clear that the capitalization of "Books and Records" in

Section 2.1 was inadvertent and unintentional.  Furthermore, as discussed above, "books and

records" must be construed in context.

### 2.    The Disputed Phrase Had a Purpose FDIC Does Not Acknowledge

The drafting of the P&A Agreement did not begin until mid- or late-September,

*see* Gearin Dep. at 18-21, after FDIC Chairman Sheila Barr unsuccessfully called Jamie Dimon

of JPMC on September 16, 2008, to "pitch" a whole-bank transaction, Ex. 135.  On September

22, 2008—three days before WaMu was closed by OTS—FDIC officials James Wigand, Herbert

Held and David Gearin first met with possible bidders to present a potential FDIC receivership

transaction.  Exs. 54, 142.  As of the next morning, September 23, Section 2.1 of the draft stated

that "the Assuming Bank expressly assumes at Book Value . . . and agrees to pay, perform, and

discharge, all of the liabilities of the Failed Bank as of Bank Closing . . . ."  Ex. 253.  Later that

same day, Sheri Foster asked Messrs. Wigand and Held:  "Lee Van Fleet called with the

---

[31] FDIC "disputes" JPMC Fact No. 26 but only to the extent that it corrects JPMC's statement that "Mr. Van Fleet inserted the phrase 'Books and Records' into the draft agreement" to clarify that "Mr. Van Fleet added the phrase 'Books and Records' to Section 2.1 of the draft agreement, but not elsewhere."  *Id.* at 8.

[32] Messrs. Gearin and Van Fleet, drafters of the P&A Agreement, also testified that "Books" was erroneously capitalized.  Gearin Dep. at 94 ("Q. Do you believe it's an error? A. Yes."); Van Fleet Dep. at 137 ("[C]apitalizing it would have been a scrivener's error.").

following question[ ]: Can we limit liabilities assumed to just the 'liabilities on the books and records' . . . ?" Ex. 903. The response must have been positive: Section 2.1 of the draft agreement that circulated within FDIC late in the day on September 23 stated "the Assuming Bank expressly assumes at Book Value . . . and agrees to pay, perform, and discharge, all of the liabilities of the Failed Bank which are reflected on the Books and Records of the Failed Bank as of Bank Closing . . . ." Ex. 255 at 13.

Mr. Gearin, on whose behalf Ms. Foster sent the question to Messrs. Wigand and Held, testified that the change in language was intended to give *comfort* to bidders that a bidder would assume only those liabilities it "would be able to discern by a very thorough due diligence." Gearin Dep. at 85; *see also id.* at 92 ("[A]dding the phrase . . . could give [bidders] some comfort that there wouldn't be exposure to liabilities that they couldn't possibly have discerned from a *review of the books and records* of the failed bank." (emphasis added)). As discussed above, it is undisputed that neither Mr. Gearin nor Mr. Van Fleet recalled any intention to capitalize the phrase "Books and Records" or either "Books" or "Records" in Section 2.1. Gearin Dep. at 94-95; Van Fleet Dep. at 131-132. Indeed, Ms. Foster's email (relaying the question from Mr. Van Fleet) did not capitalize the phrase "books and records." Ex. 903. Accordingly, the Court finds it undisputed that the phrase was adopted to provide "comfort" to bidders that they could discern liabilities to be assumed from what was shown on WaMu's accounting records and the phrase was not intended to expand liabilities to cover anything an acquiring institution could "possibly have imagined." Ex. 901 at 8.[33]

---

[33] FDIC argues that the addition of the "Books and Records" language to Section 2.1 does not signify that it intended to adopt the limited meaning suggested by JPMC. It points to its simultaneous change to the preamble, from "the Assuming Bank desires to purchase certain assets and assume certain deposit and other liabilities of the Failed Bank . . . ." Ex. 253 at 4, to "the Assuming Bank desires to purchase substantially all of the assets and assume all deposit and

This testimony is consistent with normative judicial holdings that acquiring banks in purchase-and-assumption transactions do not assume unliquidated or contingent liabilities. *See, e.g., Santopadre v. Pelican Homestead & Sav. Ass'n*, 937 F.2d 268, 272 (5th Cir. 1991) (even where "agreement purports to transfer all of the closed bank's liabilities," unliquidated litigation liabilities were not "on the books and records" of the failed bank and thus not transferred). The reasoning for these decisions is informative: banks do not assume unliquidated liabilities precisely because the parties need to be "able to rely on the books and records of the [failed bank] in determining its net worth," thereby allowing a sale to "take place in [a] timely fashion." *Id.*; *see also In re Collins Sec. Corp.*, 998 F.2d 551, 554-55 (8th Cir. 1993) (treating "books and records" and "account records" as synonymous). "Undoubtedly very few, if any, banks would enter into purchase and assumption agreements with a federal receiver if the successor banks had to assume [] latent claims of unknown magnitude." *Vernon v. RTC*, 907 F.2d 1101, 1109 (11th Cir. 1990); *see also Village of Oakwood v. State Bank & Trust Co.*, 519 F. Supp. 2d 730, 738 (N.D. Ohio 2007) ("[A]n assuming bank would rarely be inclined to enter a P&A agreement with the FDIC knowing that it could be taking on unidentified liabilities of

---

*substantially all other liabilities of the Failed Bank* on the terms and conditions set forth in this Agreement . . . ." Ex. 255 at 6 (emphasis added). FDIC maintains that the new language demonstrated its intention to transfer the disputed liabilities to the Acquiring Bank. The argument falls short. First, no bidder would have been aware that there was any change, since it was done before the P&A Agreement was sent to bidders on the evening of September 23. Second, the preamble clearly states that the Assuming Bank would acquire liabilities subject to the Agreement itself (which transferred liabilities that were on the books and records). Third, the language of the preamble is not an operative part of the Agreement. *Grynberg v. FERC*, 71 F.3d 413, 416 (D.C. Cir. 1995) ("[A] Whereas clause, while sometimes useful as an aid to interpretation, cannot create any right beyond those arising from the operative terms of the document.") (internal quotations omitted). Fourth, JPMC insists that it *did* assume substantially all liabilities. *See infra* at III.B.4.

undefined dimensions that could arise at some uncertain date in the future."), *aff'd*, 539 F.3d 373 (6th Cir. 2008).

FDIC asserts that the repurchase liabilities were not "unknown" or "unidentified" because JPMC "knew when it bid that it would be assuming WaMu's off-balance sheet mortgage securitization liabilities, including its repurchase liabilities, under the terms of this transaction" and JPMC also knew the nature and scope of such liabilities. FDIC Opp. at 32. FDIC's argument misses the mark. JPMC was aware that WaMu had large exposure from its repurchase liabilities, but no party knew the ultimate cost of these obligations after seizure by OTS. Moreover, JPMC's knowledge of WaMu's potential exposure is irrelevant unless the P&A Agreement transferred that exposure to JPMC. In one sense, the extent of the unknown potential liabilities lends credence to JPMC's contention that it only would have agreed to assume quantifiable liabilities at their Book Value.

### 3. Assuming FDIC Intended to Transfer Unbooked Liabilities to JPMC, that Intention Was Not Communicated

FDIC argues at length that the extrinsic evidence irrefutably demonstrates its intent to pass *all* of WaMu's unbooked liabilities to JPMC. But whether FDIC intended the liabilities to transfer and whether it communicated that intent to JPMC, who agreed, are separate questions, and only the latter is relevant for construing the Agreement. *See NTA Nat., Inc. v. DNC Services Corp.*, 511 F. Supp. 210, 223 (D.D.C. 1981) ("[I]t is a well-established principle that 'the subjective unexpressed, uncommunicated thoughts of a party are irrelevant to the material issue of the parties' intent.'" (quoting *Union Bank v. Winnebago Industries, Inc.*, 528 F.2d 95, 99 (9th Cir. 1975)).

When the draft P&A Agreement was delivered to JPMC on the evening of September 23, 2008, Section 2.1 unequivocally conveyed only those liabilities that were

reflected on WaMu's "Books and Records."  Ex. 257, 276.  FDIC argues that *JPMC should have known* it intended a broader use for the phrase because (1) FDIC outlined the terms of the proposed transaction to JPMC at a meeting on September 22, 2008 and (2) the Transaction Recap and Bid Instructions, released mere hours before, made clear that Option 3—which was the "all-deposit version" on which JPMC ultimately bid—required the acquiring bank to assume "all liabilities" except for those specifically excluded.  *See* FDIC Mem. at 20-22.  As a result, FDIC maintains, JPMC was aware that it was bidding on an "everything-but" transaction and knew that it was assuming all liabilities whether or not listed on WaMu's Accounting Records.  *Id.* at 22.

    FDIC's argument falls short.  Both of its cited events occurred *before* FDIC delivered the P&A Agreement to JPMC.  Therefore, even if FDIC internally intended the liabilities at issue to be acquired as of September 22, 2008, and even if JPMC knew FDIC so intended on that date, subsequent events served to alter the parties' understanding of the P&A Agreement.  Indeed, the parties could not have thought that the terms were settled as of September 22 as no contract had been provided, no bid had been made, and the Transaction Recap itself emphasized that "[t]he legal documents will be the governing documents for this transaction."  Ex. 56 at 2.  Moreover, the Transaction Recap was inconsistent with the Bid Instructions that accompanied it:  while the Transaction Recap stated that, under Option 3, the Assuming Bank would assume all liabilities "except the preferred stock, the subordinated debt and the senior debt," *id.*, the Bid Instructions stated that Assuming Bank would assume all liabilities except for "the preferred stock, non-asset related defensive litigation, subordinated debt and senior debt," Ex. 57 at 3.  As of the posting of the Transaction Recap and Bid Instructions, FDIC had not clarified what liabilities it intended to transfer under the Agreement.

The scope of the liabilities to be assumed by JPMC was crystalized after the Agreement was sent to potential bidders, late on September 23, 2008, when JPMC and FDIC began to discuss the indemnity provisions of the contract.  At that point, Mr. Gearin answered JPMC questions on indemnification, explicitly stating in an email: "The liabilities assumed are described as booked liabilities . . . .", Ex. 66, conveying that liabilities that were not "booked" were not assumed and were covered by the indemnity clause in Section 12.1.  This statement informs the parties' joint interpretation that the liabilities being assumed were limited to their Book Value on WaMu's accounting records.  FDIC seeks to avoid responsibility for Mr. Gearin's reference to "booked liabilities," but its explanations are not convincing.  According to FDIC, this email meant that "if [Mr. Eitel] wants to know which liabilities are assumed by [JPMC] . . . [he should] look at 2.1, which describes the liabilities as being those that are reflected on the books and records."  Gearin Dep. at 178:5-9.  FDIC argues that Mr. Gearin's use of the term "booked liabilities" was "paraphras[ing] [ ] the reference in 2.1 to liabilities that were reflected on the books and records."  *Id.* at 178:13-15.  The explanation is circular and fails to satisfy.

The record forecloses giving these arguments the weight to which FDIC would assign them.  In analyzing the emails between the parties in their entirety, it is apparent that JPMC was seeking to make sure that it was assuming a limited set of liabilities.  As of this email chain on September 23, *see* Ex. 66, the parties had a shared understanding: both Messrs. Cooney and Gearin understood that JPMC would assume only "booked liabilities," that is, those liabilities that were recorded at Book Value on WaMu's financial books.[34]

---

[34]    Despite the mutual understanding that the liabilities assumed were those that were "booked," Mr. Cooney continued to be concerned that the disputed clause could be interpreted in a broader fashion than was intended and that JPMC could be found liable for a pre-acquisition breach by

In further arguing its intention to transfer unbooked liabilities, FDIC relies heavily on the "Frequently Asked Questions" document that was posted for bidders at some point in the morning or early afternoon on September 24, 2008.  *See* Exs. 71, 129.[35]  In the FAQs, FDIC provided the following question and answer:

> Are the off-balance sheet credit card portfolio and mortgage securitizations included in the transaction? Do you expect the acquirer to assume the servicing obligations? If there are pricing issues associated with the contracts (e.g., the pricing is disadvantageous to the assuming institution), can we take advantage of the FDIC's repudiation powers to effect a repricing?
>
> Answer: The bank's interests and obligations associated with the off-balance sheet credit card portfolio and mortgage securitizations pass to the acquirer. Only contracts and obligations remaining in the receivership are subject to repudiation powers.

Ex. 71 at 2.  FDIC contends that the statement "The bank's interests and obligations associated with the off-balance credit card portfolio and mortgage securitizations pass to the acquirer" expressly conveyed to JPMC that "off-balance sheet" interests and obligations, such as the repurchase obligations at issue here, would transfer to the Assuming Bank.  FDIC Mem. at 24. JPMC answers that other FAQs explicitly stated that they applied to a certain transaction structure but this FAQ had no such limit; thus, it must have applied to all transaction options— Transaction Options 1-3, which included "Books and Records" in Section 2.1, and Transactions

---

WaMu of a contract that *was* reflected on the books and records, particularly one between WaMu and its parent, WMI.  *See* Ex. 66.  He told Mr. Gearin, "In a normal P&A between commercial parties this is not something a buyer would ever assume and it really doesn't make sense (nor frankly is it fair) here."  *Id.*  Mr. Gearin promised to "look at [it] again," *id.*, but there is no further evidence on the point and Section 12.1 was not changed.  Notably, if Mr. Gearin did not agree with Mr. Cooney's interpretation, he did not clarify that FDIC had some other uncommunicated intent.

[35] It is not clear when FDIC posted the FAQs, but they were circulated among JPMC officials during the afternoon of September 24.

Options 4-5, which did not include the phrase.  Therefore, JPMC argues, FDIC's answer about acquired liabilities should be construed as addressing draft language appearing in all five transactions, that is, language involving mortgage *servicing* obligations (as raised in the question posed to FDIC), and not *seller* repurchase obligations, which were not part of Transaction Options 4 or 5.[36]  FDIC responds that "[a]ny prospective bidder comparing the draft structures would understand that Transaction Options 1 through 3 transferred a broad scope of liabilities, while Transaction Options 4 and 5 enumerated the specific liabilities being transferred."  FDIC Reply [Dkt. 175] at 7 (citing Ex. 276).

 Whatever was intended or understood by the parties, the critical fact is that the FAQs came *after* FDIC's assurances to JPMC that only "booked liabilities" would be assumed, Ex. 66, and FDIC never proposed or made any change to the language of the P&A Agreement that might have changed or expanded a bidder's liabilities.  Despite the FAQs, the Agreement continued to transfer only those liabilities reflected on WaMu's books and records.  Moreover, the Bid Instructions warned bidders that the "legal documents" controlled the transaction.  Ex. 57.  Whether the FAQs were clear or not, FDIC failed to change the transaction documents to contain the language it now cites.

 FDIC also maintains that a statement "made" by Jim Wigand during the afternoon of September 24, 2008 demonstrates FDIC's intention to transfer all mortgage repurchase liabilities to the acquiring bank.  This "statement" of Mr. Wigand, *see* Ex. 79, was conveyed by Mr. Aboussie to Mr. Gearin when discussing JPMC's proposal to modify Section 2.5 to limit its assumption of a wide range of mortgage loan securitization claims, *see* Ex. 78.  In discussing

---

[36] JPMC emphasizes that the rights and any associated obligations of a mortgage servicer are distinguishable from mortgage repurchase obligations of a seller.  As noted above, *see supra* n.27, FDIC no longer disputes this point.

JPMC's proposal internally, Mr. Aboussie told Mr. Gearin that "Jim Wigand has stated that he understood and intended that all liabilities associated with loan sales (i.e., rep and warrant/repurchase claims) are to be passed to the assuming bank." Ex. 79.  This statement, FDIC argues, confirms its position.  But the argument is unpersuasive because the statement is irrelevant: to the extent it reflects an intention to pass mortgage repurchase liabilities beyond those booked on WaMu's accounting records, that intention was not communicated outside FDIC.[37]  FDIC cites additional testimony of Mr. Wigand and Mr. Held concerning FDIC's intentions, *see* FDIC Mem. at 19, but these witnesses can only testify to Mr. Wigand's internal directions to FDIC lawyers *after* the draft P&A Agreement was offered to bidders, with Section 2.1's language on Assumed Liabilities left unchanged.  Again, these internal communications reveal only Mr. Wigand's intentions without evidence that they were shared with any bidder or that the P&A Agreement was changed accordingly.  Uncommunicated intentions do not carry any weight in interpreting the intention of contracting parties.

FDIC further argues that its rejection of JPMC's proposal to modify Section 2.5 (to restrict JPMC's assumption of various claims) signaled to JPMC that FDIC intended all securitization liabilities to transfer to and be assumed by the acquiring bank.  FDIC Mem. at 26.  After JPMC proposed new language, Mr. Gearin stated that he did not believe there would be a revised agreement, Ex. 80, and JPMC then submitted its bid, noting in its cover letter that it accepted as drafted the language of Section 2.5.  Ex. 59 at 2.  JPMC responds that its proposed

---

[37] JPMC also argues that there was nothing in this email exchange suggesting that Mr. Wigand was construing the first sentence of Section 2.1 in the draft agreement for Transaction Options 1-3, as opposed to all transaction options.  JPMC Opp. at 10.  Thus, it contends, Mr. Wigand's statement was addressing the conveyance of mortgage *servicing* obligations, possibly based on some misunderstanding that seller repurchase obligations automatically accompany mortgage servicing obligations.  *Id.* (quoting Wigand Dep. at 276 for his statement that "if you take the servicing, you have to take the repurchase obligations").

change to Section 2.5 was merely an effort to expand its avoidance of various obligations including: RMBS securities-law claims; the "Book Value" of mortgage repurchase claims, as reflected on the Accounting Records; servicing-related claims; GSE repurchase claims; and claims based on RMBS owned or sponsored by WaMu's subsidiaries.  JPMC Opp. at 23.  Thus, JPMC contends, FDIC's refusal to accept its proposal meant that JPMC would acquire those liabilities, but did not mean that all of WaMu's repurchase obligations, booked or unbooked, would pass to JPMC.[38]

In any event, what ultimately controls is the language in the Agreement as it was executed.  Section 2.1 of the Agreement transfers only those liabilities with a Book Value. Moreover, Section 2.5, as drafted by FDIC, indemnified the Acquiring Bank for all liabilities not assumed under Section 2.1; thus, Section 2.5 is circular and merely returns the reader to the scope of Liabilities Assumed in Section 2.1—all those on the books and records.  Accordingly, FDIC's failure to adopt JPMC's proposed change to Section 2.5 did not necessarily communicate any intention to pass unbooked mortgage repurchase liabilities, particularly in light of the facts that FDIC had already advised that the liabilities being transferred were those that were "booked" and that the language of the Agreement remained unchanged.

FDIC also cites internal and public communications by JPMC, which FDIC argues prove that JPMC knew it had acquired WaMu's repurchase liabilities.  FDIC Mem. at 22. Specifically, FDIC quotes from presentation slides prepared for September 24, 2008 meetings with rating agencies stating that JPMC would assume "[a]ll the deposits and substantially all [WaMu] liabilities, excluding senior and subordinated debt," Ex. 62 at 20 and Ex. 63 at 20, and a

---

[38] JPMC also notes that it is not even clear that its proposed language "would cover this very action, which is not brought by any 'direct or indirect purchaser' of RMBS."  JPMC Opp. at 22.

statement made on September 25, 2008 by Charlie Scharf of JPMC to investors in which he described assumed liabilities as everything but "the unsecured debt, the subordinated debt and the preferred," Ex. 483 [Dkt. 160-24] at 3.[39]

FDIC relies on such presentations and comments to support its position that JPMC knew it would acquire WaMu's RMBS liabilities.  However, these were high-level summaries of the transaction that did not include all details of the potential acquisition.  Furthermore, as JPMC argues, it was "fair to summarize the P&A Agreement as transferring 'substantially all' of WMB's liabilities,"  JPMC Opp. at 17, because the liabilities at issue are estimated by Deutsche Bank to be valued between U.S. $6 and $10 billion and JPMC assumed liabilities under the P&A Agreement of roughly $300 billion.  Am. Compl. ¶ 85; JPMC Opp. at 18-19 (citing Ex. 682 (9/25/08 unconsolidated balance sheet)).  FDIC does not dispute these amounts, which support the statements that JPMC acquired "substantially all" of WaMu's liabilities, per the P&A Agreement.

### 4.  Post-Transaction Conduct

In the immediate days after JPMC acquired WaMu, FDIC appeared to construe the P&A Agreement as JPMC does now: to mean that only liabilities already entered on WaMu's accounting records were acquired by JPMC.  These early conversations related to unassessed tax liabilities that were not reflected on WaMu's books.  On October 8, 2008, Richard Peyster, an FDIC tax attorney, specifically stated that "[w]ith regard to any tax liability arising out of an ongoing or future audit, where no assessment had been made prior to the date of closing, such liability would not pass to Morgan.  Only liabilities on the books as of the date of the agreement pass."  Ex. 29.  In a separate email related to WaMu's tax claims, on which Messrs. Wigand,

_____

[39] Page citations within this exhibit are to the ECF page number.

48

Gearin and Aboussie were all copied, Mr. Peyster further stated that "Section 2.1 transfers all liabilities reflected on the books and records of Washington Mutual to JPMorgan Chase. Therefore, any tax liabilities on the books of Washington Mutual were transferred, and any unknown liabilities, not reflected on the books were not transferred."  Ex. 108.

FDIC argues first that "this case is not about pending tax audits" and that Mr. Peyster's statements are immaterial, as he played no substantive role in developing the terms of the transaction or drafting the P&A Agreement.  FDIC Opp. at 41-42.  Further, FDIC emphasizes Mr. Peyster's testimony that the statements made in his email were "overly simplistic and broad" and that in stating that only liabilities on the books would pass to JPMC, he was merely paraphrasing "books and records."  *See* Peyster Dep. at 83-84.

The emails speak for themselves.  Mr. Peyster may not have played a role in drafting the P&A Agreement, but when he stated that "any unknown liabilities[ ] not reflected on the books were not transferred," none of the men who was intimately familiar with the Agreement's terms—Messrs. Gearin, Wigand, and Aboussie—contradicted his understanding. Ex. 108.  Nor does FDIC's argument that WaMu's mortgage repurchase liabilities could not have been considered "unknown" carry weight.  As discussed above, while the entire banking world knew about the existence of such liabilities, no one knew the quantifiable value of the future obligation to repurchase defective mortgage loans; to the contrary, the Agreement states that a liability not reflected "on the books" did not pass to JPMC.

FDIC tax accountant Jim Thormahlen's statements that unassessed tax liabilities were a claim against the FDIC-Receiver, not JPMC, also confirm this understanding.  *See, e.g.*, Ex. 30 [Dkt. 158-5]; Ex. 404; Ex. 416.  In response, FDIC contends that Mr. Thormahlen, who was not involved in drafting the P&A Agreement, relied on JPMC's representation when

preparing a standard form letter to send to tax agencies and, thus, his statements only reflected

JPMC's interpretation of the P&A Agreement.  FDIC Opp. at 42.  But Mr. Thormahlen's

testimony does not fully support the argument.  While he testified that "JPMorgan people" told

him that JPMC did not assume tax liabilities and that he drafted his letter at the request of JPMC,

Thormahlen Dep. at 160, Mr. Thormahlen then stated his understanding that JPMC assumed all

of WaMu tax liabilities "that were on the books and records" and did not assume tax liabilities

that "weren't on the books and records [because] that's what the P&A says."  *Id.* at 158.  Mr.

Thormahlen further averred that he got his understanding of the meaning of "Books and

Records" in the P&A Agreement from "the e-mails that Peyster said was his interpretation," i.e.,

from within the FDIC itself.  *Id.* at 162.  Moreover, even if Mr. Thormahlen were adopting

JPMC's construction of the Agreement, his actions only confirmed to JPMC that its

interpretation was shared by FDIC.

    Finally, David Gearin's statements on October 28, 2008 demonstrate that JPMC

and at least some FDIC employees believed the liabilities at issue did not pass to JPMC.  *See* Ex.

82 [Dkt. 159-6].  In an internal FDIC email, Mr. Gearin stated that he "just got off the phone

with Dan Cooney, the JPMC in-house attorney who no[w] understands that we are of the view

that the repurchase obligations did pass to JPMC and cannot be put back to the receiver for

repudiation.  Unfortunately what I said was inconsistent from what they had heard over time

from three different FDIC representatives in Seattle."  *Id.*  JPMC argues that this email

represents the first time the FDIC actually informed JPMC of its position that WaMu's mortgage

repurchase liabilities passed to JPMC; JPMC also argues that the email acknowledges that FDIC

had previously taken the opposite view and had so advised JPMC.  FDIC's only response to this

evidence is to cite the FAQs, maintaining that it had previously informed all potential bidders

that the acquiring bank would assume all of WaMu's mortgage securitization liabilities, including the repurchase obligations. *See* Ex. 71. What Mr. Gearin's email makes clear is that before and immediately after the execution of the P&A Agreement, certain FDIC representatives advised JPMC that it was not acquiring repurchase obligations (to say nothing of Mr. Gearin's own assurance on September 23 that only "booked liabilities" would be transferred, *see* Ex. 66). FDIC cannot overcome the evidence that both parties contemporaneously shared the same understanding concerning WaMu's unbooked obligations due to the plain language of the Agreement.

### 5.   FDIC Drafted The Contract

JPMC argues that according to contra proferentum, a doctrine of contractual interpretation, "any ambiguity in a contract must be construed against the drafter." JPMC Mem. at 24 (quotation omitted). FDIC responds that the doctrine is one of last resort. FDIC Opp. at 35-37. "Contra proferentum is a basic principle of contract law which provides that 'in choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds.'" *Mesa Air Group v. DOT*, 87 F.3d 498, 506 (D.C. Cir. 1996) (quoting Restatement (Second) of Contracts, § 206). The doctrine is based on the belief that the drafter is "more likely than the other party to have reason to know of uncertainties of meaning. Indeed, he may leave meaning deliberately obscure, intending to decide at a later date what meaning to assert." Restatement (Second) of Contracts, § 206 cmt. A.

FDIC is correct that the doctrine of contra proferentum is limited to "cases of doubt . . . so long as other factors are not decisive." *Id.*; *see also United States ex rel. DOL v. Insurance Co. of N. Am.*, 131 F.3d 1037, 1043 (D.C. Cir. 1997). As discussed at length above,

the Agreement is clear and there is sufficient evidence to resolve this case without needing to construe the P&A Agreement against the drafter. However, if there were to remain some extant question as to the Agreement's ambiguity, this "rule of last resort" mandates the same result in favor of JPMC. *See Mesa Air*, 87 F.3d at 506.

FDIC also argues that the P&A Agreement's terms should not be construed against it because the doctrine of contra proferentum does not apply between sophisticated parties who have similar bargaining power. The Restatement provides otherwise, as does D.C. Circuit precedent. *See* Restatement (Second) of Contracts, § 206 cmt. A ("The rule is often invoked in cases of standardized contracts and in cases where the drafting party has the stronger bargaining position, but it is not limited to such cases."); *Mesa Air*, 87 F.3d at 506 (analyzing doctrine of contra proferentum and finding it weighed against Department of Transportation, as the drafter). Furthermore, while JPMC is a sophisticated party, the P&A Agreement was not a product of bilateral negotiation between FDIC and JPMC. JPMC played no role in drafting the Agreement and suggested only minimal alterations during the revision process. And, in responding to questions about the draft Agreement, FDIC clearly stated "the Purchase & Assumption agreement language is not negotiable." Ex. 71.

FDIC, as drafter of the Agreement, is bound by its terms. While not necessary to resolving the question of whether WaMu's unbooked liabilities passed to JPMC, the principle of contra proferentum serves to reinforce the Court's ultimate conclusion.

## IV. CONCLUSION

This Court now has years of experience with the P&A Agreement and multiple parties' myriad litigating positions concerning its interpretation. The record suggests that certain FDIC officials intended to require the acquiring bank to assume WaMu's mortgage repurchase

obligations and that initial bid documents sought to transfer those liabilities. FDIC can also show that JPMC was familiar with WaMu's repurchase obligations; that after FDIC drafted and offered bidders the draft P&A Agreement, FDIC executive Jim Wigand internally affirmed that FDIC intended the acquiring bank to take all of WaMu's repurchase obligations, most of which were not booked; that FDIC warned bidders of its intention in the posted FAQs memorandum before the bids, but specifically stated that the legal documents controlled; and that, for disputed reasons, JPMC tried to alter the language of the Agreement.

What FDIC does not show is that, in light of its stated intention, it changed the P&A Agreement to cover these unbooked obligations explicitly. FDIC appears to think that statements made in the FAQs and bid documents, without similar and specific contract language, are sufficient to show that it passed such liabilities to JPMC. That might have been correct, had the actual language of the P&A Agreement not been clear and limited to, as Mr. Gearin told JPMC, "booked liabilities." Indeed, multiple FDIC lawyers and representatives read the P&A Agreement in the identical way (i.e., limited to "booked liabilities"). That FDIC executives intended something else does not rescue their reliance on the non-contractual FAQs, which were specifically subject to the language of the legal documents; indeed, the FAQs were posted *after* the disputed language was offered to bidders and *no change* was made by FDIC to reflect the intention stated in the FAQs. Contrary to internal FDIC communications, there is no similar evidence that JPMC *intended to assume* WaMu's mortgage repurchase liabilities. Moreover, there is no FDIC witness that can support its deep-ocean definition of "Records" and, for purposes of this suit, FDIC fails to overcome testimony from its own representatives that the capitalization of "Books and Records" was entirely inadvertent. The presentations by JPMC to its Board of Directors and outside investors, to the effect that JPMC was acquiring all of

WaMu's assets and substantially all of its liabilities, were accurate without regard to WaMu's unbooked mortgage repurchase obligations.

FDIC is bound by its own language, which apparently did not reflect its intention. JPMC may have risked tendering its bid for WaMu in reliance on the contract language and on FDIC's statement that the legal documents controlled the transaction. In the end, as lawyers know, the unambiguous language of a contract will control, particularly when one disputant was the sole drafter.

Therefore, for the reasons set forth above, the Court will grant in part and deny in part JPMC's Motion for Summary Judgment [Dkts. 142, 143, 170], finding that JPMC is entitled to judgment that it assumed liability for the disputed mortgage repurchase liabilities only to the extent that WaMu reflected such liabilities at a stated Book Value on its financial accounting records as of September 25, 2008.[40] The Court will also grant in part and deny in part FDIC's Motion for Summary Judgment [Dkt. 144, 173], finding that FDIC is entitled to judgment that it did not assume or retain mortgage repurchase liabilities of WMMSC, the stock of which was acquired by JPMC in its entirety.

The Court leaves to another day and another argument whether Plaintiff Deutsche Bank can recover from FDIC. A memorializing Order accompanies this Amended Opinion.


Date:   June 17, 2015                        _____/s/_____
                                             ROSEMARY M. COLLYER
                                             United States District Judge

---

[40] In other words, the Court finds that any liability exceeding the Book Value reflected on WaMu's financial accounting records as of September 25, 2008 remained with the Federal Deposit Insurance Corporation as Receiver for WaMu.